Jeff P. Prostok
State Bar No. 16352500
Suzanne K. Rosen
State Bar No. 00798518
FORSHEY & PROSTOK, L.L.P.
777 Main Street, Suite 1550
Fort Worth, Texas 76102
(817) 877-8855 ● (817) 877-4151 Fax
jprostok@forsheyprostok.com
srosen@forsheyprostok.com

*Attorneys for Palisades TC, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **DALLAS REAL ESTATE INVESTORS, LLC,** | § | **Case No. 21-41488-elm11** |
| | § | |
| | § | **Emergency Consideration Requested** |
| **Debtor.** | § | |

**PALISADES TC, LLC'S EMERGENCY MOTION FOR ORDER FINDING STAY DOES NOT APPLY OR, ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY TO FILE MEMORANDUM OF AGREEMENT IN REAL PROPERTY RECORDS**

TO THE HONORABLE EDWARD L. MORRIS, UNITED STATES BANKRUPTCY JUDGE:

COMES NOW Palisades TC, LLC ("Palisades"), a party in interest in the above-referenced case, and hereby files this *Emergency Motion for Order Finding Stay Does Not Apply or, Alternatively, for Relief from the Automatic Stay to File Memorandum of Agreement in Real Property Records* (the "Motion"). In support of the Motion, Palisades would respectfully show the Court as follows:

## JURISDICTION

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1334. This bankruptcy case and all related proceedings have been referred to this Court pursuant to 28 U.S.C. § 157. This matter constitutes a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court has full constitutional jurisdiction to enter a final order on this Motion.

## EXECUTIVE SUMMARY

2. Palisades files the instant Motion seeking the entry of an order finding the stay does not apply to preclude it from filing the *Memorandum of Agreement* attached hereto as **Exhibit A** in the real property records in Collin County, Texas pertaining to the ownership of the Frisco Property (defined below) or, alternatively, granting it relief from the stay to file the Memorandum of Agreement. For the reasons described below, Palisades is concerned that the Debtor and its principal, Tim Barton, may be attempting to sell or take other action with respect to the Frisco Property without Palisades' consent in clear violation of the terms of the agreements governing the relationship between DREI and Palisades. As discussed in greater detail herein, Palisades' concern stems from, e.g., (i) the Debtor's misrepresentation of its ownership interest in FHC Acquisition, LLC, the entity which owns the Frisco Property, in its bankruptcy schedules, (ii) an approximately $3 million loan on the Frisco Property is about to expire on July 31, 2021 and the Debtor has not sought Palisades' consent or provided any documentation to Palisades relating to a proposed extension of the loan as required by the controlling agreements between the Debtor and Palisades, (iii) the Debtor incorrectly identified the name of the owner of the Frisco Property in its bankruptcy schedules; (iv) the Debtor overstated the value of the Frisco Property in its schedules, (vi) the Debtor did not file a monthly operating report for June 2021, and (vii) the Debtor is not providing Palisades with the financial reporting required under the terms of the controlling agreements between the parties. Palisades thus seeks to file the Memorandum of Agreement to give third parties notice regarding the correct ownership of the Frisco Property, which is not property of the Debtor's bankruptcy estate, to ensure that such property will not be sold or otherwise affected without Palisades' knowledge and consent.

## BACKGROUND

3. On June 22, 2021 (the "Petition Date"), Dallas Real Estate Investors, LLC ("Debtor" or "DREI") filed a voluntary petition commencing a bankruptcy case under chapter 11

of the Bankruptcy Code, 11 U.S.C. § 101, et seq. The Debtor continues to operate its business as a debtor-in-possession.

**A. Relationship Between Palisades, the Debtor, DREL and FHC Acquisition**

4. The Debtor and Palisades each own fifty percent (50%) of Dallas Real Estate Lenders, LLC ("DREL"), which owns 100% of FHC Acquisition, LLC ("FHC Acquisition"). FHC Acquisition owns certain real property described as "Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas" (the "Frisco Property").




5. A copy of the *Company Agreement of Dallas Real Estate Lenders, LLC* (the "DREL Operating Agreement") is attached hereto as **Exhibit B**. As set forth in section 1.06 of

the DREL Operating Agreement, until Palisades is "Redeemed in Full," the sole purpose of DREL is to manage and own 100% of the membership interests in FHC Acquisition and develop the Frisco Property, which is described as a "mixed use project located [on the Frisco Property] which is planned to include a luxury hotel, residences, restaurant, and retain components." See DREL Operating Agreement, § 1.06.

6. Although the membership interests in DREL are divided equally (50%-50%) between Palisades and the Debtor, Palisades' initial investment in DREL was $3.5 million dollars ($3,500,000.00) and the Debtor's initial investment was ten dollars ($10.00). The remaining capital used to acquire the Frisco Property by FHC Acquisition was acquired from an approximately $3 million loan (the "<u>FHC Loan</u>") from Texas Republic Bank, N.A. ("<u>Texas Republic</u>") pursuant to the "<u>Loan Documents</u>" as defined in section 1.06 of the DREL Operating Agreement. In exchange for its $3.5 million investment in DREL, Palisades was granted certain rights to a preferred equity return, which are set forth in section 5.02 of the DREL Operating Agreement, which (among other things) requires the repayment in full of Palisades' capital contribution in DREL plus interest and payment of Palisades' preferred profit participation before any distributions can be made to the Debtor.

**B. DREL Is a Member-Managed Limited Liability Company**

7. The DREL Operating Agreement governs the relationship between Palisades and the Debtor with respect to FHC Acquisition and the Frisco Property. Section 2.03 of the DREL Operating Agreement provides that "the Voting Members [Palisades and DREI] shall manage the Company and shall have the right to vote, in their capacity as Manager(s), upon all matters upon which Managers have the right to vote under the Act or under this Agreement, in proportion to their respective Percentage Voting Interests in the Company." Although section 2.03 provides that DREL is a member-managed LLC, section 2.08 provides that, until Palisades has been "redeemed in full" or a "Redemption Default" has occurred under the DREL Operating

Agreement, the Debtor "shall be the Manager responsible for the day-to-day management of the Company [DREL]."

8. Despite the Debtor's responsibility for DREL's day-to-day management, section 2.08 of the DREL Operating Agreement expressly precludes the Debtor from taking certain actions on behalf of DREL in relation to its ownership of FHC Acquisition (an "Opco" under the DREL Operating Agreement) or the Frisco Property (which is owned by FHC Acquisition) without Palisades' consent. The actions that the Debtor is expressly prohibited from taking under the DREL Operating Agreement relating to FHC Acquisition or the Frisco Property (the "Project" under the DREL Operating Agreement) include, e.g.:

> (a) leasing, selling, disposing, exchanging, mortgaging, pledging, or transferring the Project [the Frisco Property] or any material portion thereof …;
>
> * * *
>
> (c) applying for or modifying any existing zoning for the Project;
>
> (d) entering into any brokerage or exclusive listing agreement for the sale or l easing of any portion of the Project;
>
> * * *
>
> (g) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company or any OpCo of more than $100,000 in any year except as provided in the Project Budget;
>
> (h) entering into, amending, modifying, terminating or canceling any contract that grants any form of encumbrance (defined as any lien, easement, lease, hypothecation, or other restriction on transfer or use) over an asset of the Company or any OpCo;
>
> * * *
>
> (dd) modifying or amending any of the Loan Documents or paying in full all amounts due under the Loan Documents[1] prior to Palisades being Redeemed in Full;

[1] The term "Loan Documents" is defined in paragraph 1.06 of the DREL Operating Agreement as a loan in the approximate amount of $3 million from Texas Republic Bank to FHC Acquisition.

(ee) Incurring on behalf of the Company or any OpCo any loan or other indebtedness including loans or advances from Members of the Company or any OpCo (other than under the Loan Documents or indebtedness that constitutes customary third-party trade payables incurred by the Company or any OpCo in the ordinary course of business) or guaranty or other contingent liability, approving the form of the loan documents evidencing such indebtedness, or making any material election under such loan documents.

See DREL Operating Agreement, Ex. B, § 2.08 (a), (c), (d), (g), (h), (dd) and (ee).

9. In other words, although the Debtor is responsible for DREL's day-to-day management, it cannot make any major decisions regarding the company, which is a member-managed LLC, without Palisades' consent, including any decisions regarding leasing, selling or mortgaging the Frisco Property, applying for or modifying the existing zoning for the Frisco Property, listing the Frisco Property for sale, obtaining any new loans requiring payments of over $100,000 by DREL or FHC Acquisition, granting any form of encumbrance on the assets of DREL or FHC Acquisition, modifying or amending the existing loan documents on the Frisco Property, or incurring any loans on behalf of the DREL or FHC Acquisition.

**D. The Officers of FHC Acquisition Are Subject to the DREL Operating Agreement**

10. DREL is the 100% owner and sole member of FHC Acquisition, which owns the Frisco Property. A copy of the Company Agreement of FHC Acquisition, LLC dated January 29, 2019 is attached hereto as **Exhibit C** (the "FHC Operating Agreement"). Article X, paragraph 1 provides that the Managing Member of FHC Acquisition, which is DREL, "shall manage and control the operation of" FHC Acquisition. Likewise, Article X, paragraph 2 provides that the "powers of the Company shall be exercised by or under the authority of, and the business affairs of the Company shall be managed under the direction of the Managing Members," which is DREL. Article X, paragraph 2(b) provides that the Managing Member of FHC Acquisition (DREL) may designate one or more individuals as officers of FHC Acquisition, who have the right to perform such powers and duties as are assigned to them by the Managing Member (DREL).

11. However, the ability of the officers of FHC Acquisition to act on behalf of FHC Acquisition is expressly subject to the terms of the DREL Operating Agreement, including the terms requiring Palisades' consent to the taking of certain actions relating to FHC Acquisition and the Frisco Property. Specifically, Article X, paragraph 8 provides as follows:

> 8. Controlling Management Limitation. Notwithstanding any other provision of this Agreement, no Member or officer of the Company including, without limitation, the President or Treasurer may take any action on behalf of the Company which would acquire the approval of the Voting Members of Dallas Real Estate Lenders, LLC, a Delaware limited liability company and Sole Member of the Company ("DREL") or Palisades pursuant to the Company Agreement of DREL.

As the foregoing language makes clear, an officer of FHC Acquisition cannot take any action on behalf of FHC Acquisition that would require either the approval of the Voting Members or Palisades' consent under the DREL Operating Agreement, including any actions regarding leasing, selling or mortgaging the Frisco Property, applying for or modifying the existing zoning for the Frisco Property, listing the Frisco Property for sale, obtaining any new loans requiring payments of over $100,000 by DREL or FHC Acquisition, granting any form of encumbrance on the assets of DREL or FHC Acquisition, modifying or amending the existing FHC Loan on the Frisco Property, or incurring any loans on behalf of the DREL or FHC Acquisition.

**E. Debtor's Financial Reporting Requirements under the DREL Operating Agreement**

12. Under section 7.07(a) of the DREL Operating Agreement, the Debtor is required to cause to be prepared and delivered to each of the members (including Palisades) the following monthly and annual financial reporting: (i) monthly management reports for the Frisco Property, including progress reports on development activity and a report detailing expenditures, (ii) monthly financial statements for DREL, including balance sheets, income statements, and cash flow statements, and (iii) annual financial statements, including year-end balance sheets, income statements, cash flow statements, the amount of the Members' unreturned capital contributions, and a summary report describing the financial and business activities of DREL

during the calendar year.

13. In addition, under section 7.07(b), the Debtor is required to promptly deliver to Palisades any notices of default under any loan, including the Loan Documents relating to the FHC Loan, or any "Development Agreements" relating to the Frisco Property (as defined in section 2.08(ff) of the DREL Operating Agreement.

**F. The Imminent Expiration of the FHC Loan and the Debtor's Failure to Comply with the DREL Operating Agreement**

14. The Debtor has not been providing Palisades with the financial reporting required under the DREL Operating Agreement. Moreover, Palisades believes that the FHC Loan payable to Texas Republic was originally set to mature on or around January 30, 2021. In addition, Palisades believes that the Debtor negotiated a six-month extension of the FHC Loan in January 2021, which Palisades believes is set to expire on or around July 30, 2021.

15. As indicated, the Debtor cannot amend or modify the FHC Loan without Palisades' consent. The Debtor also cannot list the Frisco Property for sale, seek to modify the zoning for the Frisco Property, or incur any additional debt on the Frisco Property without Palisades' consent. Following the extension of the FHC Loan in January 2021, Palisades did not receive any communication from the Debtor regarding the status of the FHC Loan or any other financial reporting from the Debtor. Indeed, only after multiple requests from Palisades' counsel regarding the status of the FHC Loan on Wednesday, July 21, 2021 (**Exhibit D**), Friday, July 23, 2021 (**Exhibit E**), and Sunday, July 25, 2021 (**Exhibit F**), and Monday, July 26, 2021 (**Exhibit G**), did Palisades learn that the FHC Loan is supposedly in the process of being renewed (see **Exhibit H**). However, the Debtor unequivocally cannot modify or amend the FHC Loan Documents under section 5.02(dd) of the DREL Operating Agreement without Palisades' consent and such consent has never even been requested. In addition, despite requests by Palisades' counsel, the Debtor likewise has not provided Palisades with any of the documentation relating to the purported extension of the FHC Loan.

**G. The Memorandum of Agreement to be filed by Palisades**

16. Palisades does not have any information regarding the current status of the FHC Loan, nor has it seen any documentation regarding the terms of any purported extension being contemplated without Palisades' consent. Palisades likewise does not have current information regarding any actions taken by DREI to list, sell, apply for rezoning, refinance or otherwise affect the Frisco Property although its consent for any such action is also required. However, because it appears the FHC Loan will likely expire in a matter of days (or be extended without its consent), Palisades is concerned that the Debtor may attempt to take some action with respect to the Frisco Property without Palisades' consent in violation of the DREL Operating Agreement. Palisades' concern is well-founded and based on the following:

(a) The Debtor is apparently negotiating an extension of the FHC Loan without Palisades' consent in violation of section 5.02(dd) of the DREL Operating Agreement;

(b) The Debtor has not provided any documentation regarding the purported extension of the FHC Loan in response to requests from Palisades' counsel;

(c) The Debtor incorrectly stated its ownership interest in FHC Acquisition on its bankruptcy schedule A/B (a copy of which is attached as **Exhibit I**) as 100% when the Debtor unequivocally *does not* own 100% of FHC Acquisition. Instead, as indicated above, the Debtor owns 50% of DREL, which owns 100% of FHC Acquisition;

(d) The Debtor incorrectly identified the name of FHC Acquisition as "FHC LLC";

(e) The Debtor appears to have overstated the value of the Frisco Property as $10 million, which the Collin County Appraisal District reflects is only worth $6.34 million (see **Exhibit J**);[2]

(f) A number of the alleged creditors on the Debtor's schedules, which include architectural, engineering, and industrial design firms, appear to be creditors of FHC Acquisition rather than creditors of the Debtor. Specifically, a number of these creditors were listed on the closing statement for the Frisco Property (see **Exhibit K**), indicating that they either were not properly paid at closing or are creditors are FHC Acquisition (rather than the Debtor);

[2] Palisades does not have any information regarding the basis for the Debtor's $10 million valuation of the Frisco Property, including whether its valuation is based on a re-zoning of the property, a third party offer to acquire the property, or some other information relating to the Frisco Property that has not been disclosed to Palisades.

(g) The Debtor failed to timely file a monthly operating report for June 2021;

(h) The Debtor is not providing the financial reporting information to Palisades required under the terms of the DREL Operating Agreement.

17. Consequently, in order to protect its interest in the Frisco Property based on its ownership interest in DREL and DREL's ownership of FHC Acquistion, Palisades would like to file the Memorandum of Agreement in the real property records in Collin County relating to the Frisco Property to give notice to third parties that (i) FHC Acquisition is the owner of the Frisco Property, (ii) DREL is the sole owner and manager of FHC Acquisition, (iii) Palisades is a 50% member in DREL, (iv) no Member or officer of FHC Acquisition may take any action on behalf of FHC Acquisition which would require the approval of the Voting Members (including Palisades) or Palisades' consent under the DREL Operating Agreement, and (v) consequently, the authority to take any action on behalf of FHC Acquisition (including any sales, transfers, encumbrances, or liens) should be confirmed in writing through Palisades. Palisades believes the filing of the Memorandum of Agreement is necessary to protect its interest in the Frisco Property. Although Palisades does not believe the automatic stay prevents it from filing the Memorandum of Agreement, it nevertheless files the instant Motion out of an abundance of caution seeking entry of an order finding that the stay does not apply or, alternatively, granting relief from the automatic stay to file the Memorandum of Agreement.

## I. <u>ARGUMENTS AND AUTHORITIES</u>

### A. The Automatic Stay Does Not Apply to the Property of FHC Acquisition

18. The automatic stay provision in section 362(a) of the Bankruptcy Code reads, in relevant part:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of--
>
> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced

> before the commencement of the case under this title, or to recover a claim ***against the debtor*** that arose before the commencement of the case under this title:
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to ***exercise control over property of the estate***;
>
> (4) any act to create, perfect, or enforce any ***lien against property of the estate***.

11 U.S.C. § 362(a) (emphasis added). The automatic stay thus "imposes a moratorium" on all actions against the debtor or its property and assets." *In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1146 (5th Cir. 1987).

19. However, by its express terms, the automatic stay applies only to the debtor and property of the estate *and not* against non-debtor third parties. *Reliant Energy Servs. v. Enron Can. Corp.*, 349 F.3d 816, 825 (5th Cir. 2003); *see also, Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 544 (5th Cir. 1983). Indeed, the Fifth Circuit has noted that "section 362 is rarely, however, a valid basis on which to stay actions against non-debtors." *Id.* (*citing Arnold v. Garlock, Inc.*, 278 F.3d 426, 436 (5th Cir. 2001).

20. Moreover, the general rule that the automatic stay does not extend to non-debtors includes a debtor's subsidiaries and the property of a debtor's subsidiaries. This is so because "it is a fundamental precept of corporate law that each corporation is a separate legal entity with its own debts and assets, even when such corporation is wholly owned by another corporate entity. *Kreisler v. Goldberg*, 478 F.3d 209, 213 (4th Cir. 2007). Indeed,

> The fact that a parent corporation has an ownership interest in a subsidiary, however, does not give the parent any direct interest in the *assets* of the subsidiary. Although [debtor] could have established an ownership interest in the property, it chose not to do so. Instead, it created an LLC for the purpose of holding title to the property. Having assumed whatever benefits flowed from that decision, it cannot now ignore the existence of the LLC in order to escape its disadvantages.

*Id.* at 214 (emphasis in original). Thus, because the assets of a subsidiary belong to the subsidiary, they do not form part of a debtor's bankruptcy estate. *Id.* Moreover, while property

of the estate includes the debtor's stock in a subsidiary, it does not include the assets of the subsidiary. *In re Penn*, 2010 Bankr. LEXIS 1546, *6 (Bankr. N.D. Ga. Apr. 2, 2010).

21. Consequently, because the assets of a subsidiary do not constitute property of the debtor's estate, an action to obtain possession or exercise control over a subsidiary's property does not violate the automatic stay. *Kreisler*, 478 F.3d at 214*; accord, Nat'l Bank v. Panther Mt. Land Dev., LLC (In re Panther Mt. Land Dev., LLC)*, 686 F.3d 916, 923 (8th Cir. 2012) (finding courts will not "simply brush aside" the consequences flowing from the creation of separate corporate entities and, consequently, that "the automatic stay does not, in general, apply to actions against parties who enjoy factual or legal relationships with a debtor, such as a debtor's wholly owned subsidiaries); *In re Hitchcock*, 2020 Bankr. LEXIS 2175, *4 (Bankr. D. Neb. Aug. 14, ,2020) (same); *Manson v. Richard Friedberg & Oldstone Ventures, LLC*, 2013 U.S. Dist. LEXIS 83488, *9 (Bankr. S.D.N.Y. June 13, 2013) (finding the assets owned by the debtor's wholly owned subsidiary were not protected by the debtor's automatic stay where the subsidiary did not file its own bankruptcy petition). Such is the case even where the action may have the effect of reducing the value of the debtor's interest in the subsidiary. *Kreisler*, 478 F.3d at 214 (finding the automatic stay does not prevent the taking of actions that might reduce the value of the debtor's ownership interest in a subsidiary because the nature and extent of the debtor's ownership interest in the subsidiary would remain unchanged). Instead, if a subsidiary or separate legal entity established to hold property desires bankruptcy protection, it must file its own petition. *Kreisler*, 478 F.3d at 213-145; *In re Penn*, 2010 Bankr. LEXIS 1546 at *5; *Manson*, 2013 U.S. Dist. LEXIS 83488 at *9.

22. Here, the Debtor has a 50% ownership interest in DREL. DREL, in turn, has a 100% ownership interest in FHC Acquisition. FHC Acquisition, in turn, owns the Frisco Property. The Frisco Property, which is an asset owned by an entity in which the Debtor has an indirect interest, does not constitute part of the Debtor's bankruptcy estate. Consequently, the filing of the Memorandum of Agreement by Palisades in the Collin County property records to

give notice regarding the ownership of the Frisco Property and the rights of DREL and Palisades in relation to same, does not constitute an action against the Debtor, an act to exercise control over property of the debtor, or an act to create, perfect or enforce a lien against property of the estate. As such, the automatic stay does not apply to or prevent the filing of the Memorandum of Agreement relating to the Frisco Property. Consequently, Palisades requires entry of an order finding the stay does not apply to the filing of the Memorandum of Agreement.

**B. Alternatively, if the Automatic Stay Applies to the Property of FHC Acquisition, Cause Exists to Grant Palisades Relief to File the Memorandum of Agreement**

23. For the reasons discussed at length above, Palisades does not believe that the automatic stay in the Debtor's bankruptcy case applies to the Frisco Property. However, it acknowledges that, in certain unusual situations, the automatic stay may be extended to encompass actions against certain nonbankrupt parties, such as where the debtor and nonbankrupt party can be considered one entity or as having such a unitary interest that a judgment against the nonbankrupt entity will be binding upon the debtor's estate. *In re S.I. Acquisition*, 817 F.2d at 1148 (citing *A.H. Robbins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1985)); *see also, Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995) (citing *Teachers Ins. & Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986) ("Several courts have held that under specific circumstances nondebtors may be protected by the automatic stay—even though such protection may be temporary—if it contributes to the debtor's efforts to achieve rehabilitation.")).

