# Exhibit “N”

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| In Re:<br><br>DALLAS REAL ESTATE<br>INVESTORS, LLC,<br><br>Debtor. | **Case No. 21-41488-elm-11**<br><br>August 11, 2021<br>9:30 a.m. |

TRANSCRIPT OF TELEPHONIC
341(a) MEETING OF CREDITORS

PRESIDING OFFICER: ERIN SCHMIDT,
UNITED STATES TRUSTEE'S OFFICE.

APPEARANCES:

| | |
|---|---|
| For the U.S. Trustee: | Erin Schmidt<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242<br>(214) 767-8967 |
| For the Debtor: | Kerry Alleyne<br>JOYCE W. LINDAUER ATTORNEY, PLLC<br>1412 Main Street, Suite 500<br>Dallas, TX 75202<br>(972) 503-4033 |
| For Palisades TC, LLC.: | Suzanne K. Rosen<br>FORSHEY & PROSTOK, LLP<br>777 Main Street, Suite 1550<br>Fort Worth, TX 76102<br>(817) 878-2018 |
| For The Gate Property Owners Association: | Jacob Sparks<br>SPENCER FANE, LLP<br>2200 Ross Avenue, Suite 4800 West<br>Dallas, TX 75201<br>(214) 750-3624 |

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

MR. BARTON: I don't know if that has been sent over, but we're checking on that and we'll certainly get that sent over if it's not been sent already.

MS. SCHMIDT: And then has the Debtor opened up a debtor-in-possession account at all?

MR. BARTON: We have not. There's no bank account at this time.

MS. SCHMIDT: And then the Debtor doesn't have any employees, correct? It's not -- it's sort of a holding company for another company. Is that an accurate way of putting it?

MR. BARTON: Correct.

MS. SCHMIDT: And, now, it looks like the Debtor has retained Ms. Lindauer's firm to whom it's paid $11,750. Was that paid by JMJ Development?

MR. BARTON: I can confirm. I'm not sure, but I believe so.

MS. SCHMIDT: And what is JMJ Development?

MR. BARTON: It's a development company that is a fee developer on the project.

MS. SCHMIDT: And who controls J -- who controls JMJ?

MR. BARTON: (garbled)

MS. SCHMIDT: And Mr. Barton, you're coming across -- you're not coming across very clear over the phone.

MR. BARTON: One moment. I'll get off this headset. I apologize. Hold on.

MS. SCHMIDT: All right.

(Pause.)

MR. BARTON: Okay. Is that better?

MS. SCHMIDT: It is better. Thank you. And so --

MR. BARTON: Sorry about that.

MS. SCHMIDT: -- I noted as well that JMJ Development on the schedules is also a prepetition creditor that's owed about $487,000. The $11,750 that was paid by JMJ on behalf of this Debtor to Ms. Lindauer's firm, is that part of the prepetition loan that's owed to JMJ?

MR. BARTON: I believe that it is included, but I will confirm that.

MS. SCHMIDT: And, now, JM -- now, JMJ has paid Ms. Lindauer's retainer for another of other -- another -- a number of other cases that you're also the member or president of, correct?

MR. BARTON: That is correct.

MS. SCHMIDT: So is there an -- so, is there an engagement letter between the Debtor, Dallas Real Estate Investors, and Ms. Lindauer, or is that between Ms. Lindauer and JMJ?

MR. BARTON: No. The Debtor. There's an engagement letter between the Debtor and -- and Ms. Lindauer.

MS. SCHMIDT: And what's -- what's JMJ's role with the Debtor? I mean, what's the relationship between the two?

MR. BARTON: It's the fee developer for the project and an advisor for the Debtor.

MS. SCHMIDT: So when you say advisor to the Debtor, is that for your services as an advisor for the Debtor?

MR. BARTON: For JMJ Development, it provides services of maintaining the day-to-day activities that the entity needs to fulfill its role.

MS. SCHMIDT: Right, but who's the human being with JMJ who provides those -- that guidance, that management?

MR. BARTON: Well, there's several people in the company, so there's various people that do work on this project.

MS. SCHMIDT: All right. Do all of those people report to you at JMJ?

MR. BARTON: Yes.

MS. SCHMIDT: And so I guess my question is, JMJ is owed almost a half a million dollars by Dallas Real Estate, and you're both president of the Debtor but you're also president of JMJ Development. How do you separate out your fiduciary duties? So, like, you have a duty to the Debtor, but then you also presumably have a duty to JMJ.

