Jeff P. Prostok
State Bar No. 16352500
Suzanne K. Rosen
State Bar No. 00798518
FORSHEY & PROSTOK, L.L.P.
777 Main Street, Suite 1550
Fort Worth, Texas 76102
(817) 877-8855 ● (817) 877-4151 Fax
jprostok@forsheyprostok.com
srosen@forsheyprostok.com

*Attorneys for Palisades TC, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **DALLAS REAL ESTATE INVESTORS, LLC,** | § | **Case No. 21-41488-elm11** |
| | § | |
| | § | **Emergency Consideration Requested** |
| **Debtor.** | § | |

**PALISADES TC, LLC'S MOTION TO CONVERT BANKRUPTCY CASE TO CHAPTER 7 OR DISMISS FOR CAUSE UNDER SECTION 1112(b) OF THE BANKRUPTCY CODE**

TO THE HONORABLE EDWARD L. MORRIS, UNITED STATES BANKRUPTCY JUDGE:

COMES NOW Palisades TC, LLC ("Palisades"), a party in interest in the above-referenced case, and hereby files this *Motion to Convert Bankruptcy Case to Chapter 7 or Dismiss for Cause under Section 1112(b) of the Bankruptcy Code* (the "Motion"). In support of the Motion, Palisades would respectfully show the Court as follows:

## JURISDICTION

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1334. This bankruptcy case and all related proceedings have been referred to this Court pursuant to 28 U.S.C. § 157. This matter constitutes a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court has full constitutional jurisdiction to enter a final order on this Motion.

**EXECUTIVE SUMMARY**

2. The Debtor in this case has no cash, no bank accounts, no employees, no business operations, and no ability to fund a chapter 11 plan. Instead, its only asset is a 50% interest in another entity, Dallas Real Estate Lenders, LLC ("DREL"), which it acquired approximately 18 months ago for a mere $10. The Debtor's equity interest in DREL likely has little or no value. Although DREL owns another entity, FHC Acquisition, LLC, which owns some valuable (but undeveloped) piece of property located in Frisco, Texas (which it obtained using a bank loan and the funds from Palisades' preferred equity investment in DREL), the value of the Frisco Property likely does not exceed the amount necessary to repay the bank, the other debts on the property and the amount of Palisades' preferred equity investment in DREL, all of which would have to be paid in full before any money could flow up to the Debtor on account of its equity interest in DREL. Moreover, as explained below, if the Debtor's equity interest in DREL has any value, such value may be rapidly diminishing based on certain covenants in the purchase and sale agreement relating to the Frisco Property because the Debtor does not have the resources to properly develop the Frisco Property. Any value would also be reduced by the administrative expenses associated with a chapter 11 bankruptcy case. Thus, because the Debtor is incurring continuing loss and has no reasonable likelihood of rehabilitation, its bankruptcy case should be converted to chapter 7.

3. Alternatively, as explained below, the Debtor did not file its bankruptcy case to rehabilitate its (non-existent) business. Instead, it filed the bankruptcy case in a vain attempt to retain control over the Frisco Property while it frantically searches for a new investor willing to invest enough money in the Frisco Property to cover the $4.75 million owed to Palisades under a settlement agreement between the parties under which the Debtor defaulted. Specifically, the Debtor filed its bankruptcy petition the day before the expiration of its cure period under the settlement agreement to gain a tactical advantage in the litigation and prevent Palisades from

pursuing its rights against the Debtor, its principal, Tim Barton, and certain other Barton-related entities in state court. The Debtor presently has no cash flow or other means of curing the default under the settlement agreement and is gambling at the expense of Palisades, DREL and FHC Acquisition that an investor can be located before its bankruptcy case is converted or dismissed. This is not an appropriate use of the chapter 11 process. As a result, the Debtor's bankruptcy case should either be converted to chapter 7 or dismissed altogether. However, Palisades would prefer conversion and believes the oversight of a chapter 7 trustee is needed with respect to the Debtor's equity interest in DREL and indirect interest in the Frisco Property.

## BACKGROUND

4. On June 22, 2021 (the "Petition Date"), Dallas Real Estate Investors, LLC ("Debtor" or "DREI") filed a voluntary petition commencing a bankruptcy case under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, et seq. The Debtor continues to manage its affairs as a debtor-in-possession.

### A, Relationship Between Palisades and Timothy Barton

5. The Debtor's principal, Timothy Barton ("Barton"), owns a number of special purpose vehicles involved in various real estate development projects in the Dallas-Fort Worth area. These real estate development projects typically involve multiple levels of Barton-owned or controlled entities between Barton and the real estate project. In 2019 and 2020, Palisades invested $7.5 million into two of Barton's real estate ventures, one relating to proposed residences and a luxury hotel to be built in the Turtle Creek area of Dallas (the "Turtle Creek Property") and another relating to a luxury hotel and mixed-use real estate development project to be developed in Frisco, Texas (the "Frisco Property"). Although years have passed and substantial money has been invested into these development projects by Palisades and others, both the Turtle Creek Property and the Frisco Property remain nothing more than dirt.

