# Exhibit "D"

FILED
4/23/2020 5:45 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Christi Underwood DEPUTY

1 CIT-ESERVE

**Cause No. DC-20-06005**

| | | |
|---|---|---|
| **PALISADES TC, LLC, INDIVIDUALLY, AND ON BEHALF OF DALLAS REAL ESTATE LENDERS, LLC,** | § | **IN THE DISTRICT COURT OF** |
| **PLAINTIFF,** | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| **DALLAS REAL ESTATE INVESTORS, LLC AND TIMOTHY BARTON, INDIVIDUALLY,** | § | |
| **DEFENDANTS.** | § | **____ JUDICIAL DISTRICT** |

## PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

Plaintiff Palisades TC, LLC ("Plaintiff" or "Palisades") individually, and on behalf of Dallas Real Estate Lenders ("the Company"), files this Original Petition and Application for Temporary Restraining Order and Temporary Injunction against Defendants Dallas Real Estate Investors, LLC ("DREI") and Timothy Barton ("Barton"), individually, (collectively, "Defendants"), and alleges as follows:

## I. DISCOVERY CONTROL PLAN AND STATEMENT OF RELIEF

1. Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.4 and affirmatively pleads that this suit is not governed by the expedited-actions process in Texas Rule of Civil Procedure 169 because it seeks injunctive relief.

2. Pursuant to Texas Rule of Civil Procedure 47, Plaintiff seeks monetary relief over $1,000,000. The damages sought are within the jurisdictional limits of the court.

## II. PARTIES

3. Plaintiff Palisades TC, LLC is a Texas limited liability company doing business in Dallas County at 1919 McKinney Ave., Suite 100, Dallas, Texas 75201.

4. Defendant Dallas Real Estate Investors, LLC is a Delaware limited liability company, that does not maintain a registered agent in the State of Texas, and therefore, may be served with process through the Texas Secretary of State.

5. Defendant Timothy Barton is an individual that may be served with process at his residence in Dallas County at 3525 Arrowhead Drive, Dallas, Texas 75204, or wherever he may be found.

## III. JURISDICTION AND VENUE

6. All the parties hereto are subject to the Court's jurisdiction. The Court has subject-matter jurisdiction over the lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

7. Venue is proper in Dallas County under Section 15.002(a) of the Texas Civil Practice and Remedies Code because all of the events and omissions giving rise to the claims asserted herein occurred in Dallas County, Texas. Further, venue is proper pursuant to the provisions contained in the Company Agreement at issue. *See* Ex. A at § 10.14.

## IV. FACTS

8. Barton is the Chief Executive Officer of JMJ Development ("JMJ"), a real estate developer in Dallas, Texas.

9. On January 29, 2020, Plaintiff and DREI entered into the Company Agreement of Dallas Real Estate Lenders, LLC (the "Company Agreement") to form the Company. Plaintiff and DREI are the only two Members of the Company. A true and accurate copy of the Company Agreement is attached hereto as Exhibit A and incorporated herein by reference.

10. The sole purpose of the Company is to manage and own 100% of the membership interests in FHC Acquisition, LLC, a Texas limited liability company ("FHC") or such other investments (whether debt, equity or any combination thereof) (FHC and any other entity owning

a Project, an "OpCo") as determined and approved by the Voting Members for the sole purposes of acquiring and developing real property and improvements thereon (a "Project").

11. The initial Project is that certain real property described as "Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas" ("Frisco Property") and the development of a mixed use project located thereon which is planned to include a luxury hotel, residences, restaurant, and retail components (the "Frisco Project").

12. DREI is responsible for the day-to-day management of the Company. *See* Ex. A at § 2.08.

13. Barton is the President of DREI.

**A. Defendants' Obligations under the Company Agreement**

14. First, upon formation of the Company, Plaintiff contributed $3,500,000 to the Company as a preferred Capital Contribution (the "Priority Capital"). Plaintiff's contribution earned it a Base Return or Default Return, as applicable. Regarding Distributions, the Company Agreement requires that Plaintiff receives its Base Return or, if applicable, the Default Return. *See* Ex. A at § 5.02(a)(i). Plaintiff's Unreturned Priority Capital normally earns a Base Return due on the first day of each month, which is equal to nine percent (9%) per annum, accrued on the Unreturned Priority Capital. However, a Default Return equal to fourteen percent (14%) per annum on Plaintiff's Unreturned Priority Capital shall apply immediately at such times as any Base Return is not distributed on the due date thereof and the Default Return shall accrue in lieu of such Base Return not timely distributed. *See* Ex. A at § 5.02(a)(i).

15. Second, the Company Agreement requires that Defendants provide to Plaintiff timely financial information reports. *See* Ex. A at § 7.07.

16. Third, the Company Agreement provides that the Company shall keep books and records that shall be open for inspection and copying by any Member. *See* Ex. A at §§ 7.01, 7.02.

**B. Redemption Default**

17. Under the Company Agreement, a Redemption Default shall occur upon the happening of any of the following relevant events:

a. The Company fails at any time to distribute all amounts due to Plaintiff pursuant to Section 5.02(a)(i), *see* Ex. A at § 5.04(a)(i);

b. Any breach by any member or manager other than Plaintiff of its obligations under the Amended and Restated Company Agreement of Five Star MM, LLC dated September 16, 2019 (the "MM Company Agreement"), *see* Ex. A at § 5.04(a)(iii);

c. Any breach by any member or manager other than Plaintiff of its obligations under the Company Agreement of Five Star GM, LLC dated September 16, 2019 (the "GM LLC Agreement"), *see* Ex. A at § 5.04(a)(iv); or

d. A "Redemption Default" (as such term is defined in the GM LLC Agreement) occurs, *see* Ex. A at § 5.04(a)(v).

**C. Plaintiff's Remedies under the Company Agreement**

18. Under the Company Agreement, Plaintiff has the following remedies in the event of a Redemption Default:

a. Plaintiff shall have the right to require DREI, to request an additional Capital Contribution from the Members, other than Plaintiff, in an amount sufficient to bring Plaintiff current on the distributions (the "Capital Call Right"), *see* Ex. A at § 5.04(b); and

b. Plaintiff shall have the right to act on behalf of the Company and cause the Company to act on behalf of each OpCo, in each instance in its sole and absolute discretion without the consent or approval of DREI or any other Member of the Company or any OpCo, to market and cause the sale of the Frisco Project to an independent third party on such terms and conditions as Plaintiff may determine appropriate in its sole and absolute discretion. Further, DREI shall cooperate and shall cause the Company and each OpCo to cooperate with Plaintiff to accomplish such sale (the "Sale Right"), *see* Ex. A at § 2.09.

**D. Defendants' Redemption Defaults under the Company Agreements**

19. On March 9, 2020, there was a breach by Barton as a Member and Manager under the MM Company Agreement and as a Manager under the GM LLC Agreement when, among other things, certain distributions were not made to Plaintiff (the "Turtle Creek Project Defaults"). A true and correct copy of the lawsuit currently pending in Dallas County and filed against Barton and the other managing member entity for breaches of the MM Company Agreement and the GM LLC Agreement is attached as Exhibit B and incorporated herein by reference.

20. On March 20, 2020, Plaintiff sent Defendants a letter ("Notice of Default") officially notifying them of their existing and potential defaults under the Company Agreement, which included, but was not limited to, the occurrence of a Redemption Default pursuant to Sections 5.04(a)(iii), (iv) and (v) of the Company Agreement. A true and accurate copy of the Notice of Default is attached hereto as Exhibit C and incorporated herein by reference.

21. Defendants failed respond to the Notice of Default and failed to cure the Redemption Defaults in the time period prescribed by the Company Agreement following notice of the defaults from Plaintiff.

22. Further, Defendants failed to cause the Company to timely distribute the Base Return to Plaintiff, which was due on or before April 1, 2020 (the "April Payment Redemption Default"). As a result of the April Payment Redemption Default, the Default Return applies to the payment which was due on April 1, 2020 and which currently remains outstanding (the "April Default Return Payment").

**E. Final Demand for Defendants to Comply with Their Obligations under the Company Agreements**

23. On April 8, 2020, Plaintiff's counsel sent a final demand on behalf of Plaintiff requesting the following from Defendants (the "Final Demand"):

a. The April Default Return Payment;

b. The monthly financial reports from January 2020 through March 2020 that are required under Section 7.03 of the Company Agreement; and

c. Access to and the right to inspect and copy the following books and records of the Company pursuant to Section 7.02 of the Company Agreement and Section 18-305 of the Delaware Limited Liability Company Act:

i. Balance sheets by month from September 1, 2019 through the present day;

ii. Profit and loss statements by month from September 1, 2019 through the present day;

iii. Cash flow statements by month from September 1, 2019 through the present day; and

iv. Any information and documents regarding the Frisco Project, including but not limited to (1) any agreements with any contractor, supplier, vendor or other third party related to the Frisco Project along with contact information for all such parties, (2) any correspondence with lenders, including but not limited to any default notices, and (3) any notices, citations or other correspondence from any State or local governmental entity related to the Frisco Project.

24. A true and accurate copy of the Final Demand is attached hereto as Exhibit D and incorporated herein by reference.

25. In the Final Demand, Plaintiff also exercised its Capital Call Right and expressly reserved its right to exercise its Sale Right.

26. To date, Defendants have failed to provide *any* of the financial and accounting records to which Plaintiff is entitled and failed to provide any assurances that it has made a meaningful effort to try and obtain the requested information, in clear breach of the Company Agreement.

**F. Plaintiff's Exercise of its Sale Right**

27. The most pressing concern for Plaintiff is its intention to move forward with exercising its Sale Right under the Company Agreement. In order to exercise that remedy, Plaintiff

must have the most current understanding and status of its substantial financial investment in the Company and an accurate understanding of the business transactions of the entity. The requested information is essential to Plaintiff's exercise of its Sale Right. The information requested from Defendants is what is required, at a minimum to for Plaintiff to conduct its due diligence related to the exercise of its Sale Right. Additionally, and as previously noted, Plaintiff is also contractually allowed access to such information.

28. Further, Defendants are obligated to cooperate and shall cause the Company to cooperate with Plaintiff to accomplish a sale of the Frisco Project.

29. Accordingly, Defendants should be enjoined from preventing Plaintiff's access to the books and records of the Company, enjoined from entering into any contracts or acting on behalf of the Company, and enjoined from selling the Frisco Project.

30. The current state of the national economy due to COVID-19 makes Plaintiff's request more urgent. The current real estate market is unpredictable and Plaintiff needs to act fast if it has any hopes for selling the Frisco Project at its highest value. The Frisco Project stands to be irreparably damaged if it continues to be managed and operated by Defendants.

## V. CAUSES OF ACTION

### COUNT 1 – BREACH OF CONTRACT (COMPANY AGREEMENT)

31. The allegations above are incorporated herein by reference as if set forth in this Count.

32. The Company Agreement is a valid and enforceable written contract between Plaintiff and Defendants. The Company Agreement provided that Defendants would cause to be paid to Plaintiff the Base Return (or Default Return) on April 1, 2020, provide to Plaintiff timely financial information reports, and cooperate with Plaintiff in the event that it exercised its Sale Right.

33. Plaintiff fully performed its contractual obligations under the Company Agreement by providing the preferred Capital Contribution of $3,500,000.

34. Defendants breached the Company Agreement by (i) failing to make the April Default Return Payment; (ii) failing to submit any financial reports; and (iii) failing to cooperate with Plaintiff in exercising its Sale Right.

35. Defendants' breach caused injury to Plaintiff, which resulted in actual damages and the inability to proceed with effecting the sale of the Frisco Project.

**COUNT 2 – FRAUD**

36. The allegations above are incorporated herein by reference as if set forth in this Count.

37. Defendants failed to disclose material facts related to the Turtle Creek Project Defaults.

38. Defendants had a duty to disclose the Turtle Creek Project Defaults to Plaintiff because Defendant had a fiduciary relationship with Plaintiff.

39. The Turtle Creek Project Defaults were material because Plaintiff entered into subsequent real estate investment transactions with Defendants.

40. Defendants knew Plaintiff was ignorant of the Turtle Creek Project Defaults and did not have an equal opportunity to discover the truth related to the breach of the MM Company Agreement and the GM LLC Agreement and the financial instability of the relevant entities as Defendants controlled all of the books and records for all the relevant entities.

41. Defendants deliberately remained silent and did not disclose the Turtle Creek Project Defaults to Plaintiff.

42. By deliberately remaining silent, Defendants intended for Plaintiff to enter into subsequent real estate investment transactions without the information.

43. Plaintiff justifiably relied on Defendants' deliberate silence and believed that Turtle Creek Project Defaults had not occurred and were not going to occur.

44. By deliberately remaining silent, Defendants proximately caused injury to Plaintiff, which resulted in damages to Plaintiff.

45. Plaintiff seeks damages within the jurisdictional limits of this Court.

**COUNT 3 – ATTORNEY'S FEES**

46. The allegations above are incorporated herein by reference as if set forth in this Count.

47. Pursuant to Section 37.009 and Section 38.001 of the Texas Civil Practice and Remedies Code, Plaintiff claims reasonable attorney's fees, both in the trial of this cause and in connection with any subsequent appeal, as are equitable and just.

48. Further, Plaintiff is entitled to recover attorney fees under the provisions of the Company Agreements. *See* Ex. A at §§ 2.10, 10.12, 10.14.

## VI. APPLICATION FOR TEMPORARY RESTRAINING ORDER

49. Injunctive relief may be granted upon the showing of the following: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002).

50. As shown above, Plaintiff has shown that it has various causes of action against Defendants and a probable right to the relief sought in this lawsuit.

51. As a result of the Defendants' wrongful acts in violating the Company Agreement in numerous material respects, including but not limited to, the refusal to provide Plaintiff with access to books and records and information and material related to the Frisco Project to which Plaintiff is entitled, Plaintiff is threatened with probable, imminent and irreparable injury to its investment in the Frisco Project in amounts that currently cannot be calculated. Without access to

books and records of the Company and the information and documents related to the Frisco Project, Plaintiff is effectively prohibited from exercising its Sale Right remedy. Thus, Plaintiff has no adequate remedy at law and the requested injunctive relief is appropriate. Alternatively, and in addition, Plaintiff need not establish an inadequate remedy at law because the irreparable injury complained of relates Plaintiff's interest in the Frisco Project, which is real property. *See* Tex. Civ. Prac. & Rem Code § 65.011(5).

