# Exhibit "M"

# PURCHASE AND SALE AGREEMENT

BETWEEN

**IGO – USA LP**,
a Texas limited partnership,

AS SELLER, AND

**JMJ ACQUISITIONS, L.L.C.**,
a Texas limited liability company

AS PURCHASER

Dated as of October ____, 2018

# Table of Contents

***For reference only – in the event of a conflict between the body of the Agreement and the Table of Contents, the body of the Agreement shall control***

SECTION I PERTINENT TERMS AND BASIC INFORMATION .......... 1

1.1. Certain Basic Terms .......... 1

1.2. Closing Costs. .......... 3

SECTION II PURCHASE AND SALE .......... 3

2.1. Incorporation of Recitals .......... 3

2.2. Agreement of Purchase and Sale. .......... 4

2.3. Certain Definitions. .......... 4

2.4. Exceptions. .......... 6

2.5. Purchase Price. .......... 6

2.6. Payment of Purchase Price .......... 6

2.7. Earnest Money; Independent Consideration. .......... 6

2.8. Escrow Agent. .......... 8

SECTION III TITLE AND SURVEY .......... 9

3.1. Title Examination; Commitment for Title Insurance .......... 9

3.2. Survey. .......... 9

3.3. Title Objections; Cure of Title Objections .......... 9

3.4. Conveyance of Title. .......... 12

3.5. Pre-Closing "Gap" Title Matters. .......... 12

SECTION IV DUE DILIGENCE PERIOD .......... 12

4.1. Due Diligence. .......... 12

4.2. Insurance Requirements. .......... 14

4.3. Right of Termination........ 15

4.4. Purchaser's Project; Required Approvals. ........ 16

4.5. Subdivision Approval. ........ 16

SECTION V CLOSING ........17

5.1. Time and Place........ 17

5.2. Sellers' Obligations at Closing. ........ 17

5.3. Purchaser's Obligations at Closing........ 18

5.4. Credits and Prorations........ 19

5.5. Closing Costs. ........ 19

5.6. Conditions Precedent to Obligation of Purchaser. ........ 20

5.7. Conditions Precedent to Obligation of Seller. ........ 21

5.8. Obligations of Purchaser........ 22

5.9. Commencement and Completion Deadlines........ 22

5.10. Additional Provisions Applicable to Section 5.9. ........ 24

5.11. On-Site Infrastructure. ........ 25

5.12. Post-Closing Impact Fees. ........ 25

5.13. Licensing Requirements for "The Gate"........ 25

5.14. Survival........ 26

SECTION VI 26

REPRESENTATIONS, WARRANTIES AND COVENANTS ........26

6.1. Representations and Warranties of Seller. ........ 26

6.2. Survival of Sellers' Representations and Warranties........ 28

6.3. Covenants of Seller. ........ 28

6.4. Representations, Warranties and Covenants of Purchaser. ........ 28

6.5. Survival of Representations, Warranties and Covenants. ........ 30

6.6. Representations and Warranties Generally. 30

6.7. Limitation of Liability. 31

6.8. Post-Closing Obligations. 32

SECTION VII DEFAULT 36

7.1. Default by Purchaser. 36

7.2. Default by Seller. 37

7.3. Provisions Applicable to Claims. 37

SECTION VIII COMMISSIONS 38

8.1. Brokerage Commissions. 38

SECTION IX DISCLAIMERS AND WAIVERS 38

9.1. Accuracy of Information. 38

9.2. DISCLAIMERS. 38

9.3. Notice Required by §13.257, Texas Water Code. 40

9.4. Survival of Disclaimers. 40

SECTION X MISCELLANEOUS 40

10.1. Confidentiality. 40

10.2. Public Disclosure. 41

10.3. Jury Waiver. 42

10.4. Assignment. 42

10.5. Notices. 42

10.6. Modifications. 44

10.7. Calculation of Time Periods. 44

10.8. Successors and Assigns. 44

10.9. Entire Agreement. 44

10.10. Further Assurances. 44

10.11. Counterparts/Manners of Delivery. .... 44
10.12. Severability. .... 44
10.13. Applicable Law. .... 45
10.14. Limitation on Liability. .... 45
10.15. Merger Provision; Survival. .... 46
10.16. DTPA Waiver. .... 46
10.17. Section 1031 Exchange. .... 46
10.18. No Third Party Beneficiary. .... 47
10.19. Exhibits and Schedules. .... 47
10.20. Captions. .... 47
10.21. Construction. .... 47
10.22. Termination of Agreement. .... 47
10.23. Litigation Expenses. .... 48
10.24. Effective Date. .... 48

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "**Agreement**") is made as of the Effective Date (as defined below), by and between IGO – USA LP, a Texas limited partnership, with its principal place of business at 2595 Dallas Parkway, Suite 470, Frisco, Texas 75034 ("**Seller**"), and JMJ ACQUISITIONS, L.L.C., a Texas limited liability company, with its principal place of business at 1755 Wittington Place, Suite 340, Dallas, Texas 75234 ("**Purchaser**").

## RECITALS

WHEREAS, Seller is the owner of that certain tract or parcel of land consisting of approximately 4.539 acres, referenced as Block A, Lot 13 on that certain Conveyance Plat of The Gate prepared by Halff Associates Inc. and recorded on March 28, 2016, City Project No. CP-15-0045 (the "**Original Conveyance Plat**"), and graphically depicted on Exhibit A attached hereto and made a part hereof, situated in the City of Frisco, Collin County, Texas (the "**Land**"), together with any buildings, structures, fixtures, and other improvements located on the Land which are owned by Seller (the "**Improvements**"); and

WHEREAS, Seller desires to sell the Property (as hereinafter defined) to Purchaser in exchange for the Purchase Price (as hereinafter defined), and Purchaser desires to purchase the Property from Seller for the Purchase Price, upon and subject to the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## SECTION I
## PERTINENT TERMS AND BASIC INFORMATION

1.1. Certain Basic Terms.

This section is for convenience only, in the event of a conflict between this section and the cited section below or the remaining portion of the Agreement, the cited section (or applicable provision of the Agreement) shall govern.

| Term | Definition | Controlling Section |
|---|---|---|
| Seller | IGO – USA LP,<br>a Texas limited partnership | Preamble |
| Purchaser | JMJ Acquisitions, L.L.C.,<br>a Texas limited liability company | Preamble |

| | | |
|---|---|---|
| Seller's Attorney | John E. Bloomer<br>Scheef & Stone, L.L.P.<br>2600 Network Blvd., Suite 400<br>Frisco, Texas 75034<br>Telephone: (214) 472-2130<br>Email: john.bloomer@solidcounsel.com | {Section 10.5} |
| Purchaser's Attorney | Jay A. LaJone<br>Bennett, Weston, LaJone & Turner, P.C.<br>1603 LBJ Freeway, Suite 280<br>Dallas, Texas 75234<br>Telephone: (214) 373-2556<br>Email: jlajone@bennettweston.com | {Section 10.5} |
| Property | The land depicted on <u>Exhibit A</u>, Frisco, Collin County, TX, subject to final legal description as set forth in Section 4.5 | {Section 2.2} |
| Effective Date | The date a fully executed counterpart of this Agreement is received by the Escrow Agent. | {Section 10.23} |
| Purchase Price | $5,931,565.00 | {Section 2.5} |
| Escrow Agent | Chicago Title Insurance Company<br>2828 Routh Street, Suite 800<br>Dallas, Texas 75201<br>Attn: Shannon Bright<br>Telephone: (214) 965-1719<br>Facsimile: (214) 968-1627<br>Email: brights@CTT.com | {Section 2.8} |
| Earnest Money | Initial Deposit in the amount of $100,000.00 is to be deposited within five (5) days after the Effective Date, and the Additional Deposit in the amount of $200,000.00 is to be deposited within three (3) business days after the expiration of the Due Diligence Period | {Section 2.7} |
| Title Company | Chicago Title Insurance Company<br>[Same Address As Escrow Agent] | {Section 3.1} |
| Title Exam Deadline | 5:00 p.m., Central time, on the thirtieth (30th) day after Purchaser receives the Title Commitment, the Supporting Documents and Seller's plat of the Property, but no later than forty-five (45) days after the Effective Date | {Section 3.3} |

1.2. Closing Costs.

Closing costs shall be allocated and paid as follows:

| Cost | Responsible Party |
|---|---|
| Title Commitment, Search and Exam Fees, Basic Premium for Owner's Title Policy promulgated by the Texas Department of Insurance | Seller |
| Any endorsements or changes to the Owner's Title Policy desired by Purchaser | Purchaser |
| Update to Existing Survey or New Survey | Purchaser |
| Costs for UCC Searches, Environmental Phase I, Building Inspections, Site visit(s) of Purchaser and Purchaser's Representatives | Purchaser |
| Ad valorem property taxes | Prorated between Seller and Purchaser as of the Closing Date on a calendar year basis |
| Recordation Fees for the Deed of Conveyance | Seller |
| Escrow fees | ½ Seller<br>½ Purchaser |
| Seller's Attorney's Fees | Seller |
| Purchaser's Attorney's Fees | Purchaser |
| Settlement Costs | ½ Purchaser<br>½ Seller |
| All other closing costs, expenses, charges and fees | Per Section 5.5 |

SECTION II
**PURCHASE AND SALE**

2.1. Incorporation of Recitals.

The foregoing Recitals are hereby incorporated herein in their entirety.

2.2. Agreement of Purchase and Sale.

Subject to the terms and conditions hereinafter set forth, Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, the Property. As used herein, the term "**Property**" means:

(a) the Land;

(b) the Improvements, if any; and

(c) all right, title and interest, if any, of Seller in and to any and all of the following relating to the Land: (i) land lying in the bed of any street, road or access way, opened or proposed, on the Land; (ii) roads, alleys, rights-of-way and ingress and egress easements relating to the Land, whether surface, subsurface or otherwise; (iii) all water and water rights under or otherwise pertaining to the Land; and (iv) all governmental or quasi-governmental permits, approvals, authorities, licenses and consents, if any, of any kind or character pertaining to the Land.

Notwithstanding the foregoing, or any other term set forth in this Agreement to the contrary, the term "Property" shall not include, and Seller hereby saves, excepts, and reserves unto itself and its successors and assigns, all Excluded Property.

2.3. Certain Definitions.

For purposes of this Agreement, defined terms will be indicated by initial capital letters and will have the meanings set forth herein. As used in this Agreement, the following terms have the meanings set forth below:

"**Development Agreement**" means that certain Development Agreement dated effective March 15, 2017, by and among the City of Frisco, Texas (the "**City**"), IGO – FRISCO 1 LLC ("**IGO-Frisco**") and Seller, recorded on April 17, 2017 under Clerk's File No. 20170417000481840, Real Property Records of Collin County, Texas, including any amendments, modifications and/or restatements thereof, whether now existing or hereinafter entered into between such parties, the terms of which are incorporated herein by reference.

"**Excluded Property**" means and includes: (i) the name "The Gate", and any mark, logo, trade name, or other name utilizing "The Gate", except as set forth in the Non-Exclusive License Agreement; (ii) any of Seller's or Seller's affiliates right to receive, now or in the future, any Seller Deposits/Refunds, except as expressly stated herein; (iii) any professional photographs of the Property taken by Seller or Seller's agents, including but not limited to, photographs, negatives and transparencies in digital or other form; (iv) any Reports, Property Information or Confidential Information (as each term is used or otherwise defined in SECTION X below), or, in any other case, any other proprietary or confidential information; (v) records, correspondence and documents in Seller's or Seller's affiliates' care, custody, possession or control that are considered attorney-client privileged communications or are otherwise required by any agreement (whether oral or

in writing) to remain confidential; (vi) any insurance proceeds and condemnation awards that Seller is entitled to prior to Closing; (vii) any contracts, agreements, or instruments entered into by and between Seller and any of Seller's affiliates including, without limitation, any development agreement, development management agreement, construction agreement, construction management agreement, asset management agreement, or property management agreement, and any warranties and guaranties from any of Seller's affiliates, expressed or implied and (viii) any contract right, Claim (as hereinafter defined) or other interest now or hereafter enforceable by Seller against any of Seller's affiliates, or any administrative body, governmental or quasi-governmental authority or other third party, except as otherwise set forth in Section 6.8(a).

"**Force Majeure**" means the occurrence of any event after Closing (other than arising under, related to or in connection with, a party's lack of funds or acts or omissions, or disputes between Seller and Seller Parties, or Purchaser and Purchaser Parties, as the case may be) which prevents or delays the performance by Seller or Purchaser (as applicable) of any post-Closing obligation imposed upon it hereunder and the prevention or cessation of which event is beyond the reasonable control of such party. Delays due to events of Force Majeure shall be limited to actual delays on the critical path of such party's completion of the applicable work.

"**Impact Fees**" means, either individually or collectively as the context requires, the following: (i) any and all wastewater impact fees related to the Property (including any portion thereof) and/or Purchaser's Project which arise under the Impact Fee Ordinance, as such term is defined in the Development Agreement (collectively, the "**Wastewater Impact Fees**"); (ii) any and all applicable fees and costs related to the Property (including any portion thereof) and/or Purchaser's Project arising prior to or after Closing under the Tree Removal and Mitigation Ordinance (as such term is defined in the Development Agreement, as referenced in paragraph 6 thereof); and (iii) impact fees arising under any thoroughfare agreement with the City or other governmental agency related to Purchaser and/or Purchaser's Project.

"**Incentive Agreements**" means, either individually or collectively as the context requires, the following: (i) that certain Master Development Agreement For The Gate dated effective September 27, 2016, by and among the City, Frisco Economic Development Corporation ("**FEDC**"), Frisco Community Development Corporation ("**FCDC**"), IGO-Frisco and Seller (the, "**Master Development Agreement**"); (ii) that certain Performance Agreement dated effective September 27, 2016, by and among the City, FEDC, IGO-Frisco and Seller (the, "**FEDC Performance Agreement**"); and (iii) that certain Performance Agreement dated effective September 27, 2016, by and among the City, FCDC, IGO-Frisco and Seller (the, "**FCDC Performance Agreement**"); together with any amendments, modifications, and restatements of the foregoing, whether now existing or hereinafter entered into between such parties, the terms of which are incorporated herein by reference.

"**Seller Deposits/Refunds**" mean any of Seller's (or any of Seller's affiliates) rights to receive related to the Property: (i) security or other deposits paid to the City, the FEDC,

the FCDC or any other administrative body, governmental or quasi-governmental authority, or utility provider; (ii) any rebates, reimbursements, property tax refunds or utility refunds; (iii) other than as set forth in Section 6.8(a) below, any form of economic grant or incentive arising out of or related to the Incentive Agreements, the Property or otherwise, whether in the form of a reimbursement of cost, ad valorem and/or sales tax abatements or grants, or otherwise, from the City, the FEDC, the FCDC, or any other administrative body, governmental or quasi-governmental authority, or utility provider; (iv) any reimbursable costs, fees and expenses due and owing Seller or any of Seller's affiliates by any third party; (v) any signing bonus fee, lump sum payments, reimbursements or other payments Seller or any of Seller's affiliates are now or hereafter entitled to receive from a vendor or other third party under the terms of any license, contract, instrument or other agreement, whether or not any such license, contract, instrument or agreement is assigned to Purchaser; and (vi) any portion of the "Street Lighting Allowance" as such term is defined in that certain Electric Service Agreement dated effective November 7, 2016 (the "**ESA Agreement**," including any amendments thereto), among Seller, IGO-Frisco, and Denton County Electric Cooperative, Inc., d/b/a CoServ Electric ("**CoServ**").

2.4. Exceptions.

The Property shall be conveyed subject to the matters which are, or are deemed to be, Exceptions (as defined below) pursuant to Section 3.3 hereof.

2.5. Purchase Price.

Seller shall sell to Purchaser and Purchaser is to purchase the Property for a total of FIVE MILLION NINE HUNDRED THIRTY ONE THOUSAND FIVE HUNDRED SIXTY-FIVE AND NO/100 DOLLARS ($5,931,565.00) (the "**Purchase Price**").

2.6. Payment of Purchase Price.

The Purchase Price, as increased or decreased by prorations and adjustments as herein provided, shall be payable in full at Closing in cash by wire transfer of immediately available federal funds to a bank account designated by Escrow Agent (as defined below) in writing to Purchaser prior to the Closing.

2.7. Earnest Money; Independent Consideration.

(a) Initial Deposit. With five (5) days after the Effective Date, Purchaser shall deposit with Chicago Title Insurance Company ("**Escrow Agent**") an earnest money deposit in the amount of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) (the "**Initial Deposit**"). If Purchaser fails to timely deliver the Initial Deposit, this Agreement shall be automatically deemed void *ab initio* and of no further force or effect.

(b) Additional Deposit. Provided this Agreement has not been terminated by Purchaser prior to the expiration of the Due Diligence Period (as hereinafter defined), within three (3) business days after the expiration of the Due Diligence Period, Purchaser

shall deposit into escrow with the Escrow Agent an additional earnest money deposit in the amount of TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($200,000.00) (the "**Additional Deposit**"). If Purchaser fails to timely deliver the Additional Deposit, Purchaser shall be deemed to be in default under the terms of this Agreement. Upon such default, (i) Purchaser and Seller hereby jointly and irrevocably instruct Escrow Agent to, and Escrow Agent shall, promptly release and deliver to Seller the Initial Deposit, together with all accrued interest thereon, (ii) Seller may pursue against Purchaser any and all remedies available under the terms of this Agreement, and (iii) this Agreement shall, at the election of Seller in its sole and absolute discretion, terminate and be of no further force or effect other than as necessary for Seller to pursue its rights and remedies against Purchaser and any duties or obligations which survive the termination hereof.

