Case 21-41488-elm11 Doc 47-4 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 15 of 71

# Exhibit A

**COMPANY AGREEMENT OF**
**DALLAS REAL ESTATE LENDERS, LLC,**
**A DELAWARE LIMITED LIABILITY COMPANY**

**JANUARY 29, 2020**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| ARTICLE I ORGANIZATION | | 1 |
| 1.01 | Formation, Qualification and Continuation | 1 |
| 1.02 | Governing Law | 1 |
| 1.03 | Name | 1 |
| 1.04 | Term | 1 |
| 1.05 | Office and Agent | 1 |
| 1.06 | Purpose of Company | 1 |
| ARTICLE II MEMBERSHIP INTERTESTS, VOTING AND MANAGEMENT | | 2 |
| 2.01 | Members | 2 |
| 2.02 | Classification of Membership Interests | 2 |
| 2.03 | Percentage Ownership and Voting Interests | 2 |
| 2.04 | Management by Voting Members | 2 |
| 2.05 | Voting | 2 |
| 2.06 | Liability of Members | 3 |
| 2.07 | New Members | 3 |
| 2.08 | Special Management Provisions | 3 |
| 2.09 | Default Rights | 6 |
| 2.10 | Palisades Reimbursement | 6 |
| ARTICLE III CAPITAL ACCOUNTS | | 7 |
| 3.01 | Initial Members, Capital Commitments, and Percentage Interests | 7 |
| 3.02 | Capital Accounts | 7 |
| 3.03 | Additional Contributions | 7 |
| ARTICLE IV MANNER OF ACTING | | 7 |
| 4.01 | Officers and Agents of the Company | 7 |
| 4.02 | Meetings of Voting Members | 8 |
| 4.03 | Notice of Meetings | 8 |
| 4.04 | Record Date | 8 |
| 4.05 | Quorum | 8 |
| 4.06 | Voting | 9 |
| ARTICLE V ALLOCATIONS AND DISTRIBUTIONS | | 9 |
| 5.01 | Allocations of Profits and Losses | 9 |
| 5.02 | Distributions | 9 |
| 5.03 | Palisades Redemption | 10 |
| 5.04 | Redemption Default | 11 |
| 5.05 | Form of Distribution | 12 |
| ARTICLE VI TRANSFER AND ASSIGNMENT OF INTERESTS | | 12 |
| 6.01 | Reserved | 12 |
| 6.02 | Reserved | 12 |
| 6.03 | Restrictions on Transfer | 12 |
| 6.04 | Involuntary Transfer of a Membership Interest | 12 |

ARTICLE VII ACCOUNTING, RECORDS AND REPORTING ........ 13

7.01 Books and Records ........ 13
7.02 Inspection of Books and Records ........ 13
7.03 Accountings ........ 13
7.04 Filings ........ 13
7.05 Bank Accounts ........ 13
7.06 Company Representative ........ 14
7.07 Financial Information, Reports and Notices ........ 14
7.08 Tax Returns ........ 15

ARTICLE VIII DISSOLUTION AND WINDING UP ........ 15

8.01 Dissolution ........ 15
8.02 Winding Up ........ 15
8.03 Distributions in Kind ........ 16
8.04 Order of Payment of Liabilities on Dissolution ........ 16
8.05 Adequacy of Payment ........ 16
8.06 Compliance with Regulations ........ 16
8.07 Limitations on Payments Made in Dissolution ........ 16
8.08 Certificate of Cancellation ........ 16

ARTICLE IX EXCULPATION AND INDEMNIFICATION ........ 16

9.01 Exculpation of Members ........ 16
9.02 Indemnification by Company ........ 17
9.03 Insurance ........ 17

ARTICLE X MISCELLANEOUS ........ 17

10.01 Authority ........ 17
10.02 Indemnification by the Members ........ 17
10.03 Notices ........ 18
10.04 Severability ........ 18
10.05 Binding Effect ........ 18
10.06 Counterparts ........ 18
10.07 Entire Agreement ........ 18
10.08 Further Assurances ........ 18
10.09 Headings; Gender; Number; References ........ 18
10.10 Parties in Interest ........ 18
10.11 Amendments ........ 18
10.12 Attorneys' Fees ........ 19
10.13 Remedies Cumulative ........ 19
10.14 Jurisdiction and Venue/Equitable Remedies ........ 19
10.15 Palisades Approvals ........ 19
10.16 Palisades Payments ........ 19

Exhibit A -- Project Budget
Exhibit B – Members

# COMPANY AGREEMENT OF DALLAS REAL ESTATE LENDERS A DELAWARE LIMITED LIABILITY COMPANY

This Company Agreement (the "Agreement") of **DALLAS REAL ESTATE LENDERS, LLC**, a Delaware limited liability company (the "Company") is entered into by **DALLAS REAL ESTATE INVESTORS, LLC** ("DREI") and **PALISADES TC LLC**, a Texas limited liability company ("Palisades") on January [29], 2020 ("Effective Date").

In consideration of the mutual covenants and conditions herein, the Members agree as follows:

## ARTICLE I ORGANIZATION

**1.01 Formation, Qualification and Continuation.** The Company was formed as a limited liability company under the Delaware Limited Liability Company Act (currently Chapter 18 of Title 6 of the Delaware Code) (the "Act") by filing a Certificate of Formation with the Delaware Secretary of State November 19, 2019 (the "Certificate"). The Company will continue under the Act and this Agreement.

**1.02 Governing Law.** This Agreement shall be governed by and construed and interpreted in accordance with the Act as amended from time to time, without regard to Delaware's conflicts of laws principles. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that any provision of this Agreement is inconsistent with any provision of the Act, this Agreement shall govern to the extent permitted by the Act.

**1.03 Name.** The name of the Company shall be "DALLAS REAL ESTATE LENDERS, LLC" The business of the Company may be conducted under that name or, on compliance with applicable laws, any other name that the Voting Members deem appropriate or advisable. The Voting Members on behalf of the Company shall file any certificates, articles, fictitious business name statements and the like, and any amendments and supplements thereto, as the Voting Members consider appropriate or advisable.

**1.04 Term.** The term of the Company commenced on the filing of the Certificate and shall be perpetual unless dissolved as provided in this Agreement.

**1.05 Office and Agent.** The principal office of the Company shall be at 1755 Wittington, Suite 340, Dallas, Texas 75234 or such other place or places of business within or without the State of Delaware as the Voting Members may determine. The Company shall continuously maintain a registered agent and office in the State of Delaware as required by the Act. The registered agent shall be as stated in the Certificate or as otherwise determined by the Voting Members.

**1.06 Purpose of Company.** The purpose of the Company is to engage in all lawful activities permitted for limited liability companies under the Act; provided, however, until such time as Palisades has been Redeemed in Full (as defined in Section 5.03 hereof) the sole purpose of the Company shall be to manage and own 100% of the membership interests in FHC Acquisition, LLC, a Texas limited liability company ("FHC") or such other investments (whether debt, equity or any combination thereof) (FHC and any other entity owning a Project, an "OpCo") as determined and

approved by the Voting Members for the sole purposes of acquiring and developing real property and improvements thereon (a "Project"). The initial Project shall be that certain real property described as "Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas" ("Frisco Property") and the development of a mixed use project located thereon which is planned to include a luxury hotel, residences, restaurant, and retail components ("Frisco Project" or "Project")). The Company acknowledges that it is the sole member of FHC pursuant to the terms of the Company Agreement of FHC dated November 20, 2019 (the "FHC Agreement" and such FHC Agreement and any other agreement governing the organization and operation of an OpCo, an "OpCo Agreement"). The Company hereby authorizes FHC to enter into that certain Loan Agreement dated on or about the date hereof with Texas Republic Bank, N.A. ("Lender") for a loan in the approximate amount of $3,000,000 (the "Loan") (such Loan Agreement and all documents related thereto with Lender and related to the Loan, the "Loan Documents").

## ARTICLE II
## MEMBERSHIP INTERTESTS, VOTING AND MANAGEMENT

**2.01 Members.** A "Member" (so called) shall mean an individual, organization or entity that has been admitted as, and continues as, a member of the Company. The Members of the Company as of the Effective Date are DREI and Palisades.

**2.02 Classification of Membership Interests.** The Members' percentage interests in the income, gains, losses, deductions, voting rights and distributions, as may be affected by the terms of this Agreement are referred to in this Agreement as "Interests." As of the Effective Date, all Members are Class A Members. Other classes may be created upon the unanimous consent of the Voting Members with such rights and obligations as defined by such members.

**2.03 Percentage Ownership and Voting Interests.** A Member's Ownership Interest ("Ownership Interest") is the total of his interests in capital, together with all of the rights, as a Member or Manager of the Company, that arise from such interests. The "Percentage Ownership Interest" of a Member represents the economic interest of the Member in the Company. The "Percentage Voting Interest" of a Member represents the voting rights of a Member in the Company.

**2.04 Management by Voting Members.** Each Member is a "Voting Member." The Voting Members shall manage the Company and shall have the right to vote, in their capacity as Manager(s), upon all matters upon which Managers have the right to vote under the Act or under this Agreement, in proportion to their respective Percentage Voting Interests in the Company. Voting Members need not identify whether they are acting in their capacity as Members or Managers when they act.

**2.05 Voting.** Except as otherwise provided or permitted by this Agreement, Voting Members shall in all cases, in their capacity as Members or Managers of the Company, act collectively, and, unless otherwise specified or permitted by this Agreement, unanimously. Except as otherwise provided or permitted by this Agreement, no Voting Member acting individually, in his capacity as a Member or Manager of the Company, shall have any power or authority to sign for, bind or act on behalf of the Company in any way, to pledge the Company's credit, or to render the Company liable

for any purpose. Unless the context requires otherwise, in this Agreement, the terms "Member" or "Members," without the qualifier "Voting" refers to the Voting Members collectively; and the terms "Manager" or "Managers" refers to the Voting Members.

**2.06 Liability of Members.** All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

**2.07 New Members.** New Members may be admitted to the Company, only if such new Member (i) is approved unanimously by the Voting Members; (ii) delivers to the Company his required capital contribution (which may be zero); (iii) agrees in writing to be bound by the terms of this Agreement by becoming a party hereto; and (iv) delivers such additional documentation as the Voting Members shall reasonably require to so admit such new Member to the Company. Upon the admission of a new Member or Members, as the case may be, to the Company, the capital accounts of Members, and the calculations that are based on the capital accounts, shall be adjusted appropriately. Notwithstanding any contrary provision in this Agreement, no person may be admitted to the Company as a new Member or as a Manager without the prior written approval of Palisades.

**2.08 Special Management Provisions**. Notwithstanding any contrary provision of this Agreement, until such time as (i) Palisades has been Redeemed in Full, or (ii) a Redemption Default (as hereinafter defined in Section 5.04) has occurred, DREI shall be the Manager responsible for the day-to-day management of the Company. Notwithstanding the designation of DREI as the Manager with responsibility for day-to-day management of the Company, neither any Manager nor any officer shall undertake any of the following actions with respect to the Company under this Agreement or on behalf of the Company with respect to any OpCo, the Frisco Project or any other Project without the prior written approval of Palisades:

(a) leasing, selling, disposing, exchanging, mortgaging, pledging, or transferring the Project or any material portion thereof or other asset that costs in excess of $100,000 except as provided in the predevelopment budget attached hereto as Exhibit A (the "Project Budget");

(b) failing to maintain, demolishing, removing or rendering unusable for its intended purpose any existing improvements currently a part of the Project or entering into contracts for such purposes or construction of the anticipated improvements on the Project;

(c) applying for or modifying any existing zoning for the Project;

(d) entering into any brokerage or exclusive listing agreement for the sale or leasing of any portion of the Project;

(e) entering into, amending, modifying, terminating or canceling any property management agreement with any person for management and leasing of the Project;

(f) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate or relative of Timothy Barton ("Barton"), provided, however, that Palisades (acting alone and without any approval or joinder of any other person) will have the right to enforce any of the Company's and any

OpCo's rights and remedies under any Related-Party Agreements by and between Barton or any of his Affiliates on the one hand and the Company or any OpCo on the other hand. For purposes hereof, "Affiliate" shall mean (i) any person directly or indirectly controlling, controlled by or under common control with another person; (ii) any person that, directly or indirectly, owns or controls 10% or more of the outstanding voting securities or beneficial interests of such other person; (iii) any officer, director, trustee member, manager or general partner of such person; (iv) if such other person is an officer, director, member or manager, trustee or partner of another entity, then the entity for which that person acts in any such capacity; (v) any spouse or issue of the person or any person who is of a relationship described in Section 267 (b) of the Code substituting 10% in place of 50%, where applicable, and (vi) an entity formed which is to be owned directly or indirectly for the benefit of any of the persons described in subparagraph (v) above. For purposes of this paragraph and for determining when a person is directly or indirectly controlling, controlled by or under, controlled with any other person, the term control shall refer to an interest of 10% or more of the outstanding voting securities or beneficial interest of such person.;

(g) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company or any OpCo of more than $100,000 in any year except as provided in the Project Budget;

(h) entering into, amending, modifying, terminating or canceling any contract that grants any form of encumbrance (defined as any lien, easement, lease, hypothecation, or other restriction on transfer or use) over an asset of the Company or any OpCo;

(i) agreeing to or indemnifying any person pursuant to this Agreement or any OpCo Agreement or agreeing to or indemnifying any person other than as provided in this Agreement or any OpCo Agreement;

(j) entering into, amending, modifying, terminating or canceling any term sheet or letter of intent for the acquisition, financing, or capitalization of the Company, any OpCo, the Project, or any direct or indirect voting or economic interest in any of same;

(k) guarantying the payment of any money or debt of the Company, any OpCo, or any other person, or guarantying the performance of the Company, any OpCo, or any other person, except pursuant to the Loan Documents;

(l) approving the Project Budget or any amendment thereto;

(m) incurring any expenses (including, without limitation, for the acquisition of capital assets) outside of the approved Project Budget;

(n) making any request for additional Capital Contributions under this Agreement or any OpCo Agreement;

(o) creating reserves, determining the amount of cash available for distribution and making distributions pursuant to this Agreement or any OpCo Agreement;

(p) approving of the transfer or encumbrance of any direct or indirect interest in the Company or any OpCo and approving of any admission of any person as an additional member of the Company or any OpCo;

(q) hiring and compensation of, and any employment agreement with respect to, any employee of the Company or any OpCo or entering into any collective bargaining or other agreement with any labor union, labor organization or similar body;

(r) filing or defending any litigation, arbitration or similar legal disputes with respect to any claim or potential claim involving the Company or any OpCo equal to or greater than $100,000, or settling any claim or potential claim for an amount (including all costs of settlement) for $100,000 or more;

(s) amending or modifying this Agreement or any OpCo Agreement or the certificate of formation for the Company or any OpCo;

(t) making any election to cause the Company or any OpCo to incorporate or offer or issue securities;

(u) the selection and/or retention of any new or additional audit or tax accountants for or on behalf of the Company or any OpCo;

(v) the transfer of, or granting of a license to use, any intellectual property owned directly or indirectly by the Company or any OpCo;

(w) removing the partnership representative (as such term is defined in Section 6223(a) of the Code) of the Company or any OpCo;

(x) offering or issuing additional ownership interests by the Company or permitting the Company or any OpCo to make any loan or advance to any person;

(y) engaging in any line of business in contravention of the purposes of the Company or any OpCo as provided in this Agreement or any OpCo Agreement respectively;

(z) effecting a dissolution or liquidation of the Company or any OpCo or the merger, conversion, consolidation or other reorganization of the Company or any OpCo;

(aa) causing or permitting the Company or any OpCo to engage in any reorganization or commencing any proceedings or the filing of any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal or state bankruptcy, insolvency or similar law, on behalf of the Company or any OpCo or admitting, confessing or acquiescing to any involuntary bankruptcy filing or similar action against the Company or any OpCo;

(bb) making any distribution to any person other than Palisades under this Agreement or permitting any OpCo to make any distribution other than to the Company;

(cc) taking any other action that requires the consent of all the Members under this Agreement or any OpCo Agreement;

(dd) modifying or amending any of the Loan Documents or paying in full all amounts due under the Loan Documents prior to Palisades being Redeemed in Full;

(ee) incurring on behalf of the Company or any OpCo any loan or other indebtedness including loans or advances from Members of the Company or any OpCo (other than under the Loan Documents or indebtedness that constitutes customary third-party trade payables incurred by the Company or any OpCo in the ordinary course of business) or guaranty or other contingent liability, approving of the form of the loan documents evidencing such indebtedness, or making any material election under such loan documents;

(ff) modifying, amending, terminating or waiving any benefit or right of the Company or any OpCo under any of (i) the Purchase and Sale Agreement dated effective October 23, 2018, as amended, with respect to the Frisco Property (the "PSA"), (ii) the Master Development Agreement dated December 31, 2019 between the City of Frisco ("Frisco"), Frisco Economic Development Corporation ("FEDC"), Frisco Community Development Corporation ("FCDC") and FHC (the "MDA"), (iii) the Performance Agreement dated December 30, 2019 between FCDC and FHC (the "FCDC Agreement"), (iv) the Performance Agreement dated December 31, 2019 between FEDC and FHC (the "FEDC Agreement") (the PSA, MDA, FCDC Agreement and FEDC Agreement, collectively, the "Development Agreements" and the obligations of FHC thereunder, collectively, the "Development Obligations"); or

(gg) entering into, modifying, amending or terminating any agreement with a hotel management company or hotel franchise agreement for the Frisco Property or any portion thereof (a "Hotel Agreement").

**2.09 Default Rights**. In addition to such other rights Palisades may have under this Agreement and notwithstanding any contrary provision of this Agreement, upon the occurrence of a Redemption Default which is not timely cured, Palisades shall have the right, but not the obligation, to act on behalf of the Company and cause the Company to act on behalf of any OpCo, in each instance in the sole and absolute discretion of Palisades without the consent or approval of DREI or any other Member of the Company or any OpCo, to undertake all decisions and actions with respect to the Company under the Act and this Agreement including, without limitation, the actions specified in Section 2.08 hereof and the right to market and cause the sale of the Project to an independent third party on such terms and conditions as Palisades may determine appropriate in its sole and absolute discretion. In determining an appropriate sale price for the Project, Palisades shall not be obligated to take into consideration any so called fair value or other market value for the Project; rather Palisades may look solely to such sale price for the Project that is most likely to result in proceeds sufficient to cause Palisades to be Redeemed in Full. DREI shall cooperate and shall cause the Company and each OpCo to cooperate with Palisades in accomplishing all actions taken by Palisades in accordance with Section 2.09.

**2.10 Palisades Reimbursement.** The Company shall reimburse Palisades for all attorneys' fees and other costs it incurs in connection with the negotiation of this Agreement and its investment in the Company including, without limitation, any costs incurred to enforce its rights hereunder, such amount to be paid to Palisades within ten (10) days of Palisades submitting an invoice for same.

## ARTICLE III
## CAPITAL ACCOUNTS

**3.01 Initial Members, Capital Commitments, and Percentage Interests.** The persons listed on Exhibit B as the Class A Members are hereby admitted to the Company as a Voting Member, effective as of the Effective Date. Set forth opposite the name of each Voting Member listed on Exhibit B is such Member's initial Capital Contribution, Percentage Ownership Interest, Percentage Voting Interest as of the Effective Date, and Class of its Membership Interests. Exhibit B may be amended from time to time to reflect changes in or additions to the membership of the Company only with the consent of all Voting Members unless a Redemption Default has occurred, after all cure periods, in which instance Palisades alone may amend such Exhibit B. Any such amended Exhibit B shall (a) supersede all prior Exhibit B's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company.

**3.02 Capital Accounts.** At such time as the Company is taxed as a partnership for federal income tax purposes, the Company shall establish and maintain a capital account ("Capital Account") for each Member in accordance with Section 704(b) of the Internal Revenue Code of 1986, as amended (the "Code"), and Treasury Regulations Section 1.704-l(b)(2)(iv).

**3.03 Additional Contributions.** No Member shall be required to make any additional capital contributions to the Company. The Company may, however, accept capital contributions from the Members upon unanimous approval of the Voting Members. The capital accounts of the Members, and the calculations that are based on the capital accounts, shall be adjusted appropriately to reflect any transfer of an interest in the Company, distributions, or additional capital contributions.

## ARTICLE IV
## MANNER OF ACTING

**4.01 Officers and Agents of the Company.** The Voting Members may authorize any Member or Members of the Company, or other individuals or entities, whether or not a Member, to take action on behalf of the Company, as the Voting Members deem appropriate. Any Member may lend money to and receive loans from the Company, act as an employee, independent contractor, lessee, lessor, or surety of the company, and transact any business with the Company that could be carried out by someone who is not a Member as unanimously approved by the Voting Members. The Company may receive from or pay to any Member remuneration, in the form of wages, salary, fees, rent, interest, or any form that the Voting Members unanimously approve.

The Voting Members may appoint officers of the Company who, to the extent provided by the Voting Members, may have and may exercise all the powers and authority of the Members or Managers in the conduct of the business and affairs of the Company. The officers of the Company may consist of a President, a Treasurer, a Secretary, or other officers or agents as may be elected or appointed by the Voting Members. The Voting Members may provide rules for the appointment, removal, supervision and compensation of such officers, the scope of their authority, and any other matters relevant to the positions. The officers shall act in the name of the Company and shall supervise its operation, within the scope of their authority, under the direction and management of the Voting Members.

In addition to the authorities and duties that are normally associated with the office of the President, the Voting Members non-exclusively delegate to the President all of the powers of DREI, subject however to the restrictions defined herein including, without limitation, those in Sections 2.08 and 2.09. With prior approval of Palisades, both the President and the Treasurer are authorized to open, manage, and close any and all Company accounts with any bank or financial institution and to be a signatory on such Palisades approved accounts (although only one signatory shall be required). From and after the occurrence of a Redemption Default (as defined in Section 5.04 hereof), which is not timely cured, the terms of all existing officers of the Company shall be terminated immediately without further action and Palisades shall have the unilateral right, but not the obligation, to appoint new officers in its sole and absolute discretion.

Any action taken by a duly authorized officer, pursuant to authority granted by the Voting Members in accordance with this Agreement, shall constitute the act of and serve to bind the Company, and each Member hereby agrees neither to dispute such action nor the obligation of the Company created thereby.

**4.02 Meetings of Voting Members.** No regular, annual, special or other meetings of Voting Members are required to be held. Any action that may be taken at a meeting of Voting Members may be taken without a meeting by written consent in accordance with the Act. Meetings of the Voting Members, for any purpose or purposes, may be called at any time by any Voting Member, or by the President of the Company, if any. The Voting Members may designate any place as the place of meeting for any meeting of the Voting Members. If no designation is made, the place of meeting shall be the principal place of business of the Company.

**4.03 Notice of Meetings.** In the event that a meeting of the Voting Members is called, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than five nor more than sixty business days before the date of the meeting unless otherwise provided, either personally or by mail, by or at the direction of the Members calling the meeting, to each Voting Member. Notice of a meeting need not be given to any Voting Member who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such Voting Member.

**4.04 Record Date.** For the purpose of determining Voting Members entitled to notice of or to vote at any meeting of Voting Members or any adjournment thereof, the date on which notice of the meeting is provided shall be the record date for such determination of the Voting Members. When a determination of Voting Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

**4.05 Quorum.** Members holding all of the Percentage Voting Interests in the Company represented in person, by telephonic participation, or by proxy, shall constitute a quorum at any meeting of Voting Members. In the absence of a quorum at any such meeting, any Voting Member so represented may adjourn the meeting from time to time for a period not to exceed sixty days without further notice. However, if the adjournment is for more than sixty days, or if after the adjournment a new record date is fixed for another meeting, a notice of the adjourned meeting shall be given to each Voting Member. The Voting Members present at a duly organized meeting may continue to transact business only as previously provided on the agenda until adjournment,

notwithstanding the withdrawal during such meeting of that number of Voting Members whose absence would cause less than a quorum.

**4.06 Voting.** If a quorum is present, a unanimous vote of the Percentage Voting Interests of the Voting Members so represented shall be the act of the Members or Managers, unless the vote of a lesser proportion or number is otherwise required by the Act, by the Certificate or by this Agreement.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

**5.01 Allocations of Profits and Losses.** Profits and Losses, after deducting any guaranteed payments, shall be allocated among the Members in proportion to their Percentage Ownership Interests. Any special allocations necessary to comply with the requirements set forth in Code Section 704 and the corresponding regulations thereunder, including, without limitation, the qualified income offset and minimum gain chargeback provisions contained therein, shall be made if the Voting Members deem these actions to be appropriate.

**5.02 Distributions**. The following shall relate only to the Company's ownership in FHC and its ownership of the Frisco Project. Distributions related to any other Project shall be further defined including separate distribution schedules as approved by the Voting Members.

(a) Subject to the provisions of Section 2.08 hereof and any other provision of this Agreement requiring the approval of the Voting Members, the Voting Members shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service (including payments on loans by Members to the Company), acquisitions, and a reasonable contingency reserve (hereinafter, "Distributable Cash"). If any such Distributable Cash exists, the Manager shall cause the Company to distribute the Distributable Cash to the Members as follows:

(i) first, to Palisades, the Base Return or, if applicable, the Default Return. For purposes hereof,

"Base Return" means an amount due on the first day of each month which is equal to nine percent (9%) per annum accrued on the Unreturned Priority Capital;

"Default Return" means an amount due on the first day of each month which is equal to fourteen percent (14%) per annum, compounded annually, on the Unreturned Priority Capital. The Default Return shall apply immediately at such time as any Base Return is not distributed on the due date thereof and the Default Return shall accrue in lieu of such Base Return not timely distributed; and

"Unreturned Priority Capital" means the total Capital Contributions of Palisades less all distributions to Palisades pursuant to Sections 5.02(a)(ii), (iii) and (iv).

(ii) next, on or before eleven (11) months following the acquisition of the Frisco Property by FHC ("Frisco Property Closing"), to Palisades an amount equal to no less than one-hundred twenty-five percent (125%) of its Unreturned Priority Capital; provided however, in the event that the Manager gives written notice to Palisades on or before thirty (30) days prior to eleven (11) months following the Frisco Property Closing then this distribution requirement may be waived and substituted with the distribution in Section 5.02(a)(iii).

(iii) next, proportionately to the Capital Contributions to the Class A Members (other than Palisades) until the minimum Class A return has been paid in full as may be agreed to by the Manager and all of the other Class A Members upon the admittance of any additional Class A Members.

(iv) Finally, remaining distributions shall be paid to all Members (other than Palisades) in proportion to their Membership Interests.

The Manager may require all loans to Members including any rate of return on such loans be repaid to the Company prior to distributing any Distributable Cash to such Members.

The Company may not repay any loans or advances from Members to the Company prior to making all distributions to Palisades required in Sections 5.02(a)(i) through (iv) above.

(b) From time to time Voting Members also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with Section 5.02(a) and may be made subject to existing liabilities and obligations; provided, however, no distributions other than cash shall be made to Palisades. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

(c) For the purpose of determining the Members entitled to receive a distribution as provided for in this Agreement, the Voting Members may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the distribution is taken. If no record date is fixed, then the date on which the Voting Members take action to authorize such a distribution pursuant to this Agreement and the Code, shall be the record date for such determination of Members.

**5.03 Palisades Redemption.** The Company shall provide notice to Palisades at such time as the Company believes it has made all distributions necessary for Palisades to be Redeemed in Full. If Palisades provides written confirmation to the Company that it has been Redeemed in Full, such confirmation shall result in the Transfer of Palisades' Membership Interest to the Company without further action, writing or instrument. Palisades shall provide confirmation that it has or has not been Redeemed in Full within five (5) Business Days of receipt of the notice from the Company. Unless Palisades provides notice to the Company that it has not been Redeemed in Full within such five (5) Business Day period, Palisades shall be deemed to be Redeemed in Full if it does not otherwise provide a response. Palisades shall not waive any rights to indemnification under this Agreement when it is Redeemed in Full, such rights surviving Palisades being Redeemed in Full. For purposes of this Agreement "Redeemed in Full" means, with respect to Palisades, such time and circumstances as when

Palisades has received all amounts to which it is entitled to receive pursuant to Sections 5.02(a)(i) and (ii) plus any amounts to which Palisades may be entitled under any other provision of this Agreement (e.g., indemnification, etc.).

**5.04 Redemption Default.**

(a) A "Redemption Default" shall occur as related to a Project upon any of the following:

(i) The Company fails at any time to distribute all amounts due to Palisades pursuant to Section 5.02(a)(i).

(ii) The Company fails to distribute all amounts due to Palisades pursuant to Sections 5.02(a)(i) and (ii) on or before the expiration of the eleventh (11th) month following the Frisco Property Closing.

(iii) Any breach by any member or manager other than Palisades of its obligations under the Amended and Restated Company Agreement of Five Star MM, LLC dated September 16, 2019 (the "MM Company Agreement").

(iv) Any breach by any member or manager other than Palisades of its obligations under the Company Agreement of Five Star GM, LLC dated September 16, 2019 (the "GM LLC Agreement").

(v) A "Redemption Default" (as such term is defined in the GM LLC Agreement) occurs.

(vi) Any default occurs under any of the "Loan Documents" (as such term is defined in the MM Company Agreement).

(vii) Any Manager or Member other than Palisades breaches any of its obligations under this Agreement, including, without limitation, the failure to obtain the approval of Palisades whenever required in this Agreement.

(viii) FHC defaults, after all cure periods, upon any of its obligations under the Loan Documents or the Hotel Agreement or with respect to any of its Development Obligations under the Development Agreements.

(ix) The manager or any officer of FHC or any other OpCo takes any action prohibited by Section 2.08 or any other provision of this Agreement requiring approval of the Voting Members or Palisades.

(b) Subject to Section 5.04(c), in the event of a Redemption Default described in Section 5.04(a)(i), Palisades shall have the right to require the Manager to request an additional Capital Contribution from the Members other than Palisades in an amount sufficient to bring Palisades current on the distributions to which it is entitled pursuant to Section 5.02(a)(i). Subject to Section 5.04(c), in the event of any other Redemption Default, Palisades may exercise its rights under Section 2.09 and as otherwise provided in this Agreement.

(c) The Company shall have the right to cure any Redemption Default if within thirty (30) days (five (5) days if the default is due to the nonpayment of monies) following notice of default from Palisades of such default, if the Company cures such default within such thirty (30) day (five (5) days with respect to the payment of monies) period. If the Company cures such default within the requisite time period, the applicable Redemption Default shall be cured as if same had not occurred. Furthermore, where a distribution is not timely remitted which results in a Redemption Default and such distribution is thereafter paid by the Company along with any related costs and expenses incurred by Palisades as a result of such Redemption Default prior to Palisades exercising its rights under Section 2.09, such payment shall result in the Redemption Default being cured.

**5.05 Form of Distribution.** No Member has the right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members except on the dissolution and winding up of the Company.

## ARTICLE VI
## TRANSFER AND ASSIGNMENT OF INTERESTS

**6.01 Reserved.**

**6.02 Reserved.**

**6.03 Restrictions on Transfer.** No Member may transfer its Ownership Interest or any part thereof without the unanimous approval of the Voting Members; provided, however, in the event of a Redemption Default, Palisades may freely transfer all direct or indirect interests which it may have in the Company without the approval of any other Member, and upon any such transfer by Palisades of all or any portion of its Ownership Interest following a Redemption Default, such transferee shall be automatically admitted to the Company as a new Member with all of the rights to which Palisades is entitled under this Agreement.

**6.04 Involuntary Transfer of a Membership Interest.** A creditor's charging order or lien on a Member's Membership Interest, bankruptcy of a Member, or other involuntary transfer of Member's Membership Interest (including by death, divorce or disability), shall constitute a material breach of this Agreement by such Member. The creditor, transferee or other claimant, shall only have the rights of an Assignee, and shall have no right to become a Member, or to participate in the management of the business and affairs of the Company as a Member or Manager under any circumstances, and shall be entitled only to receive the share of profits and losses, and the return of capital, to which the Member would otherwise have been entitled. The Voting Members, including a Voting Member whose interest is the subject of the charging order, lien, bankruptcy, or involuntary transfer, may unanimously elect, by written notice that is provided to the creditor, transferee or other claimant, at any time, to purchase all or any part of Membership Interest that was the subject of the creditor's charging order, lien, bankruptcy, or other involuntary transfer, at a price that is equal to one-half (1/2) of the book value of such interest, adjusted for profits and losses to the date of purchase. The Members agree that such valuation is a good-faith attempt at fixing the value of the interest, after taking into account that the interest does not include all of the rights of a Member or Manager, and after deducting damages that are due to the material breach of this Agreement.

## ARTICLE VII
## ACCOUNTING, RECORDS AND REPORTING

**7.01 Books and Records.** The Company shall keep books and records in accordance with accepted accounting principles. The books and records shall be open for inspection and copying by any Member without cost to such Member. The fiscal year of the Company shall be the calendar year (the "Fiscal Year").

**7.02 Inspection of Books and Records.** Each Member has the right, on reasonable request for purposes reasonably related to the interest of the person as a Member or a Manager, to: (a) inspect and copy during normal business hours any of the Company's records described in Section 7.1; and (b) obtain from the Company promptly after their becoming available a copy of the Company's federal, state and local income tax or information returns for each Fiscal Year.

**7.03 Accountings.** As soon as is reasonably practicable after the close of each Fiscal Year, the Voting Members shall make or cause to be made a full and accurate accounting of the affairs of the Company as of the close of that Fiscal Year and shall prepare or cause to be prepared a balance sheet as of the end of such Fiscal Year, a profit and loss statement for that Fiscal Year and a statement of Members' equity showing the respective Capital Accounts of the Members as of the close of such Fiscal Year and the distributions, if any, to Members during such Fiscal Year, and any other statements and information necessary for a complete and fair presentation of the financial condition of the Company, all of which the Manager shall furnish to each Member. In addition, the Company shall furnish to each Member, information regarding the Company necessary for such Member to complete such Member's federal and state income tax returns. The Company shall also furnish a copy of the Company's tax returns to any Member requesting the same. On such accounting being made, profits and losses during such Fiscal Year shall be ascertained and credited or debited, as the case may be, in the books of account of the Company to the respective Members as herein provided. Until such time as Palisades has been Redeemed in Full, it shall have the right to approve all tax returns filed by the Company including all elections included therein. Until such time as Palisades has been Redeemed in Full, the Company shall provide monthly financial reports to the Members, within ten (10) days following the end of each calendar month with respect to such preceding calendar month, which financial reports shall include all expenses and income of the Company for the calendar month and balance sheet as of the last day of the calendar month detailing all assets and liabilities of the Company and the Capital Accounts of each Member.

**7.04 Filings.** The Voting Members, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Voting Members, at Company expense, shall also cause to be prepared and timely filed with appropriate federal and state regulatory and administrative bodies amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Company is required by the Act to execute or file any document and fails, after demand, to do so within a reasonable period of time or refuses to do so, any Member may prepare, execute and file that document with the Delaware Secretary of State.

**7.05 Bank Accounts.** The Company shall maintain its funds in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be co-mingled in any fashion with the funds of any other person.

**7.06 Company Representative**. Barton shall be the partnership representative of the Company pursuant to Section 6223(a) of the Code (the "Company Representative"). Notwithstanding that Barton is the Company Representative with respect to such tax years, all nonministerial decisions regarding tax elections, audit, tax litigation, settlement and other tax matters shall be subject to unanimous approval of the Voting Members. For example, but not by way of limitation, the Company Representative shall not take any position or action with the Internal Revenue Service (the "Service") without prior unanimous approval of the Voting Members, including but not limited to any decision (i) to enter into a settlement agreement with respect to any Company tax matter; (ii) to file a petition as contemplated in Section 6234(a) of the Code; (iii) to file any request contemplated in Section 6227 of the Code; or (iv) to enter into an agreement extending the period of limitations as contemplated in Section 6235(b) of the Code. If an audit results in an imputed underpayment as determined under Section 6225 of the Code, the Company and/or Barton shall accept sole responsibility for payment of any such underpayment and indemnify and hold harmless Palisades from any such underpayment. The Company Representative shall furnish to each Member a copy of all notices or other written communications received by the Company Representative from the Service within five (5) days of receipt thereof. The Company Representative shall notify each Member of all communications it has had with the Service and shall keep all Members informed of all matters which may come to its attention in its capacity as Company Representative by giving them written notice thereof within five (5) days after the Company Representative becomes informed of any such matter or within such shorter period as may be required by the appropriate statutory or regulatory provisions. Nothing contained herein is intended to authorize the Company Representative to take any action which is left to the determination of an individual Member under Sections 6221 through 6241 of the Code (and/or comparable provisions of state and local law). All non-ministerial decisions regarding tax elections, audit, tax litigation, settlement and other tax matters shall be subject to the written consent of each Member of the Company during the tax year at issue that subsequently Transferred its interest in the Company (each, a "Former Member"). For example, but not by way of limitation, the Company Representative shall not take any position or action with the Service without prior written consent of each Former Member, including but not limited to any decision (i) to enter into a settlement agreement with respect to any Company tax matter; (ii) to file a petition as contemplated in Section 6234(a) of the Code; (iii) to file any request contemplated in Section 6227 of the Code; (iv) to enter into an agreement extending the period of limitations as contemplated in Section 6235(b) of the Code; or (v) to make the "push out" election under Section 6226(a) of the Code. A Former Member shall not be required to pay any expenses incurred by the Company in connection with any tax matters. The Company hereby agrees to indemnify, defend and hold each Former Member harmless of and from any and all liabilities, claims, demands, and expenses of any kind or nature which arise or in any way relate to any violation or breach of this Section 5.4. This Section 5.4 will survive a Member's ceasing to be a member of the Company, as well as the termination, dissolution, liquidation and winding up of the Company.

**7.07 Financial Information, Reports and Notices.**

(a) DREI will cause to be prepared and delivered to each of the Members:

(i) monthly, not later than ten (10) days following the end of each calendar month, management reports for the Project including progress reports on development activity regarding the Project and a report detailing expenditures pursuant to the Project Budget including any variations from same ;

(ii) monthly, not later than ten (10) days following the end of each calendar month, financial statements of the Company, including (A) a balance sheet as of the end of such month and an income statement for such month prepared in accordance with the standard accounting principles of DREI and the amount of unreturned Capital Contributions of each Member, and (B) a cash flow statement for such month; and

(iii) annually, not later than thirty (30) days after the close of each calendar year, financial statements of the Company, including (A) a balance sheet as of the end of such calendar year, and an income statement for such calendar year, prepared in accordance with the standard accounting principles of DREI, (B) a cash flow statement for such calendar year, (C) the amount of unreturned Capital Contributions of each Member as of the last day of such calendar year, and (D) a summary report describing in reasonable detail the financial and business activities of the Company during such calendar year.

(b) The DREI will promptly deliver to Palisades copies of any notices of default under (i) any loan including, without limitation, under the Loan Documents, and (ii) under any of the Development Agreements.

**7.08 Tax Returns**. DREI shall cause to be prepared and filed all necessary federal and state income or franchise tax returns for the Company. Each Member shall furnish to DREI all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed. For federal income tax purposes, Palisades shall not be a Member of the Company (i.e. a partner in the Company filing a partnership tax return); rather the Capital Contributions of Palisades shall be treated as debt of the Company for federal income tax purposes and Palisades shall be treated as a lender to the Company for federal income tax purposes. For state law purposes, however, Palisades shall be a Member of the Company having the rights set forth in this Agreement and granted to a Member under the Act and the federal income tax treatment of Palisades shall have no effect on Palisades' status as a Member of the Company..

## ARTICLE VIII
## DISSOLUTION AND WINDING UP

**8.01 Dissolution.** The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of: the entry of a decree of judicial dissolution pursuant to the Act; or the unanimous approval of the Voting Members.

**8.02 Winding Up.** On the occurrence of an event specified in Section 8.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors. The Voting Members shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the assets and liabilities of Company, shall cause such assets to be sold or distributed, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 9.4. The Voting Members shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Members shall be entitled to reasonable compensation for such services.

**8.03 Distributions in Kind.** Any noncash assets distributed to the Members shall first be valued at their fair market value to determine the profit or loss that would have resulted if such assets were sold for such value. Such profit or loss shall then be allocated pursuant to this Agreement, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged against the Capital Account of each Member receiving an interest in a distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by unanimous consent of the Voting Members, or if any Voting Member objects, by an independent appraiser (and any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by unanimous consent of the Voting Members.

**8.04 Order of Payment of Liabilities on Dissolution.** After a determination that all known debts and liabilities of the Company in the process of winding up, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members as provided in Section 5.02 hereof.

**8.05 Adequacy of Payment.** The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, shall have been adequately provided for if payment thereof shall have been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the person, was determined in good faith and with reasonable care by the Members to be adequate at the time of any distribution of the assets pursuant to this Section. This Section shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

**8.06 Compliance with Regulations.** All payments to the Members on the winding up and dissolution of Company shall be strictly in accordance with the positive capital account balance limitation and other requirements of Regulations Section 1.704-1(b)(2)(ii)(d), as the voting Members deem appropriate.

**8.07 Limitations on Payments Made in Dissolution.** Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of such Member's positive Capital Account balance and shall have no recourse for such Member's Capital Contribution or share of profits (on dissolution or otherwise) against any other Member. No Member shall have any obligation or liability to restore or contribute capital to the Company on account of a deficit capital account which may exist at any time for such Member.

**8.08 Certificate of Cancellation.** The Voting Members conducting the winding up of the affairs of the Company shall cause to be filed in the office of, and on a form prescribed by the Delaware Secretary of State, a certificate of cancellation of the Certificate on the completion of the winding up of the affairs of the Company.

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**9.01 Exculpation of Members.** No Member shall be liable to the Company or to the other Members for damages or otherwise with respect to any actions taken or not taken in good faith and reasonably believed by such Member to be in or not opposed to the best interests of the Company,

except to the extent any related loss results from fraud, gross negligence or willful or wanton misconduct on the part of such Member or the material breach of any obligation under this Agreement or of the fiduciary duties owed to the Company or the other Members by such Member. Notwithstanding any contrary provision of this Agreement, each of the Company and DREI waive to the maximum extent possible under the Act all fiduciary duties which Palisades might otherwise owe to the Company or any other Member or Manager under the Act.

**9.02 Indemnification by Company.** The Company shall indemnify, hold harmless and defend the Members, in their capacity as Members, Managers, or Officers, from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts or omissions arising out of their activities on behalf of the Company or in furtherance of the interests of the Company, including but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, if the acts or omissions were not performed or omitted fraudulently or as a result of gross negligence or willful misconduct by the indemnified party. Reasonable expenses incurred by the indemnified party in connection with any such proceeding relating to the foregoing matters may be paid or reimbursed by the Company in advance of the final disposition of such proceeding upon receipt by the Company of (i) written affirmation by the person requesting indemnification of its good-faith belief that it has met the standard of conduct necessary for indemnification by the Company and (ii) a written undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a court of competent jurisdiction that such person has not met such standard of conduct, which undertaking shall be an unlimited general obligation of the indemnified party but need not be secured.

**9.03 Insurance.** The Company shall have the power to purchase and maintain insurance on behalf of any person who is or was a Member or an agent of the Company against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as a Member or an agent of the Company, whether or not the Company would have the power to indemnify such person against such liability under Section 10.1 or under applicable law.

## ARTICLE X
## MISCELLANEOUS

**10.01 Authority.** This Agreement constitutes a legal, valid and binding agreement of each Member, enforceable against such Member in accordance with its terms. Each Member is empowered and duly authorized to enter into this Agreement (including the power of attorney herein) under every applicable governing document, partnership agreement, trust instrument, pension plan, charter, certificate of incorporation, bylaw provision or the like. The person, if any, signing this Agreement on behalf of the Member is empowered and duly authorized to do so by the governing document or trust instrument, pension plan, charter, certificate of incorporation, bylaw provision, board of directors or stockholder resolution or the like.

**10.02 Indemnification by the Members.** Each Member hereby agrees to indemnify and defend the Company, the other Members and each of their respective employees, agents, partners, members, shareholders, officers and directors and hold them harmless from and against any and all claims, liabilities, damages, costs and expenses (including, without limitation, court costs and attorneys' fees and expenses) suffered or incurred on account of or arising out of any breach of this Agreement by that Member.

**10.03 Notices.** Except as otherwise expressly provided herein, any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally, when transmitted by facsimile if receipt is acknowledged by the addressee, one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, or three business days after being mailed by first class mail, charges and postage prepaid, properly addressed to the party to receive such notice at the address set forth beneath such Member's name on the signature pages of this Agreement. A Member may change the Member's address for purposes of this Agreement by providing notice to the Company and each Member of such change of address.

**10.04 Severability.** If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby.

**10.05 Binding Effect.** Subject to Article VI, this Agreement shall bind and inure to the benefit of the parties and their respective Successors.

**10.06 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**10.07 Entire Agreement.** This Agreement contains the entire agreement of the parties and supersedes all prior or contemporaneous written or oral negotiations, correspondence, understandings and agreements between or among the parties, regarding the subject matter hereof.

**10.08 Further Assurances.** Each Member shall provide such further information with respect to the Member as the Company may reasonably request, and shall execute such other and further certificates, instruments and other documents, as may be necessary and proper to implement, complete and perfect the transactions contemplated by this Agreement.

**10.09 Headings; Gender; Number; References.** The headings of the Sections hereof are solely for convenience of reference and are not part of this Agreement. As used herein, each gender includes each other gender, the singular includes the plural and vice versa, as the context may require. All references to Sections and subsections are intended to refer to Sections and subsections of this Agreement, except as otherwise indicated.

**10.10 Parties in Interest.** Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any persons other than the Members and their respective Successors nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**10.11 Amendments.** All amendments to this Agreement shall be in writing and signed by all of the Members to the agreement at the time of the amendment.

**10.12 Attorneys' Fees.** In any dispute between or among the Company and one or more of the Members, the prevailing party or parties in such dispute shall be entitled to recover from the non-prevailing party or parties all reasonable fees, costs and expenses including, without limitation, attorneys' fees, costs and expenses, all of which shall be deemed to have accrued on the commencement of such action, proceeding or arbitration. Attorneys' fees shall include, without limitation, fees incurred in any post-award or post-judgment motions or proceedings, contempt proceedings, garnishment, levy, and debtor and third party examinations, discovery, and bankruptcy litigation, and prevailing party shall mean the party that is determined in the arbitration, action or proceeding to have prevailed or who prevails by dismissal, default or otherwise.

**10.13 Remedies Cumulative.** Remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Member may be lawfully entitled.

**10.14 Jurisdiction and Venue/Equitable Remedies.** The Company and each Member hereby expressly agrees that if, under any circumstances, any dispute or controversy arising out of or relating to or in any way connected with this Agreement shall be the subject of any court action at law or in equity, such action shall be filed exclusively in the courts of the State of Texas or of the United States of America located in Dallas County, as selected by the Member that is the plaintiff in the action, or that initiates the proceeding. Each Member agrees not to commence any action, suit or other proceeding arising from, relating to, or in connection with this Agreement except in such a court and each Member irrevocably and unconditionally consents and submits to the personal and exclusive jurisdiction of such courts for the purposes of litigating any such action, and hereby grants jurisdiction to such courts and to any appellate courts having jurisdiction over appeals from such courts or review of such proceedings. Because the breach of the provisions of this Section would cause irreparable harm and significant injury to the Company and the other Members, which would be difficult to ascertain and which may not be compensable by damages alone, each Member agrees that the Company and the other Members will have the right to enforce the provisions of this Section by injunction, specific performance or other equitable relief in addition to any and all other remedies available to such party or parties without showing or proving any actual damage to such parties. Members will be entitled to recover all reasonable costs and expenses, including but not limited to all reasonable attorneys' fees, expert and consultants' fees, incurred in connection with the enforcement of this Section.

**10.15 Palisades Approvals**. If Palisades fails to respond to any notice requesting its approval or consent under this Agreement within five (5) Business Days of receipt of such notice requesting its approval or consent, Palisades shall be deemed to have approved the matter for which approval or consent was requested. Notwithstanding the preceding, if within five (5) Business Days of receipt of any approval or consent request notice, Palisades denies such approval or consent or requests further information in order to make its decision, Palisades' approval or consent shall not be deemed granted. Palisades agrees to undertake any response to any approval or consent request in good faith and shall act in its reasonable discretion unless its sole discretion is expressly provided for any such approval or consent request.

**10.16 Palisades Payments**. All distributions or payments of any kind due to Palisades under this Agreement shall be wired in same day available funds to such account as Palisades may provide notice.

[Signatures on following page.]

IN WITNESS WHEREOF, this Agreement has been duly executed by or on behalf of the parties hereto as of the date first above written.

**MEMBERS**

DALLAS REAL ESTATE INVESTORS, LLC
a Delaware limited liability company

By: ______________________________
Name: Timothy Barton
Its: President

1755 Wittington, Suite 340
Dallas, Texas 75234

PALISADES TC LLC,
a Texas limited liability company

By: ______________________________
Joaquin Charles de Monet, Manager

1919 McKinney Ave., Suite 100
Dallas, Texas 75201

## Exhibit A

## PROJECT BUDGET AND SUMMARY

**Project Name:** Frisco Project

**Project Summary:** Acquisition of 4.5385 acres, located at the northwest corner of future John Hickman Parkway and the Dallas North Tollway upon which will be developed (i) 231 hotel rooms, (iii) 15,000 square feet of meeting space, (iv) certain retail space, (v) certain restaurant space all of which as more fully described and conceptually shown in the PD zoning ordinance approved by the City on August 18, 2015, as Ordinance No. 15-08-57, as may be amended (the "Project").

**As defined in the "Purchaser's Statement" for the closing of the Frisco Property which may be revised as necessary upon consent of the President as evidenced by the President's execution of such statement.**

**12-Month Pre-development Budget**

| **Month** | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Project Month** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| Architectural & Engineering | 100,000 | 100,000 | 100,000 | 100,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 450,000 | 450,000 | 2,800,000 |
| Market Studies | | | | 25,000 | | | 50,000 | | | | | | 75,000 |
| Appraisal | | | | 25,000 | | | | | | | | | 25,000 |
| Civil/Survey | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Organization Costs | 10,000 | | | | 25,000 | | | | | | | | 35,000 |
| Geotech | | | | | 25,000 | | | | | | | | 25,000 |
| Project Management | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 |
| Legal | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 150,000 |
| Insurance | 20,000 | | | | | | | | | | | | 20,000 |
| **Total** | **177,500** | **147,500** | **147,500** | **197,500** | **347,500** | **297,500** | **347,500** | **297,500** | **297,500** | **297,500** | **497,500** | **497,500** | 3,550,000 |

EXHIBIT B
Members of DALLAS REAL ESTATE LENDERS, LLC

| Member's Name and Address | Capital Contribution | Percentage Ownership Interest | Class | Percentage Voting Interest |
|---|---|---|---|---|
| Palisades TC LLC<br>1919 McKinney Ave.,<br>Suite 100<br>Dallas, TX 75201 | $3,500,000.00 | 50% | A | 50% |
| Dallas Real Estate Investors, LLC<br>1755 Wittington<br>Suite 340<br>Dallas, TX 75234 | $10.00 | 50% | A | 50% |

# Exhibit B

2 CIT ESERVE / JURY DEMAND

FILED
4/22/2020 4:05 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Belinda Hernandez DEPUTY

**Cause No.** DC-20-05960

| | | |
|---|---|---|
| **PALISADES TC, LLC, INDIVIDUALLY, AND ON BEHALF OF FIVE STAR GM, LLC,** | § | **IN THE DISTRICT COURT OF** |
| **PLAINTIFF,** | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| **FIVE STAR MM, LLC AND TIMOTHY BARTON, INDIVIDUALLY,** | § | |
| **DEFENDANTS.** | § | **____ JUDICIAL DISTRICT** |

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Plaintiff Palisades TC, LLC ("Plaintiff" or "Palisades") individually, and on behalf of Five Star GM, LLC ("Five Star GM"), files this Original Petition and Application for Temporary Restraining Order and Temporary Injunction against Defendants Five Star MM, LLC (the "Company") and Timothy Barton ("Barton"), individually, (collectively, "Defendants"), and alleges as follows:

## I. DISCOVERY CONTROL PLAN AND STATEMENT OF RELIEF

1. Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.4 and affirmatively pleads that this suit is not governed by the expedited-actions process in Texas Rule of Civil Procedure 169 because it seeks injunctive relief.

2. Pursuant to Texas Rule of Civil Procedure 47, Plaintiff seeks monetary relief over $1,000,000. The damages sought are within the jurisdictional limits of the court.

## II. PARTIES

3. Plaintiff Palisades TC, LLC is a Texas limited liability company doing business in Dallas County at 1919 McKinney Ave., Suite 100, Dallas, Texas 75201.

4. Defendant Five Star MM, LLC is a Delaware limited liability company, and may be served by and through its registered agent ONE Agent Texas, LLC, at 13901 Midway Rd, Suite 102, Dallas, TX 75244-75244.

5. Defendant Timothy Barton is an individual that may be served with process at his residence in Dallas County at 3525 Arrowhead Drive, Dallas, Texas 75204, or wherever he may be found.

## III. JURISDICTION AND VENUE

6. All the parties hereto are subject to the Court's jurisdiction. The Court has subject-matter jurisdiction over the lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

7. Venue is proper in Dallas County under Section 15.002(a) of the Texas Civil Practice and Remedies Code because all of the events and omissions giving rise to the claims asserted herein occurred in Dallas County, Texas. Further, venue is proper pursuant to the provisions contained in the contracts at issue. *See* Ex. A at § 10.14, Ex. B at § 18.08.

## IV. FACTS

8. Barton is the Chief Executive Officer of JMJ Development ("JMJ"), a real estate developer in Dallas, Texas.

### A. Relevant Company Agreements

9. On September 16, 2019, Plaintiff and Barton entered into the Amended and Restated Company Agreement of Five Star MM, LLC (the "Company Agreement") to form the Company. Plaintiff and Barton are the only two Members of the Company. A true and accurate copy of the Company Agreement is attached hereto as Exhibit A and incorporated herein by reference.

10. The Company was formed for the sole purpose of managing all entities having a

direct or indirect beneficial ownership interest in MO 2999TC, LLC, a Delaware limited liability company established for the sole purposes of acquiring and developing certain real property and the improvements thereon located at 2999 Turtle Creek Boulevard, Dallas, Texas (the "Turtle Creek Project").

11. Barton is the Member, President, and Manager of the Company. *See* Ex. A at §§ 2.01, 4.01, and 2.08.

12. On September 16, 2019, Plaintiff also entered into and became a Member of the Company Agreement of Five Star GM, LLC (the "Five Star GM Agreement", together with the Company Agreement, the "Company Agreements") to form Five Star GM. The Company is the Managing Member of Five Star GM. The only other Member of Five Star GM is 2999 TC JMJ MGR, LLC. A true and accurate copy of the Five Star GM Agreement is attached hereto as Exhibit B and incorporated herein by reference. All capitalized terms used herein that are not specifically defined herein shall have the meanings provided in the Company Agreements.

13. The sole business and purpose of Five Star GM is its ownership interests and related rights in Five Star TC, LLC as the sole member of MO 2999TC MZ, LLC as the sole member of MO 2999TC LLC ("Turtle Creek Project Owner") which acquired the real property where the Turtle Creek Project is located and to take such action necessary to construct and develop a mixed use project including a luxury hotel and residences on the real property (*i.e.*, the Turtle Creek Project).

## B. Defendants' Obligations under the Company Agreements

14. First, upon formation of Five Star GM, Plaintiff contributed $4,000,000 to Five Star GM as a Preferred Capital Contribution (the "Priority Capital"). Plaintiff's contribution earned it a Base Return or Default Return, as applicable. Thus, the Five Star GM Agreement requires that distributions are made to Plaintiff as follows:

a. First, the Base Return or, if applicable, the Default Return, *see* Ex. B at § 5.02(a)(i);

b. Next, on or before March 9, 2020, an amount equal to no less than fifty percent (50%) of Plaintiff's Unreturned Priority Capital, *see* Ex. B at § 5.02(a)(ii); and

c. Next, on or before March 9, 2020, an amount equal to no less than 50% of the amount distributed to Plaintiff pursuant to item b above, *see* Ex. B at § 5.02(a)(iii).

15. Second, the Company Agreements require that Defendants provide to Plaintiff timely financial information reports. *See* Ex. A at § 7.03, Ex. B at § 12.03.

16. Third, the Company Agreements require that Defendants obtain prior written approval of certain actions, *see* Ex. A at § 2.08, Ex. B at § 6.02, including, but not limited to the following actions:

a. Entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Turtle Creek Project, *see* Ex. A at § 2.08(e), Ex. B at § 6.02(e);

b. Entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), *see* Ex. A at § 2.08(f), Ex. B at § 6.02(f);

c. Entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company or Five Star GM or any Operating Company of more than $100,000 in any year except as provided in the Turtle Creek Project Budget, *see* Ex. A at § 2.08 (g), Ex. B at § 6.02(g); and

d. Entering into, modifying, amending or terminating any agreement with Mandarin Hotels, *see* Ex. A at § 2.08(ff), Ex. B at § 6.02(ff).

17. Fourth, the Company Agreements provide that the Company and Five Star GM shall keep books and records that shall be open for inspection and copying by any Member. *See* Ex. A at § 7.01, Ex. B at § 12.01.

## C. Redemption Default

18. Under the Five Star GM Agreement, a Redemption Default shall occur upon the

happening of any of the following relevant events:

a. Five Star GM fails at any time to distribute all amounts due to Plaintiff pursuant to Section 5.02(a)(i), *see* Ex. B at § 5.04(a)(i);

b. Five Star GM fails to distribute all amounts due to Plaintiff pursuant to Sections 5.02(a)(i) and (ii) on or before March 9, 2020, *see* Ex. B at § 5.04(a)(ii); and

c. The Company, any Member other than Plaintiff, or Five Star GM breaches any of its obligations under the Five Star GM Agreement, including, without limitation, the failure to obtain the approval of Plaintiff whenever required in the Five Star GM Agreement, *see* Ex. B at § 5.04(a)(iv).

**D. Plaintiff's Remedies under the Company Agreements**

19. Under the Five Star GM Agreement, Plaintiff has the following remedies in the event of a Redemption Default:

a. Plaintiff shall have the right to require the Company, to request an additional Capital Contribution from the Members other than Plaintiff in an amount sufficient to bring Plaintiff current on the distributions (the "Capital Call Right"), *see* Ex. B at § 5.04(b); and

b. Plaintiff shall have the right to act on behalf of Five Star GM and cause Five Star GM to act on behalf of each Operating Company, in each instance in its sole and absolute discretion without the consent or approval of the Company or any other Member of Five Star GM or any Operating Company, to market and cause the sale of the Turtle Creek Project to an independent third party on such terms and conditions as Plaintiff may determine appropriate in its sole and absolute discretion. Further, the Company and each Member of Five Star GM shall cooperate and shall cause Five Star GM and each Operating Company to cooperate with Plaintiff to accomplish such sale (the "Sale Right"). *See* Ex. A at § 2.09, Ex. B at § 5.05.

**E. Defendants' Redemption Defaults under the Company Agreements**

20. As a result of the formula laid out in § 5.02 of the Five Star GM Agreement, Five Star GM was required to distribute $3,000,000, to Plaintiff on or before March 9, 2020 (the "March Unreturned Priority Capital Payment"). However, Defendants failed to cause Five Star GM to make the March Unreturned Priority Capital Payment to Plaintiff, which is a Redemption Default

under Section 5.04(a)(ii) of the Five Star GM Agreement (the "March Payment Redemption Default"). Further, Defendants have failed to cause Five Star GM to cure this Redemption Default in the time period prescribed by the Five Star GM Agreement following notice of default from Plaintiff.

21. After the March Payment Redemption Default and after Defendants failed to give any clear indication to Plaintiff of when it intended to cause Five Star GM to make the March Unreturned Priority Capital Payment, on March 20, 2020, Plaintiff sent Defendants a letter ("Notice of Default") officially notifying them of their existing and potential defaults under the Company Agreements, which included, but were not limited to, the March Payment Redemption Default, failure by Defendants to submit *any* financial reports as required by the Company Agreements, and failure to obtain prior written approval from Plaintiff for actions taken by the Company on behalf of Five Star GM. A true and accurate copy of the Notice of Default is attached hereto as Exhibit C and incorporated herein by reference.

22. On March 27, 2020, in response to Plaintiff's Notice of Default, Defendants sent Plaintiff a Project Status and Force Majeure Forbearance Request ("Forbearance Request"). The Forbearance Request failed to demonstrate that Defendants had any realistic plan to promptly cure the various existing defaults under the Company Agreements. Instead, the Forbearance Request simply confirmed the fact that, in many respects, Defendants had engaged in a course of improper conduct that breached their fiduciary duties to Five Star GM and its Members, including Plaintiff, breached their fiduciary duties to the Company's Members, including Plaintiff, and have materially breached the Company Agreements. A true and accurate copy of the Forbearance Request is attached hereto as Exhibit D and incorporated herein by reference.

23. The Forbearance Request also confirmed to Plaintiff that Defendants: (i) had

executed multiple management agreements with Mandarin Hotel Group without the prior written approval of Plaintiff, in breach of the Company Agreements and (ii) indebted the Company and Five Star GM by contracting with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates, which, upon information and belief, require future payments by or to the Company and Five Star GM of more than $100,000 in any year not provided in the Turtle Creek Project Budget without the prior written approval of Plaintiff, in breach of the Company Agreements.

24. The foregoing breaches of Defendants' obligations are each a Redemption Default under Section 5.04(a)(iv) of the Five Star GM LLC Agreement.

25. Further, Plaintiff's Unreturned Priority Capital normally earns a Base Return due on the first day of each month, which is equal to nine percent (9%) per annum, accrued on the Unreturned Priority Capital. However, a Default Return equal to fourteen percent (14%) per annum on Plaintiff's Unreturned Priority Capital shall apply immediately at such times as any Base Return is not distributed on the due date thereof and the Default Return shall accrue in lieu of such Base Return not timely distributed.

26. Defendants also failed to cause Five Star GM to timely distribute the Base Return to Plaintiff that was due on or before April 1, 2020, which is another Redemption Default under Section 5.04(i) of the Five Star GM Agreement (the "April Payment Redemption Default"). As a result of the April Payment Redemption Default, the Default Return applies to the payment which was due on April 1, 2020 and which currently remains outstanding (the "April Default Return Payment").

27. Further, at the permission of Defendants, JMJ, Barton's affiliated entity, is occupying space in the Turtle Creek Project without the written approval of Plaintiff. Defendants'

actions are in direct violation of the Company Agreements. *See* Ex. A at § 2.08(f), Ex. B at § 6.02(f). Further, such action constitutes a self-dealing transaction in breach of Defendants fiduciary duty of loyalty under the Company Agreements.

**F. Final Demand for Defendants to Comply with Their Obligations under the Company Agreements**

28. On April 8, 2020, Plaintiff's counsel responded on behalf of Plaintiff to the Forbearance Request and the April Payment Redemption Default by sending a final demand requesting the following from Defendants (the "Final Demand"):

a. The March Unreturned Priority Capital Payment;

b. The April Default Return Payment;

c. All agreements that have been entered into related to the Turtle Creek Project, including but not limited to, any agreements with Mandarin Hotel Group, SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates (the "Turtle Creek Project Agreements");

d. The monthly financial reports from September 2019 through March 2020 that are required under Section 7.03 of the Company Agreement;

e. The required financial information, reports, and notices from September 2019 through March 2020 as required by Section 12.03(a)(i)-(iii) of the Five Star GM Agreement;

f. All agreements, including but not limited to, any lease agreements or license agreements, with JMJ or any other affiliate of Barton to occupy space at the Turtle Creek Project; and

g. Access to and the right to inspect and copy the following books and records of the Company and Five Star GM pursuant to Section 7.02 of the Company Agreement, Section 12.02 of the Five Star GM Agreement, and Section 18-305 of the Delaware Limited Liability Company Act:

   i. Balance sheets by month from September 1, 2019 through the present day;

   ii. Profit and loss statements by month from September 1, 2019 through the present day;

   iii. Cash flow statements by month from September 1, 2019 through the

present day; and

iv. Five Star GM information and documents regarding the Turtle Creek Project, including but not limited to (1) any agreements with any contractor, supplier, vendor or other third party related to the Turtle Creek Project along with contact information for all such parties, (2) any correspondence with lenders, including but not limited to any default notices, and (3) any notices, citations or other correspondence from any State or local governmental entity related to the Turtle Creek Project.

29. A true and accurate copy of the Final Demand is attached hereto as Exhibit E and incorporated herein by reference.

30. In the Final Demand, Plaintiff also exercised its Capital Call Right and expressly reserved its right to exercise its Sale Right.

31. In response to the Final Demand, Defendants disputed that any Redemption Default had occurred (the "Final Demand Response") and merely provided final, executed copies of seven of the many agreements that Defendants had entered into without written approval from Plaintiff, as required by the Company Agreements (the "Final Demand Production"). A true and accurate copy of the Final Demand Response and the Final Demand Production is attached hereto as Exhibit F and Exhibit G, respectively, and incorporated herein by reference. However, Defendants failed to provide *any* of the financial and accounting records to which Plaintiff is entitled and failed to provide any assurances that it had made a meaningful effort to try and obtain the requested information, in clear breach of the Company Agreements.

**G. Plaintiff's Exercise of its Sale Right**

32. The most pressing concern for Plaintiff is its intention to move forward with exercising its Sale Right under the Company Agreements. In order to exercise that remedy, Plaintiff must have the most current understanding and status of its substantial financial investment in Five Star GM and an accurate understanding of the business transactions of the entity. The

requested information is essential to Plaintiff's exercise of its Sale Right. The information requested from Defendants is what is required, at a minimum to for Plaintiff to conduct its due diligence related to the exercise of its Sale Right. Additionally, and as previously noted, Plaintiff is also contractually allowed access to such information.

33. Further, Defendants are obligated to cooperate and shall cause Five Star GM to cooperate with Plaintiff to accomplish a sale of the Turtle Creek Project.

34. Accordingly, Defendants should be enjoined from preventing Plaintiff's access to the books and records of the Company and Five Star GM, and enjoined from undertaking any action with respect to or on behalf of Five Star MM or Five Star GM or with respect to or on behalf of Five Star TC, LLC, MO 2999TC MZ, LLC, MO 2999TC, LLC, and 2999 TC Acquisitions without the prior written approval of Palisades TC, LLC.

35. The current state of the national economy, and specifically, the current dynamics in the commercial real estate market due to the COVID-19 pandemic create an imminent threat of irreparable harm to Plaintiff. The current real estate market is unpredictable and Plaintiff needs to act fast if it has any hopes for selling the Turtle Creek Project at its highest value which is ont of Plaintiff's primary remedies for the Redemption Defaults that have occurred under the applicable company agreements. Further, the Turtle Creek Project, which is a real estate development project stands to be irreparably damaged if it continues to be managed and operated by Defendants.

## V. CAUSES OF ACTION

### COUNT 1 – BREACH OF CONTRACT (COMPANY AGREEMENT)

36. The allegations above are incorporated herein by reference as if set forth in this Count.

37. The Company Agreement is a valid and enforceable written contract between Plaintiff and Defendants. The Company Agreement provided that Defendants would provide to

Plaintiff timely financial information reports and would obtain prior written approval from Plaintiff of certain actions, including, but not limited to, (a) entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Turtle Creek Project, (b) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), (c) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company and any Operating Company of more than $100,000 in any year except as provided in the Turtle Creek Project Budget, and (d) entering into, modifying, amending or terminating any agreement with Mandarin Hotels.

38. Plaintiff fully performed its contractual obligations under the Company Agreement.

39. Defendants breached the Company Agreement by (i) failing to submit *any* financial reports; (ii) executing multiple management agreements with Mandarin Hotel Group without the prior written approval of Plaintiff; (iii) indebting the Company by contracting with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates, which, upon information and belief, require future payments by or to the Company of more than $100,000 in any year not provided in the Turtle Creek Project Budget without the prior written approval of Plaintiff; (iv) permitting JMJ to occupy space in the Turtle Creek Project without the written approval of Plaintiff; and (v) failing to provide access to the books and records of the Company.

40. Defendants breach caused injury to Plaintiff, which resulted in actual damages and the inability to proceed with effecting the sale of the Turtle Creek Project.

**COUNT 2 – BREACH OF CONTRACT (FIVE STAR GM AGREEMENT)**

41. The allegations above are incorporated herein by reference as if set forth in this

Count.

42. The Five Star GM Agreement is a valid and enforceable written contract between Plaintiff and Defendants. The Five Star GM Agreement provided that Defendants would pay Plaintiff the Unreturned Priority Capital Payment on March 9, 2020, pay Plaintiff the Base Return (or Default Return) on April 1, 2020, provide to Plaintiff timely financial information reports, and would obtain prior written approval from Plaintiff of certain actions, including, but not limited to, (a) entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Turtle Creek Project, (b) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), (c) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to Five Star GM and any Operating Company of more than $100,000 in any year except as provided in the Turtle Creek Project Budget, and (d) entering into, modifying, amending or terminating any agreement with Mandarin Hotels. The Five Star GM Agreement further provides that Defendants would cooperate with Plaintiff in the event that it exercised its Sale Right.

43. Plaintiff fully performed its contractual obligations under the Five Star GM Agreement by providing the Preferred Capital Contribution of $4,000,000.

44. Defendants breached the Five Star GM Agreement by (i) failing to make the March Unreturned Priority Capital Payment; (ii) failing to make the April Default Return Payment; (iii) failing to submit any financial reports; (iv) executing multiple management agreements with Mandarin Hotel Group without the prior written approval of Plaintiff; (v) indebting Five Star GM by contracting with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette

Davis Drake, Talley & Associates, and Lerch Bates, which, upon information and belief, require future payments by or to the Company of more than $100,000 in any year not provided in the Turtle Creek Project Budget without the prior written approval of Plaintiff; (vi) permitting JMJ to occupy space in the Turtle Creek Project without the written approval of Plaintiff; (vii) failing to provide access to the books and records of Five Star GM; and (viii) failing to cooperate with Plaintiff in exercising its Sale Right.

45. Defendants' breach caused injury to Plaintiff, which resulted in actual damages and the inability to proceed with effecting the sale of the Turtle Creek Project.

**COUNT 3 – BREACH OF FIDUCIARY DUTY**

46. The allegations above are incorporated herein by reference as if set forth in this Count.

47. Defendants, as the Managers of the Company and Five Star GM, owed fiduciary duties to Plaintiff.

48. Defendants breached their fiduciary duty of loyalty to Plaintiff and Five Star GM by engaging in self-dealing when they permitted JMJ to occupy space at the Turtle Creek Project without first obtaining written approval from Plaintiff.

49. Defendants' breach of their fiduciary duty of loyalty has injured Plaintiff and Five Star GM.

50. Defendants' breach of their fiduciary duty of loyalty to Plaintiff and Five Star GM benefited Defendants by providing free office space for an affiliate of Barton at the detriment to Plaintiff and Five Star GM.

51. Accordingly, Plaintiff seeks damages within the jurisdictional limits of this Court.

**COUNT 4 – FRAUD**

52. The allegations above are incorporated herein by reference as if set forth in this

Count.

53. Defendants failed to disclose material facts related to the financially distressed nature of the Turtle Creek Project.

54. Defendants had a duty to disclose the information to Plaintiff because Defendant had a fiduciary relationship with Plaintiff.

55. The information was material because Plaintiff entered into subsequent real estate investment transactions with Defendants, including one involving a proposed hotel and condominium project in Frisco, Texas.

56. Defendants knew Plaintiff was ignorant of the information and did not have an equal opportunity to discover the truth as Defendants controlled all of the books and records for Five Star GM.

57. Defendants deliberately remained silent and did not disclose the information to Plaintiff.

58. By deliberately remaining silent, Defendants intended for Plaintiff to enter into subsequent real estate investment transactions without information of the impending default by the Company and Five Star GM on the Unreturned Priority Capital.

59. Plaintiff justifiably relied on Defendants' deliberate silence and believed that the Turtle Creek Project and Five Star GM were financially secure.

60. By deliberately remaining silent, Defendants proximately caused injury to Plaintiff, which resulted in damages to Plaintiff.

61. Plaintiff seeks damages within the jurisdictional limits of this Court.

**COUNT 5 – ATTORNEY'S FEES**

62. The allegations above are incorporated herein by reference as if set forth in this Count.

63. Pursuant to Section 37.009 and Section 38.001 of the Texas Civil Practice and Remedies Code, Plaintiff claims reasonable attorney's fees, both in the trial of this cause and in connection with any subsequent appeal, as are equitable and just.

64. Further, Plaintiff is entitled to recover reasonable attorney fees under the provisions of the Company Agreements. *See* Ex. A at §§ 10.12, 10.14, Ex. B at § 18.08.

## VI. APPLICATION FOR TEMPORARY RESTRAINING ORDER

65. Injunctive relief may be granted upon the showing of the following: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002).

66. As shown above, Plaintiff has shown that it has various causes of action against Defendants and a probable right to the relief sought in this lawsuit.

67. As a result of the Defendants' wrongful acts in violating the Company Agreements in numerous material respects, including but not limited to, the refusal to provide Plaintiff with access to books and records and information and material related to the Turtle Creek Project to which Plaintiff is entitled, Plaintiff is threatened with probable, imminent and irreparable injury to its investment in the Turtle Creek Project in amounts that currently cannot be calculated. Without access to books and records of Five Star GM and the Company and the information and documents related to the Turtle Creek Project, Plaintiff is effectively prohibited from exercising its Sale Right remedy. Thus, Plaintiff has no adequate remedy at law and the requested injunctive relief is appropriate. Alternatively, and in addition, Plaintiff need not establish an inadequate remedy at law because the irreparable injury complained of relates Plaintiff's interest in the Turtle Creek Project, which is real property. *See* Tex. Civ. Prac. & Rem Code § 65.011(5).

68. Pursuant to Texas Rule of Civil Procedure 684, Plaintiff is able and willing to post a bond in this matter and request that the Court determine a fair and reasonable amount of security

to be given by Plaintiff for the protection of Defendants in the event the Temporary Restraining Order is wrongfully issued and results in harm to the Defendants. However, Plaintiff respectfully requests that the bond should have a nominal face value.

69. Plaintiff's Application for Temporary Restraining Order and Temporary Injunctive Relief is verified by the attached Unsworn Declaration of Joaquin de Monet, which is attached hereto as Exhibit H.

70. Specifically, Plaintiff requests that the Court enter a Temporary Restraining Order ordering Defendants Five Star MM, LLC and Timothy Barton and those persons in active concert or participation with them who receive actual notice of the order, to desist and refrain from, either directly or indirectly through others:

a. Preventing or obstructing Palisades TC, LLC from obtaining access to the following:

   i. Any contracts or any other written agreements with any party related to the Turtle Creek Project, including but not limited to, Mandarin Hotel Group, SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drak, Tally & Associates, and Lerch Bates (the "Turtle Creek Project Contracts"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to all Turtle Creek Project Contracts;

   ii. The monthly financial reports from September 2019 – March 2020 that are required under Section 7.03 of the Five Star MM Company Agreement which shall include all expenses and income of Five Star MM for the calendar month and balance sheet as of the last day of the calendar month detailing all assets and liabilities of Five Star MM and the Capital Accounts of each Member (the Monthly Five Star MM Financial Reports"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to all of the Monthly Five Star MM Financial Reports;

   iii. The monthly management reports from September 2019 – March 2020 that are required under Section 12.03(a)(i) of the Five Star GM Company Agreement which shall include all progress reports on development activity regarding the Turtle Creek Project and a report detailing expenditures pursuant to the Turtle Creek Project Budget including any variations from same (the Monthly Five Star GM

Management Reports"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to all of the Monthly Five Star GM Management Reports;

iv. The monthly financial statements of Five Star GM from September 2019 – March 2020 that are required under Section 12.03(a)(ii) of the Five Star GM Company Agreement which shall include (A) a balance sheet as of the end of the such month and an income statement for such month prepared in accordance with the standard accounting principles of the Manager and the amount of unreturned Capital Contributions of each Member, and (B) a cash flow statement for such month (the Monthly Five Star GM Financial Statement"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to all of the Monthly Five Star GM Financial Statements;

v. The annual financial statement of Five Star GM for 2019 that is required under Section 12.03(a)(iii) of the Five Star GM Company Agreement which shall include (A) a balance sheet as of the end of such calendar year, prepared in accordance with the standard accounting principles of the Manager, (B) a cash flow statement for such calendar year, (C) the amount of unreturned Capital Contributions of each Member as of the last day of such calendar year, and (D) a summary report describing in reasonable detail the financial and business activities of the Company during such calendar year (the Annual Five Star GM Financial Statement"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to the Annual Five Star GM Financial Statement;

vi. Copies of any notices of default under any loan including, without limitation, under the Loan Documents as required under Section 12.03(b) of the Five Star GM Company Agreement (the "Loan Default Notices"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to Loan Default Notices;

vii. All agreements, including but not limited to, any lease agreements or license agreements with JMJ Development LLC or any Affiliate of Timothy Barton to occupy space at the Turtle Creek Project (the "Barton Affiliate Lease Agreements"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to any Barton Affiliate Lease Agreements;

viii. Pursuant to Section 7.02 of the Five Star MM Company Agreement and Section 18-305 of the Delaware Limited Liability Company Act, all information that Palisades TC, LLC is entitled to as a Member of Five Star MM (the "Five Star MM Books and Records"). Barton and Five Star MM shall immediately provide access to

Palisades TC, LLC to the Five Star MM Books and Records;

ix. Pursuant to Section 12.01 of the Five Star GM Company Agreement and Section 18-305 of the Delaware Limited Liability Company Act, all information that Palisades TC, LLC is entitled to as a Class A Member of Five Star GM (the "Five Star GM Books and Records"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to the Five Star GM Books and Records; and

x. Any notices, citations or other enforcement correspondence from any State or local governmental entity related to the Turtle Creek Project (the "Turtle Creek Project Notices and Citations"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to the Turtle Creek Project Notices and Citations.

b. Undertaking any action with respect to or on behalf of Five Star MM or Five Star GM or with respect to or on behalf of Five Star TC, LLC, MO 2999TC MZ, LLC, MO 2999TC, LLC, and 2999 TC Acquisitions without the prior written approval of Palisades TC, LLC.

## VII. APPLICATION FOR TEMPORARY INJUNCTION

71. Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

72. Upon notice and hearing, Plaintiff requests that the Court enter a temporary injunction extending the temporary restraining order until final judgment is entered in this lawsuit.

## VIII. JURY DEMAND

73. Plaintiff demands a jury trial and tenders the appropriate fee with this Petition.

## IX. CONDITIONS PRECEDENT

74. All conditions precedent to Plaintiff being entitled to bring this action and recover the relief requested herein have been performed, have occurred, or have been waived.

## X. REQUEST FOR DISCLOSURE

75. Under Texas Rule of Civil Procedure 194, Plaintiff requests that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## XI. PRAYER

76. For these reasons, Plaintiff asks that Defendants be cited to appear and answer and, on final trial, that Plaintiff be awarded a judgment against Defendants, jointly and severally, for the following:

a. Temporary restraining order;

b. Temporary injunction;

c. Permanent injunction;

d. Actual damages;

e. Pre-judgment and post-judgment interest;

f. Court costs; and

g. All other relief to which Plaintiff is entitled.

Dated: April 22, 2020

Respectfully submitted,

WINSTEAD PC

By:/s/ Kasey Ratliff

Kasey Ratliff
kratliff@winstead.com
LaCrecia Perkins
lperkins@winstead.com

2728 N. Harwood Street
Suite 500
Dallas, TX 75201
Telephone: 214.745.5400
Facsimile: 214.745.5390

**ATTORNEYS FOR PLAINTIFF PALISADES TC, LLC**

4817-7810-9114v.1

# Exhibit C

PALISADES TC LLC
1919 McKinney Ave., Suite 100
Dallas, Texas 75201

March 20, 2020

*VIA FEDEX OVERNIGHT MAIL*

ATTN: Timothy Barton, President
Dallas Real Estate Investors, LLC
1755 Wittington, Suite 340
Dallas, Texas 75234

Re: Company Agreement dated January 29, 2020 (the "**Company Agreement**") of Dallas Real Estate Lenders, LLC, a Delaware limited liability company (the "**Company**"). All capitalized terms used herein that are not specifically defined herein shall have the meanings provided in the Company Agreement.

Mr. Barton:

You are the President of Dallas Real Estate Investors, LLC, a Delaware limited liability company ("**DREI**") which is a Member of the Company, and which under Section 2.08 of the Company Agreement, has responsibility for day-to-day management of the Company.

This letter is provided as notice that (i) a Redemption Default has occurred pursuant to Sections 5.04(a)(iii), (iv) and (v) of the Company Agreement, and (ii) the Company may be in default with respect to other obligations to Palisades under the Company Agreement (collectively, the "**Prior Actions**").

Palisades, on behalf of itself and on behalf of its successors, assigns, affiliates, owners, directors, officers, employees, parents, subsidiaries, principals, agents, members, managers, administrators, legal representatives, insurers and attorneys (collectively, the "**Reserving Parties**"), hereby reserves all rights, benefits, remedies and claims available under the Company Agreement and all other rights, benefits, remedies and claims at law, in equity or in contract that are available to the Reserving Parties (including, without limitation, for recovery of any penalties, interest and other charges imposed on the Reserving Parties) arising out of, relating to or in connection with the Prior Actions. This letter shall in no way be deemed to impair, limit or waive, any of the rights, benefits, remedies, or claims that any of the Reserving Parties may have against DREI, as the day-to-day Manager of the Company, the Company or any affiliates, constituent owners, partners, members, officers, directors, agents and representatives thereof.

Additionally, the description herein of the Prior Actions shall not be to the exclusion of any other defaults or breaches now existing or hereafter occurring under the Company

Agreement or any other documents. Furthermore, the description herein of the specific rights of the Reserving Parties shall not be deemed to limit or exclude any other rights to which the Reserving Parties may be or become entitled under the Company Agreement or any other documents, at law, in equity or otherwise.

Any past inaction or delay in exercising any of such rights, benefits, remedies or claims, shall not be deemed a course of dealing between the parties, and DREI and the Company are not entitled to rely upon the Reserving Parties continuing to refrain from taking any of such rights, benefits, remedies or claims as may be otherwise available to the Reserving Parties. The Reserving Parties hereby advise DREI and the Company that the Reserving Parties specifically reserve all such rights, benefits, remedies and claims with respect to any and all prior failures of DREI and the Company to strictly comply with the Company Agreement or any other documents, and with respect to any present or future breaches or defaults by DREI and the Company with any of the terms, covenants and conditions contained in the Company Agreement or any other documents, and that any single or partial exercise of any of such rights, benefits, remedies and claims shall not preclude any other or further exercise of any available rights, benefits, remedies and claims.

Sincerely,

PALISADES TC LLC

By: ______________________________
Joaquin Charles de Monet, Manager

# Exhibit D

WINSTEAD

Austin | Charlotte | Dallas | Fort Worth | Houston | New York | San Antonio | The Woodlands

2728 N. Harwood Street
Suite 500
Dallas, TX 75201

214.745.5400 OFFICE
214.745.5390 FAX
winstead.com

Ratliff, Kasey
direct dial: 214-745-5339

April 8, 2020

**Via Facsimile, FedEx and Email (tbarton@jmjdevelopment.com)**

Timothy Barton, President
Dallas Real Estate Investors,
LLC
1755 Wittington, Suite 340
Dallas, Texas 75234

**Re:** Company Agreement dated January 29, 2020 (the "**Company Agreement**") of Dallas Real Estate Lenders, LLC, a Delaware limited liability company (the "**Company**").

Dear Mr. Barton:

This Firm represents Palisades TC, LLC ("Palisades") in connection with its Membership Interest in the Company. We are writing to you as the President of Dallas Real Estate Investors, LLC ("DREI") which is the Manager of the Company. All capitalized terms used herein that are not specifically defined herein shall have the meanings provided in the Company Agreement.

As you are aware, on March 20, 2020, Palisades sent you notice of various actual and potential defaults under the Company Agreement (the "Default Notice"). Since receiving the Default Notice, the Company has failed to cure the defaults specified in the Default Notice within the time period prescribed by the Company Agreement. Based on Barton's actions with respect to his role as the Manager of Five Star MM, LLC which is the Managing Member and Manager of Five Star GM, LLC, my client has grave concerns that Barton and DREI have engaged and are currently engaging in a course of improper conduct that has breached their fiduciary duties to the Company, the Members, and Palisades and have materially breached the Company Agreement.

Palisades therefore has claims against Barton, DREI, and the Company on a direct and/or derivative basis for breach of the Company Agreement and for the violation of their fiduciary duties to the Company and to Palisades. In response to Barton's, DREI's, and the Company's misconduct, we have been directed by Palisades to take all steps necessary to protect and enforce its legal and equitable rights under the Company Agreement, and under Delaware law, including by filing a lawsuit against Barton, DREI, and the Company in state district court in Dallas County if the material breaches described in this letter are not cured by Barton, DREI, and the Company on or before 5:00 p.m. (Central Time) on Monday, April 13, 2020.

 WINSTEAD ATTORNEYS

**April Payment Redemption Default**

As you are aware, the purpose of the Company is to manage and own 100% of the membership interests in FHC Acquisition, LLC, a Texas limited liability company ("FHC") or such other investments (whether debt, equity or any combination thereof) (FHC and any other entity owning a Project, an "OpCo") as determined and approved by the Voting Members for the sole purposes of acquiring and developing real property and improvements thereon (a "Project"). The initial Project is that certain real property described as "Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas" ("Frisco Property") and the development of a mixed use project located thereon which is planned to include a luxury hotel, residences, restaurant, and retail components ("Frisco Project" or "Project").

Palisades contributed $3,500,000.00 as a Capital Contribution to the Company (the "Priority Capital") which is to be paid before any other distributions to the Members and which earns a Base Return or, if applicable the Default Return. Pursuant to Section 5.04(a) of the Company Agreement, a Redemption Default has occurred, including, without limitation (a) under Section 5.04(a)(iii) of the Company Agreement as a result of the breach(es) by any member or manager other than Palisades of its obligations under the Amended and Restated Company Agreement of Five Star MM, LLC dated September 16, 2019 (the "MM Company Agreement"); (b) under Section 5.04(a)(iv) of the Company Agreement as a result of the breach(es) by any member or manager other than Palisades of its obligations under the Company Agreement of Five Star GM, LLC dated September 16, 2019 (the "GM LLC Agreement"); and (c) under Section 5.04(v) of the Company Agreement as a result of the occurrence of a "Redemption Default" (as such terms is defined in the GM LLC Agreement). Further, the Company has failed to cure the Redemption Default in the time period prescribed by the Company Agreement following notice of default from Palisades.

Additionally, Palisades' Unreturned Priority Capital earns a Base Return due on the first day of each month which is equal to nine percent (9%) per annum accrued on the Unreturned Priority Capital. However, a Default Return equal to fourteen percent (14%) per annum on Palisades Unreturned Priority Capital shall apply immediately at such times as any Base Return is not distributed on the due date thereof and the Default Return shall accrue in lieu of such Base Return not timely distributed. As you are aware, DREI failed to cause the Company to timely distribute the Base Return to Palisades which was due on or before April 1, 2020 (the "April Payment Redemption Default"). As a result of the April Payment Redemption Default, the Default Return applies to the payment which was due on April 1, 2020 and which currently remains outstanding (the "April Default Return Payment").

**Demand to the Company for Capital Call, Reservation of Palisades' Sale Right and Demand for Payment**

Pursuant to Section 5.04(b) of the Company Agreement, and based on the occurrence of a Redemption Default described in Section 5.04(a)(i) of the Company Agreement, Palisades hereby exercises its right to require DREI to request an additional Capital Contribution from the Members other than Palisades in an amount sufficient to bring Palisades current on the distributions to which it is entitled pursuant to Section 5.02(a)(i) **no later than 5:00 p.m. (Central time), Monday April**

**13, 2020 (the "Demand Due Date").** Additionally, based on the occurrence of a Redemption Default, Palisades reserves all of its rights pursuant to Section 2.09 of the Company Agreement to act on behalf of the Company to market and cause the sale of the Frisco Project.

This letter constitutes formal notice of the April Payment Redemption Default. DEMAND to Barton, DREI, and the Company is hereby made for payment no later than 5:00 p.m. (Central time), on the Demand Due Date of the April Default Return Payment. As of April 8, 2020, the outstanding balance of the April Default Return Payment is $52,356.16. Please contact Joaquin de Monet at Palisades Capital Realty Advisors to determine the total payoff amount due as of any date of payment. He may be reached by phone at (214) 613-0281 or by email: jdemonet@palisadescapitalrealty.com.

**Redemption Default Based on Material Breaches of the Company Agreement and Demand for Documents**

As you were notified in the Default Notice, the Company has failed to timely provide any of the monthly financial reports that are required under Section 7.03 of the Company Agreement which shall include all expenses and income for the Company for the calendar month and balance sheet as of the last day of the calendar month detailing all assets and liabilities of the Company and the Capital Accounts of each Member. These various breaches of the Company's obligations under the Company Agreement are also each a Redemption Default under Section 5.04(a)(vii) of the Company Agreement.

Palisades demands that you produce the monthly financial reports from January 2020 through March 2020 that are required under Section 7.03 of the Company Agreement no later than the Demand Due Date.

You are hereby further reminded of Section 2.08 of the Company Agreement and the limitations therein that are placed on DREI's ability to undertake certain actions with respect to the Company or on behalf of the Company with respect to any OpCo, the Frisco Project or any other Project without the prior written approval of Palisades. These actions include but are not limited to (i) entering into, amending, modifying, terminating or canceling any property management agreement with any person for management and leasing of the Project (Section 2.08(e)); (ii) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company or any OpCo of more than $100,000 in any year except as provided in the Project Budget (Section 2.08(g)); and (iii) entering into, modifying, amending or terminating any agreement with a hotel management company or hotel franchise agreement for the Frisco Property or any portion thereof (a "Hotel Agreement")(Section 2.08(gg)). You are instructed not to undertake any of the actions specified in Section 2.08 of the Company Agreement, including those specifically enumerated in this letter.

**Books and Records Request to the Company**

Pursuant to Section 7.02 of the Company Agreement, and Section 18-305 of the Delaware Limited Liability Company Act, Palisades requests access to and the right to inspect and copy the

books and records of the Company. Specifically, Palisades requests access to and will copy the following records for the Company:

*pursuant to Section 18-305 of the Delaware Limited Liability Company Act, all information that Palisades is entitled to pursuant to Section 18-305 as a Member of the Company;

*balance sheets by month from January 1, 2020 through the present day;

*profit and loss statements by month from January 1, 2020 through the present day; and

*cash flow statements by month from January 1, 2020 through the present day.

*Information and documents regarding the Project, including but not limited to (i) any agreements with any contractor, supplier, vendor or other third party related to the Project along with contact information for all such parties, (ii) any correspondence with lenders, including but not limited to any default notices, and (iii) any notices, citations or other correspondence from any State or local governmental entity related to the Project.

Palisades is seeking this information because it wants to ensure that it has the most current understanding and status of its substantial financial investment in the Company and an accurate understanding of the business transactions of the Company. Additionally, and as previously noted, Palisades is also contractually allowed access to such information. Further, DREI is obligated to cooperate and shall cause the Company to cooperate with Palisades to accomplish a sale of the Project in the event that Palisades elects to exercise its Sale Right pursuant to Section 2.09 of the Company Agreement. The requested information is essential to Palisades' analysis related to a potential exercise of its Sale Right.

On behalf of Palisades, we request that the documents responsive to this books and records request be made available for inspection by my law firm and/or other professionals hired by Palisades. We request that these materials be produced in an electronic (PDF) format and they can be uploaded for our review in a Dropbox or other, similar manner. If you have any questions along these lines, please let us know. In addition, Palisades reserves the right to seek these files in other formats as necessary to permit a prompt review to be made of the requested material.

Please be advised that if by Monday, April 13, 2020 at 5:00 p.m. (1) Palisades has not received the April Default Return Payment, or (2) Palisades has not received the monthly financial reports that are required under Section 7.03 of the Company Agreement, or (3) Palisades has not been provided access to and the right to inspect and copy the books and records of the Company as demanded herein, Palisades shall promptly file suit against Barton, DREI, and the Company requesting that Barton and DREI be removed and replaced from their respective roles as President of DREI and Manager of the Company, and seeking damages, costs, and legal fees, and to enforce all of Palisades' rights under the Company Agreement, and under Delaware law. In such event, Palisades will also take immediate steps to procure a Brokers' Opinion of Value for the Project related to the potential exercise of its Sale Right pursuant to Section 2.09 of the Company Agreement.

In addition to the forgoing, Palisades demands that Barton, DREI, the Company, and JMJ preserve, and not alter in any way, any evidence, wherever it may be found—including any personal or work-related mobile phones or personal computers—regarding the above-referenced claims by Palisades, events, and potential parties (including any officers, directors, employees, or affiliated entities of the parties). This request for the preservation of evidence to Barton, DREI, the Company, and JMJ includes all voicemails, emails, text messages, time sheets, meeting agendas and notes, telephone records and call logs, expense reports, notes, letters, and all other relevant documents, which are maintained by Barton, DREI, the Company, and JMJ. Barton, DREI, the Company, and JMJ have a duty to preserve such evidence, and the failure to do so can result in sanctions.

By this letter, Palisades reserves all rights and remedies against Barton, DREI, the Company and any of their members, officers, directors, or affiliated entities, including the right to assert additional claims against those parties and to seek additional relief and/or amounts from you or those parties in addition to the claims set forth above. We look forward to your prompt response.

Sincerely,

M. Kasey Ratliff

cc: Mark Adams, *Via Email* (madams@jmjdevelopment.com)
Joaquin de Monet, *Via Email*
Brent Clifton, *Of the Firm*

# Exhibit E

**Unsworn Declaration § 132.001 Tex. Civ. Prac. & Rem. Code**

"My name is Joaquin Charles de Monet. My date of birth is August 29, 1964 and my business address is 1919 McKinney Avenue, Suite 100, Dallas, Texas 75201. I am Manager for Plaintiff Palisades TC, LLC. I declare under the penalty of perjury that in my capacity as Manager of Plaintiff Palisades TC, LLC, I have personal knowledge that the grounds and basis for which the Temporary Restraining Order is sought are true and correct. I have read the above and foregoing Plaintiff's Original Petition and Application for Temporary Restraining Order and Temporary Injunction, and the factual statements contained therein are within my personal knowledge and are true and correct."

Executed in Dallas County, State of Texas, on this 22nd day of April, 2020.

Joaquin de Monet, Declarant

4838-2235-0978v.1
61993-1 2/22/2019

# Exhibit "E"

**AGREEMENT**

This Agreement ("Agreement") is entered into by (a) Palisades TC, LLC ("Palisades"); and (b) Timothy Barton ("Barton"), Dallas Real Estate Investors, LLC ("DREI"), Five Star MM, LLC ("Five Star MM"), 2999 TC JMJ MGR, LLC ("JMJ MGR"), Five Star GM, LLC ("Five Star GM") (collectively the "JMJ Entities"), joined, for purposes of Paragraph 2.4 below, by Joaquin Charles de Monet ("de Monet") and JMJ Development LLC ("JMJ Dev"). Palisades and the JMJ Entities are collectively referred to as the "Parties."

## 1. RECITALS

1.1. WHEREAS Palisades, through its investment in Five Star GM, advanced $4,000,000 towards the acquisition of approximately 2.47 acres located at 2999 Turtle Creek, Dallas, Texas ("the Turtle Creek Property") under the collective terms of (i) the *Amended and Restated Company Agreement of Five Star MM, LLC* dated September 16, 2019 ("MM Agreement") and (ii) the *Company Agreement of Five Star GM, LLC* dated September 16, 2019 ("GM Agreement") (collectively, "Five Star Agreements").

1.2. WHEREAS Palisades and DREI are the members of Dallas Real Estate Lenders, LLC ("DREL");

1.3. WHEREAS the sole business and purpose of DREL is its ownership interests and related rights in FHC Acquisition, LLC ("FHC"), which acquired the approximate 4.5385 acres of real property in Frisco, Texas located at Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to Volume 2019, Page 275, Plat Records, Collin County, Texas ("the Frisco Property").

1.4. WHEREAS Palisades, through DREL, advanced $3,500,000.00 towards the acquisition of the Frisco Property (collectively, "Palisades Equity Investment") under the terms of the *Company Agreement of Dallas Real Estate Lenders, LLC* dated January 29, 2021 ("Frisco Agreement").

1.5. WHEREAS on April 22, 2021, Palisades filed a lawsuit under the style *Palisades TC, LLC, Individually, and on behalf of Five Star GM, LLC v. Five Star MM, LLC and Timothy Barton, Individually*, No. DC-20-05960, in the 193th District Court of Dallas County, Texas, with respect to the Turtle Creek Property (the "Five Star Lawsuit").

1.6. WHEREAS on April 23, 2021, Palisades filed a lawsuit under the style *Palisades TC, LLC, Individually, and on behalf of Dallas Real Estate Lenders, LLC v. Dallas Real Estate Investors, LLC and Timothy Barton, Individually* No. DC-20-06005, in the 298th District Court of Dallas County, Texas, with respect to the Frisco Property (the "DREI Lawsuit");

1.7. WHEREAS Barton and the JMJ Entities deny the material allegations against them in the DREI Lawsuit and the Five Star Lawsuit;

1.8. WHEREAS Palisades denies any material allegations against it in the DREI Lawsuit and the Five Star Lawsuit;

1.9. WHEREAS the Palisades and the JMJ Entities wish to avoid the uncertainties of litigation and to resolve the DREI Lawsuit and the Five Star Lawsuit;

NOW, THEREFORE, in consideration of the Parties' mutual promises in this Agreement and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

## 2. AGREEMENT

2.1. **Good Faith Payment.** On or before January 15, 2021, the JMJ Entities shall pay Palisades $50,000 ("Good Faith Payment") by payment as instructed in paragraph 2.3 below.

2.2. **Sanctions and Disqualification.** The JMJ Entities shall withdraw with prejudice to refiling all motions to disqualify Reese Marketos, LLP (including Joel W. Reese) as counsel for Palisades and hereby agree not to file any further motions to disqualify Palisades' existing legal counsel (or similar type motions) in either the Five Star Lawsuit or the DREI Lawsuit. The JMJ Entities (including Timothy Barton) will also withdraw with prejudice to refiling all complaints filed with the State Bar of Texas arising from or related to the Five Star Lawsuit and/or the DREI Lawsuit. Palisades will withdraw with prejudice to the refiling its motions for sanctions related to the prior affidavits submitted by Timothy Barton regarding alleged communications with Reese Marketos LLP. Upon receipt of the Good Faith Payment and the withdrawal of the motions and complaints referenced in this section, all disputes between the Parties regarding disqualification (including Palisades' request for sanctions) are hereby settled and resolved.

2.3. **Settlement Payment and Settlement Payment Deadline.** The JMJ Entities shall pay Palisades $4,950,000 (the "Settlement Payment") on or before February 15, 2021 (the "Settlement Payment Deadline"). The JMJ Entities may extend the Settlement Payment Deadline (a) until March 1, 2021 by paying an additional $50,000 on or before February 15, 2021 ("February Payment"); (b) until April 15, 2021 by timely paying the February Payment and paying an additional payment of $50,000 on or before March 15, 2021 ("March Payment"); (c) until May 15, 2021 by timely paying the February Payment and the March Payment and paying an additional payment of $50,000 on or before April 15, 2021 ("April Payment"); and (d) until June 15, 2021, by timely paying the February Payment and the March Payment and the April Payment and paying an additional $50,000 on or before May 15, 2021 (the "May Payment"). The February Payment, the March Payment, the April Payment, and the May Payment are the "Extension Payments." Each timely paid Extension Payment will reduce the Settlement Payment by the amount of the Extension Payment. All payments under this Agreement shall be made by wire transfer to the following account or such other account as may be designated by Palisades:

**ABA Routing 111025466**
**Account 50017820**

| **Business Name:** | **Bank: Pegasus Bank Dallas** |
|---|---|
| Reese Marketos LLP IOLTA | 4515 W. Mockingbird Lane |
| 750 N. St. Paul St. #600 | Dallas, TX 75209 |
| Dallas, TX 75201-3201 | 214.353.3000 |

2.4. **Mutual Releases Conditioned Upon Timely Payment of the Settlement Payment.**

(a.) **Definitions.**

1. "Claims" means any and all rights, obligations, disputes, claims, actions, causes of action, debts, damages, demands, judgments, offsets, payments, costs, attorney's fees, proceedings, costs, complaints, controversies, losses, arguments, promises, undertakings, reimbursement claims, contribution claims, recoupment rights, interests, third-party claims, indemnity claims, remedies, suits, accounts, defenses, affirmative defenses, powers, privileges, licenses, franchises, counterclaims and crossclaims, acts omitted or committed of every nature, obligations of every kind and nature, rights,

liabilities, charges, or expenses, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertable directly or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, that directly or indirectly relate to or concern the Five Star Agreements, Frisco Agreement, Frisco Related Agreements, Frisco Property, the DREI Lawsuit, the Turtle Creek Property, and/or the Five Star Lawsuit, in tort, law, equity, or otherwise pursuant to any theory of law. Claims is intended to be all inclusive of any claims arising from or related to any business, contractual, or legal relationship between any of the Parties, **but does not include claims for breach of this Agreement**.

2. "Palisades Releasors" means de Monet and Palisades, on behalf of itself and each of any affiliated, related, and associated persons, entities (including, but not limited to, DREL, FHC, Five Star GM, LLC, Five Star MM, LLC), subsidiaries, and entities managed, controlled, under common control by or with any of the foregoing, including entities in which any of the foregoing possesses any kind of interest in, and each of their respective current and former successors, assigns, administrators, executors, investors, officers, directors, members, shareholders, partners, managers, trustees, agents, representatives, employees, former employees and other person or entity related thereto or claiming by or through them. "Palisades Releasees" has the same meaning as the "Palisades Releasors."

3. "JMJ Releasors" means JMJ Dev and all of the JMJ Entities, on their own behalf and on behalf of any affiliated, related, and associated persons, entities (including, but not limited to, DREL, FHC, Five Star GM, LLC, Five Star MM, LLC), trusts, subsidiaries, and entities managed, controlled, under common control by or with any of the foregoing, including entities in which any of the foregoing possesses any kind of interest in, and each of their respective current and former successors, assigns, administrators, executors, officers, directors, members, shareholders, partners, managers, trustees, agents, representatives, employees, former employees and other person or entity claiming by or through them. "JMJ Releasees" has the same meaning as the "JMJ Releasors."

4. "Barton Releasors" means Timothy Barton and any person, trust, or entity acting on his behalf or under his direction or control. "Barton Releasees" has the same meaning as the "Barton Releasors."

(b.) **Palisades Release and Covenant Not to Sue.** Effective, and expressly conditioned upon, the timely receipt by Palisades of the Settlement Payment on or prior to the Settlement Payment Deadline, the Palisades Releasors (i) release, acquit, hold harmless and forever discharge the JMJ Releasees and Barton Releasees from all Claims; and (ii) covenant not to sue JMJ Releasees and/or Barton Releasees for any Claims.

(c.) **DREI Release and Covenant Not to Sue.** Effective, and expressly conditioned upon, the timely payment of the Settlement Payment to Palisades on or prior to the Settlement Payment Deadline, the JMJ Releasors (i) release, acquit, hold harmless and forever

discharge the Palisades Releasees and de Monet from all Claims and (ii) covenant not to sue any of the Palisades Releasees and/or Joaquin de Monet for any Claims.

(d.) **Barton Release and Covenant Not to Sue.** Effective, and expressly conditioned upon, the timely payment of the Settlement Payment to Palisades on or prior the Settlement Payment Deadline, the Barton Releasors (i) release, acquit, hold harmless and forever discharge the Palisades Releasees and de Monet from all Claims and (ii) covenant not to sue any of the Palisades Releasees and Joaquin de Monet for any Claims.

(e.) **Abatement and Possible Dismissal:** Within three days after execution of this Agreement and Palisades' receipt of the Good Faith Payment, the Parties agree to jointly request that the trial courts continue all deadlines and trial settings in the Five Star Lawsuit and the DREI Lawsuit by at least 120 days. Provided that the trial courts agree to continue the deadlines and trial settings by at least 90 days, then the Parties agree to abate all proceedings in the Five Star Lawsuit and DREI Lawsuit for as long as the Settlement Payment Deadline has not expired or terminated (but in no event beyond May 1, 2021). If the Settlement Payment is timely paid to Palisades by the Settlement Payment Deadline (as extended), then the parties will jointly dismiss with prejudice all claims in the Five Star Lawsuit and the DREI Lawsuit within 10 business days after Palisades' receipt of the Settlement Payment.

(f.) **SETTLEMENT PAYMENT DEFAULT:** If the Settlement Payment is not timely paid by the Settlement Payment Deadline (a "Settlement Payment Default"), then (a) the releases and covenants not to sue in this Agreement shall be void and not effective; (b) agreements in section 2.1 and 2.2 shall remain in effect and valid; (c) the Parties have the unconditional right to pursue the claims asserted in the Five Star Lawsuit and the DREI Lawsuit and nothing in this Agreement shall be used as a claim or defense; except that (d) any amounts paid by the JMJ Entities under this Agreement (including the Good Faith Payment and any Extension Payments and any payments under Section 2.4(g)) shall be credited against amounts that may be owed, upon final judgment, by the Defendants first in the Five Star Lawsuit and second to the DREI Lawsuit.

(g.) **SUBSTANTIAL PAYMENT:** If the Frisco Property is sold prior to the Settlement Payment Deadline, then all net proceeds (after payment of any loan secured by the Frisco Property and customary closing costs, including customary brokerage fees) up to a maximum of $4,950,000 shall be paid to Palisades. If Palisades receives at least $4,000,000 of the Settlement Payment on or prior to the Settlement Payment Deadline, then a Settlement Payment Default will not occur as long as the JMJ

Entities pay the remaining balance in equal monthly installments over an 18-month period, starting with the first payment on the 30th day after payment of the $4,000,000 and continuing thereafter on the 1st day of every month for 18 months. For example, if the sale of the Frisco Property produced net proceeds of only $4,000,000 and the balance was $4,950,000, then the JMJ Entities could pay the remaining $950,000 in 18 equal monthly installments of $52,777.77. In addition, to compensate Palisades for the delay in receipt of the full Settlement Payment, the JMJ Entities will pay one additional monthly payment in the same required amount as the prior monthly payments (the "19th Installment") within 35 days after payment of the 18th monthly installment payment. Failure to pay any monthly payment (including the 19th Installment) within 5 days after the due date shall constitute a Settlement Payment Default, requiring the parties to be governed exclusively by Section 2.4(f).

(h.) Upon receipt by Palisades of the Settlement Payment or an acceptable equivalent under subpart (g) above, Palisades will either (i) transfer all interest to the JMJ Entities of DREL and Five Star GM and Five Star MM or (ii) withdraw for no additional payments from DREL, Five Star MM and/or Five Star GM.

(i) In the event the Frisco Property is sold to an independent third party and Palisades receives the Settlement Payment or an acceptable equivalent under subpart (g) above, the Entities involved in the Frisco Property (DREL and FHC) shall terminate, with costs to be bome by each separate entity.

## 3. ADDITIONAL TERMS

3.1. **Acknowledgement.** Nothing in this Agreement is intended to be an admission of guilt or liability by any Party, but rather this is a compromise and settlement of disputed claims for which all liability is denied by all Parties.

3.2. **Right to Cure.** Notwithstanding any conflict herein, any of the JMJ Entities shall have the right to cure any default of this Agreement for five (5) Business Days after receipt of written notice, a copy of which may be sent by email to tbarton@jmjdevelopment.net, with a copy to smetzger@pmklaw.com.

3.3. **Non-Reliance and Waiver of Fraudulent Inducement.** In accordance with *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997), *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex. 2008), *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co.*, 341 S.W.3d 323 (Tex. 2011), and *Int'l Business Machines Corp. v. Lufkin Industries, LLC*, 573 S.W.3d 224 (Tex. 2019), the Parties expressly disclaim and waive any claim or allegation of fraudulent inducement with respect to this Agreement. The Parties disclaim that they or he are relying on any statement or representation that is not expressly set out in this Agreement and waives any claim of fraud or fraudulent misrepresentation relating to or conceming this Agreement. Except for the representations that are expressly included in this Agreement, the Parties

disclaim any reliance on any representation, statement, or omission made by any person, including but not limited to any other Party or any agent, attorney, or representative of any other Party, relating in any way to the negotiations, subject matter, basis, reasonableness, or effect of this Agreement. To avoid any possible doubt, the Parties expressly warrant, represent, agree, and acknowledge the following:

(a.) None of the Parties is relying on any statement or representation, whether oral, written, or otherwise, other than the representations, agreements, and warranties set forth in this Agreement.

(b.) The terms of this Agreement were negotiated, rather than boilerplate, and the Parties specifically discussed issues covered by the Agreement, including the releases in it.

(c.) The Parties are knowledgeable in business matters.

(d.) No promise or agreement that is not contained in writing in this Agreement has been made to the Parties in connection with executing this Agreement and the releases contained in this Agreement.

(e.) The Parties are relying solely on their own judgment and advice of their respective counsel when deciding whether to enter into this Agreement. Each have been represented by legal counsel who have read and explained to the Party the entire contents of this Agreement, and the legal consequences of entering into this Agreement.

(f.) The Parties enter into this Agreement freely and without duress and does so after full opportunity to consult with the legal counsel and other professionals of their choice.

(g.) The Parties' willingness to enter into this Agreement was and is based on arm's-length negotiations.

3.4. **Governing Law and Attorneys' Fees.** This Agreement shall be governed by and construed under the laws of the State of Texas. The prevailing Party in any lawsuit or other legal proceeding in which a Party seeks to interpret or enforce this Agreement will have the right to recover their reasonable attorneys' fees from each non-prevailing Party.

3.5. **Successors and Assigns; No Third-Party Beneficiaries; Amendment.** This Agreement may not be assigned or transferred. This Agreement is for the sole benefit of the Parties, and it shall not inure to the benefit of any other person or party whomsoever or whatsoever, it being the intention of the Parties that no non-Party shall be deemed a third-party beneficiary of this Agreement. This Agreement may not be amended, waived, or modified except in a writing that is signed by all Parties.

3.6. **Notices.** Any notice, statement, claim or other communication required or permitted hereunder shall be in writing and deemed delivered when received by the intended recipient by (i) electronic transmission, (ii) hand delivery, (iii) United States mail, postage prepaid and properly addressed or (iv) courier service at the following addresses:

**If to Palisades:**

Joaquin Charles de Monet
Operating Manager
Palisades Capital Realty Advisors
jdemonet@palisadescapitalrealty.com
1919 McKinney Avenue | Suite 100
Dallas, TX 75201

**If to JMJ Entities:**

Timothy Barton
President and Chief Executive Officer
JMJ Development LLC
tbarton@jmjdevelopment.net
1755 Wittington Place | Suite 340
Dallas, Texas

3.08 **Integration Clause; Counterparts.** This Agreement, including any exhibits attached hereto and fully incorporated by reference into this Settlement Agreement, states the Parties' entire agreement with respect to the matters discussed herein, and it supersedes all prior or contemporaneous oral or written understandings, settlement agreements, statements, or promises. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original for all purposes.

**AGREED AND ACCEPTED, EFFECTIVE AS OF JANUARY 11, 2021:**

**PALISADES TC, LLC**

By:____________________
Name: Joaquin Charles de Monet
Title: Operating Manager

**DALLAS REAL ESTATE INVESTORS, LLC**

By:____________________
Name: Timothy Barton
Title: President

**2999 TC JMJ MGR, LLC**

By:____________________
Name: Timothy Barton
Title: President

**FIVE STAR MM, LLC**

By:____________________
Name: Timothy Barton
Title: President

**FIVE STAR GM, LLC**

By:____________________
Name: Timothy Barton
Title: President

**JMJ DEVELOPMENT LLC**

By:____________________
Timothy Barton, President

Barton (individually) and de Monet (individually) are Parties to this Agreement solely for purposes of the conditional potential releases in Section 2.4 above and make no other agreements or representations.

____________________
Joaquin Charles de Monet, individually

____________________
Timothy Barton, individually

**If to Palisades:**

Joaquin Charles de Monet
Operating Manager
Palisades Capital Realty Advisors
jdemonet@palisadescapitalrealty.com
1919 McKinney Avenue | Suite 100
Dallas, TX 75201

**If to JMJ Entities:**

Timothy Barton
President and Chief Executive Officer
JMJ Development LLC
tbarton@jmjdevelopment.net
1755 Wittington Place | Suite 340
Dallas, Texas

3.08 **Integration Clause; Counterparts.** This Agreement, including any exhibits attached hereto and fully incorporated by reference into this Settlement Agreement, states the Parties' entire agreement with respect to the matters discussed herein, and it supersedes all prior or contemporaneous oral or written understandings, settlement agreements, statements, or promises. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original for all purposes.

**AGREED AND ACCEPTED, EFFECTIVE AS OF JANUARY 11, 2021:**

**PALISADES TC, LLC**

By: ______________________
Name: Joaquin Charles de Monet
Title: Operating Manager

**DALLAS REAL ESTATE INVESTORS, LLC**

By: ______________________
Name: Timothy Barton
Title: President

**2999 TC JMJ MGR, LLC**

By: ______________________
Name: Timothy Barton
Title: President

**FIVE STAR MM, LLC**

By: ______________________
Name: Timothy Barton
Title: President

**FIVE STAR GM, LLC**

By: ______________________
Name: Timothy Barton
Title: President

**JMJ DEVELOPMENT LLC**

By: ______________________
Timothy Barton, President

Barton (individually) and de Monet (individually) are Parties to this Agreement solely for purposes of the conditional potential releases in Section 2.4 above and make no other agreements or representations.

______________________
Joaquin Charles de Monet, individually

______________________
Timothy Barton, Individually

# Exhibit "F"

PALISADES TC LLC
1919 McKinney Ave., Suite 100
Dallas, Texas 75201

June 16, 2021

Timothy Barton
President and Chief Executive Officer
JMJ Development LLC
tbarton@jmjdevelopment.net
1755 Wittington, Suite 340
Dallas, Texas 75234

Re: Agreement dated January 11, 2021 (the "**Agreement**") by (a) Palisades TC, LLC ("Palisades"); and (b) Timothy Barton ("Barton"), Dallas Real Estate Investors, LLC ("DREI"), Five Star MM, LLC ("Five Star MM"), 2999 TC JMJ MGR, LLC ("JMJ MGR"), Five Star GM, LLC ("Five Star GM") (collectively the "JMJ Entities").

Mr. Barton:

This letter is provided as notice of default of the Agreement dated January 11, 2021. Section 2.3 of the Agreement requires the JMJ Entities to pay Palisades the Settlement Payment (currently, $4,750,000) on or before February 15, 2021 (if not extended). The JMJ Entities extended the deadline until June 15, 2021, by making the February Payment, the March Payment, the April Payment, and the May Payment.

As we have not received the Settlement Payment, you are in default of the Agreement.

Sincerely,

PALISADES TC LLC

By: ______________________
Joaquin Charles de Monet, Manager

# Exhibit "G"

Case 21-41488-elm11 Doc 4767 Filed 07/26/21 Entered 07/26/21 19:23:30 Page 12 of 189

**Fill in this information to identify the case**

Debtor name **Dallas Real Estate Investors, LLC**

United States Bankruptcy Court for the: **NORTHERN DISTRICT OF TEXAS**

Case number (if known) **21-41488-elm**

☐ Check if this is an amended filing

Official Form 206A/B

## Schedule A/B: Assets -- Real and Personal Property

**12/15**

**Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).**

**Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.**

**For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.**

### Part 1: Cash and cash equivalents

**1. Does the debtor have any cash or cash equivalents?**

☑ No. Go to Part 2.
☐ Yes. Fill in the information below.

**All cash or cash equivalents owned or controlled by the debtor** — **Current value of debtor's interest**

**2. Cash on hand**

**3. Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number

**4. Other cash equivalents** *(Identify all)*

Name of institution (bank or brokerage firm)

**5. Total of Part 1**
Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80. **$0.00**

### Part 2: Deposits and prepayments

**6. Does the debtor have any deposits or prepayments?**

☑ No. Go to Part 3.
☐ Yes. Fill in the information below.

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

**Current value of debtor's interest**

7. **Deposits, including security deposits and utility deposits**

Description, including name of holder of deposit

8. **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

9. **Total of Part 2.**
Add lines 7 through 8. Copy the total to line 81. **$0.00**

## Part 3: Accounts receivable

10. **Does the debtor have any accounts receivable?**

☑ No. Go to Part 4.
☐ Yes. Fill in the information below.

**Current value of debtor's interest**

11. **Accounts receivable**

11a. 90 days old or less: ____ face amount − ____ doubtful or uncollectible accounts = .............. → ____

11b. Over 90 days old: ____ face amount − ____ doubtful or uncollectible accounts = .............. → ____

12. **Total of Part 3**
Current value on lines 11a + 11b = line 12. Copy the total to line 82. **$0.00**

## Part 4: Investments

13. **Does the debtor own any investments?**

☑ No. Go to Part 5.
☐ Yes. Fill in the information below.

**Valuation method used for current value** **Current value of debtor's interest**

14. **Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity: % of ownership:

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

17. **Total of Part 4**
Add lines 14 through 16. Copy the total to line 83. **$0.00**

## Part 5: Inventory, excluding agriculture assets

18. **Does the debtor own any inventory (excluding agriculture assets)?**

☑ No. Go to Part 6.
☐ Yes. Fill in the information below.

Case 21-41488-elm11 Doc 47 Filed 07/06/21 Entered 07/06/21 15:37:30 Page 34 of 189

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 19. **Raw materials** | MM/DD/YYYY | | | |
| 20. **Work in progress** | | | | |
| 21. **Finished goods, including goods held for resale** | | | | |
| 22. **Other inventory or supplies** | | | | |

23. **Total of Part 5**
Add lines 19 through 22. Copy the total to line 84. **$0.00**

24. **Is any of the property listed in Part 5 perishable?**
☐ No
☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**
☐ No
☐ Yes. Book value ____________ Valuation method ____________ Current value ____________

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**
☐ No
☐ Yes

## Part 6: Farming and fishing-related assets (other than titled motor vehicles and land)

27. **Does the debtor own or lease any farming or fishing-related assets (other than titled motor vehicles and land)?**
☑ No. Go to Part 7.
☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 28. **Crops--either planted or harvested** | | | |
| 29. **Farm animals** *Examples:* Livestock, poultry, farm-raised fish | | | |
| 30. **Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| 31. **Farm and fishing supplies, chemicals, and feed** | | | |
| 32. **Other farming and fishing-related property not already listed in Part 6** | | | |

33. **Total of Part 6.**
Add lines 28 through 32. Copy the total to line 85. **$0.00**

34. **Is the debtor a member of an agricultural cooperative?**
☐ No
☐ Yes. Is any of the debtor's property stored at the cooperative?
  ☐ No
  ☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**
☐ No
☐ Yes. Book value ____________ Valuation method ____________ Current value ____________

36. **Is a depreciation schedule available for any of the property listed in Part 6?**
☐ No
☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**
☐ No
☐ Yes

Case 21-41488-elm11 Doc 47 Filed 07/08/21 Entered 07/08/21 15:23:30 Page 45 of 189

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

## Part 7: Office furniture, fixtures, and equipment; and collectibles

**38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☑ No. Go to Part 8.
☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **39. Office furniture** | | | |
| **40. Office fixtures** | | | |
| **41. Office equipment, including all computer equipment and communication systems equipment and software** | | | |
| **42. Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| **43. Total of Part 7.** Add lines 39 through 42. Copy the total to line 86. | | | **$0.00** |

**44. Is a depreciation schedule available for any of the property listed in Part 7?**

☐ No
☐ Yes

**45. Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☐ No
☐ Yes

## Part 8: Machinery, equipment, and vehicles

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☑ No. Go to Part 9.
☐ Yes. Fill in the information below.

| General description Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **47. Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| **48. Watercraft, trailers, motors, and related accessories** Examples: Boats trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| **49. Aircraft and accessories** | | | |
| **50. Other machinery, fixtures, and equipment (excluding farm machinery and equipment)** | | | |
| **51. Total of Part 8.** Add lines 47 through 50. Copy the total to line 87. | | | **$0.00** |

**52. Is a depreciation schedule available for any of the property listed in Part 8?**

☐ No
☐ Yes

**53. Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☐ No
☐ Yes

Case 21-41488-elm11 Doc 47 Filed 07/26/21 Entered 07/26/21 19:53:30 Page 56 of 189

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

## Part 9: Real property

**54. Does the debtor own or lease any real property?**

☑ No. Go to Part 10.
☐ Yes. Fill in the information below.

**55. Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| **Description and location of property** Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | **Nature and extent of debtor's interest in property** | **Net book value of debtor's interest** (Where available) | **Valuation method used for current value** | **Current value of debtor's interest** |
|---|---|---|---|---|

**56. Total of Part 9.**
Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88. **$0.00**

**57. Is a depreciation schedule available for any of the property listed in Part 9?**
☐ No
☐ Yes

**58. Has any of the property listed in Part 9 been appraised by a professional within the last year?**
☐ No
☐ Yes

## Part 10: Intangibles and Intellectual Property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☑ No. Go to Part 11.
☐ Yes. Fill in the information below.

| **General description** | **Net book value of debtor's interest** (Where available) | **Valuation method used for current value** | **Current value of debtor's interest** |
|---|---|---|---|
| **60. Patents, copyrights, trademarks, and trade secrets** | | | |
| **61. Internet domain names and websites** | | | |
| **62. Licenses, franchises, and royalties** | | | |
| **63. Customer lists, mailing lists, or other compilations** | | | |
| **64. Other intangibles, or intellectual property** | | | |
| **65. Goodwill** | | | |

**66. Total of Part 10.**
Add lines 60 through 65. Copy the total to line 89. **$0.00**

**67. Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)**?**
☐ No
☐ Yes

**68. Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
☐ No
☐ Yes

**69. Has any of the property listed in Part 10 been appraised by a professional within the last year?**
☐ No
☐ Yes

Case 21-41488-elm11 Doc 47 Filed 07/23/21 Entered 07/23/21 15:37:30 Page 67 of 189

Debtor Dallas Real Estate Investors, LLC Case number (if known) 21-41488-elm
Name

## Part 11: All other assets

**70. Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.
☑ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|
| **71. Notes receivable** | |
| Description (include name of obligor) | |
| **72. Tax refunds and unused net operating losses (NOLs)** | |
| Description (for example, federal, state, local) | |
| **73. Interests in insurance policies or annuities** | |
| **74. Causes of action against third parties (whether or not a lawsuit has been filed)** | |
| **75. Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims** | |
| **76. Trusts, equitable or future interests in property** | |
| **77. Other property of any kind not already listed** *Examples:* Season tickets, country club membership | |
| Debtor owns 100% of FHC LLC, which owns the property located at Syria Gate Way, Blk A, Lot 13, Frisco, TX 75034 | $10,000,000.00 |
| **78. Total of Part 11.** Add lines 71 through 77. Copy the total to line 90. | $10,000,000.00 |

**79. Has any of the property listed in Part 11 been appraised by a professional within the last year?**
☑ No
☐ Yes

Debtor **Dallas Real Estate Investors, LLC**
Name

Case number (if known) **21-41488-elm**

## Part 12: Summary

**In Part 12 copy all of the totals from the earlier parts of the form.**

| Type of property | | Current value of personal property | | Current value of real property |
|---|---|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | | $0.00 | | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | | $0.00 | | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | | $0.00 | | |
| 83. **Investments.** *Copy line 17, Part 4.* | | $0.00 | | |
| 84. **Inventory.** *Copy line 23, Part 5.* | | $0.00 | | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | | $0.00 | | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | | $0.00 | | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | | $0.00 | | |
| 88. **Real property.** *Copy line 56, Part 9.* → | | | | $0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | | $0.00 | | |
| 90. **All other assets.** *Copy line 78, Part 11.* | | + $10,000,000.00 | | |
| 91. **Total.** Add lines 80 through 90 for each column. | 91a. | $10,000,000.00 | + 91b. | $0.00 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92 ........ **$10,000,000.00**

Case 21-41488-elm11 Doc 47-7 Filed 07/08/21 Entered 07/08/21 19:23:30 Page 89 of 189

**Fill in this information to identify the case:**

Debtor name: Dallas Real Estate Investors, LLC

United States Bankruptcy Court for the: NORTHERN DISTRICT OF TEXAS

Case number (if known): 21-41488-elm

☐ Check if this is an amended filing

Official Form 206D

## Schedule D: Creditors Who Have Claims Secured by Property

12/15

**Be as complete and accurate as possible.**

1. **Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
☑ Yes. Fill in all of the information below.

### Part 1: List Creditors Who Have Secured Claims

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | Column A Amount of claim Do not deduct the value of collateral. | Column B Value of collateral that supports this claim |
|---|---|---|
| 2.1 | $3,500,000.00 | $10,000,000.00 |

**2.1**

**Creditor's name**
Palisades Capital Realty Advisors

**Creditor's mailing address**
1919 McKinney Avenue
Suite 100

Dallas TX 75201

**Creditor's email address, if known**

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
☑ No
☐ Yes. Specify each creditor, including this creditor, and its relative priority.

**Describe debtor's property that is subject to a lien**
Real Property

**Describe the lien**
Business Debt

**Is the creditor an insider or related party?**
☑ No
☐ Yes

**Is anyone else liable on this claim?**
☑ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**As of the petition filing date, the claim is:**
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

3. **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.** $3,500,000.00

Debtor Dallas Real Estate Investors, LLC Case number (if known) 21-41488-elm

## Part 2: List Others to Be Notified for a Debt Already Listed in Part 1

**List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.**

**If no others need to be notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.**

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| Joaquin de Monet<br>Palisades Capital Realty<br>5740 Northmoor Dr.<br><br>Dallas TX 75230 | Line 2.1 | ____ |
| Joel W. Reese<br>Reese Marketos LLP<br>750 N. Saint Paul St., Suite 600<br><br>Dallas TX 75201 | Line 2.1 | ____ |

**Fill in this information to identify the case:**

Debtor: Dallas Real Estate Investors, LLC

United States Bankruptcy Court for the: NORTHERN DISTRICT OF TEXAS

Case number (if known): 21-41488-elm

☐ Check if this is an amended filing

Official Form 206E/F

## Schedule E/F: Creditors Who Have Unsecured Claims

12/15

**Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.**

### Part 1: List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).

☑ No. Go to Part 2.
☐ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or part.** If more space is needed for priority unsecured claims, fill out and attach the Additional Page of Part 1.

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.1 Priority creditor's name and mailing address** | **As of the petition filing date, the claim is:** *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>**Basis for the claim:** | | |
| **Date or dates debt was incurred**<br>**Last 4 digits of account number** __ __ __ __<br>**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a)(____) | **Is the claim subject to offset?**<br>☐ No<br>☐ Yes | | |

Case 21-41488-elm11 Doc 17 Filed 07/28/21 Entered 07/28/21 19:23:30 Page 12 of 19

Debtor Dallas Real Estate Investors, LLC Case number (if known) 21-41488-elm

## Part 2: List All Creditors with NONPRIORITY Unsecured Claims

3. **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If more space is needed for nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

**Amount of claim**

**3.1** **Nonpriority creditor's name and mailing address**

Fab Studio
5646 Milton Street
Dallas TX 75205

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Amount of claim:** $88,453.40

**Basis for the claim:** Business Debt

**Date or dates debt was incurred**

**Last 4 digits of account number** ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

**3.2** **Nonpriority creditor's name and mailing address**

Halff Associates
12225 Greenville Avenue
Suite 200
Dallas TX 75243

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Amount of claim:** $14,267.31

**Basis for the claim:** Business Debt

**Date or dates debt was incurred**

**Last 4 digits of account number** ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

**3.3** **Nonpriority creditor's name and mailing address**

HR Sterling
13901 Midway Road
Suite 102
Dallas TX 75244

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Amount of claim:** $28,800.00

**Basis for the claim:** Business Debt

**Date or dates debt was incurred**

**Last 4 digits of account number** ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

**3.4** **Nonpriority creditor's name and mailing address**

Jackson Walker
2323 Ross Avenue
Suite 600
Dallas TX 75201

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Amount of claim:** $54,543.30

**Basis for the claim:** Attorney Fees

**Date or dates debt was incurred**

**Last 4 digits of account number** ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

Case 21-41488-elm11 Doc 47 Filed 07/08/21 Entered 07/08/21 19:53:30 Page 123 of 189

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**

## Part 2: Additional Page

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.**

Amount of claim

**3.5** Nonpriority creditor's name and mailing address

JMJ Development LLC
1755 Wittington Place
Suite 340
Dallas TX 75234

Date or dates debt was incurred
Last 4 digits of account number

As of the petition filing date, the claim is: *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: **Business Debt**

Is the claim subject to offset?
☑ No
☐ Yes

**$487,537.22**

**3.6** Nonpriority creditor's name and mailing address

McMurry Law
508 W. Lookout Drive
Suite 14-74
Richardson TX 75080

Date or dates debt was incurred
Last 4 digits of account number

As of the petition filing date, the claim is: *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: **Attorney Fees**

Is the claim subject to offset?
☑ No
☐ Yes

**$24,000.00**

**3.7** Nonpriority creditor's name and mailing address

Metzger Law PLLC
3626 N. Hall Street
Unit 800
Dallas TX 75219

Date or dates debt was incurred
Last 4 digits of account number

As of the petition filing date, the claim is: *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: **Attorney Fees**

Is the claim subject to offset?
☑ No
☐ Yes

**$15,847.95**

**3.8** Nonpriority creditor's name and mailing address

Morelli Design
7433 Varna Avenue
Los Angeles CA 91605

Date or dates debt was incurred
Last 4 digits of account number

As of the petition filing date, the claim is: *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: **Business Debt**

Is the claim subject to offset?
☑ No
☐ Yes

**$75,500.00**

Debtor Dallas Real Estate Investors, LLC Case number (if known) 21-41488-elm

**Part 2:** **Additional Page**

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.**

**Amount of claim**

**3.9** **Nonpriority creditor's name and mailing address**

The Gate Property Owners Association
2595 Dallas Parkway
Suite 470

Frisco TX 75034

**Date or dates debt was incurred**

**Last 4 digits of account number**

**As of the petition filing date, the claim is:** *Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Business Debt

**Is the claim subject to offset?**

☑ No
☐ Yes

$19,979.56

**3.10** **Nonpriority creditor's name and mailing address**

Tint Zone
860 N. Crowley Road

Crowley TX 76036

**Date or dates debt was incurred**

**Last 4 digits of account number**

**As of the petition filing date, the claim is:** *Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Business Debt

**Is the claim subject to offset?**

☑ No
☐ Yes

$1,060.85

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**

## Part 4: Total Amounts of the Priority and Nonpriority Unsecured Claims

**5. Add the amounts of priority and nonpriority unsecured claims.**

| | | Total of claim amounts |
|---|---|---|
| 5a. **Total claims from Part 1** | 5a. | **$0.00** |
| 5b. **Total claims from Part 2** | 5b. + | **$809,989.59** |
| 5c. **Total of Parts 1 and 2** Lines 5a + 5b = 5c. | 5c. | **$809,989.59** |

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor name | Dallas Real Estate Investors, LLC |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF TEXAS |
| Case number (if known) | 21-41488-elm Chapter 11 |

☐ Check if this is an amended filing

Official Form 206G

## Schedule G: Executory Contracts and Unexpired Leases

12/15

**Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.**

1. **Does the debtor have any executory contracts or unexpired leases?**

☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☑ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

2. **List all contracts and unexpired leases**

**State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease**

| | | | |
|---|---|---|---|
| 2.1 | State what the contract or lease is for and the nature of the debtor's interest | Settlement Agreement<br>Contract to be ASSUMED | Palisades TC, LLC<br>1919 McKinney Avenue<br>Suite 100<br>Dallas TX 75201 |
| | State the term remaining | | |
| | List the contract number of any government contract | | |

**Fill in this information to identify the case:**

Debtor name Dallas Real Estate Investors, LLC

United States Bankruptcy Court for the: NORTHERN DISTRICT OF TEXAS

Case number (if known) 21-41488-elm

☐ Check if this is an amended filing

Official Form 206H

## Schedule H: Codebtors

12/15

**Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.**

1. **Does the debtor have any codebtors?**
   - ☑ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.
   - ☐ Yes

2. **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, *Schedules D-G*.** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| *Column 1:* **Codebtor** | | *Column 2:* **Creditor** | |
|---|---|---|---|
| **Name** | **Mailing address** | **Name** | *Check all schedules that apply:* |

**Fill in this information to identify the case:**

Debtor Name Dallas Real Estate Investors, LLC

United States Bankruptcy Court for the: NORTHERN DISTRICT OF TEXAS

Case number (if known): 21-41488-elm

☐ Check if this is an amended filing

Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals

12/15

### Part 1: Summary of Assets

1. *Schedule A/B: Assets--Real and Personal Property* (Official Form 206A/B)

| | |
|---|---|
| 1a. **Real property:** Copy line 88 from Schedule A/B | $0.00 |
| 1b. **Total personal property:** Copy line 91A from Schedule A/B | $10,000,000.00 |
| 1c. **Total of all property** Copy line 92 from Schedule A/B | $10,000,000.00 |

### Part 2: Summary of Liabilities

| | |
|---|---|
| 2. *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D) Copy the total dollar amount listed in Column A, Amount of claim, from line 3 of Schedule D | $3,500,000.00 |
| 3. *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F) | |
| 3a. **Total claim amounts of priority unsecured claims:** Copy the total claims from Part 1 from line 5a of Schedule E/F | $0.00 |
| 3b. **Total amount of claims of nonpriority amount of unsecured claims:** Copy the total of the amount of claims from Part 2 from line 5b of Schedule E/F | + $809,989.59 |
| 4. **Total liabilities** Lines 2 + 3a + 3b | $4,309,989.59 |

**Fill in this information to identify the case and this filing:**

Debtor Name **Dallas Real Estate Investors, LLC**

United States Bankruptcy Court for the: **NORTHERN DISTRICT OF TEXAS**

Case number (if known) **21-41488-elm**

Official Form 202

## Declaration Under Penalty of Perjury for Non-Individual Debtors

**12/15**

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☑ *Schedule A/B: Assets--Real and Personal Property* (Official Form 206A/B)
- ☑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ☑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ☑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☑ *Schedule H: Codebtors* (Official Form 206H)
- ☑ *A Summary of Assets and Liabilities for Non-Individuals* (Official Form 206-Summary)
- ☐ Amended Schedule ____________
- ☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ☐ Other document that requires a declaration ____________

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **07/06/2021**
MM / DD / YYYY

X **/s/ Timothy Barton**
Signature of individual signing on behalf of debtor

**Timothy Barton**
Printed name

**President**
Position or relationship to debtor

# Exhibit "H"

Case 21-41488-elm11 Doc 43-8 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 2 of 89

**Fill in this information to identify the case**

Debtor name **Dallas Real Estate Investors, LLC**

United States Bankruptcy Court for the: **NORTHERN DISTRICT OF TEXAS**

Case number (if known) **21-41488-elm**

☐ Check if this is an amended filing

Official Form 206A/B

## Schedule A/B: Assets -- Real and Personal Property

**12/15**

**Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).**

**Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.**

**For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.**

### Part 1: Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

☑ No. Go to Part 2.
☐ Yes. Fill in the information below.

**All cash or cash equivalents owned or controlled by the debtor** — **Current value of debtor's interest**

2. **Cash on hand**

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

Name of institution (bank or brokerage firm) — Type of account — Last 4 digits of account number

4. **Other cash equivalents** *(Identify all)*

Name of institution (bank or brokerage firm)

5. **Total of Part 1**
Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80. **$0.00**

### Part 2: Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

☑ No. Go to Part 3.
☐ Yes. Fill in the information below.

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

**Current value of debtor's interest**

7. **Deposits, including security deposits and utility deposits**

Description, including name of holder of deposit

8. **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

9. **Total of Part 2.**
Add lines 7 through 8. Copy the total to line 81. **$0.00**

## Part 3: Accounts receivable

10. **Does the debtor have any accounts receivable?**

☑ No. Go to Part 4.
☐ Yes. Fill in the information below.

**Current value of debtor's interest**

11. **Accounts receivable**

11a. 90 days old or less: ______ face amount – ______ doubtful or uncollectible accounts = .............. ➔ ______

11b. Over 90 days old: ______ face amount – ______ doubtful or uncollectible accounts = .............. ➔ ______

12. **Total of Part 3**
Current value on lines 11a + 11b = line 12. Copy the total to line 82. **$0.00**

## Part 4: Investments

13. **Does the debtor own any investments?**

☑ No. Go to Part 5.
☐ Yes. Fill in the information below.

**Valuation method used for current value** | **Current value of debtor's interest**

14. **Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity: % of ownership:

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

17. **Total of Part 4**
Add lines 14 through 16. Copy the total to line 83. **$0.00**

## Part 5: Inventory, excluding agriculture assets

18. **Does the debtor own any inventory (excluding agriculture assets)?**

☑ No. Go to Part 6.
☐ Yes. Fill in the information below.

CCase221144114888eelm111 DDoc4378 FFiled088024221 EEntered088024221115387430 PPage34of89

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

| | General description | Date of the last physical inventory MM/DD/YYYY | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|---|
| 19. | **Raw materials** | | | | |
| 20. | **Work in progress** | | | | |
| 21. | **Finished goods, including goods held for resale** | | | | |
| 22. | **Other inventory or supplies** | | | | |

**23. Total of Part 5**
Add lines 19 through 22. Copy the total to line 84. **$0.00**

**24. Is any of the property listed in Part 5 perishable?**
- ☐ No
- ☐ Yes

**25. Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**
- ☐ No
- ☐ Yes. Book value ______ Valuation method ______ Current value ______

**26. Has any of the property listed in Part 5 been appraised by a professional within the last year?**
- ☐ No
- ☐ Yes

## Part 6: Farming and fishing-related assets (other than titled motor vehicles and land)

**27. Does the debtor own or lease any farming or fishing-related assets (other than titled motor vehicles and land)?**
- ☑ No. Go to Part 7.
- ☐ Yes. Fill in the information below.

| | General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 28. | **Crops--either planted or harvested** | | | |
| 29. | **Farm animals** *Examples:* Livestock, poultry, farm-raised fish | | | |
| 30. | **Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| 31. | **Farm and fishing supplies, chemicals, and feed** | | | |
| 32. | **Other farming and fishing-related property not already listed in Part 6** | | | |

**33. Total of Part 6.**
Add lines 28 through 32. Copy the total to line 85. **$0.00**

**34. Is the debtor a member of an agricultural cooperative?**
- ☐ No
- ☐ Yes. Is any of the debtor's property stored at the cooperative?
  - ☐ No
  - ☐ Yes

**35. Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**
- ☐ No
- ☐ Yes. Book value ______ Valuation method ______ Current value ______

**36. Is a depreciation schedule available for any of the property listed in Part 6?**
- ☐ No
- ☐ Yes

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

**37. Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No
☐ Yes

## Part 7: Office furniture, fixtures, and equipment; and collectibles

**38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☑ No. Go to Part 8.
☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **39. Office furniture** | | | |
| **40. Office fixtures** | | | |
| **41. Office equipment, including all computer equipment and communication systems equipment and software** | | | |
| **42. Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |

**43. Total of Part 7.**
Add lines 39 through 42. Copy the total to line 86. **$0.00**

**44. Is a depreciation schedule available for any of the property listed in Part 7?**

☐ No
☐ Yes

**45. Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☐ No
☐ Yes

## Part 8: Machinery, equipment, and vehicles

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☑ No. Go to Part 9.
☐ Yes. Fill in the information below.

| **General description** Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **47. Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| **48. Watercraft, trailers, motors, and related accessories** Examples: Boats trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| **49. Aircraft and accessories** | | | |
| **50. Other machinery, fixtures, and equipment (excluding farm machinery and equipment)** | | | |

**51. Total of Part 8.**
Add lines 47 through 50. Copy the total to line 87. **$0.00**

**52. Is a depreciation schedule available for any of the property listed in Part 8?**

☐ No
☐ Yes

Debtor Dallas Real Estate Investors, LLC
Name

Case number (if known) 21-41488-elm

53. Has any of the property listed in Part 8 been appraised by a professional within the last year?

☐ No
☐ Yes

## Part 9: Real property

54. Does the debtor own or lease any real property?

☑ No. Go to Part 10.
☐ Yes. Fill in the information below.

55. Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|

56. Total of Part 9.
Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88. **$0.00**

57. Is a depreciation schedule available for any of the property listed in Part 9?

☐ No
☐ Yes

58. Has any of the property listed in Part 9 been appraised by a professional within the last year?

☐ No
☐ Yes

## Part 10: Intangibles and Intellectual Property

59. Does the debtor have any interests in intangibles or intellectual property?

☑ No. Go to Part 11.
☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60. Patents, copyrights, trademarks, and trade secrets | | | |
| 61. Internet domain names and websites | | | |
| 62. Licenses, franchises, and royalties | | | |
| 63. Customer lists, mailing lists, or other compilations | | | |
| 64. Other intangibles, or intellectual property | | | |
| 65. Goodwill | | | |

66. Total of Part 10.
Add lines 60 through 65. Copy the total to line 89. **$0.00**

67. Do your lists or records include personally identifiable information of customers (as defined in 11 U.S.C. §§ 101(41A) and 107)?

☐ No
☐ Yes

68. Is there an amortization or other similar schedule available for any of the property listed in Part 10?

☐ No
☐ Yes

Case 21-41488-elm11 Doc 43 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 67 of 89

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

**69. Has any of the property listed in Part 10 been appraised by a professional within the last year?**

☐ No
☐ Yes

## Part 11: All other assets

**70. Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.
☑ Yes. Fill in the information below.

**Current value of debtor's interest**

**71. Notes receivable**

Description (include name of obligor)

**72. Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

**73. Interests in insurance policies or annuities**

**74. Causes of action against third parties (whether or not a lawsuit has been filed)**

**75. Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

**76. Trusts, equitable or future interests in property**

**77. Other property of any kind not already listed** *Examples:* Season tickets, country club membership

**Debtor owns 50% of Dallas Real Estate Lenders, LLC, which owns 100% of FHC Aquisition, LLC, which owns the property located at Syria Gate Way, Blk A, Lot 13, Frisco, TX 75034. The other 50% of Dallas Real Estate Lenders is owned by Palisades TC, LLC. The debtor has valued the real property at $10M. Palisades contends the value is less since the Collin County Appraisal District has the prpoerty valued at $6.34M. Debtor's value is based on it analysis of fair market value sales in the area.** **$10,000,000.00**

**78. Total of Part 11.**
Add lines 71 through 77. Copy the total to line 90. **$10,000,000.00**

**79. Has any of the property listed in Part 11 been appraised by a professional within the last year?**

☑ No
☐ Yes

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

## Part 12: Summary

**In Part 12 copy all of the totals from the earlier parts of the form.**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| **80. Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $0.00 | |
| **81. Deposits and prepayments.** *Copy line 9, Part 2.* | $0.00 | |
| **82. Accounts receivable.** *Copy line 12, Part 3.* | $0.00 | |
| **83. Investments.** *Copy line 17, Part 4.* | $0.00 | |
| **84. Inventory.** *Copy line 23, Part 5.* | $0.00 | |
| **85. Farming and fishing-related assets.** *Copy line 33, Part 6.* | $0.00 | |
| **86. Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $0.00 | |
| **87. Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $0.00 | |
| **88. Real property.** *Copy line 56, Part 9.* → | | $0.00 |
| **89. Intangibles and intellectual property.** *Copy line 66, Part 10.* | $0.00 | |
| **90. All other assets.** *Copy line 78, Part 11.* | + $10,000,000.00 | |
| **91. Total.** Add lines 80 through 90 for each column. | 91a. $10,000,000.00 | + 91b. $0.00 |

**92. Total of all property on Schedule A/B.** Lines 91a + 91b = 92 ........ **$10,000,000.00**

**Fill in this information to identify the case and this filing:**

Debtor Name **Dallas Real Estate Investors, LLC**

United States Bankruptcy Court for the: **NORTHERN DISTRICT OF TEXAS**

Case number (if known) **21-41488-elm**

Official Form 202

## Declaration Under Penalty of Perjury for Non-Individual Debtors

12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☐ *Schedule A/B: Assets--Real and Personal Property* (Official Form 206A/B)
- ☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☐ *Schedule H: Codebtors* (Official Form 206H)
- ☐ *A Summary of Assets and Liabilities for Non-Individuals* (Official Form 206-Summary)
- ☑ Amended Schedule A/B
- ☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ☐ Other document that requires a declaration

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **08/02/2021**
MM / DD / YYYY

X **/s/ Timothy Barton**
Signature of individual signing on behalf of debtor

**Timothy Barton**
Printed name

**President**
Position or relationship to debtor

# Exhibit "I"

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | Dallas Real Estate Investors, LLC |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF TEXAS |
| Case number (if known) | 21-41488-elm |

☐ Check if this is an amended filing

Official Form 207

## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy

04/19

**The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).**

## Part 1: Income

1. **Gross revenue from business**

☑ None

2. **Non-business revenue**

Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

☑ None

## Part 2: List Certain Transfers Made Before Filing for Bankruptcy

3. **Certain payments or transfers to creditors within 90 days before filing this case**

List payments or transfers–including expense reimbursements–to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☑ None

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or co-signed by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. Insiders include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☑ None

5. **Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

## Part 3: Legal Actions or Assignments

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**
List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity–within 1 year before filing this case.

☑ None

**8. Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

☑ None

## Part 4: Certain Gifts and Charitable Contributions

**9. List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☑ None

## Part 5: Certain Losses

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ None

## Part 6: Certain Payments or Transfers

**11. Payments related to bankruptcy**
List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None

| | Who was paid or who received the transfer? | If not money, describe the property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | **Joyce W. Lindauer Attorney, PLLC** | **Included the filing fee of $1,738.00** | **June 2021** | **$11,750.00** |

**Address**

**1412 Main Street**
Street
**Suite 500**

**Dallas** **TX** **75202**
City State ZIP Code

**Email or website address**

**Who made the payment, if not debtor?**
**JMJ Development LLC**

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

**12. Self-settled trusts of which the debtor is a beneficiary**

List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

☑ None

**13. Transfers not already listed on this statement**

List any transfers of money or other property--by sale, trade, or any other means--made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ None

## Part 7: Previous Locations

**14. Previous addresses**

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☑ Does not apply

## Part 8: Health Care Bankruptcies

**15. Health Care bankruptcies**

Is the debtor primarily engaged in offering services and facilities for:

- diagnosing or treating injury, deformity, or disease, or
- providing any surgical, psychiatric, drug treatment, or obstetric care?

☑ No. Go to Part 9.
☐ Yes. Fill in the information below.

## Part 9: Personally Identifiable Information

**16. Does the debtor collect and retain personally identifiable information of customers?**

☑ No.
☐ Yes. State the nature of the information collected and retained

Does the debtor have a privacy policy about that information?
☐ No.
☐ Yes.

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b) or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

☑ No. Go to Part 10.
☐ Yes. Does the debtor serve as plan administrator?
☐ No. Go to Part 10.
☐ Yes. Fill in below:

Case 21-41488-elm11 Doc 47-9 Filed 07/08/21 Entered 07/08/21 19:37:30 Page 45 of 67

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

## Part 10: Certain Financial Accounts, Safe Deposit Boxes, and Storage Units

**18. Closed financial accounts**

Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts, certificates of deposit, and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

**19. Safe deposit boxes**

List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

**20. Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☑ None

## Part 11: Property the Debtor Holds or Controls That the Debtor Does Not Own

**21. Property held for another**

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

## Part 12: Details About Environmental Information

For the purpose of Part 12, the following definitions apply:

- *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless or the medium affected (air, land, water, or any other medium).
- *Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.
- *Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

**22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law?**
Include settlements and orders.

☑ No
☐ Yes. Provide details below.

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No
☐ Yes. Provide details below.

**24. Has the debtor notified any govermental unit of any release of hazardous material?**

☑ No
☐ Yes. Provide details below.

## Part 13: Details About the Debtor's Business or Connections to Any Business

**25. Other businesses in which the debtor has or has had an interest**

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☑ None

**26. Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☑ None

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☑ None

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☑ None

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☑ None

**27. Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No.
☐ Yes. Give the details about the two most recent inventories.

**28. List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| **Timothy Barton** | **as Trustee of TLB 2018 Irrevocable Trust<br>13901 Midway Rd., Suite 102-243<br>Dallas, TX 75244** | **President / Manager** | **100%** |

**29. Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☑ No
☐ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|

Case 21-41488-elm11 Doc 47 Filed 07/06/21 Entered 07/06/21 15:37:10 Page 67 of 67

Debtor **Dallas Real Estate Investors, LLC** Case number (if known) **21-41488-elm**
Name

**30. Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☑ No
☐ Yes. Identify below.

**31. Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No
☐ Yes. Identify below.

**32. Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No
☐ Yes. Identify below.

## Part 14: Signature and Declaration

**WARNING –** Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **07/06/2021**
MM / DD / YYYY

**X** **/s/ Timothy Barton** Printed name **Timothy Barton**
Signature of individual signing on behalf of the debtor

Position or relationship to debtor **President**

**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**

☑ No
☐ Yes

# Exhibit "J"

# COMPANY AGREEMENT
# OF
# FHC ACQUISITION, LLC
# A TEXAS LIMITED LIABILITY COMPANY

## JANUARY 29, 2019

THE MEMBERSHIP INTERESTS OF FHC ACQUISITION, LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, NOR PURSUANT TO THE PROVISIONS OF ANY STATE SECURITIES ACT.

# TABLE OF CONTENTS

**ARTICLE I. DEFINED TERMS** .......... **5**
**ARTICLE II. ORGANIZATION** .......... **8**
1. Certificate of Formation. .......... 8
2. Term .......... 8
3. No State-Law Partnership .......... 8
**ARTICLE III. NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT** . **8**
1. Name .......... 8
2. Assumed Names .......... 8
3. Registered .......... 8
**ARTICLE IV. PURPOSE** .......... **9**
**ARTICLE V. MEMBERS** .......... **9**
1. Members .......... 9
2. Admission of Additional Members. .......... 9
**ARTICLE VI. CAPITAL CONTRIBUTIONS AND INTERESTS** .......... **9**
1. Capital Contributions .......... 9
2. Interests .......... 10
3. Capital Accounts .......... 10
4. Return of Capital Contributions .......... 11
5. Interest .......... 11
6. Loans from Members .......... 11
**ARTICLE VII. ALLOCATIONS AND DISTRIBUTIONS** .......... **12**
1. Allocation of Income and Loss. .......... 12
2. Determination of Income and Loss .......... 12
3. Cash Distributions .......... 12
4. Distributions of Other Property .......... 12
**ARTICLE VIII. OWNERSHIP OF COMPANY ASSETS** .......... **13**
**ARTICLE IX. FISCAL MATTERS; BOOKS AND RECORDS** .......... **13**
1. Bank Accounts; Investments .......... 13
2. Records Required by Act; Right of Inspection .......... 13
3. Books and Records of Account .......... 14
4. Tax Returns and Information .......... 14
5. Delivery of Financial Statements to Members .......... 14
6. Audits .......... 14
7. Fiscal Year .......... 14
8. Tax Elections .......... 15
**ARTICLE X MANAGEMENT OF THE COMPANY** .......... **15**
1. Control by the Members .......... 15
2. Management .......... 15
3. Powers of the Managing Members .......... 16
4. Powers of the President .......... 17
5. Ownership of Information and Materials .......... 17
6. Licenses .......... 17

7. Resignation and Removal .......... 17
**ARTICLE X. RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS .......... 18**
1. Authority; Liability to Third Parties. .......... 18
2. Breach. .......... 19
3. Remedies. .......... 19
4. Transfers of Interests .......... 19
5. Effect of Transfer of Member's Interest .......... 20
6. Admission of Transferee as Member .......... 20
7. Other Business .......... 20
8. Voting by Members .......... 21
**ARTICLE XI. MEETINGS OF MEMBERS .......... 21**
1. Place of Meeting .......... 21
2. Annual Meeting .......... 21
3. Special Meetings .......... 21
4. Notice .......... 21
5. Waiver of Notice .......... 22
6. Quorum and Attendance .......... 22
7. Voting .......... 22
8. Adjournment .......... 22
9. Conduct of Meetings .......... 22
10. Telephone Meetings .......... 22
11. Action by Written Consent .......... 23
12. Proxies .......... 23
13. Information .......... 23
**ARTICLE XII. INTENTIONALLY OMITTED .......... 24**
**ARTICLE XIII. DISSOLUTION AND WINDING UP .......... 24**
1. Events Causing Dissolution .......... 24
2. Winding Up .......... 24
3. Compensation of Liquidator .......... 25
4. Distribution of Company Assets and Proceeds of Sale Thereof .......... 25
5. Final Audit .......... 26
6. Deficit Capital Accounts .......... 26
**ARTICLE XIV. INDEMNIFICATION AND INSURANCE .......... 26**
1. Indemnification and Advance of Expenses .......... 26
2. Insurance .......... 27
3. Limit on Liability of Members .......... 27
**ARTICLE XV. MISCELLANEOUS PROVISIONS .......... 27**
1. Entire Agreement .......... 27
2. Law Governing .......... 27
3. Conference Telephone Meetings .......... 27
4. Successors and Assigns .......... 28
5. Severability .......... 28
6. Headings .......... 28
7. Construction .......... 28
8. Offset .......... 28
9. Effect of Waiver or Consent .......... 28

10. Further Assurance ............................................................ 28
11. Waiver of Certain Rights ............................................................ 29
12. Counterparts and Binding Effect ............................................................ 29
13. Attorney's Fees ............................................................ 29
14. Amendment of Agreement ............................................................ 29
15. Joinder of Managing Members ............................................................ 29
16. Notices ............................................................ 29
**SCHEDULE A............................................................ 32**

This **Company Agreement** ("Company Agreement") of **FHC Acquisition, LLC**, a Texas limited liability company, is adopted effective as of the date set forth above by the undersigned Sole Member of the Company representing 100% of the total Membership Interests in the Company on the date set forth on the cover page hereof.

## ARTICLE I.

## DEFINED TERMS

The capitalized terms used in this Company Agreement shall, unless the context otherwise requires, have the meanings specified in this Article I.

**Act.** The Texas Business Organization Code as it may be amended from time to time, and any successor to such Act.

**Additional Capital Contribution(s).** Any Capital Contributions in excess of the Initial Capital Contribution as may be approved in accordance with the provisions of Article VI hereof.

**Affiliate(s).** As applied to a Person, any other Person directly or indirectly controlling, controlled by, or under common control with that Person. Controlling, controlled by or under common control means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through ownership of voting securities or otherwise.

**Approved by the Members.** Unless otherwise stated, shall mean a decision, direction, approval and/or consent of the Members that has been determined by a Majority-in-Interest of the Members.

**Approval of the Managing Members.** Unless otherwise stated, shall mean a decision, direction, approval and/or consent of the Managing Members that has been determined by a Majority of the Managing Managers. Unless stated otherwise, as long as notice is given to all Managing Members, consent of all Managing Members shall be implied unless a Managing Member expressly dissents.

**Assets.** All interest, assets and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

**Bankruptcy.** Bankruptcy under the federal Bankruptcy Code or insolvency under any state insolvency act.

**Business Day.** Any day other than a Saturday, Sunday and those legal public holidays specified in 5 U.S.C. '6103 (a), as may be amended from time to time.

**Capital Account.** The Capital Account maintained for each Member pursuant to Article VI, Section 3 of this Company Agreement.

**Capital Contributions.** The total amount of cash or property contributed to the Company by all the Members or any one Member, as the case may be.

**Certificate of Formation.** The Certificate of Formation of the Company described in Article II, Section 1 of this Company Agreement.

**Code.** The Internal Revenue Code of 1986, as it has been and may be amended.

**Company.** FHC Acquisition, LLC, as such limited liability company may from time to time be constituted.

**Company Agreement.** This Company Agreement, including any Schedules, as originally executed and as they may be subsequently amended from time to time, by requisite vote of the Members.

**Initial Capital Contribution.** Such amounts designated as such on Schedule A hereof.

**Interest(s).** All rights and interests of a Member with regard to the Company, under this Company Agreement and the Act, including (i) the right of a Member, expressed as a percentage on Schedule A, to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under this Company Agreement, and (ii) all management rights, voting rights or rights to consent.

**Majority-in-Interest of the Members.** Members who are holding more than fifty percent (50%) of the total Interest who are entitled to vote hereunder at the applicable date after receipt by all Members of notice of such item requiring a vote.

**Managing Members.** At any time, the Person who is then managing the business of the Company in accordance with Article X of this Company Agreement. Upon the effective date of this Company Agreement, the Managing Member is Dallas Real Estate Lenders, LLC, a Delaware limited liability company.

**Member(s).** At any time, the Person(s) who then own Interests in the Company. The Members are listed on Schedule A.

**Notification.** A writing containing any information required by this Company Agreement to be communicated to any Persons which may be personally delivered, sent by registered or certified mail, postage prepaid, electronic mail with delivery confirmation to the email address specified in the Company records, or sent by facsimile transmission with delivery confirmation, to such Person, at the last known address of such Person in the Company records. Any such Notification shall be deemed to be given (i) when delivered, in the case of personal delivery, (ii) on the third business day after it is deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid, in the case of mail, and (iii) when transmitted properly (being 9:00 a.m. to 5:00 p.m., local time for the recipient, on any Business Day) in the case of facsimile transmission. Any communication containing information sent to any Person other than as required by the foregoing sentences, but which is actually received by such Person, shall constitute

Notification as of the date of such receipt by such person for all purposes of this Company Agreement.

**Operating Budget.** The annual budget prepared by the Managing Members and submitted to and approved by the Members. The Operating Budget shall reflect all costs and expenses projected or expected to be incurred by the Company during the Company's fiscal year.

**Operating Costs.** Any costs incurred by or on behalf of the Company or the Partnership pursuant to the Operating Budget.

**Operating Plan.** The annual business plan prepared by the Managing Members and submitted to and approved by the Members and the Company. The Operating Plan shall reflect all activities to be undertaken by the Company during each fiscal year of the Company, including, without limitation, any development work.

**Option.** The option of each Member hereto to purchase the other Member's Interest as set forth in Article XIII hereof.

**Persons.** Any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, trust, business trust, cooperative or association.

**Purpose.** The "Purpose" of the Company as set forth in Article IV hereof.

**Schedule A.** The schedule attached hereto and labeled "Schedule A", containing: (i) the identity of each initial Member, (ii) Initial Capital Contributions, (iii) each Member's Interest and (iv) profit/loss sharing ratio.

**Transfer.** Any assignment, hypothecation or change in the record ownership of an Interest, whether made voluntarily or involuntarily by operation of law, including, but not limited to, the following:

1. a sale, pledge, encumbrance, assignment, gift or other transfer to any Person;

2. a general assignment for the benefit of creditors, or any assignment to a creditor resulting from the creditor's foreclosure upon or execution against such Interest;

3. the filing by the transferor Member of a voluntary Bankruptcy petition; or

4. the entry of a judicial order granting the relief requested by the petitioner in an involuntary Bankruptcy proceeding filed against the transferor Member.

**Updated Business Plan.** Annual revisions to the Business Plan, or more frequently, if revisions are agreed upon, which provisions shall be prepared by the Managing Members and approved by the company.

## ARTICLE II.

## ORGANIZATION

1. Certificate of Formation. The Certificate of Formation for the Company were filed with, and a Certificate of Formation was issued by, the Secretary of State of the State of Texas.

2. Term. Pursuant to the Act, the existence of the Company began upon the effective date of the Certificate of Formation. The Company shall exist for the duration specified in the Certificate of Formation unless sooner terminated in accordance with this Company Agreement.

3. No State-Law Partnership. No provision of this Company Agreement (including, without limitation, the provisions of Article X) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of any other Member or Managing Members, for any purposes other than federal and state tax purposes.

## ARTICLE III.

## NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT

1. Name. The name of the Company is "FHC Acquisition, LLC." The name may not be changed without the approval of the Members as long as such name conforms with state law.

2. Assumed Names. The Managing Members may cause the Company to do business under one or more assumed names. In connection with the use of any such assumed names, the Managing Members shall cause the Company to comply with the Act.

3. Registered Office; Registered Agent; Principal Office in the United States; Other Offices. The registered office of the Company required by the act to be maintained in the State of Texas shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managing Members may designate, from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managing Members may designate, from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Managing Members may designate, from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by the Act. The Company may have such other offices as the Managing Members may designate from time to time.

## ARTICLE IV.

## PURPOSE

The purpose of the Company is to any and all business and/or activity (including but not limited to purchase agreements, equity and debt financing, development agreements, incentive agreements, zoning, etc.) related to the acquisition of real property described as "Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas" ("Property") and the development of a mixed use project on the Property which may consist of a luxury hotel, restaurant, retail, and/or residences.

## ARTICLE V.

## MEMBERS

1. Members. The names and addresses of the Members of the Company are as set forth on Schedule A of this Company Agreement which shall be updated as necessary.

2. Admission of Additional Members. Additional Members of the Company may be admitted as follows:

   (a) If the proposed additional Member desires to purchase an Interest from the Company, such purchase may be made and the admission of the additional Member shall become effective only if the identity of the proposed additional Member and the amount of the Capital Contribution to be made by such proposed additional Member in exchange for such proposed additional Member's Interest is approved by the Managing Members.

   (b) If the proposed additional Member desires to acquire an Interest in a Transfer from an existing Member, such Transfer may be made and the admission of the additional Member shall become effective only in accordance with Article XI, Section 2 hereof and Article XIII, Section 1 hereof. All other attempted Transfers of any Interest or right, or any part thereof, in or in respect of the Company shall be null and void ab initio.

   (c) The Managing Members may deny the membership of any proposed additional member for any reason.

## ARTICLE VI.

## CAPITAL CONTRIBUTIONS AND INTERESTS

1. Capital Contributions.

(a) Each Member shall contribute to the capital of the Company the amounts set forth as such Member's Initial Capital Contribution on Schedule A. The Initial Capital Contribution shall be in the form of cash and shall be paid simultaneously with the execution by each respective Member of this Company Agreement. Schedule A may not be amended without the written approval of all Members, unless modifications to Interests occur by virtue of other provisions of this Company Agreement.

(b) In the event any Member fails to make full payment of its Initial Capital Contribution, as and when required by Article VI, Section I (a) hereof, said Member shall be deemed in default hereunder and shall automatically, and without notice or further proceeding, forfeit its full Interest in and to the Company. Upon such default, the non-defaulting Member's shall be entitled to acquire the defaulting Member's forfeited Interest upon payment of the amount of Capital Contribution unpaid as to the defaulting Member's Interest prior to the date of Closing, as scheduled or as the same may be extended.

2. Interests.

(a) Upon making the Capital Contribution specified on Schedule A, in a timely manner, each Member shall own the Interest set forth opposite such Member's name on Schedule A.

(b) The Interests may, with the approval of the Managing Members, be evidenced by certificates issued by the Company which, if issued, shall be in such form and incorporate such legends, recitals and provisions as the Managing Members shall deem necessary or advisable. If certificates are issued, the Managing Members shall establish reasonable procedures for the delivery and reissuance of certificates in connection with Transfers of Member's Interests, split-ups or combinations of certificates, loss or destruction of certificates and other eventualities. Among other matters, such procedures may set forth required fees, indemnifications, documentation and signatures (including guarantees thereof) to be obtained from parties requesting reissuance of certificates. Such procedures need not be incorporated into this Company Agreement, but a copy thereof shall be delivered to all Members.

(c) Additional Capital Contributions may be made with the consent of no less than 50% of all Members. Membership Interests may be adjusted accordingly to reflect such additional capital contributions upon approval of the Majority In-Interest of the Members.

3. Capital Accounts. A capital account shall be established and maintained for each Member. Each Member's capital account (a) shall be increased by (i) the amount of money contributed by that Member to the Company, (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to as provided in Section 752 of the Code), and (iii) allocations to that Member of Company income and gain (or items thereof),

including income and gain exempt from tax and income and gain described in Treas. Reg. §1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treas. Reg. § 1.704-1(b)(4)(i), and (b) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to as provided in Section 752 of the Code), (iii) allocations to that Member of expenditures of the Company described in Section 705 (a)(2)(B) of the Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treas. Reg. §1. 704-1 (b)(2)(iv)(g), but excluding items described in clause (b)(iii) above and loss or deduction described in Treas. Reg. § 1.704 (b) (4) (i) or § 1.704-1 (b) (4) (iii). The Members' capital accounts shall also be maintained and adjusted as permitted by the provisions of Treas. Reg. § 1.704-1 (b) (2) (iv) (f) and as required by the other provisions of Treas. Reg. § 1. 704-1 (b)(2)(iv) and § 1.704-1 (b) (4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treas. Reg. § 1. 704-1 (b) (2) (iv) (g). A Member that has more than one Interest shall have a single capital account that reflects all its Interests, regardless of the class of Interests owned by that Member and regardless of the time or manner in which those Interests were acquired. On the Transfer of all or part of an Interest, the capital account of the transferor that is attributable to the transferred Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. § 1.704-1 (b) (2) (iv) (1).

4. Return of Capital Contributions. Except with the approval of the Managing Members and as otherwise provided herein or in the Act, no Member shall have the right to withdraw, or receive any return of, his Capital Contribution.

5. Interest. No interest shall be paid by the Company on Capital Contributions or on balances in Members' capital accounts.

6. Loans from Members. Loans by a Member to the Company shall not be considered Capital Contributions. Any amounts contributed to the Company which are not expressly authorized as Additional Capital Contributions shall be considered Loans by a Member to the Company. If any Member shall advance funds to the Company in excess of the amounts required hereunder to be contributed by him to the capital of the Company, the making of such advances shall not result in any increase in the amount of the capital account of such Member. The amounts of any such advances shall be a debt of the Company to such Member and shall be payable or collectible only out of the Company assets in accordance with the terms and conditions upon which such advances are made. Loans must be approved by the Managing Members. No loans shall earn interest unless expressly agreed to in writing by all Managing Members. The repayment of loans from a Member to the Company upon liquidation shall be subject to the order of priority set forth in Article XIII, Section 4 hereof.

## ARTICLE VII.

## ALLOCATIONS AND DISTRIBUTIONS

1. Allocation of Income and Loss.

   (a) Except as may be required by Section 704(a) of the Code and Treas. Reg. § 1.704-1(b)(2)(iv)(f)(4), the income, gains, losses, deductions and credits (or items thereof) of the Company shall be shared by the Members in accordance with Schedule A. It is the intention of the Members that allocations of income, gains, losses, deductions and credits (or items thereof) pursuant to this Article VII, Section 1 be in accordance with the Interests for tax purposes.

   (b) All items of income, gain, loss, deduction and credit allocable to any Interest that may have been transferred shall be allocated between the transferor and the transferee based upon an interim closing of the books as of the date of the transfer; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Code and the regulations thereunder.

2. Determination of Income and Loss. At the end of each fiscal year of the Company, income, gain, loss, deduction and credit (or items thereof) shall be determined for the accounting period then ending and shall be allocated to the Members in accordance with Article VII, Section 1 hereof.

3. Cash Distributions. The Managing Members have the discretion to distribute to the Members, in accordance with their respective Interests, the amount by which cash on hand exceeds the amount necessary to meet the current costs, expenses, and liabilities of the Company (including, without limitation, a reasonably adequate reserve for working capital and contingencies) as determined by the Managing Members. The distribution should be, at a minimum, sufficient to allow the Members to pay the income tax allocated to the Members as a result of the income generated by the Company. The Company shall not make any distribution to the Members if, immediately after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members with respect to their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair market value of Company Assets, except that the fair market value of Company Assets that are subject to a liability for which recourse of creditors is limited shall be included in the Company Assets only to the extent that the fair market value of the Company Assets exceeds that liability.

4. Distributions of Other Property. From time to time, the Managing Members also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their respective Interests and may be made subject to existing liabilities and obligations. Immediately prior to such distribution, the capital accounts of the Members shall be adjusted as provided in Treas. Reg. §1.704 1(b)(2)(iv)(f).

## ARTICLE VIII.

## OWNERSHIP OF COMPANY ASSETS

Company Assets shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Assets or any portion thereof. Title to any or all Company Assets shall be held in the name of the Company. All Company Assets shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Assets are held.

## ARTICLE IX.

## FISCAL MATTERS; BOOKS AND RECORDS

1. Bank Accounts; Investments. Capital Contributions, revenues and any other Company funds shall be deposited by the Managing Members in a bank account established in the name of the Company, or shall be invested and/or expended by the Managing Members in furtherance of the Purpose of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only for the purposes described herein or to be distributed to the Members pursuant to this Company Agreement. All such funds shall be deposited and applied in accordance with the terms of this Company Agreement.

2. Records Required by Act; Right of Inspection.
   (a) During the existence of the Company and for a period of four (4) years thereafter, unless the Managing Members approves of an alternative procedure, the Managing Members or the Manger's agent, at the expense of the Company, shall maintain all records required to be kept pursuant to the Act, including, without limitation, (i) a current list of the names, addresses and Member's Interests held by each of the Members (including, if any class or group of interest is established under the Certificate of Formation or this Company Agreement, the names of the Members who are Members of each such class or group); (ii) copies of federal, state and local information or income tax returns for each of the Company's six (6) most recent tax years; (iii) copies of this Company Agreement and the Certificate of Formation, including all amendments or restatements; (iv) if such information is not otherwise set forth in the Certificate of Formation or this Company Agreement, a written statement of (A) the amount of the cash contribution and a description and statement of the agreed value of any other contribution made by each Member, and the amount of the cash contribution and a description and statement of the agreed value of any other contribution that the Member has agreed to make in the future as an Additional Contribution, (B) the times at which any Additional Contributions are to be made or events requiring contributions to be made, (C) events requiring the Company to be dissolved and its affairs wound up, and (D) the date on which each Member became a Member of the Company; (v) correct and complete books and records of account of

the Company; and (vi) copies of any financial statements of the Company for the three (3) most recent years.

(b) On written request, an initial Member or an approved assignee of an Interest (an "Eligible Person") may examine and copy in person or by the Eligible Person's representative, at any reasonable time, for any proper purpose, and at the Eligible Person's expense, records required to be maintained under the Act and such other information regarding the business, affairs and financial condition of the Company as is just and reasonable for the Eligible Person to examine and copy. Upon written request by any Eligible Person made to the Managing Members at the address of the Company's principal office in the United States specified in Article III, Section 3 hereof, the Company shall provide to the Eligible Person copies of (i) this Company Agreement and the Certificate of Formation and all amendments or restatements, and (ii) any of the tax returns of the Company described above.

3. Books and Records of Account. The Managing Members, at the expense of the Company as set forth in the Operating Budget, shall maintain for the Company adequate books and records of account that shall be prepared in accordance with sound accounting principles.

4. Tax Returns and Information. The Members intend for the Company to be treated as a disregarded entity for tax purposes. The Managing Members, at the expense of the Company, shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file. Within the shorter of (i) such period as may be required by applicable law or regulation, or (ii) seventy-five (75) days after the end of each calendar year, the Managing Members shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

5. Delivery of Financial Statements to Members. As to each calendar year, the Managing Members may send to each Member, or upon request of a member, a copy of (i) a balance sheet of the Company as of the end of the calendar year, (ii) an income statement of the Company for such calendar year, (iii) a statement of changes in Member capital accounts for such calendar year. Such financial statements shall be delivered by no later than thirty (30) days following the end of the calendar year to which the statements apply. Unless the Managing Members so elects, such statements need not be audited.

6. Audits. The Managing Members may conduct an audit of the Company books, with respect to the annual financial statements under Article IX, Section 5 above. The cost of the audit shall be borne by the Company. The audits shall be performed by an accounting firm approved by the Managing Members. Not more than one (1) audit shall be required for any fiscal year.

7. Fiscal Year. The Company's fiscal year shall end on December 31 of each calendar year.

8. Tax Elections. The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) to adopt the appropriate method of accounting and to keep the Company's books and records in accordance with the rules and regulations regarding income tax accounting as opposed to accounting for financial reporting purposes;

(c) if a distribution of Company Assets as described in Section 734 of the Code occurs or if a transfer of Interest as described in Section 743 of the Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Code, to adjust the basis of Company Assets;

(d) to elect to amortize the organizational expenses of the Company ratably over a period of sixty (60) months as permitted by Section 709(b) of the Code; and

(e) any other election the Managing Members may reasonably deem appropriate and in the best interest of the Members.

Neither the Company nor any Managing Members may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law.

## ARTICLE X

## MANAGEMENT OF THE COMPANY

1. Control by the Members. The Managing Members, shall manage and control the operation of this Company through their exercise of the decision making powers granted herein.

2. Management.

(a) The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managing Members. The Managing Members need not be a resident of the State of Texas.

(b) The Managing Members may designate one or more individuals as officers of the Company, who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Managing Members. The Managing Members shall designate the salary and/or bonuses the Officers are to receive, if any. Officers need not be Members, the Managing Members or residents of the State of Texas. Any officer may be removed by the Managing Members at any time, with or without cause. Each officer shall hold office until his or her

successor shall be duly designated and take office or until the earlier of the officer's death, resignation or removal. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed by the Managing Members.

3. Powers of the Managing Members. Subject to the foregoing powers and limitations, the Managing Members, shall have the power and authority to manage the affairs of the Company, and shall have the authority to take any action deemed to be necessary, convenient or advisable in connection with the management of the Company given such actions are approved by a majority of the Managing Members. As long as prior notice is given, any Managing Member may exercise the powers granted within this agreement as the consent of the other Managing Member(s) shall be implied unless expressly objected to by the other Managing Member(s). In the event, the Managing Members are unable to reach a consensus of a majority of the Members, then such issue shall be resolved by a vote of the majority in interest of all Members. The Managing Members shall have the power to establish and maintain accounts of the Company at financial institutions and the Managing Members shall be authorized signatories on such financial institution accounts. The Managing Members shall also have the following respective duties:

(a) shall expend sums on behalf of the Company;

(b) shall be responsible for the distribution of funds, including the timing of such distributions, to the Members by way of cash, income, return of capital, profits or otherwise, all in accordance with the provisions of this Agreement and perform all matters in furtherance of the objectives of the Company and this Agreement;

(c) has the right to execute any and all agreements, contracts, documents, certifications and instruments necessary and convenient in connection with the powers described in these regulations;

(d) Any act of the Managing Members purporting to bind the Company, shall bind the Company and the ratification or consent of the Members to any such act(s) shall not be required;

(e) The Managing Members shall have the full right and authority to execute any and all documents and instruments relating to the business and affairs of the Company, without the joinder of the Members, or any other person or entity, and any person dealing with the Company may rely upon the Managing Members' execution of any such document or instrument as the act and deed of the Company, without the necessity for further inquiry; and

(f) The Managing Members shall not receive compensation for management services to the Company other than the reimbursement of any and all out-of-pocket expenses reasonably incurred by the in connection with the furtherance of its duties, obligations and responsibilities hereunder or otherwise with respect to the

management and operation of the business and affairs of the Company. Managing Members may contract with the Company and receive compensation for other services not related to the duties of a Managing Member.

4. Powers of the President. The President shall have the following rights and powers in subject to the following restrictions:

(a) managing the daily operations of the business unless such management conflicts with the powers reserved to the Managing Members or unless the Managing Members restrict such powers.

(b) with prior notice to the Managing Members, may contract on behalf of the Company for the employment and services of employees and/or independent contractors and delegate to such persons the duty to manage and supervise certain operations of Company unless the Managing Members requests to approve such decisions;

(c) may incur reasonably, ordinary, and necessary expenses in order to manage the daily operations of the Company within the monetary limits set by the Managing Members above which will require the Managing Members' approval;

(d) shall contract on behalf of the Company for the employment and services of employees and/or independent contractors and delegate to such persons the duty to manage and supervise any of the assets or operations of the Company;

(e) with prior notice to the Managing Members, may negotiate or execute any agreements, contracts, documents, certifications and instruments which may bind the company without consent of the non-managing Members;

(f) those powers delegated to him by the Managing Members which may be ongoing or for a particular purpose and may be revoked at any time by the Managing Members;

5. Ownership of Information and Materials. The Managing Members shall, upon completion of or upon any earlier termination of its management hereunder, deliver to the Company all books and records and written financial or accounting data and information of or relating to the Company and the Property whether or not prepared by the Managing Members or supplied to the Managing Members by the Company or the Company's contractors or agents, which information shall at all time be the property of the Company.

6. Licenses. The Managing Members shall, at the company's expense, qualify to do business and obtain and maintain such licenses as may be required for the performance by the Managing Members of its services hereunder.

7. Resignation and Removal. Any Managing Member or the President may resign at any time after giving prior notice of such resignation to the Members at least thirty (30) days prior to the effective date of the resignation. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the

Members, if any. Such persons may only be removed by a unanimous vote of all Members entitled to vote and with cause which is defined as the willful and gross misconduct or gross negligence which must result in material economic damage to the company and its members

8. Controlling Management Limitation. Notwithstanding any other provision of this Agreement, no Member or officer of the Company including, without limitation, the President or Treasurer may take any action on behalf of the Company which would acquire the approval of the Voting Members of Dallas Real Estate Lenders, LLC, a Delaware limited liability company and Sole Member of the Company ("DREL") or Palisades pursuant to the Company Agreement of DREL.

## ARTICLE X.

## RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS

1. Authority; Liability to Third Parties.

(c) No Member (other than Managing Member or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditure on behalf of the Company.

(d) No Member (including any Member who is Managing Member or Officer) shall be liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or order of a court.

(e) The members may amend the regulations with the approval of a majority-in-interest of the members entitled to vote and with approval of the Managing Members. Any amendments to the role of the Managing Members would also require the approval of the Managing Members.

(f) Except as otherwise limited by the terms and provisions contained in these regulations, the Members shall have all of the rights, and be afforded the status, of Members as set forth in these regulations and by law.

(g) Except as provided herein, no Member shall have any right or power to (1) take part in the management or control of the Company or its business or affairs, (2) transact any business for the Company, or (3) sign for or bind the Company in any way.

(h) No Member shall have the right to withdraw from the Company unless approved by the Managing Members.

(i) No Member shall have the right or power to cause the dissolution and winding up of the Company by court decree or otherwise.

(j) All Members hereby agree to execute any and all instruments that they may be required to execute by any approved purchaser of said property in order to effect a sale of the Company Property.

2. Breach. In addition to a member failing to adhere to these regulations, a Member will breach this Agreement if he

(a) attempts to withdraw from the Company without approval;

(b) interferes in the management of the Company affairs;

(c) engages in conduct which could result in the Company losing its tax status as a Company;

(d) engages in conduct that tends to bring the Company into disrepute;

(e) breaches any confidentiality provisions of this Agreement;

(f) fails to meet any commitment to the Company; or

(g) owns a Company interest that becomes subject to a charging order, attachment, garnishment, or similar legal proceedings.

3. Remedies. A Member who is in breach of this Agreement shall be liable to the Company for damages caused by such breach. The Company may offset the damages against any distributions or return of capital to the Member who has breached this Agreement. Additionally, if a Member violates the terms of this agreement that person may be terminated as a member and their capital contributions shall be refunded without interest including any profits or losses accrued up to the date of the breach. If necessary such capital contribution may be converted to a loan to the company if the assets are not available to refund the capital contribution at the time of the breach and is subject to reasonable interest and payment terms as determined by the Managing Members. These remedies are in addition to any additional remedies that may be available under the law.

4. Transfers of Interests. A Member may make a Transfer of such Member's Interest, only upon the approval of the Managing Members:

(a) The Member or the proposed transferee must file with the Company a written and dated instrument of such Transfer, in form and substance reasonably satisfactory to the Managing Members, executed by both the transferor and the proposed transferee, which instrument shall (i) contain the acceptance by the proposed transferee of all of

the terms and provisions of this Company Agreement, to the extent applicable to an assignee of an Interest, and identify all liabilities which the transferee shall assume upon the transfer of the Member's Interest; (ii) contain such representations as the Managing Members may deem necessary or advisable to assure that such Transfer need not be registered under any applicable federal or state securities laws; (iii) instruct the Managing Members as to the Interest to be transferred and to whom and at what address Company distributions and Notifications in respect of such Interest should henceforth be sent; and (iv) contain any information required under the Code that is reasonably requested by the Managing Members.

(b) Unless expressly waived by the Managing Members, the transferor or transferee shall deliver to the Company an opinion of counsel reasonably acceptable to the Managing Members that (i) such Transfer is exempt from the registration requirements of the Securities Act of 1933, as amended, applicable state securities laws, and any rules or regulations promulgated thereunder, and will not otherwise cause the Company to be in violation of such laws and regulations; (ii) the Transfer will not result in the termination of the Company within the meaning of Section 708(b) of the Code; and (iii) the Transfer will not adversely affect the status of the Company as a partnership under the Code.

(c) The Transfer is approved by the Managing Members, and the transferor Member.

5. Effect of Transfer of Member's Interest. A Transfer of an Interest does not entitle the transferee to become, or to exercise rights or powers of, a Member. A Transfer only entitles the transferee to receive cash distributions and allocations of Company profits and losses to the extent of the Interest transferred. Until the transferee is admitted as a Member pursuant to Article XI, Section 4 below, the transferor Member shall continue to be a Member and to be entitled to exercise any rights or powers of a Member with respect to the Interest transferred.

6. Admission of Transferee as Member. An approved transferee of an Interest desiring to be admitted as a Member must execute a counterpart of; or an agreement adopting, this Company Agreement. The admission of such transferee (including, without limitation, a transferee by reason of the death of a Member) is subject to the Managing Members acting in his sole discretion. Upon admission of the transferee as a Member, the transferee shall have, to the extent of the Interest transferred, the rights and powers and shall be subject to the restrictions and liabilities of a Member under this Company Agreement, the Articles of Formation and the Act. The transferee shall also be liable, to the extent of the Interest transferred, for the unfulfilled obligations, if any, of the transferor Member to make Capital Contributions. Whether or not the transferee of an Interest becomes a Member, the transferor Member is not released from any liability to the Company under this Company Agreement, the Certificate of Formation or the Act.

7. Other Business. The Members may engage in or possess interests in other business ventures (unconnected with the Company) of every kind and description, independently or with others, except those business in direct competition with the Company upon approval of the

Managing Members. Neither the Company nor the other Members shall have any rights in or to such independent ventures or the income or profits therefrom.

8. Voting by Members. Any decisions, directions, approvals and consents required by the Members shall be made by the vote of a Majority-in-Interest (whether by actual vote or deemed vote as provided herein) of the Members, unless this Company Agreement expressly provide that a decision shall be made by the 2/3 or unanimous vote or consent of all of the Members, which shall mean the 2/3 of the membership interests or unanimous vote of all membership interests or consent of the Members entitled to vote hereunder at the time that the vote is taken, or deemed taken.

## ARTICLE XI.

## MEETINGS OF MEMBERS

1. Place of Meeting. All meetings of Members shall be held at the principal office of the Company as provided in Article III above or at such other place as may be designated by the Member(s) calling the meeting.

2. Annual Meeting. Commencing with the calendar year next following the calendar year in which the Company was organized, annual meetings of the Members may be held on any day of the year at such hour as may be designated in the notice of the meeting, if such day is a Business Day, and if not a Business Day, then on the next following day that is a Business Day. If the annual meeting is not held on the date above specified, the Managing Members shall cause a meeting in lieu thereof to be held as soon thereafter as convenient, and any business transacted or election held at that meeting shall be as valid as if held at the annual meeting. Failure to hold the annual meeting at the designated time shall not work a dissolution of the Company. This provision shall not be construed to require the holding of any annual meeting.

3. Special Meetings. Special meetings of the Members may be called by resolution of the Members holding thirty percent (30%) or more of the Interests, for the purpose of addressing any matter upon which the Members may vote under this Company Agreement. Members may call a meeting by delivering to the Managing Members one or more written requests signed by the requisite number of Members, stating that the signing Members wish to call a meeting and indicating the specific purpose for which the meeting is to be held. Action at the meeting shall be limited to those matters specified in the call of the meeting. This provision shall not be construed to require the holding of any special meetings.

4. Notice. A Notification of all annual and special meetings, stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered by the Managing Members within a reasonable time period prior to the meaning with the presumption that reasonable notices is not less than twenty (20) nor more than sixty (60) days before the meeting to each Member. If the Managing Members fails to timely deliver such notices, then any Member may deliver such

notices to the other Members. The period of prior notice for any special meeting, which the Managing Members or any Member deems to be an emergency meeting, shall be shortened to such reasonable period of time, consistent with the nature of the emergency, sufficient to give actual notice to each Member.

5. Waiver of Notice. Attendance of a Member at a meeting or action taken by written consent shall constitute a waiver of Notification of the meeting, except where such Member attends for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called or convened. Notification of a meeting may also be waived in writing. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the Notification of the meeting but not so included, if the objection is expressly made at the meeting.

6. Quorum and Attendance. Members representing a Majority-in-Interest of the Members shall constitute a quorum at any meeting of the Members, whether present in person or by proxy.

7. Voting.

(a) All Members who are not in default hereunder shall be entitled to vote at meetings unless their membership interests are non-voting. Members may vote either in person or by proxy at any meeting. Each Member's percentage voting power at a meeting shall be in proportion to his Interest. Notwithstanding anything contained herein to the contrary, all references to approval or voting by the Members shall mean those Members who are entitled to vote hereunder at the time the vote is taken on such matter.

(b) The Managing Members shall be elected by the Majority in Interest and may only be removed in accordance with these regulations.

8. Adjournment. The Managing Members of the meeting shall have the power to adjourn the meeting from time to time, without notice, other than announcement of the time and place of the resumption of the adjourned meeting. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

9. Conduct of Meetings. The Managing Members shall conduct the meetings of the Members, including, without limitation, the determination of Persons entitled to vote, the existence of a quorum, the satisfaction of the requirements of this Article XI, the conduct of voting, the validity and effectiveness of any proxies, and the determination of any controversies, votes or challenges arising in connection with or during the meeting or voting. The Managing Members shall designate a Person to take minutes of each meeting. The minutes of each meeting of the Members shall be kept in a minute book and shall be approved by the Managing Members at the next meeting of Members.

10. Telephone Meetings. Members, Representatives or any committee appointed by the Members, may participate in a meeting by means of telephone conference or similar

communications, and participation in a meeting pursuant to this subsection shall constitute presence in person at the meeting.

11. Action by Written Consent. Any action that may be taken at a meeting of the Members may be taken without a meeting, upon prior written notice to each Member of the proposed action, if a consent in writing, setting forth the action to be taken, shall be signed by Members who are entitled to vote hereunder and who are holding the percentage of Interests required to approve such action under this Company Agreement. Such consent shall have the same force and effect as a vote of the signing Members at a meeting duly called and held pursuant to this Article XII. Notification of any action taken by means of a written consent of Members shall be sent, within a reasonable time after the date of the consent, by the Managing Members, to all Members who did not sign the written consent.

12. Proxies. A Member may vote either in person or by proxy executed in writing by the Member or its Representative. A facsimile, electronic mail, telegram, telex, cablegram or similar transmission by the Member, or a photographic, photo static, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Article. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managing Members, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managing Members who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the Managing Members, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more Persons to act as proxies, unless such instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one, or if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Interests that are the subject of such proxy are to be voted with respect to such issue.

13. Information.

a. In addition to the other rights specifically set forth in this Company Agreement, each Member is entitled to all information to which that Member is entitled to have access pursuant to the Act under the circumstances and subject to the conditions therein stated.

b. The Members acknowledge that, from time to time, they may receive information from or regarding the Company or each other in the nature of trade secrets or that otherwise

is confidential, the release of which may be damaging to the Company or each other or Persons with which they do business. Each Member shall hold in strict confidence any information it receives regarding the Company or each other that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member or Managing Member, except for disclosures (i) compelled by law (but the Member must notify the Managing Members and the other Members promptly of any request for that information, before disclosing it if practicable), (ii) to advisors or representatives of the Member, (iii) to Persons to which that Member's Interest may be transferred as permitted by this Company Agreement, but only if the recipients have agreed to be bound by the provisions of this Article, (iv) of information that such Member has also received from a source independent of the Company that the Member reasonably believes obtained the information without breach of confidentiality, or (v) of matters which have become of public knowledge. The Members acknowledge that breach of the provisions of this Article may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this Article may be enforced by specific performance.

## ARTICLE XII.

## INTENTIONALLY OMITTED

## ARTICLE XIII.

## DISSOLUTION AND WINDING UP

1. Events Causing Dissolution. The Company shall be dissolved upon the first of the following events to occur:

    (a) the expiration of the term of duration of the Company set forth in the Certificate of Formation;

    (b) the written consent of 2/3 (two-thirds) of the Membership interests entitled to vote hereunder at any time with approval of the Managing Members to dissolve and wind up the affairs of the Company;

    (c) the occurrence of any other event that causes the dissolution of a limited liability company under the Act.

2. Winding Up. If the Company is dissolved pursuant to Article XIII, Section 1, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a) The winding up of the Company's affairs shall be supervised by a liquidator. The liquidator shall be the Managing Members or, if the Managing Members prefers, a liquidator or liquidating committee selected by the Managing Members.

(b) In winding up the affairs of the Company, the liquidator shall have the right and unlimited discretion, for and on behalf of the Company;

(i) to prosecute and defend civil, criminal or administrative suits;
(ii) to collect Company Assets, including obligations owed to the Company;
(iii) to settle and close the Company's business;
(iv) to dispose of and convey all Company Assets for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Assets, having due regard for the activity and condition of the relevant market and general financial and economic conditions;
(v) to pay all reasonable selling costs and other expenses incurred in connection with the winding up of the proceeds of the disposition of Company Assets;
(vi) to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;
(vii) to distribute any remaining proceeds from the sale of Company Assets to the Members;
(viii) to prepare, execute, acknowledge and file articles of dissolution under the Act and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and
(ix) to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Managing Members under the terms of this Company Agreement to the extent necessary or desirable in the good faith judgment of the liquidator to perform its duties and functions.

3. Compensation of Liquidator. The liquidator appointed as provided herein shall not be entitled to receive any compensation for its services unless otherwise agreed upon by the liquidator and the Managing Members.

4. Distribution of Company Assets and Proceeds of Sale Thereof.

(a) Upon completion of all desired sales of Company Assets, and after payment of all selling costs and expenses, the liquidator shall distribute the proceeds of such sales, and the Company Assets that are to be distributed in kind, to the following groups in the following order of priority:

(i) to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company

distributions) of the Company, whether by payment or establishment of reserves;

(ii) to satisfy Company obligations to Members to pay past due Company distributions;

(iii) to the Members, in accordance with the positive balance in their respective Capital Accounts; and

(iv) to the Members in accordance with their respective Interests.

(b) The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group. If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective capital account balances or Interests of each Member in such group.

5. Final Audit. Within a reasonable time following the completion of the liquidation, the liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to these regulations.

6. Deficit Capital Accounts. Notwithstanding anything to the contrary contained in this Company Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Company Agreement to all Members in proportion to their respective Interests, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## ARTICLE XIV.

## INDEMNIFICATION AND INSURANCE

1. Indemnification and Advance of Expenses. The Company shall indemnify and/or advance expenses to a Person who was, is, or is threatened to be made a named defendant or respondent in a proceeding because the person (i) is or was a Managing Members, Member, officer, employee or agent of the Company, or (ii) is or was serving at the request of the Company as a Managing Member, Member, director, officer, partner, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise, to the fullest extent provided by, and in accordance with the procedures set forth in, any applicable laws; provided, however, that in the following respects as applied to the Company, the following provisions shall apply:

(a) Indemnification of any Person who has satisfied the standard of conduct set forth in the Act shall be mandatory rather than optional. The determination under the Act that indemnification shall be made shall also constitute authorization of indemnification under the Act.

(b) Advancement of expenses to a Person who has satisfied the requirements of the Act shall be mandatory rather than optional.

(c) Payment or reimbursement of expenses to a Person pursuant to the Act in connection with his appearance as a witness or other participation in a proceeding shall be mandatory rather than optional.

2. Insurance. Subject to certain provisions in the Act, the Company may, but shall not be obligated to, purchase and maintain insurance or other arrangements on behalf of any Person who is or was a Managing Member, Officer, Member, employee, agent or other Person identified above in Article XIV, Section 1 against any liability asserted against him or incurred by him in such a capacity or arising out of his status as such a Person, whether or not the Company would have the power to indemnify him against that liability under Article XIV, Section 1 or otherwise.

3. Limit on Liability of Members. The indemnification set forth in this regulations shall in no event cause the Members to incur any personal liability beyond their total Capital Contributions, nor shall it result in any other liability of the Members to any third party.

## ARTICLE XV.

## MISCELLANEOUS PROVISIONS

1. Entire Agreement. This Company Agreement contain the entire agreement among the Members relating to the subject matter hereof, and all prior agreements relative hereto which are not contained herein are terminated.

2. Law Governing. This Company Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Texas. In particular, this Company Agreement are intended to comply with the requirements of the Act and the Certificate of Formation. In the event of a direct conflict between the provisions of this Company Agreement and the mandatory provisions of the Act or any provision of the Certificate of Formation, the Act and the Certificate of Formation, in that order of priority, will control. In the event that the Act is re-codified by the Legislature, then any such references made within this document shall refer to the newly codified Act and its corresponding sections.

3. Conference Telephone Meetings. Meetings of the Members, Managing Members or any committee may be held by means of conference telephone or similar communications equipment so long as all Persons participating in the meeting can hear each other. Participation in a meeting by means of conference telephone shall constitute presence in

person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business thereat on the ground that the meeting is not lawfully called or convened.

4. Successors and Assigns. Subject to restrictions on Transfers and assignments herein, this Company Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

5. Severability. This Company Agreement are intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of this Company Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, but the extent of such invalidity or unenforceability does not destroy the basis of the bargain among the Members as expressed herein, the remainder of this Company Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

6. Headings. The Article and Article headings appearing in this Company Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article.

7. Construction. Whenever required by the context, as used in this Company Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles refer to articles of this Company Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

8. Offset. Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

9. Effect of Waiver or Consent. A waiver or consent to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute of limitations period has run. No waivers shall be enforceable unless in writing and running in favor of the Person claiming the benefit of same.

10. Further Assurance. In connection with this Company Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments, and perform any additional acts, that may be necessary or appropriate to effectuate and perform the provisions of this Company Agreement and those transactions.

11. Waiver of Certain Rights. Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the Property of the Company.

12. Counterparts and Binding Effect. This Company Agreement may be executed in one or more counterparts, each of which shall be an original but all of which taken together shall constitute a single document. This Company Agreement shall be binding upon each Member as evidenced by their signatures below.

13. Attorney's Fees. If any Member becomes involved in litigation or proceedings arising out of this Agreement or the performance thereof, the court or tribunal in such litigation or proceeding, or in a separate suit, shall award attorney's fees to the prevailing party. Unless judgment goes by default, the attorney fee award shall not be computed in accordance with any court schedule, but shall be such as to fully reimburse all attorney's fees actually incurred in good faith, regardless of the size of the judgment, it being the intention of the Members to fully compensate for all the attorney's fees paid or incurred in good faith.

14. Amendment of Agreement. This Company Agreement may be amended only in writing, in whole or in part, at any time only by the execution thereof by 2/3 of the Membership interests entitled to vote thereon with Managing Members' approval.

15. Joinder of Managing Members. The Initial Managing Members have joined in this Company Agreement for the purposes of acknowledging his appointment and agreeing to all requirements for performance by Managing Members hereunder. A Successor Managing Member, if any, shall also be required to join in this Company Agreement in the same manner and for the same purpose as the Initial Managing Members.

16. Notices. Notifications, as defined above, given under this Company Agreement shall be duly given to the appropriate addresses, fax number, email addresses set forth below (or to such other addresses or numbers as a party may designate as to itself by notice to the other):

If to Company:

FHC Acquisition, LLC
Attn: Timothy Barton
1755 Wittington Place, Suite 340
Farmers Branch, TX 75234

If to the Member:

Dallas Real Estate Lenders, LLC
Attn: Timothy Barton
1755 Wittington Place, Suite 340
Farmers Branch, TX 75234

With a copy to:

Palisades TC LLC
Attn: Joaquin Charles de Monet, Manager
1919 McKinney Avenue, Suite 100
Dallas, TX 75201

*[Remaining Portion of this Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Members of the Company have evidenced the adoption of this Company Agreement in accordance with the Act by their signatures below, such adoption to be effective as of the date first above written.

**MEMBERS:**

Dallas Real Estate Lenders, LLC
a Delaware limited liability company

By: Dallas Real Estate Investors
a Delaware limited liability company
Its: Manager

By: ______________________
Name: Timothy Barton
Its: President

## SCHEDULE A

| Member Name & Address | Initial Capital Contributions | Interest | Profit/Loss |
|---|---|---|---|
| Dallas Real Estate Lenders, LLC<br>1755 Wittington Place<br>Suite 340<br>Farmers Branch, TX 75234 | $100.00 | 100% | 100% |

# Exhibit "K"

# PURCHASER'S STATEMENT

Date: January 31, 2020 GF No. 4712010652-SB

Sale From: IGO-USA LP, a Texas limited partnership

To: FHC Acquisition, LLC, a Texas limited liability company

Property 4.539 Acres, Lot 13, Frisco, Collin County, Texas (The Gate)

**Purchase Price**........ $ 5,931,565.00

**Plus: Charges**

**FEES TO:** Chicago Title Insurance Company

| | | | |
|---|---|---|---|
| Survey Coverage | 3,933.15 | Loan Policy | 100.00 |
| T-19.1 | 2,622.10 | Tax Amendment | 25.00 |
| | | Est Recording | 800.00 |
| Guaranty Fee | 2.00 | T-19 Endorsement | 1,408.70 |
| 1/2 Escrow Fee | 500.00 | T-33 Endorsement | 20.00 |

$ 9,410.95

**FEES TO:** Texas Republic Bank

| | |
|---|---|
| Origiantion Fee | 29,657.83 |
| Underwriting fee | 2,000.00 |
| Appraisal Fee $3,000.00 | POC |
| Property Tax Monitoring Fee | 125.00 |
| Flood Fee | 14.00 |
| Commitment Fee Credit | (5,000.00) |
| Reserve Account | 372,500.00 |

$ 399,296.83

**PRORATIONS:**

| | | | | |
|---|---|---|---|---|
| Taxes | from | to | | $ 0.00 |
| Association Dues | 1/31/20 | | 5/31/2020 | $ 6,383.04 |
| | from | to | | $ |
| | from | to | | $ |
| **50% Reimbursement Infrastructure fee** | City of Frisco | | | $ POC |
| **Assessment** | The Gate Property Owners Association, Inc. | | | $ POC |
| **General Liability Insurance** | Inspire Insurance Solutions, Inc. | | | $ 840.00 |
| **Lender Legal Fee** | Scheef & Stone, LLP | | | $ 13,500.00 |
| **Legal Fee** | Winstead PC | | | $ 5,000.00 |
| **Legal Fee** | Winstead PC | | | $ 15,000.00 |
| **Investment Fee and Reimb. Expense** | Joaquin C. De Monet | | | $ 75,000.00 |
| **Legal Fee** | Jackson Walker | | | $ 79,542.69 |
| **Fees** | Fab Studio | | | $ 40,000.00 |
| **Legal Fee** | McMurry Law, PLLC | | | $ 75,000.00 |

**Total Charges** ........ $ 718,973.51
**Gross Amount Due By Purchaser**........ $ 6,650,538.51

**Less: Credits**

| | | |
|---|---|---|
| Down Payment or Earnest Money Paid to | Chicago Title Insurance Company | $ 100,000.00 |
| Loan from: | Texas Republic Bank | $ 2,965,783.00 |
| Investor Wire Palisades TC, LLC | | $ 3,580,000.00 subject to change |

**Prorations**

| | | | | |
|---|---|---|---|---|
| Taxes | from 01/1/20 | to | 1/31/20 | $ 7,690.77 |
| Rent | from | to | | $ |
| | from | to | | $ 0.00 |
| | from | to | | $ 0.00 |

**Total Credits**........ $ 6,653,473.77
**Balance Due To Buyer** $ (2,935.26)

Purchaser understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information from other resources and cannot guarantee the accuracy thereof. Any real estate agent or lender involved may be furnished a copy of this Statement. Purchaser understands that tax and insurance prorations and reserves were based on figures for the preceeding year or supplied by others, or estimates for current year, and in the event of any change for current year, all necessary adjustments must be between Purchase and Seller direct. The undersigned hereby authorizes CHICAGO TITLE INSURANCE COMPANY to make expenditures and disbursements as shown and approves same for payment. The undersigned also acknowledges receipt of Loan funds, if applicable, in the amount shown above and receipt of a copy of this statement.
POC-Paid outside of Closing

See attached signature addendum

Settlement Agent

1/30/20 3:46 PM

# Exhibit "L"

SpencerFane

JACOB SPARKS
Telephone: (214) 750-3624
Facsimile: (214) 750-3612
Email: JSparks@SpencerFane.com

Matter No. 5037270.0002

March 4, 2021

**VIA OVERNIGHT DELIVERY,**
**COURIER, FIRST CLASS MAIL**
**AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mr. Tim Barton
FHC Acquisition, LLC
1755 Wittington Place, Suite 340
Dallas, Texas 75234

**RE: Notice of Default and Demand for Payment**

Mr. Barton:

The property described as Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas (the "**Property**") acquired by FHC Acquisition, LLC ("**FHC**") from IGO-USA LP by virtue of that certain Special Warranty Deed With Vendor's Lien dated January 31, 2020, recorded February 3, 2020 under Clerk's File No. 20200203000144930, Real Property Records, Collin County, Texas, is subject to, among other things: **(i)** all the terms and conditions set forth in that certain Amended and Restated Master Declaration of Covenants, Conditions and Restrictions for The Gate recorded under Clerk's File No. 20160923001280990, Real Property Records, Collin County, Texas (the "**Declaration**") due to the recording of that certain Notice of Applicability dated January 31, 2020, recorded same date under Clerk's File No. 20200131000144690, Real Property Records, Collin County, Texas (the "**NOA**"); and **(ii)** the rules (the "**Rules**") for The Gate Property Owners Association, Inc., a Texas nonprofit corporation (the "**POA**"), which are included as "Attachment 3" to The Gate Community Manual recorded October 3, 2016 under Clerk's File No. 20161003001325810, Real Property Records, Collin County, Texas (the "**Community Manual**"). Any term capitalized, but not defined herein, shall have the same meaning ascribed to such term as set forth in the Declaration.

Pursuant to the terms and conditions set forth in the Declaration, the Property is subject to, and FHC is responsible and liable for and otherwise obligated to timely pay to the POA, all Assessments applicable to the Property. The total amount of Assessments are determined by the Board in accordance with the terms of Article IV of the Declaration. In addition to the Special

Common Area Assessment in the amount of $4,333.58 allocated to the Property per Section 4.05 of the Declaration and as reflected in Section 5 of the NOA, the Property is subject to Regular Assessments. In accordance with Section 4.03 of the Declaration, once the Board of the POA approves of the final budget for the applicable fiscal year, each Lot made subject to the terms of the Declaration is levied for the Regular Assessments in the amount set by the Board in its sole and absolute discretion, and the Board's determination will be final and binding so long as it is made in good faith. All Regular Assessments are due and payable to the POA at the beginning of the fiscal year or in such other manner as the Board may designate in its sole and absolute discretion.

By letter dated May 20, 2020 from the POA to your attention as the designated representative of FHC (the "**First Letter**"), you were provided with the allocated amount of the estimated Regular Assessments for the Property relative to the fiscal year commencing on June 1, 2020 through and including May 31, 2021, which amount is **$19,979.56**. Also included with the letter was a budget summary which provided further detail on the total amount of the estimated Regular Assessments for the ensuing fiscal year for The Gate project, and the calculation of the amount of the Regular Assessments applicable to the Property, which included a credit for an amount previously paid by FHC to the POA. The letter required payment of the stated amount to be received by the POA within thirty days.

Having not received from either you or your legal counsel, Mr. Randy Marx (*cc'd here*), any requests or other communications to discuss the status on payment of the amounts owed as reflected in the First Letter, or attempt to schedule a meeting or conference call to discuss any outstanding questions, the POA sent another letter (similar in content to this letter) dated September 16, 2020 to your attention (the "**Second Letter**") and copied your counsel (Mr. Marx) and FHC's lender representative (Mr. David L. Baty, *cc'd here*) making demand for payment of the delinquent Regular Assessments and all other amounts owed to the POA. At such time, a representative of the POA, Mr. Hatem Mojahed, had made *numerous* attempts to communicate with you and your Mr. Marx to discuss the status on payment of the amounts owed and otherwise attempt to schedule a meeting or conference call to discuss any outstanding questions. Since neither Mr. Mojahed or any other representative of the POA had received from either you or your legal counsel any requests or other communications to discuss the status on payment of the amounts owed as reflected in the First Letter and as described in the Second Letter, or attempt to schedule a meeting or conference call to discuss any outstanding questions, Mr. Mojahed (on behalf of the POA) sent another letter (similar in content to the Second Letter) dated October 14, 2020 to your attention (the "**Third Letter**") and copied (once again) Mr. Marx and Mr. Baty, making demand for payment of the delinquent Regular Assessments and all other amounts owed to the POA. Again, with no communication having been received from either you, Mr. Marx, or even Mr. Baty, to either pay in full, or make payments per an installment payment plan, or to discuss any other questions or issues, Mr. Mojahed (on behalf of the POA) sent another letter (similar in content to the Third Letter) dated January 15, 2021 to your attention (the "**Fourth Letter**", and, together with the First Letter, the Second Letter, and the Third Letter, the "**Letters**") and copied (once again) Mr. Marx and Mr. Baty, making demand for payment of the delinquent Regular Assessments and all other amounts owed to the POA.

As of the date of this letter (***almost 10 months later after the First Letter***), FHC has not paid the POA any amount of the Assessments for fiscal year 2020-2021 (or any other amounts owed to the POA), nor does there appear to be any attempt by either you, Mr. Marx, or Mr. Baty at any time over the past several months to communicate with either Mr. Mojahed or any other representative of the POA Board (or this law firm) regarding the payment of the delinquent Assessments and all other amounts owed to the POA, or attempt to schedule a meeting or conference call to discuss any outstanding questions. ***The actions (and failure to act) by FHC are totally unacceptable, reprehensible, and inexcusable, especially given the content and parties included as recipients of each of the Letters!***

Due to the pending and continuing default by FHC under the terms of the Declaration for its failure to pay its Regular Assessments for the Property as described above in the amount of **$19,979.56** (the "**Total Amount Due**"), final demand is hereby made by the POA for FHC to pay such amount ***within five (5) days after the date of this letter*** (the "**Payment Due Date**"), time being of the essence. You are hereby directed to contact Mr. Hatem Mojahed of the POA (phone: (972) 544-7475; email: hatem@igo.ae) to arrange for immediate payment of the Total Amount Due.

In addition to foregoing, you are hereby advised that if the Total Amount Due is not paid in full by 2:00 p.m. (Central time) on the Payment Due Date, then pursuant to Section 4.07 of the Declaration, the Board will levy Individual Assessments against FHC and the Property *in its sole (good faith) discretion* for, among other things, interest, late charges, and collection costs on all delinquent Assessments, including all which may have accrued since the issuance of each of the respective Letters. Per Section 4.01(b) of the Declaration, each Assessment and all interest thereon and the cost of collection thereof, is the personal obligation of FHC and all such Assessments and related interests and costs are secured by a lien granted to the POA against the Property and all Improvements thereon. Also, per Section XVII (Enforcement of Rules and Regulations) of the Rules (a copy of which FHC previously received, along with the other documents attached to the Community Manual), the Board of the POA will levy, assess, and collect reasonable fines and collection costs, as further described therein. Please note that the amount you owe will change as additional interest, late charges, fees, attorneys' fees and collection costs continue to accrue.

Nothing set forth herein is intended, nor shall it be deemed, to modify, limit, release, reduce, or waive any of POA's rights, remedies, and/or privileges under the Declaration, the NOA, the Rules, or at law or in equity, all of which are hereby specifically reserved. Furthermore, the enumeration of any specific default herein is not intended, nor shall it be deemed, to waive other defaults or violations that may currently exist under the Declaration, the NOA, and the Rules. This letter is not intended to be, and may not be construed as, an election of remedies by the POA, or as a waiver of any other additional default or breach under the Declaration, the NOA, or the Rules now or hereafter existing. All of POA's rights and remedies pursuant to the Declaration, the NOA, and the Rules are hereby expressly preserved.

This letter constitutes the notice contemplated by Texas Civil Practices and Remedies Code § 38.002. In addition, this letter constitutes notice of a claim against FHC. If FHC is not able to

Case 21-41488-elm11 Doc 47-12 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 5 of 9


pay the POA the Total Amount Due by 2:00 p.m. (Central time) on the Payment Due Date, FHC should immediately provide this letter to its lender and insurance carrier.

It is imperative that FHC deal with this situation now. Please immediately provide a copy of this letter to your attorney if the current attorney for FHC is not Mr. Marx. If you are not represented by an attorney, please contact me upon receipt of this letter.

Respectfully,

Jacob Sparks
Texas Bar No. 24066126
Arizona Bar No. 027905

**SPENCER FANE LLP**
5700 Granite Parkway, Suite 650
Plano, Texas 75024
Tel: (214) 750-3624
Fax: (214) 750-3612
Email: JSparks@SpencerFane.com

*Attorneys for The Gate Property Owners Association, Inc.*

cc: Mr. David L. Baty (*via overnight delivery*)
Texas Republic Bank, N.A.
2595 Preston Road, Suite 300
Frisco, Texas 75034

Mr. Randy P. Marx (*via overnight delivery*)
The Marx Firm, LLC
127 Howell Street
Dallas, Texas 75207

Dr. Anas A. Kozbari, for the POA (via *email*)
Mr. Hatem Mojahed, for the POA (via *email*)
Mr. John E. Bloomer, for the Firm (via *email*)

DA 2079895.3

9314 7699 0430 0080 0468 10

Mr. Tim Barton
FHC Acquisition, LLC
1755 Wittington Place, Suite 340
Dallas, TX 75234

Jacob Sparks
Spencer Fane
5700 Granite Parkway
Suite 650
Plano, TX 75024

Mr. Tim Barton
FHC Acquisition, LLC
1755 Wittington Place, Suite 340
Dallas, TX 75234

Jacob Sparks
Spencer Fane
5700 Granite Parkway
Suite 650
Plano, TX 75024

9314 7699 0430 0080 0468 10

Jacob Sparks
Spencer Fane
5700 Granite Parkway
Suite 650
Plano, TX 75024

USPS TRACKING #

9590 9699 0430 0080 0468 12

9314 7699 0430 0080 0468 10
RETURN RECEIPT REQUESTED

9590 9699 0430 0080 0468 12

Mr. Tim Barton
FHC Acquisition, LLC
1755 Wittington Place, Suite 340
Dallas, TX 75234

9314 7699 0430 0080 0468 10

ORIGIN ID:PNXA (972) 324-0318
JACOB SPARKS
SPENCER FANE LLP
5700 GRANITE PKWY
SUITE 650
PLANO, TX 75024
UNITED STATES US

SHIP DATE: 04MAR21
ACTWGT: 1.00 LB
CAD: 110425920/INET4340

BILL SENDER

TO MR. TIM BARTON
FHC ACQUISITION, LLC
1755 WITTINGTON PLACE, SUITE 340

DALLAS TX 75234
(972) 385-9934 REF: 5037270.0002
INV:
PO: DEPT:

56DJ3/AC39/FE4A

FedEx Express

E

J211121011901uv

FRI - 05 MAR 10:30A
PRIORITY OVERNIGHT

TRK# 0201 7730 7041 3230

AD PNXA

75234
TX-US DFW

**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

ORIGIN ID:PNXA (972) 324-0318
JACOB SPARKS
SPENCER FANE LLP
5700 GRANITE PKWY
SUITE 650
PLANO, TX 75024
UNITED STATES US

SHIP DATE: 04MAR21
ACTWGT: 1.00 LB
CAD: 110425920/INET4340

BILL SENDER

TO **MR. DAVID L. BATY**
**TEXAS REPUBLIC BANK, N.A.**
**2595 PRESTON ROAD, SUITE 300**

**FRISCO TX 75034**
(972) 324-0318 REF: 503727.0002
INV:
PO: DEPT:

56DJ3/AC39/FE4A

FedEx Express

E

J211121011901uv

TRK# 0201 **7730 7046 5054**

**FRI - 05 MAR 10:30A**
**PRIORITY OVERNIGHT**

**AD ADSA**

**75034**
TX-US **DFW**

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

ORIGIN ID:PNXA (972) 324-0318
JACOB SPARKS
SPENCER FANE LLP
5700 GRANITE PKWY
SUITE 650
PLANO, TX 75024
UNITED STATES US

SHIP DATE: 04MAR21
ACTWGT: 1.00 LB
CAD: 110425920/INET4340

BILL SENDER

TO MR. RANDY P. MARX
THE MARX FIRM, LLC
127 HOWELL STREET

DALLAS TX 75207
(972) 324-0318 REF: 5037270.0002
INV:
PO: DEPT:

56DJ3/AC39/FE4A

FedEx Express

E

J211121011901uv

FRI - 05 MAR 10:30A
PRIORITY OVERNIGHT

TRK# 0201 7730 7049 1452

AD NKIA

75207
TX-US DFW

**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# Exhibit "M"

# PURCHASE AND SALE AGREEMENT

BETWEEN

**IGO – USA LP,**
a Texas limited partnership,

AS SELLER, AND

**JMJ ACQUISITIONS, L.L.C.,**
a Texas limited liability company

AS PURCHASER

Dated as of October ____, 2018

## Table of Contents

***For reference only – in the event of a conflict between the body of the Agreement and the Table of Contents, the body of the Agreement shall control***

SECTION I PERTINENT TERMS AND BASIC INFORMATION .......... 1
1.1. Certain Basic Terms .......... 1
1.2. Closing Costs. .......... 3
SECTION II PURCHASE AND SALE .......... 3
2.1. Incorporation of Recitals .......... 3
2.2. Agreement of Purchase and Sale. .......... 4
2.3. Certain Definitions. .......... 4
2.4. Exceptions .......... 6
2.5. Purchase Price. .......... 6
2.6. Payment of Purchase Price .......... 6
2.7. Earnest Money; Independent Consideration. .......... 6
2.8. Escrow Agent. .......... 8
SECTION III TITLE AND SURVEY .......... 9
3.1. Title Examination; Commitment for Title Insurance .......... 9
3.2. Survey. .......... 9
3.3. Title Objections; Cure of Title Objections .......... 9
3.4. Conveyance of Title. .......... 12
3.5. Pre-Closing "Gap" Title Matters. .......... 12
SECTION IV DUE DILIGENCE PERIOD .......... 12
4.1. Due Diligence. .......... 12
4.2. Insurance Requirements .......... 14

4.3. Right of Termination. 15

4.4. Purchaser's Project; Required Approvals. 16

4.5. Subdivision Approval. 16

SECTION V CLOSING 17

5.1. Time and Place. 17

5.2. Sellers' Obligations at Closing. 17

5.3. Purchaser's Obligations at Closing. 18

5.4. Credits and Prorations. 19

5.5. Closing Costs. 19

5.6. Conditions Precedent to Obligation of Purchaser. 20

5.7. Conditions Precedent to Obligation of Seller. 21

5.8. Obligations of Purchaser. 22

5.9. Commencement and Completion Deadlines. 22

5.10. Additional Provisions Applicable to Section 5.9. 24

5.11. On-Site Infrastructure. 25

5.12. Post-Closing Impact Fees. 25

5.13. Licensing Requirements for "The Gate" 25

5.14. Survival 26

SECTION VI 26

REPRESENTATIONS, WARRANTIES AND COVENANTS 26

6.1. Representations and Warranties of Seller. 26

6.2. Survival of Sellers' Representations and Warranties 28

6.3. Covenants of Seller. 28

6.4. Representations, Warranties and Covenants of Purchaser. 28

6.5. Survival of Representations, Warranties and Covenants. 30

6.6. Representations and Warranties Generally. 30

6.7. Limitation of Liability. 31

6.8. Post-Closing Obligations. 32

SECTION VII DEFAULT 36

7.1. Default by Purchaser. 36

7.2. Default by Seller. 37

7.3. Provisions Applicable to Claims. 37

SECTION VIII COMMISSIONS 38

8.1. Brokerage Commissions. 38

SECTION IX DISCLAIMERS AND WAIVERS 38

9.1. Accuracy of Information. 38

9.2. DISCLAIMERS. 38

9.3. Notice Required by §13.257, Texas Water Code. 40

9.4. Survival of Disclaimers. 40

SECTION X MISCELLANEOUS 40

10.1. Confidentiality. 40

10.2. Public Disclosure. 41

10.3. Jury Waiver. 42

10.4. Assignment. 42

10.5. Notices. 42

10.6. Modifications. 44

10.7. Calculation of Time Periods. 44

10.8. Successors and Assigns. 44

10.9. Entire Agreement. 44

10.10. Further Assurances. 44

10.11. Counterparts/Manners of Delivery. .... 44
10.12. Severability. .... 44
10.13. Applicable Law. .... 45
10.14. Limitation on Liability. .... 45
10.15. Merger Provision; Survival. .... 46
10.16. DTPA Waiver. .... 46
10.17. Section 1031 Exchange. .... 46
10.18. No Third Party Beneficiary. .... 47
10.19. Exhibits and Schedules. .... 47
10.20. Captions. .... 47
10.21. Construction. .... 47
10.22. Termination of Agreement. .... 47
10.23. Litigation Expenses. .... 48
10.24. Effective Date. .... 48

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "**Agreement**") is made as of the Effective Date (as defined below), by and between IGO – USA LP, a Texas limited partnership, with its principal place of business at 2595 Dallas Parkway, Suite 470, Frisco, Texas 75034 ("**Seller**"), and JMJ ACQUISITIONS, L.L.C., a Texas limited liability company, with its principal place of business at 1755 Wittington Place, Suite 340, Dallas, Texas 75234 ("**Purchaser**").

## RECITALS

WHEREAS, Seller is the owner of that certain tract or parcel of land consisting of approximately 4.539 acres, referenced as Block A, Lot 13 on that certain Conveyance Plat of The Gate prepared by Halff Associates Inc. and recorded on March 28, 2016, City Project No. CP-15-0045 (the "**Original Conveyance Plat**"), and graphically depicted on Exhibit A attached hereto and made a part hereof, situated in the City of Frisco, Collin County, Texas (the "**Land**"), together with any buildings, structures, fixtures, and other improvements located on the Land which are owned by Seller (the "**Improvements**"); and

WHEREAS, Seller desires to sell the Property (as hereinafter defined) to Purchaser in exchange for the Purchase Price (as hereinafter defined), and Purchaser desires to purchase the Property from Seller for the Purchase Price, upon and subject to the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## SECTION I
## PERTINENT TERMS AND BASIC INFORMATION

1.1. Certain Basic Terms.

This section is for convenience only, in the event of a conflict between this section and the cited section below or the remaining portion of the Agreement, the cited section (or applicable provision of the Agreement) shall govern.

| Term | Definition | Controlling Section |
|---|---|---|
| Seller | IGO – USA LP,<br>a Texas limited partnership | Preamble |
| Purchaser | JMJ Acquisitions, L.L.C.,<br>a Texas limited liability company | Preamble |

| | | |
|---|---|---|
| Seller's Attorney | John E. Bloomer<br>Scheef & Stone, L.L.P.<br>2600 Network Blvd., Suite 400<br>Frisco, Texas 75034<br>Telephone: (214) 472-2130<br>Email: john.bloomer@solidcounsel.com | {Section 10.5} |
| Purchaser's Attorney | Jay A. LaJone<br>Bennett, Weston, LaJone & Turner, P.C.<br>1603 LBJ Freeway, Suite 280<br>Dallas, Texas 75234<br>Telephone: (214) 373-2556<br>Email: jlajone@bennettweston.com | {Section 10.5} |
| Property | The land depicted on Exhibit A, Frisco, Collin County, TX, subject to final legal description as set forth in Section 4.5 | {Section 2.2} |
| Effective Date | The date a fully executed counterpart of this Agreement is received by the Escrow Agent. | {Section 10.23} |
| Purchase Price | $5,931,565.00 | {Section 2.5} |
| Escrow Agent | Chicago Title Insurance Company<br>2828 Routh Street, Suite 800<br>Dallas, Texas 75201<br>Attn: Shannon Bright<br>Telephone: (214) 965-1719<br>Facsimile: (214) 968-1627<br>Email: brights@CTT.com | {Section 2.8} |
| Earnest Money | Initial Deposit in the amount of $100,000.00 is to be deposited within five (5) days after the Effective Date, and the Additional Deposit in the amount of $200,000.00 is to be deposited within three (3) business days after the expiration of the Due Diligence Period | {Section 2.7} |
| Title Company | Chicago Title Insurance Company<br>[Same Address As Escrow Agent] | {Section 3.1} |
| Title Exam Deadline | 5:00 p.m., Central time, on the thirtieth (30th) day after Purchaser receives the Title Commitment, the Supporting Documents and Seller's plat of the Property, but no later than forty-five (45) days after the Effective Date | {Section 3.3} |

Case 21-41488-elm11 Doc 47-13 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 9 of 79

1.2. Closing Costs.

Closing costs shall be allocated and paid as follows:

| Cost | Responsible Party |
|---|---|
| Title Commitment, Search and Exam Fees, Basic Premium for Owner's Title Policy promulgated by the Texas Department of Insurance | Seller |
| Any endorsements or changes to the Owner's Title Policy desired by Purchaser | Purchaser |
| Update to Existing Survey or New Survey | Purchaser |
| Costs for UCC Searches, Environmental Phase I, Building Inspections, Site visit(s) of Purchaser and Purchaser's Representatives | Purchaser |
| Ad valorem property taxes | Prorated between Seller and Purchaser as of the Closing Date on a calendar year basis |
| Recordation Fees for the Deed of Conveyance | Seller |
| Escrow fees | ½ Seller<br>½ Purchaser |
| Seller's Attorney's Fees | Seller |
| Purchaser's Attorney's Fees | Purchaser |
| Settlement Costs | ½ Purchaser<br>½ Seller |
| All other closing costs, expenses, charges and fees | Per Section 5.5 |

## SECTION II
## PURCHASE AND SALE

2.1. Incorporation of Recitals.

The foregoing Recitals are hereby incorporated herein in their entirety.

2.2. Agreement of Purchase and Sale.

Subject to the terms and conditions hereinafter set forth, Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, the Property. As used herein, the term "**Property**" means:

(a) the Land;

(b) the Improvements, if any; and

(c) all right, title and interest, if any, of Seller in and to any and all of the following relating to the Land: (i) land lying in the bed of any street, road or access way, opened or proposed, on the Land; (ii) roads, alleys, rights-of-way and ingress and egress easements relating to the Land, whether surface, subsurface or otherwise; (iii) all water and water rights under or otherwise pertaining to the Land; and (iv) all governmental or quasi-governmental permits, approvals, authorities, licenses and consents, if any, of any kind or character pertaining to the Land.

Notwithstanding the foregoing, or any other term set forth in this Agreement to the contrary, the term "Property" shall not include, and Seller hereby saves, excepts, and reserves unto itself and its successors and assigns, all Excluded Property.

2.3. Certain Definitions.

For purposes of this Agreement, defined terms will be indicated by initial capital letters and will have the meanings set forth herein. As used in this Agreement, the following terms have the meanings set forth below:

"**Development Agreement**" means that certain Development Agreement dated effective March 15, 2017, by and among the City of Frisco, Texas (the "**City**"), IGO – FRISCO 1 LLC ("**IGO-Frisco**") and Seller, recorded on April 17, 2017 under Clerk's File No. 20170417000481840, Real Property Records of Collin County, Texas, including any amendments, modifications and/or restatements thereof, whether now existing or hereinafter entered into between such parties, the terms of which are incorporated herein by reference.

"**Excluded Property**" means and includes: (i) the name "The Gate", and any mark, logo, trade name, or other name utilizing "The Gate", except as set forth in the Non-Exclusive License Agreement; (ii) any of Seller's or Seller's affiliates right to receive, now or in the future, any Seller Deposits/Refunds, except as expressly stated herein; (iii) any professional photographs of the Property taken by Seller or Seller's agents, including but not limited to, photographs, negatives and transparencies in digital or other form; (iv) any Reports, Property Information or Confidential Information (as each term is used or otherwise defined in SECTION X below), or, in any other case, any other proprietary or confidential information; (v) records, correspondence and documents in Seller's or Seller's affiliates' care, custody, possession or control that are considered attorney-client privileged communications or are otherwise required by any agreement (whether oral or

in writing) to remain confidential; (vi) any insurance proceeds and condemnation awards that Seller is entitled to prior to Closing; (vii) any contracts, agreements, or instruments entered into by and between Seller and any of Seller's affiliates including, without limitation, any development agreement, development management agreement, construction agreement, construction management agreement, asset management agreement, or property management agreement, and any warranties and guaranties from any of Seller's affiliates, expressed or implied and (viii) any contract right, Claim (as hereinafter defined) or other interest now or hereafter enforceable by Seller against any of Seller's affiliates, or any administrative body, governmental or quasi-governmental authority or other third party, except as otherwise set forth in Section 6.8(a).

"**Force Majeure**" means the occurrence of any event after Closing (other than arising under, related to or in connection with, a party's lack of funds or acts or omissions, or disputes between Seller and Seller Parties, or Purchaser and Purchaser Parties, as the case may be) which prevents or delays the performance by Seller or Purchaser (as applicable) of any post-Closing obligation imposed upon it hereunder and the prevention or cessation of which event is beyond the reasonable control of such party. Delays due to events of Force Majeure shall be limited to actual delays on the critical path of such party's completion of the applicable work.

"**Impact Fees**" means, either individually or collectively as the context requires, the following: (i) any and all wastewater impact fees related to the Property (including any portion thereof) and/or Purchaser's Project which arise under the Impact Fee Ordinance, as such term is defined in the Development Agreement (collectively, the "**Wastewater Impact Fees**"); (ii) any and all applicable fees and costs related to the Property (including any portion thereof) and/or Purchaser's Project arising prior to or after Closing under the Tree Removal and Mitigation Ordinance (as such term is defined in the Development Agreement, as referenced in paragraph 6 thereof); and (iii) impact fees arising under any thoroughfare agreement with the City or other governmental agency related to Purchaser and/or Purchaser's Project.

"**Incentive Agreements**" means, either individually or collectively as the context requires, the following: (i) that certain Master Development Agreement For The Gate dated effective September 27, 2016, by and among the City, Frisco Economic Development Corporation ("**FEDC**"), Frisco Community Development Corporation ("**FCDC**"), IGO-Frisco and Seller (the, "**Master Development Agreement**"); (ii) that certain Performance Agreement dated effective September 27, 2016, by and among the City, FEDC, IGO-Frisco and Seller (the, "**FEDC Performance Agreement**"); and (iii) that certain Performance Agreement dated effective September 27, 2016, by and among the City, FCDC, IGO-Frisco and Seller (the, "**FCDC Performance Agreement**"); together with any amendments, modifications, and restatements of the foregoing, whether now existing or hereinafter entered into between such parties, the terms of which are incorporated herein by reference.

"**Seller Deposits/Refunds**" mean any of Seller's (or any of Seller's affiliates) rights to receive related to the Property: (i) security or other deposits paid to the City, the FEDC,

the FCDC or any other administrative body, governmental or quasi-governmental authority, or utility provider; (ii) any rebates, reimbursements, property tax refunds or utility refunds; (iii) other than as set forth in Section 6.8(a) below, any form of economic grant or incentive arising out of or related to the Incentive Agreements, the Property or otherwise, whether in the form of a reimbursement of cost, ad valorem and/or sales tax abatements or grants, or otherwise, from the City, the FEDC, the FCDC, or any other administrative body, governmental or quasi-governmental authority, or utility provider; (iv) any reimbursable costs, fees and expenses due and owing Seller or any of Seller's affiliates by any third party; (v) any signing bonus fee, lump sum payments, reimbursements or other payments Seller or any of Seller's affiliates are now or hereafter entitled to receive from a vendor or other third party under the terms of any license, contract, instrument or other agreement, whether or not any such license, contract, instrument or agreement is assigned to Purchaser; and (vi) any portion of the "Street Lighting Allowance" as such term is defined in that certain Electric Service Agreement dated effective November 7, 2016 (the "**ESA Agreement**," including any amendments thereto), among Seller, IGO-Frisco, and Denton County Electric Cooperative, Inc., d/b/a CoServ Electric ("**CoServ**").

2.4. Exceptions.

The Property shall be conveyed subject to the matters which are, or are deemed to be, Exceptions (as defined below) pursuant to Section 3.3 hereof.

2.5. Purchase Price.

Seller shall sell to Purchaser and Purchaser is to purchase the Property for a total of FIVE MILLION NINE HUNDRED THIRTY ONE THOUSAND FIVE HUNDRED SIXTY-FIVE AND NO/100 DOLLARS ($5,931,565.00) (the "**Purchase Price**").

2.6. Payment of Purchase Price.

The Purchase Price, as increased or decreased by prorations and adjustments as herein provided, shall be payable in full at Closing in cash by wire transfer of immediately available federal funds to a bank account designated by Escrow Agent (as defined below) in writing to Purchaser prior to the Closing.

2.7. Earnest Money; Independent Consideration.

(a) Initial Deposit. With five (5) days after the Effective Date, Purchaser shall deposit with Chicago Title Insurance Company ("**Escrow Agent**") an earnest money deposit in the amount of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) (the "**Initial Deposit**"). If Purchaser fails to timely deliver the Initial Deposit, this Agreement shall be automatically deemed void *ab initio* and of no further force or effect.

(b) Additional Deposit. Provided this Agreement has not been terminated by Purchaser prior to the expiration of the Due Diligence Period (as hereinafter defined), within three (3) business days after the expiration of the Due Diligence Period, Purchaser

shall deposit into escrow with the Escrow Agent an additional earnest money deposit in the amount of TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($200,000.00) (the "**Additional Deposit**"). If Purchaser fails to timely deliver the Additional Deposit, Purchaser shall be deemed to be in default under the terms of this Agreement. Upon such default, (i) Purchaser and Seller hereby jointly and irrevocably instruct Escrow Agent to, and Escrow Agent shall, promptly release and deliver to Seller the Initial Deposit, together with all accrued interest thereon, (ii) Seller may pursue against Purchaser any and all remedies available under the terms of this Agreement, and (iii) this Agreement shall, at the election of Seller in its sole and absolute discretion, terminate and be of no further force or effect other than as necessary for Seller to pursue its rights and remedies against Purchaser and any duties or obligations which survive the termination hereof.

(c) Extension Deposit. Subject to Purchaser timely and properly satisfying the Closing Date extension conditions set forth in Section 5.1(a), no later than three (3) business days prior to the then-scheduled Closing Date, Purchaser shall deposit into escrow with the Escrow Agent an additional earnest money deposit in the amount of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) (the "**Extension Deposit**"). If Purchaser either, (i) fails to timely deliver the Extension Deposit, or (ii) notifies Escrow Agent not to release and deliver the Extension Deposit to Seller, or otherwise prevents delivery of such funds in a timely manner to Seller as contemplated in Section 5.1(a), Purchaser shall be deemed to be in default under the terms of this Agreement. Upon such default, (A) Purchaser and Seller hereby jointly and irrevocably instruct Escrow Agent to, and Escrow Agent shall, promptly release and deliver to Seller the Initial Deposit and the Additional Deposit, together with all accrued interest thereon, (B) Seller may pursue against Purchaser any and all remedies available under the terms of this Agreement, and (C) this Agreement shall, at the election of Seller in its sole and absolute discretion, terminate and be of no further force or effect other than as necessary for Seller to pursue its rights and remedies against Purchaser and any duties or obligations which survive the termination hereof.

(d) Earnest Money. The Initial Deposit and, upon delivery, the Additional Deposit and (if applicable) the Extension Deposit are collectively referred to herein as "**Earnest Money**". The Earnest Money (including any portion thereof) shall upon receipt be placed in an interest-bearing account at a federally insured bank and shall be deemed non-refundable upon delivery to the Escrow Agent, unless otherwise provided under the terms of this Agreement. The Earnest Money shall be applicable to the Purchase Price at Closing. All interest on the Earnest Money shall become part of the Earnest Money and will be reported to the Internal Revenue Service as income to Purchaser.

(e) Additional Escrow Instructions. The Escrow Agent shall hold and disburse the Earnest Money (including any portion thereof) in accordance with the terms and conditions of this Agreement. In connection with any termination made in accordance with this Agreement, One Hundred Dollars ($100.00) of the Earnest Money shall be paid to Seller as independent consideration for Purchaser's right to purchase the Property and for Seller's execution, delivery and performance of this Agreement (the "**Independent**

**Consideration**"). The Independent Consideration is in addition to and independent of any other consideration or payment provided for in this Agreement, is non-refundable and shall be retained by Seller notwithstanding any other provision of this Agreement. Seller acknowledges and agrees that the Independent Consideration is sufficient for Seller's covenants and obligations under this Agreement. The terms and provisions set forth in this Section 2.7 shall survive the termination of this Agreement.

2.8. Escrow Agent.

(a)

(i) All checks, money orders or drafts received by Escrow Agent will be processed for collection in the normal course of business. Escrow Agent covenants and agrees to hold and disburse the Earnest Money in accordance with the terms and conditions of this Agreement; provided, however, in the event Escrow Agent receives an Order issued by a court of competent jurisdiction instructing Escrow Agent not to release and deliver the Earnest Money to Seller or Purchaser (as applicable), then Escrow Agent shall continue to hold such Earnest Money until after receipt of mutual written instructions from the parties, or otherwise instructed by court Order. Other than for the performance of Escrow Agent's duties and obligations in accordance with the terms and conditions of this Agreement, Escrow Agent shall be without liability to either Seller or Purchaser and is hereby otherwise fully and unconditionally released from any responsibility or liability related to the holding and disbursement of the Earnest Money under the terms of this Agreement.

(ii) Seller and Purchaser shall cooperate in providing authorization to the Escrow Agent to disburse the Earnest Money in accordance with this Agreement, if requested by the Escrow Agent.

(b) The Escrow Agent shall not be liable for any damage, liability or loss arising out of its services pursuant to this Agreement, except for damage, liability or loss resulting from the breach of the terms of this Agreement, or the willful or negligent conduct of the Escrow Agent or any of its officers or employees. Each of Seller and Purchaser also hereby authorize and direct Escrow Agent to accept, comply with and obey any and all writs, orders, judgments or decrees entered or issued by any court with jurisdiction; and in case the Escrow Agent obeys or complies with any such writ, order, judgment or decree, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be subsequently reversed, modified, annulled, set aside or vacated. In case the Escrow Agent is made a party defendant to any suit or proceedings regarding the Earnest Money, the Seller and the Purchaser, for themselves, their successors and assigns, jointly and severally, agree to pay to Escrow Agent, upon written demand, all reasonable costs, attorney's fees, and expenses incurred with respect thereto; subject, however, to the parties right to seek reimbursement from Escrow Agent if Escrow Agent is found by a court of competent jurisdiction to be in breach of the terms of this Agreement. If said

costs, fees and expenses are not paid, then the Escrow Agent shall have the right to reimburse itself out of the Earnest Money then held by Escrow Agent (if any).

(c) Escrow Agent shall invest the Earnest Money on behalf of the Purchaser in a federally insured, separately denominated account, and all interest earned in connection therewith (if any) shall become part of the "Earnest Money", provided that the Escrow Agent is in receipt of a fully executed W-9 containing the Purchaser's taxpayer's identification number and required investment instructions. Escrow Agent will, upon request, furnish information concerning its procedures and fee schedules for investment. In the event the Escrow Agent is requested to invest Earnest Money hereunder, Escrow Agent shall not be held responsible for any loss of principal or interest which may be incurred as a result of making the investment or redeeming said investment for the purposes of this Agreement, except to the extent arising in connection with the breach of the terms of this Agreement, or the negligence or willful misconduct of the Escrow Agent.

(d) The terms and provisions set forth in this Section shall survive the termination of this Agreement.

## SECTION III
## TITLE AND SURVEY

3.1. Title Examination; Commitment for Title Insurance.

Within ten (10) days after Escrow Agent's receipt of the Initial Deposit, Seller shall deliver to Purchaser a Commitment for Title Insurance on the form promulgated by the Texas Department of Insurance for the Property (the "**Title Commitment**"), together with the applicable exception documents. The Title Commitment shall be issued by Chicago Title Insurance Company (the "**Title Company**") or other underwriter acceptable to the Title Company.

3.2. Survey.

Within ten (10) days after Escrow Agent's receipt of the Initial Deposit, Seller shall cause to be delivered to Purchaser the existing plat for the Property in Seller's files. Within twenty (20) days following the Effective Date (or as soon thereafter as practicable), Purchaser shall deliver to Seller a new survey for the Property (the "**Survey**"). The Survey, including any and all revisions thereto until finalized, shall be at Purchaser's sole cost and expense, and Seller shall have no obligation to pay for or otherwise reimburse Purchaser for any such cost and expense. The final Survey shall be signed, sealed and certified to Seller, Title Company, Purchaser and such additional entities as Purchaser may request. This Section shall survive the termination of this Agreement.

3.3. Title Objections; Cure of Title Objections.

The "**Title Exam Deadline**" shall be 5:00 p.m., Central time, on the thirtieth (30th) day following the date in which Purchaser has received the Title Commitment and legible copies of

all title exception documents referenced therein (the "**Supporting Documents**") and a copy of Seller's existing plat for the Property; provided, however, in no event shall the Title Exam Deadline be later than forty-five (45) days after the Effective Date. Purchaser shall have until the Title Exam Deadline to notify Seller, in writing, of such objections as Purchaser may have regarding the condition and status of the title to the Property and any matter contained in the Title Commitment and, if applicable, the Survey. Any item contained in the Title Commitment or any matter shown on the Survey to which Seller does not elect in writing to cure prior to the Title Exam Deadline shall be deemed an "**Exception**". In the event Purchaser notifies Seller of objections to title or to matters shown on the Survey prior to the Title Exam Deadline, Seller shall have the right, but not the obligation, to cure such objections; provided, however, that Seller shall, at its sole cost and expense, cure, remove, or satisfy on or before Closing, any mechanic's lien, tax lien or deed of trust lien filed against title to the Property which have not otherwise been insured or endorsed over by the Title Company or otherwise bonded over, but excluding any items or Claims created due to the acts or omissions of Purchaser or any Purchaser Parties (collectively, the "**Mandatory Cure Items**"). Within ten (10) days after receipt of Purchaser's notice of objections, Seller may notify Purchaser in writing, of Seller's election to cure or not cure such objections (other than Mandatory Cure Items, which must be removed by Seller regardless of whether Purchaser provides notice thereof). If Seller fails to give Purchaser such notice of election, then Seller shall be deemed to have elected not to cure the matter. If Seller elects to cure and this Agreement is not otherwise terminated as provided herein, Seller shall have until the date of Closing to remove, satisfy or cure the same. In the event that Seller fails to do so at or prior to Closing, Purchaser shall have a right to terminate this Agreement as its sole and exclusive remedy, thereby waiving and releasing Seller of and from any and all Claims (as such term is hereinafter defined), and thereafter neither Seller nor Purchaser shall have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement. Upon the expiration of the Title Exam Deadline, except for Mandatory Cure Items and subject to Section 3.5, Purchaser shall be deemed to have accepted the form and substance of the Survey, all matters shown thereon, all exceptions to the Title Commitment and other items shown thereon. If Seller elects (or is deemed to have elected) not to cure any objections specified in Purchaser's notice (other than Mandatory Cure Items, which must be cured by Seller), or if Seller is unable to effect a cure of an objection which Seller has elected to attempt to cure prior to the Closing, Purchaser shall, as its sole and exclusive remedy (and hereby waiving and releasing Seller of and from any and all Claims), either: (i) accept a conveyance of the Property subject to the Exceptions, specifically including any matter objected to by Purchaser which Seller is unwilling or unable to cure; or (ii) terminate this Agreement by delivering written notice thereof to Seller on or before the expiration of the Due Diligence Period, or if the Title Commitment is thereafter updated and reflects a new exception (other than an existing or permitted Exception), then Purchaser may terminate this Agreement by delivering written notice thereof to Seller on or before the expiration of such day that is five (5) days after the date of such updated Title Commitment which reflects such new exception that Seller has not agreed, in writing to cure by Closing, and was not otherwise already an Exception (or deemed Exception) to title as provided under the terms of this Agreement. Upon delivery of such notice of termination, provided Purchaser is not then in breach of the terms and conditions of this Agreement, this Agreement shall terminate and thereafter neither Seller nor Purchaser shall have any further rights,

obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement. Seller shall have no obligations to take any steps or bring any action or proceeding or otherwise to incur any effort or expense whatsoever to eliminate or modify any of the Purchaser's objections, except with respect to the Mandatory Cure Items or to any items that Seller agrees in writing to cure. For purposes of this Agreement, in addition to the foregoing, the term "**Exception(s)**" shall also specifically include, and Mandatory Cure Items shall specifically exclude: (1) any and all general real estate taxes and assessments, special taxes and assessments, franchise taxes, levies and personal property taxes imposed by any governmental or quasi-governmental authority and any assessments, dues or charges by private covenant constituting a lien or charge on the Property which are, as of the Closing, not delinquent; (2) supplemental taxes, if any, hereinafter assessed by any governmental authority against the Property to the extent due to a change in ownership and/or use of the Property as a result of this sale; (3) any access, telecommunication, cabling and/or utility agreements, memorandums of agreements, licenses or rights-of-way either filed of public record against title to or otherwise effects, the Property, whether prior to or after the Effective Date; (4) any license, contract, instrument or other agreement entered into between Seller and/or Seller's affiliate (on the one hand), and the City, the FEDC, the FCDC, or any other administrative body, governmental or quasi-governmental authority, or utility provider (on the other hand), which is either filed of public record against title to or otherwise effects, the design, entitlement, development, construction, ownership, operation, management, maintenance, use and/or occupancy of the Property, whether prior to or after the Effective Date; (5) the permits, approvals and conditions which have been or must be obtained for the design, entitlement, development, construction, ownership, operation, management, maintenance, use and/or occupancy of the Property, including without limitation, all Required Approvals (as hereinafter defined), and any document, instrument and/or agreement related to same (including, without limitation, any replat of the Property), whether or not filed of record or otherwise effecting the Property, either prior to or after the Effective Date; (6) that certain Declaration of Frisco Post Oak Property Owner's Association, Inc. dated February 17, 1997 (the "**Frisco Post Oak Declaration**"), recorded under Clerk's File No. 97-0012014, Real Property Records, Collin County, Texas, including all related amendments, modifications and supplements thereto, whether or not filed of record or otherwise effecting the Property, either prior to or after the Effective Date; (7) that certain Amended and Restated Master Declaration of Covenants, Conditions and Restrictions effective September 23, 2016, recorded under Clerk's File No. 20160923001280990, in the Official Public Records of Collin County, Texas (the "**Master Declaration**," including all related amendments, modifications and supplements thereto, whether or not filed of record or otherwise effecting the Property, either prior to or after the Effective Date); (8) any Claims created or otherwise caused by (whether directly or indirectly) the acts or omissions of Purchaser or any Purchaser Parties; (9) the Notice of Applicability and any other document, instrument or agreement required or otherwise deemed necessary to be either filed of record or otherwise affecting the Property under the terms of the Master Declaration; and (10) any changes made to the legal description of the Land, whether by Seller or Purchaser as permitted under the terms of this Agreement, and any and all matters set forth in or referenced on the new replat of all or any portion of The Gate project as contemplated by Seller and IGO-Frisco, which amends, modifies, supplements and/or replaces and supersedes in its entirety, the

Original Conveyance Plat (such new replat, including any amendments, modifications and/or replacements thereof, being referred to herein as the, "**New Conveyance Plat**").

3.4. Conveyance of Title.

At Closing, Seller shall convey fee simple title to the Property to Purchaser, subject to the Exceptions.

3.5. Pre-Closing "Gap" Title Matters.

Provided the Agreement has not otherwise been terminated, after the expiration of the Due Diligence Period, Purchaser may, prior to the Closing Date, notify Seller in writing of any objections to title first appearing on the Title Commitment after the expiration of the Due Diligence Period, other than any Exceptions. Purchaser must provide Seller written notice of any such objections within five (5) days after receipt of notice thereof, failing which Purchaser shall be deemed to have waived its right to object and such new title exception shall be deemed an Exception under the terms of this Agreement. With respect to any objections to title set forth in such notice, Seller shall have the same option to cure and Purchaser shall have the same option to accept title subject to such matters or to terminate this Agreement as those which apply to any notice of objections made by Purchaser before the Title Exam Deadline.

SECTION IV
**DUE DILIGENCE PERIOD**

4.1. Due Diligence.

From and after the Effective Date until the earlier of the termination of this Agreement or the Closing, Purchaser shall have the right to make a physical and environmental inspection of the Property, prepare for the transition of the Property to Purchaser and to examine the Property Information (as defined below). Within ten (10) days after Escrow Agent's receipt of the Initial Deposit, Seller shall provide or otherwise give access to Purchaser via a virtual data room or otherwise, copies of the documents, materials and information currently existing and in the actual possession or control of Seller applicable to the Property as shown on Exhibit C, attached hereto, and such other information that Purchaser reasonably requests and Seller agrees in writing to provide (collectively, "**Property Information**"). Purchaser understands and agrees that any on-site inspections of the Property shall be conducted upon reasonable advance notice to Seller (which notice may be sent by email to Seller). Such physical inspections shall not unreasonably interfere with the use of the Property by Seller. Such physical inspection shall not be invasive (unless Purchaser obtains the Seller's prior written consent), and in any event shall be conducted in compliance with applicable laws. Notwithstanding the foregoing, Purchaser shall have the right to perform a Phase I environmental site assessment of the Property and a geotechnical survey of the Land without Seller's consent. Purchaser shall deliver written notice to Seller not later than 24 hours (unless Seller otherwise consents in writing) prior to Purchaser or any Purchaser Parties' in person meeting with a governmental authority and Seller shall have the right, at Seller's sole option, to attend such meeting. Further, from the Effective Date until Closing, the parties agree to use commercially reasonable efforts to schedule and attend

bimonthly status calls during which such time Purchaser shall update Seller regarding Purchaser's communications with any governmental authority and progress related to Purchaser's Project (defined below). Purchaser shall not engage in any activities that would violate any permits, licenses, entitlements, environmental, wetlands or other regulations pertaining to the Property, or any terms or provisions set forth in any Exception documents. Following each entry by Purchaser with respect to inspections and/or tests on the Property made by Purchaser, Purchaser shall, to the extent of any damage caused by Purchaser's inspections or tests, restore the Property in substantially similar condition that existed immediately prior to any such inspections and/or tests to Seller's satisfaction. Such obligation to restore shall survive the termination of this Agreement. In no event shall Purchaser be responsible to repair or cure any pre-existing conditions on the Property so long as the underlying condition is merely identified which is not exacerbated or otherwise worsened by Purchaser or by any Purchaser Parties (the "**Excluded Claims**"). At no third-party expense to Seller, Seller shall reasonably cooperate with Purchaser in its due diligence investigations conducted in accordance with this Section.

Purchaser hereby assumes any risk involved with respect to Purchaser's testing, investigations, and inspections as provided herein, and, except with regard to any pre-existing condition on the Property and to the extent caused by Seller or Seller's Parties, Purchaser agrees to indemnify against and hold Seller and all of its officers, directors, employees, shareholders, members, affiliates, subsidiaries, principals, parents, trustees, attorneys, joint ventures, investors, partners, successors and assignees (individually and collectively, jointly and severally, "**Seller Parties**"), harmless from any and all actual claims, detriments, rights, remediation, counterclaims, liens, controversies, obligations, agreements, executions, debts, covenants, promises, suits, causes of action, actions, demands, liabilities, losses, damages, assessments, judgments, fines, penalties, sums of money, accounts, costs, expenses (including, without limitation, reasonable attorneys' fees and other professional fees of attorneys and professionals selected by the Seller Parties), liens, personal injury, death or property damage caused in any way by the breach of the terms of this Agreement, or the negligence or intentional misconduct of Purchaser or any of the Purchaser Parties on the Property, except to the extent caused by the gross negligence or intentional misconduct of Seller, in which event Seller shall share liability in proportion to its gross negligence or intentional misconduct, any Hazardous Materials introduced on the Property by Purchaser or any of the Purchaser Parties, and any violation by Purchaser or any of the Purchaser Parties of any laws, ordinances, statutes, codes, rules, regulations, judgments, orders and decrees enacted or promulgated by the United States, the states, the counties, the cities or any other political subdivisions properly exercising jurisdiction over the owner of the Property, the Property or the use of the Property relating to pollution, the protection or regulation of human health, natural resources or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals or toxic or hazardous substances or waste or hazardous materials (however defined) into the environment (including, without limitation, ambient air, surface water, groundwater or land or soil), whether incurred in connection with any investigation, non-judicial, quasi-judicial, judicial, mediative, arbitrative, or administrative actions or proceedings or otherwise (including pretrial, trial, appellate, administrative, bankruptcy or insolvency proceedings) or in settlement or in any other proceeding and whether or not suit was filed thereon (collectively, "**Claims**") incurred by Seller and all Seller Parties by reason of Purchaser's or any of Purchaser Parties' breach of the terms of this Agreement, or arising out of, related to, or in connection with the inspection of the Property

(other than the findings of the inspection) by Purchaser or any of its officers, directors, employees, shareholders, members, affiliates, subsidiaries, principals, parents, trustees, attorneys, joint venturers, related parties and entities, contractors and agents, each and all of the predecessors, legal representatives, heirs, successors and assigns of any of the foregoing and their respective subsidiaries, parents, affiliates, joint venturers, directors, officers, members, principals, investors, shareholders, members, trustees, designees, lenders, beneficiaries, employees, agents, brokers, property managers, asset managers, representatives, predecessors, successors, assigns, contractors, subcontractors, fiduciaries, insurers, heirs, estates, servants, other related parties and persons, and attorneys, past and present (individually and collectively, jointly and severally, "**Purchaser Parties**"), and such indemnity obligation shall survive Closing or any termination of this Agreement.

Purchaser shall be liable for all Claims resulting from, relating to, or arising out of any inspection or testing of the Property, to the extent occasioned by the negligent acts or omissions of Purchaser and Purchaser Parties, except with respect to any Excluded Claims. Purchaser's indemnity obligations shall not be limited by any workmen's compensation, benefits, disability, or other similar laws. Seller and Purchaser acknowledge and agree that the indemnities set forth herein are intended to and shall survive Closing or any termination of this Agreement.

Notwithstanding anything contained in this Agreement to the contrary, Purchaser shall have no liability to Seller under this Agreement by reason of the mere discovery of conditions existing at the Property, or with respect to any pre-existing condition of the Property (Purchaser, however, shall be responsible for any exacerbation or worsening of the underlying condition by Purchaser or by any of Purchaser Parties). Purchaser expressly acknowledges and agrees that there may be certain environmental issues and/or risks with respect to any part of the Property and that Purchaser has been expressly advised by Seller to conduct an independent investigation and inspection of the Property, subject to and as permitted under the terms of this Agreement, utilizing experts as Purchaser deems to be necessary for an independent assessment of all environmental liability and risk with respect to any part of the Property.

Purchaser further acknowledges and agrees that, having been given the opportunity to inspect and test any part of the Property, Purchaser is relying solely on its own investigation and testing of the Property expressly and not on any information provided or to be provided by Seller, and Purchaser hereby waives all objections or Claims against Seller (including, but not limited to, any right or claim of contribution and cost recovery) arising from or related to the Property or to Hazardous Materials on the Property, except as expressly set forth in this Agreement or to the extent the Hazardous Materials on the Property were intentionally hidden or concealed from Purchaser by Seller or Seller Parties and Purchaser and any of Purchaser's Parties had no means or ability to discover the existence or presence of the Hazardous Materials otherwise. Seller and Purchaser hereby acknowledge stipulate and agree that the terms, conditions, covenants, conditions and agreements set forth in this Section 4.1 are intended to and shall survive Closing or any termination of this Agreement.

4.2. Insurance Requirements.

Purchaser will, at its sole cost and expense, obtain and keep in force during the term of this Agreement, or so long as Purchaser has not restored or vacated the Property as contemplated above, effective prior to the date of access or entry to the Property, commercial and general liability insurance, each with a $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate limit, (or such other reasonable amount as Seller and Purchaser may agree upon from time to time), insuring, without limitation, coverage for bodily injury, property damage, contractual liability and personal injury liability with respect to the improvements on the Property or arising out of any of Purchaser's or the Purchaser Parties' use, inspection or occupancy of the Property, due diligence or arising out of any of the Claims. In no event shall such insurance be construed as a limitation, diminution, or offset against Purchaser's indemnity obligations as provided herein. The commercial general liability policy, with Purchaser named as the insured, shall be issued by a reputable insurer reasonably acceptable to Seller. The commercial general liability and excess liability or umbrella policies shall list Seller, IGO-Frisco and their respective affiliates and the Association (hereinafter defined) and the Association's property manager as additional named insureds as their interests may appear and shall provide that Seller will be given at least thirty (30) days' prior written notice of any cancellation, reduction in coverage, or non-payment of premiums. Prior to entry onto the Property, Purchaser shall provide a certificate of insurance evidencing the type and amounts of coverages herein required and identifying the "Certificate Holder" as Seller. The parties hereto acknowledge that the issuance of a current, valid certificate of insurance by the insurance provider or broker shall serve as evidence of payment or current premiums for said insurance policy. Purchaser will also require all Purchaser Parties or other agents entering upon the Property pursuant to Purchaser's direction to provide, maintain and keep in force worker's compensation, casualty, liability and other insurance consistent with the limits and requirements above required for all Claims which may arise, directly or indirectly, as a result of Purchaser's rights under this Agreement, including, without limitation, Purchaser's and Purchaser Parties' access to the Property as contemplated by this SECTION IV. Purchaser agrees that required insurance for the Purchaser Parties will also be on forms reasonably acceptable to Seller and issued by companies licensed to do business in the state of Texas and with an insurance rating reasonably acceptable to Seller, and insurance certificates evidencing such insurance shall be delivered by Purchaser to Seller prior to entry onto the Property by any of the Purchaser Parties or other agents.

4.3. Right of Termination.

Purchaser shall have the right to terminate this Agreement, in Purchaser's sole discretion, for any reason or no reason, by giving written notice thereof to Seller prior to 5:00 p.m., Central time on the one hundred twentieth (120th) day following the Effective Date (the "**Due Diligence Period**"). If Purchaser gives such notice of termination to Seller prior to the expiration of the Due Diligence Period, this Agreement shall terminate and, provided Purchaser is not otherwise in default under the terms of this Agreement, the Earnest Money shall be promptly returned to Purchaser and neither Seller nor Purchaser shall have any further rights or obligations under this Agreement, other than those that expressly survive a termination of this Agreement. In no event will any Earnest Money be returned to Purchaser if Seller has given written notice of a condition which must be repaired and restored and the Property is, in fact, repaired and restored to the extent required under the terms of this Agreement. Upon termination under this Section, each party shall bear its own costs incurred hereunder. If Purchaser fails to give Seller written notice

of termination prior to the expiration of the Due Diligence Period, Purchaser shall be deemed to have approved all aspects of the Property and the Property Information, and to have elected to proceed with the purchase of the Property pursuant to the terms hereof and the Earnest Money shall be non-refundable to Purchaser other than as stated in this Agreement to the contrary.

4.4. Purchaser's Project; Required Approvals.

Purchaser agrees that it will develop a full-service luxury (either a 4 or 5 star rated) Seller approved brand name flagged hotel development on the Property including underground and/or podium parking spaces (of which, 120 of such parking spaces shall be dedicated, owned, for the benefit of, and otherwise solely utilized by the owner(s) of lot 7 and lot 14 of The Gate project (each, the "**Adjacent Lot Owner**"), with reference to such 120 parking spaces being herein referred to as the "**Dedicated Parking Spaces**"), which such development may include condominiums, ancillary restaurant, full service bar(s), meeting/function space, pool (which may include a rooftop pool), pool deck, pool support restaurant and bar and retail amenities, all designed, developed and constructed in accordance with the Required Approvals, as hereinafter defined (collectively, "**Purchaser's Project**"), with all phases of Purchaser's Project to be completed on or before the Completion Deadline, as described in Section 5.9 below. Purchaser, at its expense, will from and after the Effective Date, use commercially reasonable efforts to obtain the following approvals necessary for Purchaser's Project from the Development Reviewer (as such term is defined in the Master Declaration) (hereinafter referred to as the, "**Development Reviewer Approval**"), and from all governmental and quasi-governmental agencies (hereinafter referred to as the, "**Governmental Approvals**," which, together with the Development Reviewer Approval, is hereinafter referred to as the "**Required Approvals**"): (a) if applicable, Subdivision Approval (as hereinafter defined) for the Property; (b) approval of Purchaser's site plan for Purchaser's Project ("**Site Plan Approval**"); and (c) the approval of the design, plans and specifications of Purchaser's Project from the Development Reviewer; provided, however, if Purchaser does not obtain all final Required Approvals prior to Closing, Purchaser shall not be in breach of the terms of this Agreement, and Purchaser shall continue post-Closing to achieve all Required Approvals in accordance with the terms and conditions set forth in Section 6.8 hereof. At Closing, Purchaser shall execute and deliver to Seller, IGO-Frisco and the Association (as applicable), all documents, agreements and instruments (collectively, "**Project Documents**") required by such party to comply with, or otherwise satisfy any requirement imposed on an "Owner" (as such term is defined in the Master Declaration) under the terms of any Development Documents (as such term is defined in the Master Declaration), and any owner of the Property under the terms of Frisco Post Oak Declaration or any other documents or agreements related to any Exceptions.

4.5. Subdivision Approval.

If, due to the design, location and/or development of Purchaser's Project, the City of Frisco or any other governmental agency requires the Land to be replatted, Purchaser shall promptly inform Seller in writing and shall thereafter promptly pursue diligently, continuously and in good faith the replatting of the Land (including any other portion of The Gate project) under this Section 4.5 in furtherance of a final, approved replat, which shall be recorded by Purchaser in the Official Public Records of Collin County, Texas, which such replatted Land

Case 21-41488-elm11 Doc 47-13 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 23 of 79

shall be within the boundaries and dimensions as set forth in Exhibit A and mutually acceptable to Seller and Purchaser (the "**Subdivision Approval**"). Seller shall reasonably cooperate and, if required by applicable governmental authority, join in the execution, filing and prosecution of all applications for Subdivision Approval. Seller shall have the right to approve of the form and substance of any document, agreement and/or instrument related to the replat and related Subdivision Approval, such approval not to be unreasonably withheld. Upon receipt of the recorded replat prior to Closing, Purchaser shall notify the Title Company and surveyor to update the Title Commitment and Survey to reflect the recorded replat and the legal description as shown on the recorded replat shall be used in the Deed and all other applicable closing documents, all of which shall be deemed an Exception.

## SECTION V
## CLOSING

5.1. Time and Place.

(a) The closing, funding and otherwise consummation of the transactions contemplated hereby (the "**Closing**") shall occur on or before 3:00 p.m. (Central time) on the date which is thirty (30) days after the expiration of the Due Diligence Period (the "**Closing Date**"); however, notwithstanding the foregoing, provided: (i) this Agreement has not been terminated by either party; (ii) neither Seller nor Purchaser are then in default; (iii) Purchaser has delivered into escrow with the Escrow Agent the Extension Deposit and has irrevocably and unconditionally instructed Escrow Agent in writing to immediately release and deliver the Extension Deposit via wire transfer to Seller in accordance with Seller's instructions; and (iv) all of the foregoing conditions in subparts (i)-(iii) above are satisfied no later than three (3) business days prior to the then-scheduled Closing Date (time being of the essence), then, Purchaser shall have the right, in its sole and absolute discretion, to extend the Closing Date to a date no later than thirty (30) days after the then-scheduled Closing Date by providing Seller and Escrow Agent with written notice of such extension simultaneous with the delivery of the Extension Deposit to Escrow Agent and shall identify the new Closing Date.

(b) The Closing shall occur with all deliveries required hereunder being made to Escrow Agent on or before the Closing Date, in accordance with escrow instructions consistent with the terms and conditions of this Agreement given by or on behalf of Seller and Purchaser, respectively; whereby escrow arrangements mutually acceptable to Seller and Purchaser shall allow Seller, Purchaser and their respective attorneys to consummate the Closing without being physically present and to exchange closing documents through such escrow, via electronic means, and/or .pdf (except with regard to recordable documents or other instruments reasonably requested by the parties to be provided in original "wet ink" form), which shall be physically delivered to the Escrow Agent on or before the Closing Date.

5.2. Sellers' Obligations at Closing.

At Closing, subject to Purchaser's timely and proper satisfaction of the terms and conditions set forth in Section 5.3 below, Seller shall:

(a) deliver to the Title Company for delivery to Purchaser the duly executed recordable special warranty deed for the Land, in substantially the form attached hereto as Exhibit B (the "**Deed**");

(b) deliver to the Title Company such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Seller;

(c) deliver to the Title Company a FIRPTA Certificate in substantially the form attached as Exhibit D duly executed by Seller;

(d) deliver to Purchaser possession and occupancy of the Property, subject to the Exceptions;

(e) execute a closing statement in form and content satisfactory to Seller;

(f) execute and deliver an owner's affidavit as may be reasonably required to permit the Title Company to issue an owner's title insurance policy in the form promulgated by the Texas Department of Insurance for the Property (the "**Title Policy**"); and

(g) execute and deliver such additional documents as shall be reasonably required to consummate the transactions expressly contemplated by this Agreement.

5.3. Purchaser's Obligations at Closing.

At Closing, Purchaser shall:

(a) pay to Escrow Agent the full amount of the Purchase Price, as increased or decreased by prorations and adjustments as herein provided, in immediately available wire transferred federal funds pursuant to Section 2.6 above;

(b) pay, or cause to be paid, (i) the Thoroughfare Fee associated with the Land to the City of Frisco and provide evidence of such payment to Seller pursuant to Section 5.13 below, and (ii) all costs, fees and expenses (if any) imposed by the City or any telecommunication or utility provider to bury any existing overhead electrical, telecommunication and/or other utility cables underground relative to the contemplated development of Purchaser's Project;

(c) execute a closing statement in form and content satisfactory to Purchaser;

(d) execute and deliver to Seller and/or the Association (as applicable) all Project Documents in form and substance acceptable to Seller and/or the Association;

Case 21-41488-elm11 Doc 47-13 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 25 of 79

(e) deliver to the Title Company such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser; and

(f) execute and deliver such additional documents as shall be reasonably required to consummate the transactions contemplated by this Agreement.

5.4. Credits and Prorations.

(a) The following shall be apportioned with respect to the Property as of 12:01 a.m., on the day of Closing, as if Purchaser were vested with title to the Property during the entire day upon which Closing occurs, provided that within ninety (90) days after Closing (or such later date as to taxes as may be reasonable to ascertain the final assessment amount thereof applicable to the Property, but not later than December 30 of the year of Closing), Purchaser and Seller will make a further adjustment for such rents, taxes or charges which may have accrued or been incurred prior to the Date of Closing, but not received or paid at that date:

(i) taxes and assessments levied against the Property; and

(ii) any costs, fees and expenses assessed or charged against Seller as owner of the Property under the terms of the Master Declaration and any other Project Documents.

(b) If this sale or a change in use of the Property or denial of any special use valuation of the Property after the Closing would result in the assessment after the Closing of additional taxes and interest applicable to the period of time before the Closing (the "**Rollback Taxes**"), then Seller shall be responsible for payment of all Rollback Taxes which shall be paid at Closing.

(c) The provisions of this Section shall survive Closing.

5.5. Closing Costs.

**Seller shall pay**: (a) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (b) the fee for the Title Commitment, search, exam fee and the basic premium for Title Policy; (c) all State, County and City transfer taxes which become payable by reason of the transfer of the Property from Seller to Purchaser; (d) the recordation fee for the release of any Mandatory Cure Items; (e) one-half of the Escrow Costs; and (f) any other costs, fees or expenses approved by Seller under the terms of this Agreement or the settlement statement delivered at Closing. **Purchaser shall pay**: (i) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (ii) the cost of obtaining or updating the Survey and other third party reports relating to the conducting its due diligence review and the costs of any replat of the Property pursuant to Section 4.5; (iii) pay the cost for any title endorsements; (iv) the recordation fee for the Deed and any other documents, instruments or

agreements to be recorded at Closing; (v) for all Wastewater Impact Fees (the amount of which Purchaser shall pay to Seller at Closing), and otherwise pay all other Impact Fees related to the Property and Purchaser's Project; (vi) all fees and costs associated with Purchaser's loan or otherwise incurred by Purchaser's lender; and (vii) any other costs, fees or expenses approved by Purchaser under the terms of this Agreement or the settlement statement delivered at Closing. All other costs and expenses incident to this transaction and the closing thereof shall be paid in accordance with Section 1.1 of this Agreement; if not enumerated in this Section or in Section 1.1, such costs and expenses shall be paid by the party incurring such costs and expenses. In the event of a conflict between this Section 5.5 and Section 1.1, then this Section 5.5 shall control. The provisions of this Section shall survive the Closing or any early termination of this Agreement.

5.6. Conditions Precedent to Obligation of Purchaser.

The obligation of Purchaser to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion (individually, a "**Purchaser's Condition Precedent**" and collectively, the "**Purchaser's Conditions Precedent**"):

(a) All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the date of Closing;

(b) Seller shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Seller as of the date of Closing; and

(c) The Title Company shall be committed to issue the Title Policy to Purchaser, subject to the Exceptions.

Purchaser agrees that, as soon as Purchaser has notice of the failure of a Purchaser's Condition Precedent, Purchaser shall notify Seller thereof and Seller shall have three (3) days after the receipt of such notice within which to cure such failure (no obligation to do so being implied hereby) and, if required, the Closing Date shall automatically be extended to the next business day occurring after such three (3) day period; provided, however, in no event shall the Closing Date be further extended under the terms of this Agreement (including, without limitation, by virtue of the notice and cure period set forth in Section 7.2) unless Purchaser and Seller agree in writing to such extension.

In the event (i) each and all of Seller's Conditions Precedent are timely and completely satisfied (or, if applicable, waived in writing by Seller), and (ii) each and all of the Purchaser's Conditions Precedent are not fully and completely satisfied or waived on or before the dates specified above or, if applicable, on the first business day occurring after the three (3) day cure period mentioned in the immediately preceding paragraph (which shall not be further extended without Purchaser's and Seller's prior written agreement), then Purchaser shall have the option, as its sole and exclusive remedy, to either: (A) waive all or any of such Purchaser's Conditions Precedent and proceed with Closing; or (B) pursue its other rights and remedies against Seller as

provided for and in accordance with the terms and conditions set forth in Section 7.2. The provisions set forth in this Section shall survive the termination of this Agreement.

5.7. Conditions Precedent to Obligation of Seller.

The obligation of Seller to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which may be waived by Seller in its sole discretion (individually, a **"Seller's Condition Precedent"** and collectively, the **"Seller's Conditions Precedent"**):

(a) Purchaser shall have timely deposited with Escrow Agent on or before 1:00 p.m. (Central time) on the Closing Date, the Purchase Price as adjusted pursuant to and payable in the manner provided for in this Agreement, together with any costs, fees and expenses required to be paid to the Association under the terms of the Master Declaration and any other Project Documents, and to the Frisco Post Oak Property Owner's Association under the terms of the Frisco Post Oak Declaration required to be paid at the time of transfer. Impact fees shall not be required to be paid until such time as a building permit for Purchaser's Project is obtained.

(b) Purchaser shall have delivered to Seller and the Association (as applicable) all of the items required to be delivered to Seller and/or the Association (as applicable) pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 5.2.

(c) Prior to Closing, Purchaser shall have delivered to Seller an executed copy of an agreement entered into by a hotel company who is first approved in writing by Seller (the **"Hotel Management Agreement"**) which requires (among other things), Purchaser's Project to be designed, developed, constructed, owned and operated subject to and in accordance with all Required Approvals and the terms and conditions set forth in this Agreement.

(d) All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the date of Closing.

(e) Purchaser shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Purchaser as of the date of Closing.

Seller agrees that, as soon as Seller has notice of the failure of a Seller's Condition Precedent other than Purchaser's failure to deliver the remaining portion of the Purchase Price or any other amounts required to be delivered herein by Purchaser (which event shall be deemed an automatic default by Purchaser without any notice or cure rights), Seller shall notify Purchaser thereof and Purchaser shall have three (3) days after the receipt of such notice within which to cure such failure (no obligation to do so being implied hereby) and, if required, the Closing Date shall automatically be extended to the next business day occurring after such three (3) day period; provided, however, in no event shall the Closing Date be further extended under the

terms of this Agreement (including, without limitation, by virtue of the notice and cure period set forth in Section 7.1) unless Purchaser and Seller agree in writing to such extension.

In the event each and all of the Seller's Conditions Precedent are not fully and completely satisfied or waived on or before the dates specified above or, if applicable, on the first business day occurring after the three (3) day cure period mentioned in the immediately preceding paragraph (which shall not be further extended without Purchaser's and Seller's prior written agreement), then Seller shall have the option, as its sole and exclusive remedy, to either: (A) waive all or any of such Seller's Conditions Precedent and proceed with Closing; or (B) pursue its other rights and remedies against Purchaser as provided for and in accordance with the terms and conditions set forth in Section 7.1. The provisions set forth in this Section shall survive the termination of this Agreement.

5.8. Obligations of Purchaser.

Purchaser acknowledges that conveyance of title to the Property will be subject to certain covenants, conditions, and restrictions set forth in the Frisco Post Oak Declaration and the Master Declaration that bind the Property and certain additional property surrounding the same (together with the Property, "**The Gate**"), which contain, among other items, certain customary development requirements, architectural standards and review guidelines, and general and special assessment requirements, including, without limitation, attribution of an allocable share of costs, including infrastructure costs. Purchaser acknowledges, stipulates and agrees that, as part of the continuing development, construction, operation, management, maintenance, ownership and use of The Gate, Seller, Seller's affiliates and/or the Association will prepare and file (or cause to be prepared and filed) of record various documents, agreements and instruments which are either (a) required by a governmental or quasi-governmental authority, or (b) reasonably necessary for the continuing development, construction, operation, management, maintenance, ownership and use of The Gate, or (c) otherwise allowed for, or contemplated under, the terms of the Frisco Post Oak Declaration and/or the Master Declaration, all such documents, agreements and instruments will be considered "Project Documents," as such term is defined in this Agreement. Purchaser covenants and agrees to continue to cooperate in good faith with Seller to execute, deliver and record (if necessary) such Project Documents whether prior to or post-Closing, which such obligation shall survive Closing.

Notwithstanding anything to the contrary, in no event shall Purchaser be required after Closing to execute any of the Project Documents that have a material and adverse effect on the operation and use of the Property.

5.9. Commencement and Completion Deadlines.

(a) In addition to the other obligations of Purchaser set forth in this Agreement, Purchaser hereby represents, warrants, covenants and agrees to Commence Construction on or before the Commencement Deadline, and thereafter Complete Construction on or before the Completion Deadline, as such terms are hereinafter defined, time being of the essence. In the event Purchaser or any successor-in-title fails to either Commence Construction on or before the Commencement Deadline or

Complete Construction on or before the Completion Deadline for any reason whatsoever (subject, however, to extension of time due to an event of Force Majeure, or otherwise as agreed to in writing by Seller), Purchaser and any successor-in-title shall, jointly and severally, be deemed to be in default under the terms of this Agreement and Seller shall have the immediate and unconditional right, as its sole and exclusive remedies to either: (i) make demand and cause Purchaser and any successor-in-title (jointly and severally) to pay to Seller the Performance Deadline Fee (as hereinafter defined) as liquidated damages; or (ii) repurchase (or cause its designee to repurchase) the Property and all related improvements located thereon or attached thereto by paying the then-current fee title owner of the Property an amount equal to the Purchase Price in cash on the closing date as designated in writing by Seller or its designee (as applicable), at which time the Property and all improvements thereon or attached thereto shall be sold, transferred and conveyed to Seller (or its designee) free and clear of all monetary liens, Claims (whether by Purchaser, any Purchaser Parties, or otherwise), and, to the extent required by Seller, encumbrances which first arose on and after the Closing Date. Nothing contained in this Section shall limit Seller's rights under Sections 6.8 or 10.23 hereof.

For purposes of this Section, the term "Performance Deadline Fee" means a daily fee payable by Purchaser and any successor-in-title to the Property (jointly and severally), in an amount equal to One Thousand and No/100 Dollars ($1,000.00) (the "**Performance Deadline Fee**") for each calendar day following the Commencement Deadline or the Completion Deadline (as applicable) that Purchaser or any successor-in-title to the Property does not Commence Construction or Complete Construction (as the case may be) as required under the terms of this Agreement. THE PARTIES ACKNOWLEDGE THAT THE PERFORMANCE DEADLINE FEE IS AGREED TO BY AND BETWEEN SELLER AND PURCHASER AS LIQUIDATED DAMAGES (AND NOT A PENALTY), DUE TO THE DIFFICULTY AND INCONVENIENCE OF ASCERTAINING AND MEASURING ACTUAL DAMAGES TO SELLER, AND THE UNCERTAINTY THEREOF GIVEN THE UNIQUE NATURE OF THE PURCHASER'S PROJECT AND THE NEGATIVE IMPACT AN INCOMPLETE PROJECT COULD HAVE ON THE MARKETING, SALE, DEVELOPMENT, OPERATION, USE, AND ENJOYMENT OF THE REMAINDER OF SELLER'S PROPERTY.

(b) As used in this Agreement, the following terms have the meanings indicated:

(i) "**Commence Construction**" and "**Commencement**" mean obtaining a grading permit, and commence the grading, at Purchaser's Project, all as certified in writing to Seller by Purchaser's architect to have been properly satisfied.

(ii) "**Commencement Deadline**" means the date which is nine (9) months after the date of Closing (regardless of whether or not such day is or is not a business day), time being of the essence; provided however, the Commencement Deadline shall be extended by Force Majeure and also to the date

agreed by the City of Frisco under the terms of the applicable document(s) related to the Project Incentives which will be entered into by Seller and Purchaser, as contemplated in Section 6.8 below; provided, further, however, in no event (except for Force Majeure) shall the Commencement Deadline be extended beyond the date which is fifteen (15) months after the date of Closing. Purchaser's failure (including any successor-in-title to the Property) to comply with this subparagraph shall be deemed a post-Closing default and shall allow Seller to exercise any and all rights and remedies available to Seller under the terms of this Section 5.9 and any post-Closing agreement(s) in which Seller and Purchaser are parties to, regardless of the inclusion of any other third parties.

(iii) **"Complete Construction"** and **"Completion"** mean the issuance of the final certificate of occupancy by the City for the last building and related improvements constituting Purchaser's Project.

(iv) **"Completion Deadline"** means the date which is thirty-six (36) months after the date of Commencement, time being of the essence; provided however, the Completion Deadline shall be extended by Force Majeure and also to the date agreed by the City of Frisco under the terms of the applicable document(s) related to the Project Incentives which will be entered into by Seller and Purchaser, as contemplated in Section 6.8 below. Purchaser's failure (including any successor-in-title to the Property) to comply with this subparagraph shall be deemed a post-Closing default and shall allow Seller to exercise any and all rights and remedies available to Seller under the terms of this Section 5.9 and any post-Closing agreement(s) in which Seller and Purchaser are parties to, regardless of the inclusion of any other third parties.

(c) The provisions of this Section will be either contained in the Deed executed by Seller to Purchaser in accordance with this Agreement, or at Seller's option and election, contained in a Memorandum of Agreement which will be deemed an Exception, and the terms and conditions set forth in this Section 5.9 will run with title to the Property until the date of completion of Purchaser's Project. (the "**Termination Date**"). From and after the Termination Date, at Purchaser's request, Seller agrees to execute and deliver to Purchaser for recording any document reasonably acceptable to Seller and Purchaser to evidence the termination of this Section, which Purchaser may (at its sole cost and expense) record of public record against title to the Property.

5.10. Additional Provisions Applicable to Section 5.9.

Seller is a developer of The Gate and has a vested interest in the character and reputation of The Gate. It is a fundamental policy of Seller to sell tracts in The Gate only to developers and builders whose reputation and products have been determined by Seller to be compatible with the character of The Gate. Purchaser represents and warrants to Seller that it is purchasing the Property with the intent to develop, construct, own, operate and manage Purchaser's Project and not for speculative land holding. The terms and conditions set forth in Section 5.9 were bargained for by the parties and are a material part of the determination of the Purchase Price to

be paid by Purchaser for the Property. Both Seller and Purchaser were represented by legal counsel in the negotiation of this Agreement, including Sections 5.9 and 5.10. Purchaser acknowledges and agrees that all terms and conditions of Sections 5.9 and 5.10 are enforceable in accordance with their respective terms and conditions.

5.11. On-Site Infrastructure.

As used in this Agreement, the term "**On-Site Infrastructure**" means all storm drainage, water, sanitary sewer, drive lanes and franchise utilities to support the development of Purchaser's Project on the Land, and shall include (without limitation) all side walk areas, landscaping and parallel parking constituting, in part, a portion of Purchaser's Project. A general depiction of the location of such On-Site Infrastructure work is attached hereto as Exhibit E. All On-Site Infrastructure will be built by Purchaser per The Gate Master Developer Guideline, Design and Specifications and the City Code of Frisco, Texas.

Purchaser hereby covenants and agrees that all On-Site Infrastructure relative to Purchaser's Project will be designed and constructed to conform with the Original Conveyance Plat (or if applicable, the New Conveyance Plat), and all Required Approvals. Purchaser agrees to pay for the design and construction of the On-Site Infrastructure at its sole cost and expense.

5.12. Post-Closing Impact Fees.

Purchaser shall be solely responsible for and obligated to pay all Impact Fees related to the Property (including any portion thereof) and/or Purchaser's Project; provided, however, nothing contained herein is intended to change or limit Purchaser's entitlement to the Project Incentives as contemplated in Section 6.8 hereof. As such, Purchaser covenants and agrees that it is and shall solely be responsible and liable for and shall pay or reimburse Seller and/or its affiliate (as applicable) at the time a building permit for Purchaser's Project is obtained (if already paid by Seller or its affiliate, or if Seller otherwise has the City agree to waive the assessment of all or any portion of the Impact Fees) or thereafter within ten (10) days after receipt of written demand from Seller or the City (as applicable), any and all such Impact Fees related to the Property and/or Purchaser's Project.

5.13. Licensing Requirements for "The Gate".

Purchaser acknowledges that Seller owns certain rights in the mark "THE GATE", alone and in combination with other words, in singular and plural or with design, and derivations thereof for "hotel and retail services", including common law rights in such mark(s), if any, and all applications for registrations of such mark(s), and state and federal and international registrations that have been or may be issued for such mark(s), and the goodwill associated with such mark(s) (collectively, "**Marks**"). Purchaser acknowledges, stipulates and agrees for itself and on behalf of any other owner of all or any portion of the Property (whether pre- or post-Closing), that neither Purchaser nor any other owner, operator, tenant, subtenant, licensee, lender, or management company of all or any portion of the Property, shall be entitled to use the name "The Gate", or any mark, logo, trade name, or other name utilizing "The Gate", or have any right, title or interest in the Marks, except (if at all) pursuant to a non-exclusive license

agreement in form and substance to be agreed upon between Seller and Purchaser (if at all) prior to the Closing Date (the "**Non-Exclusive License Agreement**"). The foregoing restriction on use of Marks includes, without limitation, the restriction on Purchaser's use of "The Gate" in the name of Purchaser's Project, whether as an indication of the location of Purchaser's Project or otherwise, or in the use of "The Gate" in or on goods, literature, brochures, letterhead, business cards, voicemail, signs, and advertising material bearing the Marks.

In the event Purchaser or any other owner, operator, tenant, subtenant, licensee, lender, or management company of all or any portion of the Property fails to comply with the terms and conditions set forth in this Section, Seller shall have the immediate and unconditional right, in addition to any and all rights and remedies available to Seller at law or in equity, to: (a) pursue a claim for injunctive relief against Purchaser and any other applicable party without any obligation to post a bond, or if a bond is required by a court of competent jurisdiction, the posting of a bond for a de minimis amount not to exceed $1,000.00; and/or (b) sue Purchaser or any successor-in-title to the Property and any other applicable operator, tenant, subtenant, licensee, lender, and/or management company of all or any portion of the Property (jointly and severally), for damages, including without limitation, reimbursement or payment (as applicable) of Seller's reasonable attorneys' and consultants' fees and expenses. In addition to the rights and remedies available to Seller as provided in subparts (a) and (b) above, Seller shall also be entitled to sue for and collect (jointly and severally) from Purchaser and any other third party who is violating the terms and conditions of this Section, an amount equal to $1,000.00 per day for each day that this Section is being violated, SUCH AMOUNT BEING AGREED TO BY THE PARTIES TO BE A LIQUIDATED DAMAGES AMOUNT (AND NOT BEING ASSESSED AS A PENALTY) DUE TO THE DIFFICULTY AND INCONVENIENCE OF ASCERTAINING AND MEASURING ACTUAL DAMAGES TO SELLER AND THE NEGATIVE IMPACT ON SELLER FOR USE OF THE MARKS WITHOUT ITS WRITTEN CONSENT OR CONTROL. The terms and conditions set forth in this Section shall be included in the Notice of Applicability and be deemed a covenant running with the Land.

5.14. Survival. Sections 5.11, 5.12 and 5.13 shall survive Closing, unless contained in an agreement executed at Closing in which event the sections shall be merged into such agreements.

## SECTION VI
## REPRESENTATIONS, WARRANTIES AND COVENANTS

6.1. Representations and Warranties of Seller.

Seller hereby makes the following representations and warranties to Purchaser as of the Effective Date and the Closing Date (except as may have been, or is later otherwise, disclosed in writing by Seller to Purchaser):

(a) Seller has been duly organized and is validly existing under the laws of the state of its organization and is duly qualified to transact business in the state in which the Property is located and all requisite action necessary to authorize Seller to enter into this

Agreement and to carry out its obligations hereunder have been taken. Seller has the full right and authority to enter into this Agreement and to transfer all of the Property to be conveyed by Seller pursuant hereto and to consummate or cause to be consummated the transactions contemplated herein to be made by Seller. The person signing this Agreement on behalf of Seller is authorized to do so. No consent of any partner, shareholder, creditor, investor, judicial or administrative body, governmental or quasi-governmental authority or other third party is required for Seller to enter into this Agreement and to consummate the transactions contemplated hereby which has not already been obtained.

(b) Seller has not received written notice from any governmental or public authority that the Property or any portion thereof is in violation of any applicable fire, health, building, use, and occupancy or zoning laws.

(c) Seller has no actual knowledge and has received no written notice that any condemnation or other taking by eminent domain of the Property or any portion thereof has been instituted.

(d) There is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending or, to Seller's current actual knowledge, threatened against Seller which, if adversely determined, could materially interfere with the consummation by Seller of the transactions contemplated by this Agreement.

(e) Seller has not received a written notice from any governmental authority concerning, and Seller has no current actual knowledge of any events that have given rise to or which could reasonably be expected to give rise to: (i) any alleged violation of any environmental law or regulation at, or associated with, the Property or any part thereof, or (ii) any investigation or request for information relating to the handling, packaging, transportation, treatment, storage or disposal of solid, liquid or hazardous waste or hazardous substances on-site at the Property or any part thereof. For purposes of this Agreement, the term "**Hazardous Materials**" shall include but not be limited to substances defined as "hazardous substances", "hazardous materials", or "toxic substances" in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. Paragraph 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Paragraph 1801 et seq.), and the Resource Conservation and Recovery Act (42 U.S.C. Paragraph 6901 et seq.).

(f) Neither Seller, nor to Seller's knowledge any individual or entity having an interest in Seller, is a person and/or entity with whom U.S. persons or entities are restricted from doing business under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq.; the Trading with the Enemy Act, 50 U.S.C. App. § 5; any executive orders promulgated thereunder; any implementing regulations promulgated thereunder by the U.S. Department of Treasury Office of Foreign Assets Control ("**OFAC**") (including those persons and/or entities named on OFAC's List of Specially Designated Nationals and Blocked Persons (the "**SDN List**")); or any other applicable law of the United States, including Executive Order Number 13224 on Terrorism

Financing, effective September 24, 2001 ("**Executive Order 13224**") or the United and Strengthening America by Providing Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (the "**USA Patriot Act**").

(g) Except with respect to any Exceptions or as otherwise expressly permitted in this Agreement, after the expiration of the Due Diligence Period, and provided Purchaser has not terminated this Agreement and is not otherwise in default, Seller shall not further grant or create any encumbrance upon the title to the Property without the written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.

(h) To Seller's knowledge, as of the Effective Date, other than as set forth in or otherwise contemplated under any documents, agreements or instruments listed as Exceptions, there are no agreements, written or oral, relating to the management, leasing, operation, maintenance and/or improvement of the Property or any portion thereof.

6.2. Survival of Sellers' Representations and Warranties.

The representations and warranties of Seller set forth in Section 6.1 shall survive Closing for a period of nine (9) months (the "**Survival Period**").

6.3. Covenants of Seller.

Seller hereby makes the follow covenants for the benefit of Purchaser as of the date hereof and the Closing Date:

(a) Other than with respect to any Project Documents and any document, agreement or instrument required or contemplated to be entered into that constitutes an Exception or as otherwise provided under the terms of this Agreement, prior to Closing, Seller agrees not to enter into any document, agreement or instrument relating to the upkeep, repair, maintenance or operation of the Property without Purchaser's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed.

(b) Seller will pay or cause to be paid all debts, taxes and other obligations incurred by it in connection with the use and ownership of the Property up to the date of Closing, except for those items for which proration is agreed upon in accordance with SECTION V hereof, including but not limited to all real estate and other taxes which taxes are due and payable at the time of Closing.

(c) Seller shall, at its sole cost and expense, terminate any existing Property management agreement at or prior to Closing which is applicable solely and exclusively to the Property.

6.4. Representations, Warranties and Covenants of Purchaser.

Purchaser hereby makes the following representations, warranties and covenants for the benefit of Seller as of the date hereof and the Closing Date:

(a) Purchaser is validly existing and in good standing under the laws of the state of its formation. Purchaser has the full right, power and authority to purchase the Property as provided in this Agreement and to carry out Purchaser's obligations hereunder, and all requisite action necessary to authorize Purchaser to enter into this Agreement and to carry out its obligations hereunder have been, or by the Closing will have been, taken. Any permitted assignee of Purchaser shall be an entity which, prior to the Closing, is validly existing and in good standing under the laws of the state of its formation and, if applicable, duly qualified to do business in the State of Texas. The person signing this Agreement on behalf of Purchaser is authorized to do so. No consent of any partner, shareholder, creditor, investor, judicial or administrative body, governmental or quasi-governmental authority or other third party is required for Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby which has not already been obtained.

(b) There is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending or, to Purchaser's current actual knowledge, threatened against Purchaser which, if adversely determined, could materially interfere with the consummation by Purchaser of the transactions contemplated by this Agreement.

(c) Purchaser is not: (i) a plan which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), as defined in Section 3(3) of ERISA, nor a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (each of the foregoing hereinafter referred to collectively as a "**Plan**"); or (ii) a "governmental plan" as defined in Section 3(32) of ERISA. Purchaser is acting on its own behalf and not on account of or for the benefit of any Plan. Purchaser shall not transfer the Property to any entity, person or Plan which will cause a violation of ERISA. Purchaser shall not assign its interest under this Agreement to any entity, person or Plan which, if the assignee acquires the Property, will cause a violation of ERISA.

(d) Neither Purchaser, nor to Purchaser's knowledge any individual or entity having an interest in Purchaser, is, nor will become, a person and/or entity with whom U.S. persons or entities are restricted from doing business under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq.; the Trading with the Enemy Act, 50 U.S.C. App. §5; any executive orders promulgated thereunder; any implementing regulations promulgated thereunder by OFAC (including those persons and/or entities named on the SDN List); or any other applicable law of the United States, including Executive Order 13224 or the USA Patriot Act.

(e) Should this Agreement terminate prior to the Closing Date, Purchaser shall, at its sole cost and expense, immediately (i) return or cause to be returned to Seller all copies of the Property Information received from Seller in hard copy form, and (ii) delete from its computer and other electronic storage devices the Property Information received from Seller via the virtual data room as set forth in Section 4.1.

(f) Before Closing, Purchaser agrees (whether individually or by and through an entity which is directly or indirectly owned or controlled by Purchaser) not to solicit, negotiate or enter into any document, agreement or instrument that is binding upon Seller or Seller's interest in the Property, or the Property.

(g) Within five (5) business days prior to the expiration of the Due Diligence Period, Purchaser shall deliver to Seller copies of the concept designs, renderings, landscape plans and list of materials for the development and construction of Purchaser's Project.

(h) Purchaser covenants and agrees to design, develop and construct Purchaser's Project on the Property in accordance with all the terms, conditions and provisions of this Agreement, the Required Approvals, and as otherwise required by the City of Frisco and any Exception document.

(i) The Hotel Management Agreement shall contain the following provisions: (i) Purchaser, or any other owner of the Property, is authorized and otherwise entitled to be the owner and/or operator of Purchaser's Project under the terms of the Hotel Management Agreement (upon the proper assignment and assumption thereof), notwithstanding any existing or prior default by Purchaser or any of its affiliates thereunder; and (ii) if Seller (including any applicable affiliate of Seller) has the right and elects to repurchase the Property (including any portion thereof) at any time prior to the Termination Date, then Seller (or other applicable affiliate of Seller, as applicable) shall have the right to (A) terminate the Hotel Franchise Agreement as of the date designated in writing by Seller or its affiliate, and (B) acquire the Property free and clear of any Claims arising out of or related to the Hotel Franchise Agreement. Seller agrees that, prior to the scheduled Closing Date, it will not contact any hotel company in connection with The Gate unless this Agreement is terminated.

(j) Within five (5) business days after Closing, Purchaser shall deliver to Seller, (i) a fully-executed copy (and if applicable, a recorded copy) of the Purchaser Agreement and the New Memorandum (as such terms are defined in the ESA Agreement) related to the Property, and (ii) an original Release (as such term is defined in the ESA Agreement) properly executed and notarized by CoServ so that Seller may promptly file it against title to the Property in the Real Property Records of Collin County, Texas. Purchaser's failure to timely or properly comply with this paragraph shall constitute a post-Closing default under the terms of this Agreement.

6.5. <u>Survival of Representations, Warranties and Covenants.</u>

The representations, warranties and covenants of Purchaser set forth in <u>Section 6.4</u> shall survive Closing for the Survival Period.

6.6. <u>Representations and Warranties Generally.</u>

If Purchaser makes a claim against Seller for breach of a representation and warranty under this Agreement and Seller compensates Purchaser in connection therewith, and if the claim by Purchaser against Seller relates to matters for which there is or may be a claim against a third party under any warranties, guaranties, indemnities or other Claims (including, without limitation, for workmanship, materials and performance) assigned by Seller to Purchaser pursuant to this Agreement, then Purchaser agrees that Seller shall be subrogated to Purchaser's position with respect to all Claims against such third parties, and Purchaser shall reasonably cooperate with Seller in attempting to recover against such third party(ies) at no third-party expense to Purchaser. The foregoing shall survive Closing.

6.7. Limitation of Liability.

Terms such as "to Seller's knowledge", "to the best of Seller's knowledge", or like phrases mean the actual present and conscious awareness or knowledge of the undersigned representative of Seller (**"Seller's Knowledge Party"**), without any duty of inquiry or investigation; provided that so qualifying Seller's knowledge shall in no event give rise to any personal liability on the part of Seller's Knowledge Party or any other officer or employee of Seller, on account of any breach of any representation or warranty made by Seller herein. Said terms do not include constructive knowledge, imputed knowledge, or knowledge Seller or such persons do not have but could have obtained through further investigation or inquiry. No broker, agent, or party other than Seller is authorized to make any representation or warranty for or on behalf of Seller. *No party shall have the right to bring an action against the other for any breach of a representation or warranty, or a default which arises out of or relates to a breach of a representation or warranty, which occurs prior to Closing, other than a claim for specific performance (and specifically excluding any Claim for damages, other than a claim for attorneys' fees in connection with a specific performance action per Section 10.23 below).* If, however, a party is in default under the terms of this Agreement as a result of a breach of a representation or warranty which occurs after Closing, then, the parties agree that the following terms and conditions must first be satisfied: (a) the party bringing the action for breach must have first acquired actual knowledge of the breach after Closing and must file such action within the Survival Period; and (b) neither party shall have the right to bring a cause of action for a breach of a representation or warranty post-Closing unless the damage to such party on account of such breach (individually or when combined with damages from other breaches) equals or exceeds FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00) (the **"Damages Threshold"**), whereupon meeting the Damages Threshold, the non-breaching party is entitled to first dollar recovery. Neither party shall have any liability after Closing for the breach of a representation or warranty hereunder of which the other party hereto had actual knowledge as of Closing. Furthermore, the parties agree that the aggregate maximum liability of either party for the alleged breach of any representation or warranty set forth in this Agreement is limited to non-breaching party's actual damages incurred as a direct result of breaching party's breach, up to, but not to exceed, THREE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($350,000.00) (the **"Damages Cap"**). In no event shall either party be liable to the other for incidental, consequential, or punitive damages as a result of the breaching party's breach of any or all representations or warranties set forth in SECTION VI of this Agreement. The provisions of this Section shall survive the Closing. Any breach of a representation or warranty that occurs prior to Closing shall be governed by SECTION VII.

6.8. Post-Closing Obligations.

Notwithstanding the expiration of the Survival Period or any other term, condition or provision set forth in this Agreement to the contrary, Seller and Purchaser hereby represent, warrant, covenant and agree as follows:

(a) Purchaser desires to participate in the sales and property tax rebates that are offered by certain governmental agencies to owners of commercial developments of greater than 200,000 square feet in The Gate development. In accordance with Section 4.4 and Section 6.4(h) of this Agreement, Purchaser agrees to design, develop and construct Purchaser's Project on the Property, subject to the terms and conditions set forth in this Agreement, the Incentive Agreements, and any other applicable post-Closing agreement entered into by Seller and Purchaser, so that Purchaser may be entitled to participate in any sales and property tax rebates, grants, reimbursement rights and any other economic incentives contemplated under the terms of the Incentive Agreements for The Gate which shall, (i) only relate to, and shall specifically be identified and mutually agreed to in writing by Seller and Purchaser to only include incentives allocated on a proportionate share basis to, the Property and Purchaser's Project to be developed thereon if and to the extent Purchaser is entitled to do so as the owner of Purchaser's Project, and (ii) further be approved in writing by Seller, IGO-Frisco, the City, and any other applicable governmental or quasi-governmental agency, which may include (without limitation) further amendments, modifications, terminations and/or restatements of all or any portion of the Incentive Agreements (such specific identified and mutually agreed upon rebates, grants, reimbursement rights and other economic incentives allocated on a proportionate share basis to the Property and Purchaser's Project being collectively referred to herein as the, "**Project Incentives**"). Seller agrees to use commercially reasonable efforts to seek the City's approval to allow the Project Incentives for Purchaser's Project to be separated from the balance of The Gate development within thirty (30) days of the Effective Date; provided, however, Seller's failure to do so shall not constitute a breach or default by Seller under this Agreement or entitle Purchaser to pursue any remedies or Claims against Seller.

(b) As a material inducement for each party to enter into this Agreement, both Seller and Purchaser acknowledge, stipulate and agree that, (i) once the Project Incentives are determined and agreed to in accordance with the terms and conditions set forth in this Section 6.8, at the Closing, the Project Incentives will be assigned to Purchaser on an "as is" basis, without representations, warranties or recourse against Seller (other than a representation by Seller that it has not previously assigned the Project Incentives to any other party), so that Purchaser shall be entitled to and vested with the sole right to acquire, use, be paid or reimbursed for, and otherwise receive all of the financial benefits of being the owner and holder of one hundred percent (100%) of the Project Incentives, in terms of both the gross economic value and percentage of unit shares (if any) allocated to the Property, and Seller, IGO-Frisco and any other applicable lot owner in The Gate development as designated and approved by Seller (or if applicable, IGO-Frisco) shall be entitled to and vested with the sole right to acquire, use, be paid or reimbursed for, and otherwise receive all of the financial benefits of being the owner and holder of one

hundred percent (100%) of all other remaining sales and property tax rebates, grants, reimbursement rights and any other economic incentives contemplated under the terms of the Incentive Agreements for The Gate, in terms of both the gross economic value and percentage of unit shares (if any) allocated to The Gate project.

(c) Purchaser acknowledges that Seller makes no statements, representations or warranties of any kind relating to whether Seller, the Property or Purchaser's Project are or will be entitled to any sales or property tax rebates, grants, reimbursement rights or any other economic incentives contemplated under the terms of the Incentive Agreements or otherwise for The Gate, or Purchaser's entitlement to any Project Incentives.

(d) For purposes of this Agreement, the term "**Project Incentive Conditions**" includes the timely and proper payment, performance and satisfaction of all of the following, as determined by Seller:

(i) the City, the FEDC and the FCDC (each, as applicable) approves of (A) Purchaser's Project and Purchaser's participating in the Project Incentives relative to the Property, and (B) Seller's, IGO-Frisco's and any other applicable lot owner in The Gate development of their respective rights, entitlement and participation in and to all rebates, grants, reimbursement rights and any other economic incentives that any such party(ies) negotiate and otherwise agree to in writing with the City, the FEDC and the FCDC; and

(ii) the City, the FEDC and the FCDC enter into one or more written agreements (which may include entering into wholly new agreements) in form and substance acceptable to Seller and IGO-Frisco (and, solely with respect to Purchaser's Project, also acceptable to Purchaser) which either amends or modifies, or otherwise restates or replaces in its entirety, each of the Master Development Agreement, the Performance Agreements and/or other incentive agreements which are applicable to The Gate project (including the Property) which such agreements will, among other things, (A) release, carve-out and otherwise sever from the existing Master Development Agreement and the Performance Agreements, Seller's and IGO-Frisco's (as applicable) agreement, right, duty, and obligation to pay for, perform and otherwise satisfy any and all "Performance Requirements," "Structured Parking Space" requirements (as such terms are defined in the Master Development Agreement), and any other terms and conditions set forth therein which reference or relate to the development and operation of a hotel development, which shall include (without limitation) the timely payment, performance and satisfaction by Purchaser of the terms and conditions set forth in Section 4.2 and Section 4.6 of the Master Development Agreement, and (B) allow Seller and/or IGO-Frisco (as applicable) to sell, transfer and convey to any lot owner in The Gate development other than Purchaser, all or any portion of the rebates, grants, reimbursement rights and any other economic incentives that Seller and/or IGO-Frisco (as applicable) is required or otherwise desires to sell, transfer and convey, upon such terms and conditions solely agreed to by Seller and IGO-Frisco, as applicable.

(e) In connection with the design, development and construction of the Dedicated Parking Spaces for the benefit of each applicable Adjacent Lot Owner, and the corresponding right of access to, and ownership, operation, management, maintenance, use and occupancy of, such Dedicated Parking Spaces on the Property, Seller and Purchaser hereby consent and agree to the following terms and conditions:

(i) Purchaser shall cause the Dedicated Parking Spaces to be designed, developed and constructed as part of Purchaser's Project, and shall achieve Completion of Purchaser's Project by the Completion Deadline. All costs, fees and expenses incurred or payable by Purchaser in connection with its duties and obligations related to the Dedicated Parking Spaces (whether the design, development, and construction thereof, or otherwise) shall be paid for, reimbursed from, and otherwise satisfied solely from the Project Incentives, and neither Seller, IGO-Frisco nor the Adjacent Lot Owners or any other owner of lot 7 or lot 14 in The Gate project shall be liable for any Claims related thereto;

(ii) As of the Effective Date of this Agreement, Seller or IGO-Frisco (as applicable) are the Adjacent Lot Owners, and each respective owner of lot 7 and lot 14 of The Gate (whether Seller, IGO-Frisco, or their respective successors or assigns) shall retain and otherwise continue to have the right, jointly with Purchaser other than with respect to the Restricted Dedicated Parking Spaces (in which Purchaser shall have no Retained Parking Rights thereto unless and to the extent otherwise provided for in the Parking Agreement, as hereinafter defined), to have ingress and egress access to and from, and otherwise operate, manage, maintain, use and occupy, the Dedicated Parking Spaces on the Property as each respective owner deems necessary or appropriate from time to time in its sole and absolute discretion, even after Completion of Purchaser's Project (collectively, the "**Retained Parking Rights**");

(iii) Purchaser acknowledges, stipulates and agrees that, notwithstanding the purchase of the Property and Completion of Purchaser's Project, (A) The Adjacent Property Owners will have an easement granting their right, title, claim and interest in and to the Retained Parking Rights as such rights and benefits apply to that portion of the Dedicated Parking Spaces necessary or required by the City, the FEDC, the FCDC, and any other governmental or quasi-governmental agency to approve of and otherwise issue a building permit for the proposed project to be developed on lot 7 and lot 14 of The Gate (as applicable), whether such development is by Seller, IGO-Frisco, or their respective successors or assigns (such restricted Dedicated Parking Spaces being hereinafter referred to as the, "**Restricted Dedicated Parking Spaces**"), and (B) Purchaser shall not grant, sell, license, transfer or convey, or otherwise pledge, hypothecate, encumber or cause any lien, debt, security interest or other right to be granted, attached, affixed or otherwise arise (whether by contract, operation of law or otherwise) in, on or related to, the Restricted Dedicated Parking Spaces, without the express written consent of the applicable Adjacent Lot Owner, such consent to not be unreasonably withheld. Other than as set forth herein relative to the

Restricted Dedicated Parking Spaces, Purchaser shall have certain joint rights, title, claim or interest in or to the remaining portion of the Retained Parking Rights, all as more particularly described in, and subject to the terms and conditions set forth in, the Parking Agreement;

(iv) As a part of Purchaser obtaining the Required Approvals, Purchaser shall enter into an agreement (whether one or more) in recordable form with each Adjacent Lot Owner (each such agreement being referred to herein as the, "**Parking Agreement**"), the terms and conditions of which shall be consistent with this Agreement, whereby Purchaser and the Adjacent Lot Owner (for itself and on behalf of their successors and assigns) irrevocably and unconditionally grants, transfers and otherwise conveys to the other and its respective designees (as identified in the Parking Agreement) all easements, licenses, rights of way and/or access agreements necessary or required for the Adjacent Lot Owner and its designees to access the Property for the continued and unobstructed use, enjoyment and benefit of (A) the Retained Parking Rights relative to the Restricted Dedicated Parking Spaces, and (B) the remaining portion of the Retained Parking Rights jointly with Purchaser, each to be consistent with the terms of this Agreement and Adjacent Lot Owner's (and their respective designees) anticipated use, enjoyment and benefit of the Restricted Dedicated Parking Spaces and the remaining portion of the Dedicated Parking Spaces (as applicable) in conjunction with the ownership, development, operation and use of the Adjacent Property Owner's lot; provided, however, such Parking Agreement shall contain cost sharing provisions for the maintenance of the Dedicated Parking Spaces;

(v) The Parking Agreement(s) shall be executed and filed of record against title to the Property either immediately upon Completion of Purchaser's Project, or at any time after Closing but prior to Completion of Purchaser's Project upon the written request of the Adjacent Lot Owner. Until recordation of the Parking Agreement(s), the terms and conditions set forth in this Section shall be included in the Notice of Applicability, or, if agreed to by the parties, any other form of recordable declaration mutually acceptable to Seller and Purchaser which shall be recorded at Closing and shall be deemed a covenant running with the Land and a permitted Exception to title to the Property;

(vi) If Seller (including any applicable affiliate of Seller) has the right and elects to repurchase the Property (including any portion thereof) at any time prior to the Termination Date, then Purchaser shall on the closing date of the repurchase of Purchaser's Project, sell, assign, transfer, and otherwise convey to Seller or its designee, at no cost or reimbursement obligation and otherwise free and clear of any and all Claims, all Project Incentives and all right, title and interest in and to the Dedicated Parking Spaces, whether arising out of or related to the Parking Agreement, or otherwise; and

(vii) Any document, agreement or instrument entered into by or on behalf of Purchaser related in any respect to Purchaser, the Property and/or Purchaser's Project, including without limitation, any loan documents, shall in all instances be (and shall specifically state therein that they are) subject, subordinate and otherwise inferior in all respects to all rights, titles, Claims and interests of the Adjacent Lot Owner, Seller, and its respective designees in and to the Retained Parking Rights and the terms and conditions set forth herein and in the respective Parking Agreement(s).

(f) Provided Purchaser has timely and properly satisfied all of the terms and conditions set forth in this Section 6.8, and Purchaser has caused all applicable governmental and quasi-governmental authorities to timely and properly satisfy all of the terms and conditions set forth in this Section which allows for Seller and Purchaser to receive (and subsequently divide and assign) the Project Incentives (as they relate to Purchaser's Project) and all other incentives as contemplated in the Incentive Agreements (as they relate to Seller, IGO-Frisco and any other applicable third party) as contemplated herein, but Seller fails to execute and deliver all instruments required by this Section to be delivered by Seller, then, Purchaser shall have the right, as its sole and exclusive remedy (with Purchaser hereby waiving and releasing Seller and IGO-Frisco from any and all other Claims), to pursue a claim of specific performance against Seller.

## SECTION VII
## DEFAULT

7.1. Default by Purchaser.

In the event that Purchaser fails to perform its obligations pursuant to this Agreement for any reason other than a default by Seller or the permitted termination of this Agreement by either Seller or Purchaser as herein expressly provided, or if prior to Closing any one or more of Purchaser's representations or warranties are breached in any material respect, then if such failure or breach is not cured by Closing (which date for Closing shall, upon prior written notice to Seller, be extended by a reasonable additional time to effect such a cure, but in no event shall such extension exceed five (5) days after the original date for Closing set forth in Section 5.1 hereof), then unless otherwise stated in this Agreement to the contrary, Seller shall be entitled, in addition to its right to pursue against Purchaser payment and/or reimbursement (as applicable) of any and all costs, fees and expenses Seller is entitled to receive under Section 10.23 of this Agreement, to terminate this Agreement and receive or retain (as applicable) the Earnest Money as liquidated damages for Purchaser's breach of this Agreement, it being agreed between the parties hereto that the actual damages to Seller in the event of such breach are impractical to ascertain and the amount of the Earnest Money is a reasonable estimate thereof. In addition to the foregoing rights of Seller, Seller shall retain the right to pursue against Purchaser any Claim for any indemnification obligation of Purchaser set forth in this Agreement, and these shall be Seller's sole and exclusive remedies hereunder. IN NO EVENT SHALL PURCHASER'S DIRECT OR INDIRECT PARTNERS (OTHER THAN A GENERAL PARTNER OF A PARTNERSHIP), SHAREHOLDERS, MEMBERS, OWNERS OR AFFILIATES, ANY OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF THE FOREGOING, OR ANY

Case 21-41488-elm11 Doc 47-13 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 43 of 79

AFFILIATE OR CONTROLLING PERSON THEREOF HAVE ANY LIABILITY FOR ANY CLAIM, CAUSE OF ACTION OR OTHER LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROPERTY, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY OR OTHERWISE. The provisions of this Section 7.1 shall survive Closing or the earlier termination of this Agreement.

7.2. Default by Seller.

In the event that Seller fails to perform its obligations under this Agreement for any reason other than Purchaser's default, or the permitted termination of this Agreement by either Seller or Purchaser as herein expressly provided, or if prior to Closing any or more of Seller's representations or warranties are breached in any material respect, then if such failure or breach is not cured by Closing (which date for Closing shall, upon prior written notice to Purchaser, be extended by a reasonable additional time to effect such a cure, but in no event shall such extension exceed five (5) days after the original date for Closing set forth in Section 5.1 hereof), Purchaser shall elect, as its sole and exclusive remedy, either to: (a) waive said failure or breach and proceed to Closing; or (b) pursue specific performance of this Agreement against Seller, provided that Purchaser (i) has satisfied or waived Purchaser's Closing Conditions, and (ii) is not otherwise in breach of its obligations under this Agreement (collectively, the "**Conditions Precedent**"), all prior to and as a condition to filing any notice of pendency of action or lis pendens as an encumbrance against the Property. Purchaser acknowledges that Seller shall have the right to petition a Court to expunge any such lis pendens if Purchaser fails to satisfy all Conditions Precedent. If Purchaser fails to bring an action for specific performance within 60 days of the scheduled Closing Date, Purchaser shall be deemed to have waived the remedy of specific performance and to have elected to terminate this Agreement. Purchaser waives all other rights or remedies in the event of a default by Seller. IN NO EVENT SHALL SELLER'S DIRECT OR INDIRECT PARTNERS, SHAREHOLDERS, MEMBERS, OWNERS OR AFFILIATES, ANY OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF THE FOREGOING, OR ANY AFFILIATE OR CONTROLLING PERSON THEREOF HAVE ANY LIABILITY FOR ANY CLAIM, CAUSE OF ACTION OR OTHER LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROPERTY, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY OR OTHERWISE. The provisions of this Section 7.2 shall survive Closing or the earlier termination of this Agreement.

7.3. Provisions Applicable to Claims.

Any pre- or post-judgment claims shall bear interest at the lesser of ten percent (10%) per annum, or the highest rate of interest allowed by law. If Closing is consummated, then the Parties shall have all remedies available to each respective Party as provided under the terms of this Agreement which are applicable to the alleged default (including, without limitation, the remedies provided in SECTION V above) in the event either party fails to perform any obligation under this Agreement that survives the Closing; provided, however, in no event shall Seller be liable to Purchaser for any incidental, consequential or punitive damages. The provisions of this Section 7.3 shall survive Closing or the earlier termination of this Agreement.

SECTION VIII
**COMMISSIONS**

8.1. Brokerage Commissions.

Upon the Closing of the transaction contemplated in this Agreement, Seller shall pay to Dowdle Real Estate (Attn: Jim Gandy) ("**Purchaser's Broker**") a commission ("**Purchaser's Broker's Commission**") pursuant to the terms of a separate written agreement. If Closing does not occur for any reason, then Seller shall not owe or be obligated to pay Purchaser's Broker the Purchaser's Broker's Commission. Under no circumstances shall Seller or Purchaser owe a commission or other compensation to any other broker, agent or person. Seller and Purchaser hereby each represent and warrant to the other that, other than Purchaser's Broker's Commission payable to Purchaser's Broker, no other brokers, agents, finder's fees or commissions are due or arising in connection with Purchaser entering into this Agreement or the consummation of transactions contemplated herein, and each party hereby agrees to indemnify, defend and hold the other and the Property harmless from and against all Claims arising from the warranting party whether or not such Claim is meritorious, for any compensation with respect to the entering into of this Agreement, the sale and purchase of the Property or the consummation of transactions contemplated herein. The provisions of this Section shall survive Closing or earlier termination of this Agreement.

SECTION IX
**DISCLAIMERS AND WAIVERS**

9.1. Accuracy of Information.

Except as expressly stated in this Agreement, Seller makes no representation or warranty as to the truth, accuracy or completeness of any materials, data or information delivered by Seller to Purchaser in connection with the transactions contemplated hereby.

9.2. DISCLAIMERS.

SUBJECT TO THE EXPRESS REPRESENTATIONS, WARRANTIES, AND COVENANTS OF SELLER AS SET FORTH ELSEWHERE IN THIS AGREEMENT AND IN ANY DOCUMENT DELIVERED BY SELLER TO PURCHASER AT CLOSING: (A) PURCHASER SHALL BE DEEMED TO BE SATISFIED WITH AND/OR TO HAVE WAIVED THE RESULTS OF THE DUE DILIGENCE AND TO HAVE ACCEPTED THE PROPERTY "AS IS", "WHERE IS", AND "WITH ALL FAULTS", INCLUDING LATENT DEFECTS, WITHOUT RECOURSE TO AND WITHOUT REPRESENTATION OR WARRANTY BY SELLER, EXPRESS OR IMPLIED, WHETHER STATUTORY OR OTHERWISE, AND WITHOUT ANY WARRANTIES OF TRANSFER, MERCHANTABILITY OR FITNESS FOR A PARTICULAR, OR PURCHASER'S INTENDED USE OR PURPOSES, RELATING TO THE PROPERTY, AND ANY WARRANTIES ARISING IN SECTION 2 OF THE TEXAS BUSINESS AND COMMERCE CODE; (B) PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY

Case 21-41488-elm11 Doc 47-13 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 45 of 79

REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (I) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (II) THE INCOME TO BE DERIVED FROM THE PROPERTY, (III) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (IV) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (V) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (VI) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, OR (VII) COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS, OR (VIII) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY; (C) PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT IF SELLER GIVES PURCHASER THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER WILL BE RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS IN, ON, UNDER OR ABOUT THE PROPERTY OR ANY MOLD, MILDEW OR OTHER FUNGAL GROWTHS IN, ON, UNDER OR ABOUT THE PROPERTY; (D) PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY REPORTS OR OTHER INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION; (E) SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON; (F) IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF. THE PROPERTY SHALL BE CONVEYED SUBJECT TO THE EXCEPTIONS (AS DEFINED IN <u>SECTION 3.3</u> OF THIS AGREEMENT), PROVIDED HOWEVER, SELLER SHALL DELIVER THE CLOSING

DOCUMENTS WHICH IT IS REQUIRED TO DELIVER IN ACCORDANCE WITH SECTION 5.2; (G) EXCEPT FOR THE ADJUSTMENTS AND PRORATIONS REQUIRED UNDER SECTION 5.4 HEREOF AND EXCEPT FOR PURCHASER'S REMEDIES AGAINST SELLER (SUBJECT TO THE SURVIVAL PERIOD, DAMAGES CAP, AND DAMAGES THRESHOLD) FOR THE BREACH OF ANY REPRESENTATION, WARRANTY OR COVENANT THAT SURVIVES CLOSING: UPON CLOSING, PURCHASER SHALL BE DEEMED TO HAVE ACCEPTED THE PROPERTY UNCONDITIONALLY AND WITH ANY AND ALL (NONE BEING SO IMPLIED) RIGHTS TO RESCIND, SET ASIDE OR AVOID THE TRANSACTIONS CONTEMPLATED HEREBY OR TO SEEK A REDUCTION, ADJUSTMENT, OFFSET OR RECOVERY OF THE PURCHASE PRICE, ON THE GROUNDS OF RESTITUTION OR OTHERWISE, WHICH ARE WAIVED AND RELINQUISHED. THE PROVISIONS SET FORTH IN THIS SECTION 9.2 SHALL BE DEEMED TO BE MADE A PART OF, AND OTHERWISE DEEMED TO BE SET FORTH IN, THE DEED.

PURCHASER'S INITIALS:__________

9.3. Notice Required by §13.257, Texas Water Code.

Seller hereby notifies Purchaser that the Property may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If the Property is located in a certificated area, there may be special costs or charges that Purchaser will be required to pay before Purchaser can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to the Property. Purchaser is advised to determine if the Property is in a certificated area and contact the utility service provider to determine the cost that Purchaser will be required to pay and the period, if any, that is required to provide water or sewer service to the Property. By execution of this Agreement, Purchaser acknowledges receipt of this notice.

9.4. Survival of Disclaimers.

Seller and Purchaser agree that the provisions of this SECTION IX shall survive Closing.

## SECTION X
## MISCELLANEOUS

10.1. Confidentiality.

Until Closing, Purchaser, for itself and on behalf of Purchaser Parties', and Seller for itself and on behalf of Seller Parties', hereby covenant and agree to hold in strict confidence all data and information related to Seller and its affiliates pertaining to its operations, methods, development process, acquisition, etc. received by Purchaser prior to, on, or after the Effective Date (collectively, the "**Reports**"), and shall not disclose the same to others other than Seller Parties; provided, however, that it is understood and agreed that Purchaser may disclose such data, information and Reports (collectively, the "**Confidential Information**") to the employees, investors, title companies, lenders, consultants, vendors, accountants and attorneys of Purchaser

provided that such persons are instructed to treat such Confidential Information strictly confidential. Purchaser acknowledges that any Confidential Information, including any Property Information and/or Reports, have been and continue to be delivered to Purchaser or Purchaser Parties to assist Purchaser in determining the feasibility of purchasing, insuring, financing, developing, owning, managing, and/or operating the Property. Purchaser shall not use, and Purchaser shall cause Purchaser Parties not to use, the Confidential Information for any purpose other than as set forth or related to the purposes set forth in the preceding sentence or as otherwise contemplated in this Agreement, and Purchaser acknowledges, stipulates and agrees that the Confidential Information and all other documents, terms, materials, and information provided by or on behalf of Seller to Purchaser are being provided without representation or warranty as to the completeness or accuracy of the facts, presumptions and conclusions contained therein. In permitting Purchaser to review any Confidential Information, Seller has not waived any privilege or claim of confidentiality with respect thereto, and no third-party benefits or relationships of any kind, either express or implied, have been offered, intended or created. If required to disclose information about this Agreement, Purchaser shall provide as much notice as reasonably feasible so as to allow Seller to seek injunctive relief. In the event this Agreement is terminated for any reason, Purchaser shall promptly deliver to Seller any Confidential Information provided to Purchaser or Purchaser Parties from or on behalf of Seller, and any other statements, documents, schedules, exhibits or other written information obtained from Seller and delivered to Purchaser in connection with this Agreement or the transaction contemplated herein. In the event of a breach or threatened breach by Purchaser or any Purchaser Parties of this Section, Seller shall be entitled to an injunction restraining Purchaser and any Purchaser Parties' from disclosing, in whole or in part, such Confidential Information.

Notwithstanding anything to the contrary herein, the parties hereto agree that the confidentiality and use provisions of this Agreement shall not apply to the following:

(a) Any information which appears in printed publications available to the public, or becomes generally known to the industry, other than through the breach of this Agreement or the negligence or fault of Purchaser or Purchaser Parties; and

(b) Any information which Purchaser can show by written records was rightfully in its possession prior to disclosure of such information by the Seller Parties.

Further, it shall not be a breach of this Agreement for Purchaser to disclose Confidential Information, Property Information and/or Reports in connection with an administrative, regulatory (such as securities regulations) or judicial process or proceeding, so long as Purchaser is compelled by law to disclose.

The provisions of this Section shall survive until the early termination of this Agreement or Closing, whichever is first to occur.

10.2. <u>Public Disclosure.</u>

Prior to Closing, any release to the public of information with respect to the sale contemplated herein or any matters set forth in this Agreement that would disclose the Purchase

Price will be made only in the form approved by each of Purchaser and Seller, except to the extent such release of information is to a party entitled to receive the Reports. Seller acknowledges and agrees that the Purchaser's special warranty deed with vendor's lien and related financing instruments will reference the amount of the loan applicable to the Purchaser's acquisition of the Property.

The provisions of this Section shall survive any early termination of this Agreement.

10.3. <u>Jury Waiver.</u>

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF THIS AGREEMENT OR ANY INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO. THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

10.4. <u>Assignment.</u>

Purchaser may not assign or transfer its rights or obligations under this Agreement without the prior written consent of Seller; provided, however, that Purchaser may assign its interest under this Agreement to an affiliate of Purchaser without Seller's consent. In the event that Purchaser desires to assign its rights under this Agreement, Purchaser shall send written notice to Seller at least five (5) business days prior to the Closing, and upon any permitted assignment of this Agreement, Purchaser shall promptly deliver to Seller a copy of the fully executed assignment of this Agreement and the assumption by the assignee of Purchaser's obligations hereunder. Any such assignment must include the assignee's tax identification number. Any assignee of Purchaser's interest in this Agreement shall be bound by all approvals and waivers, actual and deemed, by the original Purchaser prior to the assignment. The original Purchaser shall be released of any duties or obligations, or liability for any Claims, arising under the terms of this Agreement after the date of Assignment, and Seller shall have no duties, obligations or liability to the original Purchaser. Seller (at its sole cost) may transfer and convey the Property, and otherwise assign, transfer and delegate its rights, duties and obligations under this Agreement to an affiliate of Seller without Purchaser's consent. Upon such transfer, assignment and conveyance, the original Seller shall be immediately released of any and all duties, obligations and liability for any Claims arising under the terms of this Agreement (or otherwise) which are expressly assumed by Seller's affiliate, and all references in this Agreement to Seller shall thereafter mean and refer to Seller's affiliate, to the extent the context requires. The parties hereto agree that all representations, warranties, covenants and indemnifications shall inure to the benefit of any permitted assignee of Purchaser and Seller, as applicable.

10.5. <u>Notices.</u>

Any notice, demand or request required or permitted hereunder shall be given in writing at the addresses set forth below by any of the following means: (a) personal service; (b) certified U.S. mail, return receipt requested; (c) registered U.S. mail; (d) facsimile; (e) electronic email

(provided that a copy is also sent by the manner described in the preceding clauses (a), (b), (c), or (d)).

If to Seller:

IGO – USA LP
2595 Dallas Pkwy, Suite 470
Frisco, Texas 75034
Attention: Project Manager
Facsimile: (972) 402-5959
E-Mail: akozbari@igo.ae and hatem@igo.ae

with a copy to:

Scheef & Stone, L.L.P.
2600 Network Blvd., Suite 400
Frisco, Texas 75034
Attention: John E. Bloomer
Facsimile: (214) 472-2150
E-mail: john.bloomer@solidcounsel.com

If to Purchaser:

JMJ Acquisitions, L.L.C.
c/o Capital Markets
1755 Wittington Place, Suite 340
Dallas, Texas 75234
Attention: Mark Adams
Facsimile: ____________________
E-mail: madams@jmjdevelopment.net

with a copy to:

Bennett, Weston, LaJone & Turner, P.C.
1603 LBJ Freeway, Suite 280
Dallas, Texas 75234
Attention: Jay A. LaJone
Facsimile: (214) 393-4025
E-mail: jlajone@bennettweston.com

If to Escrow Agent:

Chicago Title Insurance Company
2828 Routh Street, Suite 800
Dallas, Texas 75201
Attention: Shannon Bright
Facsimile: (214) 968-1627
E-mail: brights@CTT.com

Any party may change its address to a different address in the United States by delivering notice to the other parties in the same manner as above provided at least ten (10) days prior to the effective date of such change. Any notice, demand or request shall be deemed given: (i) if sent by personal delivery, upon personal delivery to the party to whom the notice is directed, provided that if a party refuses delivery, then service shall be deemed given upon the date of refusal; (ii) if sent by certified mail, return receipt requested, on the third (3rd) day after deposit in the care and custody of the United States Postal Service; (iii) if sent by electronic email, upon

electronic or telephonic confirmation of receipt provided that a copy of such electronic mail is also sent to the intended addressee by personal delivery, certified mail, registered mail, or facsimile; and (iv) if sent by registered mail, on the third (3rd) day after sending.

10.6. Modifications.

This Agreement cannot be changed orally, and no executory agreement shall be effective to waive, change, modify or discharge it in whole or in part, unless such executory agreement is in writing and is signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

10.7. Calculation of Time Periods.

As used herein, the term "day" means each calendar day including a Saturday, Sunday or federal holiday or those days on which national banks in the State of Texas are closed. Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included. Unless otherwise set forth herein, the close of business is deemed to be 5:00 p.m., Central time.

10.8. Successors and Assigns.

The terms and provisions of this Agreement are binding upon the parties hereto and are to apply to and bind the permitted successors and assigns of the parties hereto.

10.9. Entire Agreement.

This Agreement, including the Exhibits, contains the entire agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

10.10. Further Assurances.

Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement. The provisions of this Section shall survive Closing.

10.11. Counterparts/Manners of Delivery.

This Agreement and further documentation may be executed in counterparts, and may be delivered by first class mail, electronic conveyance and/or pdf. All such executed counterparts shall constitute the same agreement, when delivered by any of the methods described in this Section. It shall be necessary to account for only one such counterpart in proving this Agreement.

10.12. Severability.

If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

10.13. Applicable Law.

THIS AGREEMENT SHALL IN ALL RESPECTS BE SOLELY GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE SUBSTANTIVE FEDERAL LAWS OF THE UNITED STATES AND THE LAWS OF THE STATE OF TEXAS. SELLER AND PURCHASER HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN THE STATE OF TEXAS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING SHALL BE SOLELY HEARD AND DETERMINED IN A STATE OR FEDERAL COURT SITTING IN FRISCO, COLLIN COUNTY, TEXAS (THE "**APPROVED JURISDICTION**"). THE PARTIES HERETO RECOGNIZE THAT COURTS OTHER THAN THE APPROVED JURISDICTION MAY ALSO HAVE JURISDICTION OVER SUITS, ACTIONS OR PROCEEDINGS ARISING OUT OF THIS AGREEMENT, AND IN THE EVENT THAT ANY PARTY HERETO SHALL INSTITUTE A PROCEEDING INVOLVING THIS AGREEMENT IN A JURISDICTION OTHER THAN THE APPROVED JURISDICTION, THE PARTY INSTITUTING SUCH PROCEEDING SHALL INDEMNIFY ANY OTHER PARTY HERETO FOR ANY LOSSES AND EXPENSES THAT MAY RESULT FROM THE BREACH OF THE FOREGOING COVENANT TO INSTITUTE SUCH PROCEEDING ONLY IN A STATE OR FEDERAL COURT IN THE APPROVED JURISDICTION, INCLUDING WITHOUT LIMITATION ANY ADDITIONAL EXPENSES INCURRED AS A RESULT OF LITIGATING IN ANOTHER JURISDICTION, SUCH AS REASONABLE FEES AND EXPENSES OF LOCAL COUNSEL AND TRAVEL AND LODGING EXPENSES FOR PARTIES, WITNESSES, EXPERTS AND SUPPORT PERSONNEL. PURCHASER AND SELLER AGREE THAT THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OF THE TRANSACTION CONTEMPLATED BY OR THE EARLY TERMINATION OF THIS AGREEMENT.

10.14. Limitation on Liability.

No present or future partner, director, officer, shareholder, member, employee, advisor, agent, attorney, asset manager, or sub-asset manager of or in Seller or Purchaser shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Purchaser and Seller and their successors and assigns and, without limitation, all other persons and entities, shall look solely to Purchaser's and Seller's assets for the payment of any claim or for any performance, and Purchaser and Seller hereby waive any and all such personal liability. The limitations on liability contained in this Section are in addition to, and not in limitation of, any limitation on liability applicable to Seller and Purchaser provided in any other provision of this Agreement or by law or by any other contract, agreement or instrument. This Section shall survive the termination of this Agreement and Closing.

10.15. Merger Provision; Survival.

Except as otherwise expressly provided herein, any and all rights of action of Purchaser for any breach by Seller of any representation, warranty or covenant contained in this Agreement, if any, shall merge with the Deed and other instruments executed at Closing, shall terminate at Closing and shall not survive Closing, other than those matters expressly intended to survive Closing as specifically set forth in this Agreement. On the Closing Date, Seller and Purchaser shall be fully discharged and released (without the need for separate releases or other documentation) from any liability or obligation to the other party and/or its successors and assigns with respect to any Claims or any other matter relating to this Agreement or the Property, except as provided in the Deed, any other closing document arising out of this Agreement, or those matters expressly intended to survive Closing as specifically set forth in this Agreement.

10.16. DTPA Waiver.

PURCHASER HEREBY REPRESENTS AND WARRANTS TO SELLER THAT (A) PURCHASER IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION, (B) PURCHASER IS REPRESENTED BY LEGAL COUNSEL, AND (C) PURCHASER IS SEEKING TO ACQUIRE THE PROPERTY, WHICH WILL NOT BE USED AS A FAMILY RESIDENCE, FOR A CONSIDERATION THAT EXCEEDS FIVE HUNDRED THOUSAND DOLLARS ($500,000.00), OR (D) (i) PURCHASER IS A BUSINESS ENTITY THAT EITHER HAS ASSETS OF TWENTY FIVE MILLION DOLLARS ($25,000,000.00) OR MORE OR IS OWNED OR CONTROLLED BY A CORPORATION OR ENTITY WITH ASSETS OF TWENTY FIVE MILLION DOLLARS ($25,000,000.00) OR MORE, OR (ii) PURCHASER IS A SOPHISTICATED REAL ESTATE INVESTOR AND HAS KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT ENABLE IT TO EVALUATE THE MERITS AND RISKS OF THIS TRANSACTION. PURCHASER HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS, REMEDIES AND BENEFITS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT (SECTIONS 17.41 AND FOLLOWING OF THE TEXAS BUSINESS AND COMMERCE CODE) (THE "**DTPA**") AND ANY OTHER SIMILAR CONSUMER PROTECTION LAW, WHETHER FEDERAL, STATE OR LOCAL. PURCHASER COVENANTS THAT THE DTPA DOES NOT APPLY TO THE TRANSACTIONS COVERED BY THIS AGREEMENT.

10.17. Section 1031 Exchange.

Upon request by either party, the other party shall reasonably cooperate in effectuating the purchase and sale of the Property as a part of a like kind exchange pursuant to Section 1031 of the Internal Revenue Code, including but not limited to the permitted assignment of this Agreement to an intermediary. In connection with such cooperation, the cooperating party shall not be required to: (a) assume any loan, mortgage, liability or other obligations of the exchanging party, or other persons; (b) pay any additional expenses related to the exchanging party's like kind exchange; or (c) take legal title to any other property. To exercise any rights under this Section, the party electing to exchange the Property shall provide the other with a written statement stating its intent to enter into an exchange at least five days prior to Closing. The

exchanging party will indemnify and hold the cooperating party harmless from any loss, claim, liability or damage (including attorneys' fees) incurred by the cooperating party arising from or related to the exchanging party's like kind exchange. The exchanging party agrees to pay any reasonable attorneys' fees incurred by the cooperating party in connection with any such 1031 exchange and in no event shall the Closing be postponed due to any such like-kind exchange.

10.18. No Third Party Beneficiary.

The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

10.19. Exhibits and Schedules.

All schedules and exhibits attached to this Agreement shall be deemed to be an integral part of this Agreement.

Exhibit A – Depiction of the Land
Exhibit B – Form of Deed
Exhibit C – Property Information
Exhibit D – Form of FIRPTA Certificate
Exhibit E – Depiction of Purchaser's On-Site Infrastructure Work

10.20. Captions.

The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any section or any subsection hereof.

10.21. Construction.

The parties acknowledge that the parties have had the opportunity to review this Agreement with their counsel, that their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

10.22. Termination of Agreement.

It is understood and agreed that if either Purchaser or Seller terminates this Agreement pursuant to a right of termination granted hereunder, such termination shall operate to relieve Seller and Purchaser from all obligations under this Agreement, except for such obligations as are specifically stated herein to survive the termination of this Agreement.

10.23. Litigation Expenses.

In the event either party hereto employs an attorney for the purpose of enforcing or construing this Agreement, or any judgment based on this Agreement, in any legal proceeding whatsoever, including insolvency, bankruptcy, arbitration, declaratory relief or other litigation, including appeals and rehearings, the prevailing party in such litigation shall be entitled to recover from the other party its reasonable attorneys' and consultants' fees and expenses incidental to such litigation (including, without limitation, service of process costs, filing fees, court reporter costs, investigative costs, expert witness fees, the cost of any bonds, and any and all other similar fees incurred in connection with the action or proceeding) and all court costs and fees through all trial and appellate levels. Attorneys' fees under this Section shall include reasonable attorneys' fees on appeal and, in addition, a party entitled to attorneys' fees shall be entitled to all other reasonable, out-of-pocket, third party costs and expenses actually incurred or otherwise payable in connection with such action or proceeding. In addition to the foregoing award of attorneys' fees to the prevailing party, the prevailing party in any lawsuit shall be entitled to its reasonable attorneys' fees actually incurred or otherwise payable in any post-judgment proceedings to collect or enforce the judgment. The "prevailing party" means the party determined by the final, non-appealable judgment of court of competent jurisdiction to most nearly prevail and not necessarily the one in whose favor a judgment is rendered. This provision is separate and several and shall survive the merger of this Agreement into any judgment with respect hereto.

10.24. Effective Date.

The **"Effective Date"** means the date a fully executed counterpart of this Agreement is received by the Escrow Agent.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

**SELLER**:

**IGO – USA LP,**
a Texas limited partnership

By: IGO-USA GP LLC,
a Texas limited liability company,
its General Partner

By: ______________________
Anas A. Kozbari, Manager

**PURCHASER**:

**JMJ ACQUISITIONS, L.L.C.,**
a Texas limited liability company

By: ______________________
Name: ______________________
Title: ______________________

**Escrow Agent Acceptance**

The undersigned agrees to serve as the Escrow Agent and to be bound by the provisions of Sections 2.7, 2.8 and 10.5 of this Agreement. The Escrow Agent acknowledges receiving counterparts of this Agreement signed by both Seller and Purchaser on the date shown below, which is the Effective Date of this Agreement and agrees to insert this date on the cover page of this Agreement.

Date: October ____, 2018

CHICAGO TITLE INSURANCE COMPANY

By: ______________________________
Name: ______________________________
Title: ______________________________

# EXHIBIT A

## LEGAL DESCRIPTION AND DEPICTION OF THE LAND

Lot 13, Block A of The Gate, Block A, Lots 1 Through 20, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2016, Page 211, Map Records, Collin County, Texas.



**EXHIBIT B**

**FORM OF DEED**

AFTER RECORDING RETURN TO:

______________________
______________________
______________________
______________________

(Space Above This Line for Recorder's Use Only)

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

**SPECIAL WARRANTY DEED WITH VENDOR'S LIEN**

**THIS SPECIAL WARRANTY DEED**, dated ______________, 201__, between **IGO – USA LP**, a Texas limited partnership, with its principal place of business at 2595 Dallas Parkway, Suite 470, Frisco, Texas, 75034 ("**Grantor**"), and ________________________, a ______________________, with its principal place of business at 1755 Wittington Place, Suite 340, Dallas, Texas 75234 ("**Grantee**"):

**WITNESSETH**, that Grantor, for good and valuable consideration, and the further consideration of the execution and delivery by Grantee of a [Promissory Note], of even date herewith (the "**Note**"), in the original principal sum of [$____________], payable to the order of [______________] ("**Lender**") as therein provided, and bearing interest as therein specified, the payment of which Note is secured by the vendor's lien herein retained, and is additionally secured by a first lien [Deed of Trust], of even date herewith, to [______________], Trustee, for the benefit of Lender, the receipt and sufficiency of which are hereby confessed and acknowledged, has granted bargained, sold, and conveyed and by these presents does grant, bargain, sell, convey and confirm unto Grantee, its successors, and assigns, forever, all the following described lot or parcel of land, situated, lying and being in the County of Collin, State of Texas, and being more particularly described on Exhibit "A" attached hereto and made a part hereof (the "**Land**");

**TOGETHER** with Grantor's rights, title and interest (if any) in and to the following relating to the Land: (i) land lying in the bed of any street, road or access way, opened or proposed, on the Land; (ii) roads, alleys, rights-of-way and ingress and egress easements relating to the Land, whether surface, subsurface or otherwise; (iii) all water and water rights under or otherwise pertaining to the Land; and (iv) all governmental or quasi-governmental permits, approvals,

authorities, licenses and consents, if any, of any kind or character pertaining to the Land (collectively, the "**Appurtenances**"); provided, however, nothing contained in this deed is intended to include any "Excluded Property", as such term is defined in the Purchase and Sale Agreement dated October ___, 2018, by and between Grantor and Grantee (successor-in-interest to JMJ Acquisitions, L.L.C.), as amended and assigned, the "Purchase Agreement." The Land and Appurtenances are referred to herein as the "**Property**".

THIS CONVEYANCE AND THE WARRANTIES OF TITLE HEREIN are subject to any Exception (as such term is defined in the Purchase Agreement) and those matters listed and described on Exhibit "B" attached hereto (the "**Exceptions**"), and to the following reservations (the "**Reservations**"):

1. Grantor hereby saves, excepts, and reserves unto itself, for its benefit and (to the maximum extent permitted by law) for the benefit of IGO – Frisco 1 LLC (a Texas limited liability company), The Gate Property Owners Association, Inc. (a Texas nonprofit corporation), and each of their respective affiliates, successors and assigns (each, including Grantor, the "**Benefited Party**"), to approve, in its or their (as applicable) sole discretion, the terms and conditions in which Grantee, its successors, and assigns, or any other person, trust or entity claiming any interest in or control over (whether by virtue of ownership, lien, or otherwise) Grantee, its successors, or assigns, and/or the Property (including any portion thereof) (each, including Grantee, the "**Restricted Party**") may: investigate, prospect, explore, develop, extract and/or produce (in any form and/or in any quantity) any oil, gas or other minerals (however minerals or interest therein is determined or defined, whether by law or otherwise) in, on, under, around or that can be produced or extracted from the Property, or within 2,000 feet thereof. Any rights granted by the Benefited Party to the Restricted Party shall be evidenced in writing and filed of public record against title to the Property

**THE RESERVATIONS SET FORTH HEREIN FOR THE BENEFIT OF GRANTOR, ITS SUCCESSORS AND ASSIGNS SHALL BE DEEMED A COVENANT RUNNING WITH THE PROPERTY AND SHALL BE BINDING UPON GRANTEE, ITS SUCCESSORS AND ASSIGNS. THE RESERVATIONS SHALL BE DEEMED TO "RUN WITH THE LAND."**

**TO HAVE AND TO HOLD** the Property unto the Grantee, its successors and assigns, subject to the Reservations and Exceptions, forever, and Grantor binds Grantor and Grantor's successors and assigns to **WARRANT AND FOREVER DEFEND** all and singular the Property to Grantee and Grantee's successors and assigns against all and every person or persons lawfully claiming or to claim the whole or any part thereof, when the claim is by, through or under Grantor, but not otherwise.

**EXCEPT AS PROVIDED IN THE CONTRACT FOR PURCHASE OF THE PROPERTY, GRANTEE IS DEEMED TO HAVE ACCEPTED THE PROPERTY "AS IS", "WHERE IS", AND "WITH ALL FAULTS", INCLUDING LATENT DEFECTS, WITHOUT**

**RECOURSE TO AND WITHOUT REPRESENTATION OR WARRANTY BY GRANTOR, EXPRESS OR IMPLIED, WHETHER STATUTORY OR OTHERWISE, AND WITHOUT ANY WARRANTIES OF TRANSFER, MERCHANTABILITY OR FITNESS FOR A PARTICULAR, OR GRANTEE'S INTENDED USE OR PURPOSES, RELATING TO THE PROPERTY, AND ANY WARRANTIES ARISING IN SECTION 2 OF THE TEXAS BUSINESS AND COMMERCE CODE.**

The vendor's lien against and superior title to the Property are retained until the Note described herein is fully paid according to its terms, at which time this deed shall become absolute, subject to the Reservations and Exceptions. The vendor's lien and superior title to the Property are retained for the benefit of Lender, and are transferred to Lender, without representation by, or recourse on, Grantor.

[Signature Page Follows.]

IN WITNESS WHEREOF, Grantor has executed this deed on the date set forth above.

**GRANTOR**:

IGO – USA LP,
a Texas limited partnership

By: IGO – USA GP LLC,
a Texas limited liability company,
its General Partner

By: ______________________________
Anas A. Kozbari, Manager

THE STATE OF TEXAS §
§
COUNTY OF COLLIN §

This instrument was acknowledged before me on this the ______ day of ______________, 201__, by Anas A. Kozbari, Manager of IGO – USA GP LLC, a Texas limited liability company, General Partner of IGO – USA LP, a Texas limited partnership, on behalf of said limited partnership.

______________________________________
Notary Public in and for the State of Texas

Insert:

[Exhibit "A" – Legal Description]
[Exhibit "B" - Encumbrances]

# EXHIBIT C

## PROPERTY INFORMATION

Subject to the representations, warranties, and disclaimers by Seller as set forth in the body of the Agreement, above, and to the extent such diligence materials exist (in their current condition) as of the Effective Date and are in the actual possession or control of Seller, and only with respect to those items received or generated by or on behalf of Seller or its affiliates during Seller's (or its affiliate's) ownership of the Property or in connection with Seller's (or its affiliate's) acquisition of the Property, Seller shall make the following items available to Purchaser:

[*See attached.*]

**EXHIBIT D**

**FORM OF FIRPTA CERTIFICATE**

FIRPTA

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. This Certification is provided by IGO – USA LP, a Texas limited partnership ("Transferor") to ________________, a ________________ ("Transferee"), in connection with the sale of certain real property by Transferor to Transferee. To inform Transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by Transferor, the undersigned hereby certifies the following on behalf of Transferor:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Income Tax Regulations);

2. Transferor is not a disregarded entity as defined in §1.1445-2(b)(2)(iii) of the Income Tax Regulations;

3. Transferor's U.S. employer identification number is [________________]; and

4. Transferor's office address is:

   2595 Dallas Parkway, Suite 470
   Frisco, Texas 75034

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

Case 21-41488-elm11 Doc 47-13 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 64 of 79

Dated: ____________________, 201__

IGO – USA LP,
a Texas limited partnership

By: IGO – USA GP LLC,
a Texas limited liability company,
its General Partner

By: ____________________________
Anas A. Kozbari, Manager

THE STATE OF TEXAS §
§
COUNTY OF COLLIN §

This instrument was acknowledged before me on this the ______ day of ______________, 201__, by Anas A. Kozbari, Manager of IGO – USA GP LLC, a Texas limited liability company, General Partner of IGO – USA LP, a Texas limited partnership, on behalf of said limited partnership.

________________________________________
Notary Public in and for the State of Texas

# EXHIBIT E

## DEPICTION OF PURCHASER'S ON-SITE INFRASTRUCTURE WORK

[*Insert*]

# FIRST AMENDMENT TO PURCHSE AND SALE AGREEMENT

This **FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**First Amendment**"), dated effective as of February 20, 2019, is made among **IGO-USA LP**, a Texas limited partnership ("**Seller**"), and **JMJ ACQUISITIONS, LLC**, a Texas limited liability company ("**Purchaser**", Seller and Purchaser collectively referred to herein as the "**Parties**").

## RECITALS:

A. Purchaser and Seller entered into that certain Purchase and Sale Agreement dated effective October 23, 2018, (the "**Agreement**") whereby Seller agreed to sell and Purchaser agreed to purchase approximately 4.428 acres of land located in the City of Frisco, Collin County, Texas, (the "**Property**"); and

B. The Parties wish to amend the Agreement, as more particularly described below.

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## AGREEMENTS

1. Extension of Due Diligence Period. Pursuant to Section 4.3 of the Agreement, "Purchaser shall have the right to terminate this Agreement, in Purchaser's sole discretion, for any reason or no reason, by giving written notice thereof to Seller prior to 5:00 p.m., Central time on the one hundred twentieth (120th) day following the Effective Date ("the Due Diligence Period")."

The Parties hereby agree that the Due Diligence Period will be extended by an additional sixty (60) days. The Parties agree that Section 4.3 of the Agreement is amended to read:

"Purchaser shall have the right to terminate this Agreement, in Purchaser's sole discretion, for any reason or no reason, by giving written notice thereof to Seller prior to 5:00 p.m., Central time on the one hundred eightieth (180th) day following the Effective Date ("the Due Diligence Period").

2. Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement. The Parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

3. Continued Validity. Except as amended hereby, the Agreement shall remain in full force and effect as originally written and executed.

4. Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this First Amendment.

**SELLER:** **IGO-USA LP, a Texas limited partnership**

By: IGO-USA GP LLC, a Texas limited liability company, its General Partner

By: [signature]
Name: Anas A. Kozbari
Title: Manager
Date: 02/20/2019

**PURCHASER:** **JMJ ACQUISITION, LLC, a Texas limited liability company**

By: [signature]
Name: Timothy Barton
Title: President
Date: 2/20/19

# SECOND AMENDMENT TO PURCHSE AND SALE AGREEMENT

This **SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Second Amendment**"), dated effective as of April ___, 2019, is made among **IGO-USA LP**, a Texas limited partnership ("**Seller**"), and **JMJ ACQUISITIONS, LLC,** a Texas limited liability company ("**Purchaser**", Seller and Purchaser collectively referred to herein as the "**Parties**").

## RECITALS:

A. Purchaser and Seller entered into that certain Purchase and Sale Agreement dated effective October 23, 2018, as amended by First Amendment to Purchase and Sale Agreement dated February 20, 2019, (the "**Agreement**") whereby Seller agreed to sell and Purchaser agreed to purchase approximately 4.428 acres of land located in the City of Frisco, Collin County, Texas, (the "**Property**"); and

B. The Parties wish to amend the Agreement, as more particularly described below.

C. Unless otherwise specified herein, defined terms used herein shall have the same meaning as in the Agreement.

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## AGREEMENTS

1. The Parties hereby agree that the Due Diligence Period will be extended to July 31, 2019. The Parties agree that Section 4.3 of the Agreement is amended to read:

"Purchaser shall have the right to terminate this Agreement, in Purchaser's sole discretion, for any reason or no reason, by giving written notice thereof to Seller prior to 5:00 p.m., Central time July 31, 2019 ("the Due Diligence Period")."

2. Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement. The Parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

3. Continued Validity. Except as amended hereby, the Agreement shall remain in full force and effect as originally written and executed.

4. Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Second Amendment.

**SELLER:**

**IGO-USA LP, a Texas limited partnership**

By: ______________________
Name: ______________________
Title: ______________________
Date: ______________________

**PURCHASER:**

**JMJ ACQUISITION, LLC, a Texas limited liability company**

By: ______________________
Name: ______________________
Title: ______________________
Date: ______________________

# THIRD AMENDMENT TO PURCHSE AND SALE AGREEMENT

This **THIRD AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Third Amendment**"), is effective as of July 25, 2019, is made among **IGO-USA LP**, a Texas limited partnership ("**Seller**"), and **JMJ ACQUISITIONS, LLC,** a Texas limited liability company ("**Purchaser**", Seller and Purchaser collectively referred to herein as the "**Parties**").

## RECITALS:

A. Purchaser and Seller entered into that certain Purchase and Sale Agreement dated effective October 23, 2018, as amended by First Amendment to Purchase and Sale Agreement dated February 20, 2019 and Second Amendment dated April 22, 2019 (collectively, the "**Agreement**") whereby Seller agreed to sell and Purchaser agreed to purchase approximately 4.539 +/-acres of land located in the City of Frisco, Collin County, Texas, (the "**Property**"); and

B. The Parties wish to amend the Agreement, as more particularly described below.

C. Unless otherwise specified herein, defined terms used herein shall have the same meaning as in the Agreement.

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## AGREEMENTS

1. Due Diligence Period. The Due Diligence Period is extended through July 31, 2019, and thus the first sentence of section "**4.3 Right of Termination**" of the Agreement is amended and replaced with the following, and the remaining provisions in this section shall remain unmodified:

> "Purchaser shall have the right to terminate this Agreement, in Purchaser's sole discretion, for any reason or no reason, by giving written notice thereof to Seller prior to 5:00 p.m., Central time on July 31, 2019 ("the Due Diligence Period").

2. Additional Deposit. Section "**2.7. Earnest Money; Independent Consideration**" subsection "**(b) Additional Deposit**" is amended to replace "within three (3) business days after the expiration of the Due Diligence Period" with "within three (3) business days following the receipt of notice to Purchaser of final approval by the City of the zoning change for the Property as applied for by the Purchaser". Seller agrees to reasonably cooperate with Purchaser's zoning change application and efforts to obtain approval from the City of the zoning change as reasonably necessary including the execution of any required documents. Purchaser shall be responsible for all costs and fees related to Purchaser's zoning change application for the Property.

3. Purchaser's Project: Required Approvals. Section "**4.4. Purchaser's Project:**

**Require Approvals"** is amended to replace "Seller approved brand name flagged" with "Seller approved brand name flagged, which Purchaser shall present such name to Seller no later than October 15, 2019, failing which Purchaser shall be deemed to be in default,". All other language in section 4.4. shall remain unmodified and if in conflict with the foregoing, this Amendment shall control.

4. Closing. Section **"5.1 Time and Place (a)"** is amended to replace "on the date which is thirty (30) days after the expiration of the Due Diligence period" with "on the date which is ***the earlier to occur of***: (A) thirty (30) days after the later of (i) expiration of the Due Diligence Period, (ii) approval of the zoning change for the Property as applied for by the Purchaser, (iii) approval and agreement by the City and Seller to remove the Property from all Incentive Agreements, and (iv) delivery to Purchaser of all Required Approvals for the Purchaser's Project which may be contingent upon Closing by Purchaser including as required under the Master Declaration; or (B) November 15, 2019, time being of the essence." All other language in Section 5.1 (a) shall remain unmodified and if in conflict with the foregoing, this Amendment shall control.

5. Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement. The Parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

6. Continued Validity. Except as amended hereby, the Agreement shall remain in full force and effect as originally written and executed.

7. Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Third Amendment.

*[Signature Page to Follow]*

IN WITNES WHEROF, the parties hereto have duly executed this Third Amendment as of the Effective Date.

**SELLER:**

**IGO-USA LP**, a Texas limited partnership

By: IGO-USA GP LLC
A Texas limited liability company
Its: General Partner

By: [signature]
Name: Anas Korbani
Title: CEO

Date: 7/25/019

**PURCHASER:**

**JMJ ACQUISITIONS, LLC**, a Texas limited liability company

By: [signature]
Name: Timothy Barton
Title: President
Date: 7/25/19

Case 21-41488-elm11 Doc 47-13 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 73 of 79

# FOURTH AMENDMENT TO PURCHSE AND SALE AGREEMENT

This **FOURTH AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Third Amendment**"), is effective as of October 31, 2019, is made between **IGO-USA LP**, a Texas limited partnership ("**Seller**"), and **JMJ ACQUISITIONS, LLC**, a Texas limited liability company ("**Purchaser**", Seller and Purchaser collectively referred to herein as the "**Parties**").

## RECITALS:

A. Purchaser and Seller entered into that certain Purchase and Sale Agreement dated effective October 23, 2018, as amended by that certain First Amendment to Purchase and Sale Agreement dated February 20, 2019, that certain Second Amendment to Purchase and Sale Agreement dated April 22, 2019, and that certain Third Amendment to Purchase and Sale Agreement dated July 25, 2019 (collectively, the "**Agreement**"), whereby Seller agreed to sell and Purchaser agreed to purchase approximately 4.539 +/-acres of land located in the City of Frisco, Collin County, Texas, (the "**Property**"); and

B. The Parties wish to amend the Agreement, as more particularly described below.

C. Unless otherwise specified herein, defined terms used herein shall have the same meaning as in the Agreement.

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## AGREEMENTS

1. Purchaser's Project: Required Approvals. The first sentence in Section 4.4 is amended to read in its entirety: "Purchaser agrees that it will develop a full-service luxury (either a 4 or 5 star rated) brand name flagged hotel development on the Property including underground and/or podium parking spaces (of which, 120 of such parking spaces shall be dedicated, owned, for the benefit of, and otherwise solely utilized by the owner(s) of lot 7 and lot 14 of The Gate project (each, the "**Adjacent Lot Owner**"), with reference to such 120 parking spaces being herein referred to as the "**Dedicated Parking Spaces**"), which such development may include condominiums, ancillary restaurant, full service bar(s), meeting/function space, pool (which may include a rooftop pool), pool deck, pool support restaurant and bar and retail amenities, all designed, developed and constructed in accordance with the Required Approvals, as hereinafter defined (collectively, "**Purchaser's Project**"), with all phases of Purchaser's Project to be completed on or before the Completion Deadline, as described in Section 5.9 below." All other language in Section 4.4. shall remain unmodified and if in conflict with the foregoing, this Amendment shall control.

2. Conditions Precedent to Obligation of Seller. Section 5.7(c) is hereby amended to read in its entirety: "Intentionally deleted."

3. Obligations of Purchaser. Section "**5.8. Obligations of Purchaser**" is amended to include the following at the end of the last paragraph in the Section: "Purchaser covenants and agrees to continue to discuss and consult with Seller with respect to the selection and approval of the hotel operator, which such obligation shall survive Closing. Prior to Commencement, Purchaser shall deliver to Seller an executed copy of an agreement entered into by the hotel operator who Purchaser previously consulted with Seller (the "**Hotel Management Agreement**") which shall require (among other things), Purchaser's Project to be designed, developed, constructed, owned and operated subject to and in accordance with all Required Approvals and the terms and conditions set forth in this Agreement."

4. Closing. Section "**5.1 Time and Place (a)**" is amended to read in its entirety: "The closing, funding and otherwise consummation of the transactions contemplated hereby (the "**Closing**") shall occur on or before 3:00 p.m. (Central time) on December 1, 2019 (the "**Closing Date**")."

5. Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement. The Parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

6. Continued Validity. Except as amended hereby, the Agreement shall remain in full force and effect as originally written and executed.

7. Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Fourth Amendment.

*[Signature Page to Follow]*

Case 21-41488-elm11 Doc 47-13 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 75 of 79

IN WITNES WHEROF, the parties hereto have duly executed this Fourth Amendment as of the Effective Date.

**SELLER:**

**IGO – USA LP,**
a Texas limited partnership

By: IGO-USA GP LLC,
a Texas limited liability company,
its General Partner

By: 10/31/019
Anas A. Kozbari, Manager

**PURCHASER:**

**JMJ ACQUISITIONS, LLC,**
a Texas limited liability company

By:
Name: Tim Barton
Title: President
Date: ______________________

# FIFTH AMENDMENT TO PURCHASE AND SALE AGREEMENT

This **FIFTH AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Fifth Amendment**"), effective as of November 27, 2019 ("**Effective Date**"), is made between **IGO-USA LP**, a Texas limited partnership ("**Seller**"), and **JMJ ACQUISITIONS, LLC,** a Texas limited liability company ("**Purchaser**", Seller and Purchaser collectively referred to herein as the "**Parties**").

## RECITALS:

A. Purchaser and Seller entered into that certain Purchase and Sale Agreement dated effective October 23, 2018, as amended by that certain First Amendment to Purchase and Sale Agreement dated February 20, 2019, that certain Second Amendment to Purchase and Sale Agreement dated April 22, 2019, that certain Third Amendment to Purchase and Sale Agreement dated July 25, 2019, and that certain Fourth Amendment to Purchase and Sale Agreement dated October 31, 2019 (collectively, the "**Agreement**"), whereby Seller agreed to sell and Purchaser agreed to purchase approximately 4.539 +/-acres of land located in the City of Frisco, Collin County, Texas, (the "**Property**").

B. The Parties wish to amend the Agreement, as more particularly described below.

C. Unless otherwise specified herein, defined terms used herein shall have the same meaning as in the Agreement.

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## AGREEMENTS

1. Legal Description. The Parties hereby acknowledge and agree that the legal description of the Land to be conveyed to Purchaser at Closing under the terms of the Agreement is as follows:

> " Lot 13, Block A, The Gate, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2019, Page 275, Plat Records, Collin County, Texas, which was formally referred to as Lot 13, Block A of The Gate, Block A, Lots 1 Through 20, an addition to the City of Frisco, Collin County, Texas, according to the plat thereof recorded in Volume 2016, Page 211, Map Records, Collin County, Texas."

2. Closing. Section "**5.1 Time and Place (a)**" is amended to read in its entirety: "The closing, funding and otherwise consummation of the transactions contemplated hereby (the "**Closing**") shall occur on or before 3:00 p.m. (Central time) on December 19, 2019, time being of the essence (the "**Closing Date**")."

Case 21-41488-elm11 Doc 47-13 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 77 of 79

3. Notices. The Parties agree that, as of the Effective Date hereof, the notice address and related contact information for each of Seller and Purchaser as set forth in Section 10.5 of the Agreement are hereby amended to read as follows:

| | |
|---|---|
| If to Seller: | IGO – USA LP<br>2595 Dallas Pkwy, Suite 470<br>Frisco, Texas 75034<br>Attention: Project Manager<br>E-mail: akozbari@igo.ae and hatem@igo.ae |
| with a copy to: | Spencer Fane LLP<br>5700 Granite Parkway, Suite 650<br>Plano, Texas 75024<br>Attention: John E. Bloomer, Esq.<br>E-mail: jbloomer@spencerfane.com |
| If to Purchaser: | JMJ Acquisitions, LLC<br>c/o Capital Markets<br>1755 Wittington Place, Suite 340<br>Dallas, Texas 75234<br>Attention: David Messersmith<br>E-mail: DMessersmith@jmjdevelopment.com |
| with a copy to: | McMurry Law, PLLC<br>508 W. Lookout Drive, Suite 14-74<br>Richardson, Texas 75080<br>Attention: Vance McMurry, Esq.<br>E-mail: vance@mcmurrylegal.com |

4. Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement. The Parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

5. Continued Validity. Except as amended hereby, the Agreement shall remain in full force and effect.

6. Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Fifth Amendment.

IN WITNES WHEROF, the parties hereto have duly executed this Fifth Amendment to be effective as of the Effective Date.

**SELLER:**

**IGO – USA LP,**
a Texas limited partnership

By: IGO-USA GP LLC,
a Texas limited liability company,
its General Partner

By: ______________________
Anas A. Kozbari, Manager

**PURCHASER:**

**JMJ ACQUISITIONS, LLC,**
a Texas limited liability company

By: ______________________
Tim Barton, President

By: ____________________
Anas A. Kozbari, Manager

PURCHASER: **JMJ ACQUISITIONS, LLC,**
a Texas limited liability company

By: ____________________
Tim Barton, President

# Exhibit "N"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| In Re:<br><br>DALLAS REAL ESTATE INVESTORS, LLC,<br><br>Debtor. | **Case No. 21-41488-elm-11**<br><br>August 11, 2021<br>9:30 a.m. |

TRANSCRIPT OF TELEPHONIC
341(a) MEETING OF CREDITORS

PRESIDING OFFICER: ERIN SCHMIDT,
UNITED STATES TRUSTEE'S OFFICE.

APPEARANCES:

| | |
|---|---|
| For the U.S. Trustee: | Erin Schmidt<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242<br>(214) 767-8967 |
| For the Debtor: | Kerry Alleyne<br>JOYCE W. LINDAUER ATTORNEY, PLLC<br>1412 Main Street, Suite 500<br>Dallas, TX 75202<br>(972) 503-4033 |
| For Palisades TC, LLC.: | Suzanne K. Rosen<br>FORSHEY & PROSTOK, LLP<br>777 Main Street, Suite 1550<br>Fort Worth, TX 76102<br>(817) 878-2018 |
| For The Gate Property Owners Association: | Jacob Sparks<br>SPENCER FANE, LLP<br>2200 Ross Avenue, Suite 4800 West<br>Dallas, TX 75201<br>(214) 750-3624 |

Case 21-41488-elm11 Doc 47-14 Filed 08/24/21 Entered 08/24/21 15:37:30 Page 3 of 32



Transcribed by:

Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

MR. BARTON: I don't know if that has been sent over, but we're checking on that and we'll certainly get that sent over if it's not been sent already.

MS. SCHMIDT: And then has the Debtor opened up a debtor-in-possession account at all?

MR. BARTON: We have not. There's no bank account at this time.

MS. SCHMIDT: And then the Debtor doesn't have any employees, correct? It's not -- it's sort of a holding company for another company. Is that an accurate way of putting it?

MR. BARTON: Correct.

MS. SCHMIDT: And, now, it looks like the Debtor has retained Ms. Lindauer's firm to whom it's paid $11,750. Was that paid by JMJ Development?

MR. BARTON: I can confirm. I'm not sure, but I believe so.

MS. SCHMIDT: And what is JMJ Development?

MR. BARTON: It's a development company that is a fee developer on the project.

MS. SCHMIDT: And who controls J -- who controls JMJ?

MR. BARTON: (garbled)

MS. SCHMIDT: And Mr. Barton, you're coming across -- you're not coming across very clear over the phone.

MR. BARTON: One moment. I'll get off this headset. I apologize. Hold on.

MS. SCHMIDT: All right.

(Pause.)

MR. BARTON: Okay. Is that better?

MS. SCHMIDT: It is better. Thank you. And so --

MR. BARTON: Sorry about that.

MS. SCHMIDT: -- I noted as well that JMJ Development on the schedules is also a prepetition creditor that's owed about $487,000. The $11,750 that was paid by JMJ on behalf of this Debtor to Ms. Lindauer's firm, is that part of the prepetition loan that's owed to JMJ?

MR. BARTON: I believe that it is included, but I will confirm that.

MS. SCHMIDT: And, now, JM -- now, JMJ has paid Ms. Lindauer's retainer for another of other -- another -- a number of other cases that you're also the member or president of, correct?

MR. BARTON: That is correct.

MS. SCHMIDT: So is there an -- so, is there an engagement letter between the Debtor, Dallas Real Estate Investors, and Ms. Lindauer, or is that between Ms. Lindauer and JMJ?

MR. BARTON: No. The Debtor. There's an engagement letter between the Debtor and -- and Ms. Lindauer.

MS. SCHMIDT: And what's -- what's JMJ's role with the Debtor? I mean, what's the relationship between the two?

MR. BARTON: It's the fee developer for the project and an advisor for the Debtor.

MS. SCHMIDT: So when you say advisor to the Debtor, is that for your services as an advisor for the Debtor?

MR. BARTON: For JMJ Development, it provides services of maintaining the day-to-day activities that the entity needs to fulfill its role.

MS. SCHMIDT: Right, but who's the human being with JMJ who provides those -- that guidance, that management?

MR. BARTON: Well, there's several people in the company, so there's various people that do work on this project.

MS. SCHMIDT: All right. Do all of those people report to you at JMJ?

MR. BARTON: Yes.

MS. SCHMIDT: And so I guess my question is, JMJ is owed almost a half a million dollars by Dallas Real Estate, and you're both president of the Debtor but you're also president of JMJ Development. How do you separate out your fiduciary duties? So, like, you have a duty to the Debtor, but then you also presumably have a duty to JMJ.

MR. BARTON: It's quite simple. The -- the Debtor takes priority because JMJ is doing work for the Debtor, and

so therefore it's subservient to the Debtor and the Debtor's fiduciary responsibilities are prime to JMJ's because it's a service provider.

MS. SCHMIDT: Okay. So, what does the Debtor do?

MR. BARTON: The Debtor is a holding company that owns an entity that is building a hotel and condominium development project on a piece of land located in Frisco.

MS. SCHMIDT: So, this is -- so, the Debtor owns, what is it, 50 percent -- let me look at the -- I'm going to start with the amended Schedule A/B. So I'm looking at Docket No. 37. So the Debtor has no cash. I'm looking at Page 1 of 8.

MR. BARTON: Correct.

MS. SCHMIDT: And so I'm looking at Page 6 of 8 on Docket 37. The Debtor owns 50 percent of Dallas Real Estate Lenders, which owns a hundred percent of FHC Acquisition, which owns the property at Syria Gate Way in Frisco. So the -- so the hotel is being built in Frisco; is that what -- was that your testimony?

MR. BARTON: That is correct.

MS. SCHMIDT: And so where in the process is the hotel? Like, what stage is it at?

MR. BARTON: Sure. It's a vacant piece of land right now, and all the entitlements and rights in the City have been secured, and now what goes on for about nine months

is the planning and the drawings and working with securing a management company for the hotel that will be built. And all these plans and drawings are underway.

And that process normally takes about nine months, and then once that's done, then the construction loan is approved based on the drawings and plans, the general contractor is hired to do the GMP contract for a fixed price, and then the construction starts.

MS. SCHMIDT: So, when you mean by the entitlements from the City of Frisco, the City of Frisco has said it's okay to build a hotel on this lot?

MR. BARTON: That is correct.

MS. SCHMIDT: What type of hotel will it be?

MR. BARTON: It's under negotiations on the actual management company, but it is a four-and-a-half to five-star hotel brand, so a higher-end hotel. Higher than, let's say, a Motel 6 or a regular Sheraton. So, an upper-end hotel, as well as -- 222 keys, as well as 70 condominiums that will be sold with the services and the branding of the management company.

MS. SCHMIDT: So, have you decided on a hotel brand yet?

MR. BARTON: We have two that have been selected, and the negotiations are going back and forth to determine which would be the best one.

MS. SCHMIDT: And so, so what's the role -- so, where are the decisions made on this? Is that at the level of Dallas Real Estate Investors, is it at the level of Real Estate Lenders Acquisition, LLC, or is it at the level of FHIC?

MR. BARTON: FHC.

MS. SCHMIDT: All right. So, FHC is the one -- so, for -- so, for those drawings and things like that, those engineers and architects doing the drawings and the plan, would they bill -- would they bill FHC, then?

MR. BARTON: That is correct.

MS. SCHMIDT: And so -- so the Debtor, is it -- well, just what does it do?

MR. BARTON: The Debtor is the holding company of the entity that owns the land.

MS. SCHMIDT: Okay. But, actually, it's the holding company of the holding company that owns the land? Would that be more accurate?

MR. BARTON: Well, the entity FH is the ownership entity, and it owns the land.

MS. SCHMIDT: So would Real Estate --

MR. BARTON: Whereas when you say a holding company, normally it's owning shares in another company.

MS. SCHMIDT: Okay. And so Real Estate Lenders Acquisition, would that be the entity that actually builds

And that time, as well as what the actual work value is, would bring an additional value for the plans.

MS. SCHMIDT: So, let's turn to Docket 16, which are the original schedules, and turning to Schedule D on Page 8 of 18. And so looking at Schedule D on Palisades, this $3.5 million that they're owed, is this -- how is this loan structured?

MR. BARTON: $3-1/2 million is part of the settlement agreement that was done with the Palisades group, and -- and they've been paid a portion of the original $4 million, and I believe that's -- that's what brought it down to $3-1/2 [million] now.

MS. SCHMIDT: Okay. When were they paid $4 million?

MR. BARTON: Say it again?

MS. SCHMIDT: When were they paid the $4 million?

MR. BARTON: Well, there's an agreed settlement of that amount of money, and then installment payments were paid over the last six months.

MS. SCHMIDT: Where did the money come from?

MR. BARTON: The money was advanced from JMJ Development.

MS. SCHMIDT: And the -- okay. And according to Schedule D, nobody else is liable on the claim. But you just testified before there might be some other entities liable on the claim to Palisades.

MR. BARTON: Yes. What I said is I believe there is and I need to double-check that. That is -- there is a -- I have to confirm whether the other entities are the -- the obligors or they're guaranteeing. I don't know that sitting here today.

MS. SCHMIDT: Okay. So it looks like Schedule D and Schedule H may need to be amended to disclose those -- either the co-obligors or the guarantors on that debt.

And then --

MR. BARTON: Yes.

MS. SCHMIDT: -- turning to Schedule E/F, what is FAB Studio? I'm on Page 11 of 18.

MR. BARTON: An archi... yeah, an architectural firm.

MS. SCHMIDT: And so did FAB Studio, is their bill to the Debtor or is it to FHC?

MR. BARTON: So, it's billed to FHC and the Debtor guarantees the debt to FHC on these plans and the design.

MS. SCHMIDT: All right. So I don't think that's on the schedules. That needs to be amended to disclose that FHC may be liable on that.

What about Hap Associates?

MR. BARTON: That was -- that would be the same thing. They're the engineering firm.

MS. SCHMIDT: And then HR Sterling?

MR. BARTON: They do -- take care of any of the administrative work and filings for the entity and do the paperwork and accounting for it. And that is direct to the Debtor.

MS. SCHMIDT: So they do bill the Debtor directly? What about Jackson Walker, --

MR. BARTON: Correct.

MS. SCHMIDT: -- the law firm?

MR. BARTON: Yeah, I need to double-check. I believe that's direct to the Debtor.

MS. SCHMIDT: And then obviously JMJ Development, that $487,000, does that include the amount that was paid to Palisades?

MR. BARTON: Yes.

MS. SCHMIDT: And then McMurray -- does Palisades and the Debtor, do they have any common ownership or management?

MR. BARTON: At this time, with the settlement agreement, I don't believe they do. But, you know, I'd have to have the lawyers opine on it after reading that. But it's my understanding that, with this settlement agreement, not at this time.

MS. SCHMIDT: And then McMurray Law and Metzger Law, did they bill directly to the Debtor, or to FHC or somebody else?

MR. BARTON: The Debt... the Debtor.

MS. SCHMIDT: And these attorneys, what work were they doing on behalf of the Debtor?

MR. BARTON: The ongoing issues with Palisades over the last -- I think it's been about a year and a half or so, maybe two years.

MS. SCHMIDT: And then Morelli Design?

MR. BARTON: Similar to FAB Studios, they are -- contracted with FHC and an obligor of the Debtor.

MS. SCHMIDT: And then The Gate Property Owners Association, they're owed $19,000. What is that -- is that for HOA dues or what is that for?

MR. BARTON: That is correct. The master plan development has owner -- an owners association, and there's certain payments that have to be made to maintain the property, and that's what this payment is.

MS. SCHMIDT: Okay. And so on Schedule H, there aren't any co-debtors listed. That's going to need to be amended, because it looks like other entities are liable on some of the debts listed on Schedule D and E/F, and that needs to be fully disclosed.

MR. BARTON: Okay. We'll get that corrected. Thank you.

MS. SCHMIDT: So, on Schedule -- pardon me. On Docket 17, which are the statements, is it true that the

Debtor has never made any money?

MR. BARTON: That's correct.

MS. SCHMIDT: And there's been no losses or anything from fire, theft, or other casualty within a year before the filing of the case?

MR. BARTON: Correct.

MS. SCHMIDT: And then I'm looking at Page 3 of 6 of Docket 17. I'm looking at Question 13, Transfers Not Already Listed on This Statement. List any transfers of money or other property, by sale, trade, or any other means, made by a debtor or a person acting on behalf of the debtor within two years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security.

Has the -- has anybody made any transfers on behalf of the Debtor in the past two years?

MR. BARTON: No.

MS. SCHMIDT: What about that payment of --

MR. BARTON: No.

MS. SCHMIDT: -- JMJ Development to Palisades?

MR. BARTON: Say it again?

MS. SCHMIDT: So, you testified before that JMJ Development transferred money to Palisades to resolve -- pursuant to an agreeme... a settlement. When were those

transfers made?

MR. BARTON: That is not -- it's not -- it's not a transfer. It's an advance and a payment on behalf of the Debtor. So I don't -- I don't classify that as a transfer.

MS. SCHMIDT: Did money move?

MR. BARTON: What I understand a transfer is, something that the debtor had is transferred out of it or given to another party in the last two years. Those are just normal payments.

MS. SCHMIDT: Okay, but were those -- what about the lien? When did -- does Palisades have a lien against the Debtor or does it have a lien against FHC?

MR. BARTON: There is no liens that I know of.

MS. SCHMIDT: So why is it a --

MR. BARTON: What lien are you talking about?

MS. SCHMIDT: Well, Palisades is listed as a secured creditor on Schedule D. What does it have a lien against that the Debtor owns?

MR. BARTON: I'm -- I don't believe you need a lien to be a secured debt.

MS. SCHMIDT: What's its collateral?

MR. BARTON: Do you?

MS. SCHMIDT: Well, what's its collateral?

MR. BARTON: Well, it has -- yeah, it has -- I'll have to have the lawyers answer what the collateral is, but

as far as I know, they have their membership units in the Debtor entity. And there's also the settlement agreement. So that -- that seems -- that seems to be a secured settlement agreement with a fixed payment. But I can certainly get the lawyers opining on this.

MS. ALLEYNE: I think it's listed as a secured claim because of the interest in the property.

MS. SCHMIDT: Okay. But is it -- I guess what I'm asking is do they have -- have they -- has Palisades filed a lien in the deed records against the property that's owned by FHC? Or --

MR. BARTON: No. There is no lien filed. There's no lien filed anywhere.

MS. SCHMIDT: And then -- now, the Debtor, does it have any books and records?

MR. BARTON: As there's no bank accounts and no activity, there's very basic accounting of what's been advanced to it, but -- but no -- no balance sheet or P&L because there's been no activities. There's just an accumulation of the -- the debts that it has.

MS. SCHMIDT: But how do you track those debts if you don't really have records?

MR. BARTON: Well, I mean, it's just -- it's not a full-blown accounting audited statement, is what I'm saying. It's just a -- a very parochial book of what is owed. So we

do have that, yes.

MS. SCHMIDT: So I'm looking at Docket 17. I'm on Page 5 of 6. And No. 25, Question 25, Other Businesses in Which the Debtor Has or Has Had an Interest. And so the Debtor checked "None" in response. But we know that's not true because we have information listed in the schedule showing that the Debtor owns 50 percent of Real Estate Lenders Acquisition. So we need to amend the statements -- first off, I think we need to include --

MR. BARTON: Hold -- hold -- hold -- could you tell me which one you were looking at again?

MS. SCHMIDT: All right. So I'm looking at Question 25. I'm on Page 5 of 6 of Docket 17, the statements.

MR. BARTON: Page 5. Which part is it called? Part 12 or --

MS. SCHMIDT: It's Part 13, Details About the Debtor's Business --

MR. BARTON: Oh, Part 13? Oh, yes, I have it, I have it. It's right there. Yes.

MS. SCHMIDT: Yeah.

MR. BARTON: Yes, I have it.

MS. SCHMIDT: Yeah. So, 25, you checked "None." That's not true. You need to amend 25.

26, when I look at the responses to the subquestions, the subparts of Question 26, I would be under the impression that

the Debtor has no records. But if I were to ask for even the basic records, that -- because surely you had to have some type of records to put together schedules and Statement of Financial Affairs for this case -- where are those records kept?

MR. BARTON: Yeah, basically what they are is a -- an accounting of everybody that it owes money to. And that worksheet, if you will, has been done and we can give you that. That -- if that's what you're speaking to as a set of books.

But as I described, with not any ongoing business or revenue coming and going, there's just a list of the folks that it owes money to.

MS. SCHMIDT: Right. Where is that list kept?

MR. BARTON: With HR Sterling. I can get that for you.

MS. SCHMIDT: Well, you need to disclose that. You need to disclose that it's with HR Sterling right now under SOFA 26.

MR. BARTON: Okay.

MS. SCHMIDT: And then let's see. So the hundred -- so, who's the hundred percent owner? Is it you or is it TLB 2018 Irrevocable Trust?

MR. BARTON: The trust.

MS. SCHMIDT: Okay. And who's the trust for the

benefit of?

MR. BARTON: Tim Barton.

MS. SCHMIDT: Okay. And is the Debtor, is it a member of any consolidated group for tax purposes?

MR. BARTON: Could you repeat that one more time?

MS. SCHMIDT: So, has the Debtor -- is it a member of a consolidated group for tax purposes at all?

MR. BARTON: No.

MS. SCHMIDT: I'm going to go ahead and pass the witness for now. Mr. Sparks, if you have any questions for the Debtor, for Mr. Barton.

MR. SPARKS: Yes. Thank you.

EXAMINATION BY MR. SPARKS

MR. SPARKS: Mr. Barton, earlier you said JMJ Development is a fee developer on the project. Can you remind me, what project are you referring to?

MR. BARTON: The FHC hotel that's being built on John Hickman and the Toll Road, that piece of property there.

MR. SPARKS: Okay. And FHC Acquisition owns that real property?

MR. BARTON: Correct.

MR. SPARKS: And has FHC began construction on that project?

MR. BARTON: No.

MR. SPARKS: When was FHC's deadline to begin

construction?

MR. BARTON: I don't have that in front of me.

MR. SPARKS: Is it currently incurring a thousand dollars a day penalty for over a hundred days now for not starting construction on time?

MR. BARTON: I'm not familiar with that. I'd have to look at it.

MR. SPARKS: On Page 13 of the schedules, my client, The Gate Property Owners Association, is listed as a creditor of Dallas Real Estate Investors, LLC, the Debtor in this case. Is The Gate a creditor of Dallas Real Estate Investors?

MR. BARTON: FHC owes money to The Gate, and the Debtor is obligated to pay for FHC.

MR. SPARKS: So FHC is a creditor of Dallas Real Estate Investors; is that right?

MR. BARTON: Could you repeat that again?

MR. SPARKS: So, it sounds like FHC is a creditor of Dallas Real Estate Investors. Is that right?

MR. BARTON: Yeah, I'd have to ask the lawyers how they would articulate that, but as I said, FHC owes the money and any of those debts that FHC has is an obligation of the -- Dallas Real Estate.

MR. SPARKS: So is Dallas Real Estate Investors planning to pay The Gate the amount that it owes? That FHC

owes?

MR. BARTON: It -- it is planned to clear that debt. That is correct.

MR. SPARKS: So, the debt that's listed there is $19,979.56. What is that debt for?

MR. BARTON: I believe it's for the homeowners association or the association of The Gate. They have certain maintenance and other activities that are ongoing that they bill back to each property owner.

MR. SPARKS: You're talking about the regular assessments that FHC owes to The Gate?

MR. BARTON: I believe that's correct, yes.

MR. SPARKS: So the Debtor is going to pay that debt; is that right?

MR. BARTON: Correct.

MR. SPARKS: With what money?

MR. BARTON: It has negotiations going right now for new capital and recapitalization of the company, and also, as FHC moves forward with new financing, it will also bring in capital and repay its obligations to the DRE and as well as any other obligation that it has.

MR. SPARKS: Okay. And so when is construction slated to begin on the property?

MR. BARTON: January. Of next year.

MR. SPARKS: Okay. Now, you said somebody offered

FHC $9,250,000 for the real property nine months ago; is that right?

MR. BARTON: Correct.

MR. SPARKS: And who made that offer?

MR. BARTON: Well, there's confidentiality. And I'll -- can talk to the lawyers and see if we can disclose that to you.

MR. SPARKS: And you said that you believe the dirt is worth $10 million; is that right?

MR. BARTON: Correct.

MR. SPARKS: Does that valuation take into account the restrictive covenants on the property?

MR. BARTON: All of the covenants that are in place, correct.

MR. SPARKS: Okay. Thank you. I'll pass the witness.

MS. SCHMIDT: All right. Thank you, Mr. Sparks.

Ms. Rosen, any questions?

MS. ROSEN: Your Honor.

EXAMINATION BY MS. ROSEN

MS. ROSEN: Good morning, Mr. Barton. I have a quick question. I'm looking at Docket No. 16, which were the original schedules, and I'm looking at Schedule G, which is on Page 16 of 18. And there you have listed a settlement agreement -- a settlement agreement contract to be assumed.

And that's with Palisades. Is it the Debtor's intention to assume that executory contract?

MR. BARTON: Yes.

MS. ROSEN: And are you aware that when an executory contract is assumed that the Debtor is required to pay any outstanding defaults?

MR. BARTON: I don't understand what you mean.

MS. ROSEN: It means that when a debtor assumes a contract, in order to be able to assume an executory contract, you have to pay any amounts that are owing on the contract in order to be able to assume it.

MR. BARTON: Correct.

MS. ROSEN: Okay. And so my question is it says here that the executory -- the settlement agreement, as an executory contract, is to be assumed. And do you know how much is currently owed? I think you said earlier it was something over $4 million under the settlement agreement.

MR. BARTON: It's less than $4 million because there's been payments that have already been made.

MS. ROSEN: Okay. So less than $4 million, but over $3 million?

MR. BARTON: Correct.

MS. ROSEN: And how is the Debtor going to be able to assume that executory contract? With what money?

MR. BARTON: It's in negotiations as we speak with

parties that are going to invest into -- into the Debtor's entity and pay off the settlement agreement.

MS. ROSEN: And what's the time schedule on that?

MR. BARTON: Right now, we believe it will be done in less than 60 days.

MS. ROSEN: And what's the status of the negotiations? Are these just verbal negotiations? Do you have -- have you exchanged a letter of intent or a term sheet? Or what's the -- what's the status on those negotiations?

MR. BARTON: There was a letter of intent and it moved to a term sheet and now we're working on a actual contract that would be the final document for the closing.

MS. ROSEN: Okay. Do you recall --

(Interruption.)

MS. SCHMIDT: All right. We are back on the record. Ms. Rosen, do you want to ask your question again, if you can remember what it was?

MS. ROSEN: I'll do my best.

Okay. So, Mr. Barton, last week, Palisades and the Debtor and some other of the related entities entered into an agreed order on a motion that had previously been filed by Palisades. And as part of that agreed order, FHC Acquisition, Dallas Real Estate Lenders, and the Debtor and Palisades agreed to provide each other with copies of any

letters of intent, term sheets, purchase and sale agreements, or similar documents relating to any investment or potential investment in the Frisco property, FHC Acquisition, or Dallas Real Estate Lenders.

And it sounds like you are telling me that the Debtor has a letter of intent and a term sheet with a third party relating -- that will result in some sort of a recapitalization of the property. And I guess my question is, have those documents been provided to Palisades? To my knowledge, they have not. And when will they be provided?

MR. BARTON: Yes. I can check with our lawyers, I know they've been given to them, and it's, you know, in the process of getting over to Palisades.

MS. ROSEN: By your lawyers, do you mean Ms. Lindauer?

MR. BARTON: Ms. Lindauer and also Mr. Metzger, Steve Metzger.

MS. ROSEN: And is -- I apologize. Who's on the line from Ms. Lindauer's firm?

MS. ALLEYNE: Kerry Alleyne.

MS. ROSEN: Hi. Ms. Alleyne, would you mind, please, providing us with copies of those documents?

MS. ALLEYNE: I mean, I'll check in on the status with Ms. Lindauer and Mr. Metzger. I wasn't involved, so I'll look into it.

MS. ROSEN: I just want to make a formal demand for those records. I mean, that was part of our deal last week, was that those things are supposed to be provided. And I appreciate Mr. Barton saying that those will be provided to us, and I just -- we need -- we need to get those documents. Okay.

MS. ALLEYNE: Well, --

MS. ROSEN: So, Mr. Barton, --

MS. ALLEYNE: -- not going to accept this as a venue for a formal demand. I will check into it. I have no idea what occurred. I wasn't involved.

MS. ROSEN: Okay. No, I appreciate it. We've just got a court order that those are to be turned over, and I just want to make sure that those are going to be turned over.

MR. BARTON: We'll get it done.

MS. ROSEN: Okay.

MR. BARTON: No problem.

MS. ROSEN: Okay. I appreciate it. Thank you.

Mr. Barton, okay. Another question. As to FHC (inaudible) level relating to the property, is there any bank debt on the property?

MR. BARTON: Yes.

MS. ROSEN: How much is that bank debt?

MR. BARTON: I believe it's $3-1/2 -- $3.2 [million]

or -- somewhere between $3.2 and $3.5 [million] is the amount of the loan.

MS. ROSEN: Okay. When was that -- when did that loan originally go into place?

MR. BARTON: Hmm. I think January of 2020.

MS. ROSEN: Okay. And what was the original term?

MR. BARTON: I believe it's been $3.2 [million] -- well, that -- I don't -- the original amount I don't think has changed since the date of --

MS. ROSEN: I'm sorry. I didn't mean to -- you can finish your answer. I'm sorry.

MR. BARTON: Yeah. The original amount when the property was acquired, there was a loan on there, and that amount has not changed.

MS. ROSEN: What was the term of that loan? Was it a 12-month term? Was it a one-year loan?

MR. BARTON: I believe it was a one-year with a six-month extension, and we've done one extension, and the next extension is -- is underway as we speak.

MS. ROSEN: So if there was -- if it was for a year from January and there's a six-month extension, so January, that means that it would have expired in July?

MR. BARTON: I believe the end of July. That's correct.

MS. ROSEN: Has there been a default?

MR. BARTON: No. The bank has, I think, over -- over a hundred thousand dollars of interest payments. And so there's just been a month extension while they're waiting to get the documents for the next six-month extension done.

MS. ROSEN: There's been a one-month extension?

MR. BARTON: Correct.

MS. ROSEN: Is that something that was in writing?

MR. BARTON: It is not. The bank just did it. They're, you know, they're underway of getting the paperwork and they've been a little bit busy, so they -- they just extended it. And hopefully we'll have those documents today or tomorrow.

MS. ROSEN: What -- what was the basis for the extension? Was it a verbal or was that an email?

MR. BARTON: There's no email or anything. They -- you know, we spoke to them on the phone and they -- they said that the loan is fine for another month and that they will, you know, they expect to have the paperwork done, you know, last Friday, but I guess they've been a little bit busy with -- with everything going on and the COVID issues that have been popping up. They had some staff that was out. And so there's a little bit of a delay.

MS. ROSEN: Okay. And when those -- when that extension gets signed, though, those documents are also going to be provided to Palisades, correct?

MR. BARTON: Absolutely, yes.

MS. ROSEN: What's the -- let me see.

MS. SCHMIDT: And Ms. Rosen, about how many more questions do you have? The reason I'm asking is that there's another 341 meeting starting at 10:00 a.m., and it's 9:55. I didn't know if you had like only one or two more questions, or --

MS. ROSEN: Just, I guess my only other question is what's -- what's the status on getting the property -- or, the amount that's owed to the Property Association paid?

MR. BARTON: Your question is when is it going to be paid?

MS. ROSEN: Correct.

MR. BARTON: I would -- I would see it getting paid within the next 60 days.

MS. ROSEN: And you -- okay. And paid, are you talking paid by the Debtor or paid by FHC Acquisition?

MR. BARTON: It would ultimately be paid by the Debtor. So, yes, from the Debtor.

MS. ROSEN: What's the agreement between the Debtor and FHC Acquisition that requires FHC -- that requires the Debtor to pay FHC Acquisition's bills?

MR. BARTON: As the holding company for it, if FHC doesn't have funds, then it looks to the Debtor for funds.

MS. ROSEN: But the Debtor is not the holding

company, is it? Of FHC Acquisition?
MR. BARTON: I believe it is, yes.
MS. ROSEN: Is there another level in between called Dallas Real Estate Lenders?
MR. BARTON: I'd have to look at the org chart. I don't have it sitting here in front of me.
MS. SCHMIDT: That's how it's -- that's how it's --
MS. ROSEN: Okay.
MS. SCHMIDT: -- set forth in Schedule A/B.
MR. BARTON: Okay. I'd like to confirm that in the org chart before I comment on it.
MS. SCHMIDT: Well, you signed those schedules under penalty of perjury, Mr. Barton.
MR. BARTON: I believe that that is -- information is correct, but I'd like to check it.
MS. SCHMIDT: Sorry, Ms. Rosen. Go own.
MS. ROSEN: I don't think I have any other questions, Erin. You can get on to your next 341.
MS. SCHMIDT: All right. So we need to get some amendments to the schedules and SOFAs, Ms. Alleyne. And I'll email those proposed amendments to you, as well as some other outstanding administrative issues. Like, for example, the declaration page on the insurance. Do you think you can get those amendments done in about two weeks from today?
MS. ALLEYNE: Yes.

MS. SCHMIDT: All right. With that, I'm going to go ahead and conclude the meeting of creditors. I'm going to hit the stop button on the recorder.

(Whereupon, after 50 minutes, the meeting of creditors was concluded.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript to the best of my ability from the electronic sound recording provided of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **08/19/2021**

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS 3

WITNESSES

Tim Barton, Debtor's Representative

Examination by Ms. Schmidt 4
Examination by Mr. Sparks 24
Examination by Ms. Rosen 27

EXHIBITS

END OF MEETING 36

INDEX 37

# Exhibit "O"

**Suki Rosen**

**From:** Joyce Lindauer <joyce@joycelindauer.com>
**Sent:** Wednesday, August 11, 2021 3:58 PM
**To:** Suki Rosen
**Subject:** RE: [External] DREI - 341 meeting and formal document request

I have not seen any of this but I will pass along your message

---

**From:** Suki Rosen <srosen@forsheyprostok.com>
**Sent:** Wednesday, August 11, 2021 3:30 PM
**To:** Joyce Lindauer <joyce@joycelindauer.com>; 'larry martin' <larry.martin1948@gmail.com>
**Subject:** DREI - 341 meeting and formal document request

HI Joyce and Larry,
Mr. Barton testified under oath at the 341 meeting this morning that the debtor has been in discussions with a potential investor in the Frisco property and the parties have executed an LOI, term sheet, and are now working on definitive documentation for a final agreement. As you know, under the agreed order we all signed last week, the debtor and related entities are required to provide "any letters of intent, term sheets, purchase and sale agreements, or similar documents relating to any investment or potential investment in the Frisco Property, FHC Acquisition, or DREL" to Palisades. I made a formal demand for these documents at the 341 meeting, but I wanted to follow up with you by email. Mr. Barton testified that he has provided them to his counsel, including the Lindauer Firm. As a result, please send us those documents immediately. If we have not received them by Friday, we will have no choice but to file a motion to enforce the agreed order.

Separately, what is the plan for paying the outstanding property owners association (POA) fees? Counsel for the POA indicated that they plan to file suit against FHC Acquisition because the amounts have not been paid. Please advise. Thanks.
Best,

**Suzanne K. "Suki" Rosen | FORSHEYPROSTOK LLP**
**Partner | 817.878.2018 | Fax 817.877.4151**
**777 Main Street, Suite 1550 | Fort Worth, TX 76102**

✉ srosen@forsheyprostok.com

www.forsheyprostok.com

CONFIDENTIALITY STATEMENT--VIRUS WARNING --
Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this email message is attorney-client privileged and confidential, intended for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by email and destroy all copies of the original message. Although this email and any attachments are believed to be free of any virus or other defects that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Forshey & Prostok, L.L.P. for any loss or damage arising in any way from its use.

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot

be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing, or recommending to another party any tax-related matters addressed.