24. Palisades does not believe that the Frisco Property is property of the Debtor's bankruptcy estate subject to the automatic stay or that the filing of the Memorandum of Agreement would violate the automatic stay. Nevertheless, should the Court disagree and find that the automatic stay in the Debtor's bankruptcy case does extend to the Frisco Property, then cause exists to grant Palisades relief from the stay to file the Memorandum of Agreement under section 362(d). The interests of Palisades, DREL and FHC Acquisition in the Frisco Property

are not adequately protected. As discussed above, the Debtor is taking actions with respect to the Frisco Property without Palisades' consent in violation of the DREL Operating Agreement. The Debtor is also not providing Palisades with the required financial reporting information under the DREL Operating Agreement. In addition, the Debtor has misrepresented its ownership in FHC Acquistion in its bankruptcy schedules as a 100% ownership interest and incorrectly identified FHC Acquisition as "FHC, LLC," which may potentially obscure the actual ownership of FHC Acquisition. As a result, because it appears the Debtor is attempting to extend the FHC Loan in a matter of days without Palisades' consent or even informing Palisades of the terms of such extension, Palisades is concerned that the Debtor may also cause FHC Acquisition to sell or take other action with respect to the Frisco Property without Palisades' consent in violation of the FHC Acquisition Operating Agreement and the DREL Operating Agreement. Palisades needs relief from the automatic stay to protect its interests in DREL, FHC Acquisition and the Frisco Property because it does not have up to date information regarding the status or terms of the FHC Loan and the Debtor is not providing it with regular financial reporting as required under the DREL Operating Agreement. Likewise, although counsel for Palisades has requested documentation regarding the purported extension of the FHC Loan, Palisades still has not received such documentation.

25. In addition, the Debtor does not have any equity in the Frisco Property and such property is not necessary to an effective reorganization. Indeed, the Debtor's only property interest here is its 50% ownership interest in DREL which, in turn, owns FHC Acquisition (which owns the Frisco Property). Even so, the Frisco Property is listed in the Collin County Appraisal District as having a value of only $6.34 million. As discussed, the property is currently subject to the FHC Loan of approximately $3 million plus interest. In addition, Palisades is entitled to a return on its preferred capital contribution in DREL, which was $3.5 million, plus another approximately $1.5 million in interest and minimum profit participation before the Debtor would be entitled to any recovery on account of its membership interest in DREL. See Ex. B, DREL

Operating Agreement, § 5.02(a). Because the Frisco Property does not appear to be worth more than the approximately $3 million in outstanding debt and approximately $5 million owed to Palisades on account of its preferred equity interest, the Debtor does not have any equity in its ownership interest in DREL (arising from its ownership of FHC Acquistion which, in turn owns the Frisco Property).

26. The Frisco Property also is not necessary to an effective reorganization. Indeed, Palisades does not believe the Debtor has any ability to reorganize in this case. In addition to the fact that the Debtor has no equity in its ownership interest in DREL, even as the "Manager" of DREL the Debtor cannot take any material action with respect to either FHC Acquisition or the Frisco Property without Palisades' consent, including any action to sell, mortgage, transfer or refinance the Frisco Property. Indeed, it is not entirely clear what the Debtor hopes to accomplish through the instant chapter 11 bankruptcy case. Regardless, because the Debtor does not have any equity in the Frisco Property and is precluded by the terms of the DREL Operating Agreement from taking any action with respect to such property without Palisades' consent, the Frisco Property cannot be necessary to an effective reorganization. As a result, Palisades should be granted leave from the automatic stay so that it can file the Memorandum of Agreement to put third parties on notice with respect to the rights as between the Debtor, Palisades, DREL and FHC Acquisition as they pertain to the Frisco Property.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Palisades TC, LLC respectfully requests that, upon hearing of this Motion, the Court: (i) enter an order finding the automatic stay in the Debtor's bankruptcy case does not extend to the Frisco Property and does not prohibit Palisades from filing the Memorandum of Agreement, (ii) alternatively, if the automatic stay does apply, enter an order granting Palisades relief from the automatic stay to file the Memorandum of Agreement, and (iii) granting Palisades such other and further relief as is just and equitable.

A copy of Palisades' proposed order granting the alternative forms of relief requested herein is attached hereto as **Exhibit L.**

DATED: July 27, 2021.

Respectfully Submitted,

/s/ Suzanne K. Rosen
Jeff P. Prostok
State Bar No. 16352500
Suzanne K. Rosen
State Bar No. 00798518
**FORSHEY & PROSTOK, LLP**
777 Main Street, Suite 1550
Fort Worth, TX 76102
(817) 877-8855 Telephone
(817) 877-4151 Facsimile
jprostok@forsheyprostok.com
srosen@forsheyprostok.com

ATTORNEYS FOR PALISADES TC, LLC

## CERTIFICATE OF CONFERENCE

The undersigned certifies that on July 25-26, 2021, the undersigned contacted Debtor's counsel, Joyce Lindauer, to inquire regarding the Debtor's position as to whether the filing of the Memorandum of Agreement would violate the automatic stay in the Debtor's bankruptcy case. Ms. Lindauer responded that she would check with her client. As of the time of filing of this Motion, no response as to the Debtor's position regarding the applicability (or non-applicability) of the automatic stay has been received from counsel for the Debtor. As a result, the undersigned will file an amended certificate of conference once a response is received. In the meantime, the relief requested herein must be deemed as opposed.

/s/ Suzanne K. Rosen
Suzanne K. Rosen

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2021 a copy of the foregoing document was served through the Court's ECF system on those parties receiving ECF notice, and as indicated below on the parties reflected below.

*Via Email*
Joyce Lindauer (joyce@joycelindauer.com)

*Via Email*
Erin Schmidt (erin.schmidt2@usdoj.gov)

/s/ Suzanne K. Rosen
Suzanne K. Rosen

# Exhibit A

Record and Return:

Palisades TC, LLC
1919 McKinney Ave, Suite 100
Dallas, Texas 75201

**Memorandum of Agreement Regarding Limited Liability Company Agreement Authority**

This MEMORANDUM OF AGREEMENT dated as of July ___, 2021 ("**Memorandum**") is made by Palisades TC, LLC, a Texas limited liability company ("**Preferred Member**"), who is a 50 percent member of Dallas Real Estate Lenders, LLC, the sole member of FHC Acquisition, LLC ("**Owner**"). **FHC Acquisition, LLC** is the fee owner of the Property, as defined and described below. Preferred Member is a member under the Company Agreement of Dallas Real Estate Lenders, LLC ("**Operating Agreement**").

Preferred Member provided a preferred equity investment (the "**Investment**") as set forth above to permit Owner to purchase the property located at (the "**Property**"):

Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas.

**PLEASE TAKE NOTICE** that, under the Company Agreement for the Owner, no Member or officer of the Owner may take any action on behalf of the Company which would require the approval of the Voting Members of Dallas Real Estate Lenders, LLC (which includes the Preferred Member) or the Preferred Member pursuant to the Company Agreement of Dallas Real Estate Lenders, LLC. Dallas Real Estate Lenders, LLC is managed collectively by the Voting Members, which includes Palisades TC, LLC. Consequently, the authority to take any action on behalf of the Owner (including any sales, transfers, encumbrances, or liens) should be confirmed in writing through the Preferred Member, who may be contacted through the following address:

Palisades TC, LLC
1919 McKinney Ave, Suite 100
Dallas, Texas 75201
Telephone: (310) 745-4414
Email: jdemonet@palisadescapitalrealty.com

This Memorandum shall be recorded in the real property records in the county in the state in which the Property is situated and provides notice of the Preferred Member's rights under the Operating Agreement in connection with any refinancing, transfer or other disposition of the Property.

**IN WITNESS WHEREOF**, Preferred Member has executed this Memorandum the day and year first above written.

**Palisades TC LLC,**
a Texas limited liability company

By: ______________________________
Name: Joaquin Charles de Monet
Title: Manager

STATE OF TEXAS )

) ss.:

COUNTY OF DALLAS )

On July ____, 2021 before me, ______________________________, a Notary Public for said state, personally appeared Joaquin Charles de Monet, personally known to me OR proved to me on the basis of satisfactory evidence to be the person(s) whose names(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

______________________________
Notary Public

# Exhibit B

# COMPANY AGREEMENT OF
# DALLAS REAL ESTATE LENDERS, LLC,
# A DELAWARE LIMITED LIABILITY COMPANY

**JANUARY 29, 2020**

# TABLE OF CONTENTS

**Page**

ARTICLE I ORGANIZATION .......... 1

1.01 Formation, Qualification and Continuation .......... 1
1.02 Governing Law .......... 1
1.03 Name .......... 1
1.04 Term .......... 1
1.05 Office and Agent .......... 1
1.06 Purpose of Company .......... 1

ARTICLE II MEMBERSHIP INTERTESTS, VOTING AND MANAGEMENT .......... 2

2.01 Members .......... 2
2.02 Classification of Membership Interests .......... 2
2.03 Percentage Ownership and Voting Interests .......... 2
2.04 Management by Voting Members .......... 2
2.05 Voting .......... 2
2.06 Liability of Members .......... 3
2.07 New Members .......... 3
2.08 Special Management Provisions .......... 3
2.09 Default Rights .......... 6
2.10 Palisades Reimbursement .......... 6

ARTICLE III CAPITAL ACCOUNTS .......... 7

3.01 Initial Members, Capital Commitments, and Percentage Interests .......... 7
3.02 Capital Accounts .......... 7
3.03 Additional Contributions .......... 7

ARTICLE IV MANNER OF ACTING .......... 7

4.01 Officers and Agents of the Company .......... 7
4.02 Meetings of Voting Members .......... 8
4.03 Notice of Meetings .......... 8
4.04 Record Date .......... 8
4.05 Quorum .......... 8
4.06 Voting .......... 9

ARTICLE V ALLOCATIONS AND DISTRIBUTIONS .......... 9

5.01 Allocations of Profits and Losses .......... 9
5.02 Distributions .......... 9
5.03 Palisades Redemption .......... 10
5.04 Redemption Default .......... 11
5.05 Form of Distribution .......... 12

ARTICLE VI TRANSFER AND ASSIGNMENT OF INTERESTS .......... 12

6.01 Reserved .......... 12
6.02 Reserved .......... 12
6.03 Restrictions on Transfer .......... 12
6.04 Involuntary Transfer of a Membership Interest .......... 12

ARTICLE VII ACCOUNTING, RECORDS AND REPORTING ..... 13

7.01 Books and Records ..... 13
7.02 Inspection of Books and Records ..... 13
7.03 Accountings ..... 13
7.04 Filings ..... 13
7.05 Bank Accounts ..... 13
7.06 Company Representative ..... 14
7.07 Financial Information, Reports and Notices ..... 14
7.08 Tax Returns ..... 15

ARTICLE VIII DISSOLUTION AND WINDING UP ..... 15

8.01 Dissolution ..... 15
8.02 Winding Up ..... 15
8.03 Distributions in Kind ..... 16
8.04 Order of Payment of Liabilities on Dissolution ..... 16
8.05 Adequacy of Payment ..... 16
8.06 Compliance with Regulations ..... 16
8.07 Limitations on Payments Made in Dissolution ..... 16
8.08 Certificate of Cancellation ..... 16

ARTICLE IX EXCULPATION AND INDEMNIFICATION ..... 16

9.01 Exculpation of Members ..... 16
9.02 Indemnification by Company ..... 17
9.03 Insurance ..... 17

ARTICLE X MISCELLANEOUS ..... 17

10.01 Authority ..... 17
10.02 Indemnification by the Members ..... 17
10.03 Notices ..... 18
10.04 Severability ..... 18
10.05 Binding Effect ..... 18
10.06 Counterparts ..... 18
10.07 Entire Agreement ..... 18
10.08 Further Assurances ..... 18
10.09 Headings; Gender; Number; References ..... 18
10.10 Parties in Interest ..... 18
10.11 Amendments ..... 18
10.12 Attorneys' Fees ..... 19
10.13 Remedies Cumulative ..... 19
10.14 Jurisdiction and Venue/Equitable Remedies ..... 19
10.15 Palisades Approvals ..... 19
10.16 Palisades Payments ..... 19

Exhibit A – Project Budget
Exhibit B – Members

# COMPANY AGREEMENT OF DALLAS REAL ESTATE LENDERS
# A DELAWARE LIMITED LIABILITY COMPANY

This Company Agreement (the "Agreement") of **DALLAS REAL ESTATE LENDERS, LLC**, a Delaware limited liability company (the "Company") is entered into by **DALLAS REAL ESTATE INVESTORS, LLC** ("DREI") and **PALISADES TC LLC**, a Texas limited liability company ("Palisades") on January [___], 2020 ("Effective Date").

In consideration of the mutual covenants and conditions herein, the Members agree as follows:

## ARTICLE I
## ORGANIZATION

**1.01 Formation, Qualification and Continuation.** The Company was formed as a limited liability company under the Delaware Limited Liability Company Act (currently Chapter 18 of Title 6 of the Delaware Code) (the "Act") by filing a Certificate of Formation with the Delaware Secretary of State November 19, 2019 (the "Certificate"). The Company will continue under the Act and this Agreement.

**1.02 Governing Law.** This Agreement shall be governed by and construed and interpreted in accordance with the Act as amended from time to time, without regard to Delaware's conflicts of laws principles. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that any provision of this Agreement is inconsistent with any provision of the Act, this Agreement shall govern to the extent permitted by the Act.

**1.03 Name.** The name of the Company shall be "DALLAS REAL ESTATE LENDERS, LLC" The business of the Company may be conducted under that name or, on compliance with applicable laws, any other name that the Voting Members deem appropriate or advisable. The Voting Members on behalf of the Company shall file any certificates, articles, fictitious business name statements and the like, and any amendments and supplements thereto, as the Voting Members consider appropriate or advisable.

**1.04 Term.** The term of the Company commenced on the filing of the Certificate and shall be perpetual unless dissolved as provided in this Agreement.

**1.05 Office and Agent.** The principal office of the Company shall be at 1755 Wittington, Suite 340, Dallas, Texas 75234 or such other place or places of business within or without the State of Delaware as the Voting Members may determine. The Company shall continuously maintain a registered agent and office in the State of Delaware as required by the Act. The registered agent shall be as stated in the Certificate or as otherwise determined by the Voting Members.

**1.06 Purpose of Company.** The purpose of the Company is to engage in all lawful activities permitted for limited liability companies under the Act; provided, however, until such time as Palisades has been Redeemed in Full (as defined in Section 5.03 hereof) the sole purpose of the Company shall be to manage and own 100% of the membership interests in FHC Acquisition, LLC, a Texas limited liability company ("FHC") or such other investments (whether debt, equity or any combination thereof) (FHC and any other entity owning a Project, an "OpCo") as determined and

approved by the Voting Members for the sole purposes of acquiring and developing real property and improvements thereon (a "Project"). The initial Project shall be that certain real property described as "Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas" ("Frisco Property") and the development of a mixed use project located thereon which is planned to include a luxury hotel, residences, restaurant, and retail components ("Frisco Project" or "Project")). The Company acknowledges that it is the sole member of FHC pursuant to the terms of the Company Agreement of FHC dated November 20, 2019 (the "FHC Agreement" and such FHC Agreement and any other agreement governing the organization and operation of an OpCo, an "OpCo Agreement"). The Company hereby authorizes FHC to enter into that certain Loan Agreement dated on or about the date hereof with Texas Republic Bank, N.A. ("Lender") for a loan in the approximate amount of $3,000,000 (the "Loan") (such Loan Agreement and all documents related thereto with Lender and related to the Loan, the "Loan Documents").

## ARTICLE II
## MEMBERSHIP INTERTESTS, VOTING AND MANAGEMENT

**2.01 Members.** A "Member" (so called) shall mean an individual, organization or entity that has been admitted as, and continues as, a member of the Company. The Members of the Company as of the Effective Date are DREI and Palisades.

**2.02 Classification of Membership Interests.** The Members' percentage interests in the income, gains, losses, deductions, voting rights and distributions, as may be affected by the terms of this Agreement are referred to in this Agreement as "Interests." As of the Effective Date, all Members are Class A Members. Other classes may be created upon the unanimous consent of the Voting Members with such rights and obligations as defined by such members.

**2.03 Percentage Ownership and Voting Interests.** A Member's Ownership Interest ("Ownership Interest") is the total of his interests in capital, together with all of the rights, as a Member or Manager of the Company, that arise from such interests. The "Percentage Ownership Interest" of a Member represents the economic interest of the Member in the Company. The "Percentage Voting Interest" of a Member represents the voting rights of a Member in the Company.

**2.04 Management by Voting Members.** Each Member is a "Voting Member." The Voting Members shall manage the Company and shall have the right to vote, in their capacity as Manager(s), upon all matters upon which Managers have the right to vote under the Act or under this Agreement, in proportion to their respective Percentage Voting Interests in the Company. Voting Members need not identify whether they are acting in their capacity as Members or Managers when they act.

**2.05 Voting.** Except as otherwise provided or permitted by this Agreement, Voting Members shall in all cases, in their capacity as Members or Managers of the Company, act collectively, and, unless otherwise specified or permitted by this Agreement, unanimously. Except as otherwise provided or permitted by this Agreement, no Voting Member acting individually, in his capacity as a Member or Manager of the Company, shall have any power or authority to sign for, bind or act on behalf of the Company in any way, to pledge the Company's credit, or to render the Company liable

for any purpose. Unless the context requires otherwise, in this Agreement, the terms "Member" or "Members," without the qualifier "Voting" refers to the Voting Members collectively; and the terms "Manager" or "Managers" refers to the Voting Members.

**2.06 Liability of Members.** All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

**2.07 New Members.** New Members may be admitted to the Company, only if such new Member (i) is approved unanimously by the Voting Members; (ii) delivers to the Company his required capital contribution (which may be zero); (iii) agrees in writing to be bound by the terms of this Agreement by becoming a party hereto; and (iv) delivers such additional documentation as the Voting Members shall reasonably require to so admit such new Member to the Company. Upon the admission of a new Member or Members, as the case may be, to the Company, the capital accounts of Members, and the calculations that are based on the capital accounts, shall be adjusted appropriately. Notwithstanding any contrary provision in this Agreement, no person may be admitted to the Company as a new Member or as a Manager without the prior written approval of Palisades.

**2.08 Special Management Provisions**. Notwithstanding any contrary provision of this Agreement, until such time as (i) Palisades has been Redeemed in Full, or (ii) a Redemption Default (as hereinafter defined in Section 5.04) has occurred, DREI shall be the Manager responsible for the day-to-day management of the Company. Notwithstanding the designation of DREI as the Manager with responsibility for day-to-day management of the Company, neither any Manager nor any officer shall undertake any of the following actions with respect to the Company under this Agreement or on behalf of the Company with respect to any OpCo, the Frisco Project or any other Project without the prior written approval of Palisades:

(a) leasing, selling, disposing, exchanging, mortgaging, pledging, or transferring the Project or any material portion thereof or other asset that costs in excess of $100,000 except as provided in the predevelopment budget attached hereto as Exhibit A (the "Project Budget");

(b) failing to maintain, demolishing, removing or rendering unusable for its intended purpose any existing improvements currently a part of the Project or entering into contracts for such purposes or construction of the anticipated improvements on the Project;

(c) applying for or modifying any existing zoning for the Project;

(d) entering into any brokerage or exclusive listing agreement for the sale or leasing of any portion of the Project;

(e) entering into, amending, modifying, terminating or canceling any property management agreement with any person for management and leasing of the Project;

(f) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate or relative of Timothy Barton ("Barton"), provided, however, that Palisades (acting alone and without any approval or joinder of any other person) will have the right to enforce any of the Company's and any

OpCo's rights and remedies under any Related-Party Agreements by and between Barton or any of his Affiliates on the one hand and the Company or any OpCo on the other hand. For purposes hereof, "Affiliate" shall mean (i) any person directly or indirectly controlling, controlled by or under common control with another person; (ii) any person that, directly or indirectly, owns or controls 10% or more of the outstanding voting securities or beneficial interests of such other person; (iii) any officer, director, trustee member, manager or general partner of such person; (iv) if such other person is an officer, director, member or manager, trustee or partner of another entity, then the entity for which that person acts in any such capacity; (v) any spouse or issue of the person or any person who is of a relationship described in Section 267 (b) of the Code substituting 10% in place of 50%, where applicable, and (vi) an entity formed which is to be owned directly or indirectly for the benefit of any of the persons described in subparagraph (v) above. For purposes of this paragraph and for determining when a person is directly or indirectly controlling, controlled by or under, controlled with any other person, the term control shall refer to an interest of 10% or more of the outstanding voting securities or beneficial interest of such person.;

(g) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company or any OpCo of more than $100,000 in any year except as provided in the Project Budget;

(h) entering into, amending, modifying, terminating or canceling any contract that grants any form of encumbrance (defined as any lien, easement, lease, hypothecation, or other restriction on transfer or use) over an asset of the Company or any OpCo;

(i) agreeing to or indemnifying any person pursuant to this Agreement or any OpCo Agreement or agreeing to or indemnifying any person other than as provided in this Agreement or any OpCo Agreement;

(j) entering into, amending, modifying, terminating or canceling any term sheet or letter of intent for the acquisition, financing, or capitalization of the Company, any OpCo, the Project, or any direct or indirect voting or economic interest in any of same;

(k) guarantying the payment of any money or debt of the Company, any OpCo, or any other person, or guarantying the performance of the Company, any OpCo, or any other person, except pursuant to the Loan Documents;

(l) approving the Project Budget or any amendment thereto;

(m) incurring any expenses (including, without limitation, for the acquisition of capital assets) outside of the approved Project Budget;

(n) making any request for additional Capital Contributions under this Agreement or any OpCo Agreement;

(o) creating reserves, determining the amount of cash available for distribution and making distributions pursuant to this Agreement or any OpCo Agreement;

(p) approving of the transfer or encumbrance of any direct or indirect interest in the Company or any OpCo and approving of any admission of any person as an additional member of the Company or any OpCo;

(q) hiring and compensation of, and any employment agreement with respect to, any employee of the Company or any OpCo or entering into any collective bargaining or other agreement with any labor union, labor organization or similar body;

(r) filing or defending any litigation, arbitration or similar legal disputes with respect to any claim or potential claim involving the Company or any OpCo equal to or greater than $100,000, or settling any claim or potential claim for an amount (including all costs of settlement) for $100,000 or more;

(s) amending or modifying this Agreement or any OpCo Agreement or the certificate of formation for the Company or any OpCo;

(t) making any election to cause the Company or any OpCo to incorporate or offer or issue securities;

(u) the selection and/or retention of any new or additional audit or tax accountants for or on behalf of the Company or any OpCo;

(v) the transfer of, or granting of a license to use, any intellectual property owned directly or indirectly by the Company or any OpCo;

(w) removing the partnership representative (as such term is defined in Section 6223(a) of the Code) of the Company or any OpCo;

(x) offering or issuing additional ownership interests by the Company or permitting the Company or any OpCo to make any loan or advance to any person;

(y) engaging in any line of business in contravention of the purposes of the Company or any OpCo as provided in this Agreement or any OpCo Agreement respectively;

(z) effecting a dissolution or liquidation of the Company or any OpCo or the merger, conversion, consolidation or other reorganization of the Company or any OpCo;

(aa) causing or permitting the Company or any OpCo to engage in any reorganization or commencing any proceedings or the filing of any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal or state bankruptcy, insolvency or similar law, on behalf of the Company or any OpCo or admitting, confessing or acquiescing to any involuntary bankruptcy filing or similar action against the Company or any OpCo;

(bb) making any distribution to any person other than Palisades under this Agreement or permitting any OpCo to make any distribution other than to the Company;

(cc) taking any other action that requires the consent of all the Members under this Agreement or any OpCo Agreement;

(dd) modifying or amending any of the Loan Documents or paying in full all amounts due under the Loan Documents prior to Palisades being Redeemed in Full;

(ee) incurring on behalf of the Company or any OpCo any loan or other indebtedness including loans or advances from Members of the Company or any OpCo (other than under the Loan Documents or indebtedness that constitutes customary third-party trade payables incurred by the Company or any OpCo in the ordinary course of business) or guaranty or other contingent liability, approving of the form of the loan documents evidencing such indebtedness, or making any material election under such loan documents;

(ff) modifying, amending, terminating or waiving any benefit or right of the Company or any OpCo under any of (i) the Purchase and Sale Agreement dated effective October 23, 2018, as amended, with respect to the Frisco Property (the "PSA"), (ii) the Master Development Agreement dated December 31, 2019 between the City of Frisco ("Frisco"), Frisco Economic Development Corporation ("FEDC"), Frisco Community Development Corporation ("FCDC") and FHC (the "MDA"), (iii) the Performance Agreement dated December 30, 2019 between FCDC and FHC (the "FCDC Agreement"), (iv) the Performance Agreement dated December 31, 2019 between FEDC and FHC (the "FEDC Agreement") (the PSA, MDA, FCDC Agreement and FEDC Agreement, collectively, the "Development Agreements" and the obligations of FHC thereunder, collectively, the "Development Obligations"); or

(gg) entering into, modifying, amending or terminating any agreement with a hotel management company or hotel franchise agreement for the Frisco Property or any portion thereof (a "Hotel Agreement").