MR. BARTON: It's quite simple. The -- the Debtor takes priority because JMJ is doing work for the Debtor, and

so therefore it's subservient to the Debtor and the Debtor's fiduciary responsibilities are prime to JMJ's because it's a service provider.

MS. SCHMIDT: Okay. So, what does the Debtor do?

MR. BARTON: The Debtor is a holding company that owns an entity that is building a hotel and condominium development project on a piece of land located in Frisco.

MS. SCHMIDT: So, this is -- so, the Debtor owns, what is it, 50 percent -- let me look at the -- I'm going to start with the amended Schedule A/B. So I'm looking at Docket No. 37. So the Debtor has no cash. I'm looking at Page 1 of 8.

MR. BARTON: Correct.

MS. SCHMIDT: And so I'm looking at Page 6 of 8 on Docket 37. The Debtor owns 50 percent of Dallas Real Estate Lenders, which owns a hundred percent of FHC Acquisition, which owns the property at Syria Gate Way in Frisco. So the -- so the hotel is being built in Frisco; is that what -- was that your testimony?

MR. BARTON: That is correct.

MS. SCHMIDT: And so where in the process is the hotel? Like, what stage is it at?

MR. BARTON: Sure. It's a vacant piece of land right now, and all the entitlements and rights in the City have been secured, and now what goes on for about nine months

is the planning and the drawings and working with securing a management company for the hotel that will be built. And all these plans and drawings are underway.

And that process normally takes about nine months, and then once that's done, then the construction loan is approved based on the drawings and plans, the general contractor is hired to do the GMP contract for a fixed price, and then the construction starts.

MS. SCHMIDT: So, when you mean by the entitlements from the City of Frisco, the City of Frisco has said it's okay to build a hotel on this lot?

MR. BARTON: That is correct.

MS. SCHMIDT: What type of hotel will it be?

MR. BARTON: It's under negotiations on the actual management company, but it is a four-and-a-half to five-star hotel brand, so a higher-end hotel. Higher than, let's say, a Motel 6 or a regular Sheraton. So, an upper-end hotel, as well as -- 222 keys, as well as 70 condominiums that will be sold with the services and the branding of the management company.

MS. SCHMIDT: So, have you decided on a hotel brand yet?

MR. BARTON: We have two that have been selected, and the negotiations are going back and forth to determine which would be the best one.

MS. SCHMIDT: And so, so what's the role -- so, where are the decisions made on this? Is that at the level of Dallas Real Estate Investors, is it at the level of Real Estate Lenders Acquisition, LLC, or is it at the level of FHIC?

MR. BARTON: FHC.

MS. SCHMIDT: All right. So, FHC is the one -- so, for -- so, for those drawings and things like that, those engineers and architects doing the drawings and the plan, would they bill -- would they bill FHC, then?

MR. BARTON: That is correct.

MS. SCHMIDT: And so -- so the Debtor, is it -- well, just what does it do?

MR. BARTON: The Debtor is the holding company of the entity that owns the land.

MS. SCHMIDT: Okay. But, actually, it's the holding company of the holding company that owns the land? Would that be more accurate?

MR. BARTON: Well, the entity FH is the ownership entity, and it owns the land.

MS. SCHMIDT: So would Real Estate --

MR. BARTON: Whereas when you say a holding company, normally it's owning shares in another company.

MS. SCHMIDT: Okay. And so Real Estate Lenders Acquisition, would that be the entity that actually builds

And that time, as well as what the actual work value is, would bring an additional value for the plans.

MS. SCHMIDT: So, let's turn to Docket 16, which are the original schedules, and turning to Schedule D on Page 8 of 18. And so looking at Schedule D on Palisades, this $3.5 million that they're owed, is this -- how is this loan structured?

MR. BARTON: $3-1/2 million is part of the settlement agreement that was done with the Palisades group, and -- and they've been paid a portion of the original $4 million, and I believe that's -- that's what brought it down to $3-1/2 [million] now.

MS. SCHMIDT: Okay. When were they paid $4 million?

MR. BARTON: Say it again?

MS. SCHMIDT: When were they paid the $4 million?

MR. BARTON: Well, there's an agreed settlement of that amount of money, and then installment payments were paid over the last six months.

MS. SCHMIDT: Where did the money come from?

MR. BARTON: The money was advanced from JMJ Development.