**B. Palisades' Investment in the Turtle Creek Property**

6. In 2019, Palisades made a preferred capital contribution of $4 million to acquire a 49.95% interest in an entity called Five Star GM, LLC ("Five Star GM"). Five Star GM was owned 49.95% by Palisades, 49.95% by 2999 TC JMJ MGR, LLC[1] (a Barton affiliate), and 0.1% by Five Star MM, LLC ("Five Star MM"), which is wholly owned by Barton. There are at least three additional entities (Five Star TC, LLC, MO 2999TC MZ, LLC, and MO 2999TC, LLC) between Five Star GM and the Turtle Creek Property, such that the organizational structure pertaining to the ownership of the Turtle Creek Property is believed to be as follows:




[1] At least one of the investors in 2999 TC JMJ MGR, LLC, named 2999TC LP, LLC, also recently sought bankruptcy protection in Case No. 20-43204-mxm11.

7. The Turtle Creek Property was to be managed by Barton through Five Star MM. However, section 5.02 of the Five Star GM Company Agreement dated September 16, 2019 (the "Five Star GM Company Agreement"), a copy of which is attached hereto as **Exhibit A**, provided for Palisades to receive a priority return on account of its preferred capital contribution. (See Ex. A, §5.02(a)). The Five Star GM Company Agreement also required Five Star MM, as the managing member, to obtain prior written approval from Palisades before taking certain actions relating to the Turtle Creek Property. (See Ex. A, § 6.02(a) through (ff)). Finally, the Five Star GM Company Agreement also required Five Star MM to provide Palisades with timely financial reporting (see Ex. A, §12.03) and access to the Five Star GM books and records (see Ex. A, §12.01).

**C. State Court Lawsuit by Palisades against Five Star MM, LLC and Barton**

8. The relationship between Palisades, on the one hand, and Five Star MM and Barton, on the other, quickly soured. Approximately seven (7) months after making its $4 million preferred capital contribution in Five Star GM, Palisades sued Five Star MM and Barton in the 193rd District Court in Dallas County, Texas for, e.g., breaching the Five Star GM Company Agreement by failing to make certain preferred equity payments to Palisades, failing to provide Palisades with the required financial reporting, taking certain actions with respect to the Turtle Creek Property without Palisades written consent, permitting a Barton-affiliated entity, JMJ Development, to occupy space on the Turtle Creek Property without Palisades' consent, and failing to provide Palisades with access to Five Star GM's books and records. Palisades also asserted claims for breach of fiduciary duty and fraud against Barton and Five Star MM. Finally, Palisades requested injunctive relief to prevent Five Star MM and Barton from obstructing Palisades' access to Five Star GM's books and records or taking any other action relating to the Turtle Creek Property without Palisades' written consent in violation of the Five Star GM Company Agreement. A copy of Palisades' Original Petition and Application for Temporary

Restraining Order and Temporary Injunction against Five Star MM and Barton, individually, is attached hereto as **Exhibit B**.

**D. Palisades Investment in Dallas Real Estate Lenders, LLC**

9. In 2020, Palisades made a preferred capital contribution of $3.5 million to acquire a preferred equity interest in Dallas Real Estate Lenders, LLC ("DREL"), another Barton-affiliated entity. The Debtor and Palisades each own fifty percent (50%) of DREL, which owns 100% of FHC Acquisition, LLC ("FHC Acquisition"). FHC Acquisition owns certain real property described as "Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas," referred to herein as the Frisco Property. Consequently, the relationship between Palisades, Barton, the Debtor, DREL, FHC Acquisition and the Frisco Property is as follows:



10. The Frisco Property was to be managed by Barton through DREI. However, section 5.02 of the DREL Company Agreement dated January 29, 2020 (the "DREL Company Agreement"), a copy of which is attached hereto as **Exhibit C**, likewise provided for Palisades to receive a priority return on account of its preferred capital contribution. (See Ex. C, §5.02(a)). Although Debtor is the "Manager" of DREL responsible for its day-to-day management, the DREL Company Agreement likewise requires the Debtor to obtain prior written approval from Palisades before taking certain actions relating to the Frisco Property. (See Ex. C, § 2.08(a) through (gg)). Finally, the DREL Company Agreement also requires DREI to provide Palisades with timely financial reporting (see Ex. C, §7.07) and provides for equal access by the Members to DREL's books and records (see Ex. C, §7.02).

11. Although the membership interests in DREL are divided equally (50%-50%) between Palisades and the Debtor, ***Palisades' initial investment in DREL was $3.5 million dollars ($3,500,000.00) and the Debtor's initial investment was ten dollars ($10.00).*** The remaining capital used by FHC Acquisition to acquire the Frisco Property was obtained from an approximately $3 million loan (the "FHC Loan") from Texas Republic Bank, N.A. ("Texas Republic"). In exchange for its $3.5 million investment in DREL, Palisades was granted the right to a preferred equity return, set forth in section 5.02 of the DREL Operating Agreement, which (among other things) requires the repayment in full of Palisades' capital contribution in DREL plus interest and payment of Palisades' preferred profit participation before any distributions can be made to the Debtor.