52. Pursuant to Texas Rule of Civil Procedure 684, Plaintiff is able and willing to post a bond in this matter and request that the Court determine a fair and reasonable amount of security to be given by Plaintiff for the protection of Defendants in the event the Temporary Restraining Order is wrongfully issued and results in harm to the Defendants. However, Plaintiff' respectfully requests that the bond should have a nominal face value.

53. Plaintiff's Application for Temporary Restraining Order and Temporary Injunctive Relief is verified by the attached Verification of Joaquin de Monet, which is attached hereto as Exhibit E.

54. Specifically, Plaintiff requests that the Court enter a Temporary Restraining Order ordering Defendants Dallas Real Estate Investors, LLC and Timothy Barton and those persons in active concert or participation with them who receive actual notice of the order, to desist and refrain from, either directly or indirectly through others:

a. Preventing or obstructing Palisades TC, LLC from obtaining access to the following:

   i. Any contracts or any other written agreements with any party related to the Frisco Project. Barton and DREI shall immediately provide access to Palisades TC, LLC to all Frisco Project Contracts;

   ii. The monthly financial reports from January 2020 – March 2020 that are required under Section 7.07 of the Company Agreement which shall include all expenses and income of the Company for the calendar month and balance sheet as of the last day of the calendar

month detailing all assets and liabilities of the Company and the Capital Accounts of each Member (the "Monthly Company Financial Reports"). Barton and DREI shall immediately provide access to Palisades TC, LLC to all of the Monthly Company Financial Reports;

iii. The monthly management reports from January 2020 – March 2020 that are required under Section 7.07 of the Company Agreement, which shall include all progress reports on development activity regarding the Frisco Project and a report detailing expenditures pursuant to the Frisco Project Budget including any variations from same (the Monthly Company Management Reports"). Barton and DREI shall immediately provide access to Palisades TC, LLC to all of the Monthly Company Management Reports;

iv. Copies of any notices of default under any loan including, without limitation, under the Loan Documents as required under Section 7.07(b) of the Company Agreement (the "Loan Default Notices"). Barton and DREI shall immediately provide access to Palisades TC, LLC to Loan Default Notices;

v. Pursuant to Sections 7.10 and 7.02 of the Company Agreement and Section 18-305 of the Delaware Limited Liability Company Act, all information that Palisades TC, LLC is entitled to as a Member of the Company (the "Company Books and Records"). Barton and DREI shall immediately provide access to Palisades TC, LLC to the Company Books and Records;

vi. Any notices, citations or other enforcement correspondence from any State or local governmental entity related to the Frisco Project (the "Frisco Project Notices and Citations"). Barton and DREI shall immediately provide access to Palisades TC, LLC to the Frisco Project Notices and Citations.

b. Undertaking any action with respect to or on behalf of the Company or with respect to or on behalf of FHC Acquisition, LLC or any other entity owning a Project without the prior written approval of Palisades TC, LLC.

## VII. APPLICATION FOR TEMPORARY INJUNCTION

55. Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

56. Upon notice and hearing, Plaintiff requests that the Court enter a temporary injunction extending the temporary restraining order until final judgment is entered in this lawsuit.

## VIII. JURY DEMAND

57. Plaintiff demands a jury trial and tenders the appropriate fee with this Petition.

## IX. CONDITIONS PRECEDENT

58. All conditions precedent to Plaintiff being entitled to bring this action and recover the relief requested herein have been performed, have occurred, or have been waived.

## X. REQUEST FOR DISCLOSURE

59. Under Texas Rule of Civil Procedure 194, Plaintiff requests that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## XI. PRAYER

60. For these reasons, Plaintiff asks that Defendants be cited to appear and answer and, on final trial, that Plaintiff be awarded a judgment against Defendants, jointly and severally, for the following:

a. Temporary restraining order;

b. Temporary injunction;

c. Permanent injunction;

d. Actual damages;

e. Pre-judgment and post-judgment interest;

f. Court costs; and

g. All other relief to which Plaintiff is entitled.

Dated: April 23, 2020

Respectfully submitted,

By:/s/ Kasey Ratliff

Kasey Ratliff
kratliff@winstead.com
LaCrecia Perkins
lperkins@winstead.com

**WINSTEAD PC**
2728 N. Harwood Street
Suite 500
Dallas, TX 75201
Telephone: 214.745.5400
Facsimile: 214.745.5390

**ATTORNEYS FOR PLAINTIFF
PALISADES TC, LLC**

4817-7810-9114v.1

# Exhibit A

# COMPANY AGREEMENT OF
# DALLAS REAL ESTATE LENDERS, LLC,
# A DELAWARE LIMITED LIABILITY COMPANY

**JANUARY 29, 2020**

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE I ORGANIZATION | | 1 |
| 1.01 | Formation, Qualification and Continuation | 1 |
| 1.02 | Governing Law | 1 |
| 1.03 | Name | 1 |
| 1.04 | Term | 1 |
| 1.05 | Office and Agent | 1 |
| 1.06 | Purpose of Company | 1 |
| ARTICLE II MEMBERSHIP INTERTESTS, VOTING AND MANAGEMENT | | 2 |
| 2.01 | Members | 2 |
| 2.02 | Classification of Membership Interests | 2 |
| 2.03 | Percentage Ownership and Voting Interests | 2 |
| 2.04 | Management by Voting Members | 2 |
| 2.05 | Voting | 2 |
| 2.06 | Liability of Members | 3 |
| 2.07 | New Members | 3 |
| 2.08 | Special Management Provisions | 3 |
| 2.09 | Default Rights | 6 |
| 2.10 | Palisades Reimbursement | 6 |
| ARTICLE III CAPITAL ACCOUNTS | | 7 |
| 3.01 | Initial Members, Capital Commitments, and Percentage Interests | 7 |
| 3.02 | Capital Accounts | 7 |
| 3.03 | Additional Contributions | 7 |
| ARTICLE IV MANNER OF ACTING | | 7 |
| 4.01 | Officers and Agents of the Company | 7 |
| 4.02 | Meetings of Voting Members | 8 |
| 4.03 | Notice of Meetings | 8 |
| 4.04 | Record Date | 8 |
| 4.05 | Quorum | 8 |
| 4.06 | Voting | 9 |
| ARTICLE V ALLOCATIONS AND DISTRIBUTIONS | | 9 |
| 5.01 | Allocations of Profits and Losses | 9 |
| 5.02 | Distributions | 9 |
| 5.03 | Palisades Redemption | 10 |
| 5.04 | Redemption Default | 11 |
| 5.05 | Form of Distribution | 12 |
| ARTICLE VI TRANSFER AND ASSIGNMENT OF INTERESTS | | 12 |
| 6.01 | Reserved | 12 |
| 6.02 | Reserved | 12 |
| 6.03 | Restrictions on Transfer | 12 |
| 6.04 | Involuntary Transfer of a Membership Interest | 12 |

ARTICLE VII ACCOUNTING, RECORDS AND REPORTING ..... 13
7.01 Books and Records ..... 13
7.02 Inspection of Books and Records ..... 13
7.03 Accountings ..... 13
7.04 Filings ..... 13
7.05 Bank Accounts ..... 13
7.06 Company Representative ..... 14
7.07 Financial Information, Reports and Notices ..... 14
7.08 Tax Returns ..... 15

ARTICLE VIII DISSOLUTION AND WINDING UP ..... 15
8.01 Dissolution ..... 15
8.02 Winding Up ..... 15
8.03 Distributions in Kind ..... 16
8.04 Order of Payment of Liabilities on Dissolution ..... 16
8.05 Adequacy of Payment ..... 16
8.06 Compliance with Regulations ..... 16
8.07 Limitations on Payments Made in Dissolution ..... 16
8.08 Certificate of Cancellation ..... 16

ARTICLE IX EXCULPATION AND INDEMNIFICATION ..... 16
9.01 Exculpation of Members ..... 16
9.02 Indemnification by Company ..... 17
9.03 Insurance ..... 17

ARTICLE X MISCELLANEOUS ..... 17
10.01 Authority ..... 17
10.02 Indemnification by the Members ..... 17
10.03 Notices ..... 18
10.04 Severability ..... 18
10.05 Binding Effect ..... 18
10.06 Counterparts ..... 18
10.07 Entire Agreement ..... 18
10.08 Further Assurances ..... 18
10.09 Headings; Gender; Number; References ..... 18
10.10 Parties in Interest ..... 18
10.11 Amendments ..... 18
10.12 Attorneys' Fees ..... 19
10.13 Remedies Cumulative ..... 19
10.14 Jurisdiction and Venue/Equitable Remedies ..... 19
10.15 Palisades Approvals ..... 19
10.16 Palisades Payments ..... 19

Exhibit A – Project Budget
Exhibit B – Members

# COMPANY AGREEMENT OF DALLAS REAL ESTATE LENDERS A DELAWARE LIMITED LIABILITY COMPANY

This Company Agreement (the "Agreement") of **DALLAS REAL ESTATE LENDERS, LLC**, a Delaware limited liability company (the "Company") is entered into by **DALLAS REAL ESTATE INVESTORS, LLC** ("DREI") and **PALISADES TC LLC**, a Texas limited liability company ("Palisades") on January [29], 2020 ("Effective Date").

In consideration of the mutual covenants and conditions herein, the Members agree as follows:

## ARTICLE I ORGANIZATION

**1.01 Formation, Qualification and Continuation.** The Company was formed as a limited liability company under the Delaware Limited Liability Company Act (currently Chapter 18 of Title 6 of the Delaware Code) (the "Act") by filing a Certificate of Formation with the Delaware Secretary of State November 19, 2019 (the "Certificate"). The Company will continue under the Act and this Agreement.

**1.02 Governing Law.** This Agreement shall be governed by and construed and interpreted in accordance with the Act as amended from time to time, without regard to Delaware's conflicts of laws principles. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that any provision of this Agreement is inconsistent with any provision of the Act, this Agreement shall govern to the extent permitted by the Act.

**1.03 Name.** The name of the Company shall be "DALLAS REAL ESTATE LENDERS, LLC" The business of the Company may be conducted under that name or, on compliance with applicable laws, any other name that the Voting Members deem appropriate or advisable. The Voting Members on behalf of the Company shall file any certificates, articles, fictitious business name statements and the like, and any amendments and supplements thereto, as the Voting Members consider appropriate or advisable.

**1.04 Term.** The term of the Company commenced on the filing of the Certificate and shall be perpetual unless dissolved as provided in this Agreement.

**1.05 Office and Agent.** The principal office of the Company shall be at 1755 Wittington, Suite 340, Dallas, Texas 75234 or such other place or places of business within or without the State of Delaware as the Voting Members may determine. The Company shall continuously maintain a registered agent and office in the State of Delaware as required by the Act. The registered agent shall be as stated in the Certificate or as otherwise determined by the Voting Members.

**1.06 Purpose of Company.** The purpose of the Company is to engage in all lawful activities permitted for limited liability companies under the Act; provided, however, until such time as Palisades has been Redeemed in Full (as defined in Section 5.03 hereof) the sole purpose of the Company shall be to manage and own 100% of the membership interests in FHC Acquisition, LLC, a Texas limited liability company ("FHC") or such other investments (whether debt, equity or any combination thereof) (FHC and any other entity owning a Project, an "OpCo") as determined and

approved by the Voting Members for the sole purposes of acquiring and developing real property and improvements thereon (a "Project"). The initial Project shall be that certain real property described as "Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas" ("Frisco Property") and the development of a mixed use project located thereon which is planned to include a luxury hotel, residences, restaurant, and retail components ("Frisco Project" or "Project")). The Company acknowledges that it is the sole member of FHC pursuant to the terms of the Company Agreement of FHC dated November 20, 2019 (the "FHC Agreement" and such FHC Agreement and any other agreement governing the organization and operation of an OpCo, an "OpCo Agreement"). The Company hereby authorizes FHC to enter into that certain Loan Agreement dated on or about the date hereof with Texas Republic Bank, N.A. ("Lender") for a loan in the approximate amount of $3,000,000 (the "Loan") (such Loan Agreement and all documents related thereto with Lender and related to the Loan, the "Loan Documents").

## ARTICLE II
## MEMBERSHIP INTERTESTS, VOTING AND MANAGEMENT

**2.01 Members.** A "Member" (so called) shall mean an individual, organization or entity that has been admitted as, and continues as, a member of the Company. The Members of the Company as of the Effective Date are DREI and Palisades.

**2.02 Classification of Membership Interests.** The Members' percentage interests in the income, gains, losses, deductions, voting rights and distributions, as may be affected by the terms of this Agreement are referred to in this Agreement as "Interests." As of the Effective Date, all Members are Class A Members. Other classes may be created upon the unanimous consent of the Voting Members with such rights and obligations as defined by such members.

**2.03 Percentage Ownership and Voting Interests.** A Member's Ownership Interest ("Ownership Interest") is the total of his interests in capital, together with all of the rights, as a Member or Manager of the Company, that arise from such interests. The "Percentage Ownership Interest" of a Member represents the economic interest of the Member in the Company. The "Percentage Voting Interest" of a Member represents the voting rights of a Member in the Company.

**2.04 Management by Voting Members.** Each Member is a "Voting Member." The Voting Members shall manage the Company and shall have the right to vote, in their capacity as Manager(s), upon all matters upon which Managers have the right to vote under the Act or under this Agreement, in proportion to their respective Percentage Voting Interests in the Company. Voting Members need not identify whether they are acting in their capacity as Members or Managers when they act.

**2.05 Voting.** Except as otherwise provided or permitted by this Agreement, Voting Members shall in all cases, in their capacity as Members or Managers of the Company, act collectively, and, unless otherwise specified or permitted by this Agreement, unanimously. Except as otherwise provided or permitted by this Agreement, no Voting Member acting individually, in his capacity as a Member or Manager of the Company, shall have any power or authority to sign for, bind or act on behalf of the Company in any way, to pledge the Company's credit, or to render the Company liable

for any purpose. Unless the context requires otherwise, in this Agreement, the terms "Member" or "Members," without the qualifier "Voting" refers to the Voting Members collectively; and the terms "Manager" or "Managers" refers to the Voting Members.