(c) Extension Deposit. Subject to Purchaser timely and properly satisfying the Closing Date extension conditions set forth in Section 5.1(a), no later than three (3) business days prior to the then-scheduled Closing Date, Purchaser shall deposit into escrow with the Escrow Agent an additional earnest money deposit in the amount of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) (the "**Extension Deposit**"). If Purchaser either, (i) fails to timely deliver the Extension Deposit, or (ii) notifies Escrow Agent not to release and deliver the Extension Deposit to Seller, or otherwise prevents delivery of such funds in a timely manner to Seller as contemplated in Section 5.1(a), Purchaser shall be deemed to be in default under the terms of this Agreement. Upon such default, (A) Purchaser and Seller hereby jointly and irrevocably instruct Escrow Agent to, and Escrow Agent shall, promptly release and deliver to Seller the Initial Deposit and the Additional Deposit, together with all accrued interest thereon, (B) Seller may pursue against Purchaser any and all remedies available under the terms of this Agreement, and (C) this Agreement shall, at the election of Seller in its sole and absolute discretion, terminate and be of no further force or effect other than as necessary for Seller to pursue its rights and remedies against Purchaser and any duties or obligations which survive the termination hereof.

(d) Earnest Money. The Initial Deposit and, upon delivery, the Additional Deposit and (if applicable) the Extension Deposit are collectively referred to herein as "**Earnest Money**". The Earnest Money (including any portion thereof) shall upon receipt be placed in an interest-bearing account at a federally insured bank and shall be deemed non-refundable upon delivery to the Escrow Agent, unless otherwise provided under the terms of this Agreement. The Earnest Money shall be applicable to the Purchase Price at Closing. All interest on the Earnest Money shall become part of the Earnest Money and will be reported to the Internal Revenue Service as income to Purchaser.

(e) Additional Escrow Instructions. The Escrow Agent shall hold and disburse the Earnest Money (including any portion thereof) in accordance with the terms and conditions of this Agreement. In connection with any termination made in accordance with this Agreement, One Hundred Dollars ($100.00) of the Earnest Money shall be paid to Seller as independent consideration for Purchaser's right to purchase the Property and for Seller's execution, delivery and performance of this Agreement (the "**Independent**

**Consideration**"). The Independent Consideration is in addition to and independent of any other consideration or payment provided for in this Agreement, is non-refundable and shall be retained by Seller notwithstanding any other provision of this Agreement. Seller acknowledges and agrees that the Independent Consideration is sufficient for Seller's covenants and obligations under this Agreement. The terms and provisions set forth in this Section 2.7 shall survive the termination of this Agreement.

2.8. Escrow Agent.

(a)

(i) All checks, money orders or drafts received by Escrow Agent will be processed for collection in the normal course of business. Escrow Agent covenants and agrees to hold and disburse the Earnest Money in accordance with the terms and conditions of this Agreement; provided, however, in the event Escrow Agent receives an Order issued by a court of competent jurisdiction instructing Escrow Agent not to release and deliver the Earnest Money to Seller or Purchaser (as applicable), then Escrow Agent shall continue to hold such Earnest Money until after receipt of mutual written instructions from the parties, or otherwise instructed by court Order. Other than for the performance of Escrow Agent's duties and obligations in accordance with the terms and conditions of this Agreement, Escrow Agent shall be without liability to either Seller or Purchaser and is hereby otherwise fully and unconditionally released from any responsibility or liability related to the holding and disbursement of the Earnest Money under the terms of this Agreement.

(ii) Seller and Purchaser shall cooperate in providing authorization to the Escrow Agent to disburse the Earnest Money in accordance with this Agreement, if requested by the Escrow Agent.

(b) The Escrow Agent shall not be liable for any damage, liability or loss arising out of its services pursuant to this Agreement, except for damage, liability or loss resulting from the breach of the terms of this Agreement, or the willful or negligent conduct of the Escrow Agent or any of its officers or employees. Each of Seller and Purchaser also hereby authorize and direct Escrow Agent to accept, comply with and obey any and all writs, orders, judgments or decrees entered or issued by any court with jurisdiction; and in case the Escrow Agent obeys or complies with any such writ, order, judgment or decree, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be subsequently reversed, modified, annulled, set aside or vacated. In case the Escrow Agent is made a party defendant to any suit or proceedings regarding the Earnest Money, the Seller and the Purchaser, for themselves, their successors and assigns, jointly and severally, agree to pay to Escrow Agent, upon written demand, all reasonable costs, attorney's fees, and expenses incurred with respect thereto; subject, however, to the parties right to seek reimbursement from Escrow Agent if Escrow Agent is found by a court of competent jurisdiction to be in breach of the terms of this Agreement. If said

costs, fees and expenses are not paid, then the Escrow Agent shall have the right to reimburse itself out of the Earnest Money then held by Escrow Agent (if any).

(c) Escrow Agent shall invest the Earnest Money on behalf of the Purchaser in a federally insured, separately denominated account, and all interest earned in connection therewith (if any) shall become part of the "Earnest Money", provided that the Escrow Agent is in receipt of a fully executed W-9 containing the Purchaser's taxpayer's identification number and required investment instructions. Escrow Agent will, upon request, furnish information concerning its procedures and fee schedules for investment. In the event the Escrow Agent is requested to invest Earnest Money hereunder, Escrow Agent shall not be held responsible for any loss of principal or interest which may be incurred as a result of making the investment or redeeming said investment for the purposes of this Agreement, except to the extent arising in connection with the breach of the terms of this Agreement, or the negligence or willful misconduct of the Escrow Agent.

(d) The terms and provisions set forth in this Section shall survive the termination of this Agreement.

## SECTION III
## TITLE AND SURVEY

3.1. Title Examination; Commitment for Title Insurance.

Within ten (10) days after Escrow Agent's receipt of the Initial Deposit, Seller shall deliver to Purchaser a Commitment for Title Insurance on the form promulgated by the Texas Department of Insurance for the Property (the "**Title Commitment**"), together with the applicable exception documents. The Title Commitment shall be issued by Chicago Title Insurance Company (the "**Title Company**") or other underwriter acceptable to the Title Company.

3.2. Survey.

Within ten (10) days after Escrow Agent's receipt of the Initial Deposit, Seller shall cause to be delivered to Purchaser the existing plat for the Property in Seller's files. Within twenty (20) days following the Effective Date (or as soon thereafter as practicable), Purchaser shall deliver to Seller a new survey for the Property (the "**Survey**"). The Survey, including any and all revisions thereto until finalized, shall be at Purchaser's sole cost and expense, and Seller shall have no obligation to pay for or otherwise reimburse Purchaser for any such cost and expense. The final Survey shall be signed, sealed and certified to Seller, Title Company, Purchaser and such additional entities as Purchaser may request. This Section shall survive the termination of this Agreement.

3.3. Title Objections; Cure of Title Objections.

The "**Title Exam Deadline**" shall be 5:00 p.m., Central time, on the thirtieth (30th) day following the date in which Purchaser has received the Title Commitment and legible copies of

all title exception documents referenced therein (the "**Supporting Documents**") and a copy of Seller's existing plat for the Property; provided, however, in no event shall the Title Exam Deadline be later than forty-five (45) days after the Effective Date. Purchaser shall have until the Title Exam Deadline to notify Seller, in writing, of such objections as Purchaser may have regarding the condition and status of the title to the Property and any matter contained in the Title Commitment and, if applicable, the Survey. Any item contained in the Title Commitment or any matter shown on the Survey to which Seller does not elect in writing to cure prior to the Title Exam Deadline shall be deemed an "**Exception**". In the event Purchaser notifies Seller of objections to title or to matters shown on the Survey prior to the Title Exam Deadline, Seller shall have the right, but not the obligation, to cure such objections; provided, however, that Seller shall, at its sole cost and expense, cure, remove, or satisfy on or before Closing, any mechanic's lien, tax lien or deed of trust lien filed against title to the Property which have not otherwise been insured or endorsed over by the Title Company or otherwise bonded over, but excluding any items or Claims created due to the acts or omissions of Purchaser or any Purchaser Parties (collectively, the "**Mandatory Cure Items**"). Within ten (10) days after receipt of Purchaser's notice of objections, Seller may notify Purchaser in writing, of Seller's election to cure or not cure such objections (other than Mandatory Cure Items, which must be removed by Seller regardless of whether Purchaser provides notice thereof). If Seller fails to give Purchaser such notice of election, then Seller shall be deemed to have elected not to cure the matter. If Seller elects to cure and this Agreement is not otherwise terminated as provided herein, Seller shall have until the date of Closing to remove, satisfy or cure the same. In the event that Seller fails to do so at or prior to Closing, Purchaser shall have a right to terminate this Agreement as its sole and exclusive remedy, thereby waiving and releasing Seller of and from any and all Claims (as such term is hereinafter defined), and thereafter neither Seller nor Purchaser shall have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement. Upon the expiration of the Title Exam Deadline, except for Mandatory Cure Items and subject to Section 3.5, Purchaser shall be deemed to have accepted the form and substance of the Survey, all matters shown thereon, all exceptions to the Title Commitment and other items shown thereon. If Seller elects (or is deemed to have elected) not to cure any objections specified in Purchaser's notice (other than Mandatory Cure Items, which must be cured by Seller), or if Seller is unable to effect a cure of an objection which Seller has elected to attempt to cure prior to the Closing, Purchaser shall, as its sole and exclusive remedy (and hereby waiving and releasing Seller of and from any and all Claims), either: (i) accept a conveyance of the Property subject to the Exceptions, specifically including any matter objected to by Purchaser which Seller is unwilling or unable to cure; or (ii) terminate this Agreement by delivering written notice thereof to Seller on or before the expiration of the Due Diligence Period, or if the Title Commitment is thereafter updated and reflects a new exception (other than an existing or permitted Exception), then Purchaser may terminate this Agreement by delivering written notice thereof to Seller on or before the expiration of such day that is five (5) days after the date of such updated Title Commitment which reflects such new exception that Seller has not agreed, in writing to cure by Closing, and was not otherwise already an Exception (or deemed Exception) to title as provided under the terms of this Agreement. Upon delivery of such notice of termination, provided Purchaser is not then in breach of the terms and conditions of this Agreement, this Agreement shall terminate and thereafter neither Seller nor Purchaser shall have any further rights,

obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement. Seller shall have no obligations to take any steps or bring any action or proceeding or otherwise to incur any effort or expense whatsoever to eliminate or modify any of the Purchaser's objections, except with respect to the Mandatory Cure Items or to any items that Seller agrees in writing to cure. For purposes of this Agreement, in addition to the foregoing, the term "**Exception(s)**" shall also specifically include, and Mandatory Cure Items shall specifically exclude: (1) any and all general real estate taxes and assessments, special taxes and assessments, franchise taxes, levies and personal property taxes imposed by any governmental or quasi-governmental authority and any assessments, dues or charges by private covenant constituting a lien or charge on the Property which are, as of the Closing, not delinquent; (2) supplemental taxes, if any, hereinafter assessed by any governmental authority against the Property to the extent due to a change in ownership and/or use of the Property as a result of this sale; (3) any access, telecommunication, cabling and/or utility agreements, memorandums of agreements, licenses or rights-of-way either filed of public record against title to or otherwise effects, the Property, whether prior to or after the Effective Date; (4) any license, contract, instrument or other agreement entered into between Seller and/or Seller's affiliate (on the one hand), and the City, the FEDC, the FCDC, or any other administrative body, governmental or quasi-governmental authority, or utility provider (on the other hand), which is either filed of public record against title to or otherwise effects, the design, entitlement, development, construction, ownership, operation, management, maintenance, use and/or occupancy of the Property, whether prior to or after the Effective Date; (5) the permits, approvals and conditions which have been or must be obtained for the design, entitlement, development, construction, ownership, operation, management, maintenance, use and/or occupancy of the Property, including without limitation, all Required Approvals (as hereinafter defined), and any document, instrument and/or agreement related to same (including, without limitation, any replat of the Property), whether or not filed of record or otherwise effecting the Property, either prior to or after the Effective Date; (6) that certain Declaration of Frisco Post Oak Property Owner's Association, Inc. dated February 17, 1997 (the "**Frisco Post Oak Declaration**"), recorded under Clerk's File No. 97-0012014, Real Property Records, Collin County, Texas, including all related amendments, modifications and supplements thereto, whether or not filed of record or otherwise effecting the Property, either prior to or after the Effective Date; (7) that certain Amended and Restated Master Declaration of Covenants, Conditions and Restrictions effective September 23, 2016, recorded under Clerk's File No. 20160923001280990, in the Official Public Records of Collin County, Texas (the "**Master Declaration**," including all related amendments, modifications and supplements thereto, whether or not filed of record or otherwise effecting the Property, either prior to or after the Effective Date); (8) any Claims created or otherwise caused by (whether directly or indirectly) the acts or omissions of Purchaser or any Purchaser Parties; (9) the Notice of Applicability and any other document, instrument or agreement required or otherwise deemed necessary to be either filed of record or otherwise affecting the Property under the terms of the Master Declaration; and (10) any changes made to the legal description of the Land, whether by Seller or Purchaser as permitted under the terms of this Agreement, and any and all matters set forth in or referenced on the new replat of all or any portion of The Gate project as contemplated by Seller and IGO-Frisco, which amends, modifies, supplements and/or replaces and supersedes in its entirety, the

Original Conveyance Plat (such new replat, including any amendments, modifications and/or replacements thereof, being referred to herein as the, "**New Conveyance Plat**").

3.4. Conveyance of Title.

At Closing, Seller shall convey fee simple title to the Property to Purchaser, subject to the Exceptions.

3.5. Pre-Closing "Gap" Title Matters.

Provided the Agreement has not otherwise been terminated, after the expiration of the Due Diligence Period, Purchaser may, prior to the Closing Date, notify Seller in writing of any objections to title first appearing on the Title Commitment after the expiration of the Due Diligence Period, other than any Exceptions. Purchaser must provide Seller written notice of any such objections within five (5) days after receipt of notice thereof, failing which Purchaser shall be deemed to have waived its right to object and such new title exception shall be deemed an Exception under the terms of this Agreement. With respect to any objections to title set forth in such notice, Seller shall have the same option to cure and Purchaser shall have the same option to accept title subject to such matters or to terminate this Agreement as those which apply to any notice of objections made by Purchaser before the Title Exam Deadline.

## SECTION IV
## DUE DILIGENCE PERIOD

4.1. Due Diligence.

From and after the Effective Date until the earlier of the termination of this Agreement or the Closing, Purchaser shall have the right to make a physical and environmental inspection of the Property, prepare for the transition of the Property to Purchaser and to examine the Property Information (as defined below). Within ten (10) days after Escrow Agent's receipt of the Initial Deposit, Seller shall provide or otherwise give access to Purchaser via a virtual data room or otherwise, copies of the documents, materials and information currently existing and in the actual possession or control of Seller applicable to the Property as shown on Exhibit C, attached hereto, and such other information that Purchaser reasonably requests and Seller agrees in writing to provide (collectively, "**Property Information**"). Purchaser understands and agrees that any on-site inspections of the Property shall be conducted upon reasonable advance notice to Seller (which notice may be sent by email to Seller). Such physical inspections shall not unreasonably interfere with the use of the Property by Seller. Such physical inspection shall not be invasive (unless Purchaser obtains the Seller's prior written consent), and in any event shall be conducted in compliance with applicable laws. Notwithstanding the foregoing, Purchaser shall have the right to perform a Phase I environmental site assessment of the Property and a geotechnical survey of the Land without Seller's consent. Purchaser shall deliver written notice to Seller not later than 24 hours (unless Seller otherwise consents in writing) prior to Purchaser or any Purchaser Parties' in person meeting with a governmental authority and Seller shall have the right, at Seller's sole option, to attend such meeting. Further, from the Effective Date until Closing, the parties agree to use commercially reasonable efforts to schedule and attend

bimonthly status calls during which such time Purchaser shall update Seller regarding Purchaser's communications with any governmental authority and progress related to Purchaser's Project (defined below). Purchaser shall not engage in any activities that would violate any permits, licenses, entitlements, environmental, wetlands or other regulations pertaining to the Property, or any terms or provisions set forth in any Exception documents. Following each entry by Purchaser with respect to inspections and/or tests on the Property made by Purchaser, Purchaser shall, to the extent of any damage caused by Purchaser's inspections or tests, restore the Property in substantially similar condition that existed immediately prior to any such inspections and/or tests to Seller's satisfaction. Such obligation to restore shall survive the termination of this Agreement. In no event shall Purchaser be responsible to repair or cure any pre-existing conditions on the Property so long as the underlying condition is merely identified which is not exacerbated or otherwise worsened by Purchaser or by any Purchaser Parties (the "**Excluded Claims**"). At no third-party expense to Seller, Seller shall reasonably cooperate with Purchaser in its due diligence investigations conducted in accordance with this Section.

Purchaser hereby assumes any risk involved with respect to Purchaser's testing, investigations, and inspections as provided herein, and, except with regard to any pre-existing condition on the Property and to the extent caused by Seller or Seller's Parties, Purchaser agrees to indemnify against and hold Seller and all of its officers, directors, employees, shareholders, members, affiliates, subsidiaries, principals, parents, trustees, attorneys, joint ventures, investors, partners, successors and assignees (individually and collectively, jointly and severally, "**Seller Parties**"), harmless from any and all actual claims, detriments, rights, remediation, counterclaims, liens, controversies, obligations, agreements, executions, debts, covenants, promises, suits, causes of action, actions, demands, liabilities, losses, damages, assessments, judgments, fines, penalties, sums of money, accounts, costs, expenses (including, without limitation, reasonable attorneys' fees and other professional fees of attorneys and professionals selected by the Seller Parties), liens, personal injury, death or property damage caused in any way by the breach of the terms of this Agreement, or the negligence or intentional misconduct of Purchaser or any of the Purchaser Parties on the Property, except to the extent caused by the gross negligence or intentional misconduct of Seller, in which event Seller shall share liability in proportion to its gross negligence or intentional misconduct, any Hazardous Materials introduced on the Property by Purchaser or any of the Purchaser Parties, and any violation by Purchaser or any of the Purchaser Parties of any laws, ordinances, statutes, codes, rules, regulations, judgments, orders and decrees enacted or promulgated by the United States, the states, the counties, the cities or any other political subdivisions properly exercising jurisdiction over the owner of the Property, the Property or the use of the Property relating to pollution, the protection or regulation of human health, natural resources or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals or toxic or hazardous substances or waste or hazardous materials (however defined) into the environment (including, without limitation, ambient air, surface water, groundwater or land or soil), whether incurred in connection with any investigation, non-judicial, quasi-judicial, judicial, mediative, arbitrative, or administrative actions or proceedings or otherwise (including pretrial, trial, appellate, administrative, bankruptcy or insolvency proceedings) or in settlement or in any other proceeding and whether or not suit was filed thereon (collectively, "**Claims**") incurred by Seller and all Seller Parties by reason of Purchaser's or any of Purchaser Parties' breach of the terms of this Agreement, or arising out of, related to, or in connection with the inspection of the Property

(other than the findings of the inspection) by Purchaser or any of its officers, directors, employees, shareholders, members, affiliates, subsidiaries, principals, parents, trustees, attorneys, joint venturers, related parties and entities, contractors and agents, each and all of the predecessors, legal representatives, heirs, successors and assigns of any of the foregoing and their respective subsidiaries, parents, affiliates, joint venturers, directors, officers, members, principals, investors, shareholders, members, trustees, designees, lenders, beneficiaries, employees, agents, brokers, property managers, asset managers, representatives, predecessors, successors, assigns, contractors, subcontractors, fiduciaries, insurers, heirs, estates, servants, other related parties and persons, and attorneys, past and present (individually and collectively, jointly and severally, "**Purchaser Parties**"), and such indemnity obligation shall survive Closing or any termination of this Agreement.