**2.09 Default Rights**. In addition to such other rights Palisades may have under this Agreement and notwithstanding any contrary provision of this Agreement, upon the occurrence of a Redemption Default which is not timely cured, Palisades shall have the right, but not the obligation, to act on behalf of the Company and cause the Company to act on behalf of any OpCo, in each instance in the sole and absolute discretion of Palisades without the consent or approval of DREI or any other Member of the Company or any OpCo, to undertake all decisions and actions with respect to the Company under the Act and this Agreement including, without limitation, the actions specified in Section 2.08 hereof and the right to market and cause the sale of the Project to an independent third party on such terms and conditions as Palisades may determine appropriate in its sole and absolute discretion. In determining an appropriate sale price for the Project, Palisades shall not be obligated to take into consideration any so called fair value or other market value for the Project; rather Palisades may look solely to such sale price for the Project that is most likely to result in proceeds sufficient to cause Palisades to be Redeemed in Full. DREI shall cooperate and shall cause the Company and each OpCo to cooperate with Palisades in accomplishing all actions taken by Palisades in accordance with Section 2.09.

**2.10 Palisades Reimbursement.** The Company shall reimburse Palisades for all attorneys' fees and other costs it incurs in connection with the negotiation of this Agreement and its investment in the Company including, without limitation, any costs incurred to enforce its rights hereunder, such amount to be paid to Palisades within ten (10) days of Palisades submitting an invoice for same.

## ARTICLE III
## CAPITAL ACCOUNTS

**3.01 Initial Members, Capital Commitments, and Percentage Interests**. The persons listed on Exhibit B as the Class A Members are hereby admitted to the Company as a Voting Member, effective as of the Effective Date. Set forth opposite the name of each Voting Member listed on Exhibit B is such Member's initial Capital Contribution, Percentage Ownership Interest, Percentage Voting Interest as of the Effective Date, and Class of its Membership Interests. Exhibit B may be amended from time to time to reflect changes in or additions to the membership of the Company only with the consent of all Voting Members unless a Redemption Default has occurred, after all cure periods, in which instance Palisades alone may amend such Exhibit B. Any such amended Exhibit B shall (a) supersede all prior Exhibit B's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company.

**3.02 Capital Accounts.** At such time as the Company is taxed as a partnership for federal income tax purposes, the Company shall establish and maintain a capital account ("Capital Account") for each Member in accordance with Section 704(b) of the Internal Revenue Code of 1986, as amended (the "Code"), and Treasury Regulations Section 1.704-l(b)(2)(iv).

**3.03 Additional Contributions.** No Member shall be required to make any additional capital contributions to the Company. The Company may, however, accept capital contributions from the Members upon unanimous approval of the Voting Members. The capital accounts of the Members, and the calculations that are based on the capital accounts, shall be adjusted appropriately to reflect any transfer of an interest in the Company, distributions, or additional capital contributions.

## ARTICLE IV
## MANNER OF ACTING

**4.01 Officers and Agents of the Company.** The Voting Members may authorize any Member or Members of the Company, or other individuals or entities, whether or not a Member, to take action on behalf of the Company, as the Voting Members deem appropriate. Any Member may lend money to and receive loans from the Company, act as an employee, independent contractor, lessee, lessor, or surety of the company, and transact any business with the Company that could be carried out by someone who is not a Member as unanimously approved by the Voting Members. The Company may receive from or pay to any Member remuneration, in the form of wages, salary, fees, rent, interest, or any form that the Voting Members unanimously approve.

The Voting Members may appoint officers of the Company who, to the extent provided by the Voting Members, may have and may exercise all the powers and authority of the Members or Managers in the conduct of the business and affairs of the Company. The officers of the Company may consist of a President, a Treasurer, a Secretary, or other officers or agents as may be elected or appointed by the Voting Members. The Voting Members may provide rules for the appointment, removal, supervision and compensation of such officers, the scope of their authority, and any other matters relevant to the positions. The officers shall act in the name of the Company and shall supervise its operation, within the scope of their authority, under the direction and management of the Voting Members.

In addition to the authorities and duties that are normally associated with the office of the President, the Voting Members non-exclusively delegate to the President all of the powers of DREI, subject however to the restrictions defined herein including, without limitation, those in Sections 2.08 and 2.09. With prior approval of Palisades, both the President and the Treasurer are authorized to open, manage, and close any and all Company accounts with any bank or financial institution and to be a signatory on such Palisades approved accounts (although only one signatory shall be required). From and after the occurrence of a Redemption Default (as defined in Section 5.04 hereof), which is not timely cured, the terms of all existing officers of the Company shall be terminated immediately without further action and Palisades shall have the unilateral right, but not the obligation, to appoint new officers in its sole and absolute discretion.

Any action taken by a duly authorized officer, pursuant to authority granted by the Voting Members in accordance with this Agreement, shall constitute the act of and serve to bind the Company, and each Member hereby agrees neither to dispute such action nor the obligation of the Company created thereby.

**4.02 Meetings of Voting Members.** No regular, annual, special or other meetings of Voting Members are required to be held. Any action that may be taken at a meeting of Voting Members may be taken without a meeting by written consent in accordance with the Act. Meetings of the Voting Members, for any purpose or purposes, may be called at any time by any Voting Member, or by the President of the Company, if any. The Voting Members may designate any place as the place of meeting for any meeting of the Voting Members. If no designation is made, the place of meeting shall be the principal place of business of the Company.

**4.03 Notice of Meetings.** In the event that a meeting of the Voting Members is called, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than five nor more than sixty business days before the date of the meeting unless otherwise provided, either personally or by mail, by or at the direction of the Members calling the meeting, to each Voting Member. Notice of a meeting need not be given to any Voting Member who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such Voting Member.

**4.04 Record Date.** For the purpose of determining Voting Members entitled to notice of or to vote at any meeting of Voting Members or any adjournment thereof, the date on which notice of the meeting is provided shall be the record date for such determination of the Voting Members. When a determination of Voting Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

**4.05 Quorum.** Members holding all of the Percentage Voting Interests in the Company represented in person, by telephonic participation, or by proxy, shall constitute a quorum at any meeting of Voting Members. In the absence of a quorum at any such meeting, any Voting Member so represented may adjourn the meeting from time to time for a period not to exceed sixty days without further notice. However, if the adjournment is for more than sixty days, or if after the adjournment a new record date is fixed for another meeting, a notice of the adjourned meeting shall be given to each Voting Member. The Voting Members present at a duly organized meeting may continue to transact business only as previously provided on the agenda until adjournment,

notwithstanding the withdrawal during such meeting of that number of Voting Members whose absence would cause less than a quorum.

**4.06 Voting.** If a quorum is present, a unanimous vote of the Percentage Voting Interests of the Voting Members so represented shall be the act of the Members or Managers, unless the vote of a lesser proportion or number is otherwise required by the Act, by the Certificate or by this Agreement.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

**5.01 Allocations of Profits and Losses.** Profits and Losses, after deducting any guaranteed payments, shall be allocated among the Members in proportion to their Percentage Ownership Interests. Any special allocations necessary to comply with the requirements set forth in Code Section 704 and the corresponding regulations thereunder, including, without limitation, the qualified income offset and minimum gain chargeback provisions contained therein, shall be made if the Voting Members deem these actions to be appropriate.

**5.02 Distributions**. The following shall relate only to the Company's ownership in FHC and its ownership of the Frisco Project. Distributions related to any other Project shall be further defined including separate distribution schedules as approved by the Voting Members.

(a) Subject to the provisions of Section 2.08 hereof and any other provision of this Agreement requiring the approval of the Voting Members, the Voting Members shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service (including payments on loans by Members to the Company), acquisitions, and a reasonable contingency reserve (hereinafter, "Distributable Cash"). If any such Distributable Cash exists, the Manager shall cause the Company to distribute the Distributable Cash to the Members as follows:

(i) first, to Palisades, the Base Return or, if applicable, the Default Return. For purposes hereof,

"Base Return" means an amount due on the first day of each month which is equal to nine percent (9%) per annum accrued on the Unreturned Priority Capital;

"Default Return" means an amount due on the first day of each month which is equal to fourteen percent (14%) per annum, compounded annually, on the Unreturned Priority Capital. The Default Return shall apply immediately at such time as any Base Return is not distributed on the due date thereof and the Default Return shall accrue in lieu of such Base Return not timely distributed; and

"Unreturned Priority Capital" means the total Capital Contributions of Palisades less all distributions to Palisades pursuant to Sections 5.02(a)(ii), (iii) and (iv).

(ii) next, on or before eleven (11) months following the acquisition of the Frisco Property by FHC ("Frisco Property Closing"), to Palisades an amount equal to no less than one-hundred twenty-five percent (125%) of its Unreturned Priority Capital; provided however, in the event that the Manager gives written notice to Palisades on or before thirty (30) days prior to eleven (11) months following the Frisco Property Closing then this distribution requirement may be waived and substituted with the distribution in Section 5.02(a)(iii).

(iii) next, proportionately to the Capital Contributions to the Class A Members (other than Palisades) until the minimum Class A return has been paid in full as may be agreed to by the Manager and all of the other Class A Members upon the admittance of any additional Class A Members.

(iv) Finally, remaining distributions shall be paid to all Members (other than Palisades) in proportion to their Membership Interests.

The Manager may require all loans to Members including any rate of return on such loans be repaid to the Company prior to distributing any Distributable Cash to such Members.

The Company may not repay any loans or advances from Members to the Company prior to making all distributions to Palisades required in Sections 5.02(a)(i) through (iv) above.

(b) From time to time Voting Members also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with Section 5.02(a) and may be made subject to existing liabilities and obligations; provided, however, no distributions other than cash shall be made to Palisades. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

(c) For the purpose of determining the Members entitled to receive a distribution as provided for in this Agreement, the Voting Members may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the distribution is taken. If no record date is fixed, then the date on which the Voting Members take action to authorize such a distribution pursuant to this Agreement and the Code, shall be the record date for such determination of Members.

**5.03 Palisades Redemption.** The Company shall provide notice to Palisades at such time as the Company believes it has made all distributions necessary for Palisades to be Redeemed in Full. If Palisades provides written confirmation to the Company that it has been Redeemed in Full, such confirmation shall result in the Transfer of Palisades' Membership Interest to the Company without further action, writing or instrument. Palisades shall provide confirmation that it has or has not been Redeemed in Full within five (5) Business Days of receipt of the notice from the Company. Unless Palisades provides notice to the Company that it has <u>not</u> been Redeemed in Full within such five (5) Business Day period, Palisades shall be deemed to be Redeemed in Full if it does not otherwise provide a response. Palisades shall not waive any rights to indemnification under this Agreement when it is Redeemed in Full, such rights surviving Palisades being Redeemed in Full. For purposes of this Agreement "Redeemed in Full" means, with respect to Palisades, such time and circumstances as when

Palisades has received all amounts to which it is entitled to receive pursuant to Sections 5.02(a)(i) and (ii) plus any amounts to which Palisades may be entitled under any other provision of this Agreement (e.g., indemnification, etc.).

**5.04 Redemption Default.**

(a) A "Redemption Default" shall occur as related to a Project upon any of the following:

(i) The Company fails at any time to distribute all amounts due to Palisades pursuant to Section 5.02(a)(i).

(ii) The Company fails to distribute all amounts due to Palisades pursuant to Sections 5.02(a)(i) and (ii) on or before the expiration of the eleventh (11th) month following the Frisco Property Closing.

(iii) Any breach by any member or manager other than Palisades of its obligations under the Amended and Restated Company Agreement of Five Star MM, LLC dated September 16, 2019 (the "MM Company Agreement").

(iv) Any breach by any member or manager other than Palisades of its obligations under the Company Agreement of Five Star GM, LLC dated September 16, 2019 (the "GM LLC Agreement").

(v) A "Redemption Default" (as such term is defined in the GM LLC Agreement) occurs.

(vi) Any default occurs under any of the "Loan Documents" (as such term is defined in the MM Company Agreement).

(vii) Any Manager or Member other than Palisades breaches any of its obligations under this Agreement, including, without limitation, the failure to obtain the approval of Palisades whenever required in this Agreement.

(viii) FHC defaults, after all cure periods, upon any of its obligations under the Loan Documents or the Hotel Agreement or with respect to any of its Development Obligations under the Development Agreements.

(ix) The manager or any officer of FHC or any other OpCo takes any action prohibited by Section 2.08 or any other provision of this Agreement requiring approval of the Voting Members or Palisades.

(b) Subject to Section 5.04(c), in the event of a Redemption Default described in Section 5.04(a)(i), Palisades shall have the right to require the Manager to request an additional Capital Contribution from the Members other than Palisades in an amount sufficient to bring Palisades current on the distributions to which it is entitled pursuant to Section 5.02(a)(i). Subject to Section 5.04(c), in the event of any other Redemption Default, Palisades may exercise its rights under Section 2.09 and as otherwise provided in this Agreement.

(c) The Company shall have the right to cure any Redemption Default if within thirty (30) days (five (5) days if the default is due to the nonpayment of monies) following notice of default from Palisades of such default, if the Company cures such default within such thirty (30) day (five (5) days with respect to the payment of monies) period. If the Company cures such default within the requisite time period, the applicable Redemption Default shall be cured as if same had not occurred. Furthermore, where a distribution is not timely remitted which results in a Redemption Default and such distribution is thereafter paid by the Company along with any related costs and expenses incurred by Palisades as a result of such Redemption Default prior to Palisades exercising its rights under Section 2.09, such payment shall result in the Redemption Default being cured.

**5.05 Form of Distribution.** No Member has the right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members except on the dissolution and winding up of the Company.

## ARTICLE VI
## TRANSFER AND ASSIGNMENT OF INTERESTS

**6.01 Reserved.**

**6.02 Reserved.**

**6.03 Restrictions on Transfer.** No Member may transfer its Ownership Interest or any part thereof without the unanimous approval of the Voting Members; provided, however, in the event of a Redemption Default, Palisades may freely transfer all direct or indirect interests which it may have in the Company without the approval of any other Member, and upon any such transfer by Palisades of all or any portion of its Ownership Interest following a Redemption Default, such transferee shall be automatically admitted to the Company as a new Member with all of the rights to which Palisades is entitled under this Agreement.

**6.04 Involuntary Transfer of a Membership Interest.** A creditor's charging order or lien on a Member's Membership Interest, bankruptcy of a Member, or other involuntary transfer of Member's Membership Interest (including by death, divorce or disability), shall constitute a material breach of this Agreement by such Member. The creditor, transferee or other claimant, shall only have the rights of an Assignee, and shall have no right to become a Member, or to participate in the management of the business and affairs of the Company as a Member or Manager under any circumstances, and shall be entitled only to receive the share of profits and losses, and the return of capital, to which the Member would otherwise have been entitled. The Voting Members, including a Voting Member whose interest is the subject of the charging order, lien, bankruptcy, or involuntary transfer, may unanimously elect, by written notice that is provided to the creditor, transferee or other claimant, at any time, to purchase all or any part of Membership Interest that was the subject of the creditor's charging order, lien, bankruptcy, or other involuntary transfer, at a price that is equal to one-half (1/2) of the book value of such interest, adjusted for profits and losses to the date of purchase. The Members agree that such valuation is a good-faith attempt at fixing the value of the interest, after taking into account that the interest does not include all of the rights of a Member or Manager, and after deducting damages that are due to the material breach of this Agreement.

# ARTICLE VII
# ACCOUNTING, RECORDS AND REPORTING

**7.01 Books and Records.** The Company shall keep books and records in accordance with accepted accounting principles. The books and records shall be open for inspection and copying by any Member without cost to such Member. The fiscal year of the Company shall be the calendar year (the "Fiscal Year").

**7.02 Inspection of Books and Records.** Each Member has the right, on reasonable request for purposes reasonably related to the interest of the person as a Member or a Manager, to: (a) inspect and copy during normal business hours any of the Company's records described in Section 7.1; and (b) obtain from the Company promptly after their becoming available a copy of the Company's federal, state and local income tax or information returns for each Fiscal Year.

**7.03 Accountings.** As soon as is reasonably practicable after the close of each Fiscal Year, the Voting Members shall make or cause to be made a full and accurate accounting of the affairs of the Company as of the close of that Fiscal Year and shall prepare or cause to be prepared a balance sheet as of the end of such Fiscal Year, a profit and loss statement for that Fiscal Year and a statement of Members' equity showing the respective Capital Accounts of the Members as of the close of such Fiscal Year and the distributions, if any, to Members during such Fiscal Year, and any other statements and information necessary for a complete and fair presentation of the financial condition of the Company, all of which the Manager shall furnish to each Member. In addition, the Company shall furnish to each Member, information regarding the Company necessary for such Member to complete such Member's federal and state income tax returns. The Company shall also furnish a copy of the Company's tax returns to any Member requesting the same. On such accounting being made, profits and losses during such Fiscal Year shall be ascertained and credited or debited, as the case may be, in the books of account of the Company to the respective Members as herein provided. Until such time as Palisades has been Redeemed in Full, it shall have the right to approve all tax returns filed by the Company including all elections included therein. Until such time as Palisades has been Redeemed in Full, the Company shall provide monthly financial reports to the Members, within ten (10) days following the end of each calendar month with respect to such preceding calendar month, which financial reports shall include all expenses and income of the Company for the calendar month and balance sheet as of the last day of the calendar month detailing all assets and liabilities of the Company and the Capital Accounts of each Member.

**7.04 Filings.** The Voting Members, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Voting Members, at Company expense, shall also cause to be prepared and timely filed with appropriate federal and state regulatory and administrative bodies amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Company is required by the Act to execute or file any document and fails, after demand, to do so within a reasonable period of time or refuses to do so, any Member may prepare, execute and file that document with the Delaware Secretary of State.

**7.05 Bank Accounts.** The Company shall maintain its funds in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be co-mingled in any fashion with the funds of any other person.

**7.06 Company Representative**. Barton shall be the partnership representative of the Company pursuant to Section 6223(a) of the Code (the "Company Representative"). Notwithstanding that Barton is the Company Representative with respect to such tax years, all nonministerial decisions regarding tax elections, audit, tax litigation, settlement and other tax matters shall be subject to unanimous approval of the Voting Members. For example, but not by way of limitation, the Company Representative shall not take any position or action with the Internal Revenue Service (the "Service") without prior unanimous approval of the Voting Members, including but not limited to any decision (i) to enter into a settlement agreement with respect to any Company tax matter; (ii) to file a petition as contemplated in Section 6234(a) of the Code; (iii) to file any request contemplated in Section 6227 of the Code; or (iv) to enter into an agreement extending the period of limitations as contemplated in Section 6235(b) of the Code. If an audit results in an imputed underpayment as determined under Section 6225 of the Code, the Company and/or Barton shall accept sole responsibility for payment of any such underpayment and indemnify and hold harmless Palisades from any such underpayment. The Company Representative shall furnish to each Member a copy of all notices or other written communications received by the Company Representative from the Service within five (5) days of receipt thereof. The Company Representative shall notify each Member of all communications it has had with the Service and shall keep all Members informed of all matters which may come to its attention in its capacity as Company Representative by giving them written notice thereof within five (5) days after the Company Representative becomes informed of any such matter or within such shorter period as may be required by the appropriate statutory or regulatory provisions. Nothing contained herein is intended to authorize the Company Representative to take any action which is left to the determination of an individual Member under Sections 6221 through 6241 of the Code (and/or comparable provisions of state and local law). All non-ministerial decisions regarding tax elections, audit, tax litigation, settlement and other tax matters shall be subject to the written consent of each Member of the Company during the tax year at issue that subsequently Transferred its interest in the Company (each, a "Former Member"). For example, but not by way of limitation, the Company Representative shall not take any position or action with the Service without prior written consent of each Former Member, including but not limited to any decision (i) to enter into a settlement agreement with respect to any Company tax matter; (ii) to file a petition as contemplated in Section 6234(a) of the Code; (iii) to file any request contemplated in Section 6227 of the Code; (iv) to enter into an agreement extending the period of limitations as contemplated in Section 6235(b) of the Code; or (v) to make the "push out" election under Section 6226(a) of the Code. A Former Member shall not be required to pay any expenses incurred by the Company in connection with any tax matters. The Company hereby agrees to indemnify, defend and hold each Former Member harmless of and from any and all liabilities, claims, demands, and expenses of any kind or nature which arise or in any way relate to any violation or breach of this Section 5.4. This Section 5.4 will survive a Member's ceasing to be a member of the Company, as well as the termination, dissolution, liquidation and winding up of the Company.