MS. SCHMIDT: And the -- okay. And according to Schedule D, nobody else is liable on the claim. But you just testified before there might be some other entities liable on the claim to Palisades.

MR. BARTON: Yes. What I said is I believe there is and I need to double-check that. That is -- there is a -- I have to confirm whether the other entities are the -- the obligors or they're guaranteeing. I don't know that sitting here today.

MS. SCHMIDT: Okay. So it looks like Schedule D and Schedule H may need to be amended to disclose those -- either the co-obligors or the guarantors on that debt.

And then --

MR. BARTON: Yes.

MS. SCHMIDT: -- turning to Schedule E/F, what is FAB Studio? I'm on Page 11 of 18.

MR. BARTON: An archi... yeah, an architectural firm.

MS. SCHMIDT: And so did FAB Studio, is their bill to the Debtor or is it to FHC?

MR. BARTON: So, it's billed to FHC and the Debtor guarantees the debt to FHC on these plans and the design.

MS. SCHMIDT: All right. So I don't think that's on the schedules. That needs to be amended to disclose that FHC may be liable on that.

What about Hap Associates?

MR. BARTON: That was -- that would be the same thing. They're the engineering firm.

MS. SCHMIDT: And then HR Sterling?

MR. BARTON: They do -- take care of any of the administrative work and filings for the entity and do the paperwork and accounting for it. And that is direct to the Debtor.

MS. SCHMIDT: So they do bill the Debtor directly?
What about Jackson Walker, --

MR. BARTON: Correct.

MS. SCHMIDT: -- the law firm?

MR. BARTON: Yeah, I need to double-check. I believe that's direct to the Debtor.

MS. SCHMIDT: And then obviously JMJ Development, that $487,000, does that include the amount that was paid to Palisades?

MR. BARTON: Yes.

MS. SCHMIDT: And then McMurray -- does Palisades and the Debtor, do they have any common ownership or management?

MR. BARTON: At this time, with the settlement agreement, I don't believe they do. But, you know, I'd have to have the lawyers opine on it after reading that. But it's my understanding that, with this settlement agreement, not at this time.

MS. SCHMIDT: And then McMurray Law and Metzger Law, did they bill directly to the Debtor, or to FHC or somebody else?

MR. BARTON: The Debt... the Debtor.

MS. SCHMIDT: And these attorneys, what work were they doing on behalf of the Debtor?

MR. BARTON: The ongoing issues with Palisades over the last -- I think it's been about a year and a half or so, maybe two years.

MS. SCHMIDT: And then Morelli Design?

MR. BARTON: Similar to FAB Studios, they are -- contracted with FHC and an obligor of the Debtor.

MS. SCHMIDT: And then The Gate Property Owners Association, they're owed $19,000. What is that -- is that for HOA dues or what is that for?

MR. BARTON: That is correct. The master plan development has owner -- an owners association, and there's certain payments that have to be made to maintain the property, and that's what this payment is.

MS. SCHMIDT: Okay. And so on Schedule H, there aren't any co-debtors listed. That's going to need to be amended, because it looks like other entities are liable on some of the debts listed on Schedule D and E/F, and that needs to be fully disclosed.

MR. BARTON: Okay. We'll get that corrected. Thank you.

MS. SCHMIDT: So, on Schedule -- pardon me. On Docket 17, which are the statements, is it true that the

Debtor has never made any money?

MR. BARTON: That's correct.

MS. SCHMIDT: And there's been no losses or anything from fire, theft, or other casualty within a year before the filing of the case?

MR. BARTON: Correct.

MS. SCHMIDT: And then I'm looking at Page 3 of 6 of Docket 17. I'm looking at Question 13, Transfers Not Already Listed on This Statement. List any transfers of money or other property, by sale, trade, or any other means, made by a debtor or a person acting on behalf of the debtor within two years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security.

Has the -- has anybody made any transfers on behalf of the Debtor in the past two years?

MR. BARTON: No.

MS. SCHMIDT: What about that payment of --

MR. BARTON: No.

MS. SCHMIDT: -- JMJ Development to Palisades?

MR. BARTON: Say it again?

MS. SCHMIDT: So, you testified before that JMJ Development transferred money to Palisades to resolve -- pursuant to an agreeme... a settlement. When were those

transfers made?

MR. BARTON: That is not -- it's not -- it's not a transfer. It's an advance and a payment on behalf of the Debtor. So I don't -- I don't classify that as a transfer.