**E. The Litigation Between Palisades, Barton and the Debtor**

12. The relationship between Palisades, on the one hand, and the Debtor and Barton, on the other, also quickly soured. Approximately three (3) months after making its $3.5 million preferred capital contribution in DREL, Palisades sued DREI and Barton in the 298th District Court in Dallas County, Texas for, e.g., breaching the DREL Company Agreement by

failing to make certain preferred equity payments to Palisades, failing to provide Palisades with the required financial reporting, taking certain actions with respect to the Frisco Property without Palisades written consent, and failing to provide Palisades with access to DREL's books and records. Palisades also asserted claims for fraud against the Debtor and Barton based on their failure to disclose certain defaults relating to the Turtle Creek Project in order to induce Palisades to invest in the Frisco Project. Finally, Palisades requested injunctive relief to prevent DREI and Barton from obstructing Palisades' access to DREL's books and records or taking any other action relating to the Frisco Property without Palisades' written consent in violation of the DREL Company Agreement. A copy of Palisades' Original Petition and Application for Temporary Restraining Order and Temporary Injunction against the Debtor and Barton, individually, is attached hereto as **Exhibit D**.[2]

## F. The Settlement Agreement between Palisades, Five Star MM, the Debtor and Barton

13. After some contentious, expensive and time-consuming litigation in the two state court suits between Palisades and Barton and the Barton-related entities (Five Star MM and the Debtor), which included motions by Barton in both cases to disqualify Palisades' state court counsel and motions for sanctions against Barton and his affiliated entities by Palisades, the parties entered into a global settlement agreement (the "Settlement Agreement") dated January 11, 2021. A copy of the Settlement Agreement is attached hereto as **Exhibit E**. The Settlement Agreement is between Palisades, on the one hand, and Barton, the Debtor, Five Star MM, 2999 TC JMJ MGR, LLC, and Five Star GM, LLC (collectively, the "JMJ Entities"), on the other.[3] The Settlement Agreement, if performed by the JMJ Entities, would have resolved the two state

[2] On July 27, 2021, the Debtor removed the DREI state court litigation matter to the United States District Court for the Northern District of Texas under 28 U.S.C. § 1452 and Fed. R. Bankr. P. 9027, where it remains pending as Civil Action No. 21-cv-01745-K. However, the case has not yet been referred to the Bankruptcy Court.

[3] The Settlement Agreement also includes the manager of Palisades, Joaquin de Monet, and JMJ Development LLC (another Barton entity) for purposes of the releases in section 2.4 of the Settlement Agreement.

court litigation matters between Palisades, Barton and the Barton-related entities named in the respective lawsuits.

14. The Settlement Agreement provides for a payment by the JMJ Entities to Palisades of $5 million. Section 2.1 of the Settlement Agreement required the JMJ Entities, which include the Debtor, to make a "good faith" payment of $50,000 to Palisades by January 15, 2021. The remaining $4.95 million (the "Settlement Payment") under the Settlement Agreement was due and payable by the JMJ Entities on or before February 15, 2021 (the "Settlement Payment Deadline"). However, section 2.3 of the Settlement Agreement also provides that the JMJ Entities may extend the Settlement Payment Deadline through June 15, 2021 by making additional $50,000 payments on or before February 15, 2021, March 15, 2021, April 15, 2021 and May 15, 2021 (the "Extension Payments"). The Settlement Agreement further provides that each timely paid Extension Payment will reduce the amount of the Settlement Payment by the amount of the Extension Payment.

15. After the execution of the Settlement Agreement, the JMJ Entities made the good faith payment and the Extension Payments. The effect of making these payments was that: (i) the amount of the remaining Settlement Payment was reduced from $5 million to $4.75 million, and (ii) the full amount of the remaining Settlement Payment (or $4.75 million) was due and payable on June 15, 2021. Ultimately, after extending the Settlement Payment Deadline for five months, the JMJ Entities did not pay the remaining Settlement Payment on June 15, 2021. However, paragraph 3.2 of the Settlement Agreement provides the following right to cure:

> 3.2. **Right to Cure**. Notwithstanding any conflict herein, any of the JMJ Entities shall have the right to cure any default of this Agreement for five (5) Business Days after receipt of written notice, a copy of which may be sent by email to tbarton@jmjdevelopment.net, with a copy to smetzger@pmklaw.com.

See Ex. E, Settlement Agreement, §3.2).

16. Accordingly, on June 16, 2021, Palisades sent a written notice of default (the "Default Letter") to the JMJ Entities, including the Debtor, that they had defaulted under the Settlement Agreement by failing to pay the remaining Settlement Payment by the Settlement Payment Deadline on June 15, 2021. A copy of the Default Letter is attached hereto as **Exhibit F**. Under section 3.2 of the Settlement Agreement, the JMJ Entities had five (5) business days, or until June 23, 2021, to cure the default by paying the full amount of the $4.75 million Settlement Payment under the Settlement Agreement.

17. The Settlement Agreement provides in section 2.4 that the mutual releases contained in the Settlement Agreement are conditioned upon timely payment of the Settlement Payment and that, in the event of a default under the Settlement Agreement, with one exception not relevant here, the releases would be void and the parties would be free to pursue their respective claims in the state court proceedings. Section 2.4 of the Settlement Agreement also provides that the good faith payment and Extension Payments will be credited against amounts that may be owed, upon final judgment, by the defendants in the state court proceedings.