**2.06 Liability of Members.** All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

**2.07 New Members.** New Members may be admitted to the Company, only if such new Member (i) is approved unanimously by the Voting Members; (ii) delivers to the Company his required capital contribution (which may be zero); (iii) agrees in writing to be bound by the terms of this Agreement by becoming a party hereto; and (iv) delivers such additional documentation as the Voting Members shall reasonably require to so admit such new Member to the Company. Upon the admission of a new Member or Members, as the case may be, to the Company, the capital accounts of Members, and the calculations that are based on the capital accounts, shall be adjusted appropriately. Notwithstanding any contrary provision in this Agreement, no person may be admitted to the Company as a new Member or as a Manager without the prior written approval of Palisades.

**2.08 Special Management Provisions**. Notwithstanding any contrary provision of this Agreement, until such time as (i) Palisades has been Redeemed in Full, or (ii) a Redemption Default (as hereinafter defined in Section 5.04) has occurred, DREI shall be the Manager responsible for the day-to-day management of the Company. Notwithstanding the designation of DREI as the Manager with responsibility for day-to-day management of the Company, neither any Manager nor any officer shall undertake any of the following actions with respect to the Company under this Agreement or on behalf of the Company with respect to any OpCo, the Frisco Project or any other Project without the prior written approval of Palisades:

(a) leasing, selling, disposing, exchanging, mortgaging, pledging, or transferring the Project or any material portion thereof or other asset that costs in excess of $100,000 except as provided in the predevelopment budget attached hereto as Exhibit A (the "Project Budget");

(b) failing to maintain, demolishing, removing or rendering unusable for its intended purpose any existing improvements currently a part of the Project or entering into contracts for such purposes or construction of the anticipated improvements on the Project;

(c) applying for or modifying any existing zoning for the Project;

(d) entering into any brokerage or exclusive listing agreement for the sale or leasing of any portion of the Project;

(e) entering into, amending, modifying, terminating or canceling any property management agreement with any person for management and leasing of the Project;

(f) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate or relative of Timothy Barton ("Barton"), provided, however, that Palisades (acting alone and without any approval or joinder of any other person) will have the right to enforce any of the Company's and any

OpCo's rights and remedies under any Related-Party Agreements by and between Barton or any of his Affiliates on the one hand and the Company or any OpCo on the other hand. For purposes hereof, "Affiliate" shall mean (i) any person directly or indirectly controlling, controlled by or under common control with another person; (ii) any person that, directly or indirectly, owns or controls 10% or more of the outstanding voting securities or beneficial interests of such other person; (iii) any officer, director, trustee member, manager or general partner of such person; (iv) if such other person is an officer, director, member or manager, trustee or partner of another entity, then the entity for which that person acts in any such capacity; (v) any spouse or issue of the person or any person who is of a relationship described in Section 267 (b) of the Code substituting 10% in place of 50%, where applicable, and (vi) an entity formed which is to be owned directly or indirectly for the benefit of any of the persons described in subparagraph (v) above. For purposes of this paragraph and for determining when a person is directly or indirectly controlling, controlled by or under, controlled with any other person, the term control shall refer to an interest of 10% or more of the outstanding voting securities or beneficial interest of such person.;

(g) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company or any OpCo of more than $100,000 in any year except as provided in the Project Budget;

(h) entering into, amending, modifying, terminating or canceling any contract that grants any form of encumbrance (defined as any lien, easement, lease, hypothecation, or other restriction on transfer or use) over an asset of the Company or any OpCo;

(i) agreeing to or indemnifying any person pursuant to this Agreement or any OpCo Agreement or agreeing to or indemnifying any person other than as provided in this Agreement or any OpCo Agreement;

(j) entering into, amending, modifying, terminating or canceling any term sheet or letter of intent for the acquisition, financing, or capitalization of the Company, any OpCo, the Project, or any direct or indirect voting or economic interest in any of same;

(k) guarantying the payment of any money or debt of the Company, any OpCo, or any other person, or guarantying the performance of the Company, any OpCo, or any other person, except pursuant to the Loan Documents;

(l) approving the Project Budget or any amendment thereto;

(m) incurring any expenses (including, without limitation, for the acquisition of capital assets) outside of the approved Project Budget;

(n) making any request for additional Capital Contributions under this Agreement or any OpCo Agreement;

(o) creating reserves, determining the amount of cash available for distribution and making distributions pursuant to this Agreement or any OpCo Agreement;

(p) approving of the transfer or encumbrance of any direct or indirect interest in the Company or any OpCo and approving of any admission of any person as an additional member of the Company or any OpCo;

(q) hiring and compensation of, and any employment agreement with respect to, any employee of the Company or any OpCo or entering into any collective bargaining or other agreement with any labor union, labor organization or similar body;

(r) filing or defending any litigation, arbitration or similar legal disputes with respect to any claim or potential claim involving the Company or any OpCo equal to or greater than $100,000, or settling any claim or potential claim for an amount (including all costs of settlement) for $100,000 or more;

(s) amending or modifying this Agreement or any OpCo Agreement or the certificate of formation for the Company or any OpCo;

(t) making any election to cause the Company or any OpCo to incorporate or offer or issue securities;

(u) the selection and/or retention of any new or additional audit or tax accountants for or on behalf of the Company or any OpCo;

(v) the transfer of, or granting of a license to use, any intellectual property owned directly or indirectly by the Company or any OpCo;

(w) removing the partnership representative (as such term is defined in Section 6223(a) of the Code) of the Company or any OpCo;

(x) offering or issuing additional ownership interests by the Company or permitting the Company or any OpCo to make any loan or advance to any person;

(y) engaging in any line of business in contravention of the purposes of the Company or any OpCo as provided in this Agreement or any OpCo Agreement respectively;

(z) effecting a dissolution or liquidation of the Company or any OpCo or the merger, conversion, consolidation or other reorganization of the Company or any OpCo;

(aa) causing or permitting the Company or any OpCo to engage in any reorganization or commencing any proceedings or the filing of any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal or state bankruptcy, insolvency or similar law, on behalf of the Company or any OpCo or admitting, confessing or acquiescing to any involuntary bankruptcy filing or similar action against the Company or any OpCo;

(bb) making any distribution to any person other than Palisades under this Agreement or permitting any OpCo to make any distribution other than to the Company;

(cc) taking any other action that requires the consent of all the Members under this Agreement or any OpCo Agreement;

(dd) modifying or amending any of the Loan Documents or paying in full all amounts due under the Loan Documents prior to Palisades being Redeemed in Full;

(ee) incurring on behalf of the Company or any OpCo any loan or other indebtedness including loans or advances from Members of the Company or any OpCo (other than under the Loan Documents or indebtedness that constitutes customary third-party trade payables incurred by the Company or any OpCo in the ordinary course of business) or guaranty or other contingent liability, approving of the form of the loan documents evidencing such indebtedness, or making any material election under such loan documents;

(ff) modifying, amending, terminating or waiving any benefit or right of the Company or any OpCo under any of (i) the Purchase and Sale Agreement dated effective October 23, 2018, as amended, with respect to the Frisco Property (the "PSA"), (ii) the Master Development Agreement dated December 31, 2019 between the City of Frisco ("Frisco"), Frisco Economic Development Corporation ("FEDC"), Frisco Community Development Corporation ("FCDC") and FHC (the "MDA"), (iii) the Performance Agreement dated December 30, 2019 between FCDC and FHC (the "FCDC Agreement"), (iv) the Performance Agreement dated December 31, 2019 between FEDC and FHC (the "FEDC Agreement") (the PSA, MDA, FCDC Agreement and FEDC Agreement, collectively, the "Development Agreements" and the obligations of FHC thereunder, collectively, the "Development Obligations"); or

(gg) entering into, modifying, amending or terminating any agreement with a hotel management company or hotel franchise agreement for the Frisco Property or any portion thereof (a "Hotel Agreement").

**2.09 Default Rights**. In addition to such other rights Palisades may have under this Agreement and notwithstanding any contrary provision of this Agreement, upon the occurrence of a Redemption Default which is not timely cured, Palisades shall have the right, but not the obligation, to act on behalf of the Company and cause the Company to act on behalf of any OpCo, in each instance in the sole and absolute discretion of Palisades without the consent or approval of DREI or any other Member of the Company or any OpCo, to undertake all decisions and actions with respect to the Company under the Act and this Agreement including, without limitation, the actions specified in Section 2.08 hereof and the right to market and cause the sale of the Project to an independent third party on such terms and conditions as Palisades may determine appropriate in its sole and absolute discretion. In determining an appropriate sale price for the Project, Palisades shall not be obligated to take into consideration any so called fair value or other market value for the Project; rather Palisades may look solely to such sale price for the Project that is most likely to result in proceeds sufficient to cause Palisades to be Redeemed in Full. DREI shall cooperate and shall cause the Company and each OpCo to cooperate with Palisades in accomplishing all actions taken by Palisades in accordance with Section 2.09.

**2.10 Palisades Reimbursement.** The Company shall reimburse Palisades for all attorneys' fees and other costs it incurs in connection with the negotiation of this Agreement and its investment in the Company including, without limitation, any costs incurred to enforce its rights hereunder, such amount to be paid to Palisades within ten (10) days of Palisades submitting an invoice for same.

## ARTICLE III
## CAPITAL ACCOUNTS

**3.01 Initial Members, Capital Commitments, and Percentage Interests**. The persons listed on Exhibit B as the Class A Members are hereby admitted to the Company as a Voting Member, effective as of the Effective Date. Set forth opposite the name of each Voting Member listed on Exhibit B is such Member's initial Capital Contribution, Percentage Ownership Interest, Percentage Voting Interest as of the Effective Date, and Class of its Membership Interests. Exhibit B may be amended from time to time to reflect changes in or additions to the membership of the Company only with the consent of all Voting Members unless a Redemption Default has occurred, after all cure periods, in which instance Palisades alone may amend such Exhibit B. Any such amended Exhibit B shall (a) supersede all prior Exhibit B's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company.

**3.02 Capital Accounts.** At such time as the Company is taxed as a partnership for federal income tax purposes, the Company shall establish and maintain a capital account ("Capital Account") for each Member in accordance with Section 704(b) of the Internal Revenue Code of 1986, as amended (the "Code"), and Treasury Regulations Section 1.704-l(b)(2)(iv).

**3.03 Additional Contributions.** No Member shall be required to make any additional capital contributions to the Company. The Company may, however, accept capital contributions from the Members upon unanimous approval of the Voting Members. The capital accounts of the Members, and the calculations that are based on the capital accounts, shall be adjusted appropriately to reflect any transfer of an interest in the Company, distributions, or additional capital contributions.

## ARTICLE IV
## MANNER OF ACTING

**4.01 Officers and Agents of the Company.** The Voting Members may authorize any Member or Members of the Company, or other individuals or entities, whether or not a Member, to take action on behalf of the Company, as the Voting Members deem appropriate. Any Member may lend money to and receive loans from the Company, act as an employee, independent contractor, lessee, lessor, or surety of the company, and transact any business with the Company that could be carried out by someone who is not a Member as unanimously approved by the Voting Members. The Company may receive from or pay to any Member remuneration, in the form of wages, salary, fees, rent, interest, or any form that the Voting Members unanimously approve.

The Voting Members may appoint officers of the Company who, to the extent provided by the Voting Members, may have and may exercise all the powers and authority of the Members or Managers in the conduct of the business and affairs of the Company. The officers of the Company may consist of a President, a Treasurer, a Secretary, or other officers or agents as may be elected or appointed by the Voting Members. The Voting Members may provide rules for the appointment, removal, supervision and compensation of such officers, the scope of their authority, and any other matters relevant to the positions. The officers shall act in the name of the Company and shall supervise its operation, within the scope of their authority, under the direction and management of the Voting Members.

In addition to the authorities and duties that are normally associated with the office of the President, the Voting Members non-exclusively delegate to the President all of the powers of DREI, subject however to the restrictions defined herein including, without limitation, those in Sections 2.08 and 2.09. With prior approval of Palisades, both the President and the Treasurer are authorized to open, manage, and close any and all Company accounts with any bank or financial institution and to be a signatory on such Palisades approved accounts (although only one signatory shall be required). From and after the occurrence of a Redemption Default (as defined in Section 5.04 hereof), which is not timely cured, the terms of all existing officers of the Company shall be terminated immediately without further action and Palisades shall have the unilateral right, but not the obligation, to appoint new officers in its sole and absolute discretion.

Any action taken by a duly authorized officer, pursuant to authority granted by the Voting Members in accordance with this Agreement, shall constitute the act of and serve to bind the Company, and each Member hereby agrees neither to dispute such action nor the obligation of the Company created thereby.

**4.02 Meetings of Voting Members.** No regular, annual, special or other meetings of Voting Members are required to be held. Any action that may be taken at a meeting of Voting Members may be taken without a meeting by written consent in accordance with the Act. Meetings of the Voting Members, for any purpose or purposes, may be called at any time by any Voting Member, or by the President of the Company, if any. The Voting Members may designate any place as the place of meeting for any meeting of the Voting Members. If no designation is made, the place of meeting shall be the principal place of business of the Company.

**4.03 Notice of Meetings.** In the event that a meeting of the Voting Members is called, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than five nor more than sixty business days before the date of the meeting unless otherwise provided, either personally or by mail, by or at the direction of the Members calling the meeting, to each Voting Member. Notice of a meeting need not be given to any Voting Member who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such Voting Member.

**4.04 Record Date.** For the purpose of determining Voting Members entitled to notice of or to vote at any meeting of Voting Members or any adjournment thereof, the date on which notice of the meeting is provided shall be the record date for such determination of the Voting Members. When a determination of Voting Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

**4.05 Quorum.** Members holding all of the Percentage Voting Interests in the Company represented in person, by telephonic participation, or by proxy, shall constitute a quorum at any meeting of Voting Members. In the absence of a quorum at any such meeting, any Voting Member so represented may adjourn the meeting from time to time for a period not to exceed sixty days without further notice. However, if the adjournment is for more than sixty days, or if after the adjournment a new record date is fixed for another meeting, a notice of the adjourned meeting shall be given to each Voting Member. The Voting Members present at a duly organized meeting may continue to transact business only as previously provided on the agenda until adjournment,

notwithstanding the withdrawal during such meeting of that number of Voting Members whose absence would cause less than a quorum.