Purchaser shall be liable for all Claims resulting from, relating to, or arising out of any inspection or testing of the Property, to the extent occasioned by the negligent acts or omissions of Purchaser and Purchaser Parties, except with respect to any Excluded Claims. Purchaser's indemnity obligations shall not be limited by any workmen's compensation, benefits, disability, or other similar laws. Seller and Purchaser acknowledge and agree that the indemnities set forth herein are intended to and shall survive Closing or any termination of this Agreement.

Notwithstanding anything contained in this Agreement to the contrary, Purchaser shall have no liability to Seller under this Agreement by reason of the mere discovery of conditions existing at the Property, or with respect to any pre-existing condition of the Property (Purchaser, however, shall be responsible for any exacerbation or worsening of the underlying condition by Purchaser or by any of Purchaser Parties). Purchaser expressly acknowledges and agrees that there may be certain environmental issues and/or risks with respect to any part of the Property and that Purchaser has been expressly advised by Seller to conduct an independent investigation and inspection of the Property, subject to and as permitted under the terms of this Agreement, utilizing experts as Purchaser deems to be necessary for an independent assessment of all environmental liability and risk with respect to any part of the Property.

Purchaser further acknowledges and agrees that, having been given the opportunity to inspect and test any part of the Property, Purchaser is relying solely on its own investigation and testing of the Property expressly and not on any information provided or to be provided by Seller, and Purchaser hereby waives all objections or Claims against Seller (including, but not limited to, any right or claim of contribution and cost recovery) arising from or related to the Property or to Hazardous Materials on the Property, except as expressly set forth in this Agreement or to the extent the Hazardous Materials on the Property were intentionally hidden or concealed from Purchaser by Seller or Seller Parties and Purchaser and any of Purchaser's Parties had no means or ability to discover the existence or presence of the Hazardous Materials otherwise. Seller and Purchaser hereby acknowledge stipulate and agree that the terms, conditions, covenants, conditions and agreements set forth in this Section 4.1 are intended to and shall survive Closing or any termination of this Agreement.

4.2. Insurance Requirements.

Purchaser will, at its sole cost and expense, obtain and keep in force during the term of this Agreement, or so long as Purchaser has not restored or vacated the Property as contemplated above, effective prior to the date of access or entry to the Property, commercial and general liability insurance, each with a $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate limit, (or such other reasonable amount as Seller and Purchaser may agree upon from time to time), insuring, without limitation, coverage for bodily injury, property damage, contractual liability and personal injury liability with respect to the improvements on the Property or arising out of any of Purchaser's or the Purchaser Parties' use, inspection or occupancy of the Property, due diligence or arising out of any of the Claims. In no event shall such insurance be construed as a limitation, diminution, or offset against Purchaser's indemnity obligations as provided herein. The commercial general liability policy, with Purchaser named as the insured, shall be issued by a reputable insurer reasonably acceptable to Seller. The commercial general liability and excess liability or umbrella policies shall list Seller, IGO-Frisco and their respective affiliates and the Association (hereinafter defined) and the Association's property manager as additional named insureds as their interests may appear and shall provide that Seller will be given at least thirty (30) days' prior written notice of any cancellation, reduction in coverage, or non-payment of premiums. Prior to entry onto the Property, Purchaser shall provide a certificate of insurance evidencing the type and amounts of coverages herein required and identifying the "Certificate Holder" as Seller. The parties hereto acknowledge that the issuance of a current, valid certificate of insurance by the insurance provider or broker shall serve as evidence of payment or current premiums for said insurance policy. Purchaser will also require all Purchaser Parties or other agents entering upon the Property pursuant to Purchaser's direction to provide, maintain and keep in force worker's compensation, casualty, liability and other insurance consistent with the limits and requirements above required for all Claims which may arise, directly or indirectly, as a result of Purchaser's rights under this Agreement, including, without limitation, Purchaser's and Purchaser Parties' access to the Property as contemplated by this SECTION IV. Purchaser agrees that required insurance for the Purchaser Parties will also be on forms reasonably acceptable to Seller and issued by companies licensed to do business in the state of Texas and with an insurance rating reasonably acceptable to Seller, and insurance certificates evidencing such insurance shall be delivered by Purchaser to Seller prior to entry onto the Property by any of the Purchaser Parties or other agents.

4.3. Right of Termination.

Purchaser shall have the right to terminate this Agreement, in Purchaser's sole discretion, for any reason or no reason, by giving written notice thereof to Seller prior to 5:00 p.m., Central time on the one hundred twentieth (120th) day following the Effective Date (the "**Due Diligence Period**"). If Purchaser gives such notice of termination to Seller prior to the expiration of the Due Diligence Period, this Agreement shall terminate and, provided Purchaser is not otherwise in default under the terms of this Agreement, the Earnest Money shall be promptly returned to Purchaser and neither Seller nor Purchaser shall have any further rights or obligations under this Agreement, other than those that expressly survive a termination of this Agreement. In no event will any Earnest Money be returned to Purchaser if Seller has given written notice of a condition which must be repaired and restored and the Property is, in fact, repaired and restored to the extent required under the terms of this Agreement. Upon termination under this Section, each party shall bear its own costs incurred hereunder. If Purchaser fails to give Seller written notice

of termination prior to the expiration of the Due Diligence Period, Purchaser shall be deemed to have approved all aspects of the Property and the Property Information, and to have elected to proceed with the purchase of the Property pursuant to the terms hereof and the Earnest Money shall be non-refundable to Purchaser other than as stated in this Agreement to the contrary.

4.4. Purchaser's Project; Required Approvals.

Purchaser agrees that it will develop a full-service luxury (either a 4 or 5 star rated) Seller approved brand name flagged hotel development on the Property including underground and/or podium parking spaces (of which, 120 of such parking spaces shall be dedicated, owned, for the benefit of, and otherwise solely utilized by the owner(s) of lot 7 and lot 14 of The Gate project (each, the "**Adjacent Lot Owner**"), with reference to such 120 parking spaces being herein referred to as the "**Dedicated Parking Spaces**"), which such development may include condominiums, ancillary restaurant, full service bar(s), meeting/function space, pool (which may include a rooftop pool), pool deck, pool support restaurant and bar and retail amenities, all designed, developed and constructed in accordance with the Required Approvals, as hereinafter defined (collectively, "**Purchaser's Project**"), with all phases of Purchaser's Project to be completed on or before the Completion Deadline, as described in Section 5.9 below. Purchaser, at its expense, will from and after the Effective Date, use commercially reasonable efforts to obtain the following approvals necessary for Purchaser's Project from the Development Reviewer (as such term is defined in the Master Declaration) (hereinafter referred to as the, "**Development Reviewer Approval**"), and from all governmental and quasi-governmental agencies (hereinafter referred to as the, "**Governmental Approvals**," which, together with the Development Reviewer Approval, is hereinafter referred to as the "**Required Approvals**"): (a) if applicable, Subdivision Approval (as hereinafter defined) for the Property; (b) approval of Purchaser's site plan for Purchaser's Project ("**Site Plan Approval**"); and (c) the approval of the design, plans and specifications of Purchaser's Project from the Development Reviewer; provided, however, if Purchaser does not obtain all final Required Approvals prior to Closing, Purchaser shall not be in breach of the terms of this Agreement, and Purchaser shall continue post-Closing to achieve all Required Approvals in accordance with the terms and conditions set forth in Section 6.8 hereof. At Closing, Purchaser shall execute and deliver to Seller, IGO-Frisco and the Association (as applicable), all documents, agreements and instruments (collectively, "**Project Documents**") required by such party to comply with, or otherwise satisfy any requirement imposed on an "Owner" (as such term is defined in the Master Declaration) under the terms of any Development Documents (as such term is defined in the Master Declaration), and any owner of the Property under the terms of Frisco Post Oak Declaration or any other documents or agreements related to any Exceptions.

4.5. Subdivision Approval.

If, due to the design, location and/or development of Purchaser's Project, the City of Frisco or any other governmental agency requires the Land to be replatted, Purchaser shall promptly inform Seller in writing and shall thereafter promptly pursue diligently, continuously and in good faith the replatting of the Land (including any other portion of The Gate project) under this Section 4.5 in furtherance of a final, approved replat, which shall be recorded by Purchaser in the Official Public Records of Collin County, Texas, which such replatted Land

shall be within the boundaries and dimensions as set forth in Exhibit A and mutually acceptable to Seller and Purchaser (the "**Subdivision Approval**"). Seller shall reasonably cooperate and, if required by applicable governmental authority, join in the execution, filing and prosecution of all applications for Subdivision Approval. Seller shall have the right to approve of the form and substance of any document, agreement and/or instrument related to the replat and related Subdivision Approval, such approval not to be unreasonably withheld. Upon receipt of the recorded replat prior to Closing, Purchaser shall notify the Title Company and surveyor to update the Title Commitment and Survey to reflect the recorded replat and the legal description as shown on the recorded replat shall be used in the Deed and all other applicable closing documents, all of which shall be deemed an Exception.

## SECTION V
## CLOSING

5.1. Time and Place.

(a) The closing, funding and otherwise consummation of the transactions contemplated hereby (the "**Closing**") shall occur on or before 3:00 p.m. (Central time) on the date which is thirty (30) days after the expiration of the Due Diligence Period (the "**Closing Date**"); however, notwithstanding the foregoing, provided: (i) this Agreement has not been terminated by either party; (ii) neither Seller nor Purchaser are then in default; (iii) Purchaser has delivered into escrow with the Escrow Agent the Extension Deposit and has irrevocably and unconditionally instructed Escrow Agent in writing to immediately release and deliver the Extension Deposit via wire transfer to Seller in accordance with Seller's instructions; and (iv) all of the foregoing conditions in subparts (i)-(iii) above are satisfied no later than three (3) business days prior to the then-scheduled Closing Date (time being of the essence), then, Purchaser shall have the right, in its sole and absolute discretion, to extend the Closing Date to a date no later than thirty (30) days after the then-scheduled Closing Date by providing Seller and Escrow Agent with written notice of such extension simultaneous with the delivery of the Extension Deposit to Escrow Agent and shall identify the new Closing Date.

(b) The Closing shall occur with all deliveries required hereunder being made to Escrow Agent on or before the Closing Date, in accordance with escrow instructions consistent with the terms and conditions of this Agreement given by or on behalf of Seller and Purchaser, respectively; whereby escrow arrangements mutually acceptable to Seller and Purchaser shall allow Seller, Purchaser and their respective attorneys to consummate the Closing without being physically present and to exchange closing documents through such escrow, via electronic means, and/or .pdf (except with regard to recordable documents or other instruments reasonably requested by the parties to be provided in original "wet ink" form), which shall be physically delivered to the Escrow Agent on or before the Closing Date.

5.2. Sellers' Obligations at Closing.

At Closing, subject to Purchaser's timely and proper satisfaction of the terms and conditions set forth in Section 5.3 below, Seller shall:

(a) deliver to the Title Company for delivery to Purchaser the duly executed recordable special warranty deed for the Land, in substantially the form attached hereto as Exhibit B (the "**Deed**");

(b) deliver to the Title Company such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Seller;

(c) deliver to the Title Company a FIRPTA Certificate in substantially the form attached as Exhibit D duly executed by Seller;

(d) deliver to Purchaser possession and occupancy of the Property, subject to the Exceptions;

(e) execute a closing statement in form and content satisfactory to Seller;

(f) execute and deliver an owner's affidavit as may be reasonably required to permit the Title Company to issue an owner's title insurance policy in the form promulgated by the Texas Department of Insurance for the Property (the "**Title Policy**"); and

(g) execute and deliver such additional documents as shall be reasonably required to consummate the transactions expressly contemplated by this Agreement.

5.3. Purchaser's Obligations at Closing.

At Closing, Purchaser shall:

(a) pay to Escrow Agent the full amount of the Purchase Price, as increased or decreased by prorations and adjustments as herein provided, in immediately available wire transferred federal funds pursuant to Section 2.6 above;

(b) pay, or cause to be paid, (i) the Thoroughfare Fee associated with the Land to the City of Frisco and provide evidence of such payment to Seller pursuant to Section 5.13 below, and (ii) all costs, fees and expenses (if any) imposed by the City or any telecommunication or utility provider to bury any existing overhead electrical, telecommunication and/or other utility cables underground relative to the contemplated development of Purchaser's Project;

(c) execute a closing statement in form and content satisfactory to Purchaser;

(d) execute and deliver to Seller and/or the Association (as applicable) all Project Documents in form and substance acceptable to Seller and/or the Association;

(e) deliver to the Title Company such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser; and

(f) execute and deliver such additional documents as shall be reasonably required to consummate the transactions contemplated by this Agreement.

5.4. Credits and Prorations.

(a) The following shall be apportioned with respect to the Property as of 12:01 a.m., on the day of Closing, as if Purchaser were vested with title to the Property during the entire day upon which Closing occurs, provided that within ninety (90) days after Closing (or such later date as to taxes as may be reasonable to ascertain the final assessment amount thereof applicable to the Property, but not later than December 30 of the year of Closing), Purchaser and Seller will make a further adjustment for such rents, taxes or charges which may have accrued or been incurred prior to the Date of Closing, but not received or paid at that date:

(i) taxes and assessments levied against the Property; and

(ii) any costs, fees and expenses assessed or charged against Seller as owner of the Property under the terms of the Master Declaration and any other Project Documents.

(b) If this sale or a change in use of the Property or denial of any special use valuation of the Property after the Closing would result in the assessment after the Closing of additional taxes and interest applicable to the period of time before the Closing (the "**Rollback Taxes**"), then Seller shall be responsible for payment of all Rollback Taxes which shall be paid at Closing.

(c) The provisions of this Section shall survive Closing.

5.5. Closing Costs.

**Seller shall pay**: (a) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (b) the fee for the Title Commitment, search, exam fee and the basic premium for Title Policy; (c) all State, County and City transfer taxes which become payable by reason of the transfer of the Property from Seller to Purchaser; (d) the recordation fee for the release of any Mandatory Cure Items; (e) one-half of the Escrow Costs; and (f) any other costs, fees or expenses approved by Seller under the terms of this Agreement or the settlement statement delivered at Closing. **Purchaser shall pay**: (i) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (ii) the cost of obtaining or updating the Survey and other third party reports relating to the conducting its due diligence review and the costs of any replat of the Property pursuant to Section 4.5; (iii) pay the cost for any title endorsements; (iv) the recordation fee for the Deed and any other documents, instruments or

agreements to be recorded at Closing; (v) for all Wastewater Impact Fees (the amount of which Purchaser shall pay to Seller at Closing), and otherwise pay all other Impact Fees related to the Property and Purchaser's Project; (vi) all fees and costs associated with Purchaser's loan or otherwise incurred by Purchaser's lender; and (vii) any other costs, fees or expenses approved by Purchaser under the terms of this Agreement or the settlement statement delivered at Closing. All other costs and expenses incident to this transaction and the closing thereof shall be paid in accordance with Section 1.1 of this Agreement; if not enumerated in this Section or in Section 1.1, such costs and expenses shall be paid by the party incurring such costs and expenses. In the event of a conflict between this Section 5.5 and Section 1.1, then this Section 5.5 shall control. The provisions of this Section shall survive the Closing or any early termination of this Agreement.

5.6. Conditions Precedent to Obligation of Purchaser.

The obligation of Purchaser to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion (individually, a "**Purchaser's Condition Precedent**" and collectively, the "**Purchaser's Conditions Precedent**"):

(a) All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the date of Closing;

(b) Seller shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Seller as of the date of Closing; and

(c) The Title Company shall be committed to issue the Title Policy to Purchaser, subject to the Exceptions.

Purchaser agrees that, as soon as Purchaser has notice of the failure of a Purchaser's Condition Precedent, Purchaser shall notify Seller thereof and Seller shall have three (3) days after the receipt of such notice within which to cure such failure (no obligation to do so being implied hereby) and, if required, the Closing Date shall automatically be extended to the next business day occurring after such three (3) day period; provided, however, in no event shall the Closing Date be further extended under the terms of this Agreement (including, without limitation, by virtue of the notice and cure period set forth in Section 7.2) unless Purchaser and Seller agree in writing to such extension.

In the event (i) each and all of Seller's Conditions Precedent are timely and completely satisfied (or, if applicable, waived in writing by Seller), and (ii) each and all of the Purchaser's Conditions Precedent are not fully and completely satisfied or waived on or before the dates specified above or, if applicable, on the first business day occurring after the three (3) day cure period mentioned in the immediately preceding paragraph (which shall not be further extended without Purchaser's and Seller's prior written agreement), then Purchaser shall have the option, as its sole and exclusive remedy, to either: (A) waive all or any of such Purchaser's Conditions Precedent and proceed with Closing; or (B) pursue its other rights and remedies against Seller as

provided for and in accordance with the terms and conditions set forth in Section 7.2. The provisions set forth in this Section shall survive the termination of this Agreement.