**7.07 Financial Information, Reports and Notices**.

(a) DREI will cause to be prepared and delivered to each of the Members:

(i) monthly, not later than ten (10) days following the end of each calendar month, management reports for the Project including progress reports on development activity regarding the Project and a report detailing expenditures pursuant to the Project Budget including any variations from same ;

(ii) monthly, not later than ten (10) days following the end of each calendar month, financial statements of the Company, including (A) a balance sheet as of the end of such month and an income statement for such month prepared in accordance with the standard accounting principles of DREI and the amount of unreturned Capital Contributions of each Member, and (B) a cash flow statement for such month; and

(iii) annually, not later than thirty (30) days after the close of each calendar year, financial statements of the Company, including (A) a balance sheet as of the end of such calendar year, and an income statement for such calendar year, prepared in accordance with the standard accounting principles of DREI, (B) a cash flow statement for such calendar year, (C) the amount of unreturned Capital Contributions of each Member as of the last day of such calendar year, and (D) a summary report describing in reasonable detail the financial and business activities of the Company during such calendar year.

(b) The DREI will promptly deliver to Palisades copies of any notices of default under (i) any loan including, without limitation, under the Loan Documents, and (ii) under any of the Development Agreements.

**7.08 Tax Returns**. DREI shall cause to be prepared and filed all necessary federal and state income or franchise tax returns for the Company. Each Member shall furnish to DREI all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed. For federal income tax purposes, Palisades shall not be a Member of the Company (i.e. a partner in the Company filing a partnership tax return); rather the Capital Contributions of Palisades shall be treated as debt of the Company for federal income tax purposes and Palisades shall be treated as a lender to the Company for federal income tax purposes. For state law purposes, however, Palisades shall be a Member of the Company having the rights set forth in this Agreement and granted to a Member under the Act and the federal income tax treatment of Palisades shall have no effect on Palisades' status as a Member of the Company..

## ARTICLE VIII
## DISSOLUTION AND WINDING UP

**8.01 Dissolution.** The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of: the entry of a decree of judicial dissolution pursuant to the Act; or the unanimous approval of the Voting Members.

**8.02 Winding Up.** On the occurrence of an event specified in Section 8.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors. The Voting Members shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the assets and liabilities of Company, shall cause such assets to be sold or distributed, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 9.4. The Voting Members shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Members shall be entitled to reasonable compensation for such services.

**8.03 Distributions in Kind.** Any noncash assets distributed to the Members shall first be valued at their fair market value to determine the profit or loss that would have resulted if such assets were sold for such value. Such profit or loss shall then be allocated pursuant to this Agreement, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged against the Capital Account of each Member receiving an interest in a distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by unanimous consent of the Voting Members, or if any Voting Member objects, by an independent appraiser (and any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by unanimous consent of the Voting Members.

**8.04 Order of Payment of Liabilities on Dissolution.** After a determination that all known debts and liabilities of the Company in the process of winding up, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members as provided in Section 5.02 hereof.

**8.05 Adequacy of Payment.** The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, shall have been adequately provided for if payment thereof shall have been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the person, was determined in good faith and with reasonable care by the Members to be adequate at the time of any distribution of the assets pursuant to this Section. This Section shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

**8.06 Compliance with Regulations.** All payments to the Members on the winding up and dissolution of Company shall be strictly in accordance with the positive capital account balance limitation and other requirements of Regulations Section 1.704-1(b)(2)(ii)(d), as the voting Members deem appropriate.

**8.07 Limitations on Payments Made in Dissolution.** Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of such Member's positive Capital Account balance and shall have no recourse for such Member's Capital Contribution or share of profits (on dissolution or otherwise) against any other Member. No Member shall have any obligation or liability to restore or contribute capital to the Company on account of a deficit capital account which may exist at any time for such Member.

**8.08 Certificate of Cancellation.** The Voting Members conducting the winding up of the affairs of the Company shall cause to be filed in the office of, and on a form prescribed by the Delaware Secretary of State, a certificate of cancellation of the Certificate on the completion of the winding up of the affairs of the Company.

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**9.01 Exculpation of Members.** No Member shall be liable to the Company or to the other Members for damages or otherwise with respect to any actions taken or not taken in good faith and reasonably believed by such Member to be in or not opposed to the best interests of the Company,

except to the extent any related loss results from fraud, gross negligence or willful or wanton misconduct on the part of such Member or the material breach of any obligation under this Agreement or of the fiduciary duties owed to the Company or the other Members by such Member. Notwithstanding any contrary provision of this Agreement, each of the Company and DREI waive to the maximum extent possible under the Act all fiduciary duties which Palisades might otherwise owe to the Company or any other Member or Manager under the Act.

**9.02 Indemnification by Company.** The Company shall indemnify, hold harmless and defend the Members, in their capacity as Members, Managers, or Officers, from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts or omissions arising out of their activities on behalf of the Company or in furtherance of the interests of the Company, including but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, if the acts or omissions were not performed or omitted fraudulently or as a result of gross negligence or willful misconduct by the indemnified party. Reasonable expenses incurred by the indemnified party in connection with any such proceeding relating to the foregoing matters may be paid or reimbursed by the Company in advance of the final disposition of such proceeding upon receipt by the Company of (i) written affirmation by the person requesting indemnification of its good-faith belief that it has met the standard of conduct necessary for indemnification by the Company and (ii) a written undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a court of competent jurisdiction that such person has not met such standard of conduct, which undertaking shall be an unlimited general obligation of the indemnified party but need not be secured.

**9.03 Insurance.** The Company shall have the power to purchase and maintain insurance on behalf of any person who is or was a Member or an agent of the Company against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as a Member or an agent of the Company, whether or not the Company would have the power to indemnify such person against such liability under Section 10.1 or under applicable law.

## ARTICLE X
## MISCELLANEOUS

**10.01 Authority.** This Agreement constitutes a legal, valid and binding agreement of each Member, enforceable against such Member in accordance with its terms. Each Member is empowered and duly authorized to enter into this Agreement (including the power of attorney herein) under every applicable governing document, partnership agreement, trust instrument, pension plan, charter, certificate of incorporation, bylaw provision or the like. The person, if any, signing this Agreement on behalf of the Member is empowered and duly authorized to do so by the governing document or trust instrument, pension plan, charter, certificate of incorporation, bylaw provision, board of directors or stockholder resolution or the like.

**10.02 Indemnification by the Members.** Each Member hereby agrees to indemnify and defend the Company, the other Members and each of their respective employees, agents, partners, members, shareholders, officers and directors and hold them harmless from and against any and all claims, liabilities, damages, costs and expenses (including, without limitation, court costs and attorneys' fees and expenses) suffered or incurred on account of or arising out of any breach of this Agreement by that Member.

**10.03 Notices.** Except as otherwise expressly provided herein, any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally, when transmitted by facsimile if receipt is acknowledged by the addressee, one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, or three business days after being mailed by first class mail, charges and postage prepaid, properly addressed to the party to receive such notice at the address set forth beneath such Member's name on the signature pages of this Agreement. A Member may change the Member's address for purposes of this Agreement by providing notice to the Company and each Member of such change of address.

**10.04 Severability.** If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby.

**10.05 Binding Effect.** Subject to Article VI, this Agreement shall bind and inure to the benefit of the parties and their respective Successors.

**10.06 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**10.07 Entire Agreement.** This Agreement contains the entire agreement of the parties and supersedes all prior or contemporaneous written or oral negotiations, correspondence, understandings and agreements between or among the parties, regarding the subject matter hereof.

**10.08 Further Assurances.** Each Member shall provide such further information with respect to the Member as the Company may reasonably request, and shall execute such other and further certificates, instruments and other documents, as may be necessary and proper to implement, complete and perfect the transactions contemplated by this Agreement.

**10.09 Headings; Gender; Number; References.** The headings of the Sections hereof are solely for convenience of reference and are not part of this Agreement. As used herein, each gender includes each other gender, the singular includes the plural and vice versa, as the context may require. All references to Sections and subsections are intended to refer to Sections and subsections of this Agreement, except as otherwise indicated.

**10.10 Parties in Interest.** Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any persons other than the Members and their respective Successors nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**10.11 Amendments.** All amendments to this Agreement shall be in writing and signed by all of the Members to the agreement at the time of the amendment.

**10.12 Attorneys' Fees.** In any dispute between or among the Company and one or more of the Members, the prevailing party or parties in such dispute shall be entitled to recover from the non-prevailing party or parties all reasonable fees, costs and expenses including, without limitation, attorneys' fees, costs and expenses, all of which shall be deemed to have accrued on the commencement of such action, proceeding or arbitration. Attorneys' fees shall include, without limitation, fees incurred in any post-award or post-judgment motions or proceedings, contempt proceedings, garnishment, levy, and debtor and third party examinations, discovery, and bankruptcy litigation, and prevailing party shall mean the party that is determined in the arbitration, action or proceeding to have prevailed or who prevails by dismissal, default or otherwise.

**10.13 Remedies Cumulative.** Remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Member may be lawfully entitled.

**10.14 Jurisdiction and Venue/Equitable Remedies.** The Company and each Member hereby expressly agrees that if, under any circumstances, any dispute or controversy arising out of or relating to or in any way connected with this Agreement shall be the subject of any court action at law or in equity, such action shall be filed exclusively in the courts of the State of Texas or of the United States of America located in Dallas County, as selected by the Member that is the plaintiff in the action, or that initiates the proceeding. Each Member agrees not to commence any action, suit or other proceeding arising from, relating to, or in connection with this Agreement except in such a court and each Member irrevocably and unconditionally consents and submits to the personal and exclusive jurisdiction of such courts for the purposes of litigating any such action, and hereby grants jurisdiction to such courts and to any appellate courts having jurisdiction over appeals from such courts or review of such proceedings. Because the breach of the provisions of this Section would cause irreparable harm and significant injury to the Company and the other Members, which would be difficult to ascertain and which may not be compensable by damages alone, each Member agrees that the Company and the other Members will have the right to enforce the provisions of this Section by injunction, specific performance or other equitable relief in addition to any and all other remedies available to such party or parties without showing or proving any actual damage to such parties. Members will be entitled to recover all reasonable costs and expenses, including but not limited to all reasonable attorneys' fees, expert and consultants' fees, incurred in connection with the enforcement of this Section.

**10.15 Palisades Approvals**. If Palisades fails to respond to any notice requesting its approval or consent under this Agreement within five (5) Business Days of receipt of such notice requesting its approval or consent, Palisades shall be deemed to have approved the matter for which approval or consent was requested. Notwithstanding the preceding, if within five (5) Business Days of receipt of any approval or consent request notice, Palisades denies such approval or consent or requests further information in order to make its decision, Palisades' approval or consent shall not be deemed granted. Palisades agrees to undertake any response to any approval or consent request in good faith and shall act in its reasonable discretion unless its sole discretion is expressly provided for any such approval or consent request.

**10.16 Palisades Payments**. All distributions or payments of any kind due to Palisades under this Agreement shall be wired in same day available funds to such account as Palisades may provide notice.

[Signatures on following page.]

IN WITNESS WHEREOF, this Agreement has been duly executed by or on behalf of the parties hereto as of the date first above written.

**MEMBERS**

DALLAS REAL ESTATE INVESTORS, LLC
a Delaware limited liability company

By: ______________________________
Name: Timothy Barton
Its: President

1755 Wittington, Suite 340
Dallas, Texas 75234

PALISADES TC LLC,
a Texas limited liability company

By: ______________________________
Joaquin Charles de Monet, Manager

1919 McKinney Ave., Suite 100
Dallas, Texas 75201

## Exhibit A

## PROJECT BUDGET AND SUMMARY

**Project Name:** Frisco Project

**Project Summary:** Acquisition of 4.5385 acres, located at the northwest corner of future John Hickman Parkway and the Dallas North Tollway upon which will be developed (i) 231 hotel rooms, (iii) 15,000 square feet of meeting space, (iv) certain retail space, (v) certain restaurant space all of which as more fully described and conceptually shown in the PD zoning ordinance approved by the City on August 18, 2015, as Ordinance No. 15-08-57, as may be amended (the "Project").

**As defined in the "Purchaser's Statement" for the closing of the Frisco Property which may be revised as necessary upon consent of the President as evidenced by the President's execution of such statement.**

**12-Month Pre-development Budget**

| **Month** | **Jan-20** | **Feb-20** | **Mar-20** | **Apr-20** | **May-20** | **Jun-20** | **Jul-20** | **Aug-20** | **Sep-20** | **Oct-20** | **Nov-20** | **Dec-20** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Project Month** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **12** | |
| Architectural & Engineering | 100,000 | 100,000 | 100,000 | 100,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 450,000 | 450,000 | 2,800,000 |
| Market Studies | | | | 25,000 | | | 50,000 | | | | | | 75,000 |
| Appraisal | | | | 25,000 | | | | | | | | | 25,000 |
| Civil/Survey | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Organization Costs | 10,000 | | | | 25,000 | | | | | | | | 35,000 |
| Geotech | | | | | 25,000 | | | | | | | | 25,000 |
| Project Management | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 |
| Legal | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 150,000 |
| Insurance | 20,000 | | | | | | | | | | | | 20,000 |
| **Total** | **177,500** | **147,500** | **147,500** | **197,500** | **347,500** | **297,500** | **347,500** | **297,500** | **297,500** | **297,500** | **497,500** | **497,500** | **3,550,000** |

EXHIBIT B
Members of DALLAS REAL ESTATE LENDERS, LLC

| Member's Name and Address | Capital Contribution | Percentage Ownership Interest | Class | Percentage Voting Interest |
|---|---|---|---|---|
| Palisades TC LLC<br>1919 McKinney Ave.,<br>Suite 100<br>Dallas, TX 75201 | $3,500,000.00 | 50% | A | 50% |
| Dallas Real Estate Investors, LLC<br>1755 Wittington<br>Suite 340<br>Dallas, TX 75234 | $10.00 | 50% | A | 50% |

# Exhibit C

# COMPANY AGREEMENT
# OF
# FHC ACQUISITION, LLC
# A TEXAS LIMITED LIABILITY COMPANY

## JANUARY 29, 2019

THE MEMBERSHIP INTERESTS OF FHC ACQUISITION, LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, NOR PURSUANT TO THE PROVISIONS OF ANY STATE SECURITIES ACT.

# TABLE OF CONTENTS

**ARTICLE I. DEFINED TERMS ..... 5**
**ARTICLE II. ORGANIZATION ..... 8**
1. Certificate of Formation ..... 8
2. Term ..... 8
3. No State-Law Partnership ..... 8

**ARTICLE III. NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT . 8**
1. Name ..... 8
2. Assumed Names ..... 8
3. Registered ..... 8

**ARTICLE IV. PURPOSE ..... 9**
**ARTICLE V. MEMBERS ..... 9**
1. Members ..... 9
2. Admission of Additional Members ..... 9

**ARTICLE VI. CAPITAL CONTRIBUTIONS AND INTERESTS ..... 9**
1. Capital Contributions ..... 9
2. Interests ..... 10
3. Capital Accounts ..... 10
4. Return of Capital Contributions ..... 11
5. Interest ..... 11
6. Loans from Members ..... 11

**ARTICLE VII. ALLOCATIONS AND DISTRIBUTIONS ..... 12**
1. Allocation of Income and Loss. ..... 12
2. Determination of Income and Loss ..... 12
3. Cash Distributions ..... 12
4. Distributions of Other Property ..... 12

**ARTICLE VIII. OWNERSHIP OF COMPANY ASSETS ..... 13**
**ARTICLE IX. FISCAL MATTERS; BOOKS AND RECORDS ..... 13**
1. Bank Accounts; Investments ..... 13
2. Records Required by Act; Right of Inspection ..... 13
3. Books and Records of Account ..... 14
4. Tax Returns and Information ..... 14
5. Delivery of Financial Statements to Members ..... 14
6. Audits ..... 14
7. Fiscal Year ..... 14
8. Tax Elections ..... 15

**ARTICLE X MANAGEMENT OF THE COMPANY ..... 15**
1. Control by the Members ..... 15
2. Management ..... 15
3. Powers of the Managing Members ..... 16
4. Powers of the President ..... 17
5. Ownership of Information and Materials ..... 17
6. Licenses ..... 17

7. Resignation and Removal ........ 17

**ARTICLE X. RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS ........ 18**

1. Authority; Liability to Third Parties. ........ 18
2. Breach. ........ 19
3. Remedies. ........ 19
4. Transfers of Interests ........ 19
5. Effect of Transfer of Member's Interest ........ 20
6. Admission of Transferee as Member ........ 20
7. Other Business ........ 20
8. Voting by Members ........ 21

**ARTICLE XI. MEETINGS OF MEMBERS ........ 21**

1. Place of Meeting ........ 21
2. Annual Meeting ........ 21
3. Special Meetings ........ 21
4. Notice ........ 21
5. Waiver of Notice ........ 22
6. Quorum and Attendance ........ 22
7. Voting ........ 22
8. Adjournment ........ 22
9. Conduct of Meetings ........ 22
10. Telephone Meetings ........ 22
11. Action by Written Consent ........ 23
12. Proxies ........ 23
13. Information ........ 23

**ARTICLE XII. INTENTIONALLY OMITTED ........ 24**

**ARTICLE XIII. DISSOLUTION AND WINDING UP ........ 24**

1. Events Causing Dissolution ........ 24
2. Winding Up ........ 24
3. Compensation of Liquidator ........ 25
4. Distribution of Company Assets and Proceeds of Sale Thereof ........ 25
5. Final Audit ........ 26
6. Deficit Capital Accounts ........ 26

**ARTICLE XIV. INDEMNIFICATION AND INSURANCE ........ 26**

1. Indemnification and Advance of Expenses ........ 26
2. Insurance ........ 27
3. Limit on Liability of Members ........ 27

**ARTICLE XV. MISCELLANEOUS PROVISIONS ........ 27**

1. Entire Agreement ........ 27
2. Law Governing ........ 27
3. Conference Telephone Meetings ........ 27
4. Successors and Assigns ........ 28
5. Severability ........ 28
6. Headings ........ 28
7. Construction ........ 28
8. Offset ........ 28
9. Effect of Waiver or Consent ........ 28

10. Further Assurance ........ 28
11. Waiver of Certain Rights ........ 29
12. Counterparts and Binding Effect ........ 29
13. Attorney's Fees ........ 29
14. Amendment of Agreement ........ 29
15. Joinder of Managing Members ........ 29
16. Notices ........ 29
**SCHEDULE A........ 32**

This **Company Agreement** ("Company Agreement") of **FHC Acquisition, LLC**, a Texas limited liability company, is adopted effective as of the date set forth above by the undersigned Sole Member of the Company representing 100% of the total Membership Interests in the Company on the date set forth on the cover page hereof.

## ARTICLE I.

## DEFINED TERMS

The capitalized terms used in this Company Agreement shall, unless the context otherwise requires, have the meanings specified in this Article I.

**Act.** The Texas Business Organization Code as it may be amended from time to time, and any successor to such Act.

**Additional Capital Contribution(s).** Any Capital Contributions in excess of the Initial Capital Contribution as may be approved in accordance with the provisions of Article VI hereof.

**Affiliate(s).** As applied to a Person, any other Person directly or indirectly controlling, controlled by, or under common control with that Person. Controlling, controlled by or under common control means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through ownership of voting securities or otherwise.

**Approved by the Members.** Unless otherwise stated, shall mean a decision, direction, approval and/or consent of the Members that has been determined by a Majority-in-Interest of the Members.

**Approval of the Managing Members**. Unless otherwise stated, shall mean a decision, direction, approval and/or consent of the Managing Members that has been determined by a Majority of the Managing Managers. Unless stated otherwise, as long as notice is given to all Managing Members, consent of all Managing Members shall be implied unless a Managing Member expressly dissents.

**Assets.** All interest, assets and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

**Bankruptcy.** Bankruptcy under the federal Bankruptcy Code or insolvency under any state insolvency act.

**Business Day.** Any day other than a Saturday, Sunday and those legal public holidays specified in 5 U.S.C. '6103 (a), as may be amended from time to time.

**Capital Account.** The Capital Account maintained for each Member pursuant to Article VI, Section 3 of this Company Agreement.

**Capital Contributions.** The total amount of cash or property contributed to the Company by all the Members or any one Member, as the case may be.

**Certificate of Formation.** The Certificate of Formation of the Company described in Article II, Section 1 of this Company Agreement.

**Code.** The Internal Revenue Code of 1986, as it has been and may be amended.

**Company.** FHC Acquisition, LLC, as such limited liability company may from time to time be constituted.

**Company Agreement.** This Company Agreement, including any Schedules, as originally executed and as they may be subsequently amended from time to time, by requisite vote of the Members.

**Initial Capital Contribution.** Such amounts designated as such on Schedule A hereof.

**Interest(s).** All rights and interests of a Member with regard to the Company, under this Company Agreement and the Act, including (i) the right of a Member, expressed as a percentage on Schedule A, to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under this Company Agreement, and (ii) all management rights, voting rights or rights to consent.

**Majority-in-Interest of the Members.** Members who are holding more than fifty percent (50%) of the total Interest who are entitled to vote hereunder at the applicable date after receipt by all Members of notice of such item requiring a vote.