MS. SCHMIDT: Did money move?

MR. BARTON: What I understand a transfer is, something that the debtor had is transferred out of it or given to another party in the last two years. Those are just normal payments.

MS. SCHMIDT: Okay, but were those -- what about the lien? When did -- does Palisades have a lien against the Debtor or does it have a lien against FHC?

MR. BARTON: There is no liens that I know of.

MS. SCHMIDT: So why is it a --

MR. BARTON: What lien are you talking about?

MS. SCHMIDT: Well, Palisades is listed as a secured creditor on Schedule D. What does it have a lien against that the Debtor owns?

MR. BARTON: I'm -- I don't believe you need a lien to be a secured debt.

MS. SCHMIDT: What's its collateral?

MR. BARTON: Do you?

MS. SCHMIDT: Well, what's its collateral?

MR. BARTON: Well, it has -- yeah, it has -- I'll have to have the lawyers answer what the collateral is, but

as far as I know, they have their membership units in the Debtor entity. And there's also the settlement agreement. So that -- that seems -- that seems to be a secured settlement agreement with a fixed payment. But I can certainly get the lawyers opining on this.

MS. ALLEYNE: I think it's listed as a secured claim because of the interest in the property.

MS. SCHMIDT: Okay. But is it -- I guess what I'm asking is do they have -- have they -- has Palisades filed a lien in the deed records against the property that's owned by FHC? Or --

MR. BARTON: No. There is no lien filed. There's no lien filed anywhere.

MS. SCHMIDT: And then -- now, the Debtor, does it have any books and records?

MR. BARTON: As there's no bank accounts and no activity, there's very basic accounting of what's been advanced to it, but -- but no -- no balance sheet or P&L because there's been no activities. There's just an accumulation of the -- the debts that it has.

MS. SCHMIDT: But how do you track those debts if you don't really have records?

MR. BARTON: Well, I mean, it's just -- it's not a full-blown accounting audited statement, is what I'm saying. It's just a -- a very parochial book of what is owed. So we

do have that, yes.

MS. SCHMIDT: So I'm looking at Docket 17. I'm on Page 5 of 6. And No. 25, Question 25, Other Businesses in Which the Debtor Has or Has Had an Interest. And so the Debtor checked "None" in response. But we know that's not true because we have information listed in the schedule showing that the Debtor owns 50 percent of Real Estate Lenders Acquisition. So we need to amend the statements -- first off, I think we need to include --

MR. BARTON: Hold -- hold -- hold -- could you tell me which one you were looking at again?

MS. SCHMIDT: All right. So I'm looking at Question 25. I'm on Page 5 of 6 of Docket 17, the statements.

MR. BARTON: Page 5. Which part is it called? Part 12 or --

MS. SCHMIDT: It's Part 13, Details About the Debtor's Business --

MR. BARTON: Oh, Part 13? Oh, yes, I have it, I have it. It's right there. Yes.

MS. SCHMIDT: Yeah.

MR. BARTON: Yes, I have it.

MS. SCHMIDT: Yeah. So, 25, you checked "None." That's not true. You need to amend 25.

26, when I look at the responses to the subquestions, the subparts of Question 26, I would be under the impression that

the Debtor has no records. But if I were to ask for even the basic records, that -- because surely you had to have some type of records to put together schedules and Statement of Financial Affairs for this case -- where are those records kept?

MR. BARTON: Yeah, basically what they are is a -- an accounting of everybody that it owes money to. And that worksheet, if you will, has been done and we can give you that. That -- if that's what you're speaking to as a set of books.

But as I described, with not any ongoing business or revenue coming and going, there's just a list of the folks that it owes money to.

MS. SCHMIDT: Right. Where is that list kept?

MR. BARTON: With HR Sterling. I can get that for you.

MS. SCHMIDT: Well, you need to disclose that. You need to disclose that it's with HR Sterling right now under SOFA 26.

MR. BARTON: Okay.

MS. SCHMIDT: And then let's see. So the hundred -- so, who's the hundred percent owner? Is it you or is it TLB 2018 Irrevocable Trust?

MR. BARTON: The trust.