### G. The Debtor Failed to Cure the Default under the Settlement Agreement and Filed Bankruptcy as a Litigation Tactic to Thwart Palisades in the State Court Proceedings

18. The JMJ Entities did not cure the default under the Settlement Agreement by making the $4.75 million Settlement Payment on or before June 23, 2021. Instead, on June 22, 2021, the Debtor filed the instant bankruptcy case. The Debtor's bankruptcy case was apparently filed as a litigation tactic to thwart Palisades' efforts in the state court action while the JMJ Entities attempt to search for a new investor to invest in the Turtle Creek Property and/or Frisco Property. If they are able to locate such an investor, it appears the Debtor intends to (i) assume the Settlement Agreement, and (ii) cure the default under the Settlement Agreement with the funds obtained from this (yet to be located) new investor. However, the Debtor's use of the bankruptcy process as a litigation tactic, and its gambling on its ability to locate a new

investor for either the Turtle Creek Property or Frisco Property at the expense of Palisades, is not a proper use of the protections afforded under the Bankruptcy Code. Ultimately, this case involves a two-party dispute between Palisades and Barton and his related entities, including the Debtor, and should either be converted to chapter 7 so a chapter 7 trustee can manage the Debtor's business affairs or dismissed altogether so that Palisades may pursue its rights in state court under the applicable agreements.

**H. The Debtor Has No Employees, No Cash or Business to Rehabilitate**

19. The Debtor's bankruptcy Schedules [Docket Nos. 16 and 37], attached hereto as **Exhibits G and H**, respectively, reflect that the Debtor has no cash, bank accounts, business operations from which to generate revenue, or property of any kind or nature other than its 50% equity interest in DREL. Incredibly, although the Debtor's interest in DREL was only acquired approximately eighteen (18) months ago for a mere ten dollars ($10), the Debtor's Schedules list its equity interest in DREL as having a value of $10 million. In reality, the value of the Debtor's interest in DREL is much lower (and possibly worth $0) because the Debtor's valuation does not account for (i) the FHC Loan of $3+ million against the Frisco Property, or (ii) either the $4.75 million Settlement Payment or the preferred payments that would have to be made to Palisades under the DREL Company Agreement, which Palisades estimates to be approximately $5 million, either of which would have to be paid before the Debtor could realize any value on account of its equity interest in DREL.[4] Moreover, the Collin County Appraisal District currently lists the value of the unfinished Frisco Property at only $6.34 million, which would not be enough to repay the FHC Loan and cover either the Settlement Payment or Palisades' preferred equity investment.

[4] Curiously, the Debtor listed Palisades as a secured creditor in its Schedule D [see Dkt. 16, p. 8]. As discussed above, Palisades made a $3.5 million capital contribution to DREL. It is not a secured creditor of the Debtor.

20. The Debtor's Statement of Financial Affairs ("SOFA") [Docket No. 17], attached hereto as **Exhibit I**, likewise demonstrates that the Debtor has no business income, books or records, and that even its filing fee and attorneys' fees have been paid for by another Barton-affiliated entity, JMJ Development LLC ("JMJ Development").

21. Finally, likely because it has no business operations, the Debtor also has little or no business debt. Specifically, although the Debtor listed Palisades as a secured creditor with a $3.5 million secured claim, this is incorrect. As discussed above, Palisades made a $3.5 million preferred equity investment in DREL. It is not a secured creditor of the Debtor. Likewise, Barton testified at the section 341 Creditors Meeting that the majority of the $ 809,989.59 in unsecured claims reflected on the Debtor's schedules pertain to the Frisco Property and are thus claims against FHC Acquisition (and not the Debtor). These include the purported unsecured claims of Fab Studio, Halff Associates, HR Sterling, Morelli Design, and the Gate Property Owners Association (the "Gate POA"), all of which total $198,220.27. The Debtor's remaining purported unsecured claims include (i) law firms which Barton testified were engaged in connection with the state court litigation between Palisades and the Debtor (including Jackson Walker, McMurray Law,[5] and Metzger Law PLLC), which total $94,391.25, and (ii) an unsecured claim in the amount of $487,537.22 to JMJ Development for alleged "Business Debt."[6] Consequently, aside from an unexplained claim by "Tint Zone" in the amount of $1,060.85 and the alleged insider claim to JMJ Development LLC (which may be subject to recharacterization as a capital contribution or equitable subordination), all of the purported unsecured claims of the Debtor are either debts owed to FHC Acquisition (not the Debtor) or represent attorneys fees incurred by the Debtor litigating the state court matters with Palisades.

[5] The original Purchaser Statement for the Frisco Property attached hereto as **Exhibit K** also contains debts to Jackson Walker and McMurray Law, PLLC. Consequently, these claims also appear to be debts of FHC Acquisition rather than the Debtor.

[6] At the creditor's meeting, however, Barton testified that these amounts also include payments made to Palisades under the Settlement Agreement. See Ex. N at p. 15.