**4.06 Voting.** If a quorum is present, a unanimous vote of the Percentage Voting Interests of the Voting Members so represented shall be the act of the Members or Managers, unless the vote of a lesser proportion or number is otherwise required by the Act, by the Certificate or by this Agreement.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

**5.01 Allocations of Profits and Losses.** Profits and Losses, after deducting any guaranteed payments, shall be allocated among the Members in proportion to their Percentage Ownership Interests. Any special allocations necessary to comply with the requirements set forth in Code Section 704 and the corresponding regulations thereunder, including, without limitation, the qualified income offset and minimum gain chargeback provisions contained therein, shall be made if the Voting Members deem these actions to be appropriate.

**5.02 Distributions**. The following shall relate only to the Company's ownership in FHC and its ownership of the Frisco Project. Distributions related to any other Project shall be further defined including separate distribution schedules as approved by the Voting Members.

(a) Subject to the provisions of Section 2.08 hereof and any other provision of this Agreement requiring the approval of the Voting Members, the Voting Members shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service (including payments on loans by Members to the Company), acquisitions, and a reasonable contingency reserve (hereinafter, "Distributable Cash"). If any such Distributable Cash exists, the Manager shall cause the Company to distribute the Distributable Cash to the Members as follows:

(i) first, to Palisades, the Base Return or, if applicable, the Default Return. For purposes hereof,

"Base Return" means an amount due on the first day of each month which is equal to nine percent (9%) per annum accrued on the Unreturned Priority Capital;

"Default Return" means an amount due on the first day of each month which is equal to fourteen percent (14%) per annum, compounded annually, on the Unreturned Priority Capital. The Default Return shall apply immediately at such time as any Base Return is not distributed on the due date thereof and the Default Return shall accrue in lieu of such Base Return not timely distributed; and

"Unreturned Priority Capital" means the total Capital Contributions of Palisades less all distributions to Palisades pursuant to Sections 5.02(a)(ii), (iii) and (iv).

(ii) next, on or before eleven (11) months following the acquisition of the Frisco Property by FHC ("Frisco Property Closing"), to Palisades an amount equal to no less than one-hundred twenty-five percent (125%) of its Unreturned Priority Capital; provided however, in the event that the Manager gives written notice to Palisades on or before thirty (30) days prior to eleven (11) months following the Frisco Property Closing then this distribution requirement may be waived and substituted with the distribution in Section 5.02(a)(iii).

(iii) next, proportionately to the Capital Contributions to the Class A Members (other than Palisades) until the minimum Class A return has been paid in full as may be agreed to by the Manager and all of the other Class A Members upon the admittance of any additional Class A Members.

(iv) Finally, remaining distributions shall be paid to all Members (other than Palisades) in proportion to their Membership Interests.

The Manager may require all loans to Members including any rate of return on such loans be repaid to the Company prior to distributing any Distributable Cash to such Members.

The Company may not repay any loans or advances from Members to the Company prior to making all distributions to Palisades required in Sections 5.02(a)(i) through (iv) above.

(b) From time to time Voting Members also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with Section 5.02(a) and may be made subject to existing liabilities and obligations; provided, however, no distributions other than cash shall be made to Palisades. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

(c) For the purpose of determining the Members entitled to receive a distribution as provided for in this Agreement, the Voting Members may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the distribution is taken. If no record date is fixed, then the date on which the Voting Members take action to authorize such a distribution pursuant to this Agreement and the Code, shall be the record date for such determination of Members.

**5.03 Palisades Redemption.** The Company shall provide notice to Palisades at such time as the Company believes it has made all distributions necessary for Palisades to be Redeemed in Full. If Palisades provides written confirmation to the Company that it has been Redeemed in Full, such confirmation shall result in the Transfer of Palisades' Membership Interest to the Company without further action, writing or instrument. Palisades shall provide confirmation that it has or has not been Redeemed in Full within five (5) Business Days of receipt of the notice from the Company. Unless Palisades provides notice to the Company that it has <u>not</u> been Redeemed in Full within such five (5) Business Day period, Palisades shall be deemed to be Redeemed in Full if it does not otherwise provide a response. Palisades shall not waive any rights to indemnification under this Agreement when it is Redeemed in Full, such rights surviving Palisades being Redeemed in Full. For purposes of this Agreement "Redeemed in Full" means, with respect to Palisades, such time and circumstances as when

Palisades has received all amounts to which it is entitled to receive pursuant to Sections 5.02(a)(i) and (ii) plus any amounts to which Palisades may be entitled under any other provision of this Agreement (e.g., indemnification, etc.).

**5.04 Redemption Default.**

(a) A "Redemption Default" shall occur as related to a Project upon any of the following:

(i) The Company fails at any time to distribute all amounts due to Palisades pursuant to Section 5.02(a)(i).

(ii) The Company fails to distribute all amounts due to Palisades pursuant to Sections 5.02(a)(i) and (ii) on or before the expiration of the eleventh (11th) month following the Frisco Property Closing.

(iii) Any breach by any member or manager other than Palisades of its obligations under the Amended and Restated Company Agreement of Five Star MM, LLC dated September 16, 2019 (the "MM Company Agreement").

(iv) Any breach by any member or manager other than Palisades of its obligations under the Company Agreement of Five Star GM, LLC dated September 16, 2019 (the "GM LLC Agreement").

(v) A "Redemption Default" (as such term is defined in the GM LLC Agreement) occurs.

(vi) Any default occurs under any of the "Loan Documents" (as such term is defined in the MM Company Agreement).

(vii) Any Manager or Member other than Palisades breaches any of its obligations under this Agreement, including, without limitation, the failure to obtain the approval of Palisades whenever required in this Agreement.

(viii) FHC defaults, after all cure periods, upon any of its obligations under the Loan Documents or the Hotel Agreement or with respect to any of its Development Obligations under the Development Agreements.

(ix) The manager or any officer of FHC or any other OpCo takes any action prohibited by Section 2.08 or any other provision of this Agreement requiring approval of the Voting Members or Palisades.

(b) Subject to Section 5.04(c), in the event of a Redemption Default described in Section 5.04(a)(i), Palisades shall have the right to require the Manager to request an additional Capital Contribution from the Members other than Palisades in an amount sufficient to bring Palisades current on the distributions to which it is entitled pursuant to Section 5.02(a)(i). Subject to Section 5.04(c), in the event of any other Redemption Default, Palisades may exercise its rights under Section 2.09 and as otherwise provided in this Agreement.

(c) The Company shall have the right to cure any Redemption Default if within thirty (30) days (five (5) days if the default is due to the nonpayment of monies) following notice of default from Palisades of such default, if the Company cures such default within such thirty (30) day (five (5) days with respect to the payment of monies) period. If the Company cures such default within the requisite time period, the applicable Redemption Default shall be cured as if same had not occurred. Furthermore, where a distribution is not timely remitted which results in a Redemption Default and such distribution is thereafter paid by the Company along with any related costs and expenses incurred by Palisades as a result of such Redemption Default prior to Palisades exercising its rights under Section 2.09, such payment shall result in the Redemption Default being cured.

**5.05 Form of Distribution.** No Member has the right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members except on the dissolution and winding up of the Company.

## ARTICLE VI
## TRANSFER AND ASSIGNMENT OF INTERESTS

**6.01 Reserved.**

**6.02 Reserved.**

**6.03 Restrictions on Transfer.** No Member may transfer its Ownership Interest or any part thereof without the unanimous approval of the Voting Members; provided, however, in the event of a Redemption Default, Palisades may freely transfer all direct or indirect interests which it may have in the Company without the approval of any other Member, and upon any such transfer by Palisades of all or any portion of its Ownership Interest following a Redemption Default, such transferee shall be automatically admitted to the Company as a new Member with all of the rights to which Palisades is entitled under this Agreement.

**6.04 Involuntary Transfer of a Membership Interest.** A creditor's charging order or lien on a Member's Membership Interest, bankruptcy of a Member, or other involuntary transfer of Member's Membership Interest (including by death, divorce or disability), shall constitute a material breach of this Agreement by such Member. The creditor, transferee or other claimant, shall only have the rights of an Assignee, and shall have no right to become a Member, or to participate in the management of the business and affairs of the Company as a Member or Manager under any circumstances, and shall be entitled only to receive the share of profits and losses, and the return of capital, to which the Member would otherwise have been entitled. The Voting Members, including a Voting Member whose interest is the subject of the charging order, lien, bankruptcy, or involuntary transfer, may unanimously elect, by written notice that is provided to the creditor, transferee or other claimant, at any time, to purchase all or any part of Membership Interest that was the subject of the creditor's charging order, lien, bankruptcy, or other involuntary transfer, at a price that is equal to one-half (1/2) of the book value of such interest, adjusted for profits and losses to the date of purchase. The Members agree that such valuation is a good-faith attempt at fixing the value of the interest, after taking into account that the interest does not include all of the rights of a Member or Manager, and after deducting damages that are due to the material breach of this Agreement.

## ARTICLE VII
## ACCOUNTING, RECORDS AND REPORTING

**7.01 Books and Records.** The Company shall keep books and records in accordance with accepted accounting principles. The books and records shall be open for inspection and copying by any Member without cost to such Member. The fiscal year of the Company shall be the calendar year (the "Fiscal Year").

**7.02 Inspection of Books and Records.** Each Member has the right, on reasonable request for purposes reasonably related to the interest of the person as a Member or a Manager, to: (a) inspect and copy during normal business hours any of the Company's records described in Section 7.1; and (b) obtain from the Company promptly after their becoming available a copy of the Company's federal, state and local income tax or information returns for each Fiscal Year.

**7.03 Accountings.** As soon as is reasonably practicable after the close of each Fiscal Year, the Voting Members shall make or cause to be made a full and accurate accounting of the affairs of the Company as of the close of that Fiscal Year and shall prepare or cause to be prepared a balance sheet as of the end of such Fiscal Year, a profit and loss statement for that Fiscal Year and a statement of Members' equity showing the respective Capital Accounts of the Members as of the close of such Fiscal Year and the distributions, if any, to Members during such Fiscal Year, and any other statements and information necessary for a complete and fair presentation of the financial condition of the Company, all of which the Manager shall furnish to each Member. In addition, the Company shall furnish to each Member, information regarding the Company necessary for such Member to complete such Member's federal and state income tax returns. The Company shall also furnish a copy of the Company's tax returns to any Member requesting the same. On such accounting being made, profits and losses during such Fiscal Year shall be ascertained and credited or debited, as the case may be, in the books of account of the Company to the respective Members as herein provided. Until such time as Palisades has been Redeemed in Full, it shall have the right to approve all tax returns filed by the Company including all elections included therein. Until such time as Palisades has been Redeemed in Full, the Company shall provide monthly financial reports to the Members, within ten (10) days following the end of each calendar month with respect to such preceding calendar month, which financial reports shall include all expenses and income of the Company for the calendar month and balance sheet as of the last day of the calendar month detailing all assets and liabilities of the Company and the Capital Accounts of each Member.

**7.04 Filings.** The Voting Members, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Voting Members, at Company expense, shall also cause to be prepared and timely filed with appropriate federal and state regulatory and administrative bodies amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Company is required by the Act to execute or file any document and fails, after demand, to do so within a reasonable period of time or refuses to do so, any Member may prepare, execute and file that document with the Delaware Secretary of State.

**7.05 Bank Accounts.** The Company shall maintain its funds in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be co-mingled in any fashion with the funds of any other person.

**7.06 Company Representative.** Barton shall be the partnership representative of the Company pursuant to Section 6223(a) of the Code (the "Company Representative"). Notwithstanding that Barton is the Company Representative with respect to such tax years, all nonministerial decisions regarding tax elections, audit, tax litigation, settlement and other tax matters shall be subject to unanimous approval of the Voting Members. For example, but not by way of limitation, the Company Representative shall not take any position or action with the Internal Revenue Service (the "Service") without prior unanimous approval of the Voting Members, including but not limited to any decision (i) to enter into a settlement agreement with respect to any Company tax matter; (ii) to file a petition as contemplated in Section 6234(a) of the Code; (iii) to file any request contemplated in Section 6227 of the Code; or (iv) to enter into an agreement extending the period of limitations as contemplated in Section 6235(b) of the Code. If an audit results in an imputed underpayment as determined under Section 6225 of the Code, the Company and/or Barton shall accept sole responsibility for payment of any such underpayment and indemnify and hold harmless Palisades from any such underpayment. The Company Representative shall furnish to each Member a copy of all notices or other written communications received by the Company Representative from the Service within five (5) days of receipt thereof. The Company Representative shall notify each Member of all communications it has had with the Service and shall keep all Members informed of all matters which may come to its attention in its capacity as Company Representative by giving them written notice thereof within five (5) days after the Company Representative becomes informed of any such matter or within such shorter period as may be required by the appropriate statutory or regulatory provisions. Nothing contained herein is intended to authorize the Company Representative to take any action which is left to the determination of an individual Member under Sections 6221 through 6241 of the Code (and/or comparable provisions of state and local law). All non-ministerial decisions regarding tax elections, audit, tax litigation, settlement and other tax matters shall be subject to the written consent of each Member of the Company during the tax year at issue that subsequently Transferred its interest in the Company (each, a "Former Member"). For example, but not by way of limitation, the Company Representative shall not take any position or action with the Service without prior written consent of each Former Member, including but not limited to any decision (i) to enter into a settlement agreement with respect to any Company tax matter; (ii) to file a petition as contemplated in Section 6234(a) of the Code; (iii) to file any request contemplated in Section 6227 of the Code; (iv) to enter into an agreement extending the period of limitations as contemplated in Section 6235(b) of the Code; or (v) to make the "push out" election under Section 6226(a) of the Code. A Former Member shall not be required to pay any expenses incurred by the Company in connection with any tax matters. The Company hereby agrees to indemnify, defend and hold each Former Member harmless of and from any and all liabilities, claims, demands, and expenses of any kind or nature which arise or in any way relate to any violation or breach of this Section 5.4. This Section 5.4 will survive a Member's ceasing to be a member of the Company, as well as the termination, dissolution, liquidation and winding up of the Company.

**7.07 Financial Information, Reports and Notices.**

(a) DREI will cause to be prepared and delivered to each of the Members:

(i) monthly, not later than ten (10) days following the end of each calendar month, management reports for the Project including progress reports on development activity regarding the Project and a report detailing expenditures pursuant to the Project Budget including any variations from same ;

(ii) monthly, not later than ten (10) days following the end of each calendar month, financial statements of the Company, including (A) a balance sheet as of the end of such month and an income statement for such month prepared in accordance with the standard accounting principles of DREI and the amount of unreturned Capital Contributions of each Member, and (B) a cash flow statement for such month; and

(iii) annually, not later than thirty (30) days after the close of each calendar year, financial statements of the Company, including (A) a balance sheet as of the end of such calendar year, and an income statement for such calendar year, prepared in accordance with the standard accounting principles of DREI, (B) a cash flow statement for such calendar year, (C) the amount of unreturned Capital Contributions of each Member as of the last day of such calendar year, and (D) a summary report describing in reasonable detail the financial and business activities of the Company during such calendar year.