5.7. Conditions Precedent to Obligation of Seller.

The obligation of Seller to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which may be waived by Seller in its sole discretion (individually, a "**Seller's Condition Precedent**" and collectively, the "**Seller's Conditions Precedent**"):

(a) Purchaser shall have timely deposited with Escrow Agent on or before 1:00 p.m. (Central time) on the Closing Date, the Purchase Price as adjusted pursuant to and payable in the manner provided for in this Agreement, together with any costs, fees and expenses required to be paid to the Association under the terms of the Master Declaration and any other Project Documents, and to the Frisco Post Oak Property Owner's Association under the terms of the Frisco Post Oak Declaration required to be paid at the time of transfer. Impact fees shall not be required to be paid until such time as a building permit for Purchaser's Project is obtained.

(b) Purchaser shall have delivered to Seller and the Association (as applicable) all of the items required to be delivered to Seller and/or the Association (as applicable) pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 5.2.

(c) Prior to Closing, Purchaser shall have delivered to Seller an executed copy of an agreement entered into by a hotel company who is first approved in writing by Seller (the "**Hotel Management Agreement**") which requires (among other things), Purchaser's Project to be designed, developed, constructed, owned and operated subject to and in accordance with all Required Approvals and the terms and conditions set forth in this Agreement.

(d) All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the date of Closing.

(e) Purchaser shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Purchaser as of the date of Closing.

Seller agrees that, as soon as Seller has notice of the failure of a Seller's Condition Precedent other than Purchaser's failure to deliver the remaining portion of the Purchase Price or any other amounts required to be delivered herein by Purchaser (which event shall be deemed an automatic default by Purchaser without any notice or cure rights), Seller shall notify Purchaser thereof and Purchaser shall have three (3) days after the receipt of such notice within which to cure such failure (no obligation to do so being implied hereby) and, if required, the Closing Date shall automatically be extended to the next business day occurring after such three (3) day period; provided, however, in no event shall the Closing Date be further extended under the

terms of this Agreement (including, without limitation, by virtue of the notice and cure period set forth in Section 7.1) unless Purchaser and Seller agree in writing to such extension.

In the event each and all of the Seller's Conditions Precedent are not fully and completely satisfied or waived on or before the dates specified above or, if applicable, on the first business day occurring after the three (3) day cure period mentioned in the immediately preceding paragraph (which shall not be further extended without Purchaser's and Seller's prior written agreement), then Seller shall have the option, as its sole and exclusive remedy, to either: (A) waive all or any of such Seller's Conditions Precedent and proceed with Closing; or (B) pursue its other rights and remedies against Purchaser as provided for and in accordance with the terms and conditions set forth in Section 7.1. The provisions set forth in this Section shall survive the termination of this Agreement.

5.8. Obligations of Purchaser.

Purchaser acknowledges that conveyance of title to the Property will be subject to certain covenants, conditions, and restrictions set forth in the Frisco Post Oak Declaration and the Master Declaration that bind the Property and certain additional property surrounding the same (together with the Property, "**The Gate**"), which contain, among other items, certain customary development requirements, architectural standards and review guidelines, and general and special assessment requirements, including, without limitation, attribution of an allocable share of costs, including infrastructure costs. Purchaser acknowledges, stipulates and agrees that, as part of the continuing development, construction, operation, management, maintenance, ownership and use of The Gate, Seller, Seller's affiliates and/or the Association will prepare and file (or cause to be prepared and filed) of record various documents, agreements and instruments which are either (a) required by a governmental or quasi-governmental authority, or (b) reasonably necessary for the continuing development, construction, operation, management, maintenance, ownership and use of The Gate, or (c) otherwise allowed for, or contemplated under, the terms of the Frisco Post Oak Declaration and/or the Master Declaration, all such documents, agreements and instruments will be considered "Project Documents," as such term is defined in this Agreement. Purchaser covenants and agrees to continue to cooperate in good faith with Seller to execute, deliver and record (if necessary) such Project Documents whether prior to or post-Closing, which such obligation shall survive Closing.

Notwithstanding anything to the contrary, in no event shall Purchaser be required after Closing to execute any of the Project Documents that have a material and adverse effect on the operation and use of the Property.

5.9. Commencement and Completion Deadlines.

(a) In addition to the other obligations of Purchaser set forth in this Agreement, Purchaser hereby represents, warrants, covenants and agrees to Commence Construction on or before the Commencement Deadline, and thereafter Complete Construction on or before the Completion Deadline, as such terms are hereinafter defined, time being of the essence. In the event Purchaser or any successor-in-title fails to either Commence Construction on or before the Commencement Deadline or

Complete Construction on or before the Completion Deadline for any reason whatsoever (subject, however, to extension of time due to an event of Force Majeure, or otherwise as agreed to in writing by Seller), Purchaser and any successor-in-title shall, jointly and severally, be deemed to be in default under the terms of this Agreement and Seller shall have the immediate and unconditional right, as its sole and exclusive remedies to either: (i) make demand and cause Purchaser and any successor-in-title (jointly and severally) to pay to Seller the Performance Deadline Fee (as hereinafter defined) as liquidated damages; or (ii) repurchase (or cause its designee to repurchase) the Property and all related improvements located thereon or attached thereto by paying the then-current fee title owner of the Property an amount equal to the Purchase Price in cash on the closing date as designated in writing by Seller or its designee (as applicable), at which time the Property and all improvements thereon or attached thereto shall be sold, transferred and conveyed to Seller (or its designee) free and clear of all monetary liens, Claims (whether by Purchaser, any Purchaser Parties, or otherwise), and, to the extent required by Seller, encumbrances which first arose on and after the Closing Date. Nothing contained in this Section shall limit Seller's rights under Sections 6.8 or 10.23 hereof.

For purposes of this Section, the term "Performance Deadline Fee" means a daily fee payable by Purchaser and any successor-in-title to the Property (jointly and severally), in an amount equal to One Thousand and No/100 Dollars ($1,000.00) (the "**Performance Deadline Fee**") for each calendar day following the Commencement Deadline or the Completion Deadline (as applicable) that Purchaser or any successor-in-title to the Property does not Commence Construction or Complete Construction (as the case may be) as required under the terms of this Agreement. THE PARTIES ACKNOWLEDGE THAT THE PERFORMANCE DEADLINE FEE IS AGREED TO BY AND BETWEEN SELLER AND PURCHASER AS LIQUIDATED DAMAGES (AND NOT A PENALTY), DUE TO THE DIFFICULTY AND INCONVENIENCE OF ASCERTAINING AND MEASURING ACTUAL DAMAGES TO SELLER, AND THE UNCERTAINTY THEREOF GIVEN THE UNIQUE NATURE OF THE PURCHASER'S PROJECT AND THE NEGATIVE IMPACT AN INCOMPLETE PROJECT COULD HAVE ON THE MARKETING, SALE, DEVELOPMENT, OPERATION, USE, AND ENJOYMENT OF THE REMAINDER OF SELLER'S PROPERTY.

(b) As used in this Agreement, the following terms have the meanings indicated:

(i) "**Commence Construction**" and "**Commencement**" mean obtaining a grading permit, and commence the grading, at Purchaser's Project, all as certified in writing to Seller by Purchaser's architect to have been properly satisfied.

(ii) "**Commencement Deadline**" means the date which is nine (9) months after the date of Closing (regardless of whether or not such day is or is not a business day), time being of the essence; provided however, the Commencement Deadline shall be extended by Force Majeure and also to the date

agreed by the City of Frisco under the terms of the applicable document(s) related to the Project Incentives which will be entered into by Seller and Purchaser, as contemplated in Section 6.8 below; provided, further, however, in no event (except for Force Majeure) shall the Commencement Deadline be extended beyond the date which is fifteen (15) months after the date of Closing. Purchaser's failure (including any successor-in-title to the Property) to comply with this subparagraph shall be deemed a post-Closing default and shall allow Seller to exercise any and all rights and remedies available to Seller under the terms of this Section 5.9 and any post-Closing agreement(s) in which Seller and Purchaser are parties to, regardless of the inclusion of any other third parties.

(iii) "**Complete Construction**" and "**Completion**" mean the issuance of the final certificate of occupancy by the City for the last building and related improvements constituting Purchaser's Project.

(iv) "**Completion Deadline**" means the date which is thirty-six (36) months after the date of Commencement, time being of the essence; provided however, the Completion Deadline shall be extended by Force Majeure and also to the date agreed by the City of Frisco under the terms of the applicable document(s) related to the Project Incentives which will be entered into by Seller and Purchaser, as contemplated in Section 6.8 below. Purchaser's failure (including any successor-in-title to the Property) to comply with this subparagraph shall be deemed a post-Closing default and shall allow Seller to exercise any and all rights and remedies available to Seller under the terms of this Section 5.9 and any post-Closing agreement(s) in which Seller and Purchaser are parties to, regardless of the inclusion of any other third parties.

(c) The provisions of this Section will be either contained in the Deed executed by Seller to Purchaser in accordance with this Agreement, or at Seller's option and election, contained in a Memorandum of Agreement which will be deemed an Exception, and the terms and conditions set forth in this Section 5.9 will run with title to the Property until the date of completion of Purchaser's Project. (the "**Termination Date**"). From and after the Termination Date, at Purchaser's request, Seller agrees to execute and deliver to Purchaser for recording any document reasonably acceptable to Seller and Purchaser to evidence the termination of this Section, which Purchaser may (at its sole cost and expense) record of public record against title to the Property.

5.10. Additional Provisions Applicable to Section 5.9.

Seller is a developer of The Gate and has a vested interest in the character and reputation of The Gate. It is a fundamental policy of Seller to sell tracts in The Gate only to developers and builders whose reputation and products have been determined by Seller to be compatible with the character of The Gate. Purchaser represents and warrants to Seller that it is purchasing the Property with the intent to develop, construct, own, operate and manage Purchaser's Project and not for speculative land holding. The terms and conditions set forth in Section 5.9 were bargained for by the parties and are a material part of the determination of the Purchase Price to

be paid by Purchaser for the Property. Both Seller and Purchaser were represented by legal counsel in the negotiation of this Agreement, including Sections 5.9 and 5.10. Purchaser acknowledges and agrees that all terms and conditions of Sections 5.9 and 5.10 are enforceable in accordance with their respective terms and conditions.

5.11. On-Site Infrastructure.

As used in this Agreement, the term "**On-Site Infrastructure**" means all storm drainage, water, sanitary sewer, drive lanes and franchise utilities to support the development of Purchaser's Project on the Land, and shall include (without limitation) all side walk areas, landscaping and parallel parking constituting, in part, a portion of Purchaser's Project. A general depiction of the location of such On-Site Infrastructure work is attached hereto as Exhibit E. All On-Site Infrastructure will be built by Purchaser per The Gate Master Developer Guideline, Design and Specifications and the City Code of Frisco, Texas.

Purchaser hereby covenants and agrees that all On-Site Infrastructure relative to Purchaser's Project will be designed and constructed to conform with the Original Conveyance Plat (or if applicable, the New Conveyance Plat), and all Required Approvals. Purchaser agrees to pay for the design and construction of the On-Site Infrastructure at its sole cost and expense.

5.12. Post-Closing Impact Fees.

Purchaser shall be solely responsible for and obligated to pay all Impact Fees related to the Property (including any portion thereof) and/or Purchaser's Project; provided, however, nothing contained herein is intended to change or limit Purchaser's entitlement to the Project Incentives as contemplated in Section 6.8 hereof. As such, Purchaser covenants and agrees that it is and shall solely be responsible and liable for and shall pay or reimburse Seller and/or its affiliate (as applicable) at the time a building permit for Purchaser's Project is obtained (if already paid by Seller or its affiliate, or if Seller otherwise has the City agree to waive the assessment of all or any portion of the Impact Fees) or thereafter within ten (10) days after receipt of written demand from Seller or the City (as applicable), any and all such Impact Fees related to the Property and/or Purchaser's Project.

5.13. Licensing Requirements for "The Gate".

Purchaser acknowledges that Seller owns certain rights in the mark "THE GATE", alone and in combination with other words, in singular and plural or with design, and derivations thereof for "hotel and retail services", including common law rights in such mark(s), if any, and all applications for registrations of such mark(s), and state and federal and international registrations that have been or may be issued for such mark(s), and the goodwill associated with such mark(s) (collectively, "**Marks**"). Purchaser acknowledges, stipulates and agrees for itself and on behalf of any other owner of all or any portion of the Property (whether pre- or post-Closing), that neither Purchaser nor any other owner, operator, tenant, subtenant, licensee, lender, or management company of all or any portion of the Property, shall be entitled to use the name "The Gate", or any mark, logo, trade name, or other name utilizing "The Gate", or have any right, title or interest in the Marks, except (if at all) pursuant to a non-exclusive license

agreement in form and substance to be agreed upon between Seller and Purchaser (if at all) prior to the Closing Date (the "**Non-Exclusive License Agreement**"). The foregoing restriction on use of Marks includes, without limitation, the restriction on Purchaser's use of "The Gate" in the name of Purchaser's Project, whether as an indication of the location of Purchaser's Project or otherwise, or in the use of "The Gate" in or on goods, literature, brochures, letterhead, business cards, voicemail, signs, and advertising material bearing the Marks.

In the event Purchaser or any other owner, operator, tenant, subtenant, licensee, lender, or management company of all or any portion of the Property fails to comply with the terms and conditions set forth in this Section, Seller shall have the immediate and unconditional right, in addition to any and all rights and remedies available to Seller at law or in equity, to: (a) pursue a claim for injunctive relief against Purchaser and any other applicable party without any obligation to post a bond, or if a bond is required by a court of competent jurisdiction, the posting of a bond for a de minimis amount not to exceed $1,000.00; and/or (b) sue Purchaser or any successor-in-title to the Property and any other applicable operator, tenant, subtenant, licensee, lender, and/or management company of all or any portion of the Property (jointly and severally), for damages, including without limitation, reimbursement or payment (as applicable) of Seller's reasonable attorneys' and consultants' fees and expenses. In addition to the rights and remedies available to Seller as provided in subparts (a) and (b) above, Seller shall also be entitled to sue for and collect (jointly and severally) from Purchaser and any other third party who is violating the terms and conditions of this Section, an amount equal to $1,000.00 per day for each day that this Section is being violated, SUCH AMOUNT BEING AGREED TO BY THE PARTIES TO BE A LIQUIDATED DAMAGES AMOUNT (AND NOT BEING ASSESSED AS A PENALTY) DUE TO THE DIFFICULTY AND INCONVENIENCE OF ASCERTAINING AND MEASURING ACTUAL DAMAGES TO SELLER AND THE NEGATIVE IMPACT ON SELLER FOR USE OF THE MARKS WITHOUT ITS WRITTEN CONSENT OR CONTROL. The terms and conditions set forth in this Section shall be included in the Notice of Applicability and be deemed a covenant running with the Land.

5.14. Survival. Sections 5.11, 5.12 and 5.13 shall survive Closing, unless contained in an agreement executed at Closing in which event the sections shall be merged into such agreements.

## SECTION VI
## REPRESENTATIONS, WARRANTIES AND COVENANTS

6.1. Representations and Warranties of Seller.

Seller hereby makes the following representations and warranties to Purchaser as of the Effective Date and the Closing Date (except as may have been, or is later otherwise, disclosed in writing by Seller to Purchaser):

(a) Seller has been duly organized and is validly existing under the laws of the state of its organization and is duly qualified to transact business in the state in which the Property is located and all requisite action necessary to authorize Seller to enter into this

Agreement and to carry out its obligations hereunder have been taken. Seller has the full right and authority to enter into this Agreement and to transfer all of the Property to be conveyed by Seller pursuant hereto and to consummate or cause to be consummated the transactions contemplated herein to be made by Seller. The person signing this Agreement on behalf of Seller is authorized to do so. No consent of any partner, shareholder, creditor, investor, judicial or administrative body, governmental or quasi-governmental authority or other third party is required for Seller to enter into this Agreement and to consummate the transactions contemplated hereby which has not already been obtained.

(b) Seller has not received written notice from any governmental or public authority that the Property or any portion thereof is in violation of any applicable fire, health, building, use, and occupancy or zoning laws.

(c) Seller has no actual knowledge and has received no written notice that any condemnation or other taking by eminent domain of the Property or any portion thereof has been instituted.

(d) There is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending or, to Seller's current actual knowledge, threatened against Seller which, if adversely determined, could materially interfere with the consummation by Seller of the transactions contemplated by this Agreement.

(e) Seller has not received a written notice from any governmental authority concerning, and Seller has no current actual knowledge of any events that have given rise to or which could reasonably be expected to give rise to: (i) any alleged violation of any environmental law or regulation at, or associated with, the Property or any part thereof, or (ii) any investigation or request for information relating to the handling, packaging, transportation, treatment, storage or disposal of solid, liquid or hazardous waste or hazardous substances on-site at the Property or any part thereof. For purposes of this Agreement, the term "**Hazardous Materials**" shall include but not be limited to substances defined as "hazardous substances", "hazardous materials", or "toxic substances" in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. Paragraph 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Paragraph 1801 et seq.), and the Resource Conservation and Recovery Act (42 U.S.C. Paragraph 6901 et seq.).

(f) Neither Seller, nor to Seller's knowledge any individual or entity having an interest in Seller, is a person and/or entity with whom U.S. persons or entities are restricted from doing business under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq.; the Trading with the Enemy Act, 50 U.S.C. App. § 5; any executive orders promulgated thereunder; any implementing regulations promulgated thereunder by the U.S. Department of Treasury Office of Foreign Assets Control ("**OFAC**") (including those persons and/or entities named on OFAC's List of Specially Designated Nationals and Blocked Persons (the "**SDN List**")); or any other applicable law of the United States, including Executive Order Number 13224 on Terrorism

Financing, effective September 24, 2001 ("**Executive Order 13224**") or the United and Strengthening America by Providing Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (the "**USA Patriot Act**").

(g) Except with respect to any Exceptions or as otherwise expressly permitted in this Agreement, after the expiration of the Due Diligence Period, and provided Purchaser has not terminated this Agreement and is not otherwise in default, Seller shall not further grant or create any encumbrance upon the title to the Property without the written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.

(h) To Seller's knowledge, as of the Effective Date, other than as set forth in or otherwise contemplated under any documents, agreements or instruments listed as Exceptions, there are no agreements, written or oral, relating to the management, leasing, operation, maintenance and/or improvement of the Property or any portion thereof.