**Managing Members.** At any time, the Person who is then managing the business of the Company in accordance with Article X of this Company Agreement. Upon the effective date of this Company Agreement, the Managing Member is Dallas Real Estate Lenders, LLC, a Delaware limited liability company.

**Member(s).** At any time, the Person(s) who then own Interests in the Company. The Members are listed on Schedule A.

**Notification.** A writing containing any information required by this Company Agreement to be communicated to any Persons which may be personally delivered, sent by registered or certified mail, postage prepaid, electronic mail with delivery confirmation to the email address specified in the Company records, or sent by facsimile transmission with delivery confirmation, to such Person, at the last known address of such Person in the Company records. Any such Notification shall be deemed to be given (i) when delivered, in the case of personal delivery, (ii) on the third business day after it is deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid, in the case of mail, and (iii) when transmitted properly (being 9:00 a.m. to 5:00 p.m., local time for the recipient, on any Business Day) in the case of facsimile transmission. Any communication containing information sent to any Person other than as required by the foregoing sentences, but which is actually received by such Person, shall constitute

Notification as of the date of such receipt by such person for all purposes of this Company Agreement.

**Operating Budget.** The annual budget prepared by the Managing Members and submitted to and approved by the Members. The Operating Budget shall reflect all costs and expenses projected or expected to be incurred by the Company during the Company's fiscal year.

**Operating Costs.** Any costs incurred by or on behalf of the Company or the Partnership pursuant to the Operating Budget.

**Operating Plan.** The annual business plan prepared by the Managing Members and submitted to and approved by the Members and the Company. The Operating Plan shall reflect all activities to be undertaken by the Company during each fiscal year of the Company, including, without limitation, any development work.

**Option.** The option of each Member hereto to purchase the other Member's Interest as set forth in Article XIII hereof.

**Persons.** Any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, trust, business trust, cooperative or association.

**Purpose.** The "Purpose" of the Company as set forth in Article IV hereof.

**Schedule A.** The schedule attached hereto and labeled "Schedule A", containing: (i) the identity of each initial Member, (ii) Initial Capital Contributions, (iii) each Member's Interest and (iv) profit/loss sharing ratio.

**Transfer.** Any assignment, hypothecation or change in the record ownership of an Interest, whether made voluntarily or involuntarily by operation of law, including, but not limited to, the following:

1. a sale, pledge, encumbrance, assignment, gift or other transfer to any Person;

2. a general assignment for the benefit of creditors, or any assignment to a creditor resulting from the creditor's foreclosure upon or execution against such Interest;

3. the filing by the transferor Member of a voluntary Bankruptcy petition; or

4. the entry of a judicial order granting the relief requested by the petitioner in an involuntary Bankruptcy proceeding filed against the transferor Member.

**Updated Business Plan.** Annual revisions to the Business Plan, or more frequently, if revisions are agreed upon, which provisions shall be prepared by the Managing Members and approved by the company.

## ARTICLE II.

## ORGANIZATION

1. Certificate of Formation. The Certificate of Formation for the Company were filed with, and a Certificate of Formation was issued by, the Secretary of State of the State of Texas.

2. Term. Pursuant to the Act, the existence of the Company began upon the effective date of the Certificate of Formation. The Company shall exist for the duration specified in the Certificate of Formation unless sooner terminated in accordance with this Company Agreement.

3. No State-Law Partnership. No provision of this Company Agreement (including, without limitation, the provisions of Article X) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of any other Member or Managing Members, for any purposes other than federal and state tax purposes.

## ARTICLE III.

## NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT

1. Name. The name of the Company is "FHC Acquisition, LLC." The name may not be changed without the approval of the Members as long as such name conforms with state law.

2. Assumed Names. The Managing Members may cause the Company to do business under one or more assumed names. In connection with the use of any such assumed names, the Managing Members shall cause the Company to comply with the Act.

3. Registered Office; Registered Agent; Principal Office in the United States; Other Offices. The registered office of the Company required by the act to be maintained in the State of Texas shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managing Members may designate, from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managing Members may designate, from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Managing Members may designate, from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by the Act. The Company may have such other offices as the Managing Members may designate from time to time.

## ARTICLE IV.

## PURPOSE

The purpose of the Company is to any and all business and/or activity (including but not limited to purchase agreements, equity and debt financing, development agreements, incentive agreements, zoning, etc.) related to the acquisition of real property described as "Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas" ("Property") and the development of a mixed use project on the Property which may consist of a luxury hotel, restaurant, retail, and/or residences.

## ARTICLE V.

## MEMBERS

1. Members. The names and addresses of the Members of the Company are as set forth on Schedule A of this Company Agreement which shall be updated as necessary.

2. Admission of Additional Members. Additional Members of the Company may be admitted as follows:

   (a) If the proposed additional Member desires to purchase an Interest from the Company, such purchase may be made and the admission of the additional Member shall become effective only if the identity of the proposed additional Member and the amount of the Capital Contribution to be made by such proposed additional Member in exchange for such proposed additional Member's Interest is approved by the Managing Members.

   (b) If the proposed additional Member desires to acquire an Interest in a Transfer from an existing Member, such Transfer may be made and the admission of the additional Member shall become effective only in accordance with Article XI, Section 2 hereof and Article XIII, Section I hereof. All other attempted Transfers of any Interest or right, or any part thereof, in or in respect of the Company shall be null and void ab initio.

   (c) The Managing Members may deny the membership of any proposed additional member for any reason.

## ARTICLE VI.

## CAPITAL CONTRIBUTIONS AND INTERESTS

1. Capital Contributions.

(a) Each Member shall contribute to the capital of the Company the amounts set forth as such Member's Initial Capital Contribution on Schedule A. The Initial Capital Contribution shall be in the form of cash and shall be paid simultaneously with the execution by each respective Member of this Company Agreement. Schedule A may not be amended without the written approval of all Members, unless modifications to Interests occur by virtue of other provisions of this Company Agreement.

(b) In the event any Member fails to make full payment of its Initial Capital Contribution, as and when required by Article VI, Section I (a) hereof, said Member shall be deemed in default hereunder and shall automatically, and without notice or further proceeding, forfeit its full Interest in and to the Company. Upon such default, the non-defaulting Member's shall be entitled to acquire the defaulting Member's forfeited Interest upon payment of the amount of Capital Contribution unpaid as to the defaulting Member's Interest prior to the date of Closing, as scheduled or as the same may be extended.

2. Interests.

(a) Upon making the Capital Contribution specified on Schedule A, in a timely manner, each Member shall own the Interest set forth opposite such Member's name on Schedule A.

(b) The Interests may, with the approval of the Managing Members, be evidenced by certificates issued by the Company which, if issued, shall be in such form and incorporate such legends, recitals and provisions as the Managing Members shall deem necessary or advisable. If certificates are issued, the Managing Members shall establish reasonable procedures for the delivery and reissuance of certificates in connection with Transfers of Member's Interests, split-ups or combinations of certificates, loss or destruction of certificates and other eventualities. Among other matters, such procedures may set forth required fees, indemnifications, documentation and signatures (including guarantees thereof) to be obtained from parties requesting reissuance of certificates. Such procedures need not be incorporated into this Company Agreement, but a copy thereof shall be delivered to all Members.

(c) Additional Capital Contributions may be made with the consent of no less than 50% of all Members. Membership Interests may be adjusted accordingly to reflect such additional capital contributions upon approval of the Majority In-Interest of the Members.

3. Capital Accounts. A capital account shall be established and maintained for each Member. Each Member's capital account (a) shall be increased by (i) the amount of money contributed by that Member to the Company, (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to as provided in Section 752 of the Code), and (iii) allocations to that Member of Company income and gain (or items thereof),

including income and gain exempt from tax and income and gain described in Treas. Reg. §1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treas. Reg. § 1.704-1(b)(4)(i), and (b) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to as provided in Section 752 of the Code), (iii) allocations to that Member of expenditures of the Company described in Section 705 (a)(2)(B) of the Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treas. Reg. §1. 704-1 (b)(2)(iv)(g), but excluding items described in clause (b)(iii) above and loss or deduction described in Treas. Reg. § 1.704 (b) (4) (i) or § 1.704-1 (b) (4) (iii). The Members' capital accounts shall also be maintained and adjusted as permitted by the provisions of Treas. Reg. § 1.704-1 (b) (2) (iv) (f) and as required by the other provisions of Treas. Reg. § 1. 704-1 (b)(2)(iv) and § 1.704-1 (b) (4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treas. Reg. § 1. 704-1 (b) (2) (iv) (g). A Member that has more than one Interest shall have a single capital account that reflects all its Interests, regardless of the class of Interests owned by that Member and regardless of the time or manner in which those Interests were acquired. On the Transfer of all or part of an Interest, the capital account of the transferor that is attributable to the transferred Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. § 1.704-1 (b) (2) (iv) (1).

4. Return of Capital Contributions. Except with the approval of the Managing Members and as otherwise provided herein or in the Act, no Member shall have the right to withdraw, or receive any return of, his Capital Contribution.

5. Interest. No interest shall be paid by the Company on Capital Contributions or on balances in Members' capital accounts.

6. Loans from Members. Loans by a Member to the Company shall not be considered Capital Contributions. Any amounts contributed to the Company which are not expressly authorized as Additional Capital Contributions shall be considered Loans by a Member to the Company. If any Member shall advance funds to the Company in excess of the amounts required hereunder to be contributed by him to the capital of the Company, the making of such advances shall not result in any increase in the amount of the capital account of such Member. The amounts of any such advances shall be a debt of the Company to such Member and shall be payable or collectible only out of the Company assets in accordance with the terms and conditions upon which such advances are made. Loans must be approved by the Managing Members. No loans shall earn interest unless expressly agreed to in writing by all Managing Members. The repayment of loans from a Member to the Company upon liquidation shall be subject to the order of priority set forth in Article XIII, Section 4 hereof.

## ARTICLE VII.

## ALLOCATIONS AND DISTRIBUTIONS

1. Allocation of Income and Loss.

   (a) Except as may be required by Section 704(a) of the Code and Treas. Reg. § 1.704-1(b)(2)(iv)(f)(4), the income, gains, losses, deductions and credits (or items thereof) of the Company shall be shared by the Members in accordance with Schedule A. It is the intention of the Members that allocations of income, gains, losses, deductions and credits (or items thereof) pursuant to this Article VII, Section 1 be in accordance with the Interests for tax purposes.

   (b) All items of income, gain, loss, deduction and credit allocable to any Interest that may have been transferred shall be allocated between the transferor and the transferee based upon an interim closing of the books as of the date of the transfer; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Code and the regulations thereunder.

2. Determination of Income and Loss. At the end of each fiscal year of the Company, income, gain, loss, deduction and credit (or items thereof) shall be determined for the accounting period then ending and shall be allocated to the Members in accordance with Article VII, Section 1 hereof.

3. Cash Distributions. The Managing Members have the discretion to distribute to the Members, in accordance with their respective Interests, the amount by which cash on hand exceeds the amount necessary to meet the current costs, expenses, and liabilities of the Company (including, without limitation, a reasonably adequate reserve for working capital and contingencies) as determined by the Managing Members. The distribution should be, at a minimum, sufficient to allow the Members to pay the income tax allocated to the Members as a result of the income generated by the Company. The Company shall not make any distribution to the Members if, immediately after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members with respect to their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair market value of Company Assets, except that the fair market value of Company Assets that are subject to a liability for which recourse of creditors is limited shall be included in the Company Assets only to the extent that the fair market value of the Company Assets exceeds that liability.

4. Distributions of Other Property. From time to time, the Managing Members also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their respective Interests and may be made subject to existing liabilities and obligations. Immediately prior to such distribution, the capital accounts of the Members shall be adjusted as provided in Treas. Reg. §1.704 l(b)(2)(iv)(f).

## ARTICLE VIII.

## OWNERSHIP OF COMPANY ASSETS

Company Assets shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Assets or any portion thereof. Title to any or all Company Assets shall be held in the name of the Company. All Company Assets shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Assets are held.

## ARTICLE IX.

## FISCAL MATTERS; BOOKS AND RECORDS

1. Bank Accounts; Investments. Capital Contributions, revenues and any other Company funds shall be deposited by the Managing Members in a bank account established in the name of the Company, or shall be invested and/or expended by the Managing Members in furtherance of the Purpose of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only for the purposes described herein or to be distributed to the Members pursuant to this Company Agreement. All such funds shall be deposited and applied in accordance with the terms of this Company Agreement.

2. Records Required by Act; Right of Inspection.
   (a) During the existence of the Company and for a period of four (4) years thereafter, unless the Managing Members approves of an alternative procedure, the Managing Members or the Manger's agent, at the expense of the Company, shall maintain all records required to be kept pursuant to the Act, including, without limitation, (i) a current list of the names, addresses and Member's Interests held by each of the Members (including, if any class or group of interest is established under the Certificate of Formation or this Company Agreement, the names of the Members who are Members of each such class or group); (ii) copies of federal, state and local information or income tax returns for each of the Company's six (6) most recent tax years; (iii) copies of this Company Agreement and the Certificate of Formation, including all amendments or restatements; (iv) if such information is not otherwise set forth in the Certificate of Formation or this Company Agreement, a written statement of (A) the amount of the cash contribution and a description and statement of the agreed value of any other contribution made by each Member, and the amount of the cash contribution and a description and statement of the agreed value of any other contribution that the Member has agreed to make in the future as an Additional Contribution, (B) the times at which any Additional Contributions are to be made or events requiring contributions to be made, (C) events requiring the Company to be dissolved and its affairs wound up, and (D) the date on which each Member became a Member of the Company; (v) correct and complete books and records of account of

the Company; and (vi) copies of any financial statements of the Company for the three (3) most recent years.

(b) On written request, an initial Member or an approved assignee of an Interest (an "Eligible Person") may examine and copy in person or by the Eligible Person's representative, at any reasonable time, for any proper purpose, and at the Eligible Person's expense, records required to be maintained under the Act and such other information regarding the business, affairs and financial condition of the Company as is just and reasonable for the Eligible Person to examine and copy. Upon written request by any Eligible Person made to the Managing Members at the address of the Company's principal office in the United States specified in Article III, Section 3 hereof, the Company shall provide to the Eligible Person copies of (i) this Company Agreement and the Certificate of Formation and all amendments or restatements, and (ii) any of the tax returns of the Company described above.

3. Books and Records of Account. The Managing Members, at the expense of the Company as set forth in the Operating Budget, shall maintain for the Company adequate books and records of account that shall be prepared in accordance with sound accounting principles.

4. Tax Returns and Information. The Members intend for the Company to be treated as a disregarded entity for tax purposes. The Managing Members, at the expense of the Company, shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file. Within the shorter of (i) such period as may be required by applicable law or regulation, or (ii) seventy-five (75) days after the end of each calendar year, the Managing Members shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

5. Delivery of Financial Statements to Members. As to each calendar year, the Managing Members may send to each Member, or upon request of a member, a copy of (i) a balance sheet of the Company as of the end of the calendar year, (ii) an income statement of the Company for such calendar year, (iii) a statement of changes in Member capital accounts for such calendar year. Such financial statements shall be delivered by no later than thirty (30) days following the end of the calendar year to which the statements apply. Unless the Managing Members so elects, such statements need not be audited.

6. Audits. The Managing Members may conduct an audit of the Company books, with respect to the annual financial statements under Article IX, Section 5 above. The cost of the audit shall be borne by the Company. The audits shall be performed by an accounting firm approved by the Managing Members. Not more than one (1) audit shall be required for any fiscal year.

7. Fiscal Year. The Company's fiscal year shall end on December 31 of each calendar year.

8. Tax Elections. The Company shall make the following elections on the appropriate tax returns:

   (a) to adopt the calendar year as the Company's fiscal year;

   (b) to adopt the appropriate method of accounting and to keep the Company's books and records in accordance with the rules and regulations regarding income tax accounting as opposed to accounting for financial reporting purposes;

   (c) if a distribution of Company Assets as described in Section 734 of the Code occurs or if a transfer of Interest as described in Section 743 of the Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Code, to adjust the basis of Company Assets;

   (d) to elect to amortize the organizational expenses of the Company ratably over a period of sixty (60) months as permitted by Section 709(b) of the Code; and

   (e) any other election the Managing Members may reasonably deem appropriate and in the best interest of the Members.

Neither the Company nor any Managing Members may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law.

## ARTICLE X

## MANAGEMENT OF THE COMPANY

1. Control by the Members. The Managing Members, shall manage and control the operation of this Company through their exercise of the decision making powers granted herein.

2. Management.

   (a) The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managing Members. The Managing Members need not be a resident of the State of Texas.

   (b) The Managing Members may designate one or more individuals as officers of the Company, who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Managing Members. The Managing Members shall designate the salary and/or bonuses the Officers are to receive, if any. Officers need not be Members, the Managing Members or residents of the State of Texas. Any officer may be removed by the Managing Members at any time, with or without cause. Each officer shall hold office until his or her

successor shall be duly designated and take office or until the earlier of the officer's death, resignation or removal. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed by the Managing Members.

3. Powers of the Managing Members. Subject to the foregoing powers and limitations, the Managing Members, shall have the power and authority to manage the affairs of the Company, and shall have the authority to take any action deemed to be necessary, convenient or advisable in connection with the management of the Company given such actions are approved by a majority of the Managing Members. As long as prior notice is given, any Managing Member may exercise the powers granted within this agreement as the consent of the other Managing Member(s) shall be implied unless expressly objected to by the other Managing Member(s). In the event, the Managing Members are unable to reach a consensus of a majority of the Members, then such issue shall be resolved by a vote of the majority in interest of all Members. The Managing Members shall have the power to establish and maintain accounts of the Company at financial institutions and the Managing Members shall be authorized signatories on such financial institution accounts. The Managing Members shall also have the following respective duties:

(a) shall expend sums on behalf of the Company;

(b) shall be responsible for the distribution of funds, including the timing of such distributions, to the Members by way of cash, income, return of capital, profits or otherwise, all in accordance with the provisions of this Agreement and perform all matters in furtherance of the objectives of the Company and this Agreement;

(c) has the right to execute any and all agreements, contracts, documents, certifications and instruments necessary and convenient in connection with the powers described in these regulations;

(d) Any act of the Managing Members purporting to bind the Company, shall bind the Company and the ratification or consent of the Members to any such act(s) shall not be required;

(e) The Managing Members shall have the full right and authority to execute any and all documents and instruments relating to the business and affairs of the Company, without the joinder of the Members, or any other person or entity, and any person dealing with the Company may rely upon the Managing Members' execution of any such document or instrument as the act and deed of the Company, without the necessity for further inquiry; and

(f) The Managing Members shall not receive compensation for management services to the Company other than the reimbursement of any and all out-of-pocket expenses reasonably incurred by the in connection with the furtherance of its duties, obligations and responsibilities hereunder or otherwise with respect to the

management and operation of the business and affairs of the Company. Managing Members may contract with the Company and receive compensation for other services not related to the duties of a Managing Member.

4. Powers of the President. The President shall have the following rights and powers in subject to the following restrictions:

(a) managing the daily operations of the business unless such management conflicts with the powers reserved to the Managing Members or unless the Managing Members restrict such powers.

(b) with prior notice to the Managing Members, may contract on behalf of the Company for the employment and services of employees and/or independent contractors and delegate to such persons the duty to manage and supervise certain operations of Company unless the Managing Members requests to approve such decisions;

(c) may incur reasonably, ordinary, and necessary expenses in order to manage the daily operations of the Company within the monetary limits set by the Managing Members above which will require the Managing Members' approval;

(d) shall contract on behalf of the Company for the employment and services of employees and/or independent contractors and delegate to such persons the duty to manage and supervise any of the assets or operations of the Company;

(e) with prior notice to the Managing Members, may negotiate or execute any agreements, contracts, documents, certifications and instruments which may bind the company without consent of the non-managing Members;

(f) those powers delegated to him by the Managing Members which may be ongoing or for a particular purpose and may be revoked at any time by the Managing Members;

5. Ownership of Information and Materials. The Managing Members shall, upon completion of or upon any earlier termination of its management hereunder, deliver to the Company all books and records and written financial or accounting data and information of or relating to the Company and the Property whether or not prepared by the Managing Members or supplied to the Managing Members by the Company or the Company's contractors or agents, which information shall at all time be the property of the Company.

6. Licenses. The Managing Members shall, at the company's expense, qualify to do business and obtain and maintain such licenses as may be required for the performance by the Managing Members of its services hereunder.

7. Resignation and Removal. Any Managing Member or the President may resign at any time after giving prior notice of such resignation to the Members at least thirty (30) days prior to the effective date of the resignation. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the

Members, if any. Such persons may only be removed by a unanimous vote of all Members entitled to vote and with cause which is defined as the willful and gross misconduct or gross negligence which must result in material economic damage to the company and its members

8. Controlling Management Limitation. Notwithstanding any other provision of this Agreement, no Member or officer of the Company including, without limitation, the President or Treasurer may take any action on behalf of the Company which would acquire the approval of the Voting Members of Dallas Real Estate Lenders, LLC, a Delaware limited liability company and Sole Member of the Company ("DREL") or Palisades pursuant to the Company Agreement of DREL.

## ARTICLE X.

## RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS

1. Authority; Liability to Third Parties.

(c) No Member (other than Managing Member or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditure on behalf of the Company.

(d) No Member (including any Member who is Managing Member or Officer) shall be liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or order of a court.

(e) The members may amend the regulations with the approval of a majority-in-interest of the members entitled to vote and with approval of the Managing Members. Any amendments to the role of the Managing Members would also require the approval of the Managing Members.

(f) Except as otherwise limited by the terms and provisions contained in these regulations, the Members shall have all of the rights, and be afforded the status, of Members as set forth in these regulations and by law.

(g) Except as provided herein, no Member shall have any right or power to (1) take part in the management or control of the Company or its business or affairs, (2) transact any business for the Company, or (3) sign for or bind the Company in any way.

(h) No Member shall have the right to withdraw from the Company unless approved by the Managing Members.

(i) No Member shall have the right or power to cause the dissolution and winding up of the Company by court decree or otherwise.

(j) All Members hereby agree to execute any and all instruments that they may be required to execute by any approved purchaser of said property in order to effect a sale of the Company Property.