MS. SCHMIDT: Okay. And who's the trust for the

benefit of?
MR. BARTON: Tim Barton.
MS. SCHMIDT: Okay. And is the Debtor, is it a member of any consolidated group for tax purposes?
MR. BARTON: Could you repeat that one more time?
MS. SCHMIDT: So, has the Debtor -- is it a member of a consolidated group for tax purposes at all?
MR. BARTON: No.
MS. SCHMIDT: I'm going to go ahead and pass the witness for now. Mr. Sparks, if you have any questions for the Debtor, for Mr. Barton.
MR. SPARKS: Yes. Thank you.

EXAMINATION BY MR. SPARKS

MR. SPARKS: Mr. Barton, earlier you said JMJ Development is a fee developer on the project. Can you remind me, what project are you referring to?
MR. BARTON: The FHC hotel that's being built on John Hickman and the Toll Road, that piece of property there.
MR. SPARKS: Okay. And FHC Acquisition owns that real property?
MR. BARTON: Correct.
MR. SPARKS: And has FHC began construction on that project?
MR. BARTON: No.
MR. SPARKS: When was FHC's deadline to begin

construction?

MR. BARTON: I don't have that in front of me.

MR. SPARKS: Is it currently incurring a thousand dollars a day penalty for over a hundred days now for not starting construction on time?

MR. BARTON: I'm not familiar with that. I'd have to look at it.

MR. SPARKS: On Page 13 of the schedules, my client, The Gate Property Owners Association, is listed as a creditor of Dallas Real Estate Investors, LLC, the Debtor in this case. Is The Gate a creditor of Dallas Real Estate Investors?

MR. BARTON: FHC owes money to The Gate, and the Debtor is obligated to pay for FHC.

MR. SPARKS: So FHC is a creditor of Dallas Real Estate Investors; is that right?

MR. BARTON: Could you repeat that again?

MR. SPARKS: So, it sounds like FHC is a creditor of Dallas Real Estate Investors. Is that right?

MR. BARTON: Yeah, I'd have to ask the lawyers how they would articulate that, but as I said, FHC owes the money and any of those debts that FHC has is an obligation of the -- Dallas Real Estate.

MR. SPARKS: So is Dallas Real Estate Investors planning to pay The Gate the amount that it owes? That FHC

owes?

MR. BARTON: It -- it is planned to clear that debt. That is correct.

MR. SPARKS: So, the debt that's listed there is $19,979.56. What is that debt for?

MR. BARTON: I believe it's for the homeowners association or the association of The Gate. They have certain maintenance and other activities that are ongoing that they bill back to each property owner.

MR. SPARKS: You're talking about the regular assessments that FHC owes to The Gate?

MR. BARTON: I believe that's correct, yes.

MR. SPARKS: So the Debtor is going to pay that debt; is that right?

MR. BARTON: Correct.

MR. SPARKS: With what money?

MR. BARTON: It has negotiations going right now for new capital and recapitalization of the company, and also, as FHC moves forward with new financing, it will also bring in capital and repay its obligations to the DRE and as well as any other obligation that it has.

MR. SPARKS: Okay. And so when is construction slated to begin on the property?

MR. BARTON: January. Of next year.

MR. SPARKS: Okay. Now, you said somebody offered

FHC $9,250,000 for the real property nine months ago; is that right?

MR. BARTON: Correct.

MR. SPARKS: And who made that offer?

MR. BARTON: Well, there's confidentiality. And I'll -- can talk to the lawyers and see if we can disclose that to you.

MR. SPARKS: And you said that you believe the dirt is worth $10 million; is that right?

MR. BARTON: Correct.

MR. SPARKS: Does that valuation take into account the restrictive covenants on the property?

MR. BARTON: All of the covenants that are in place, correct.

MR. SPARKS: Okay. Thank you. I'll pass the witness.

MS. SCHMIDT: All right. Thank you, Mr. Sparks.

Ms. Rosen, any questions?

MS. ROSEN: Your Honor.

EXAMINATION BY MS. ROSEN

MS. ROSEN: Good morning, Mr. Barton. I have a quick question. I'm looking at Docket No. 16, which were the original schedules, and I'm looking at Schedule G, which is on Page 16 of 18. And there you have listed a settlement agreement -- a settlement agreement contract to be assumed.

And that's with Palisades. Is it the Debtor's intention to assume that executory contract?

MR. BARTON: Yes.

MS. ROSEN: And are you aware that when an executory contract is assumed that the Debtor is required to pay any outstanding defaults?

MR. BARTON: I don't understand what you mean.

MS. ROSEN: It means that when a debtor assumes a contract, in order to be able to assume an executory contract, you have to pay any amounts that are owing on the contract in order to be able to assume it.