### I. The Debtor Is Not Properly Managing DREL or the Frisco Property

22. As discussed, the Debtor is the Manager of DREL responsible for overseeing its day-to-day business operations. DREL, in turn, is the sole member of FHC Acquisition. (See the FHC Acquisition Company Agreement attached hereto as **Exhibit J** at Schedule A). The FHC Acquisition Company Agreement further provides that DREL is the "Managing Member" of FHC Acquisition (see FHC Acquisition Company Agreement at p. 6). However, under Article X, paragraph 8, DREL as the Managing Member of FHC Acquisition, cannot take any actions which would require Palisades' approval. (See FHC Acquisition Company Agreement at p. 18). Thus, as the Manager responsible for the day-to-day management of DREL, the Debtor also controls FHC Acquisition (subject to the taking of certain actions which require Palisades' written approval) because DREL is the sole member and Managing Member of FHC Acquisition.

23. However, the Debtor does not appear able to capably manage the affairs of DREL and/or FHC Acquisition. For example, as evidenced from the Debtor's schedules, the $19,979.56 for the Gate POA fees have not been paid for the June 1, 2020 to May 31, 2021 fiscal year. Indeed, counsel for the Gate POA has sent several demand letters to Barton and is threatening litigation against FHC Acquisition. (See Demand Letter dated March 4, 2021 attached hereto as **Exhibit L**). Additional Gate POA fees for the June 1, 2021 to May 31, 2022 may also be due and payable. The amount owed by FHC Acquisition to the Gate POA is not known to Palisades, however, because the Debtor never provided Palisades with any of the statements or default letters from the Gate POA. Instead, the default letters were obtained from the Gate POA's counsel.

24. Moreover, section 5.9 of the purchase and sale agreement for the Frisco Property (the "Frisco Property PSA") requires FHC Acquisition to commence construction on the development project within nine (9) months of the closing of the sale on January 31, 2021, and complete construction within construction within three years after the date construction

commences. The time period to commence construction expired on October 31, 2020. Since no construction on the project has begun, absent an extension based on force majeure or unless otherwise agreed to with the seller of the Frisco Property, it appears FHC Acquisition may be incurring a $1,000 "performance deadline fee" for every day that transpires before construction on the property commences. (See section 5.9 of the Frisco Property PSA and the amendments thereto, which are collectively attached as **Exhibit M**). Alternatively, absent an extension based on force majeure or an agreed extension with the seller, the Frisco Property PSA contains a provision for the repurchase of the property by the seller. The Frisco Property PSA also provides that the failure to comply with the commencement deadline and completion deadline constitute a post-closing default under the Frisco Property PSA. Consequently, by the end of August 2021, FHC Acquisition may have incurred approximately $123,000 in performance deadline fees based on its failure to commence construction on the Frisco Property. Alternatively, if the Debtor allowed FHC Acquisition to default under the Frisco Property PSA, it may have put the entire investment in the Frisco Property in jeopardy.

25. In addition to a possible default under the Frisco Property PSA, the Debtor may also have allowed FHC Acquisition to default under the terms of the FHC Loan. Barton testified at the 341 Meeting that the original term of the FHC Loan was for one year or until approximately January 31, 2021. Barton further testified that the FHC Loan had been extended for six (6) months, until July 31, 2021. Although Barton testified that the Debtor obtained a verbal one-month extension and has been working with Texas Republic to obtain an additional six-month extension of the FHC Loan, the Debtor has not obtained any written documentation providing for a further extension of the FHC Loan. (See Transcript Excerpts from Section 341 Meeting, attached hereto as **Exhibit N**, at pp. 31-34). Alternatively, to the extent any further extension of the FHC Loan has been obtained, the Debtor has not provided such information to Palisades in violation of the terms of the Agreed Order entered into between Palisades and the

Debtor on August 3, 2021 [see Docket No. 42]. Either way, aside from a purported one month verbal extension, Palisades has no information regarding the status of the FHC Loan, including whether it is (or may soon be) in default.

26. Finally, the Debtor's schedule G provides that the Debtor intends to assume the Settlement Agreement with Palisades. However, the Debtor currently has no cash, revenues or business operations of any kind from which it could make the $4.75 million Settlement Payment. At the Section 341 Meeting, Mr. Barton testified that the Debtor is in negotiations with some unknown parties that are purportedly going to invest in the Frisco Property and make the Settlement Payment to Palisades. (See Transcript Excerpts, Ex. N at pp. 27-29). Mr. Barton further testified that a letter of intent and term sheet have been executed with such third party to recapitalize the property and that he is "working on a actual contract that would be the final document for closing." (See Ex. N at pp. 29-30). Under the Agreed Order entered on August 3, 2021, however, Barton and his related entities are required to provide Palisades with copies of "any letters of intent, term sheets, purchase and sale agreements, or similar documents relating to any investment or potential investment in the Frisco Property, FHC Acquisition, or DREL." [See Docket 42 at ¶ 6]. Counsel for Palisades requested a copy of the documentation relating to this purported recapitalization and followed up with an email to the Debtor's counsel requesting this information. [See Email to J. Lindauer attached hereto as **Exhibit O**]. To date, however, no documentation regarding a proposed recapitalization or other investment relating to the Frisco Property has been provided. Consequently, either no such investor exists or the Debtor is violating the terms of the Court's Agreed Order. Either scenario supports conversion.