(b) The DREI will promptly deliver to Palisades copies of any notices of default under (i) any loan including, without limitation, under the Loan Documents, and (ii) under any of the Development Agreements.

**7.08 Tax Returns**. DREI shall cause to be prepared and filed all necessary federal and state income or franchise tax returns for the Company. Each Member shall furnish to DREI all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed. For federal income tax purposes, Palisades shall not be a Member of the Company (i.e. a partner in the Company filing a partnership tax return); rather the Capital Contributions of Palisades shall be treated as debt of the Company for federal income tax purposes and Palisades shall be treated as a lender to the Company for federal income tax purposes. For state law purposes, however, Palisades shall be a Member of the Company having the rights set forth in this Agreement and granted to a Member under the Act and the federal income tax treatment of Palisades shall have no effect on Palisades' status as a Member of the Company..

## ARTICLE VIII
## DISSOLUTION AND WINDING UP

**8.01 Dissolution.** The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of: the entry of a decree of judicial dissolution pursuant to the Act; or the unanimous approval of the Voting Members.

**8.02 Winding Up.** On the occurrence of an event specified in Section 8.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors. The Voting Members shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the assets and liabilities of Company, shall cause such assets to be sold or distributed, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 9.4. The Voting Members shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Members shall be entitled to reasonable compensation for such services.

**8.03 Distributions in Kind.** Any noncash assets distributed to the Members shall first be valued at their fair market value to determine the profit or loss that would have resulted if such assets were sold for such value. Such profit or loss shall then be allocated pursuant to this Agreement, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged against the Capital Account of each Member receiving an interest in a distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by unanimous consent of the Voting Members, or if any Voting Member objects, by an independent appraiser (and any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by unanimous consent of the Voting Members.

**8.04 Order of Payment of Liabilities on Dissolution.** After a determination that all known debts and liabilities of the Company in the process of winding up, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members as provided in Section 5.02 hereof.

**8.05 Adequacy of Payment.** The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, shall have been adequately provided for if payment thereof shall have been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the person, was determined in good faith and with reasonable care by the Members to be adequate at the time of any distribution of the assets pursuant to this Section. This Section shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

**8.06 Compliance with Regulations.** All payments to the Members on the winding up and dissolution of Company shall be strictly in accordance with the positive capital account balance limitation and other requirements of Regulations Section 1.704-1(b)(2)(ii)(d), as the voting Members deem appropriate.

**8.07 Limitations on Payments Made in Dissolution.** Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of such Member's positive Capital Account balance and shall have no recourse for such Member's Capital Contribution or share of profits (on dissolution or otherwise) against any other Member. No Member shall have any obligation or liability to restore or contribute capital to the Company on account of a deficit capital account which may exist at any time for such Member.

**8.08 Certificate of Cancellation.** The Voting Members conducting the winding up of the affairs of the Company shall cause to be filed in the office of, and on a form prescribed by the Delaware Secretary of State, a certificate of cancellation of the Certificate on the completion of the winding up of the affairs of the Company.

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**9.01 Exculpation of Members.** No Member shall be liable to the Company or to the other Members for damages or otherwise with respect to any actions taken or not taken in good faith and reasonably believed by such Member to be in or not opposed to the best interests of the Company,

except to the extent any related loss results from fraud, gross negligence or willful or wanton misconduct on the part of such Member or the material breach of any obligation under this Agreement or of the fiduciary duties owed to the Company or the other Members by such Member. Notwithstanding any contrary provision of this Agreement, each of the Company and DREI waive to the maximum extent possible under the Act all fiduciary duties which Palisades might otherwise owe to the Company or any other Member or Manager under the Act.

**9.02 Indemnification by Company.** The Company shall indemnify, hold harmless and defend the Members, in their capacity as Members, Managers, or Officers, from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts or omissions arising out of their activities on behalf of the Company or in furtherance of the interests of the Company, including but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, if the acts or omissions were not performed or omitted fraudulently or as a result of gross negligence or willful misconduct by the indemnified party. Reasonable expenses incurred by the indemnified party in connection with any such proceeding relating to the foregoing matters may be paid or reimbursed by the Company in advance of the final disposition of such proceeding upon receipt by the Company of (i) written affirmation by the person requesting indemnification of its good-faith belief that it has met the standard of conduct necessary for indemnification by the Company and (ii) a written undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a court of competent jurisdiction that such person has not met such standard of conduct, which undertaking shall be an unlimited general obligation of the indemnified party but need not be secured.

**9.03 Insurance.** The Company shall have the power to purchase and maintain insurance on behalf of any person who is or was a Member or an agent of the Company against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as a Member or an agent of the Company, whether or not the Company would have the power to indemnify such person against such liability under Section 10.1 or under applicable law.

## ARTICLE X
## MISCELLANEOUS

**10.01 Authority.** This Agreement constitutes a legal, valid and binding agreement of each Member, enforceable against such Member in accordance with its terms. Each Member is empowered and duly authorized to enter into this Agreement (including the power of attorney herein) under every applicable governing document, partnership agreement, trust instrument, pension plan, charter, certificate of incorporation, bylaw provision or the like. The person, if any, signing this Agreement on behalf of the Member is empowered and duly authorized to do so by the governing document or trust instrument, pension plan, charter, certificate of incorporation, bylaw provision, board of directors or stockholder resolution or the like.

**10.02 Indemnification by the Members.** Each Member hereby agrees to indemnify and defend the Company, the other Members and each of their respective employees, agents, partners, members, shareholders, officers and directors and hold them harmless from and against any and all claims, liabilities, damages, costs and expenses (including, without limitation, court costs and attorneys' fees and expenses) suffered or incurred on account of or arising out of any breach of this Agreement by that Member.

**10.03 Notices.** Except as otherwise expressly provided herein, any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally, when transmitted by facsimile if receipt is acknowledged by the addressee, one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, or three business days after being mailed by first class mail, charges and postage prepaid, properly addressed to the party to receive such notice at the address set forth beneath such Member's name on the signature pages of this Agreement. A Member may change the Member's address for purposes of this Agreement by providing notice to the Company and each Member of such change of address.

**10.04 Severability.** If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby.

**10.05 Binding Effect.** Subject to Article VI, this Agreement shall bind and inure to the benefit of the parties and their respective Successors.

**10.06 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**10.07 Entire Agreement.** This Agreement contains the entire agreement of the parties and supersedes all prior or contemporaneous written or oral negotiations, correspondence, understandings and agreements between or among the parties, regarding the subject matter hereof.

**10.08 Further Assurances.** Each Member shall provide such further information with respect to the Member as the Company may reasonably request, and shall execute such other and further certificates, instruments and other documents, as may be necessary and proper to implement, complete and perfect the transactions contemplated by this Agreement.

**10.09 Headings; Gender; Number; References.** The headings of the Sections hereof are solely for convenience of reference and are not part of this Agreement. As used herein, each gender includes each other gender, the singular includes the plural and vice versa, as the context may require. All references to Sections and subsections are intended to refer to Sections and subsections of this Agreement, except as otherwise indicated.

**10.10 Parties in Interest.** Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any persons other than the Members and their respective Successors nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**10.11 Amendments.** All amendments to this Agreement shall be in writing and signed by all of the Members to the agreement at the time of the amendment.

**10.12 Attorneys' Fees.** In any dispute between or among the Company and one or more of the Members, the prevailing party or parties in such dispute shall be entitled to recover from the non-prevailing party or parties all reasonable fees, costs and expenses including, without limitation, attorneys' fees, costs and expenses, all of which shall be deemed to have accrued on the commencement of such action, proceeding or arbitration. Attorneys' fees shall include, without limitation, fees incurred in any post-award or post-judgment motions or proceedings, contempt proceedings, garnishment, levy, and debtor and third party examinations, discovery, and bankruptcy litigation, and prevailing party shall mean the party that is determined in the arbitration, action or proceeding to have prevailed or who prevails by dismissal, default or otherwise.

**10.13 Remedies Cumulative.** Remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Member may be lawfully entitled.

**10.14 Jurisdiction and Venue/Equitable Remedies.** The Company and each Member hereby expressly agrees that if, under any circumstances, any dispute or controversy arising out of or relating to or in any way connected with this Agreement shall be the subject of any court action at law or in equity, such action shall be filed exclusively in the courts of the State of Texas or of the United States of America located in Dallas County, as selected by the Member that is the plaintiff in the action, or that initiates the proceeding. Each Member agrees not to commence any action, suit or other proceeding arising from, relating to, or in connection with this Agreement except in such a court and each Member irrevocably and unconditionally consents and submits to the personal and exclusive jurisdiction of such courts for the purposes of litigating any such action, and hereby grants jurisdiction to such courts and to any appellate courts having jurisdiction over appeals from such courts or review of such proceedings. Because the breach of the provisions of this Section would cause irreparable harm and significant injury to the Company and the other Members, which would be difficult to ascertain and which may not be compensable by damages alone, each Member agrees that the Company and the other Members will have the right to enforce the provisions of this Section by injunction, specific performance or other equitable relief in addition to any and all other remedies available to such party or parties without showing or proving any actual damage to such parties. Members will be entitled to recover all reasonable costs and expenses, including but not limited to all reasonable attorneys' fees, expert and consultants' fees, incurred in connection with the enforcement of this Section.

**10.15 Palisades Approvals.** If Palisades fails to respond to any notice requesting its approval or consent under this Agreement within five (5) Business Days of receipt of such notice requesting its approval or consent, Palisades shall be deemed to have approved the matter for which approval or consent was requested. Notwithstanding the preceding, if within five (5) Business Days of receipt of any approval or consent request notice, Palisades denies such approval or consent or requests further information in order to make its decision, Palisades' approval or consent shall not be deemed granted. Palisades agrees to undertake any response to any approval or consent request in good faith and shall act in its reasonable discretion unless its sole discretion is expressly provided for any such approval or consent request.

**10.16 Palisades Payments.** All distributions or payments of any kind due to Palisades under this Agreement shall be wired in same day available funds to such account as Palisades may provide notice.

[Signatures on following page.]

IN WITNESS WHEREOF, this Agreement has been duly executed by or on behalf of the parties hereto as of the date first above written.

**MEMBERS**

DALLAS REAL ESTATE INVESTORS, LLC
a Delaware limited liability company

By: ______________________________
Name: Timothy Barton
Its: President

1755 Wittington, Suite 340
Dallas, Texas 75234

PALISADES TC LLC,
a Texas limited liability company

By: ______________________________
Joaquin Charles de Monet, Manager

1919 McKinney Ave., Suite 100
Dallas, Texas 75201

## Exhibit A

## PROJECT BUDGET AND SUMMARY

**Project Name:** Frisco Project

**Project Summary:** Acquisition of 4.5385 acres, located at the northwest corner of future John Hickman Parkway and the Dallas North Tollway upon which will be developed (i) 231 hotel rooms, (iii) 15,000 square feet of meeting space, (iv) certain retail space, (v) certain restaurant space all of which as more fully described and conceptually shown in the PD zoning ordinance approved by the City on August 18, 2015, as Ordinance No. 15-08-57, as may be amended (the "Project").

**As defined in the "Purchaser's Statement" for the closing of the Frisco Property which may be revised as necessary upon consent of the President as evidenced by the President's execution of such statement.**

**12-Month Pre-development Budget**

| **Month** | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Project Month** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| Architectural & Engineering | 100,000 | 100,000 | 100,000 | 100,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 450,000 | 450,000 | 2,800,000 |
| Market Studies | | | | 25,000 | | | 50,000 | | | | | | 75,000 |
| Appraisal | | | | 25,000 | | | | | | | | | 25,000 |
| Civil/Survey | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Organization Costs | 10,000 | | | | 25,000 | | | | | | | | 35,000 |
| Geotech | | | | | 25,000 | | | | | | | | 25,000 |
| Project Management | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 |
| Legal | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 150,000 |
| Insurance | 20,000 | | | | | | | | | | | | 20,000 |
| **Total** | **177,500** | **147,500** | **147,500** | **197,500** | **347,500** | **297,500** | **347,500** | **297,500** | **297,500** | **297,500** | **497,500** | **497,500** | **3,550,000** |

# EXHIBIT B
## Members of DALLAS REAL ESTATE LENDERS, LLC

| Member's Name and Address | Capital Contribution | Percentage Ownership Interest | Class | Percentage Voting Interest |
|---|---|---|---|---|
| Palisades TC LLC<br>1919 McKinney Ave.,<br>Suite 100<br>Dallas, TX 75201 | $3,500,000.00 | 50% | A | 50% |
| Dallas Real Estate Investors, LLC<br>1755 Wittington<br>Suite 340<br>Dallas, TX 75234 | $10.00 | 50% | A | 50% |

# Exhibit B

FILED
4/22/2020 4:05 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Belinda Hernandez DEPUTY

**Cause No. DC-20-05960**

| | | |
|---|---|---|
| **PALISADES TC, LLC, INDIVIDUALLY, AND ON BEHALF OF FIVE STAR GM, LLC,** | § | **IN THE DISTRICT COURT OF** |
| **PLAINTIFF,** | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| **FIVE STAR MM, LLC AND TIMOTHY BARTON, INDIVIDUALLY,** | § | |
| **DEFENDANTS.** | § | **____ JUDICIAL DISTRICT** |

## PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

Plaintiff Palisades TC, LLC ("Plaintiff" or "Palisades") individually, and on behalf of Five Star GM, LLC ("Five Star GM"), files this Original Petition and Application for Temporary Restraining Order and Temporary Injunction against Defendants Five Star MM, LLC (the "Company") and Timothy Barton ("Barton"), individually, (collectively, "Defendants"), and alleges as follows:

## I. DISCOVERY CONTROL PLAN AND STATEMENT OF RELIEF

1. Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.4 and affirmatively pleads that this suit is not governed by the expedited-actions process in Texas Rule of Civil Procedure 169 because it seeks injunctive relief.