6.2. <u>Survival of Sellers' Representations and Warranties.</u>

The representations and warranties of Seller set forth in <u>Section 6.1</u> shall survive Closing for a period of nine (9) months (the "**Survival Period**").

6.3. <u>Covenants of Seller.</u>

Seller hereby makes the follow covenants for the benefit of Purchaser as of the date hereof and the Closing Date:

(a) Other than with respect to any Project Documents and any document, agreement or instrument required or contemplated to be entered into that constitutes an Exception or as otherwise provided under the terms of this Agreement, prior to Closing, Seller agrees not to enter into any document, agreement or instrument relating to the upkeep, repair, maintenance or operation of the Property without Purchaser's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed.

(b) Seller will pay or cause to be paid all debts, taxes and other obligations incurred by it in connection with the use and ownership of the Property up to the date of Closing, except for those items for which proration is agreed upon in accordance with SECTION V hereof, including but not limited to all real estate and other taxes which taxes are due and payable at the time of Closing.

(c) Seller shall, at its sole cost and expense, terminate any existing Property management agreement at or prior to Closing which is applicable solely and exclusively to the Property.

6.4. <u>Representations, Warranties and Covenants of Purchaser.</u>

Purchaser hereby makes the following representations, warranties and covenants for the benefit of Seller as of the date hereof and the Closing Date:

(a) Purchaser is validly existing and in good standing under the laws of the state of its formation. Purchaser has the full right, power and authority to purchase the Property as provided in this Agreement and to carry out Purchaser's obligations hereunder, and all requisite action necessary to authorize Purchaser to enter into this Agreement and to carry out its obligations hereunder have been, or by the Closing will have been, taken. Any permitted assignee of Purchaser shall be an entity which, prior to the Closing, is validly existing and in good standing under the laws of the state of its formation and, if applicable, duly qualified to do business in the State of Texas. The person signing this Agreement on behalf of Purchaser is authorized to do so. No consent of any partner, shareholder, creditor, investor, judicial or administrative body, governmental or quasi-governmental authority or other third party is required for Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby which has not already been obtained.

(b) There is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending or, to Purchaser's current actual knowledge, threatened against Purchaser which, if adversely determined, could materially interfere with the consummation by Purchaser of the transactions contemplated by this Agreement.

(c) Purchaser is not: (i) a plan which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), as defined in Section 3(3) of ERISA, nor a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (each of the foregoing hereinafter referred to collectively as a "**Plan**"); or (ii) a "governmental plan" as defined in Section 3(32) of ERISA. Purchaser is acting on its own behalf and not on account of or for the benefit of any Plan. Purchaser shall not transfer the Property to any entity, person or Plan which will cause a violation of ERISA. Purchaser shall not assign its interest under this Agreement to any entity, person or Plan which, if the assignee acquires the Property, will cause a violation of ERISA.

(d) Neither Purchaser, nor to Purchaser's knowledge any individual or entity having an interest in Purchaser, is, nor will become, a person and/or entity with whom U.S. persons or entities are restricted from doing business under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq.; the Trading with the Enemy Act, 50 U.S.C. App. §5; any executive orders promulgated thereunder; any implementing regulations promulgated thereunder by OFAC (including those persons and/or entities named on the SDN List); or any other applicable law of the United States, including Executive Order 13224 or the USA Patriot Act.

(e) Should this Agreement terminate prior to the Closing Date, Purchaser shall, at its sole cost and expense, immediately (i) return or cause to be returned to Seller all copies of the Property Information received from Seller in hard copy form, and (ii) delete from its computer and other electronic storage devices the Property Information received from Seller via the virtual data room as set forth in Section 4.1.

(f) Before Closing, Purchaser agrees (whether individually or by and through an entity which is directly or indirectly owned or controlled by Purchaser) not to solicit, negotiate or enter into any document, agreement or instrument that is binding upon Seller or Seller's interest in the Property, or the Property.

(g) Within five (5) business days prior to the expiration of the Due Diligence Period, Purchaser shall deliver to Seller copies of the concept designs, renderings, landscape plans and list of materials for the development and construction of Purchaser's Project.

(h) Purchaser covenants and agrees to design, develop and construct Purchaser's Project on the Property in accordance with all the terms, conditions and provisions of this Agreement, the Required Approvals, and as otherwise required by the City of Frisco and any Exception document.

(i) The Hotel Management Agreement shall contain the following provisions: (i) Purchaser, or any other owner of the Property, is authorized and otherwise entitled to be the owner and/or operator of Purchaser's Project under the terms of the Hotel Management Agreement (upon the proper assignment and assumption thereof), notwithstanding any existing or prior default by Purchaser or any of its affiliates thereunder; and (ii) if Seller (including any applicable affiliate of Seller) has the right and elects to repurchase the Property (including any portion thereof) at any time prior to the Termination Date, then Seller (or other applicable affiliate of Seller, as applicable) shall have the right to (A) terminate the Hotel Franchise Agreement as of the date designated in writing by Seller or its affiliate, and (B) acquire the Property free and clear of any Claims arising out of or related to the Hotel Franchise Agreement. Seller agrees that, prior to the scheduled Closing Date, it will not contact any hotel company in connection with The Gate unless this Agreement is terminated.

(j) Within five (5) business days after Closing, Purchaser shall deliver to Seller, (i) a fully-executed copy (and if applicable, a recorded copy) of the Purchaser Agreement and the New Memorandum (as such terms are defined in the ESA Agreement) related to the Property, and (ii) an original Release (as such term is defined in the ESA Agreement) properly executed and notarized by CoServ so that Seller may promptly file it against title to the Property in the Real Property Records of Collin County, Texas. Purchaser's failure to timely or properly comply with this paragraph shall constitute a post-Closing default under the terms of this Agreement.

6.5. Survival of Representations, Warranties and Covenants.

The representations, warranties and covenants of Purchaser set forth in Section 6.4 shall survive Closing for the Survival Period.

6.6. Representations and Warranties Generally.

If Purchaser makes a claim against Seller for breach of a representation and warranty under this Agreement and Seller compensates Purchaser in connection therewith, and if the claim by Purchaser against Seller relates to matters for which there is or may be a claim against a third party under any warranties, guaranties, indemnities or other Claims (including, without limitation, for workmanship, materials and performance) assigned by Seller to Purchaser pursuant to this Agreement, then Purchaser agrees that Seller shall be subrogated to Purchaser's position with respect to all Claims against such third parties, and Purchaser shall reasonably cooperate with Seller in attempting to recover against such third party(ies) at no third-party expense to Purchaser. The foregoing shall survive Closing.

6.7. Limitation of Liability.

Terms such as "to Seller's knowledge", "to the best of Seller's knowledge", or like phrases mean the actual present and conscious awareness or knowledge of the undersigned representative of Seller ("**Seller's Knowledge Party**"), without any duty of inquiry or investigation; provided that so qualifying Seller's knowledge shall in no event give rise to any personal liability on the part of Seller's Knowledge Party or any other officer or employee of Seller, on account of any breach of any representation or warranty made by Seller herein. Said terms do not include constructive knowledge, imputed knowledge, or knowledge Seller or such persons do not have but could have obtained through further investigation or inquiry. No broker, agent, or party other than Seller is authorized to make any representation or warranty for or on behalf of Seller. *No party shall have the right to bring an action against the other for any breach of a representation or warranty, or a default which arises out of or relates to a breach of a representation or warranty, which occurs prior to Closing, other than a claim for specific performance (and specifically excluding any Claim for damages, other than a claim for attorneys' fees in connection with a specific performance action per Section 10.23 below).* If, however, a party is in default under the terms of this Agreement as a result of a breach of a representation or warranty which occurs after Closing, then, the parties agree that the following terms and conditions must first be satisfied: (a) the party bringing the action for breach must have first acquired actual knowledge of the breach after Closing and must file such action within the Survival Period; and (b) neither party shall have the right to bring a cause of action for a breach of a representation or warranty post-Closing unless the damage to such party on account of such breach (individually or when combined with damages from other breaches) equals or exceeds FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00) (the "**Damages Threshold**"), whereupon meeting the Damages Threshold, the non-breaching party is entitled to first dollar recovery. Neither party shall have any liability after Closing for the breach of a representation or warranty hereunder of which the other party hereto had actual knowledge as of Closing. Furthermore, the parties agree that the aggregate maximum liability of either party for the alleged breach of any representation or warranty set forth in this Agreement is limited to non-breaching party's actual damages incurred as a direct result of breaching party's breach, up to, but not to exceed, THREE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($350,000.00) (the "**Damages Cap**"). In no event shall either party be liable to the other for incidental, consequential, or punitive damages as a result of the breaching party's breach of any or all representations or warranties set forth in SECTION VI of this Agreement. The provisions of this Section shall survive the Closing. Any breach of a representation or warranty that occurs prior to Closing shall be governed by SECTION VII.

6.8. Post-Closing Obligations.

Notwithstanding the expiration of the Survival Period or any other term, condition or provision set forth in this Agreement to the contrary, Seller and Purchaser hereby represent, warrant, covenant and agree as follows:

(a) Purchaser desires to participate in the sales and property tax rebates that are offered by certain governmental agencies to owners of commercial developments of greater than 200,000 square feet in The Gate development. In accordance with Section 4.4 and Section 6.4(h) of this Agreement, Purchaser agrees to design, develop and construct Purchaser's Project on the Property, subject to the terms and conditions set forth in this Agreement, the Incentive Agreements, and any other applicable post-Closing agreement entered into by Seller and Purchaser, so that Purchaser may be entitled to participate in any sales and property tax rebates, grants, reimbursement rights and any other economic incentives contemplated under the terms of the Incentive Agreements for The Gate which shall, (i) only relate to, and shall specifically be identified and mutually agreed to in writing by Seller and Purchaser to only include incentives allocated on a proportionate share basis to, the Property and Purchaser's Project to be developed thereon if and to the extent Purchaser is entitled to do so as the owner of Purchaser's Project, and (ii) further be approved in writing by Seller, IGO-Frisco, the City, and any other applicable governmental or quasi-governmental agency, which may include (without limitation) further amendments, modifications, terminations and/or restatements of all or any portion of the Incentive Agreements (such specific identified and mutually agreed upon rebates, grants, reimbursement rights and other economic incentives allocated on a proportionate share basis to the Property and Purchaser's Project being collectively referred to herein as the, "**Project Incentives**"). Seller agrees to use commercially reasonable efforts to seek the City's approval to allow the Project Incentives for Purchaser's Project to be separated from the balance of The Gate development within thirty (30) days of the Effective Date; provided, however, Seller's failure to do so shall not constitute a breach or default by Seller under this Agreement or entitle Purchaser to pursue any remedies or Claims against Seller.

(b) As a material inducement for each party to enter into this Agreement, both Seller and Purchaser acknowledge, stipulate and agree that, (i) once the Project Incentives are determined and agreed to in accordance with the terms and conditions set forth in this Section 6.8, at the Closing, the Project Incentives will be assigned to Purchaser on an "as is" basis, without representations, warranties or recourse against Seller (other than a representation by Seller that it has not previously assigned the Project Incentives to any other party), so that Purchaser shall be entitled to and vested with the sole right to acquire, use, be paid or reimbursed for, and otherwise receive all of the financial benefits of being the owner and holder of one hundred percent (100%) of the Project Incentives, in terms of both the gross economic value and percentage of unit shares (if any) allocated to the Property, and Seller, IGO-Frisco and any other applicable lot owner in The Gate development as designated and approved by Seller (or if applicable, IGO-Frisco) shall be entitled to and vested with the sole right to acquire, use, be paid or reimbursed for, and otherwise receive all of the financial benefits of being the owner and holder of one

hundred percent (100%) of all other remaining sales and property tax rebates, grants, reimbursement rights and any other economic incentives contemplated under the terms of the Incentive Agreements for The Gate, in terms of both the gross economic value and percentage of unit shares (if any) allocated to The Gate project.

(c) Purchaser acknowledges that Seller makes no statements, representations or warranties of any kind relating to whether Seller, the Property or Purchaser's Project are or will be entitled to any sales or property tax rebates, grants, reimbursement rights or any other economic incentives contemplated under the terms of the Incentive Agreements or otherwise for The Gate, or Purchaser's entitlement to any Project Incentives.

(d) For purposes of this Agreement, the term "**Project Incentive Conditions**" includes the timely and proper payment, performance and satisfaction of all of the following, as determined by Seller:

(i) the City, the FEDC and the FCDC (each, as applicable) approves of (A) Purchaser's Project and Purchaser's participating in the Project Incentives relative to the Property, and (B) Seller's, IGO-Frisco's and any other applicable lot owner in The Gate development of their respective rights, entitlement and participation in and to all rebates, grants, reimbursement rights and any other economic incentives that any such party(ies) negotiate and otherwise agree to in writing with the City, the FEDC and the FCDC; and

(ii) the City, the FEDC and the FCDC enter into one or more written agreements (which may include entering into wholly new agreements) in form and substance acceptable to Seller and IGO-Frisco (and, solely with respect to Purchaser's Project, also acceptable to Purchaser) which either amends or modifies, or otherwise restates or replaces in its entirety, each of the Master Development Agreement, the Performance Agreements and/or other incentive agreements which are applicable to The Gate project (including the Property) which such agreements will, among other things, (A) release, carve-out and otherwise sever from the existing Master Development Agreement and the Performance Agreements, Seller's and IGO-Frisco's (as applicable) agreement, right, duty, and obligation to pay for, perform and otherwise satisfy any and all "Performance Requirements," "Structured Parking Space" requirements (as such terms are defined in the Master Development Agreement), and any other terms and conditions set forth therein which reference or relate to the development and operation of a hotel development, which shall include (without limitation) the timely payment, performance and satisfaction by Purchaser of the terms and conditions set forth in Section 4.2 and Section 4.6 of the Master Development Agreement, and (B) allow Seller and/or IGO-Frisco (as applicable) to sell, transfer and convey to any lot owner in The Gate development other than Purchaser, all or any portion of the rebates, grants, reimbursement rights and any other economic incentives that Seller and/or IGO-Frisco (as applicable) is required or otherwise desires to sell, transfer and convey, upon such terms and conditions solely agreed to by Seller and IGO-Frisco, as applicable.

(e) In connection with the design, development and construction of the Dedicated Parking Spaces for the benefit of each applicable Adjacent Lot Owner, and the corresponding right of access to, and ownership, operation, management, maintenance, use and occupancy of, such Dedicated Parking Spaces on the Property, Seller and Purchaser hereby consent and agree to the following terms and conditions:

(i) Purchaser shall cause the Dedicated Parking Spaces to be designed, developed and constructed as part of Purchaser's Project, and shall achieve Completion of Purchaser's Project by the Completion Deadline. All costs, fees and expenses incurred or payable by Purchaser in connection with its duties and obligations related to the Dedicated Parking Spaces (whether the design, development, and construction thereof, or otherwise) shall be paid for, reimbursed from, and otherwise satisfied solely from the Project Incentives, and neither Seller, IGO-Frisco nor the Adjacent Lot Owners or any other owner of lot 7 or lot 14 in The Gate project shall be liable for any Claims related thereto;

(ii) As of the Effective Date of this Agreement, Seller or IGO-Frisco (as applicable) are the Adjacent Lot Owners, and each respective owner of lot 7 and lot 14 of The Gate (whether Seller, IGO-Frisco, or their respective successors or assigns) shall retain and otherwise continue to have the right, jointly with Purchaser other than with respect to the Restricted Dedicated Parking Spaces (in which Purchaser shall have no Retained Parking Rights thereto unless and to the extent otherwise provided for in the Parking Agreement, as hereinafter defined), to have ingress and egress access to and from, and otherwise operate, manage, maintain, use and occupy, the Dedicated Parking Spaces on the Property as each respective owner deems necessary or appropriate from time to time in its sole and absolute discretion, even after Completion of Purchaser's Project (collectively, the "**Retained Parking Rights**");

(iii) Purchaser acknowledges, stipulates and agrees that, notwithstanding the purchase of the Property and Completion of Purchaser's Project, (A) The Adjacent Property Owners will have an easement granting their right, title, claim and interest in and to the Retained Parking Rights as such rights and benefits apply to that portion of the Dedicated Parking Spaces necessary or required by the City, the FEDC, the FCDC, and any other governmental or quasi-governmental agency to approve of and otherwise issue a building permit for the proposed project to be developed on lot 7 and lot 14 of The Gate (as applicable), whether such development is by Seller, IGO-Frisco, or their respective successors or assigns (such restricted Dedicated Parking Spaces being hereinafter referred to as the, "**Restricted Dedicated Parking Spaces**"), and (B) Purchaser shall not grant, sell, license, transfer or convey, or otherwise pledge, hypothecate, encumber or cause any lien, debt, security interest or other right to be granted, attached, affixed or otherwise arise (whether by contract, operation of law or otherwise) in, on or related to, the Restricted Dedicated Parking Spaces, without the express written consent of the applicable Adjacent Lot Owner, such consent to not be unreasonably withheld. Other than as set forth herein relative to the

Restricted Dedicated Parking Spaces, Purchaser shall have certain joint rights, title, claim or interest in or to the remaining portion of the Retained Parking Rights, all as more particularly described in, and subject to the terms and conditions set forth in, the Parking Agreement;

(iv) As a part of Purchaser obtaining the Required Approvals, Purchaser shall enter into an agreement (whether one or more) in recordable form with each Adjacent Lot Owner (each such agreement being referred to herein as the, "**Parking Agreement**"), the terms and conditions of which shall be consistent with this Agreement, whereby Purchaser and the Adjacent Lot Owner (for itself and on behalf of their successors and assigns) irrevocably and unconditionally grants, transfers and otherwise conveys to the other and its respective designees (as identified in the Parking Agreement) all easements, licenses, rights of way and/or access agreements necessary or required for the Adjacent Lot Owner and its designees to access the Property for the continued and unobstructed use, enjoyment and benefit of (A) the Retained Parking Rights relative to the Restricted Dedicated Parking Spaces, and (B) the remaining portion of the Retained Parking Rights jointly with Purchaser, each to be consistent with the terms of this Agreement and Adjacent Lot Owner's (and their respective designees) anticipated use, enjoyment and benefit of the Restricted Dedicated Parking Spaces and the remaining portion of the Dedicated Parking Spaces (as applicable) in conjunction with the ownership, development, operation and use of the Adjacent Property Owner's lot; provided, however, such Parking Agreement shall contain cost sharing provisions for the maintenance of the Dedicated Parking Spaces;

(v) The Parking Agreement(s) shall be executed and filed of record against title to the Property either immediately upon Completion of Purchaser's Project, or at any time after Closing but prior to Completion of Purchaser's Project upon the written request of the Adjacent Lot Owner. Until recordation of the Parking Agreement(s), the terms and conditions set forth in this Section shall be included in the Notice of Applicability, or, if agreed to by the parties, any other form of recordable declaration mutually acceptable to Seller and Purchaser which shall be recorded at Closing and shall be deemed a covenant running with the Land and a permitted Exception to title to the Property;

(vi) If Seller (including any applicable affiliate of Seller) has the right and elects to repurchase the Property (including any portion thereof) at any time prior to the Termination Date, then Purchaser shall on the closing date of the repurchase of Purchaser's Project, sell, assign, transfer, and otherwise convey to Seller or its designee, at no cost or reimbursement obligation and otherwise free and clear of any and all Claims, all Project Incentives and all right, title and interest in and to the Dedicated Parking Spaces, whether arising out of or related to the Parking Agreement, or otherwise; and

(vii) Any document, agreement or instrument entered into by or on behalf of Purchaser related in any respect to Purchaser, the Property and/or Purchaser's Project, including without limitation, any loan documents, shall in all instances be (and shall specifically state therein that they are) subject, subordinate and otherwise inferior in all respects to all rights, titles, Claims and interests of the Adjacent Lot Owner, Seller, and its respective designees in and to the Retained Parking Rights and the terms and conditions set forth herein and in the respective Parking Agreement(s).