2. Breach. In addition to a member failing to adhere to these regulations, a Member will breach this Agreement if he

(a) attempts to withdraw from the Company without approval;

(b) interferes in the management of the Company affairs;

(c) engages in conduct which could result in the Company losing its tax status as a Company;

(d) engages in conduct that tends to bring the Company into disrepute;

(e) breaches any confidentiality provisions of this Agreement;

(f) fails to meet any commitment to the Company; or

(g) owns a Company interest that becomes subject to a charging order, attachment, garnishment, or similar legal proceedings.

3. Remedies. A Member who is in breach of this Agreement shall be liable to the Company for damages caused by such breach. The Company may offset the damages against any distributions or return of capital to the Member who has breached this Agreement. Additionally, if a Member violates the terms of this agreement that person may be terminated as a member and their capital contributions shall be refunded without interest including any profits or losses accrued up to the date of the breach. If necessary such capital contribution may be converted to a loan to the company if the assets are not available to refund the capital contribution at the time of the breach and is subject to reasonable interest and payment terms as determined by the Managing Members. These remedies are in addition to any additional remedies that may be available under the law.

4. Transfers of Interests. A Member may make a Transfer of such Member's Interest, only upon the approval of the Managing Members:

(a) The Member or the proposed transferee must file with the Company a written and dated instrument of such Transfer, in form and substance reasonably satisfactory to the Managing Members, executed by both the transferor and the proposed transferee, which instrument shall (i) contain the acceptance by the proposed transferee of all of

the terms and provisions of this Company Agreement, to the extent applicable to an assignee of an Interest, and identify all liabilities which the transferee shall assume upon the transfer of the Member's Interest; (ii) contain such representations as the Managing Members may deem necessary or advisable to assure that such Transfer need not be registered under any applicable federal or state securities laws; (iii) instruct the Managing Members as to the Interest to be transferred and to whom and at what address Company distributions and Notifications in respect of such Interest should henceforth be sent; and (iv) contain any information required under the Code that is reasonably requested by the Managing Members.

(b) Unless expressly waived by the Managing Members, the transferor or transferee shall deliver to the Company an opinion of counsel reasonably acceptable to the Managing Members that (i) such Transfer is exempt from the registration requirements of the Securities Act of 1933, as amended, applicable state securities laws, and any rules or regulations promulgated thereunder, and will not otherwise cause the Company to be in violation of such laws and regulations; (ii) the Transfer will not result in the termination of the Company within the meaning of Section 708(b) of the Code; and (iii) the Transfer will not adversely affect the status of the Company as a partnership under the Code.

(c) The Transfer is approved by the Managing Members, and the transferor Member.

5. Effect of Transfer of Member's Interest. A Transfer of an Interest does not entitle the transferee to become, or to exercise rights or powers of, a Member. A Transfer only entitles the transferee to receive cash distributions and allocations of Company profits and losses to the extent of the Interest transferred. Until the transferee is admitted as a Member pursuant to Article XI, Section 4 below, the transferor Member shall continue to be a Member and to be entitled to exercise any rights or powers of a Member with respect to the Interest transferred.

6. Admission of Transferee as Member. An approved transferee of an Interest desiring to be admitted as a Member must execute a counterpart of, or an agreement adopting, this Company Agreement. The admission of such transferee (including, without limitation, a transferee by reason of the death of a Member) is subject to the Managing Members acting in his sole discretion. Upon admission of the transferee as a Member, the transferee shall have, to the extent of the Interest transferred, the rights and powers and shall be subject to the restrictions and liabilities of a Member under this Company Agreement, the Articles of Formation and the Act. The transferee shall also be liable, to the extent of the Interest transferred, for the unfulfilled obligations, if any, of the transferor Member to make Capital Contributions. Whether or not the transferee of an Interest becomes a Member, the transferor Member is not released from any liability to the Company under this Company Agreement, the Certificate of Formation or the Act.

7. Other Business. The Members may engage in or possess interests in other business ventures (unconnected with the Company) of every kind and description, independently or with others, except those business in direct competition with the Company upon approval of the

Managing Members. Neither the Company nor the other Members shall have any rights in or to such independent ventures or the income or profits therefrom.

8. Voting by Members. Any decisions, directions, approvals and consents required by the Members shall be made by the vote of a Majority-in-Interest (whether by actual vote or deemed vote as provided herein) of the Members, unless this Company Agreement expressly provide that a decision shall be made by the 2/3 or unanimous vote or consent of all of the Members, which shall mean the 2/3 of the membership interests or unanimous vote of all membership interests or consent of the Members entitled to vote hereunder at the time that the vote is taken, or deemed taken.

## ARTICLE XI.

## MEETINGS OF MEMBERS

1. Place of Meeting. All meetings of Members shall be held at the principal office of the Company as provided in Article III above or at such other place as may be designated by the Member(s) calling the meeting.

2. Annual Meeting. Commencing with the calendar year next following the calendar year in which the Company was organized, annual meetings of the Members may be held on any day of the year at such hour as may be designated in the notice of the meeting, if such day is a Business Day, and if not a Business Day, then on the next following day that is a Business Day. If the annual meeting is not held on the date above specified, the Managing Members shall cause a meeting in lieu thereof to be held as soon thereafter as convenient, and any business transacted or election held at that meeting shall be as valid as if held at the annual meeting. Failure to hold the annual meeting at the designated time shall not work a dissolution of the Company. This provision shall not be construed to require the holding of any annual meeting.

3. Special Meetings. Special meetings of the Members may be called by resolution of the Members holding thirty percent (30%) or more of the Interests, for the purpose of addressing any matter upon which the Members may vote under this Company Agreement. Members may call a meeting by delivering to the Managing Members one or more written requests signed by the requisite number of Members, stating that the signing Members wish to call a meeting and indicating the specific purpose for which the meeting is to be held. Action at the meeting shall be limited to those matters specified in the call of the meeting. This provision shall not be construed to require the holding of any special meetings.

4. Notice. A Notification of all annual and special meetings, stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered by the Managing Members within a reasonable time period prior to the meaning with the presumption that reasonable notices is not less than twenty (20) nor more than sixty (60) days before the meeting to each Member. If the Managing Members fails to timely deliver such notices, then any Member may deliver such

notices to the other Members. The period of prior notice for any special meeting, which the Managing Members or any Member deems to be an emergency meeting, shall be shortened to such reasonable period of time, consistent with the nature of the emergency, sufficient to give actual notice to each Member.

5. Waiver of Notice. Attendance of a Member at a meeting or action taken by written consent shall constitute a waiver of Notification of the meeting, except where such Member attends for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called or convened. Notification of a meeting may also be waived in writing. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the Notification of the meeting but not so included, if the objection is expressly made at the meeting.

6. Quorum and Attendance. Members representing a Majority-in-Interest of the Members shall constitute a quorum at any meeting of the Members, whether present in person or by proxy.

7. Voting.
   (a) All Members who are not in default hereunder shall be entitled to vote at meetings unless their membership interests are non-voting. Members may vote either in person or by proxy at any meeting. Each Member's percentage voting power at a meeting shall be in proportion to his Interest. Notwithstanding anything contained herein to the contrary, all references to approval or voting by the Members shall mean those Members who are entitled to vote hereunder at the time the vote is taken on such matter.

   (b) The Managing Members shall be elected by the Majority in Interest and may only be removed in accordance with these regulations.

8. Adjournment. The Managing Members of the meeting shall have the power to adjourn the meeting from time to time, without notice, other than announcement of the time and place of the resumption of the adjourned meeting. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

9. Conduct of Meetings. The Managing Members shall conduct the meetings of the Members, including, without limitation, the determination of Persons entitled to vote, the existence of a quorum, the satisfaction of the requirements of this Article XI, the conduct of voting, the validity and effectiveness of any proxies, and the determination of any controversies, votes or challenges arising in connection with or during the meeting or voting. The Managing Members shall designate a Person to take minutes of each meeting. The minutes of each meeting of the Members shall be kept in a minute book and shall be approved by the Managing Members at the next meeting of Members.

10. Telephone Meetings. Members, Representatives or any committee appointed by the Members, may participate in a meeting by means of telephone conference or similar

communications, and participation in a meeting pursuant to this subsection shall constitute presence in person at the meeting.

11. Action by Written Consent. Any action that may be taken at a meeting of the Members may be taken without a meeting, upon prior written notice to each Member of the proposed action, if a consent in writing, setting forth the action to be taken, shall be signed by Members who are entitled to vote hereunder and who are holding the percentage of Interests required to approve such action under this Company Agreement. Such consent shall have the same force and effect as a vote of the signing Members at a meeting duly called and held pursuant to this Article XII. Notification of any action taken by means of a written consent of Members shall be sent, within a reasonable time after the date of the consent, by the Managing Members, to all Members who did not sign the written consent.

12. Proxies. A Member may vote either in person or by proxy executed in writing by the Member or its Representative. A facsimile, electronic mail, telegram, telex, cablegram or similar transmission by the Member, or a photographic, photo static, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Article. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managing Members, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managing Members who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the Managing Members, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more Persons to act as proxies, unless such instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one, or if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Interests that are the subject of such proxy are to be voted with respect to such issue.

13. Information.

a. In addition to the other rights specifically set forth in this Company Agreement, each Member is entitled to all information to which that Member is entitled to have access pursuant to the Act under the circumstances and subject to the conditions therein stated.

b. The Members acknowledge that, from time to time, they may receive information from or regarding the Company or each other in the nature of trade secrets or that otherwise

is confidential, the release of which may be damaging to the Company or each other or Persons with which they do business. Each Member shall hold in strict confidence any information it receives regarding the Company or each other that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member or Managing Member, except for disclosures (i) compelled by law (but the Member must notify the Managing Members and the other Members promptly of any request for that information, before disclosing it if practicable), (ii) to advisors or representatives of the Member, (iii) to Persons to which that Member's Interest may be transferred as permitted by this Company Agreement, but only if the recipients have agreed to be bound by the provisions of this Article, (iv) of information that such Member has also received from a source independent of the Company that the Member reasonably believes obtained the information without breach of confidentiality, or (v) of matters which have become of public knowledge. The Members acknowledge that breach of the provisions of this Article may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this Article may be enforced by specific performance.

## ARTICLE XII.

## INTENTIONALLY OMITTED

## ARTICLE XIII.

## DISSOLUTION AND WINDING UP

1. Events Causing Dissolution. The Company shall be dissolved upon the first of the following events to occur:

   (a) the expiration of the term of duration of the Company set forth in the Certificate of Formation;

   (b) the written consent of 2/3 (two-thirds) of the Membership interests entitled to vote hereunder at any time with approval of the Managing Members to dissolve and wind up the affairs of the Company;

   (c) the occurrence of any other event that causes the dissolution of a limited liability company under the Act.

2. Winding Up. If the Company is dissolved pursuant to Article XIII, Section 1, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a) The winding up of the Company's affairs shall be supervised by a liquidator. The liquidator shall be the Managing Members or, if the Managing Members prefers, a liquidator or liquidating committee selected by the Managing Members.

(b) In winding up the affairs of the Company, the liquidator shall have the right and unlimited discretion, for and on behalf of the Company;

(i) to prosecute and defend civil, criminal or administrative suits;
(ii) to collect Company Assets, including obligations owed to the Company;
(iii) to settle and close the Company's business;
(iv) to dispose of and convey all Company Assets for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Assets, having due regard for the activity and condition of the relevant market and general financial and economic conditions;
(v) to pay all reasonable selling costs and other expenses incurred in connection with the winding up of the proceeds of the disposition of Company Assets;
(vi) to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;
(vii) to distribute any remaining proceeds from the sale of Company Assets to the Members;
(viii) to prepare, execute, acknowledge and file articles of dissolution under the Act and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and
(ix) to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Managing Members under the terms of this Company Agreement to the extent necessary or desirable in the good faith judgment of the liquidator to perform its duties and functions.

3. Compensation of Liquidator. The liquidator appointed as provided herein shall not be entitled to receive any compensation for its services unless otherwise agreed upon by the liquidator and the Managing Members.

4. Distribution of Company Assets and Proceeds of Sale Thereof.

(a) Upon completion of all desired sales of Company Assets, and after payment of all selling costs and expenses, the liquidator shall distribute the proceeds of such sales, and the Company Assets that are to be distributed in kind, to the following groups in the following order of priority:

(i) to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company

distributions) of the Company, whether by payment or establishment of reserves;

(ii) to satisfy Company obligations to Members to pay past due Company distributions;

(iii) to the Members, in accordance with the positive balance in their respective Capital Accounts; and

(iv) to the Members in accordance with their respective Interests.

(b) The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group. If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective capital account balances or Interests of each Member in such group.

5. Final Audit. Within a reasonable time following the completion of the liquidation, the liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to these regulations.

6. Deficit Capital Accounts. Notwithstanding anything to the contrary contained in this Company Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Company Agreement to all Members in proportion to their respective Interests, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## ARTICLE XIV.

## INDEMNIFICATION AND INSURANCE

1. Indemnification and Advance of Expenses. The Company shall indemnify and/or advance expenses to a Person who was, is, or is threatened to be made a named defendant or respondent in a proceeding because the person (i) is or was a Managing Members, Member, officer, employee or agent of the Company, or (ii) is or was serving at the request of the Company as a Managing Member, Member, director, officer, partner, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise, to the fullest extent provided by, and in accordance with the procedures set forth in, any applicable laws; provided, however, that in the following respects as applied to the Company, the following provisions shall apply:

(a) Indemnification of any Person who has satisfied the standard of conduct set forth in the Act shall be mandatory rather than optional. The determination under the Act that indemnification shall be made shall also constitute authorization of indemnification under the Act.

(b) Advancement of expenses to a Person who has satisfied the requirements of the Act shall be mandatory rather than optional.

(c) Payment or reimbursement of expenses to a Person pursuant to the Act in connection with his appearance as a witness or other participation in a proceeding shall be mandatory rather than optional.

2. Insurance. Subject to certain provisions in the Act, the Company may, but shall not be obligated to, purchase and maintain insurance or other arrangements on behalf of any Person who is or was a Managing Member, Officer, Member, employee, agent or other Person identified above in Article XIV, Section 1 against any liability asserted against him or incurred by him in such a capacity or arising out of his status as such a Person, whether or not the Company would have the power to indemnify him against that liability under Article XIV, Section 1 or otherwise.

3. Limit on Liability of Members. The indemnification set forth in this regulations shall in no event cause the Members to incur any personal liability beyond their total Capital Contributions, nor shall it result in any other liability of the Members to any third party.

## ARTICLE XV.

## MISCELLANEOUS PROVISIONS

1. Entire Agreement. This Company Agreement contain the entire agreement among the Members relating to the subject matter hereof, and all prior agreements relative hereto which are not contained herein are terminated.

2. Law Governing. This Company Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Texas. In particular, this Company Agreement are intended to comply with the requirements of the Act and the Certificate of Formation. In the event of a direct conflict between the provisions of this Company Agreement and the mandatory provisions of the Act or any provision of the Certificate of Formation, the Act and the Certificate of Formation, in that order of priority, will control. In the event that the Act is re-codified by the Legislature, then any such references made within this document shall refer to the newly codified Act and its corresponding sections.

3. Conference Telephone Meetings. Meetings of the Members, Managing Members or any committee may be held by means of conference telephone or similar communications equipment so long as all Persons participating in the meeting can hear each other. Participation in a meeting by means of conference telephone shall constitute presence in

person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business thereat on the ground that the meeting is not lawfully called or convened.

4. Successors and Assigns. Subject to restrictions on Transfers and assignments herein, this Company Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

5. Severability. This Company Agreement are intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of this Company Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, but the extent of such invalidity or unenforceability does not destroy the basis of the bargain among the Members as expressed herein, the remainder of this Company Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

6. Headings. The Article and Article headings appearing in this Company Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article.

7. Construction. Whenever required by the context, as used in this Company Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles refer to articles of this Company Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

8. Offset. Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

9. Effect of Waiver or Consent. A waiver or consent to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute of limitations period has run. No waivers shall be enforceable unless in writing and running in favor of the Person claiming the benefit of same.

10. Further Assurance. In connection with this Company Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments, and perform any additional acts, that may be necessary or appropriate to effectuate and perform the provisions of this Company Agreement and those transactions.

11. Waiver of Certain Rights. Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the Property of the Company.

12. Counterparts and Binding Effect. This Company Agreement may be executed in one or more counterparts, each of which shall be an original but all of which taken together shall constitute a single document. This Company Agreement shall be binding upon each Member as evidenced by their signatures below.

13. Attorney's Fees. If any Member becomes involved in litigation or proceedings arising out of this Agreement or the performance thereof, the court or tribunal in such litigation or proceeding, or in a separate suit, shall award attorney's fees to the prevailing party. Unless judgment goes by default, the attorney fee award shall not be computed in accordance with any court schedule, but shall be such as to fully reimburse all attorney's fees actually incurred in good faith, regardless of the size of the judgment, it being the intention of the Members to fully compensate for all the attorney's fees paid or incurred in good faith.

14. Amendment of Agreement. This Company Agreement may be amended only in writing, in whole or in part, at any time only by the execution thereof by 2/3 of the Membership interests entitled to vote thereon with Managing Members' approval.

15. Joinder of Managing Members. The Initial Managing Members have joined in this Company Agreement for the purposes of acknowledging his appointment and agreeing to all requirements for performance by Managing Members hereunder. A Successor Managing Member, if any, shall also be required to join in this Company Agreement in the same manner and for the same purpose as the Initial Managing Members.

16. Notices. Notifications, as defined above, given under this Company Agreement shall be duly given to the appropriate addresses, fax number, email addresses set forth below (or to such other addresses or numbers as a party may designate as to itself by notice to the other):

If to Company:

FHC Acquisition, LLC
Attn: Timothy Barton
1755 Wittington Place, Suite 340
Farmers Branch, TX 75234

If to the Member:

Dallas Real Estate Lenders, LLC
Attn: Timothy Barton
1755 Wittington Place, Suite 340
Farmers Branch, TX 75234

With a copy to:

Palisades TC LLC
Attn: Joaquin Charles de Monet, Manager
1919 McKinney Avenue, Suite 100
Dallas, TX 75201

*[Remaining Portion of this Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Members of the Company have evidenced the adoption of this Company Agreement in accordance with the Act by their signatures below, such adoption to be effective as of the date first above written.

**MEMBERS:**

Dallas Real Estate Lenders, LLC
a Delaware limited liability company

By: Dallas Real Estate Investors
a Delaware limited liability company
Its: Manager

By: ______________________
Name: Timothy Barton
Its: President

# SCHEDULE A

| Member Name & Address | Initial Capital Contributions | Interest | Profit/Loss |
|---|---|---|---|
| Dallas Real Estate Lenders, LLC<br>1755 Wittington Place<br>Suite 340<br>Farmers Branch, TX 75234 | $100.00 | 100% | 100% |

# Exhibit D

**Suki Rosen**

**From:** Suki Rosen
**Sent:** Wednesday, July 21, 2021 11:46 AM
**To:** joyce@joycelindauer.com
**Cc:** Jeff Prostok
**Subject:** Dallas Real Estate Investors

**Importance:** High

Hi Joyce,
I left you a VM this morning, but wanted to send an email as well. We represent Palisades in the DREI bankruptcy case. It is our understanding that there is a loan from Texas Republic Bank to FHC Acquisition that is about to mature on or around August 1, 2021. Could you please check with your client to see if that loan agreement has been amended or extended and, if so, provide us with the documentation relating to the amendment or extension? Many thanks.
Best,

**Suzanne K. "Suki" Rosen | FORSHEYPROSTOK LLP**
**Partner | 817.878.2018 | Fax 817.877.4151**
**777 Main Street, Suite 1550 | Fort Worth, TX 76102**

srosen@forsheyprostok.com

www.forsheyprostok.com

CONFIDENTIALITY STATEMENT--VIRUS WARNING --
Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this email message is attorney-client privileged and confidential, intended for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by email and destroy all copies of the original message. Although this email and any attachments are believed to be free of any virus or other defects that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Forshey & Prostok, L.L.P. for any loss or damage arising in any way from its use.

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing, or recommending to another party any tax-related matters addressed.

# Exhibit E

## Suki Rosen

**From:** Suki Rosen
**Sent:** Friday, July 23, 2021 1:27 PM
**To:** 'Joyce Lindauer'
**Cc:** Jeff Prostok
**Subject:** RE: [External] Dallas Real Estate Investors

Thanks. Anything to report on the loan to FCH Acquisition?

**Suki Rosen | FORSHEYPROSTOK, LLP**
**Partner | P 817.878.2018 | Main 817.877.8855**

---

**From:** Joyce Lindauer <joyce@joycelindauer.com>
**Sent:** Thursday, July 22, 2021 2:28 PM
**To:** Suki Rosen <srosen@forsheyprostok.com>
**Subject:** RE: [External] Dallas Real Estate Investors

I am checking on your question

---

**From:** Suki Rosen <srosen@forsheyprostok.com>
**Sent:** Wednesday, July 21, 2021 11:46 AM
**To:** Joyce Lindauer <joyce@joycelindauer.com>
**Cc:** Jeff Prostok <jprostok@forsheyprostok.com>
**Subject:** Dallas Real Estate Investors
**Importance:** High

Hi Joyce,
I left you a VM this morning, but wanted to send an email as well. We represent Palisades in the DREI bankruptcy case. It is our understanding that there is a loan from Texas Republic Bank to FHC Acquisition that is about to mature on or around August 1, 2021. Could you please check with your client to see if that loan agreement has been amended or extended and, if so, provide us with the documentation relating to the amendment or extension? Many thanks.
Best,

**Suzanne K. "Suki" Rosen | FORSHEYPROSTOK LLP**
**Partner | 817.878.2018 | Fax 817.877.4151**
**777 Main Street, Suite 1550 | Fort Worth, TX 76102**

✉ srosen@forsheyprostok.com

**www.forsheyprostok.com**

CONFIDENTIALITY STATEMENT--VIRUS WARNING --
Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this email message is attorney-client privileged and confidential, intended for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by email and destroy all copies of the original message. Although this email and any attachments are believed to be free of any virus or other defects that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Forshey & Prostok, L.L.P. for any loss or damage arising in any way from its use.

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing, or recommending to another party any tax-related matters addressed.