MR. BARTON: Correct.

MS. ROSEN: Okay. And so my question is it says here that the executory -- the settlement agreement, as an executory contract, is to be assumed. And do you know how much is currently owed? I think you said earlier it was something over $4 million under the settlement agreement.

MR. BARTON: It's less than $4 million because there's been payments that have already been made.

MS. ROSEN: Okay. So less than $4 million, but over $3 million?

MR. BARTON: Correct.

MS. ROSEN: And how is the Debtor going to be able to assume that executory contract? With what money?

MR. BARTON: It's in negotiations as we speak with

parties that are going to invest into -- into the Debtor's entity and pay off the settlement agreement.

MS. ROSEN: And what's the time schedule on that?

MR. BARTON: Right now, we believe it will be done in less than 60 days.

MS. ROSEN: And what's the status of the negotiations? Are these just verbal negotiations? Do you have -- have you exchanged a letter of intent or a term sheet? Or what's the -- what's the status on those negotiations?

MR. BARTON: There was a letter of intent and it moved to a term sheet and now we're working on a actual contract that would be the final document for the closing.

MS. ROSEN: Okay. Do you recall --

(Interruption.)

MS. SCHMIDT: All right. We are back on the record. Ms. Rosen, do you want to ask your question again, if you can remember what it was?

MS. ROSEN: I'll do my best.

Okay. So, Mr. Barton, last week, Palisades and the Debtor and some other of the related entities entered into an agreed order on a motion that had previously been filed by Palisades. And as part of that agreed order, FHC Acquisition, Dallas Real Estate Lenders, and the Debtor and Palisades agreed to provide each other with copies of any

letters of intent, term sheets, purchase and sale agreements, or similar documents relating to any investment or potential investment in the Frisco property, FHC Acquisition, or Dallas Real Estate Lenders.

And it sounds like you are telling me that the Debtor has a letter of intent and a term sheet with a third party relating -- that will result in some sort of a recapitalization of the property. And I guess my question is, have those documents been provided to Palisades? To my knowledge, they have not. And when will they be provided?

MR. BARTON: Yes. I can check with our lawyers, I know they've been given to them, and it's, you know, in the process of getting over to Palisades.

MS. ROSEN: By your lawyers, do you mean Ms. Lindauer?

MR. BARTON: Ms. Lindauer and also Mr. Metzger, Steve Metzger.

MS. ROSEN: And is -- I apologize. Who's on the line from Ms. Lindauer's firm?

MS. ALLEYNE: Kerry Alleyne.

MS. ROSEN: Hi. Ms. Alleyne, would you mind, please, providing us with copies of those documents?

MS. ALLEYNE: I mean, I'll check in on the status with Ms. Lindauer and Mr. Metzger. I wasn't involved, so I'll look into it.

MS. ROSEN: I just want to make a formal demand for those records. I mean, that was part of our deal last week, was that those things are supposed to be provided. And I appreciate Mr. Barton saying that those will be provided to us, and I just -- we need -- we need to get those documents. Okay.

MS. ALLEYNE: Well, --

MS. ROSEN: So, Mr. Barton, --

MS. ALLEYNE: -- not going to accept this as a venue for a formal demand. I will check into it. I have no idea what occurred. I wasn't involved.

MS. ROSEN: Okay. No, I appreciate it. We've just got a court order that those are to be turned over, and I just want to make sure that those are going to be turned over.

MR. BARTON: We'll get it done.

MS. ROSEN: Okay.

MR. BARTON: No problem.

MS. ROSEN: Okay. I appreciate it. Thank you.

Mr. Barton, okay. Another question. As to FHC (inaudible) level relating to the property, is there any bank debt on the property?

MR. BARTON: Yes.

MS. ROSEN: How much is that bank debt?

MR. BARTON: I believe it's $3-1/2 -- $3.2 [million]

or -- somewhere between $3.2 and $3.5 [million] is the amount of the loan.

MS. ROSEN: Okay. When was that -- when did that loan originally go into place?

MR. BARTON: Hmm. I think January of 2020.

MS. ROSEN: Okay. And what was the original term?

MR. BARTON: I believe it's been $3.2 [million] -- well, that -- I don't -- the original amount I don't think has changed since the date of --

MS. ROSEN: I'm sorry. I didn't mean to -- you can finish your answer. I'm sorry.

MR. BARTON: Yeah. The original amount when the property was acquired, there was a loan on there, and that amount has not changed.