27. As discussed in greater detail below, the Debtor's bankruptcy case should be converted to chapter 7 or dismissed for cause. The Debtor has no business operations and, consequently, the administrative expenses of its chapter 11 case are causing continuing loss to its bankruptcy estate. Likewise, because the Debtor has no cash, employees or business

operations, there is no business here to rehabilitate and the Debtor clearly does not have the resources to develop the Frisco Property. Because the Debtor lacks the resources to develop the Frisco Property, the company it manages (FHC Acquisition) may be in default under the Frisco Property PSA, incurring performance deadline fees of $1,000 per day, and/or at risk of losing its entire investment in the Frisco Property. Further, if the Debtor has any equity in the Frisco Property, such equity is being negatively and directly impacted by the Debtor's inability to properly develop the property. Finally, this bankruptcy case was improperly filed as a litigation tactic to prevent Palisades from pursuing its rights against the Debtor, Barton and the other JMJ Entities under the applicable transaction documents in state court. Consequently, to the extent there may be equity in the Frisco Property, the case should be converted to chapter 7 so that the Frisco Property may be sold to repay the FHC Loan, pay FHC Acquisition's creditors, pay the amounts owed to Palisades on account of its preferred equity investment in DREL under the DREL Company Agreement, and then distribute the remainder to the chapter 7 trustee on account of the Debtor's equity interest in DREL for distribution to the Debtor's legitimate creditors. Alternatively, because it involves a two-party dispute, the case may also be converted or dismissed as a bad faith filing.

## ARGUMENTS AND AUTHORITIES

### A. The Debtor's Bankruptcy Case Should Be Converted to Chapter 7 for Cause

28. By this Motion, Palisades requests entry an order, pursuant to Bankruptcy Code section 1112(b)(4)(A), converting the case to chapter 7 for cause. Bankruptcy Code section 1112(b)(1) of the Bankruptcy Code provides, in pertinent part:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1). As a co-investor in DREL with the Debtor and the party with the

greatest economic interest in (and risk relating to) the Frisco Property, which is not being properly managed by the Debtor, Palisades is a party in interest in this bankruptcy case.

29. Section 1112(b)(4)(A) provides that "cause" to convert or dismiss a case includes "substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A) (emphasis added). Bankruptcy courts are given wide discretion in determining what constitutes cause for the purposes of Bankruptcy Code section 1112(b)(4)(A). *In re Koerner*, 800 F.2d 1358, 1367 (5th Cir. 1986); *see also In re Sullivan Central Plaza I, Ltd.*, 935 F.2d 723, 728 (5th Cir. 1991) ("A determination of whether or not cause under section 1112(b) exists rests in the sound discretion of the bankruptcy court."). The inquiry is "case-specific, focusing on the circumstances of each debtor." *In re Timbers Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 371-72 (5th Cir. 1987) (en banc), *aff'd sub nom, United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988).

30. Two elements must be shown under section 1112(b)(4)(A). The first element is that the debtor is suffering from a substantial or continuing loss to or diminution of the estate. *In re TMT Procurement Corp.*, 534 B.R. 912, 920 (Bankr. S.D. Tex. 2015) ("Cause is defined under the Code as a 'substantial or continuing loss to or diminution of the estate.'"). In other words, cause is not premised on both a substantial and continuing loss. Either will support dismissal or conversion. *Id.* The element turns on "whether a debtor has suffered a negative cash flow or declining asset value." *In re Ashley Oaks Development Corp.*, 458 B.R. 280, 285 (Bankr D. S.C. 2011).

31. The second element is that there is an absence of reasonable likelihood of rehabilitation in the case. Rehabilitation for purposes of section 1112(b)(4)(A) does not mean reorganization through a liquidating plan. Instead, it is much more restrictive and refers to the Debtor's ability to restore the viability of the business. *In re Herb Philipson's Army & Navy Stores, Inc.*, 2019 U.S. Bankr. LEXIS 3831, *18-19 (Bankr. N.D.N.Y. Dec. 19, 2019) (collecting

cases). Further, the likelihood of rehabilitation must be based on evidence and the facts of the case. "[N]o matter how sincere a debtor may be, a court is not bound to clog its docket with visionary or impracticable schemes of resuscitation." *In re Irasel Sand, LLC,* 569 B.R. 433, 442 (Bankr. S.D. Tex. 2017) (quoting *In re 865 Centennial Ave. Assocs. Ltd.*, 200 B.R. 800, 810 (Bankr. D.N.J. 1996)). Moreover,

> [a] Chapter 11 case may be dismissed at any time. Creditors need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired . . . Creditors likewise, need not incur the added time and expense of a confirmation hearing on a plan they believe cannot be effectuated . . . The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless.

*In re 865 Centennial Ave. Assocs. Ltd.*, 200 B.R. at 810 (*quoting Matter of Woodbrook Assoc's*, 19 F.3d 312, 317 (7th Cir. 1994), rehearing denied (1994) (citations omitted)).

32. Consequently, courts routinely find that a debtor with no revenues and no source of capital to reorganize does not have a likelihood of rehabilitation. *See, e.g., In re Irasel Sand*, 569 B.R. at 442 (collecting cases and finding no reasonable likelihood of rehabilitation existed where debtor had negative equity in its property, negative cash flow, and no source of capital to rehabilitate the debtor's business); *In re 865 Centennial Ave. Assocs. Ltd.*, 200 B.R. at 810-11 (finding no likelihood of rehabilitation where debtor had negative equity in property, no source of income and no source of funding); *In re L.S. Good & Co.*, 8 B.R. 315, (Bankr. N.D. W. Va. 1980) (finding no likelihood of rehabilitation where debtor needed $4 million and 2-3 years to rehabilitate its business but had no source for the required funding).