2. Pursuant to Texas Rule of Civil Procedure 47, Plaintiff seeks monetary relief over $1,000,000. The damages sought are within the jurisdictional limits of the court.

## II. PARTIES

3. Plaintiff Palisades TC, LLC is a Texas limited liability company doing business in Dallas County at 1919 McKinney Ave., Suite 100, Dallas, Texas 75201.

4. Defendant Five Star MM, LLC is a Delaware limited liability company, and may be served by and through its registered agent ONE Agent Texas, LLC, at 13901 Midway Rd, Suite 102, Dallas, TX 75244-75244.

5. Defendant Timothy Barton is an individual that may be served with process at his residence in Dallas County at 3525 Arrowhead Drive, Dallas, Texas 75204, or wherever he may be found.

## III. JURISDICTION AND VENUE

6. All the parties hereto are subject to the Court's jurisdiction. The Court has subject-matter jurisdiction over the lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

7. Venue is proper in Dallas County under Section 15.002(a) of the Texas Civil Practice and Remedies Code because all of the events and omissions giving rise to the claims asserted herein occurred in Dallas County, Texas. Further, venue is proper pursuant to the provisions contained in the contracts at issue. *See* Ex. A at § 10.14, Ex. B at § 18.08.

## IV. FACTS

8. Barton is the Chief Executive Officer of JMJ Development ("JMJ"), a real estate developer in Dallas, Texas.

### A. Relevant Company Agreements

9. On September 16, 2019, Plaintiff and Barton entered into the Amended and Restated Company Agreement of Five Star MM, LLC (the "Company Agreement") to form the Company. Plaintiff and Barton are the only two Members of the Company. A true and accurate copy of the Company Agreement is attached hereto as Exhibit A and incorporated herein by reference.

10. The Company was formed for the sole purpose of managing all entities having a

direct or indirect beneficial ownership interest in MO 2999TC, LLC, a Delaware limited liability company established for the sole purposes of acquiring and developing certain real property and the improvements thereon located at 2999 Turtle Creek Boulevard, Dallas, Texas (the "Turtle Creek Project").

11. Barton is the Member, President, and Manager of the Company. *See* Ex. A at §§ 2.01, 4.01, and 2.08.

12. On September 16, 2019, Plaintiff also entered into and became a Member of the Company Agreement of Five Star GM, LLC (the "Five Star GM Agreement", together with the Company Agreement, the "Company Agreements") to form Five Star GM. The Company is the Managing Member of Five Star GM. The only other Member of Five Star GM is 2999 TC JMJ MGR, LLC. A true and accurate copy of the Five Star GM Agreement is attached hereto as Exhibit B and incorporated herein by reference. All capitalized terms used herein that are not specifically defined herein shall have the meanings provided in the Company Agreements.

13. The sole business and purpose of Five Star GM is its ownership interests and related rights in Five Star TC, LLC as the sole member of MO 2999TC MZ, LLC as the sole member of MO 2999TC LLC ("Turtle Creek Project Owner") which acquired the real property where the Turtle Creek Project is located and to take such action necessary to construct and develop a mixed use project including a luxury hotel and residences on the real property (*i.e.*, the Turtle Creek Project).

**B. Defendants' Obligations under the Company Agreements**

14. First, upon formation of Five Star GM, Plaintiff contributed $4,000,000 to Five Star GM as a Preferred Capital Contribution (the "Priority Capital"). Plaintiff's contribution earned it a Base Return or Default Return, as applicable. Thus, the Five Star GM Agreement requires that distributions are made to Plaintiff as follows:

a. First, the Base Return or, if applicable, the Default Return, *see* Ex. B at § 5.02(a)(i);

b. Next, on or before March 9, 2020, an amount equal to no less than fifty percent (50%) of Plaintiff's Unreturned Priority Capital, *see* Ex. B at § 5.02(a)(ii); and

c. Next, on or before March 9, 2020, an amount equal to no less than 50% of the amount distributed to Plaintiff pursuant to item b above, *see* Ex. B at § 5.02(a)(iii).

15. Second, the Company Agreements require that Defendants provide to Plaintiff timely financial information reports. *See* Ex. A at § 7.03, Ex. B at § 12.03.

16. Third, the Company Agreements require that Defendants obtain prior written approval of certain actions, *see* Ex. A at § 2.08, Ex. B at § 6.02, including, but not limited to the following actions:

a. Entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Turtle Creek Project, *see* Ex. A at § 2.08(e), Ex. B at § 6.02(e);

b. Entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), *see* Ex. A at § 2.08(f), Ex. B at § 6.02(f);

c. Entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company or Five Star GM or any Operating Company of more than $100,000 in any year except as provided in the Turtle Creek Project Budget, *see* Ex. A at § 2.08 (g), Ex. B at § 6.02(g); and

d. Entering into, modifying, amending or terminating any agreement with Mandarin Hotels, *see* Ex. A at § 2.08(ff), Ex. B at § 6.02(ff).

17. Fourth, the Company Agreements provide that the Company and Five Star GM shall keep books and records that shall be open for inspection and copying by any Member. *See* Ex. A at § 7.01, Ex. B at § 12.01.

**C. Redemption Default**

18. Under the Five Star GM Agreement, a Redemption Default shall occur upon the

happening of any of the following relevant events:

a. Five Star GM fails at any time to distribute all amounts due to Plaintiff pursuant to Section 5.02(a)(i), *see* Ex. B at § 5.04(a)(i);

b. Five Star GM fails to distribute all amounts due to Plaintiff pursuant to Sections 5.02(a)(i) and (ii) on or before March 9, 2020, *see* Ex. B at § 5.04(a)(ii); and

c. The Company, any Member other than Plaintiff, or Five Star GM breaches any of its obligations under the Five Star GM Agreement, including, without limitation, the failure to obtain the approval of Plaintiff whenever required in the Five Star GM Agreement, *see* Ex. B at § 5.04(a)(iv).

**D. Plaintiff's Remedies under the Company Agreements**

19. Under the Five Star GM Agreement, Plaintiff has the following remedies in the event of a Redemption Default:

a. Plaintiff shall have the right to require the Company, to request an additional Capital Contribution from the Members other than Plaintiff in an amount sufficient to bring Plaintiff current on the distributions (the "Capital Call Right"), *see* Ex. B at § 5.04(b); and

b. Plaintiff shall have the right to act on behalf of Five Star GM and cause Five Star GM to act on behalf of each Operating Company, in each instance in its sole and absolute discretion without the consent or approval of the Company or any other Member of Five Star GM or any Operating Company, to market and cause the sale of the Turtle Creek Project to an independent third party on such terms and conditions as Plaintiff may determine appropriate in its sole and absolute discretion. Further, the Company and each Member of Five Star GM shall cooperate and shall cause Five Star GM and each Operating Company to cooperate with Plaintiff to accomplish such sale (the "Sale Right"). *See* Ex. A at § 2.09, Ex. B at § 5.05.

**E. Defendants' Redemption Defaults under the Company Agreements**

20. As a result of the formula laid out in § 5.02 of the Five Star GM Agreement, Five Star GM was required to distribute $3,000,000, to Plaintiff on or before March 9, 2020 (the "March Unreturned Priority Capital Payment"). However, Defendants failed to cause Five Star GM to make the March Unreturned Priority Capital Payment to Plaintiff, which is a Redemption Default

under Section 5.04(a)(ii) of the Five Star GM Agreement (the "March Payment Redemption Default"). Further, Defendants have failed to cause Five Star GM to cure this Redemption Default in the time period prescribed by the Five Star GM Agreement following notice of default from Plaintiff.

21. After the March Payment Redemption Default and after Defendants failed to give any clear indication to Plaintiff of when it intended to cause Five Star GM to make the March Unreturned Priority Capital Payment, on March 20, 2020, Plaintiff sent Defendants a letter ("Notice of Default") officially notifying them of their existing and potential defaults under the Company Agreements, which included, but were not limited to, the March Payment Redemption Default, failure by Defendants to submit *any* financial reports as required by the Company Agreements, and failure to obtain prior written approval from Plaintiff for actions taken by the Company on behalf of Five Star GM. A true and accurate copy of the Notice of Default is attached hereto as Exhibit C and incorporated herein by reference.

22. On March 27, 2020, in response to Plaintiff's Notice of Default, Defendants sent Plaintiff a Project Status and Force Majeure Forbearance Request ("Forbearance Request"). The Forbearance Request failed to demonstrate that Defendants had any realistic plan to promptly cure the various existing defaults under the Company Agreements. Instead, the Forbearance Request simply confirmed the fact that, in many respects, Defendants had engaged in a course of improper conduct that breached their fiduciary duties to Five Star GM and its Members, including Plaintiff, breached their fiduciary duties to the Company's Members, including Plaintiff, and have materially breached the Company Agreements. A true and accurate copy of the Forbearance Request is attached hereto as Exhibit D and incorporated herein by reference.

23. The Forbearance Request also confirmed to Plaintiff that Defendants: (i) had

executed multiple management agreements with Mandarin Hotel Group without the prior written approval of Plaintiff, in breach of the Company Agreements and (ii) indebted the Company and Five Star GM by contracting with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates, which, upon information and belief, require future payments by or to the Company and Five Star GM of more than $100,000 in any year not provided in the Turtle Creek Project Budget without the prior written approval of Plaintiff, in breach of the Company Agreements.

24. The foregoing breaches of Defendants' obligations are each a Redemption Default under Section 5.04(a)(iv) of the Five Star GM LLC Agreement.

25. Further, Plaintiff's Unreturned Priority Capital normally earns a Base Return due on the first day of each month, which is equal to nine percent (9%) per annum, accrued on the Unreturned Priority Capital. However, a Default Return equal to fourteen percent (14%) per annum on Plaintiff's Unreturned Priority Capital shall apply immediately at such times as any Base Return is not distributed on the due date thereof and the Default Return shall accrue in lieu of such Base Return not timely distributed.

26. Defendants also failed to cause Five Star GM to timely distribute the Base Return to Plaintiff that was due on or before April 1, 2020, which is another Redemption Default under Section 5.04(i) of the Five Star GM Agreement (the "April Payment Redemption Default"). As a result of the April Payment Redemption Default, the Default Return applies to the payment which was due on April 1, 2020 and which currently remains outstanding (the "April Default Return Payment").

27. Further, at the permission of Defendants, JMJ, Barton's affiliated entity, is occupying space in the Turtle Creek Project without the written approval of Plaintiff. Defendants'

actions are in direct violation of the Company Agreements. *See* Ex. A at § 2.08(f), Ex. B at § 6.02(f). Further, such action constitutes a self-dealing transaction in breach of Defendants fiduciary duty of loyalty under the Company Agreements.

**F. Final Demand for Defendants to Comply with Their Obligations under the Company Agreements**

28. On April 8, 2020, Plaintiff's counsel responded on behalf of Plaintiff to the Forbearance Request and the April Payment Redemption Default by sending a final demand requesting the following from Defendants (the "Final Demand"):

a. The March Unreturned Priority Capital Payment;

b. The April Default Return Payment;

c. All agreements that have been entered into related to the Turtle Creek Project, including but not limited to, any agreements with Mandarin Hotel Group, SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates (the "Turtle Creek Project Agreements");

d. The monthly financial reports from September 2019 through March 2020 that are required under Section 7.03 of the Company Agreement;

e. The required financial information, reports, and notices from September 2019 through March 2020 as required by Section 12.03(a)(i)-(iii) of the Five Star GM Agreement;

f. All agreements, including but not limited to, any lease agreements or license agreements, with JMJ or any other affiliate of Barton to occupy space at the Turtle Creek Project; and

g. Access to and the right to inspect and copy the following books and records of the Company and Five Star GM pursuant to Section 7.02 of the Company Agreement, Section 12.02 of the Five Star GM Agreement, and Section 18-305 of the Delaware Limited Liability Company Act:

    i. Balance sheets by month from September 1, 2019 through the present day;

    ii. Profit and loss statements by month from September 1, 2019 through the present day;

    iii. Cash flow statements by month from September 1, 2019 through the

present day; and

iv. Five Star GM information and documents regarding the Turtle Creek Project, including but not limited to (1) any agreements with any contractor, supplier, vendor or other third party related to the Turtle Creek Project along with contact information for all such parties, (2) any correspondence with lenders, including but not limited to any default notices, and (3) any notices, citations or other correspondence from any State or local governmental entity related to the Turtle Creek Project.

29. A true and accurate copy of the Final Demand is attached hereto as Exhibit E and incorporated herein by reference.

30. In the Final Demand, Plaintiff also exercised its Capital Call Right and expressly reserved its right to exercise its Sale Right.

31. In response to the Final Demand, Defendants disputed that any Redemption Default had occurred (the "Final Demand Response") and merely provided final, executed copies of seven of the many agreements that Defendants had entered into without written approval from Plaintiff, as required by the Company Agreements (the "Final Demand Production"). A true and accurate copy of the Final Demand Response and the Final Demand Production is attached hereto as Exhibit F and Exhibit G, respectively, and incorporated herein by reference. However, Defendants failed to provide *any* of the financial and accounting records to which Plaintiff is entitled and failed to provide any assurances that it had made a meaningful effort to try and obtain the requested information, in clear breach of the Company Agreements.

**G. Plaintiff's Exercise of its Sale Right**

32. The most pressing concern for Plaintiff is its intention to move forward with exercising its Sale Right under the Company Agreements. In order to exercise that remedy, Plaintiff must have the most current understanding and status of its substantial financial investment in Five Star GM and an accurate understanding of the business transactions of the entity. The

requested information is essential to Plaintiff's exercise of its Sale Right. The information requested from Defendants is what is required, at a minimum to for Plaintiff to conduct its due diligence related to the exercise of its Sale Right. Additionally, and as previously noted, Plaintiff is also contractually allowed access to such information.

33. Further, Defendants are obligated to cooperate and shall cause Five Star GM to cooperate with Plaintiff to accomplish a sale of the Turtle Creek Project.

34. Accordingly, Defendants should be enjoined from preventing Plaintiff's access to the books and records of the Company and Five Star GM, and enjoined from undertaking any action with respect to or on behalf of Five Star MM or Five Star GM or with respect to or on behalf of Five Star TC, LLC, MO 2999TC MZ, LLC, MO 2999TC, LLC, and 2999 TC Acquisitions without the prior written approval of Palisades TC, LLC.