(f) Provided Purchaser has timely and properly satisfied all of the terms and conditions set forth in this Section 6.8, and Purchaser has caused all applicable governmental and quasi-governmental authorities to timely and properly satisfy all of the terms and conditions set forth in this Section which allows for Seller and Purchaser to receive (and subsequently divide and assign) the Project Incentives (as they relate to Purchaser's Project) and all other incentives as contemplated in the Incentive Agreements (as they relate to Seller, IGO-Frisco and any other applicable third party) as contemplated herein, but Seller fails to execute and deliver all instruments required by this Section to be delivered by Seller, then, Purchaser shall have the right, as its sole and exclusive remedy (with Purchaser hereby waiving and releasing Seller and IGO-Frisco from any and all other Claims), to pursue a claim of specific performance against Seller.

## SECTION VII
## DEFAULT

7.1. Default by Purchaser.

In the event that Purchaser fails to perform its obligations pursuant to this Agreement for any reason other than a default by Seller or the permitted termination of this Agreement by either Seller or Purchaser as herein expressly provided, or if prior to Closing any one or more of Purchaser's representations or warranties are breached in any material respect, then if such failure or breach is not cured by Closing (which date for Closing shall, upon prior written notice to Seller, be extended by a reasonable additional time to effect such a cure, but in no event shall such extension exceed five (5) days after the original date for Closing set forth in Section 5.1 hereof), then unless otherwise stated in this Agreement to the contrary, Seller shall be entitled, in addition to its right to pursue against Purchaser payment and/or reimbursement (as applicable) of any and all costs, fees and expenses Seller is entitled to receive under Section 10.23 of this Agreement, to terminate this Agreement and receive or retain (as applicable) the Earnest Money as liquidated damages for Purchaser's breach of this Agreement, it being agreed between the parties hereto that the actual damages to Seller in the event of such breach are impractical to ascertain and the amount of the Earnest Money is a reasonable estimate thereof. In addition to the foregoing rights of Seller, Seller shall retain the right to pursue against Purchaser any Claim for any indemnification obligation of Purchaser set forth in this Agreement, and these shall be Seller's sole and exclusive remedies hereunder. IN NO EVENT SHALL PURCHASER'S DIRECT OR INDIRECT PARTNERS (OTHER THAN A GENERAL PARTNER OF A PARTNERSHIP), SHAREHOLDERS, MEMBERS, OWNERS OR AFFILIATES, ANY OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF THE FOREGOING, OR ANY

AFFILIATE OR CONTROLLING PERSON THEREOF HAVE ANY LIABILITY FOR ANY CLAIM, CAUSE OF ACTION OR OTHER LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROPERTY, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY OR OTHERWISE. The provisions of this Section 7.1 shall survive Closing or the earlier termination of this Agreement.

7.2. Default by Seller.

In the event that Seller fails to perform its obligations under this Agreement for any reason other than Purchaser's default, or the permitted termination of this Agreement by either Seller or Purchaser as herein expressly provided, or if prior to Closing any or more of Seller's representations or warranties are breached in any material respect, then if such failure or breach is not cured by Closing (which date for Closing shall, upon prior written notice to Purchaser, be extended by a reasonable additional time to effect such a cure, but in no event shall such extension exceed five (5) days after the original date for Closing set forth in Section 5.1 hereof), Purchaser shall elect, as its sole and exclusive remedy, either to: (a) waive said failure or breach and proceed to Closing; or (b) pursue specific performance of this Agreement against Seller, provided that Purchaser (i) has satisfied or waived Purchaser's Closing Conditions, and (ii) is not otherwise in breach of its obligations under this Agreement (collectively, the "**Conditions Precedent**"), all prior to and as a condition to filing any notice of pendency of action or lis pendens as an encumbrance against the Property. Purchaser acknowledges that Seller shall have the right to petition a Court to expunge any such lis pendens if Purchaser fails to satisfy all Conditions Precedent. If Purchaser fails to bring an action for specific performance within 60 days of the scheduled Closing Date, Purchaser shall be deemed to have waived the remedy of specific performance and to have elected to terminate this Agreement. Purchaser waives all other rights or remedies in the event of a default by Seller. IN NO EVENT SHALL SELLER'S DIRECT OR INDIRECT PARTNERS, SHAREHOLDERS, MEMBERS, OWNERS OR AFFILIATES, ANY OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF THE FOREGOING, OR ANY AFFILIATE OR CONTROLLING PERSON THEREOF HAVE ANY LIABILITY FOR ANY CLAIM, CAUSE OF ACTION OR OTHER LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROPERTY, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY OR OTHERWISE. The provisions of this Section 7.2 shall survive Closing or the earlier termination of this Agreement.

7.3. Provisions Applicable to Claims.

Any pre- or post-judgment claims shall bear interest at the lesser of ten percent (10%) per annum, or the highest rate of interest allowed by law. If Closing is consummated, then the Parties shall have all remedies available to each respective Party as provided under the terms of this Agreement which are applicable to the alleged default (including, without limitation, the remedies provided in SECTION V above) in the event either party fails to perform any obligation under this Agreement that survives the Closing; provided, however, in no event shall Seller be liable to Purchaser for any incidental, consequential or punitive damages. The provisions of this Section 7.3 shall survive Closing or the earlier termination of this Agreement.

SECTION VIII

**COMMISSIONS**

8.1. Brokerage Commissions.

Upon the Closing of the transaction contemplated in this Agreement, Seller shall pay to Dowdle Real Estate (Attn: Jim Gandy) ("**Purchaser's Broker**") a commission ("**Purchaser's Broker's Commission**") pursuant to the terms of a separate written agreement. If Closing does not occur for any reason, then Seller shall not owe or be obligated to pay Purchaser's Broker the Purchaser's Broker's Commission. Under no circumstances shall Seller or Purchaser owe a commission or other compensation to any other broker, agent or person. Seller and Purchaser hereby each represent and warrant to the other that, other than Purchaser's Broker's Commission payable to Purchaser's Broker, no other brokers, agents, finder's fees or commissions are due or arising in connection with Purchaser entering into this Agreement or the consummation of transactions contemplated herein, and each party hereby agrees to indemnify, defend and hold the other and the Property harmless from and against all Claims arising from the warranting party whether or not such Claim is meritorious, for any compensation with respect to the entering into of this Agreement, the sale and purchase of the Property or the consummation of transactions contemplated herein. The provisions of this Section shall survive Closing or earlier termination of this Agreement.

SECTION IX

**DISCLAIMERS AND WAIVERS**

9.1. Accuracy of Information.

Except as expressly stated in this Agreement, Seller makes no representation or warranty as to the truth, accuracy or completeness of any materials, data or information delivered by Seller to Purchaser in connection with the transactions contemplated hereby.

9.2. DISCLAIMERS.

SUBJECT TO THE EXPRESS REPRESENTATIONS, WARRANTIES, AND COVENANTS OF SELLER AS SET FORTH ELSEWHERE IN THIS AGREEMENT AND IN ANY DOCUMENT DELIVERED BY SELLER TO PURCHASER AT CLOSING: (A) PURCHASER SHALL BE DEEMED TO BE SATISFIED WITH AND/OR TO HAVE WAIVED THE RESULTS OF THE DUE DILIGENCE AND TO HAVE ACCEPTED THE PROPERTY "AS IS", "WHERE IS", AND "WITH ALL FAULTS", INCLUDING LATENT DEFECTS, WITHOUT RECOURSE TO AND WITHOUT REPRESENTATION OR WARRANTY BY SELLER, EXPRESS OR IMPLIED, WHETHER STATUTORY OR OTHERWISE, AND WITHOUT ANY WARRANTIES OF TRANSFER, MERCHANTABILITY OR FITNESS FOR A PARTICULAR, OR PURCHASER'S INTENDED USE OR PURPOSES, RELATING TO THE PROPERTY, AND ANY WARRANTIES ARISING IN SECTION 2 OF THE TEXAS BUSINESS AND COMMERCE CODE; (B) PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY

REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (I) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (II) THE INCOME TO BE DERIVED FROM THE PROPERTY, (III) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (IV) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (V) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (VI) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, OR (VII) COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS, OR (VIII) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY; (C) PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT IF SELLER GIVES PURCHASER THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER WILL BE RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS IN, ON, UNDER OR ABOUT THE PROPERTY OR ANY MOLD, MILDEW OR OTHER FUNGAL GROWTHS IN, ON, UNDER OR ABOUT THE PROPERTY; (D) PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY REPORTS OR OTHER INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION; (E) SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON; (F) IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF. THE PROPERTY SHALL BE CONVEYED SUBJECT TO THE EXCEPTIONS (AS DEFINED IN <u>SECTION 3.3</u> OF THIS AGREEMENT), PROVIDED HOWEVER, SELLER SHALL DELIVER THE CLOSING

DOCUMENTS WHICH IT IS REQUIRED TO DELIVER IN ACCORDANCE WITH SECTION 5.2; (G) EXCEPT FOR THE ADJUSTMENTS AND PRORATIONS REQUIRED UNDER SECTION 5.4 HEREOF AND EXCEPT FOR PURCHASER'S REMEDIES AGAINST SELLER (SUBJECT TO THE SURVIVAL PERIOD, DAMAGES CAP, AND DAMAGES THRESHOLD) FOR THE BREACH OF ANY REPRESENTATION, WARRANTY OR COVENANT THAT SURVIVES CLOSING: UPON CLOSING, PURCHASER SHALL BE DEEMED TO HAVE ACCEPTED THE PROPERTY UNCONDITIONALLY AND WITH ANY AND ALL (NONE BEING SO IMPLIED) RIGHTS TO RESCIND, SET ASIDE OR AVOID THE TRANSACTIONS CONTEMPLATED HEREBY OR TO SEEK A REDUCTION, ADJUSTMENT, OFFSET OR RECOVERY OF THE PURCHASE PRICE, ON THE GROUNDS OF RESTITUTION OR OTHERWISE, WHICH ARE WAIVED AND RELINQUISHED. THE PROVISIONS SET FORTH IN THIS SECTION 9.2 SHALL BE DEEMED TO BE MADE A PART OF, AND OTHERWISE DEEMED TO BE SET FORTH IN, THE DEED.

PURCHASER'S INITIALS:_________

9.3. Notice Required by §13.257, Texas Water Code.

Seller hereby notifies Purchaser that the Property may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If the Property is located in a certificated area, there may be special costs or charges that Purchaser will be required to pay before Purchaser can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to the Property. Purchaser is advised to determine if the Property is in a certificated area and contact the utility service provider to determine the cost that Purchaser will be required to pay and the period, if any, that is required to provide water or sewer service to the Property. By execution of this Agreement, Purchaser acknowledges receipt of this notice.

9.4. Survival of Disclaimers.

Seller and Purchaser agree that the provisions of this SECTION IX shall survive Closing.

## SECTION X
## MISCELLANEOUS

10.1. Confidentiality.

Until Closing, Purchaser, for itself and on behalf of Purchaser Parties', and Seller for itself and on behalf of Seller Parties', hereby covenant and agree to hold in strict confidence all data and information related to Seller and its affiliates pertaining to its operations, methods, development process, acquisition, etc. received by Purchaser prior to, on, or after the Effective Date (collectively, the "**Reports**"), and shall not disclose the same to others other than Seller Parties; provided, however, that it is understood and agreed that Purchaser may disclose such data, information and Reports (collectively, the "**Confidential Information**") to the employees, investors, title companies, lenders, consultants, vendors, accountants and attorneys of Purchaser

provided that such persons are instructed to treat such Confidential Information strictly confidential. Purchaser acknowledges that any Confidential Information, including any Property Information and/or Reports, have been and continue to be delivered to Purchaser or Purchaser Parties to assist Purchaser in determining the feasibility of purchasing, insuring, financing, developing, owning, managing, and/or operating the Property. Purchaser shall not use, and Purchaser shall cause Purchaser Parties not to use, the Confidential Information for any purpose other than as set forth or related to the purposes set forth in the preceding sentence or as otherwise contemplated in this Agreement, and Purchaser acknowledges, stipulates and agrees that the Confidential Information and all other documents, terms, materials, and information provided by or on behalf of Seller to Purchaser are being provided without representation or warranty as to the completeness or accuracy of the facts, presumptions and conclusions contained therein. In permitting Purchaser to review any Confidential Information, Seller has not waived any privilege or claim of confidentiality with respect thereto, and no third-party benefits or relationships of any kind, either express or implied, have been offered, intended or created. If required to disclose information about this Agreement, Purchaser shall provide as much notice as reasonably feasible so as to allow Seller to seek injunctive relief. In the event this Agreement is terminated for any reason, Purchaser shall promptly deliver to Seller any Confidential Information provided to Purchaser or Purchaser Parties from or on behalf of Seller, and any other statements, documents, schedules, exhibits or other written information obtained from Seller and delivered to Purchaser in connection with this Agreement or the transaction contemplated herein. In the event of a breach or threatened breach by Purchaser or any Purchaser Parties of this Section, Seller shall be entitled to an injunction restraining Purchaser and any Purchaser Parties' from disclosing, in whole or in part, such Confidential Information.

Notwithstanding anything to the contrary herein, the parties hereto agree that the confidentiality and use provisions of this Agreement shall not apply to the following:

(a) Any information which appears in printed publications available to the public, or becomes generally known to the industry, other than through the breach of this Agreement or the negligence or fault of Purchaser or Purchaser Parties; and

(b) Any information which Purchaser can show by written records was rightfully in its possession prior to disclosure of such information by the Seller Parties.

Further, it shall not be a breach of this Agreement for Purchaser to disclose Confidential Information, Property Information and/or Reports in connection with an administrative, regulatory (such as securities regulations) or judicial process or proceeding, so long as Purchaser is compelled by law to disclose.

The provisions of this Section shall survive until the early termination of this Agreement or Closing, whichever is first to occur.

10.2. <u>Public Disclosure.</u>

Prior to Closing, any release to the public of information with respect to the sale contemplated herein or any matters set forth in this Agreement that would disclose the Purchase

Price will be made only in the form approved by each of Purchaser and Seller, except to the extent such release of information is to a party entitled to receive the Reports. Seller acknowledges and agrees that the Purchaser's special warranty deed with vendor's lien and related financing instruments will reference the amount of the loan applicable to the Purchaser's acquisition of the Property.

The provisions of this Section shall survive any early termination of this Agreement.

10.3. Jury Waiver.

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF THIS AGREEMENT OR ANY INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO. THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

10.4. Assignment.

Purchaser may not assign or transfer its rights or obligations under this Agreement without the prior written consent of Seller; provided, however, that Purchaser may assign its interest under this Agreement to an affiliate of Purchaser without Seller's consent. In the event that Purchaser desires to assign its rights under this Agreement, Purchaser shall send written notice to Seller at least five (5) business days prior to the Closing, and upon any permitted assignment of this Agreement, Purchaser shall promptly deliver to Seller a copy of the fully executed assignment of this Agreement and the assumption by the assignee of Purchaser's obligations hereunder. Any such assignment must include the assignee's tax identification number. Any assignee of Purchaser's interest in this Agreement shall be bound by all approvals and waivers, actual and deemed, by the original Purchaser prior to the assignment. The original Purchaser shall be released of any duties or obligations, or liability for any Claims, arising under the terms of this Agreement after the date of Assignment, and Seller shall have no duties, obligations or liability to the original Purchaser. Seller (at its sole cost) may transfer and convey the Property, and otherwise assign, transfer and delegate its rights, duties and obligations under this Agreement to an affiliate of Seller without Purchaser's consent. Upon such transfer, assignment and conveyance, the original Seller shall be immediately released of any and all duties, obligations and liability for any Claims arising under the terms of this Agreement (or otherwise) which are expressly assumed by Seller's affiliate, and all references in this Agreement to Seller shall thereafter mean and refer to Seller's affiliate, to the extent the context requires. The parties hereto agree that all representations, warranties, covenants and indemnifications shall inure to the benefit of any permitted assignee of Purchaser and Seller, as applicable.