# Exhibit F

**Suki Rosen**

---

**From:** Suki Rosen
**Sent:** Sunday, July 25, 2021 12:26 PM
**To:** 'Joyce Lindauer'
**Cc:** Jeff Prostok
**Subject:** RE: [External] Dallas Real Estate Investors
**Attachments:** Frisco Memo of Agreement 7.24.2021.docx

**Importance:** High

Hi Joyce,
I wanted to circle back with you on this to see if DREI has an update on the status of the loan to FHC Acquisition, which we understand will expire at the end of July. In addition, our client intends to file the attached memorandum of opinion tomorrow relating to the Frisco property, which is owned by FHC Acquisition. Because FHC Acquisition is not in bankruptcy, we do not believe that the stay applies its property or that filing the attached in the real property records in Collin County would violate the automatic stay applicable to DREI. Please let me know immediately if you disagree and we will file a motion for relief from the automatic stay. If you could please get back to me tomorrow on the status of the loan as well given it is our understanding that the current extension is about to expire in a few days, I'd appreciate it. Thanks.
Best,

**Suki Rosen | FORSHEYPROSTOK, LLP**
**Partner | P 817.878.2018 | Main 817.877.8855**

---

**From:** Suki Rosen
**Sent:** Friday, July 23, 2021 1:27 PM
**To:** 'Joyce Lindauer' <joyce@joycelindauer.com>
**Cc:** Jeff Prostok <jprostok@forsheyprostok.com>
**Subject:** RE: [External] Dallas Real Estate Investors

Thanks. Anything to report on the loan to FCH Acquisition?

**Suki Rosen | FORSHEYPROSTOK, LLP**
**Partner | P 817.878.2018 | Main 817.877.8855**

---

**From:** Joyce Lindauer <joyce@joycelindauer.com>
**Sent:** Thursday, July 22, 2021 2:28 PM
**To:** Suki Rosen <srosen@forsheyprostok.com>
**Subject:** RE: [External] Dallas Real Estate Investors

I am checking on your question

---

**From:** Suki Rosen <srosen@forsheyprostok.com>
**Sent:** Wednesday, July 21, 2021 11:46 AM
**To:** Joyce Lindauer <joyce@joycelindauer.com>
**Cc:** Jeff Prostok <jprostok@forsheyprostok.com>
**Subject:** Dallas Real Estate Investors
**Importance:** High

Hi Joyce,
I left you a VM this morning, but wanted to send an email as well. We represent Palisades in the DREI bankruptcy case. It is our understanding that there is a loan from Texas Republic Bank to FHC Acquisition that is about to mature on or around August 1, 2021. Could you please check with your client to see if that loan agreement has been amended or extended and, if so, provide us with the documentation relating to the amendment or extension? Many thanks.
Best,

**Suzanne K. "Suki" Rosen | FORSHEYPROSTOK LLP**
**Partner | 817.878.2018 | Fax 817.877.4151**
**777 Main Street, Suite 1550 | Fort Worth, TX 76102**

srosen@forsheyprostok.com

**www.forsheyprostok.com**

CONFIDENTIALITY STATEMENT--VIRUS WARNING --
Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this email message is attorney-client privileged and confidential, intended for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by email and destroy all copies of the original message. Although this email and any attachments are believed to be free of any virus or other defects that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Forshey & Prostok, L.L.P. for any loss or damage arising in any way from its use.

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing, or recommending to another party any tax-related matters addressed.

Record and Return:

Palisades TC, LLC
1919 McKinney Ave, Suite 100
Dallas, Texas 75201

**Memorandum of Agreement Regarding Limited Liability Company Agreement Authority**

This MEMORANDUM OF AGREEMENT dated as of July ___, 2021 ("**Memorandum**") is made by Palisades TC, LLC, a Texas limited liability company ("**Preferred Member**"), who is a 50 percent member of Dallas Real Estate Lenders, LLC, the sole member of FHC Acquisition, LLC ("**Owner**"). **FHC Acquisition, LLC** is the fee owner of the Property, as defined and described below. Preferred Member is a member under the Company Agreement of Dallas Real Estate Lenders, LLC ("**Operating Agreement**").

Preferred Member provided a preferred equity investment (the "**Investment**") as set forth above to permit Owner to purchase the property located at (the "**Property**"):

Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas.

**PLEASE TAKE NOTICE** that, under the Company Agreement for the Owner, no Member or officer of the Owner may take any action on behalf of the Company which would require the approval of the Voting Members of Dallas Real Estate Lenders, LLC (which includes the Preferred Member) or the Preferred Member pursuant to the Company Agreement of Dallas Real Estate Lenders, LLC. Dallas Real Estate Lenders, LLC is managed collectively by the Voting Members, which includes Palisades TC, LLC. Consequently, the authority to take any action on behalf of the Owner (including any sales, transfers, encumbrances, or liens) should be confirmed in writing through the Preferred Member, who may be contacted through the following address:

Palisades TC, LLC
1919 McKinney Ave, Suite 100
Dallas, Texas 75201
Telephone: (310) 745-4414
Email: jdemonet@palisadescapitalrealty.com

This Memorandum shall be recorded in the real property records in the county in the state in which the Property is situated and provides notice of the Preferred Member's rights under the Operating Agreement in connection with any refinancing, transfer or other disposition of the Property.

**IN WITNESS WHEREOF**, Preferred Member has executed this Memorandum the day and year first above written.

**Palisades TC LLC,**
a Texas limited liability company

By: ______________________________
Name: Joaquin Charles de Monet
Title: Manager

STATE OF TEXAS )

) ss.:

COUNTY OF DALLAS )

On July ____, 2021 before me, _______________________________, a Notary Public for said state, personally appeared Joaquin Charles de Monet, personally known to me OR proved to me on the basis of satisfactory evidence to be the person(s) whose names(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

_____________________________
Notary Public

# Exhibit G

**Suki Rosen**

**From:** Suki Rosen
**Sent:** Monday, July 26, 2021 9:40 AM
**To:** 'Joyce Lindauer'
**Cc:** Jeff Prostok
**Subject:** RE: [External] Dallas Real Estate Investors

Thanks. The information regarding the loan is somewhat critical given my client's understanding that the previous extension of the loan will expire at the end of the month (and we've been asking for it since last Wednesday). Also, the stay issue is a legal question. Could you please let me know the Debtor's position as to whether the automatic stay in DREI's bankruptcy case applies to the property of FHC Acquisition? Perhaps it would help to jump on a call to discuss? Let me know if you have any availability today for a call. Thanks.
Best,

**Suki Rosen | FORSHEYPROSTOK, LLP**
**Partner | P 817.878.2018 | Main 817.877.8855**

---

**From:** Joyce Lindauer <joyce@joycelindauer.com>
**Sent:** Monday, July 26, 2021 9:10 AM
**To:** Suki Rosen <srosen@forsheyprostok.com>
**Cc:** Jeff Prostok <jprostok@forsheyprostok.com>
**Subject:** RE: [External] Dallas Real Estate Investors

I am checking with my client

---

**From:** Suki Rosen <srosen@forsheyprostok.com>
**Sent:** Sunday, July 25, 2021 12:26 PM
**To:** Joyce Lindauer <joyce@joycelindauer.com>
**Cc:** Jeff Prostok <jprostok@forsheyprostok.com>
**Subject:** RE: [External] Dallas Real Estate Investors
**Importance:** High

Hi Joyce,
I wanted to circle back with you on this to see if DREI has an update on the status of the loan to FHC Acquisition, which we understand will expire at the end of July. In addition, our client intends to file the attached memorandum of opinion tomorrow relating to the Frisco property, which is owned by FHC Acquisition. Because FHC Acquisition is not in bankruptcy, we do not believe that the stay applies its property or that filing the attached in the real property records in Collin County would violate the automatic stay applicable to DREI. Please let me know immediately if you disagree and we will file a motion for relief from the automatic stay. If you could please get back to me tomorrow on the status of the loan as well given it is our understanding that the current extension is about to expire in a few days, I'd appreciate it. Thanks.
Best,

**Suki Rosen | FORSHEYPROSTOK, LLP**
**Partner | P 817.878.2018 | Main 817.877.8855**

---

**From:** Suki Rosen
**Sent:** Friday, July 23, 2021 1:27 PM

**To:** 'Joyce Lindauer' <joyce@joycelindauer.com>
**Cc:** Jeff Prostok <jprostok@forsheyprostok.com>
**Subject:** RE: [External] Dallas Real Estate Investors

Thanks. Anything to report on the loan to FCH Acquisition?

**Suki Rosen | FORSHEYPROSTOK, LLP**
**Partner | P 817.878.2018 | Main 817.877.8855**

---

**From:** Joyce Lindauer <joyce@joycelindauer.com>
**Sent:** Thursday, July 22, 2021 2:28 PM
**To:** Suki Rosen <srosen@forsheyprostok.com>
**Subject:** RE: [External] Dallas Real Estate Investors

I am checking on your question

---

**From:** Suki Rosen <srosen@forsheyprostok.com>
**Sent:** Wednesday, July 21, 2021 11:46 AM
**To:** Joyce Lindauer <joyce@joycelindauer.com>
**Cc:** Jeff Prostok <jprostok@forsheyprostok.com>
**Subject:** Dallas Real Estate Investors
**Importance:** High

Hi Joyce,
I left you a VM this morning, but wanted to send an email as well. We represent Palisades in the DREI bankruptcy case. It is our understanding that there is a loan from Texas Republic Bank to FHC Acquisition that is about to mature on or around August 1, 2021. Could you please check with your client to see if that loan agreement has been amended or extended and, if so, provide us with the documentation relating to the amendment or extension? Many thanks.
Best,

**Suzanne K. "Suki" Rosen | FORSHEYPROSTOK LLP**
**Partner | 817.878.2018 | Fax 817.877.4151**
**777 Main Street, Suite 1550 | Fort Worth, TX 76102**

✉ srosen@forsheyprostok.com

**www.forsheyprostok.com**

CONFIDENTIALITY STATEMENT--VIRUS WARNING --
Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this email message is attorney-client privileged and confidential, intended for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by email and destroy all copies of the original message. Although this email and any attachments are believed to be free of any virus or other defects that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Forshey & Prostok, L.L.P. for any loss or damage arising in any way from its use.

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing, or recommending to another party any tax-related matters addressed.

# Exhibit H

**Suki Rosen**

**From:** Joyce Lindauer <joyce@joycelindauer.com>
**Sent:** Monday, July 26, 2021 4:59 PM
**To:** Suki Rosen
**Subject:** RE: [External] Dallas Real Estate Investors

I am advised that the land loan is renewing this week

I am also advised that if your client will go back to confirming what was asked previously my client will make the payment in 60 days as proposed.

Funding is still available if your client will agree to the time line in the document

**PLEASE NOTE OUR NEW ADDRESS IN DOWNTOWN DALLAS**

JOYCE LINDAUER
Attorney at Law
And Mediator

Joyce Lindauer
Joyce W. Lindauer Attorney, PLLC
1412 Main Street
Suite 500
Dallas, TX 75202
PH 972-503-4033
FAX 972-503-4034
CEL 214-957-8039

---

**From:** Suki Rosen <srosen@forsheyprostok.com>
**Sent:** Sunday, July 25, 2021 12:26 PM
**To:** Joyce Lindauer <joyce@joycelindauer.com>
**Cc:** Jeff Prostok <jprostok@forsheyprostok.com>
**Subject:** RE: [External] Dallas Real Estate Investors
**Importance:** High

Hi Joyce,
I wanted to circle back with you on this to see if DREI has an update on the status of the loan to FHC Acquisition, which we understand will expire at the end of July. In addition, our client intends to file the attached memorandum of opinion tomorrow relating to the Frisco property, which is owned by FHC Acquisition. Because FHC Acquisition is not in bankruptcy, we do not believe that the stay applies its property or that filing the attached in the real property records in

Collin County would violate the automatic stay applicable to DREI. Please let me know immediately if you disagree and we will file a motion for relief from the automatic stay. If you could please get back to me tomorrow on the status of the loan as well given it is our understanding that the current extension is about to expire in a few days, I'd appreciate it. Thanks.
Best,

**Suki Rosen | FORSHEYPROSTOK, LLP**
**Partner | P 817.878.2018 | Main 817.877.8855**

---

**From:** Suki Rosen
**Sent:** Friday, July 23, 2021 1:27 PM
**To:** 'Joyce Lindauer' <joyce@joycelindauer.com>
**Cc:** Jeff Prostok <jprostok@forsheyprostok.com>
**Subject:** RE: [External] Dallas Real Estate Investors

Thanks. Anything to report on the loan to FCH Acquisition?

**Suki Rosen | FORSHEYPROSTOK, LLP**
**Partner | P 817.878.2018 | Main 817.877.8855**

---

**From:** Joyce Lindauer <joyce@joycelindauer.com>
**Sent:** Thursday, July 22, 2021 2:28 PM
**To:** Suki Rosen <srosen@forsheyprostok.com>
**Subject:** RE: [External] Dallas Real Estate Investors

I am checking on your question

---

**From:** Suki Rosen <srosen@forsheyprostok.com>
**Sent:** Wednesday, July 21, 2021 11:46 AM
**To:** Joyce Lindauer <joyce@joycelindauer.com>
**Cc:** Jeff Prostok <jprostok@forsheyprostok.com>
**Subject:** Dallas Real Estate Investors
**Importance:** High

Hi Joyce,
I left you a VM this morning, but wanted to send an email as well. We represent Palisades in the DREI bankruptcy case. It is our understanding that there is a loan from Texas Republic Bank to FHC Acquisition that is about to mature on or around August 1, 2021. Could you please check with your client to see if that loan agreement has been amended or extended and, if so, provide us with the documentation relating to the amendment or extension? Many thanks.
Best,

**Suzanne K. "Suki" Rosen | FORSHEYPROSTOK LLP**
**Partner | 817.878.2018 | Fax 817.877.4151**
**777 Main Street, Suite 1550 | Fort Worth, TX 76102**

✉ srosen@forsheyprostok.com

**www.forsheyprostok.com**

CONFIDENTIALITY STATEMENT--VIRUS WARNING --
Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this email message is attorney-client privileged and confidential, intended for the sole use of the intended recipient(s). Any

unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by email and destroy all copies of the original message. Although this email and any attachments are believed to be free of any virus or other defects that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Forshey & Prostok, L.L.P. for any loss or damage arising in any way from its use.

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing, or recommending to another party any tax-related matters addressed.

# Exhibit I

**Fill in this information to identify the case**

Debtor name **Dallas Real Estate Investors, LLC**

United States Bankruptcy Court for the: **NORTHERN DISTRICT OF TEXAS**

Case number (if known) **21-41488-elm**

☐ Check if this is an amended filing

Official Form 206A/B

## Schedule A/B: Assets -- Real and Personal Property 12/15

**Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).**

**Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.**

**For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.**

### Part 1: Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

☑ No. Go to Part 2.
☐ Yes. Fill in the information below.

**All cash or cash equivalents owned or controlled by the debtor** — **Current value of debtor's interest**

2. **Cash on hand**

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number

4. **Other cash equivalents** *(Identify all)*

Name of institution (bank or brokerage firm)

5. **Total of Part 1**
Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80. **$0.00**

### Part 2: Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

☑ No. Go to Part 3.
☐ Yes. Fill in the information below.

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

**Current value of debtor's interest**

**7. Deposits, including security deposits and utility deposits**

Description, including name of holder of deposit

**8. Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

**9. Total of Part 2.**
Add lines 7 through 8. Copy the total to line 81. **$0.00**

## Part 3: Accounts receivable

**10. Does the debtor have any accounts receivable?**

☑ No. Go to Part 4.
☐ Yes. Fill in the information below.

**Current value of debtor's interest**

**11. Accounts receivable**

11a. 90 days old or less: ________ face amount – ________ doubtful or uncollectible accounts = ............. ➔ ________

11b. Over 90 days old: ________ face amount – ________ doubtful or uncollectible accounts = ............. ➔ ________

**12. Total of Part 3**
Current value on lines 11a + 11b = line 12. Copy the total to line 82. **$0.00**

## Part 4: Investments

**13. Does the debtor own any investments?**

☑ No. Go to Part 5.
☐ Yes. Fill in the information below.

**Valuation method used for current value** **Current value of debtor's interest**

**14. Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

**15. Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity: % of ownership:

**16. Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

**17. Total of Part 4**
Add lines 14 through 16. Copy the total to line 83. **$0.00**

## Part 5: Inventory, excluding agriculture assets

**18. Does the debtor own any inventory (excluding agriculture assets)?**

☑ No. Go to Part 6.
☐ Yes. Fill in the information below.

Case 21-41488-elm11 Doc 125 Filed 07/06/21 Entered 07/06/21 19:24:38 Page 3 of 18

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| **19. Raw materials** | MM/DD/YYYY | | | |
| **20. Work in progress** | | | | |
| **21. Finished goods, including goods held for resale** | | | | |
| **22. Other inventory or supplies** | | | | |

**23. Total of Part 5**
Add lines 19 through 22. Copy the total to line 84. **$0.00**

**24. Is any of the property listed in Part 5 perishable?**
☐ No
☐ Yes

**25. Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**
☐ No
☐ Yes. Book value ________ Valuation method ________ Current value ________

**26. Has any of the property listed in Part 5 been appraised by a professional within the last year?**
☐ No
☐ Yes

## Part 6: Farming and fishing-related assets (other than titled motor vehicles and land)

**27. Does the debtor own or lease any farming or fishing-related assets (other than titled motor vehicles and land)?**
☑ No. Go to Part 7.
☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **28. Crops--either planted or harvested** | | | |
| **29. Farm animals** *Examples:* Livestock, poultry, farm-raised fish | | | |
| **30. Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| **31. Farm and fishing supplies, chemicals, and feed** | | | |
| **32. Other farming and fishing-related property not already listed in Part 6** | | | |

**33. Total of Part 6.**
Add lines 28 through 32. Copy the total to line 85. **$0.00**

**34. Is the debtor a member of an agricultural cooperative?**
☐ No
☐ Yes. Is any of the debtor's property stored at the cooperative?
  ☐ No
  ☐ Yes

**35. Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**
☐ No
☐ Yes. Book value ________ Valuation method ________ Current value ________

**36. Is a depreciation schedule available for any of the property listed in Part 6?**
☐ No
☐ Yes

**37. Has any of the property listed in Part 6 been appraised by a professional within the last year?**
☐ No
☐ Yes

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

## Part 7: Office furniture, fixtures, and equipment; and collectibles

**38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☑ No. Go to Part 8.
☐ Yes. Fill in the information below.

| **General description** | **Net book value of debtor's interest** (Where available) | **Valuation method used for current value** | **Current value of debtor's interest** |
|---|---|---|---|
| **39. Office furniture** | | | |
| **40. Office fixtures** | | | |
| **41. Office equipment, including all computer equipment and communication systems equipment and software** | | | |
| **42. Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |

**43. Total of Part 7.** **$0.00**
Add lines 39 through 42. Copy the total to line 86.

**44. Is a depreciation schedule available for any of the property listed in Part 7?**
☐ No
☐ Yes

**45. Has any of the property listed in Part 7 been appraised by a professional within the last year?**
☐ No
☐ Yes

## Part 8: Machinery, equipment, and vehicles

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☑ No. Go to Part 9.
☐ Yes. Fill in the information below.

| **General description** Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | **Net book value of debtor's interest** (Where available) | **Valuation method used for current value** | **Current value of debtor's interest** |
|---|---|---|---|
| **47. Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| **48. Watercraft, trailers, motors, and related accessories** Examples: Boats trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| **49. Aircraft and accessories** | | | |
| **50. Other machinery, fixtures, and equipment (excluding farm machinery and equipment)** | | | |

**51. Total of Part 8.** **$0.00**
Add lines 47 through 50. Copy the total to line 87.

**52. Is a depreciation schedule available for any of the property listed in Part 8?**
☐ No
☐ Yes

**53. Has any of the property listed in Part 8 been appraised by a professional within the last year?**
☐ No
☐ Yes

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

## Part 9: Real property

**54. Does the debtor own or lease any real property?**

☑ No. Go to Part 10.
☐ Yes. Fill in the information below.

**55. Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| **Description and location of property** Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | **Nature and extent of debtor's interest in property** | **Net book value of debtor's interest** (Where available) | **Valuation method used for current value** | **Current value of debtor's interest** |
|---|---|---|---|---|

**56. Total of Part 9.**
Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88. **$0.00**

**57. Is a depreciation schedule available for any of the property listed in Part 9?**
☐ No
☐ Yes

**58. Has any of the property listed in Part 9 been appraised by a professional within the last year?**
☐ No
☐ Yes

## Part 10: Intangibles and Intellectual Property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☑ No. Go to Part 11.
☐ Yes. Fill in the information below.

| **General description** | **Net book value of debtor's interest** (Where available) | **Valuation method used for current value** | **Current value of debtor's interest** |
|---|---|---|---|
| **60. Patents, copyrights, trademarks, and trade secrets** | | | |
| **61. Internet domain names and websites** | | | |
| **62. Licenses, franchises, and royalties** | | | |
| **63. Customer lists, mailing lists, or other compilations** | | | |
| **64. Other intangibles, or intellectual property** | | | |
| **65. Goodwill** | | | |

**66. Total of Part 10.**
Add lines 60 through 65. Copy the total to line 89. **$0.00**

**67. Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)**?**
☐ No
☐ Yes

**68. Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
☐ No
☐ Yes

**69. Has any of the property listed in Part 10 been appraised by a professional within the last year?**
☐ No
☐ Yes

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

## Part 11: All other assets

**70. Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.
☑ Yes. Fill in the information below.

**Current value of debtor's interest**

**71. Notes receivable**

Description (include name of obligor)

**72. Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

**73. Interests in insurance policies or annuities**

**74. Causes of action against third parties (whether or not a lawsuit has been filed)**

**75. Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

**76. Trusts, equitable or future interests in property**

**77. Other property of any kind not already listed** *Examples:* Season tickets, country club membership

**Debtor owns 100% of FHC LLC, which owns the property located at Syria Gate Way, Blk A, Lot 13, Frisco, TX 75034** — **$10,000,000.00**

**78. Total of Part 11.**
Add lines 71 through 77. Copy the total to line 90. — **$10,000,000.00**

**79. Has any of the property listed in Part 11 been appraised by a professional within the last year?**
☑ No
☐ Yes

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

## Part 12: Summary

**In Part 12 copy all of the totals from the earlier parts of the form.**

| | Type of property | Current value of personal property | Current value of real property |
|---|---|---|---|
| 80. | **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $0.00 | |
| 81. | **Deposits and prepayments.** *Copy line 9, Part 2.* | $0.00 | |
| 82. | **Accounts receivable.** *Copy line 12, Part 3.* | $0.00 | |
| 83. | **Investments.** *Copy line 17, Part 4.* | $0.00 | |
| 84. | **Inventory.** *Copy line 23, Part 5.* | $0.00 | |
| 85. | **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $0.00 | |
| 86. | **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $0.00 | |
| 87. | **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $0.00 | |
| 88. | **Real property.** *Copy line 56, Part 9.* ➔ | | $0.00 |
| 89. | **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $0.00 | |
| 90. | **All other assets.** *Copy line 78, Part 11.* | + $10,000,000.00 | |
| 91. | **Total.** Add lines 80 through 90 for each column. | 91a. $10,000,000.00 | + 91b. $0.00 |

**92. Total of all property on Schedule A/B.** Lines 91a + 91b = 92 ........ **$10,000,000.00**

**Fill in this information to identify the case:**

Debtor name **Dallas Real Estate Investors, LLC**

United States Bankruptcy Court for the: **NORTHERN DISTRICT OF TEXAS**

Case number (if known) **21-41488-elm**

☐ Check if this is an amended filing

Official Form 206D

## Schedule D: Creditors Who Have Claims Secured by Property

**12/15**

**Be as complete and accurate as possible.**

**1. Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
☑ Yes. Fill in all of the information below.

## Part 1: List Creditors Who Have Secured Claims

**2. List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | Column A **Amount of claim** Do not deduct the value of collateral. | Column B **Value of collateral that supports this claim** |
|---|---|---|
| **2.1** Creditor's name: **Palisades Capital Realty Advisors** | **$3,500,000.00** | **$10,000,000.00** |

**Creditor's mailing address**
1919 McKinney Avenue
Suite 100

Dallas TX 75201

**Creditor's email address, if known**

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
☑ No
☐ Yes. Specify each creditor, including this creditor, and its relative priority.