MS. ROSEN: What was the term of that loan? Was it a 12-month term? Was it a one-year loan?

MR. BARTON: I believe it was a one-year with a six-month extension, and we've done one extension, and the next extension is -- is underway as we speak.

MS. ROSEN: So if there was -- if it was for a year from January and there's a six-month extension, so January, that means that it would have expired in July?

MR. BARTON: I believe the end of July. That's correct.

MS. ROSEN: Has there been a default?

MR. BARTON: No. The bank has, I think, over -- over a hundred thousand dollars of interest payments. And so there's just been a month extension while they're waiting to get the documents for the next six-month extension done.

MS. ROSEN: There's been a one-month extension?

MR. BARTON: Correct.

MS. ROSEN: Is that something that was in writing?

MR. BARTON: It is not. The bank just did it. They're, you know, they're underway of getting the paperwork and they've been a little bit busy, so they -- they just extended it. And hopefully we'll have those documents today or tomorrow.

MS. ROSEN: What -- what was the basis for the extension? Was it a verbal or was that an email?

MR. BARTON: There's no email or anything. They -- you know, we spoke to them on the phone and they -- they said that the loan is fine for another month and that they will, you know, they expect to have the paperwork done, you know, last Friday, but I guess they've been a little bit busy with -- with everything going on and the COVID issues that have been popping up. They had some staff that was out. And so there's a little bit of a delay.

MS. ROSEN: Okay. And when those -- when that extension gets signed, though, those documents are also going to be provided to Palisades, correct?

MR. BARTON: Absolutely, yes.

MS. ROSEN: What's the -- let me see.

MS. SCHMIDT: And Ms. Rosen, about how many more questions do you have? The reason I'm asking is that there's another 341 meeting starting at 10:00 a.m., and it's 9:55. I didn't know if you had like only one or two more questions, or --

MS. ROSEN: Just, I guess my only other question is what's -- what's the status on getting the property -- or, the amount that's owed to the Property Association paid?

MR. BARTON: Your question is when is it going to be paid?

MS. ROSEN: Correct.

MR. BARTON: I would -- I would see it getting paid within the next 60 days.

MS. ROSEN: And you -- okay. And paid, are you talking paid by the Debtor or paid by FHC Acquisition?

MR. BARTON: It would ultimately be paid by the Debtor. So, yes, from the Debtor.

MS. ROSEN: What's the agreement between the Debtor and FHC Acquisition that requires FHC -- that requires the Debtor to pay FHC Acquisition's bills?

MR. BARTON: As the holding company for it, if FHC doesn't have funds, then it looks to the Debtor for funds.

MS. ROSEN: But the Debtor is not the holding

company, is it? Of FHC Acquisition?

MR. BARTON: I believe it is, yes.

MS. ROSEN: Is there another level in between called Dallas Real Estate Lenders?

MR. BARTON: I'd have to look at the org chart. I don't have it sitting here in front of me.

MS. SCHMIDT: That's how it's -- that's how it's --

MS. ROSEN: Okay.

MS. SCHMIDT: -- set forth in Schedule A/B.

MR. BARTON: Okay. I'd like to confirm that in the org chart before I comment on it.

MS. SCHMIDT: Well, you signed those schedules under penalty of perjury, Mr. Barton.

MR. BARTON: I believe that that is -- information is correct, but I'd like to check it.

MS. SCHMIDT: Sorry, Ms. Rosen. Go own.

MS. ROSEN: I don't think I have any other questions, Erin. You can get on to your next 341.

MS. SCHMIDT: All right. So we need to get some amendments to the schedules and SOFAs, Ms. Alleyne. And I'll email those proposed amendments to you, as well as some other outstanding administrative issues. Like, for example, the declaration page on the insurance. Do you think you can get those amendments done in about two weeks from today?

MS. ALLEYNE: Yes.

MS. SCHMIDT: All right. With that, I'm going to go ahead and conclude the meeting of creditors. I'm going to hit the stop button on the recorder.

(Whereupon, after 50 minutes, the meeting of creditors was concluded.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript to the best of my ability from the electronic sound recording provided of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **08/19/2021**

_________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS 3

WITNESSES

Tim Barton, Debtor's Representative

Examination by Ms. Schmidt 4
Examination by Mr. Sparks 24
Examination by Ms. Rosen 27

EXHIBITS

END OF MEETING 36

INDEX 37