33. In this case, both elements are met. Without any revenue from business operations, the Debtor has suffered and will continue to suffer continuing losses in the form of both (i) the $1,000 per day in possible fees being assessed against the Frisco Property (which reduces any equity the Debtor may have in the property) and (ii) the administrative costs associated with remaining in chapter 11. The fact that the Debtor has no revenue and a negative cash flow satisfies the first element. *See, e.g.*, *Loop Corp. v. U.S. Trustee*, 379 F.3d

511, 516 (8th Cir. 2004); *In re Herb Philipson's Army & Navy Stores, Inc.*, 2019 U.S. Bankr. LEXIS 3831 at *16-17 (collecting cases); *In re Citi-Toledo Partners*, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994).

34. As to the second element, the Debtor also has no reasonable likelihood of rehabilitation. Absent an extension based on force majeure or an agreement with the seller of the Frisco Property (which has never been communicated to Palisades), the Debtor is experiencing losses resulting from the $1,000 in daily fees being assessed against the Frisco Property or at risk of losing its indirect investment in the Frisco Property altogether, which directly diminishes any equity the Debtor may otherwise have in the property arising from its equity interest in DREL. In addition, the Debtor has no cash, no revenues from business operations, substantial negative cash flow resulting from increasing administrative expenses, no contracts or commitments from anyone to replace Palisades as the primary investor in DREL, no source of funding for its chapter 11 case, no source of funding for a chapter 11 plan, and no demonstrated source of funding for it to be able to pay either the $4.75 million it would take for it to be able to cure outstanding defaults and assume the Settlement Agreement or otherwise develop the Frisco Property. Likewise, the number of unpaid claims relating to the Frisco Property (including the claims of architects, engineers, and property owner's association fees) demonstrate that the Debtor does not have the resources necessary to fund the development of the Frisco Property. Finally, given the amount needed to repay the FHC Loan ($3+ million) and make either the Settlement Payment ($4.75 million) or pay the amount of Palisades' preferred equity return (approximately $5 million) before any funds could flow up to the Debtor from its investment in DREL, it is likely that the Debtor's equity interest in DREL has little or no value. This is particularly true where the property remains undeveloped and substantial additional capital will be required to develop the luxury hotel and residences on the Frisco Property.

35. The Debtor is in as bad or worse condition than the debtors in the cases cited

above. Moreover, given its meager ten-dollar ($10) investment in DREL, creditors should not be put to the expense of a continued chapter 11 process when the Debtor has no reasonable likelihood of rehabilitation and will not be able to propose a plan. Indeed, a primary purpose of section 1112(b) is to "preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *Loop Corp.,* 379 F.3d at 516; *In re TMT Procurement Corp.*, 534 B.R. at 922. The Debtor and Barton should not be permitted to gamble on the likelihood of finding an angel investor for the Frisco Property at the expense of Palisades and any legitimate creditors. The Debtor also has no revenues, no hope of rehabilitating its business, and no ability to develop the Frisco Property. As a result, the Debtor's bankruptcy case should be converted to chapter 7 so the Frisco Property may be sold to pay FHC Acquisition's creditors and maximize the return to Palisades and the Debtor on account of their investment in FHC Acquisition.

**B. Alternatively, the Debtor's Bankruptcy Case Was Not Filed in Good Faith**

36. The Fifth Circuit has provided guidance for trial courts to determine if a debtor lacked good faith in filing for bankruptcy relief. *In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986). In *Little Creek*, the issue of good faith arose in connection with relief from the automatic stay under section 362(d) and dismissal or conversion under section 1112(b). There, the Fifth Circuit stated:

> Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. Findings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but nonexclusive patterns, and they are based on a conglomerate of factors rather than on any single datum. Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been

> unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand -still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of the property. There are sometimes allegations of wrongdoing by the debtor or its principals. The "new debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith cases.
>
> ***Resort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's "terminal euphoria."*** The Sixth Circuit in *Winshall Settlor's Trust*, 758 F.2d at 1137, aptly noted that
>
> > the purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state. *See In re Dolton Lodge Trust No. 35188*, 22 B.R. 918, 922 (Bankr. N.D. Ill. 1982). "If there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre*. . . ." *In re Ironsides, Inc.*, 34 Bankr. 337, 339 (Bankr. W.D. Ky. 1983).
>
> Neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions.

*Little Creek*, 779 F.2d at 1072-73 (emphasis added, internal footnotes omitted).

37. In a recent opinion, Judge Hale noted that almost every Court of Appeals follows some variation of the Fifth Circuit's "totality of the circumstances" approach to the good faith filing requirement for Chapter 11 petitions referenced above from *Little Creek*. *In re NRA of America*, 628 B.R. 262, 280 (Bankr. N.D. Tex. 2021). The analysis can be distilled down to "two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical legal advantage." *Id.* (*citing In re 15375 Mem'l Corp*, 589 F.3d 605, 618 (3d Cir. 2009)). Here, the Debtor's petition does not serve a valid bankruptcy purpose because the Debtor has no hope of rehabilitation and was instead filed to obtain a tactical advantage in the state court litigation between Palisades, Barton and the Barton-related entities.