35. The current state of the national economy, and specifically, the current dynamics in the commercial real estate market due to the COVID-19 pandemic create an imminent threat of irreparable harm to Plaintiff. The current real estate market is unpredictable and Plaintiff needs to act fast if it has any hopes for selling the Turtle Creek Project at its highest value which is ont of Plaintiff's primary remedies for the Redemption Defaults that have occurred under the applicable company agreements. Further, the Turtle Creek Project, which is a real estate development project stands to be irreparably damaged if it continues to be managed and operated by Defendants.

## V. CAUSES OF ACTION

### COUNT 1 – BREACH OF CONTRACT (COMPANY AGREEMENT)

36. The allegations above are incorporated herein by reference as if set forth in this Count.

37. The Company Agreement is a valid and enforceable written contract between Plaintiff and Defendants. The Company Agreement provided that Defendants would provide to

Plaintiff timely financial information reports and would obtain prior written approval from Plaintiff of certain actions, including, but not limited to, (a) entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Turtle Creek Project, (b) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), (c) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company and any Operating Company of more than $100,000 in any year except as provided in the Turtle Creek Project Budget, and (d) entering into, modifying, amending or terminating any agreement with Mandarin Hotels.

38. Plaintiff fully performed its contractual obligations under the Company Agreement.

39. Defendants breached the Company Agreement by (i) failing to submit *any* financial reports; (ii) executing multiple management agreements with Mandarin Hotel Group without the prior written approval of Plaintiff; (iii) indebting the Company by contracting with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates, which, upon information and belief, require future payments by or to the Company of more than $100,000 in any year not provided in the Turtle Creek Project Budget without the prior written approval of Plaintiff; (iv) permitting JMJ to occupy space in the Turtle Creek Project without the written approval of Plaintiff; and (v) failing to provide access to the books and records of the Company.

40. Defendants breach caused injury to Plaintiff, which resulted in actual damages and the inability to proceed with effecting the sale of the Turtle Creek Project.

**COUNT 2 – BREACH OF CONTRACT (FIVE STAR GM AGREEMENT)**

41. The allegations above are incorporated herein by reference as if set forth in this

Count.

42. The Five Star GM Agreement is a valid and enforceable written contract between Plaintiff and Defendants. The Five Star GM Agreement provided that Defendants would pay Plaintiff the Unreturned Priority Capital Payment on March 9, 2020, pay Plaintiff the Base Return (or Default Return) on April 1, 2020, provide to Plaintiff timely financial information reports, and would obtain prior written approval from Plaintiff of certain actions, including, but not limited to, (a) entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Turtle Creek Project, (b) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), (c) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to Five Star GM and any Operating Company of more than $100,000 in any year except as provided in the Turtle Creek Project Budget, and (d) entering into, modifying, amending or terminating any agreement with Mandarin Hotels. The Five Star GM Agreement further provides that Defendants would cooperate with Plaintiff in the event that it exercised its Sale Right.

43. Plaintiff fully performed its contractual obligations under the Five Star GM Agreement by providing the Preferred Capital Contribution of $4,000,000.

44. Defendants breached the Five Star GM Agreement by (i) failing to make the March Unreturned Priority Capital Payment; (ii) failing to make the April Default Return Payment; (iii) failing to submit any financial reports; (iv) executing multiple management agreements with Mandarin Hotel Group without the prior written approval of Plaintiff; (v) indebting Five Star GM by contracting with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette

Davis Drake, Talley & Associates, and Lerch Bates, which, upon information and belief, require future payments by or to the Company of more than $100,000 in any year not provided in the Turtle Creek Project Budget without the prior written approval of Plaintiff; (vi) permitting JMJ to occupy space in the Turtle Creek Project without the written approval of Plaintiff; (vii) failing to provide access to the books and records of Five Star GM; and (viii) failing to cooperate with Plaintiff in exercising its Sale Right.

45. Defendants' breach caused injury to Plaintiff, which resulted in actual damages and the inability to proceed with effecting the sale of the Turtle Creek Project.

**COUNT 3 – BREACH OF FIDUCIARY DUTY**

46. The allegations above are incorporated herein by reference as if set forth in this Count.

47. Defendants, as the Managers of the Company and Five Star GM, owed fiduciary duties to Plaintiff.

48. Defendants breached their fiduciary duty of loyalty to Plaintiff and Five Star GM by engaging in self-dealing when they permitted JMJ to occupy space at the Turtle Creek Project without first obtaining written approval from Plaintiff.

49. Defendants' breach of their fiduciary duty of loyalty has injured Plaintiff and Five Star GM.

50. Defendants' breach of their fiduciary duty of loyalty to Plaintiff and Five Star GM benefited Defendants by providing free office space for an affiliate of Barton at the detriment to Plaintiff and Five Star GM.

51. Accordingly, Plaintiff seeks damages within the jurisdictional limits of this Court.

**COUNT 4 – FRAUD**

52. The allegations above are incorporated herein by reference as if set forth in this

Count.

53. Defendants failed to disclose material facts related to the financially distressed nature of the Turtle Creek Project.

54. Defendants had a duty to disclose the information to Plaintiff because Defendant had a fiduciary relationship with Plaintiff.

55. The information was material because Plaintiff entered into subsequent real estate investment transactions with Defendants, including one involving a proposed hotel and condominium project in Frisco, Texas.

56. Defendants knew Plaintiff was ignorant of the information and did not have an equal opportunity to discover the truth as Defendants controlled all of the books and records for Five Star GM.

57. Defendants deliberately remained silent and did not disclose the information to Plaintiff.

58. By deliberately remaining silent, Defendants intended for Plaintiff to enter into subsequent real estate investment transactions without information of the impending default by the Company and Five Star GM on the Unreturned Priority Capital.

59. Plaintiff justifiably relied on Defendants' deliberate silence and believed that the Turtle Creek Project and Five Star GM were financially secure.

60. By deliberately remaining silent, Defendants proximately caused injury to Plaintiff, which resulted in damages to Plaintiff.

61. Plaintiff seeks damages within the jurisdictional limits of this Court.

## COUNT 5 – ATTORNEY'S FEES

62. The allegations above are incorporated herein by reference as if set forth in this Count.

63. Pursuant to Section 37.009 and Section 38.001 of the Texas Civil Practice and Remedies Code, Plaintiff claims reasonable attorney's fees, both in the trial of this cause and in connection with any subsequent appeal, as are equitable and just.

64. Further, Plaintiff is entitled to recover reasonable attorney fees under the provisions of the Company Agreements. *See* Ex. A at §§ 10.12, 10.14, Ex. B at § 18.08.

## VI. APPLICATION FOR TEMPORARY RESTRAINING ORDER

65. Injunctive relief may be granted upon the showing of the following: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002).

66. As shown above, Plaintiff has shown that it has various causes of action against Defendants and a probable right to the relief sought in this lawsuit.

67. As a result of the Defendants' wrongful acts in violating the Company Agreements in numerous material respects, including but not limited to, the refusal to provide Plaintiff with access to books and records and information and material related to the Turtle Creek Project to which Plaintiff is entitled, Plaintiff is threatened with probable, imminent and irreparable injury to its investment in the Turtle Creek Project in amounts that currently cannot be calculated. Without access to books and records of Five Star GM and the Company and the information and documents related to the Turtle Creek Project, Plaintiff is effectively prohibited from exercising its Sale Right remedy. Thus, Plaintiff has no adequate remedy at law and the requested injunctive relief is appropriate. Alternatively, and in addition, Plaintiff need not establish an inadequate remedy at law because the irreparable injury complained of relates Plaintiff's interest in the Turtle Creek Project, which is real property. *See* Tex. Civ. Prac. & Rem Code § 65.011(5).

68. Pursuant to Texas Rule of Civil Procedure 684, Plaintiff is able and willing to post a bond in this matter and request that the Court determine a fair and reasonable amount of security

to be given by Plaintiff for the protection of Defendants in the event the Temporary Restraining Order is wrongfully issued and results in harm to the Defendants. However, Plaintiff' respectfully requests that the bond should have a nominal face value.

69. Plaintiff's Application for Temporary Restraining Order and Temporary Injunctive Relief is verified by the attached Unsworn Declaration of Joaquin de Monet, which is attached hereto as Exhibit H.

70. Specifically, Plaintiff requests that the Court enter a Temporary Restraining Order ordering Defendants Five Star MM, LLC and Timothy Barton and those persons in active concert or participation with them who receive actual notice of the order, to desist and refrain from, either directly or indirectly through others:

a. Preventing or obstructing Palisades TC, LLC from obtaining access to the following:

   i. Any contracts or any other written agreements with any party related to the Turtle Creek Project, including but not limited to, Mandarin Hotel Group, SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drak, Tally & Associates, and Lerch Bates (the "Turtle Creek Project Contracts"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to all Turtle Creek Project Contracts;

   ii. The monthly financial reports from September 2019 – March 2020 that are required under Section 7.03 of the Five Star MM Company Agreement which shall include all expenses and income of Five Star MM for the calendar month and balance sheet as of the last day of the calendar month detailing all assets and liabilities of Five Star MM and the Capital Accounts of each Member (the Monthly Five Star MM Financial Reports"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to all of the Monthly Five Star MM Financial Reports;

   iii. The monthly management reports from September 2019 – March 2020 that are required under Section 12.03(a)(i) of the Five Star GM Company Agreement which shall include all progress reports on development activity regarding the Turtle Creek Project and a report detailing expenditures pursuant to the Turtle Creek Project Budget including any variations from same (the Monthly Five Star GM

Management Reports"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to all of the Monthly Five Star GM Management Reports;

iv. The monthly financial statements of Five Star GM from September 2019 – March 2020 that are required under Section 12.03(a)(ii) of the Five Star GM Company Agreement which shall include (A) a balance sheet as of the end of the such month and an income statement for such month prepared in accordance with the standard accounting principles of the Manager and the amount of unreturned Capital Contributions of each Member, and (B) a cash flow statement for such month (the Monthly Five Star GM Financial Statement"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to all of the Monthly Five Star GM Financial Statements;

v. The annual financial statement of Five Star GM for 2019 that is required under Section 12.03(a)(iii) of the Five Star GM Company Agreement which shall include (A) a balance sheet as of the end of such calendar year, prepared in accordance with the standard accounting principles of the Manager, (B) a cash flow statement for such calendar year, (C) the amount of unreturned Capital Contributions of each Member as of the last day of such calendar year, and (D) a summary report describing in reasonable detail the financial and business activities of the Company during such calendar year (the Annual Five Star GM Financial Statement"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to the Annual Five Star GM Financial Statement;

vi. Copies of any notices of default under any loan including, without limitation, under the Loan Documents as required under Section 12.03(b) of the Five Star GM Company Agreement (the "Loan Default Notices"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to Loan Default Notices;

vii. All agreements, including but not limited to, any lease agreements or license agreements with JMJ Development LLC or any Affiliate of Timothy Barton to occupy space at the Turtle Creek Project (the "Barton Affiliate Lease Agreements"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to any Barton Affiliate Lease Agreements;

viii. Pursuant to Section 7.02 of the Five Star MM Company Agreement and Section 18-305 of the Delaware Limited Liability Company Act, all information that Palisades TC, LLC is entitled to as a Member of Five Star MM (the "Five Star MM Books and Records"). Barton and Five Star MM shall immediately provide access to

Palisades TC, LLC to the Five Star MM Books and Records;

ix. Pursuant to Section 12.01 of the Five Star GM Company Agreement and Section 18-305 of the Delaware Limited Liability Company Act, all information that Palisades TC, LLC is entitled to as a Class A Member of Five Star GM (the "Five Star GM Books and Records"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to the Five Star GM Books and Records; and

x. Any notices, citations or other enforcement correspondence from any State or local governmental entity related to the Turtle Creek Project (the "Turtle Creek Project Notices and Citations"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to the Turtle Creek Project Notices and Citations.

b. Undertaking any action with respect to or on behalf of Five Star MM or Five Star GM or with respect to or on behalf of Five Star TC, LLC, MO 2999TC MZ, LLC, MO 2999TC, LLC, and 2999 TC Acquisitions without the prior written approval of Palisades TC, LLC.

## VII. APPLICATION FOR TEMPORARY INJUNCTION

71. Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

72. Upon notice and hearing, Plaintiff requests that the Court enter a temporary injunction extending the temporary restraining order until final judgment is entered in this lawsuit.

## VIII. JURY DEMAND

73. Plaintiff demands a jury trial and tenders the appropriate fee with this Petition.

## IX. CONDITIONS PRECEDENT

74. All conditions precedent to Plaintiff being entitled to bring this action and recover the relief requested herein have been performed, have occurred, or have been waived.

## X. REQUEST FOR DISCLOSURE

75. Under Texas Rule of Civil Procedure 194, Plaintiff requests that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## XI. PRAYER

76. For these reasons, Plaintiff asks that Defendants be cited to appear and answer and, on final trial, that Plaintiff be awarded a judgment against Defendants, jointly and severally, for the following:

a. Temporary restraining order;

b. Temporary injunction;

c. Permanent injunction;

d. Actual damages;

e. Pre-judgment and post-judgment interest;

f. Court costs; and

g. All other relief to which Plaintiff is entitled.

Dated: April 22, 2020

Respectfully submitted,

WINSTEAD PC

By:/s/ Kasey Ratliff

Kasey Ratliff
kratliff@winstead.com
LaCrecia Perkins
lperkins@winstead.com

2728 N. Harwood Street
Suite 500
Dallas, TX 75201
Telephone: 214.745.5400
Facsimile: 214.745.5390

**ATTORNEYS FOR PLAINTIFF**
**PALISADES TC, LLC**

4817-7810-9114v.1

# Exhibit C

PALISADES TC LLC
1919 McKinney Ave., Suite 100
Dallas, Texas 75201

March 20, 2020

*VIA FEDEX OVERNIGHT MAIL*

ATTN: Timothy Barton, President
Dallas Real Estate Investors, LLC
1755 Wittington, Suite 340
Dallas, Texas 75234

Re: Company Agreement dated January 29, 2020 (the "**Company Agreement**") of Dallas Real Estate Lenders, LLC, a Delaware limited liability company (the "**Company**"). All capitalized terms used herein that are not specifically defined herein shall have the meanings provided in the Company Agreement.

Mr. Barton:

You are the President of Dallas Real Estate Investors, LLC, a Delaware limited liability company ("**DREI**") which is a Member of the Company, and which under Section 2.08 of the Company Agreement, has responsibility for day-to-day management of the Company.