10.5. Notices.

Any notice, demand or request required or permitted hereunder shall be given in writing at the addresses set forth below by any of the following means: (a) personal service; (b) certified U.S. mail, return receipt requested; (c) registered U.S. mail; (d) facsimile; (e) electronic email

(provided that a copy is also sent by the manner described in the preceding clauses (a), (b), (c), or (d)).

| | | |
|---|---|---|
| If to Seller: | IGO – USA LP<br>2595 Dallas Pkwy, Suite 470<br>Frisco, Texas 75034 | |
| | Attention: | Project Manager |
| | Facsimile: | (972) 402-5959 |
| | E-Mail: | akozbari@igo.ae <u>and</u> hatem@igo.ae |
| with a copy to: | Scheef & Stone, L.L.P.<br>2600 Network Blvd., Suite 400<br>Frisco, Texas 75034 | |
| | Attention: | John E. Bloomer |
| | Facsimile: | (214) 472-2150 |
| | E-mail: | john.bloomer@solidcounsel.com |
| If to Purchaser: | JMJ Acquisitions, L.L.C.<br>c/o Capital Markets<br>1755 Wittington Place, Suite 340<br>Dallas, Texas 75234 | |
| | Attention: | Mark Adams |
| | Facsimile: | ____________________ |
| | E-mail: | madams@jmjdevelopment.net |
| with a copy to: | Bennett, Weston, LaJone & Turner, P.C.<br>1603 LBJ Freeway, Suite 280<br>Dallas, Texas 75234 | |
| | Attention: | Jay A. LaJone |
| | Facsimile: | (214) 393-4025 |
| | E-mail: | jlajone@bennettweston.com |
| If to Escrow Agent: | Chicago Title Insurance Company<br>2828 Routh Street, Suite 800<br>Dallas, Texas 75201 | |
| | Attention: | Shannon Bright |
| | Facsimile: | (214) 968-1627 |
| | E-mail: | brights@CTT.com |

Any party may change its address to a different address in the United States by delivering notice to the other parties in the same manner as above provided at least ten (10) days prior to the effective date of such change. Any notice, demand or request shall be deemed given: (i) if sent by personal delivery, upon personal delivery to the party to whom the notice is directed, provided that if a party refuses delivery, then service shall be deemed given upon the date of refusal; (ii) if sent by certified mail, return receipt requested, on the third (3rd) day after deposit in the care and custody of the United States Postal Service; (iii) if sent by electronic email, upon

electronic or telephonic confirmation of receipt provided that a copy of such electronic mail is also sent to the intended addressee by personal delivery, certified mail, registered mail, or facsimile; and (iv) if sent by registered mail, on the third (3rd) day after sending.

10.6. Modifications.

This Agreement cannot be changed orally, and no executory agreement shall be effective to waive, change, modify or discharge it in whole or in part, unless such executory agreement is in writing and is signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

10.7. Calculation of Time Periods.

As used herein, the term "day" means each calendar day including a Saturday, Sunday or federal holiday or those days on which national banks in the State of Texas are closed. Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included. Unless otherwise set forth herein, the close of business is deemed to be 5:00 p.m., Central time.

10.8. Successors and Assigns.

The terms and provisions of this Agreement are binding upon the parties hereto and are to apply to and bind the permitted successors and assigns of the parties hereto.

10.9. Entire Agreement.

This Agreement, including the Exhibits, contains the entire agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

10.10. Further Assurances.

Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement. The provisions of this Section shall survive Closing.

10.11. Counterparts/Manners of Delivery.

This Agreement and further documentation may be executed in counterparts, and may be delivered by first class mail, electronic conveyance and/or pdf. All such executed counterparts shall constitute the same agreement, when delivered by any of the methods described in this Section. It shall be necessary to account for only one such counterpart in proving this Agreement.

10.12. Severability.

If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

10.13. Applicable Law.

THIS AGREEMENT SHALL IN ALL RESPECTS BE SOLELY GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE SUBSTANTIVE FEDERAL LAWS OF THE UNITED STATES AND THE LAWS OF THE STATE OF TEXAS. SELLER AND PURCHASER HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN THE STATE OF TEXAS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING SHALL BE SOLELY HEARD AND DETERMINED IN A STATE OR FEDERAL COURT SITTING IN FRISCO, COLLIN COUNTY, TEXAS (THE "**APPROVED JURISDICTION**"). THE PARTIES HERETO RECOGNIZE THAT COURTS OTHER THAN THE APPROVED JURISDICTION MAY ALSO HAVE JURISDICTION OVER SUITS, ACTIONS OR PROCEEDINGS ARISING OUT OF THIS AGREEMENT, AND IN THE EVENT THAT ANY PARTY HERETO SHALL INSTITUTE A PROCEEDING INVOLVING THIS AGREEMENT IN A JURISDICTION OTHER THAN THE APPROVED JURISDICTION, THE PARTY INSTITUTING SUCH PROCEEDING SHALL INDEMNIFY ANY OTHER PARTY HERETO FOR ANY LOSSES AND EXPENSES THAT MAY RESULT FROM THE BREACH OF THE FOREGOING COVENANT TO INSTITUTE SUCH PROCEEDING ONLY IN A STATE OR FEDERAL COURT IN THE APPROVED JURISDICTION, INCLUDING WITHOUT LIMITATION ANY ADDITIONAL EXPENSES INCURRED AS A RESULT OF LITIGATING IN ANOTHER JURISDICTION, SUCH AS REASONABLE FEES AND EXPENSES OF LOCAL COUNSEL AND TRAVEL AND LODGING EXPENSES FOR PARTIES, WITNESSES, EXPERTS AND SUPPORT PERSONNEL. PURCHASER AND SELLER AGREE THAT THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OF THE TRANSACTION CONTEMPLATED BY OR THE EARLY TERMINATION OF THIS AGREEMENT.

10.14. Limitation on Liability.

No present or future partner, director, officer, shareholder, member, employee, advisor, agent, attorney, asset manager, or sub-asset manager of or in Seller or Purchaser shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Purchaser and Seller and their successors and assigns and, without limitation, all other persons and entities, shall look solely to Purchaser's and Seller's assets for the payment of any claim or for any performance, and Purchaser and Seller hereby waive any and all such personal liability. The limitations on liability contained in this Section are in addition to, and not in limitation of, any limitation on liability applicable to Seller and Purchaser provided in any other provision of this Agreement or by law or by any other contract, agreement or instrument. This Section shall survive the termination of this Agreement and Closing.

10.15. Merger Provision; Survival.

Except as otherwise expressly provided herein, any and all rights of action of Purchaser for any breach by Seller of any representation, warranty or covenant contained in this Agreement, if any, shall merge with the Deed and other instruments executed at Closing, shall terminate at Closing and shall not survive Closing, other than those matters expressly intended to survive Closing as specifically set forth in this Agreement. On the Closing Date, Seller and Purchaser shall be fully discharged and released (without the need for separate releases or other documentation) from any liability or obligation to the other party and/or its successors and assigns with respect to any Claims or any other matter relating to this Agreement or the Property, except as provided in the Deed, any other closing document arising out of this Agreement, or those matters expressly intended to survive Closing as specifically set forth in this Agreement.

10.16. DTPA Waiver.

PURCHASER HEREBY REPRESENTS AND WARRANTS TO SELLER THAT (A) PURCHASER IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION, (B) PURCHASER IS REPRESENTED BY LEGAL COUNSEL, AND (C) PURCHASER IS SEEKING TO ACQUIRE THE PROPERTY, WHICH WILL NOT BE USED AS A FAMILY RESIDENCE, FOR A CONSIDERATION THAT EXCEEDS FIVE HUNDRED THOUSAND DOLLARS ($500,000.00), OR (D) (i) PURCHASER IS A BUSINESS ENTITY THAT EITHER HAS ASSETS OF TWENTY FIVE MILLION DOLLARS ($25,000,000.00) OR MORE OR IS OWNED OR CONTROLLED BY A CORPORATION OR ENTITY WITH ASSETS OF TWENTY FIVE MILLION DOLLARS ($25,000,000.00) OR MORE, OR (ii) PURCHASER IS A SOPHISTICATED REAL ESTATE INVESTOR AND HAS KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT ENABLE IT TO EVALUATE THE MERITS AND RISKS OF THIS TRANSACTION. PURCHASER HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS, REMEDIES AND BENEFITS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT (SECTIONS 17.41 AND FOLLOWING OF THE TEXAS BUSINESS AND COMMERCE CODE) (THE "**DTPA**") AND ANY OTHER SIMILAR CONSUMER PROTECTION LAW, WHETHER FEDERAL, STATE OR LOCAL. PURCHASER COVENANTS THAT THE DTPA DOES NOT APPLY TO THE TRANSACTIONS COVERED BY THIS AGREEMENT.

10.17. Section 1031 Exchange.

Upon request by either party, the other party shall reasonably cooperate in effectuating the purchase and sale of the Property as a part of a like kind exchange pursuant to Section 1031 of the Internal Revenue Code, including but not limited to the permitted assignment of this Agreement to an intermediary. In connection with such cooperation, the cooperating party shall not be required to: (a) assume any loan, mortgage, liability or other obligations of the exchanging party, or other persons; (b) pay any additional expenses related to the exchanging party's like kind exchange; or (c) take legal title to any other property. To exercise any rights under this Section, the party electing to exchange the Property shall provide the other with a written statement stating its intent to enter into an exchange at least five days prior to Closing. The

exchanging party will indemnify and hold the cooperating party harmless from any loss, claim, liability or damage (including attorneys' fees) incurred by the cooperating party arising from or related to the exchanging party's like kind exchange. The exchanging party agrees to pay any reasonable attorneys' fees incurred by the cooperating party in connection with any such 1031 exchange and in no event shall the Closing be postponed due to any such like-kind exchange.

10.18. No Third Party Beneficiary.

The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

10.19. Exhibits and Schedules.

All schedules and exhibits attached to this Agreement shall be deemed to be an integral part of this Agreement.

Exhibit A – Depiction of the Land
Exhibit B – Form of Deed
Exhibit C – Property Information
Exhibit D – Form of FIRPTA Certificate
Exhibit E – Depiction of Purchaser's On-Site Infrastructure Work

10.20. Captions.

The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any section or any subsection hereof.

10.21. Construction.

The parties acknowledge that the parties have had the opportunity to review this Agreement with their counsel, that their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

10.22. Termination of Agreement.

It is understood and agreed that if either Purchaser or Seller terminates this Agreement pursuant to a right of termination granted hereunder, such termination shall operate to relieve Seller and Purchaser from all obligations under this Agreement, except for such obligations as are specifically stated herein to survive the termination of this Agreement.

10.23. Litigation Expenses.

In the event either party hereto employs an attorney for the purpose of enforcing or construing this Agreement, or any judgment based on this Agreement, in any legal proceeding whatsoever, including insolvency, bankruptcy, arbitration, declaratory relief or other litigation, including appeals and rehearings, the prevailing party in such litigation shall be entitled to recover from the other party its reasonable attorneys' and consultants' fees and expenses incidental to such litigation (including, without limitation, service of process costs, filing fees, court reporter costs, investigative costs, expert witness fees, the cost of any bonds, and any and all other similar fees incurred in connection with the action or proceeding) and all court costs and fees through all trial and appellate levels. Attorneys' fees under this Section shall include reasonable attorneys' fees on appeal and, in addition, a party entitled to attorneys' fees shall be entitled to all other reasonable, out-of-pocket, third party costs and expenses actually incurred or otherwise payable in connection with such action or proceeding. In addition to the foregoing award of attorneys' fees to the prevailing party, the prevailing party in any lawsuit shall be entitled to its reasonable attorneys' fees actually incurred or otherwise payable in any post-judgment proceedings to collect or enforce the judgment. The "prevailing party" means the party determined by the final, non-appealable judgment of court of competent jurisdiction to most nearly prevail and not necessarily the one in whose favor a judgment is rendered. This provision is separate and several and shall survive the merger of this Agreement into any judgment with respect hereto.

10.24. Effective Date.

The "**Effective Date**" means the date a fully executed counterpart of this Agreement is received by the Escrow Agent.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

**SELLER:**

**IGO – USA LP,**
a Texas limited partnership

By: IGO-USA GP LLC,
a Texas limited liability company,
its General Partner

By: ______________________________
Anas A. Kozbari, Manager

**PURCHASER:**

**JMJ ACQUISITIONS, L.L.C.,**
a Texas limited liability company

By: ______________________________
Name: ______________________________
Title: ______________________________

**Escrow Agent Acceptance**

The undersigned agrees to serve as the Escrow Agent and to be bound by the provisions of Sections 2.7, 2.8 and 10.5 of this Agreement. The Escrow Agent acknowledges receiving counterparts of this Agreement signed by both Seller and Purchaser on the date shown below, which is the Effective Date of this Agreement and agrees to insert this date on the cover page of this Agreement.

Date: October ____, 2018

CHICAGO TITLE INSURANCE COMPANY

By: ______________________________
Name: ______________________________
Title: ______________________________

# EXHIBIT A

## LEGAL DESCRIPTION AND DEPICTION OF THE LAND

Lot 13, Block A of The Gate, Block A, Lots 1 Through 20, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2016, Page 211, Map Records, Collin County, Texas.






1046378v4

**EXHIBIT B**

**FORM OF DEED**

AFTER RECORDING RETURN TO:

______________________
______________________
______________________
______________________

(Space Above This Line for Recorder's Use Only)

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

**SPECIAL WARRANTY DEED WITH VENDOR'S LIEN**

**THIS SPECIAL WARRANTY DEED**, dated _______________, 201__, between **IGO – USA LP**, a Texas limited partnership, with its principal place of business at 2595 Dallas Parkway, Suite 470, Frisco, Texas, 75034 ("**Grantor**"), and ____________________________, a ______________________, with its principal place of business at 1755 Wittington Place, Suite 340, Dallas, Texas 75234 ("**Grantee**"):

**WITNESSETH**, that Grantor, for good and valuable consideration, and the further consideration of the execution and delivery by Grantee of a [Promissory Note], of even date herewith (the "**Note**"), in the original principal sum of [$____________], payable to the order of [______________] ("**Lender**") as therein provided, and bearing interest as therein specified, the payment of which Note is secured by the vendor's lien herein retained, and is additionally secured by a first lien [Deed of Trust], of even date herewith, to [______________], Trustee, for the benefit of Lender, the receipt and sufficiency of which are hereby confessed and acknowledged, has granted bargained, sold, and conveyed and by these presents does grant, bargain, sell, convey and confirm unto Grantee, its successors, and assigns, forever, all the following described lot or parcel of land, situated, lying and being in the County of Collin, State of Texas, and being more particularly described on Exhibit "A" attached hereto and made a part hereof (the "**Land**");

**TOGETHER** with Grantor's rights, title and interest (if any) in and to the following relating to the Land: (i) land lying in the bed of any street, road or access way, opened or proposed, on the Land; (ii) roads, alleys, rights-of-way and ingress and egress easements relating to the Land, whether surface, subsurface or otherwise; (iii) all water and water rights under or otherwise pertaining to the Land; and (iv) all governmental or quasi-governmental permits, approvals,

authorities, licenses and consents, if any, of any kind or character pertaining to the Land (collectively, the "**Appurtenances**"); provided, however, nothing contained in this deed is intended to include any "Excluded Property", as such term is defined in the Purchase and Sale Agreement dated October ___, 2018, by and between Grantor and Grantee (successor-in-interest to JMJ Acquisitions, L.L.C.), as amended and assigned, the "Purchase Agreement." The Land and Appurtenances are referred to herein as the "**Property**".

THIS CONVEYANCE AND THE WARRANTIES OF TITLE HEREIN are subject to any Exception (as such term is defined in the Purchase Agreement) and those matters listed and described on Exhibit "B" attached hereto (the "**Exceptions**"), and to the following reservations (the "**Reservations**"):

1. Grantor hereby saves, excepts, and reserves unto itself, for its benefit and (to the maximum extent permitted by law) for the benefit of IGO – Frisco 1 LLC (a Texas limited liability company), The Gate Property Owners Association, Inc. (a Texas nonprofit corporation), and each of their respective affiliates, successors and assigns (each, including Grantor, the "**Benefited Party**"), to approve, in its or their (as applicable) sole discretion, the terms and conditions in which Grantee, its successors, and assigns, or any other person, trust or entity claiming any interest in or control over (whether by virtue of ownership, lien, or otherwise) Grantee, its successors, or assigns, and/or the Property (including any portion thereof) (each, including Grantee, the "**Restricted Party**") may: investigate, prospect, explore, develop, extract and/or produce (in any form and/or in any quantity) any oil, gas or other minerals (however minerals or interest therein is determined or defined, whether by law or otherwise) in, on, under, around or that can be produced or extracted from the Property, or within 2,000 feet thereof. Any rights granted by the Benefited Party to the Restricted Party shall be evidenced in writing and filed of public record against title to the Property

**THE RESERVATIONS SET FORTH HEREIN FOR THE BENEFIT OF GRANTOR, ITS SUCCESSORS AND ASSIGNS SHALL BE DEEMED A COVENANT RUNNING WITH THE PROPERTY AND SHALL BE BINDING UPON GRANTEE, ITS SUCCESSORS AND ASSIGNS. THE RESERVATIONS SHALL BE DEEMED TO "RUN WITH THE LAND."**

**TO HAVE AND TO HOLD** the Property unto the Grantee, its successors and assigns, subject to the Reservations and Exceptions, forever, and Grantor binds Grantor and Grantor's successors and assigns to **WARRANT AND FOREVER DEFEND** all and singular the Property to Grantee and Grantee's successors and assigns against all and every person or persons lawfully claiming or to claim the whole or any part thereof, when the claim is by, through or under Grantor, but not otherwise.

**EXCEPT AS PROVIDED IN THE CONTRACT FOR PURCHASE OF THE PROPERTY, GRANTEE IS DEEMED TO HAVE ACCEPTED THE PROPERTY "AS IS", "WHERE IS", AND "WITH ALL FAULTS", INCLUDING LATENT DEFECTS, WITHOUT**

**RECOURSE TO AND WITHOUT REPRESENTATION OR WARRANTY BY GRANTOR, EXPRESS OR IMPLIED, WHETHER STATUTORY OR OTHERWISE, AND WITHOUT ANY WARRANTIES OF TRANSFER, MERCHANTABILITY OR FITNESS FOR A PARTICULAR, OR GRANTEE'S INTENDED USE OR PURPOSES, RELATING TO THE PROPERTY, AND ANY WARRANTIES ARISING IN SECTION 2 OF THE TEXAS BUSINESS AND COMMERCE CODE.**

The vendor's lien against and superior title to the Property are retained until the Note described herein is fully paid according to its terms, at which time this deed shall become absolute, subject to the Reservations and Exceptions. The vendor's lien and superior title to the Property are retained for the benefit of Lender, and are transferred to Lender, without representation by, or recourse on, Grantor.