**Describe debtor's property that is subject to a lien**
Real Property

**Describe the lien**
Business Debt

**Is the creditor an insider or related party?**
☑ No
☐ Yes

**Is anyone else liable on this claim?**
☑ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**As of the petition filing date, the claim is:**
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

**3. Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.** **$3,500,000.00**

Case 21-41488-elm11 Doc 15 Filed 07/06/21 Entered 07/06/21 19:14:36 Page 9 of 18

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**

## Part 2: List Others to Be Notified for a Debt Already Listed in Part 1

**List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.**

**If no others need to be notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.**

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| **Joaquin de Monet**<br>**Palisades Capital Realty**<br>**5740 Northmoor Dr.**<br><br>**Dallas TX 75230** | Line **2.1** | ___ ___ ___ ___ |
| **Joel W. Reese**<br>**Reese Marketos LLP**<br>**750 N. Saint Paul St., Suite 600**<br><br>**Dallas TX 75201** | Line **2.1** | ___ ___ ___ ___ |

**Fill in this information to identify the case:**

Debtor **Dallas Real Estate Investors, LLC**

United States Bankruptcy Court for the: **NORTHERN DISTRICT OF TEXAS**

Case number (if known) **21-41488-elm**

☐ Check if this is an amended filing

Official Form 206E/F

## Schedule E/F: Creditors Who Have Unsecured Claims

**12/15**

**Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.**

### Part 1: List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).

☑ No. Go to Part 2.
☐ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or part.**
If more space is needed for priority unsecured claims, fill out and attach the Additional Page of Part 1.

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.1** **Priority creditor's name and mailing address** | **As of the petition filing date, the claim is:** *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>**Basis for the claim:** | | |
| **Date or dates debt was incurred** | **Is the claim subject to offset?**<br>☐ No<br>☐ Yes | | |
| **Last 4 digits of account number** ___ ___ ___ ___ | | | |
| **Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a)( ______ ) | | | |

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**

## Part 2: List All Creditors with NONPRIORITY Unsecured Claims

3. **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If more space is needed for nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

**Amount of claim**

**3.1** **Nonpriority creditor's name and mailing address**

**Fab Studio**
**5646 Milton Street**
**Dallas TX 75205**

**Date or dates debt was incurred** ___
**Last 4 digits of account number** ___ ___ ___ ___

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** **Business Debt**

**Is the claim subject to offset?**
☑ No
☐ Yes

**$88,453.40**

**3.2** **Nonpriority creditor's name and mailing address**

**Halff Associates**
**12225 Greenville Avenue**
**Suite 200**
**Dallas TX 75243**

**Date or dates debt was incurred** ___
**Last 4 digits of account number** ___ ___ ___ ___

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** **Business Debt**

**Is the claim subject to offset?**
☑ No
☐ Yes

**$14,267.31**

**3.3** **Nonpriority creditor's name and mailing address**

**HR Sterling**
**13901 Midway Road**
**Suite 102**
**Dallas TX 75244**

**Date or dates debt was incurred** ___
**Last 4 digits of account number** ___ ___ ___ ___

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** **Business Debt**

**Is the claim subject to offset?**
☑ No
☐ Yes

**$28,800.00**

**3.4** **Nonpriority creditor's name and mailing address**

**Jackson Walker**
**2323 Ross Avenue**
**Suite 600**
**Dallas TX 75201**

**Date or dates debt was incurred** ___
**Last 4 digits of account number** ___ ___ ___ ___

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** **Attorney Fees**

**Is the claim subject to offset?**
☑ No
☐ Yes

**$54,543.30**

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**

## Part 2: Additional Page

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.**

**Amount of claim**

**3.5** **Nonpriority creditor's name and mailing address**

**JMJ Development LLC**
**1755 Wittington Place**
**Suite 340**
**Dallas TX 75234**

**Date or dates debt was incurred** ____

**Last 4 digits of account number** __ __ __ __

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** **Business Debt**

**Is the claim subject to offset?**
☑ No
☐ Yes

**$487,537.22**

**3.6** **Nonpriority creditor's name and mailing address**

**McMurry Law**
**508 W. Lookout Drive**
**Suite 14-74**
**Richardson TX 75080**

**Date or dates debt was incurred** ____

**Last 4 digits of account number** __ __ __ __

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** **Attorney Fees**

**Is the claim subject to offset?**
☑ No
☐ Yes

**$24,000.00**

**3.7** **Nonpriority creditor's name and mailing address**

**Metzger Law PLLC**
**3626 N. Hall Street**
**Unit 800**
**Dallas TX 75219**

**Date or dates debt was incurred** ____

**Last 4 digits of account number** __ __ __ __

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** **Attorney Fees**

**Is the claim subject to offset?**
☑ No
☐ Yes

**$15,847.95**

**3.8** **Nonpriority creditor's name and mailing address**

**Morelli Design**
**7433 Varna Avenue**
**Los Angeles CA 91605**

**Date or dates debt was incurred** ____

**Last 4 digits of account number** __ __ __ __

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** **Business Debt**

**Is the claim subject to offset?**
☑ No
☐ Yes

**$75,500.00**

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**

## Part 2: Additional Page

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.** **Amount of claim**

**3.9** **Nonpriority creditor's name and mailing address**

**The Gate Property Owners Association**
**2595 Dallas Parkway**
**Suite 470**
**Frisco TX 75034**

**Date or dates debt was incurred**

**Last 4 digits of account number** __ __ __ __

**As of the petition filing date, the claim is:** *Check all that apply.*

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:** **Business Debt**

**Is the claim subject to offset?**

- ☑ No
- ☐ Yes

**$19,979.56**

**3.10** **Nonpriority creditor's name and mailing address**

**Tint Zone**
**860 N. Crowley Road**
**Crowley TX 76036**

**Date or dates debt was incurred**

**Last 4 digits of account number** __ __ __ __

**As of the petition filing date, the claim is:** *Check all that apply.*

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:** **Business Debt**

**Is the claim subject to offset?**

- ☑ No
- ☐ Yes

**$1,060.85**

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**

## Part 4: Total Amounts of the Priority and Nonpriority Unsecured Claims

**5. Add the amounts of priority and nonpriority unsecured claims.**

| | | | Total of claim amounts |
|---|---|---|---|
| 5a. | **Total claims from Part 1** | 5a. | **$0.00** |
| 5b. | **Total claims from Part 2** | 5b. + | **$809,989.59** |
| 5c. | **Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | 5c. | **$809,989.59** |

**Fill in this information to identify the case:**

Debtor name **Dallas Real Estate Investors, LLC**

United States Bankruptcy Court for the: **NORTHERN DISTRICT OF TEXAS**

Case number (if known) **21-41488-elm** Chapter **11**

☐ Check if this is an amended filing

Official Form 206G

## Schedule G: Executory Contracts and Unexpired Leases **12/15**

**Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.**

**1. Does the debtor have any executory contracts or unexpired leases?**

☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☑ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

**2. List all contracts and unexpired leases** — **State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease**

| | | | |
|---|---|---|---|
| 2.1 | **State what the contract or lease is for and the nature of the debtor's interest** | **Settlement Agreement Contract to be ASSUMED** | **Palisades TC, LLC**<br>**1919 McKinney Avenue**<br>**Suite 100**<br>**Dallas TX 75201** |
| | **State the term remaining** | | |
| | **List the contract number of any government contract** | | |

**Fill in this information to identify the case:**

Debtor name **Dallas Real Estate Investors, LLC**

United States Bankruptcy Court for the: **NORTHERN DISTRICT OF TEXAS**

Case number (if known) **21-41488-elm**

☐ Check if this is an amended filing

Official Form 206H

## Schedule H: Codebtors

**12/15**

**Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.**

1. **Does the debtor have any codebtors?**
   ☑ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.
   ☐ Yes

2. **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, *Schedules D-G.*** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| *Column 1:* **Codebtor** | | *Column 2:* **Creditor** | |
|---|---|---|---|
| **Name** | **Mailing address** | **Name** | *Check all schedules that apply:* |

**Fill in this information to identify the case:**

Debtor Name **Dallas Real Estate Investors, LLC**

United States Bankruptcy Court for the: **NORTHERN DISTRICT OF TEXAS**

Case number (if known): **21-41488-elm**

☐ Check if this is an amended filing

Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals

**12/15**

### Part 1: Summary of Assets

**1.** ***Schedule A/B: Assets--Real and Personal Property*** (Official Form 206A/B)

| | |
|---|---|
| 1a. **Real property:**<br>Copy line 88 from Schedule A/B | **$0.00** |
| 1b. **Total personal property:**<br>Copy line 91A from Schedule A/B | **$10,000,000.00** |
| 1c. **Total of all property**<br>Copy line 92 from Schedule A/B | **$10,000,000.00** |

### Part 2: Summary of Liabilities

| | |
|---|---|
| **2.** ***Schedule D: Creditors Who Have Claims Secured by Property*** (Official Form 206D)<br>Copy the total dollar amount listed in Column A, Amount of claim, from line 3 of Schedule D | **$3,500,000.00** |
| **3.** ***Schedule E/F: Creditors Who Have Unsecured Claims*** (Official Form 206E/F) | |
| 3a. **Total claim amounts of priority unsecured claims:**<br>Copy the total claims from Part 1 from line 5a of Schedule E/F | **$0.00** |
| 3b. **Total amount of claims of nonpriority amount of unsecured claims:**<br>Copy the total of the amount of claims from Part 2 from line 5b of Schedule E/F | **+ $809,989.59** |
| **4. Total liabilities**<br>Lines 2 + 3a + 3b | **$4,309,989.59** |

**Fill in this information to identify the case and this filing:**

Debtor Name **Dallas Real Estate Investors, LLC**

United States Bankruptcy Court for the: **NORTHERN DISTRICT OF TEXAS**

Case number (if known) **21-41488-elm**

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors

**12/15**

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☑ *Schedule A/B: Assets--Real and Personal Property* (Official Form 206A/B)
- ☑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ☑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ☑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☑ *Schedule H: Codebtors* (Official Form 206H)
- ☑ *A Summary of Assets and Liabilities for Non-Individuals* (Official Form 206-Summary)
- ☐ Amended Schedule ______________
- ☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ☐ Other document that requires a declaration ______________

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **07/06/2021**
MM / DD / YYYY

X **/s/ Timothy Barton**
Signature of individual signing on behalf of debtor

**Timothy Barton**
Printed name

**President**
Position or relationship to debtor

# Exhibit J

# Property Search

## Property ID: 2735901 - Tax Year: 2021

### General Information

| | |
|---|---|
| **Property ID** | 2735901 |
| **Property Status** | Active |
| **Geographic ID** | R-10958-00A-0130-1 |
| **Property Type** | Real |
| **Property Address** | Syria Gate Way<br>Frisco, TX |
| **Total Land Area** | 197,697 sq. ft. |
| **Total Improvement Main Area** | n/a |
| **Abstract/Subdivision** | Gate The |
| **Primary State Code** | C1 (Vacant Commercial Lots (In City)) |
| **Legal Description** | GATE THE, BLK A, LOT 13; (REVISED) |
| **Tax Agent** | Ee Okpa/byeonghyeck Oh |

### Owner Information

| | |
|---|---|
| **Owner ID** | 1135836 |
| **Owner Name(s)** | Fhc Acquisition LLC |
| **Exemptions** | None |
| **Percent Ownership** | 100.00% |
| **Mailing Address** | 1755 Wittington Pl Ste 340<br>Dallas, TX 75234-1930 |

### 2021 Value Information

| | |
|---|---|
| **Improvement Homesite Value** | $0 |
| **Improvement Non-Homesite Value** | $0 |
| **Total Improvement Market Value** | **$0** |
| **Land Homesite Value** | $0 |
| **Land Non-Homesite Value** | $6,340,000 |
| **Land Agricultural Market Value** | $0 |
| **Total Land Market Value** | **$6,340,000** |
| **Total Market Value** | $6,340,000 |
| **Agricultural Use Loss** | $0 |
| **Total Appraised Value** | $6,340,000 |
| **Homestead Cap Loss** | $0 |
| **Total Assessed Value** | **$6,340,000** |

### Entities

| Taxing Entity | Tax Rate | Collected By |
|---|---|---|
| CFR (Frisco City) | 0.446600 (2020 Rate) | Collin County Tax Office |
| GCN (Collin County) | 0.172531 (2020 Rate) | Collin County Tax Office |
| JCN (Collin College) | 0.081222 (2020 Rate) | Collin County Tax Office |
| SFR (Frisco ISD) | 1.310200 (2020 Rate) | Collin County Tax Office |

### Improvements

Our records don't show any improvement data for Property ID 2735901 in the year 2021.

### Land Segments

| | |
|---|---|
| **Land Segment #1** | Commercial |
| **State Code** | C1 (Vacant Commercial Lots (In City)) |
| **Homesite** | No |
| **Market Value** | |
| **Ag Use Value** | n/a |
| **Land Size** | |

4.5385 acres
197,697 sq. ft.

## Value History

| Year | Improvement | Land | Market | Ag Loss | Appraised | HS Cap Loss | Assessed |
|---|---|---|---|---|---|---|---|
| 2021 | $0 | $6,340,000 | $6,340,000 | $0 | $6,340,000 | $0 | $6,340,000 |
| 2020 | $0 | $5,525,150 | $5,525,150 | $0 | $5,525,150 | $0 | $5,525,150 |
| 2019 | $0 | $4,448,674 | $4,448,674 | $0 | $4,448,674 | $0 | $4,448,674 |
| 2018 | $0 | $4,448,674 | $4,448,674 | $0 | $4,448,674 | $0 | $4,448,674 |
| 2017 | $0 | $2,372,626 | $2,372,626 | $0 | $2,372,626 | $0 | $2,372,626 |

## Deed History

| Deed Date | Seller | Buyer | Instr # | Volume/Page |
|---|---|---|---|---|
| 01/31/2020 | IGO - USA LP | FHC ACQUISITION LLC | 20200203000144930 | |

### SB 541 – Amends Section 25.027 of the Property Tax Code, effective September 1, 2005

***RESTRICTION ON POSTING DETAILED IMPROVEMENT INFORMATION ON INTERNET WEBSITE:***

Information in appraisal records may not be posted on the Internet if the information is a photograph, sketch, or floor plan of an improvement to real property that is designed primarily for use as a human residence. This section does not apply to an aerial photograph that depicts five or more separately owned buildings.

### HB 394 – Amends Section 25.027 of the Property Tax Code, effective September 1, 2015

***RESTRICTION ON POSTING AGE RELATED INFORMATION ON INTERNET WEBSITE:***

Information in appraisal records may not be posted on the Internet if the information indicates the age of a property owner, including information indicating that a property owner is 65 years of age or older.

# Exhibit K

# PURCHASER'S STATEMENT

Date: January 31, 2020 GF No. 4712010652-SB

Sale From: IGO-USA LP, a Texas limited partnership

To: FHC Acquisition, LLC, a Texas limited liability company

Property 4.539 Acres, Lot 13, Frisco, Collin County, Texas (The Gate)

**Purchase Price**.................................................... $ **5,931,565.00**

**Plus: Charges**

**FEES TO:** Chicago Title Insurance Company

| | | | | |
|---|---|---|---|---|
| Survey Coverage | 3,933.15 | Loan Policy | 100.00 | |
| T-19.1 | 2,622.10 | Tax Amendment | 25.00 | |
| | | Est Recording | 800.00 | |
| Guaranty Fee | 2.00 | T-19 Endorsement | 1,408.70 | |
| 1/2 Escrow Fee | 500.00 | T-33 Endorsement | 20.00 | |
| | | | | $ 9,410.95 |

**FEES TO:** Texas Republic Bank

| | | |
|---|---|---|
| Origiantion Fee | 29,657.83 | |
| Underwriting fee | 2,000.00 | |
| Appraisal Fee $3,000.00 | POC | |
| Property Tax Monitoring Fee | 125.00 | |
| Flood Fee | 14.00 | |
| Commitment Fee Credit | (5,000.00) | |
| Reserve Account | 372,500.00 | |
| | | $ 399,296.83 |

**PRORATIONS:**

| | | | | | |
|---|---|---|---|---|---|
| Taxes | from | | to | | $ 0.00 |
| Association Dues | | 1/31/20 | | 5/31/2020 | $ 6,383.04 |
| | from | | to | | $ |
| | from | | to | | $ |
| **50% Reimbursement Infrastructure fee** | | City of Frisco | | | $ POC |
| **Assessment** | | The Gate Property Owners Association, Inc. | | | $ POC |
| **General Liability Insurance** | | Inspire Insurance Solutions, Inc. | | | $ 840.00 |
| **Lender Legal Fee** | | Scheef & Stone, LLP | | | $ 13,500.00 |
| **Legal Fee** | | Winstead PC | | | $ 5,000.00 |
| **Legal Fee** | | Winstead PC | | | $ 15,000.00 |
| **Investment Fee and Reimb. Expense** | | Joaquin C. De Monet | | | $ 75,000.00 |
| **Legal Fee** | | Jackson Walker | | | $ 79,542.69 |
| **Fees** | | Fab Studio | | | $ 40,000.00 |
| **Legal Fee** | | McMurry Law, PLLC | | | $ 75,000.00 |

**Total Charges** .................................................... $ **718,973.51**
**Gross Amount Due By Purchaser**.................................................... $ **6,650,538.51**

**Less: Credits**

| | | | |
|---|---|---|---|
| Down Payment or Earnest Money Paid to | Chicago Title Insurance Company | $ 100,000.00 | |
| Loan from: | Texas Republic Bank | $ 2,965,783.00 | |
| Investor Wire Palisades TC, LLC | | $ 3,580,000.00 | subject to change |

**Prorations**

| | | | | | |
|---|---|---|---|---|---|
| Taxes | from | 01/1/20 | to | 1/31/20 | $ 7,690.77 |
| Rent | from | | to | | $ |
| | from | | to | | $ 0.00 |
| | from | | to | | $ 0.00 |

**Total Credits**.................................................... $ **6,653,473.77**
**Balance Due To Buyer** $ **(2,935.26)**

Purchaser understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information from other resources and cannot guarantee the accuracy thereof. Any real estate agent or lender involved may be furnished a copy of this Statement. Purchaser understands that tax and insurance prorations and reserves were based on figures for the preceeding year or supplied by others, or estimates for current year, and in the event of any change for current year, all necessary adjustments must be between Purchase and Seller direct. The undersigned hereby authorizes CHICAGO TITLE INSURANCE COMPANY to make expenditures and disbursements as shown and approves same for payment. The undersigned also acknowledges receipt of Loan funds, if applicable, in the amount shown above and receipt of a copy of this statement.
POC-Paid outside of Closing

See attached signature addendum

Settlement Agent

1/30/20 3:46 PM

# Exhibit L

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **DALLAS REAL ESTATE INVESTORS, LLC,** | § | **Case No. 21-41488-elm11** |
| | § | |
| | § | **Emergency Consideration Requested** |
| **Debtor.** | § | |

**ORDER GRANTING PALISADES TC, LLC'S EMERGENCY MOTION FOR ORDER FINDING STAY DOES NOT APPLY OR, ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY TO FILE MEMORANDUM OF AGREEMENT IN REAL PROPERTY RECORDS**

Came on to be considered the *Emergency Motion for Order Finding Stay Does Not Apply or, Alternatively, for Relief from the Automatic Stay to File Memorandum of Agreement in Real Property Records* (the "Motion") [Docket No. __] filed by Palisades TC, LLC ("Palisades"). The Court has considered the Motion and any response filed to the Motion and determined that it has jurisdiction over this matter, that due notice of the Motion was provided and is sufficient under the circumstances, and that no other or further notice be provided. The Court has further determined, based upon all of the proceedings had before the Court and after due deliberation of the Motion, that good cause exists for granting the relief requested in the Motion.

ACCORDINLY, it is hereby **ORDERED** that:

1. The Motion is hereby **GRANTED.**

2. Capitalized terms not defined herein shall have the meaning attributed to such terms in the Motion.

3. The automatic stay under section 362(a) does not apply to the Frisco Property.

4. Palisades may file the Memorandum of Agreement relating to the Frisco Property in the real property records in Collin County, Texas and such filing will not violate the automatic stay in the Debtor's bankruptcy case.

5. [In the alternative to paragraphs 3 and 4, above] The automatic stay under section 362(a) applies to the Frisco Property.

6. The interests of Palisades are not adequately protected. Consequently, Palisades is hereby granted relief from the automatic stay to file the Memorandum of Agreement relating to the Frisco Property in the real property records in Collin County, Texas.

### End of Order ###