38. Bankruptcy courts have a duty to "dismiss illegitimate petitions, thus depriving

dishonest bankrupts the ability to wield the 'potent judicially enforced weapon' of the automatic stay against honest but unfortunate creditors." *In re Hesed Enters., LLC*, 2017 Bankr. LEXIS 3322, *18 (Bankr. N.D. Tex. Sept. 29, 2017). Consequently, courts have consistently held that a case involving a two-party dispute filed for the purpose of obtaining an unfair litigation advantage is not filed in good faith and should be converted or dismissed. *E.g., In re NRA of America*, 628 B.R. at 281-83 (collecting cases and dismissing bankruptcy case as a bad faith filing where the case was filed to gain an unfair litigation advantage and avoid state regulatory scheme); *In re Hesed Enters.*, 2017 Bankr. LEXIS 3322 at *20-22 (dismissing bankruptcy case where debtor had no employees, no cash, no prospects for reorganization, no available sources of income to fund a plan and suit was filed solely to delay the entry of judgment in a state court lawsuit); *In re Phicof, LLC*, 2011 Bankr. LEXIS 4541, *15-17 (Bankr. W.D. Tex. Nov. 22, 2011) (dismissing bankruptcy case where debtor's only assets were interests in limited partnerships which owned property for which plans for development were speculative, only a small percentage of profits would be passed through to the Debtor, and the case was primarily a two-party dispute); *In re Katon, Inc.*, 2009 Bankr. LEXIS 4435, *14-15 (Bankr. S.D. Miss. Mar. 6, 2009) (finding cause existed to convert chapter 11 case to chapter 7 where case involved a two party dispute and was filed as a litigation tactic to stall arbitration proceedings); *In re Sherwood Enters., Inc.*, 112 B.R. 165, 170-71 (Bankr. S.D. Tex. 1989) (dismissing bankruptcy case where case was filed as a litigation tactic in a two-party dispute in an effort to wrest control of assets away from a third-party receiver and avoid the cost of a supersedeas bond).

39. Such is the case here. The Debtor has no assets other than its 50% interest in DREL. The Debtor has no cash, no business operations, no employees, and no ability to fund a chapter 11 plan unless it is able to locate another party willing to invest enough in the Frisco Property to at least cover the Settlement Payment (not to mention the potential costs associated with actually developing the Frisco Property). This case was filed the day before the final

Settlement Payment Deadline to prevent Palisades from pursuing its rights in the state court litigation matters between Palisades, Barton and the Barton-related entities. Indeed, absent the bankruptcy filing, the failure by the JMJ Entities (including the Debtor) to make the Settlement Payment would have placed the parties back in their pre-settlement position (except for the fact that the Extension Payments would reduce the amounts owed to Palisades upon the entry of a judgment in the state court litigation matters relating first to the Turtle Creek Property and second to the Frisco Property). (See Ex. E, Settlement Agreement at section 2.4(f)).

40. There is no business here to rehabilitate and, given the approximately $8+ million that would have to be paid to Texas Republic, other creditors of FHC Acquisition, and Palisades before any money would flow to the Debtor from a sale of the Frisco Property, it is extremely unlikely that the Debtor's equity interest in DREI has any value (which is not surprising considering the Debtor acquired such interest 18 months ago for a mere $10). This case was filed in bad faith to gain a litigation advantage in the state court matters and keep Barton and DREI in control of the Frisco Property while they frantically search for a new investor. This is not a legitimate use of a chapter 11 bankruptcy proceeding. Consequently, the Debtor's bankruptcy case should either be converted to chapter 7 or dismissed. However, as mentioned above, Palisades would prefer conversion to chapter 7. A chapter 7 trustee is needed so that the Frisco Property may be sold and any proceeds used to pay the debts of FHC Acquisition, the amount owed to Palisades under the DREL Company Agreement, and the Debtor's legitimate creditors.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Palisades TC, LLC respectfully requests that, upon hearing of this Motion, the Court: (i) enter an order granting the Motion, (ii) converting the case to a case under chapter 7 or, alternatively, dismissing the case altogether, and (iii) granting Palisades such other and further relief as is just and equitable.

DATED: August 24, 2021.

Respectfully Submitted,

/s/ Suzanne K. Rosen
Jeff P. Prostok
State Bar No. 16352500
Suzanne K. Rosen
State Bar No. 00798518
**FORSHEY & PROSTOK, LLP**
777 Main Street, Suite 1550
Fort Worth, TX 76102
(817) 877-8855 Telephone
(817) 877-4151 Facsimile
jprostok@forsheyprostok.com
srosen@forsheyprostok.com

ATTORNEYS FOR PALISADES TC, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2021 a copy of the foregoing document was served through the Court's ECF system on those parties receiving ECF notice, and as indicated below on the parties reflected below.

*Via Email*
Joyce Lindauer (joyce@joycelindauer.com)

*Via Email*
Erin Schmidt (erin.schmidt2@usdoj.gov)

/s/ Suzanne K. Rosen
Suzanne K. Rosen