This letter is provided as notice that (i) a Redemption Default has occurred pursuant to Sections 5.04(a)(iii), (iv) and (v) of the Company Agreement, and (ii) the Company may be in default with respect to other obligations to Palisades under the Company Agreement (collectively, the "**Prior Actions**").

Palisades, on behalf of itself and on behalf of its successors, assigns, affiliates, owners, directors, officers, employees, parents, subsidiaries, principals, agents, members, managers, administrators, legal representatives, insurers and attorneys (collectively, the "**Reserving Parties**"), hereby reserves all rights, benefits, remedies and claims available under the Company Agreement and all other rights, benefits, remedies and claims at law, in equity or in contract that are available to the Reserving Parties (including, without limitation, for recovery of any penalties, interest and other charges imposed on the Reserving Parties) arising out of, relating to or in connection with the Prior Actions. This letter shall in no way be deemed to impair, limit or waive, any of the rights, benefits, remedies, or claims that any of the Reserving Parties may have against DREI, as the day-to-day Manager of the Company, the Company or any affiliates, constituent owners, partners, members, officers, directors, agents and representatives thereof.

Additionally, the description herein of the Prior Actions shall not be to the exclusion of any other defaults or breaches now existing or hereafter occurring under the Company

Agreement or any other documents. Furthermore, the description herein of the specific rights of the Reserving Parties shall not be deemed to limit or exclude any other rights to which the Reserving Parties may be or become entitled under the Company Agreement or any other documents, at law, in equity or otherwise.

Any past inaction or delay in exercising any of such rights, benefits, remedies or claims, shall not be deemed a course of dealing between the parties, and DREI and the Company are not entitled to rely upon the Reserving Parties continuing to refrain from taking any of such rights, benefits, remedies or claims as may be otherwise available to the Reserving Parties. The Reserving Parties hereby advise DREI and the Company that the Reserving Parties specifically reserve all such rights, benefits, remedies and claims with respect to any and all prior failures of DREI and the Company to strictly comply with the Company Agreement or any other documents, and with respect to any present or future breaches or defaults by DREI and the Company with any of the terms, covenants and conditions contained in the Company Agreement or any other documents, and that any single or partial exercise of any of such rights, benefits, remedies and claims shall not preclude any other or further exercise of any available rights, benefits, remedies and claims.

Sincerely,

PALISADES TC LLC

By: ________________________________
Joaquin Charles de Monet, Manager

# Exhibit D

WINSTEAD

Austin | Charlotte | Dallas | Fort Worth | Houston | New York | San Antonio | The Woodlands

2728 N. Harwood Street
Suite 500
Dallas, TX 75201

214.745.5400 OFFICE
214.745.5390 FAX
winstead.com

Ratliff, Kasey
direct dial: 214-745-5339

April 8, 2020

**Via Facsimile, FedEx and Email (tbarton@jmjdevelopment.com)**

Timothy Barton, President
Dallas Real Estate Investors,
LLC
1755 Wittington, Suite 340
Dallas, Texas 75234

**Re:** Company Agreement dated January 29, 2020 (the "**Company Agreement**") of Dallas Real Estate Lenders, LLC, a Delaware limited liability company (the "**Company**").

Dear Mr. Barton:

This Firm represents Palisades TC, LLC ("Palisades") in connection with its Membership Interest in the Company. We are writing to you as the President of Dallas Real Estate Investors, LLC ("DREI") which is the Manager of the Company. All capitalized terms used herein that are not specifically defined herein shall have the meanings provided in the Company Agreement.

As you are aware, on March 20, 2020, Palisades sent you notice of various actual and potential defaults under the Company Agreement (the "Default Notice"). Since receiving the Default Notice, the Company has failed to cure the defaults specified in the Default Notice within the time period prescribed by the Company Agreement. Based on Barton's actions with respect to his role as the Manager of Five Star MM, LLC which is the Managing Member and Manager of Five Star GM, LLC, my client has grave concerns that Barton and DREI have engaged and are currently engaging in a course of improper conduct that has breached their fiduciary duties to the Company, the Members, and Palisades and have materially breached the Company Agreement.

Palisades therefore has claims against Barton, DREI, and the Company on a direct and/or derivative basis for breach of the Company Agreement and for the violation of their fiduciary duties to the Company and to Palisades. In response to Barton's, DREI's, and the Company's misconduct, we have been directed by Palisades to take all steps necessary to protect and enforce its legal and equitable rights under the Company Agreement, and under Delaware law, including by filing a lawsuit against Barton, DREI, and the Company in state district court in Dallas County if the material breaches described in this letter are not cured by Barton, DREI, and the Company on or before 5:00 p.m. (Central Time) on Monday, April 13, 2020.

**April Payment Redemption Default**

As you are aware, the purpose of the Company is to manage and own 100% of the membership interests in FHC Acquisition, LLC, a Texas limited liability company ("FHC") or such other investments (whether debt, equity or any combination thereof) (FHC and any other entity owning a Project, an "OpCo") as determined and approved by the Voting Members for the sole purposes of acquiring and developing real property and improvements thereon (a "Project"). The initial Project is that certain real property described as "Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas" ("Frisco Property") and the development of a mixed use project located thereon which is planned to include a luxury hotel, residences, restaurant, and retail components ("Frisco Project" or "Project").

Palisades contributed $3,500,000.00 as a Capital Contribution to the Company (the "Priority Capital") which is to be paid before any other distributions to the Members and which earns a Base Return or, if applicable the Default Return. Pursuant to Section 5.04(a) of the Company Agreement, a Redemption Default has occurred, including, without limitation (a) under Section 5.04(a)(iii) of the Company Agreement as a result of the breach(es) by any member or manager other than Palisades of its obligations under the Amended and Restated Company Agreement of Five Star MM, LLC dated September 16, 2019 (the "MM Company Agreement"); (b) under Section 5.04(a)(iv) of the Company Agreement as a result of the breach(es) by any member or manager other than Palisades of its obligations under the Company Agreement of Five Star GM, LLC dated September 16, 2019 (the "GM LLC Agreement"); and (c) under Section 5.04(v) of the Company Agreement as a result of the occurrence of a "Redemption Default" (as such terms is defined in the GM LLC Agreement). Further, the Company has failed to cure the Redemption Default in the time period prescribed by the Company Agreement following notice of default from Palisades.

Additionally, Palisades' Unreturned Priority Capital earns a Base Return due on the first day of each month which is equal to nine percent (9%) per annum accrued on the Unreturned Priority Capital. However, a Default Return equal to fourteen percent (14%) per annum on Palisades Unreturned Priority Capital shall apply immediately at such times as any Base Return is not distributed on the due date thereof and the Default Return shall accrue in lieu of such Base Return not timely distributed. As you are aware, DREI failed to cause the Company to timely distribute the Base Return to Palisades which was due on or before April 1, 2020 (the "April Payment Redemption Default"). As a result of the April Payment Redemption Default, the Default Return applies to the payment which was due on April 1, 2020 and which currently remains outstanding (the "April Default Return Payment").

**Demand to the Company for Capital Call, Reservation of Palisades' Sale Right and Demand for Payment**

Pursuant to Section 5.04(b) of the Company Agreement, and based on the occurrence of a Redemption Default described in Section 5.04(a)(i) of the Company Agreement, Palisades hereby exercises its right to require DREI to request an additional Capital Contribution from the Members other than Palisades in an amount sufficient to bring Palisades current on the distributions to which it is entitled pursuant to Section 5.02(a)(i) **no later than 5:00 p.m. (Central time), Monday April**

**13, 2020 (the "Demand Due Date").** Additionally, based on the occurrence of a Redemption Default, Palisades reserves all of its rights pursuant to Section 2.09 of the Company Agreement to act on behalf of the Company to market and cause the sale of the Frisco Project.

This letter constitutes formal notice of the April Payment Redemption Default. DEMAND to Barton, DREI, and the Company is hereby made for payment no later than 5:00 p.m. (Central time), on the Demand Due Date of the April Default Return Payment. As of April 8, 2020, the outstanding balance of the April Default Return Payment is $52,356.16. Please contact Joaquin de Monet at Palisades Capital Realty Advisors to determine the total payoff amount due as of any date of payment. He may be reached by phone at (214) 613-0281 or by email: jdemonet@palisadescapitalrealty.com.

**Redemption Default Based on Material Breaches of the Company Agreement and Demand for Documents**

As you were notified in the Default Notice, the Company has failed to timely provide any of the monthly financial reports that are required under Section 7.03 of the Company Agreement which shall include all expenses and income for the Company for the calendar month and balance sheet as of the last day of the calendar month detailing all assets and liabilities of the Company and the Capital Accounts of each Member. These various breaches of the Company's obligations under the Company Agreement are also each a Redemption Default under Section 5.04(a)(vii) of the Company Agreement.

Palisades demands that you produce the monthly financial reports from January 2020 through March 2020 that are required under Section 7.03 of the Company Agreement no later than the Demand Due Date.

You are hereby further reminded of Section 2.08 of the Company Agreement and the limitations therein that are placed on DREI's ability to undertake certain actions with respect to the Company or on behalf of the Company with respect to any OpCo, the Frisco Project or any other Project without the prior written approval of Palisades. These actions include but are not limited to (i) entering into, amending, modifying, terminating or canceling any property management agreement with any person for management and leasing of the Project (Section 2.08(e)); (ii) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company or any OpCo of more than $100,000 in any year except as provided in the Project Budget (Section 2.08(g)); and (iii) entering into, modifying, amending or terminating any agreement with a hotel management company or hotel franchise agreement for the Frisco Property or any portion thereof (a "Hotel Agreement")(Section 2.08(gg)). You are instructed not to undertake any of the actions specified in Section 2.08 of the Company Agreement, including those specifically enumerated in this letter.

**Books and Records Request to the Company**

Pursuant to Section 7.02 of the Company Agreement, and Section 18-305 of the Delaware Limited Liability Company Act, Palisades requests access to and the right to inspect and copy the

books and records of the Company. Specifically, Palisades requests access to and will copy the following records for the Company:

*pursuant to Section 18-305 of the Delaware Limited Liability Company Act, all information that Palisades is entitled to pursuant to Section 18-305 as a Member of the Company;

*balance sheets by month from January 1, 2020 through the present day;

*profit and loss statements by month from January 1, 2020 through the present day; and

*cash flow statements by month from January 1, 2020 through the present day.

*Information and documents regarding the Project, including but not limited to (i) any agreements with any contractor, supplier, vendor or other third party related to the Project along with contact information for all such parties, (ii) any correspondence with lenders, including but not limited to any default notices, and (iii) any notices, citations or other correspondence from any State or local governmental entity related to the Project.

Palisades is seeking this information because it wants to ensure that it has the most current understanding and status of its substantial financial investment in the Company and an accurate understanding of the business transactions of the Company. Additionally, and as previously noted, Palisades is also contractually allowed access to such information. Further, DREI is obligated to cooperate and shall cause the Company to cooperate with Palisades to accomplish a sale of the Project in the event that Palisades elects to exercise its Sale Right pursuant to Section 2.09 of the Company Agreement. The requested information is essential to Palisades' analysis related to a potential exercise of its Sale Right.

On behalf of Palisades, we request that the documents responsive to this books and records request be made available for inspection by my law firm and/or other professionals hired by Palisades. We request that these materials be produced in an electronic (PDF) format and they can be uploaded for our review in a Dropbox or other, similar manner. If you have any questions along these lines, please let us know. In addition, Palisades reserves the right to seek these files in other formats as necessary to permit a prompt review to be made of the requested material.

Please be advised that if by Monday, April 13, 2020 at 5:00 p.m. (1) Palisades has not received the April Default Return Payment, or (2) Palisades has not received the monthly financial reports that are required under Section 7.03 of the Company Agreement, or (3) Palisades has not been provided access to and the right to inspect and copy the books and records of the Company as demanded herein, Palisades shall promptly file suit against Barton, DREI, and the Company requesting that Barton and DREI be removed and replaced from their respective roles as President of DREI and Manager of the Company, and seeking damages, costs, and legal fees, and to enforce all of Palisades' rights under the Company Agreement, and under Delaware law. In such event, Palisades will also take immediate steps to procure a Brokers' Opinion of Value for the Project related to the potential exercise of its Sale Right pursuant to Section 2.09 of the Company Agreement.


WINSTEAD ATTORNEYS

In addition to the forgoing, Palisades demands that Barton, DREI, the Company, and JMJ preserve, and not alter in any way, any evidence, wherever it may be found—including any personal or work-related mobile phones or personal computers—regarding the above-referenced claims by Palisades, events, and potential parties (including any officers, directors, employees, or affiliated entities of the parties). This request for the preservation of evidence to Barton, DREI, the Company, and JMJ includes all voicemails, emails, text messages, time sheets, meeting agendas and notes, telephone records and call logs, expense reports, notes, letters, and all other relevant documents, which are maintained by Barton, DREI, the Company, and JMJ. Barton, DREI, the Company, and JMJ have a duty to preserve such evidence, and the failure to do so can result in sanctions.

By this letter, Palisades reserves all rights and remedies against Barton, DREI, the Company and any of their members, officers, directors, or affiliated entities, including the right to assert additional claims against those parties and to seek additional relief and/or amounts from you or those parties in addition to the claims set forth above. We look forward to your prompt response.

Sincerely,

M. Kasey Ratliff

cc: Mark Adams, *Via Email* (madams@jmjdevelopment.com)
Joaquin de Monet, *Via Email*
Brent Clifton, *Of the Firm*

# Exhibit E

**Unsworn Declaration § 132.001 Tex. Civ. Prac. & Rem. Code**

"My name is Joaquin Charles de Monet. My date of birth is August 29, 1964 and my business address is 1919 McKinney Avenue, Suite 100, Dallas, Texas 75201. I am Manager for Plaintiff Palisades TC, LLC. I declare under the penalty of perjury that in my capacity as Manager of Plaintiff Palisades TC, LLC, I have personal knowledge that the grounds and basis for which the Temporary Restraining Order is sought are true and correct. I have read the above and foregoing Plaintiff's Original Petition and Application for Temporary Restraining Order and Temporary Injunction, and the factual statements contained therein are within my personal knowledge and are true and correct."

Executed in Dallas County, State of Texas, on this 22nd day of April, 2020.

Joaquin de Monet, Declarant

4838-2235-0978v.1
61993-1 2/22/2019