[Signature Page Follows.]

IN WITNESS WHEREOF, Grantor has executed this deed on the date set forth above.

**GRANTOR**:

IGO – USA LP,
a Texas limited partnership

By: IGO – USA GP LLC,
a Texas limited liability company,
its General Partner

By: ______________________________
Anas A. Kozbari, Manager

THE STATE OF TEXAS §
§
COUNTY OF COLLIN §

This instrument was acknowledged before me on this the ______ day of ______________, 201__, by Anas A. Kozbari, Manager of IGO – USA GP LLC, a Texas limited liability company, General Partner of IGO – USA LP, a Texas limited partnership, on behalf of said limited partnership.

______________________________
Notary Public in and for the State of Texas

Insert:

[Exhibit "A" – Legal Description]
[Exhibit "B" - Encumbrances]

# EXHIBIT C

## PROPERTY INFORMATION

Subject to the representations, warranties, and disclaimers by Seller as set forth in the body of the Agreement, above, and to the extent such diligence materials exist (in their current condition) as of the Effective Date and are in the actual possession or control of Seller, and only with respect to those items received or generated by or on behalf of Seller or its affiliates during Seller's (or its affiliate's) ownership of the Property or in connection with Seller's (or its affiliate's) acquisition of the Property, Seller shall make the following items available to Purchaser:

[*See attached.*]

**EXHIBIT D**

# FORM OF FIRPTA CERTIFICATE

FIRPTA

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. This Certification is provided by IGO – USA LP, a Texas limited partnership ("Transferor") to ________________, a ________________ ("Transferee"), in connection with the sale of certain real property by Transferor to Transferee. To inform Transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by Transferor, the undersigned hereby certifies the following on behalf of Transferor:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Income Tax Regulations);

2. Transferor is not a disregarded entity as defined in §1.1445-2(b)(2)(iii) of the Income Tax Regulations;

3. Transferor's U.S. employer identification number is [________________]; and

4. Transferor's office address is:

   2595 Dallas Parkway, Suite 470
   Frisco, Texas 75034

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

Dated: ____________________, 201__

IGO – USA LP,
a Texas limited partnership

By: IGO – USA GP LLC,
a Texas limited liability company,
its General Partner

By: ______________________________
Anas A. Kozbari, Manager

THE STATE OF TEXAS §
§
COUNTY OF COLLIN §

This instrument was acknowledged before me on this the ______ day of ______________, 201__, by Anas A. Kozbari, Manager of IGO – USA GP LLC, a Texas limited liability company, General Partner of IGO – USA LP, a Texas limited partnership, on behalf of said limited partnership.

__________________________________________
Notary Public in and for the State of Texas

# EXHIBIT E

## DEPICTION OF PURCHASER'S ON-SITE INFRASTRUCTURE WORK

[*Insert*]

# FIRST AMENDMENT TO PURCHSE AND SALE AGREEMENT

This **FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**First Amendment**"), dated effective as of February 20, 2019, is made among **IGO-USA LP**, a Texas limited partnership ("**Seller**"), and **JMJ ACQUISITIONS, LLC**, a Texas limited liability company ("**Purchaser**", Seller and Purchaser collectively referred to herein as the "**Parties**").

## RECITALS:

A. Purchaser and Seller entered into that certain Purchase and Sale Agreement dated effective October 23, 2018, (the "**Agreement**") whereby Seller agreed to sell and Purchaser agreed to purchase approximately 4.428 acres of land located in the City of Frisco, Collin County, Texas, (the "**Property**"); and

B. The Parties wish to amend the Agreement, as more particularly described below.

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## AGREEMENTS

1. Extension of Due Diligence Period. Pursuant to Section 4.3 of the Agreement, "Purchaser shall have the right to terminate this Agreement, in Purchaser's sole discretion, for any reason or no reason, by giving written notice thereof to Seller prior to 5:00 p.m., Central time on the one hundred twentieth (120th) day following the Effective Date ("the Due Diligence Period")."

The Parties hereby agree that the Due Diligence Period will be extended by an additional sixty (60) days. The Parties agree that Section 4.3 of the Agreement is amended to read:

"Purchaser shall have the right to terminate this Agreement, in Purchaser's sole discretion, for any reason or no reason, by giving written notice thereof to Seller prior to 5:00 p.m., Central time on the one hundred eightieth (180th) day following the Effective Date ("the Due Diligence Period").

2. Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement. The Parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

3. Continued Validity. Except as amended hereby, the Agreement shall remain in full force and effect as originally written and executed.

4. Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this First Amendment.

**SELLER:** **IGO-USA LP, a Texas limited partnership**
By: IGO-USA GP LLC, a Texas limited liability company, its General Partner

By: ______________________
Name: Anas A. Kozbari
Title: Manager
Date: 02/20/2019

**PURCHASER:** **JMJ ACQUISITION, LLC, a Texas limited liability company**

By: ______________________
Name: Timothy Barton
Title: President
Date: 2/20/19

# SECOND AMENDMENT TO PURCHSE AND SALE AGREEMENT

This **SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Second Amendment**"), dated effective as of April ____, 2019, is made among **IGO-USA LP**, a Texas limited partnership ("**Seller**"), and **JMJ ACQUISITIONS, LLC,** a Texas limited liability company ("**Purchaser**", Seller and Purchaser collectively referred to herein as the "**Parties**").

## RECITALS:

A. Purchaser and Seller entered into that certain Purchase and Sale Agreement dated effective October 23, 2018, as amended by First Amendment to Purchase and Sale Agreement dated February 20, 2019, (the "**Agreement**") whereby Seller agreed to sell and Purchaser agreed to purchase approximately 4.428 acres of land located in the City of Frisco, Collin County, Texas, (the "**Property**"); and

B. The Parties wish to amend the Agreement, as more particularly described below.

C. Unless otherwise specified herein, defined terms used herein shall have the same meaning as in the Agreement.

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## AGREEMENTS

1. The Parties hereby agree that the Due Diligence Period will be extended to July 31, 2019. The Parties agree that Section 4.3 of the Agreement is amended to read:

"Purchaser shall have the right to terminate this Agreement, in Purchaser's sole discretion, for any reason or no reason, by giving written notice thereof to Seller prior to 5:00 p.m., Central time July 31, 2019 ("the Due Diligence Period")."

2. Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement. The Parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

3. Continued Validity. Except as amended hereby, the Agreement shall remain in full force and effect as originally written and executed.

4. Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Second Amendment.

**SELLER:**

**IGO-USA LP, a Texas limited partnership**

By: ______________________
Name: ______________________
Title: ______________________
Date: ______________________

**PURCHASER:**

**JMJ ACQUISITION, LLC, a Texas limited liability company**

By: ______________________
Name: ______________________
Title: ______________________
Date: ______________________

# THIRD AMENDMENT TO PURCHSE AND SALE AGREEMENT

This **THIRD AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Third Amendment**"), is effective as of July 25, 2019, is made among **IGO-USA LP**, a Texas limited partnership ("**Seller**"), and **JMJ ACQUISITIONS, LLC,** a Texas limited liability company ("**Purchaser**", Seller and Purchaser collectively referred to herein as the "**Parties**").

## RECITALS:

A. Purchaser and Seller entered into that certain Purchase and Sale Agreement dated effective October 23, 2018, as amended by First Amendment to Purchase and Sale Agreement dated February 20, 2019 and Second Amendment dated April 22, 2019 (collectively, the "**Agreement**") whereby Seller agreed to sell and Purchaser agreed to purchase approximately 4.539 +/-acres of land located in the City of Frisco, Collin County, Texas, (the "**Property**"); and

B. The Parties wish to amend the Agreement, as more particularly described below.

C. Unless otherwise specified herein, defined terms used herein shall have the same meaning as in the Agreement.

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## AGREEMENTS

1. Due Diligence Period. The Due Diligence Period is extended through July 31, 2019, and thus the first sentence of section "**4.3 Right of Termination**" of the Agreement is amended and replaced with the following, and the remaining provisions in this section shall remain unmodified:

> "Purchaser shall have the right to terminate this Agreement, in Purchaser's sole discretion, for any reason or no reason, by giving written notice thereof to Seller prior to 5:00 p.m., Central time on July 31, 2019 ("the Due Diligence Period").

2. Additional Deposit. Section "**2.7. Earnest Money; Independent Consideration**" subsection "**(b) Additional Deposit**" is amended to replace "within three (3) business days after the expiration of the Due Diligence Period" with "within three (3) business days following the receipt of notice to Purchaser of final approval by the City of the zoning change for the Property as applied for by the Purchaser". Seller agrees to reasonably cooperate with Purchaser's zoning change application and efforts to obtain approval from the City of the zoning change as reasonably necessary including the execution of any required documents. Purchaser shall be responsible for all costs and fees related to Purchaser's zoning change application for the Property.

3. Purchaser's Project: Required Approvals. Section "**4.4. Purchaser's Project:**

**Require Approvals"** is amended to replace "Seller approved brand name flagged" with "Seller approved brand name flagged, which Purchaser shall present such name to Seller no later than October 15, 2019, failing which Purchaser shall be deemed to be in default,". All other language in section 4.4. shall remain unmodified and if in conflict with the foregoing, this Amendment shall control.

4. Closing. Section "**5.1 Time and Place (a)"** is amended to replace "on the date which is thirty (30) days after the expiration of the Due Diligence period" with "on the date which is ***the earlier to occur of***: (A) thirty (30) days after the later of (i) expiration of the Due Diligence Period, (ii) approval of the zoning change for the Property as applied for by the Purchaser, (iii) approval and agreement by the City and Seller to remove the Property from all Incentive Agreements, and (iv) delivery to Purchaser of all Required Approvals for the Purchaser's Project which may be contingent upon Closing by Purchaser including as required under the Master Declaration; or (B) November 15, 2019, time being of the essence." All other language in Section 5.1 (a) shall remain unmodified and if in conflict with the foregoing, this Amendment shall control.

5. Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement. The Parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

6. Continued Validity. Except as amended hereby, the Agreement shall remain in full force and effect as originally written and executed.

7. Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Third Amendment.

*[Signature Page to Follow]*

IN WITNES WHEROF, the parties hereto have duly executed this Third Amendment as of the Effective Date.

**SELLER:**

**IGO-USA LP**, a Texas limited partnership

By: IGO-USA GP LLC
A Texas limited liability company
Its: General Partner

By: __________
Name: Amos Korbani
Title: CEO

Date: 7/25/019

**PURCHASER:**

**JMJ ACQUISITIONS, LLC**, a Texas limited liability company

By: __________
Name: Timothy Barton
Title: President
Date: 7/25/19

## FOURTH AMENDMENT TO PURCHSE AND SALE AGREEMENT

This **FOURTH AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Third Amendment**"), is effective as of October 31, 2019, is made between **IGO-USA LP**, a Texas limited partnership ("**Seller**"), and **JMJ ACQUISITIONS, LLC,** a Texas limited liability company ("**Purchaser**", Seller and Purchaser collectively referred to herein as the "**Parties**").

**RECITALS:**

A. Purchaser and Seller entered into that certain Purchase and Sale Agreement dated effective October 23, 2018, as amended by that certain First Amendment to Purchase and Sale Agreement dated February 20, 2019, that certain Second Amendment to Purchase and Sale Agreement dated April 22, 2019, and that certain Third Amendment to Purchase and Sale Agreement dated July 25, 2019 (collectively, the "**Agreement**"), whereby Seller agreed to sell and Purchaser agreed to purchase approximately 4.539 +/-acres of land located in the City of Frisco, Collin County, Texas, (the "**Property**"); and

B. The Parties wish to amend the Agreement, as more particularly described below.

C. Unless otherwise specified herein, defined terms used herein shall have the same meaning as in the Agreement.

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

**AGREEMENTS**

1. Purchaser's Project: Required Approvals. The first sentence in Section 4.4 is amended to read in its entirety: "Purchaser agrees that it will develop a full-service luxury (either a 4 or 5 star rated) brand name flagged hotel development on the Property including underground and/or podium parking spaces (of which, 120 of such parking spaces shall be dedicated, owned, for the benefit of, and otherwise solely utilized by the owner(s) of lot 7 and lot 14 of The Gate project (each, the "**Adjacent Lot Owner**"), with reference to such 120 parking spaces being herein referred to as the "**Dedicated Parking Spaces**"), which such development may include condominiums, ancillary restaurant, full service bar(s), meeting/function space, pool (which may include a rooftop pool), pool deck, pool support restaurant and bar and retail amenities, all designed, developed and constructed in accordance with the Required Approvals, as hereinafter defined (collectively, "**Purchaser's Project**"), with all phases of Purchaser's Project to be completed on or before the Completion Deadline, as described in Section 5.9 below." All other language in Section 4.4. shall remain unmodified and if in conflict with the foregoing, this Amendment shall control.

2. Conditions Precedent to Obligation of Seller. Section 5.7(c) is hereby amended to read in its entirety: "Intentionally deleted."

3. Obligations of Purchaser. Section "**5.8. Obligations of Purchaser**" is amended to include the following at the end of the last paragraph in the Section: "Purchaser covenants and agrees to continue to discuss and consult with Seller with respect to the selection and approval of the hotel operator, which such obligation shall survive Closing. Prior to Commencement, Purchaser shall deliver to Seller an executed copy of an agreement entered into by the hotel operator who Purchaser previously consulted with Seller (the "**Hotel Management Agreement**") which shall require (among other things), Purchaser's Project to be designed, developed, constructed, owned and operated subject to and in accordance with all Required Approvals and the terms and conditions set forth in this Agreement."

4. Closing. Section "**5.1 Time and Place (a)**" is amended to read in its entirety: "The closing, funding and otherwise consummation of the transactions contemplated hereby (the "**Closing**") shall occur on or before 3:00 p.m. (Central time) on December 1, 2019 (the "**Closing Date**")."

5. Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement. The Parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

6. Continued Validity. Except as amended hereby, the Agreement shall remain in full force and effect as originally written and executed.

7. Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Fourth Amendment.

*[Signature Page to Follow]*

IN WITNES WHEROF, the parties hereto have duly executed this Fourth Amendment as of the Effective Date.

**SELLER:**

**IGO – USA LP,**
a Texas limited partnership

By: IGO-USA GP LLC,
a Texas limited liability company,
its General Partner

By: ______________________ 10/31/019
Anas A. Kozbari, Manager

**PURCHASER:**

**JMJ ACQUISITIONS, LLC,**
a Texas limited liability company

By: ______________________
Name: Tim Barton
Title: President
Date: ______________________

# FIFTH AMENDMENT TO PURCHASE AND SALE AGREEMENT

This **FIFTH AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Fifth Amendment**"), effective as of November 27, 2019 ("**Effective Date**"), is made between **IGO-USA LP**, a Texas limited partnership ("**Seller**"), and **JMJ ACQUISITIONS, LLC,** a Texas limited liability company ("**Purchaser**". Seller and Purchaser collectively referred to herein as the "**Parties**").

## RECITALS:

A. Purchaser and Seller entered into that certain Purchase and Sale Agreement dated effective October 23, 2018, as amended by that certain First Amendment to Purchase and Sale Agreement dated February 20, 2019, that certain Second Amendment to Purchase and Sale Agreement dated April 22, 2019, that certain Third Amendment to Purchase and Sale Agreement dated July 25, 2019, and that certain Fourth Amendment to Purchase and Sale Agreement dated October 31, 2019 (collectively, the "**Agreement**"), whereby Seller agreed to sell and Purchaser agreed to purchase approximately 4.539 +/-acres of land located in the City of Frisco, Collin County, Texas, (the "**Property**").

B. The Parties wish to amend the Agreement, as more particularly described below.

C. Unless otherwise specified herein, defined terms used herein shall have the same meaning as in the Agreement.

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## AGREEMENTS

1. Legal Description. The Parties hereby acknowledge and agree that the legal description of the Land to be conveyed to Purchaser at Closing under the terms of the Agreement is as follows:

> " Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas, which was formally referred to as Lot 13, Block A of The Gate, Block A, Lots 1 Through 20, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2016, Page 211, Map Records, Collin County, Texas."

2. Closing. Section "**5.1 Time and Place (a)**" is amended to read in its entirety: "The closing, funding and otherwise consummation of the transactions contemplated hereby (the "**Closing**") shall occur on or before 3:00 p.m. (Central time) on December 19, 2019, time being of the essence (the "**Closing Date**")."

3. Notices. The Parties agree that, as of the Effective Date hereof, the notice address and related contact information for each of Seller and Purchaser as set forth in Section 10.5 of the Agreement are hereby amended to read as follows:

If to Seller:
IGO – USA LP
2595 Dallas Pkwy, Suite 470
Frisco, Texas 75034
Attention: Project Manager
E-mail: akozbari@igo.ae and hatem@igo.ae

with a copy to:
Spencer Fane LLP
5700 Granite Parkway, Suite 650
Plano, Texas 75024
Attention: John E. Bloomer, Esq.
E-mail: jbloomer@spencerfane.com

If to Purchaser:
JMJ Acquisitions, LLC
c/o Capital Markets
1755 Wittington Place, Suite 340
Dallas, Texas 75234
Attention: David Messersmith
E-mail: DMessersmith@jmjdevelopment.com

with a copy to:
McMurry Law, PLLC
508 W. Lookout Drive, Suite 14-74
Richardson, Texas 75080
Attention: Vance McMurry, Esq.
E-mail: vance@mcmurrylegal.com

4. Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement. The Parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

5. Continued Validity. Except as amended hereby, the Agreement shall remain in full force and effect.

6. Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Fifth Amendment.

IN WITNES WHEROF, the parties hereto have duly executed this Fifth Amendment to be effective as of the Effective Date.

**SELLER:**

**IGO – USA LP**,
a Texas limited partnership

By: IGO-USA GP LLC,
a Texas limited liability company,
its General Partner

By: ______________________
Anas A. Kozbari, Manager

**PURCHASER:**

**JMJ ACQUISITIONS, LLC**,
a Texas limited liability company

By: ______________________
Tim Barton, President

By: ____________________________

Anas A. Kozbari, Manager

**PURCHASER:** **JMJ ACQUISITIONS, LLC,**
a Texas limited liability company

By: ____________________________

Tim Barton, President