# Exhibit "3"

FILED
4/22/2020 4:05 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Belinda Hernandez DEPUTY

**Cause No. DC-20-05960**

| | | |
|---|---|---|
| **PALISADES TC, LLC, INDIVIDUALLY, AND ON BEHALF OF FIVE STAR GM, LLC,** | § | **IN THE DISTRICT COURT OF** |
| **PLAINTIFF,** | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| **FIVE STAR MM, LLC AND TIMOTHY BARTON, INDIVIDUALLY,** | § | |
| **DEFENDANTS.** | § | **____ JUDICIAL DISTRICT** |

## PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

Plaintiff Palisades TC, LLC ("Plaintiff" or "Palisades") individually, and on behalf of Five Star GM, LLC ("Five Star GM"), files this Original Petition and Application for Temporary Restraining Order and Temporary Injunction against Defendants Five Star MM, LLC (the "Company") and Timothy Barton ("Barton"), individually, (collectively, "Defendants"), and alleges as follows:

## I. DISCOVERY CONTROL PLAN AND STATEMENT OF RELIEF

1. Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.4 and affirmatively pleads that this suit is not governed by the expedited-actions process in Texas Rule of Civil Procedure 169 because it seeks injunctive relief.

2. Pursuant to Texas Rule of Civil Procedure 47, Plaintiff seeks monetary relief over $1,000,000. The damages sought are within the jurisdictional limits of the court.

## II. PARTIES

3. Plaintiff Palisades TC, LLC is a Texas limited liability company doing business in Dallas County at 1919 McKinney Ave., Suite 100, Dallas, Texas 75201.

4. Defendant Five Star MM, LLC is a Delaware limited liability company, and may be served by and through its registered agent ONE Agent Texas, LLC, at 13901 Midway Rd, Suite 102, Dallas, TX 75244-75244.

5. Defendant Timothy Barton is an individual that may be served with process at his residence in Dallas County at 3525 Arrowhead Drive, Dallas, Texas 75204, or wherever he may be found.

## III. JURISDICTION AND VENUE

6. All the parties hereto are subject to the Court's jurisdiction. The Court has subject-matter jurisdiction over the lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

7. Venue is proper in Dallas County under Section 15.002(a) of the Texas Civil Practice and Remedies Code because all of the events and omissions giving rise to the claims asserted herein occurred in Dallas County, Texas. Further, venue is proper pursuant to the provisions contained in the contracts at issue. *See* Ex. A at § 10.14, Ex. B at § 18.08.

## IV. FACTS

8. Barton is the Chief Executive Officer of JMJ Development ("JMJ"), a real estate developer in Dallas, Texas.

### A. Relevant Company Agreements

9. On September 16, 2019, Plaintiff and Barton entered into the Amended and Restated Company Agreement of Five Star MM, LLC (the "Company Agreement") to form the Company. Plaintiff and Barton are the only two Members of the Company. A true and accurate copy of the Company Agreement is attached hereto as Exhibit A and incorporated herein by reference.

10. The Company was formed for the sole purpose of managing all entities having a

direct or indirect beneficial ownership interest in MO 2999TC, LLC, a Delaware limited liability company established for the sole purposes of acquiring and developing certain real property and the improvements thereon located at 2999 Turtle Creek Boulevard, Dallas, Texas (the "Turtle Creek Project").

11. Barton is the Member, President, and Manager of the Company. *See* Ex. A at §§ 2.01, 4.01, and 2.08.

12. On September 16, 2019, Plaintiff also entered into and became a Member of the Company Agreement of Five Star GM, LLC (the "Five Star GM Agreement", together with the Company Agreement, the "Company Agreements") to form Five Star GM. The Company is the Managing Member of Five Star GM. The only other Member of Five Star GM is 2999 TC JMJ MGR, LLC. A true and accurate copy of the Five Star GM Agreement is attached hereto as Exhibit B and incorporated herein by reference. All capitalized terms used herein that are not specifically defined herein shall have the meanings provided in the Company Agreements.

13. The sole business and purpose of Five Star GM is its ownership interests and related rights in Five Star TC, LLC as the sole member of MO 2999TC MZ, LLC as the sole member of MO 2999TC LLC ("Turtle Creek Project Owner") which acquired the real property where the Turtle Creek Project is located and to take such action necessary to construct and develop a mixed use project including a luxury hotel and residences on the real property (*i.e.*, the Turtle Creek Project).

**B. Defendants' Obligations under the Company Agreements**

14. First, upon formation of Five Star GM, Plaintiff contributed $4,000,000 to Five Star GM as a Preferred Capital Contribution (the "Priority Capital"). Plaintiff's contribution earned it a Base Return or Default Return, as applicable. Thus, the Five Star GM Agreement requires that distributions are made to Plaintiff as follows:

a. First, the Base Return or, if applicable, the Default Return, *see* Ex. B at § 5.02(a)(i);

b. Next, on or before March 9, 2020, an amount equal to no less than fifty percent (50%) of Plaintiff's Unreturned Priority Capital, *see* Ex. B at § 5.02(a)(ii); and

c. Next, on or before March 9, 2020, an amount equal to no less than 50% of the amount distributed to Plaintiff pursuant to item b above, *see* Ex. B at § 5.02(a)(iii).

15. Second, the Company Agreements require that Defendants provide to Plaintiff timely financial information reports. *See* Ex. A at § 7.03, Ex. B at § 12.03.

16. Third, the Company Agreements require that Defendants obtain prior written approval of certain actions, *see* Ex. A at § 2.08, Ex. B at § 6.02, including, but not limited to the following actions:

a. Entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Turtle Creek Project, *see* Ex. A at § 2.08(e), Ex. B at § 6.02(e);

b. Entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), *see* Ex. A at § 2.08(f), Ex. B at § 6.02(f);

c. Entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company or Five Star GM or any Operating Company of more than $100,000 in any year except as provided in the Turtle Creek Project Budget, *see* Ex. A at § 2.08 (g), Ex. B at § 6.02(g); and

d. Entering into, modifying, amending or terminating any agreement with Mandarin Hotels, *see* Ex. A at § 2.08(ff), Ex. B at § 6.02(ff).

17. Fourth, the Company Agreements provide that the Company and Five Star GM shall keep books and records that shall be open for inspection and copying by any Member. *See* Ex. A at § 7.01, Ex. B at § 12.01.

## C. Redemption Default

18. Under the Five Star GM Agreement, a Redemption Default shall occur upon the

happening of any of the following relevant events:

a. Five Star GM fails at any time to distribute all amounts due to Plaintiff pursuant to Section 5.02(a)(i), *see* Ex. B at § 5.04(a)(i);

b. Five Star GM fails to distribute all amounts due to Plaintiff pursuant to Sections 5.02(a)(i) and (ii) on or before March 9, 2020, *see* Ex. B at § 5.04(a)(ii); and

c. The Company, any Member other than Plaintiff, or Five Star GM breaches any of its obligations under the Five Star GM Agreement, including, without limitation, the failure to obtain the approval of Plaintiff whenever required in the Five Star GM Agreement, *see* Ex. B at § 5.04(a)(iv).

**D. Plaintiff's Remedies under the Company Agreements**

19. Under the Five Star GM Agreement, Plaintiff has the following remedies in the event of a Redemption Default:

a. Plaintiff shall have the right to require the Company, to request an additional Capital Contribution from the Members other than Plaintiff in an amount sufficient to bring Plaintiff current on the distributions (the "Capital Call Right"), *see* Ex. B at § 5.04(b); and

b. Plaintiff shall have the right to act on behalf of Five Star GM and cause Five Star GM to act on behalf of each Operating Company, in each instance in its sole and absolute discretion without the consent or approval of the Company or any other Member of Five Star GM or any Operating Company, to market and cause the sale of the Turtle Creek Project to an independent third party on such terms and conditions as Plaintiff may determine appropriate in its sole and absolute discretion. Further, the Company and each Member of Five Star GM shall cooperate and shall cause Five Star GM and each Operating Company to cooperate with Plaintiff to accomplish such sale (the "Sale Right"). *See* Ex. A at § 2.09, Ex. B at § 5.05.

**E. Defendants' Redemption Defaults under the Company Agreements**

20. As a result of the formula laid out in § 5.02 of the Five Star GM Agreement, Five Star GM was required to distribute $3,000,000, to Plaintiff on or before March 9, 2020 (the "March Unreturned Priority Capital Payment"). However, Defendants failed to cause Five Star GM to make the March Unreturned Priority Capital Payment to Plaintiff, which is a Redemption Default

under Section 5.04(a)(ii) of the Five Star GM Agreement (the "March Payment Redemption Default"). Further, Defendants have failed to cause Five Star GM to cure this Redemption Default in the time period prescribed by the Five Star GM Agreement following notice of default from Plaintiff.

21. After the March Payment Redemption Default and after Defendants failed to give any clear indication to Plaintiff of when it intended to cause Five Star GM to make the March Unreturned Priority Capital Payment, on March 20, 2020, Plaintiff sent Defendants a letter ("Notice of Default") officially notifying them of their existing and potential defaults under the Company Agreements, which included, but were not limited to, the March Payment Redemption Default, failure by Defendants to submit *any* financial reports as required by the Company Agreements, and failure to obtain prior written approval from Plaintiff for actions taken by the Company on behalf of Five Star GM. A true and accurate copy of the Notice of Default is attached hereto as Exhibit C and incorporated herein by reference.

22. On March 27, 2020, in response to Plaintiff's Notice of Default, Defendants sent Plaintiff a Project Status and Force Majeure Forbearance Request ("Forbearance Request"). The Forbearance Request failed to demonstrate that Defendants had any realistic plan to promptly cure the various existing defaults under the Company Agreements. Instead, the Forbearance Request simply confirmed the fact that, in many respects, Defendants had engaged in a course of improper conduct that breached their fiduciary duties to Five Star GM and its Members, including Plaintiff, breached their fiduciary duties to the Company's Members, including Plaintiff, and have materially breached the Company Agreements. A true and accurate copy of the Forbearance Request is attached hereto as Exhibit D and incorporated herein by reference.

23. The Forbearance Request also confirmed to Plaintiff that Defendants: (i) had

executed multiple management agreements with Mandarin Hotel Group without the prior written approval of Plaintiff, in breach of the Company Agreements and (ii) indebted the Company and Five Star GM by contracting with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates, which, upon information and belief, require future payments by or to the Company and Five Star GM of more than $100,000 in any year not provided in the Turtle Creek Project Budget without the prior written approval of Plaintiff, in breach of the Company Agreements.

24. The foregoing breaches of Defendants' obligations are each a Redemption Default under Section 5.04(a)(iv) of the Five Star GM LLC Agreement.

25. Further, Plaintiff's Unreturned Priority Capital normally earns a Base Return due on the first day of each month, which is equal to nine percent (9%) per annum, accrued on the Unreturned Priority Capital. However, a Default Return equal to fourteen percent (14%) per annum on Plaintiff's Unreturned Priority Capital shall apply immediately at such times as any Base Return is not distributed on the due date thereof and the Default Return shall accrue in lieu of such Base Return not timely distributed.

26. Defendants also failed to cause Five Star GM to timely distribute the Base Return to Plaintiff that was due on or before April 1, 2020, which is another Redemption Default under Section 5.04(i) of the Five Star GM Agreement (the "April Payment Redemption Default"). As a result of the April Payment Redemption Default, the Default Return applies to the payment which was due on April 1, 2020 and which currently remains outstanding (the "April Default Return Payment").

27. Further, at the permission of Defendants, JMJ, Barton's affiliated entity, is occupying space in the Turtle Creek Project without the written approval of Plaintiff. Defendants'

actions are in direct violation of the Company Agreements. *See* Ex. A at § 2.08(f), Ex. B at § 6.02(f). Further, such action constitutes a self-dealing transaction in breach of Defendants fiduciary duty of loyalty under the Company Agreements.

**F. Final Demand for Defendants to Comply with Their Obligations under the Company Agreements**

28. On April 8, 2020, Plaintiff's counsel responded on behalf of Plaintiff to the Forbearance Request and the April Payment Redemption Default by sending a final demand requesting the following from Defendants (the "Final Demand"):

a. The March Unreturned Priority Capital Payment;

b. The April Default Return Payment;

c. All agreements that have been entered into related to the Turtle Creek Project, including but not limited to, any agreements with Mandarin Hotel Group, SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates (the "Turtle Creek Project Agreements");

d. The monthly financial reports from September 2019 through March 2020 that are required under Section 7.03 of the Company Agreement;

e. The required financial information, reports, and notices from September 2019 through March 2020 as required by Section 12.03(a)(i)-(iii) of the Five Star GM Agreement;

f. All agreements, including but not limited to, any lease agreements or license agreements, with JMJ or any other affiliate of Barton to occupy space at the Turtle Creek Project; and

g. Access to and the right to inspect and copy the following books and records of the Company and Five Star GM pursuant to Section 7.02 of the Company Agreement, Section 12.02 of the Five Star GM Agreement, and Section 18-305 of the Delaware Limited Liability Company Act:

   i. Balance sheets by month from September 1, 2019 through the present day;

   ii. Profit and loss statements by month from September 1, 2019 through the present day;

   iii. Cash flow statements by month from September 1, 2019 through the

present day; and

iv. Five Star GM information and documents regarding the Turtle Creek Project, including but not limited to (1) any agreements with any contractor, supplier, vendor or other third party related to the Turtle Creek Project along with contact information for all such parties, (2) any correspondence with lenders, including but not limited to any default notices, and (3) any notices, citations or other correspondence from any State or local governmental entity related to the Turtle Creek Project.

29. A true and accurate copy of the Final Demand is attached hereto as Exhibit E and incorporated herein by reference.

30. In the Final Demand, Plaintiff also exercised its Capital Call Right and expressly reserved its right to exercise its Sale Right.

31. In response to the Final Demand, Defendants disputed that any Redemption Default had occurred (the "Final Demand Response") and merely provided final, executed copies of seven of the many agreements that Defendants had entered into without written approval from Plaintiff, as required by the Company Agreements (the "Final Demand Production"). A true and accurate copy of the Final Demand Response and the Final Demand Production is attached hereto as Exhibit F and Exhibit G, respectively, and incorporated herein by reference. However, Defendants failed to provide *any* of the financial and accounting records to which Plaintiff is entitled and failed to provide any assurances that it had made a meaningful effort to try and obtain the requested information, in clear breach of the Company Agreements.

**G. Plaintiff's Exercise of its Sale Right**

32. The most pressing concern for Plaintiff is its intention to move forward with exercising its Sale Right under the Company Agreements. In order to exercise that remedy, Plaintiff must have the most current understanding and status of its substantial financial investment in Five Star GM and an accurate understanding of the business transactions of the entity. The

requested information is essential to Plaintiff's exercise of its Sale Right. The information requested from Defendants is what is required, at a minimum to for Plaintiff to conduct its due diligence related to the exercise of its Sale Right. Additionally, and as previously noted, Plaintiff is also contractually allowed access to such information.

33. Further, Defendants are obligated to cooperate and shall cause Five Star GM to cooperate with Plaintiff to accomplish a sale of the Turtle Creek Project.

34. Accordingly, Defendants should be enjoined from preventing Plaintiff's access to the books and records of the Company and Five Star GM, and enjoined from undertaking any action with respect to or on behalf of Five Star MM or Five Star GM or with respect to or on behalf of Five Star TC, LLC, MO 2999TC MZ, LLC, MO 2999TC, LLC, and 2999 TC Acquisitions without the prior written approval of Palisades TC, LLC.

35. The current state of the national economy, and specifically, the current dynamics in the commercial real estate market due to the COVID-19 pandemic create an imminent threat of irreparable harm to Plaintiff. The current real estate market is unpredictable and Plaintiff needs to act fast if it has any hopes for selling the Turtle Creek Project at its highest value which is ont of Plaintiff's primary remedies for the Redemption Defaults that have occurred under the applicable company agreements. Further, the Turtle Creek Project, which is a real estate development project stands to be irreparably damaged if it continues to be managed and operated by Defendants.

## V. CAUSES OF ACTION

### COUNT 1 – BREACH OF CONTRACT (COMPANY AGREEMENT)

36. The allegations above are incorporated herein by reference as if set forth in this Count.

37. The Company Agreement is a valid and enforceable written contract between Plaintiff and Defendants. The Company Agreement provided that Defendants would provide to

Plaintiff timely financial information reports and would obtain prior written approval from Plaintiff of certain actions, including, but not limited to, (a) entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Turtle Creek Project, (b) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), (c) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company and any Operating Company of more than $100,000 in any year except as provided in the Turtle Creek Project Budget, and (d) entering into, modifying, amending or terminating any agreement with Mandarin Hotels.

38. Plaintiff fully performed its contractual obligations under the Company Agreement.

39. Defendants breached the Company Agreement by (i) failing to submit *any* financial reports; (ii) executing multiple management agreements with Mandarin Hotel Group without the prior written approval of Plaintiff; (iii) indebting the Company by contracting with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates, which, upon information and belief, require future payments by or to the Company of more than $100,000 in any year not provided in the Turtle Creek Project Budget without the prior written approval of Plaintiff; (iv) permitting JMJ to occupy space in the Turtle Creek Project without the written approval of Plaintiff; and (v) failing to provide access to the books and records of the Company.

40. Defendants breach caused injury to Plaintiff, which resulted in actual damages and the inability to proceed with effecting the sale of the Turtle Creek Project.

**COUNT 2 – BREACH OF CONTRACT (FIVE STAR GM AGREEMENT)**

41. The allegations above are incorporated herein by reference as if set forth in this

Count.

42. The Five Star GM Agreement is a valid and enforceable written contract between Plaintiff and Defendants. The Five Star GM Agreement provided that Defendants would pay Plaintiff the Unreturned Priority Capital Payment on March 9, 2020, pay Plaintiff the Base Return (or Default Return) on April 1, 2020, provide to Plaintiff timely financial information reports, and would obtain prior written approval from Plaintiff of certain actions, including, but not limited to, (a) entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Turtle Creek Project, (b) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), (c) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to Five Star GM and any Operating Company of more than $100,000 in any year except as provided in the Turtle Creek Project Budget, and (d) entering into, modifying, amending or terminating any agreement with Mandarin Hotels. The Five Star GM Agreement further provides that Defendants would cooperate with Plaintiff in the event that it exercised its Sale Right.

43. Plaintiff fully performed its contractual obligations under the Five Star GM Agreement by providing the Preferred Capital Contribution of $4,000,000.

44. Defendants breached the Five Star GM Agreement by (i) failing to make the March Unreturned Priority Capital Payment; (ii) failing to make the April Default Return Payment; (iii) failing to submit any financial reports; (iv) executing multiple management agreements with Mandarin Hotel Group without the prior written approval of Plaintiff; (v) indebting Five Star GM by contracting with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette

Davis Drake, Talley & Associates, and Lerch Bates, which, upon information and belief, require future payments by or to the Company of more than $100,000 in any year not provided in the Turtle Creek Project Budget without the prior written approval of Plaintiff; (vi) permitting JMJ to occupy space in the Turtle Creek Project without the written approval of Plaintiff; (vii) failing to provide access to the books and records of Five Star GM; and (viii) failing to cooperate with Plaintiff in exercising its Sale Right.

45. Defendants' breach caused injury to Plaintiff, which resulted in actual damages and the inability to proceed with effecting the sale of the Turtle Creek Project.

**COUNT 3 – BREACH OF FIDUCIARY DUTY**

46. The allegations above are incorporated herein by reference as if set forth in this Count.

47. Defendants, as the Managers of the Company and Five Star GM, owed fiduciary duties to Plaintiff.

48. Defendants breached their fiduciary duty of loyalty to Plaintiff and Five Star GM by engaging in self-dealing when they permitted JMJ to occupy space at the Turtle Creek Project without first obtaining written approval from Plaintiff.

49. Defendants' breach of their fiduciary duty of loyalty has injured Plaintiff and Five Star GM.

50. Defendants' breach of their fiduciary duty of loyalty to Plaintiff and Five Star GM benefited Defendants by providing free office space for an affiliate of Barton at the detriment to Plaintiff and Five Star GM.

51. Accordingly, Plaintiff seeks damages within the jurisdictional limits of this Court.

**COUNT 4 – FRAUD**

52. The allegations above are incorporated herein by reference as if set forth in this

Count.

53. Defendants failed to disclose material facts related to the financially distressed nature of the Turtle Creek Project.

54. Defendants had a duty to disclose the information to Plaintiff because Defendant had a fiduciary relationship with Plaintiff.

55. The information was material because Plaintiff entered into subsequent real estate investment transactions with Defendants, including one involving a proposed hotel and condominium project in Frisco, Texas.

56. Defendants knew Plaintiff was ignorant of the information and did not have an equal opportunity to discover the truth as Defendants controlled all of the books and records for Five Star GM.

57. Defendants deliberately remained silent and did not disclose the information to Plaintiff.

58. By deliberately remaining silent, Defendants intended for Plaintiff to enter into subsequent real estate investment transactions without information of the impending default by the Company and Five Star GM on the Unreturned Priority Capital.

59. Plaintiff justifiably relied on Defendants' deliberate silence and believed that the Turtle Creek Project and Five Star GM were financially secure.

60. By deliberately remaining silent, Defendants proximately caused injury to Plaintiff, which resulted in damages to Plaintiff.

61. Plaintiff seeks damages within the jurisdictional limits of this Court.

**COUNT 5 – ATTORNEY'S FEES**

62. The allegations above are incorporated herein by reference as if set forth in this Count.

63. Pursuant to Section 37.009 and Section 38.001 of the Texas Civil Practice and Remedies Code, Plaintiff claims reasonable attorney's fees, both in the trial of this cause and in connection with any subsequent appeal, as are equitable and just.

64. Further, Plaintiff is entitled to recover reasonable attorney fees under the provisions of the Company Agreements. *See* Ex. A at §§ 10.12, 10.14, Ex. B at § 18.08.

## VI. APPLICATION FOR TEMPORARY RESTRAINING ORDER

65. Injunctive relief may be granted upon the showing of the following: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002).

66. As shown above, Plaintiff has shown that it has various causes of action against Defendants and a probable right to the relief sought in this lawsuit.

67. As a result of the Defendants' wrongful acts in violating the Company Agreements in numerous material respects, including but not limited to, the refusal to provide Plaintiff with access to books and records and information and material related to the Turtle Creek Project to which Plaintiff is entitled, Plaintiff is threatened with probable, imminent and irreparable injury to its investment in the Turtle Creek Project in amounts that currently cannot be calculated. Without access to books and records of Five Star GM and the Company and the information and documents related to the Turtle Creek Project, Plaintiff is effectively prohibited from exercising its Sale Right remedy. Thus, Plaintiff has no adequate remedy at law and the requested injunctive relief is appropriate. Alternatively, and in addition, Plaintiff need not establish an inadequate remedy at law because the irreparable injury complained of relates Plaintiff's interest in the Turtle Creek Project, which is real property. *See* Tex. Civ. Prac. & Rem Code § 65.011(5).

68. Pursuant to Texas Rule of Civil Procedure 684, Plaintiff is able and willing to post a bond in this matter and request that the Court determine a fair and reasonable amount of security

to be given by Plaintiff for the protection of Defendants in the event the Temporary Restraining Order is wrongfully issued and results in harm to the Defendants. However, Plaintiff' respectfully requests that the bond should have a nominal face value.

69. Plaintiff's Application for Temporary Restraining Order and Temporary Injunctive Relief is verified by the attached Unsworn Declaration of Joaquin de Monet, which is attached hereto as Exhibit H.

70. Specifically, Plaintiff requests that the Court enter a Temporary Restraining Order ordering Defendants Five Star MM, LLC and Timothy Barton and those persons in active concert or participation with them who receive actual notice of the order, to desist and refrain from, either directly or indirectly through others:

a. Preventing or obstructing Palisades TC, LLC from obtaining access to the following:

   i. Any contracts or any other written agreements with any party related to the Turtle Creek Project, including but not limited to, Mandarin Hotel Group, SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drak, Tally & Associates, and Lerch Bates (the "Turtle Creek Project Contracts"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to all Turtle Creek Project Contracts;

   ii. The monthly financial reports from September 2019 – March 2020 that are required under Section 7.03 of the Five Star MM Company Agreement which shall include all expenses and income of Five Star MM for the calendar month and balance sheet as of the last day of the calendar month detailing all assets and liabilities of Five Star MM and the Capital Accounts of each Member (the Monthly Five Star MM Financial Reports"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to all of the Monthly Five Star MM Financial Reports;

   iii. The monthly management reports from September 2019 – March 2020 that are required under Section 12.03(a)(i) of the Five Star GM Company Agreement which shall include all progress reports on development activity regarding the Turtle Creek Project and a report detailing expenditures pursuant to the Turtle Creek Project Budget including any variations from same (the Monthly Five Star GM

Management Reports"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to all of the Monthly Five Star GM Management Reports;

iv. The monthly financial statements of Five Star GM from September 2019 – March 2020 that are required under Section 12.03(a)(ii) of the Five Star GM Company Agreement which shall include (A) a balance sheet as of the end of the such month and an income statement for such month prepared in accordance with the standard accounting principles of the Manager and the amount of unreturned Capital Contributions of each Member, and (B) a cash flow statement for such month (the Monthly Five Star GM Financial Statement"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to all of the Monthly Five Star GM Financial Statements;

v. The annual financial statement of Five Star GM for 2019 that is required under Section 12.03(a)(iii) of the Five Star GM Company Agreement which shall include (A) a balance sheet as of the end of such calendar year, prepared in accordance with the standard accounting principles of the Manager, (B) a cash flow statement for such calendar year, (C) the amount of unreturned Capital Contributions of each Member as of the last day of such calendar year, and (D) a summary report describing in reasonable detail the financial and business activities of the Company during such calendar year (the Annual Five Star GM Financial Statement"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to the Annual Five Star GM Financial Statement;

vi. Copies of any notices of default under any loan including, without limitation, under the Loan Documents as required under Section 12.03(b) of the Five Star GM Company Agreement (the "Loan Default Notices"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to Loan Default Notices;

vii. All agreements, including but not limited to, any lease agreements or license agreements with JMJ Development LLC or any Affiliate of Timothy Barton to occupy space at the Turtle Creek Project (the "Barton Affiliate Lease Agreements"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to any Barton Affiliate Lease Agreements;

viii. Pursuant to Section 7.02 of the Five Star MM Company Agreement and Section 18-305 of the Delaware Limited Liability Company Act, all information that Palisades TC, LLC is entitled to as a Member of Five Star MM (the "Five Star MM Books and Records"). Barton and Five Star MM shall immediately provide access to

Palisades TC, LLC to the Five Star MM Books and Records;

ix. Pursuant to Section 12.01 of the Five Star GM Company Agreement and Section 18-305 of the Delaware Limited Liability Company Act, all information that Palisades TC, LLC is entitled to as a Class A Member of Five Star GM (the "Five Star GM Books and Records"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to the Five Star GM Books and Records; and

x. Any notices, citations or other enforcement correspondence from any State or local governmental entity related to the Turtle Creek Project (the "Turtle Creek Project Notices and Citations"). Barton and Five Star MM shall immediately provide access to Palisades TC, LLC to the Turtle Creek Project Notices and Citations.

b. Undertaking any action with respect to or on behalf of Five Star MM or Five Star GM or with respect to or on behalf of Five Star TC, LLC, MO 2999TC MZ, LLC, MO 2999TC, LLC, and 2999 TC Acquisitions without the prior written approval of Palisades TC, LLC.

## VII. APPLICATION FOR TEMPORARY INJUNCTION

71. Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

72. Upon notice and hearing, Plaintiff requests that the Court enter a temporary injunction extending the temporary restraining order until final judgment is entered in this lawsuit.

## VIII. JURY DEMAND

73. Plaintiff demands a jury trial and tenders the appropriate fee with this Petition.

## IX. CONDITIONS PRECEDENT

74. All conditions precedent to Plaintiff being entitled to bring this action and recover the relief requested herein have been performed, have occurred, or have been waived.

## X. REQUEST FOR DISCLOSURE

75. Under Texas Rule of Civil Procedure 194, Plaintiff requests that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## XI. PRAYER

76. For these reasons, Plaintiff asks that Defendants be cited to appear and answer and, on final trial, that Plaintiff be awarded a judgment against Defendants, jointly and severally, for the following:

a. Temporary restraining order;

b. Temporary injunction;

c. Permanent injunction;

d. Actual damages;

e. Pre-judgment and post-judgment interest;

f. Court costs; and

g. All other relief to which Plaintiff is entitled.

Dated: April 22, 2020

Respectfully submitted,

WINSTEAD PC

By:/s/ Kasey Ratliff
Kasey Ratliff
kratliff@winstead.com
LaCrecia Perkins
lperkins@winstead.com

2728 N. Harwood Street
Suite 500
Dallas, TX 75201
Telephone: 214.745.5400
Facsimile: 214.745.5390

**ATTORNEYS FOR PLAINTIFF PALISADES TC, LLC**

4817-7810-9114v.1

# Exhibit A

# AMENDED AND RESTATED COMPANY AGREEMENT OF FIVE STAR MM, LLC, A DELAWARE LIMITED LIABILITY COMPANY

**SEPTEMBER 16, 2019**

## TABLE OF CONTENTS

**Page**

ARTICLE I ORGANIZATION ........ 1
1.01 Formation, Qualification and Continuation ........ 1
1.02 Governing Law ........ 1
1.03 Name ........ 1
1.04 Term ........ 1
1.05 Office and Agent ........ 1
1.06 Purpose of Company ........ 2
ARTICLE II MEMBERSHIP INTERTESTS, VOTING AND MANAGEMENT ........ 2
2.01 Members ........ 2
2.02 Classification of Membership Interests ........ 2
2.03 Percentage Ownership and Voting Interests ........ 2
2.04 Management by Voting Members ........ 2
2.05 Voting ........ 3
2.06 Liability of Members ........ 3
2.07 New Members ........ 3
2.08 Special Management Provisions ........ 3
2.09 Sale Right ........ 7
ARTICLE III CAPITAL ACCOUNTS ........ 7
3.01 Initial Capital Contributions ........ 7
3.02 Capital Accounts ........ 7
3.03 Additional Contributions ........ 7
ARTICLE IV MANNER OF ACTING ........ 7
4.01 Officers and Agents of the Company ........ 7
4.02 Meetings of Voting Members ........ 8
4.03 Notice of Meetings ........ 8
4.04 Record Date ........ 8
4.05 Quorum ........ 9
4.06 Voting ........ 9
ARTICLE V ALLOCATIONS AND DISTRIBUTIONS ........ 9
5.01 Allocations of Profits and Losses ........ 9
5.02 Distributions ........ 9
5.03 Form of Distribution ........ 9
ARTICLE VI TRANSFER AND ASSIGNMENT OF INTERESTS ........ 10
6.01 Reserved ........ 10
6.02 Reserved ........ 10
6.03 Restrictions on Transfer ........ 10
6.04 Involuntary Transfer of a Membership Interest ........ 10

ARTICLE VII ACCOUNTING, RECORDS AND REPORTING ..... 10

7.01 Books and Records ..... 10
7.02 Inspection of Books and Records ..... 10
7.03 Accountings ..... 11
7.04 Filings ..... 11
7.05 Bank Accounts ..... 11
7.06 Company Representative ..... 11

ARTICLE VIII DISSOLUTION AND WINDING UP ..... 12

8.01 Dissolution ..... 12
8.02 Winding Up ..... 12
8.03 Distributions in Kind ..... 13
8.04 Order of Payment of Liabilities on Dissolution ..... 13
8.05 Adequacy of Payment ..... 13
8.06 Compliance with Regulations ..... 13
8.07 Limitations on Payments Made in Dissolution ..... 13
8.08 Certificate of Cancellation ..... 13

ARTICLE IX EXCULPATION AND INDEMNIFICATION ..... 14

9.01 Exculpation of Members ..... 14
9.02 Indemnification by Company ..... 14
9.03 Insurance ..... 14

ARTICLE X MISCELLANEOUS ..... 14

10.01 Authority ..... 14
10.02 Indemnification by the Members ..... 15
10.03 Notices ..... 15
10.04 Severability ..... 15
10.05 Binding Effect ..... 15
10.06 Counterparts ..... 15
10.07 Entire Agreement ..... 15
10.08 Further Assurances ..... 15
10.09 Headings; Gender; Number; References ..... 15
10.10 Parties in Interest ..... 15
10.11 Amendments ..... 16
10.12 Attorneys' Fees ..... 16
10.13 Remedies Cumulative ..... 16
10.14 Jurisdiction and Venue/Equitable Remedies ..... 16
10.15 Palisades Approvals ..... 16
10.16 Palisades Payments ..... 17

Exhibit A – Predevelopment Budget

# AMENDED AND RESTATED COMPANY AGREEMENT OF FIVE STAR MM, LLC, A DELAWARE LIMITED LIABILITY COMPANY

This Amended and Restated Company Agreement (the "Agreement") of **FIVE STAR MM, LLC**, a Delaware limited liability company (the "Company") is entered into by Timothy Barton ("Barton") and **PALISADES TC LLC**, a Texas limited liability company ("Palisades") on September 16, 2019 ("Effective Date").

The initial Company Agreement of the Company dated June 4, 2019 is superseded by this Agreement which shall govern the Company and the rights and obligations of the Members from and after the Effective Date. Barton hereby agrees to hold harmless and indemnify Palisades from any and all claims, costs, expenses and obligations, contingent or otherwise, known or unknown which may exist with respect to the Company and are attributable to the period prior to the Effective Date.

In consideration of the mutual covenants and conditions herein, the Members agree as follows:

## ARTICLE I
## ORGANIZATION

**1.01 Formation, Qualification and Continuation.** The Company was formed as a limited liability company under the Delaware Limited Liability Company Act (currently Chapter 18 of Title 6 of the Delaware Code) (the "Act") by filing a Certificate of Formation with the Delaware Secretary of State on June 4, 2019 (the "Certificate"). The Company is continued under the Act and this Agreement.

**1.02 Governing Law.** This Agreement shall be governed by and construed and interpreted in accordance with the Act as amended from time to time, without regard to Delaware's conflicts of laws principles. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that any provision of this Agreement is inconsistent with any provision of the Act, this Agreement shall govern to the extent permitted by the Act.

**1.03 Name.** The name of the Company shall be "FIVE STAR MM, LLC" The business of the Company may be conducted under that name or, on compliance with applicable laws, any other name that the Voting Members deem appropriate or advisable. The Voting Members on behalf of the Company shall file any certificates, articles, fictitious business name statements and the like, and any amendments and supplements thereto, as the Voting Members consider appropriate or advisable.

**1.04 Term.** The term of the Company commenced on the filing of the Certificate and shall be perpetual unless dissolved as provided in this Agreement.

**1.05 Office and Agent.** The principal office of the Company shall be at 1755 Wittington, Suite 340, Dallas, Texas 75234 or such other place or places of business within or without the State of Delaware as the Voting Members may determine. The Company shall continuously maintain a

registered agent and office in the State of Delaware as required by the Act. The registered agent shall be as stated in the Certificate or as otherwise determined by the Voting Members.

**1.06 Purpose of Company.** The purpose of the Company is to engage in all lawful activities permitted for limited liability companies under the Act; provided, however, until such time as Palisades has been Redeemed in Full (as defined in Section 5.02 hereof) the sole purpose of the Company shall be to manage all entities having a direct or indirect beneficial ownership interest in MO 2999TC, LLC, a Delaware limited liability company established for the sole purposes of acquiring and developing certain real property and the improvements thereon located at 2999 Turtle Creek Boulevard, Dallas, Texas (the "Project").

## ARTICLE II
## MEMBERSHIP INTERTESTS, VOTING AND MANAGEMENT

**2.01 Members.** A "Member" (so called) shall mean an individual, organization or entity that has been admitted as, and continues as, a member of the Company. The Members of the Company as of the Effective Date are Barton and Palisades.

**2.02 Classification of Membership Interests.** The Members' percentage interests in the income, gains, losses, deductions, voting rights and distributions, as may be affected by the terms of this Agreement are referred to in this Agreement as "Interests."

**2.03 Percentage Ownership and Voting Interests.** A Member's Ownership Interest ("Ownership Interest") is the total of his interests in capital, together with all of the rights, as a Member or Manager of the Company, that arise from such interests. The "Percentage Ownership Interest" of a Member represents the economic interest of the Member in the Company. The "Percentage Voting Interest" of a Member represents the voting rights of a Member in the Company. The initial Percentage Ownership Interests of the Members are as follows:

| | |
|---|---|
| Barton | 100% |
| Palisades | 0% |

The initial Percentage Voting Interests of the Members are as follows:

| | |
|---|---|
| Barton | 50% |
| Palisades | 50% |

Barton acknowledges and agrees on his own behalf and on behalf of the Company that the Percentage Voting Interest for Palisades reflects the value Palisades has provided to Five Star GM, LLC, a Delaware limited liability company ("Five Star GM") of which the Company is a manager and member pursuant to the Company Agreement of Five Star GM dated September 16, 2019 (the "Five Star GM LLC Agreement") and that Palisades would not have provided such value to Five Star GM or entered into this Agreement or the Five Star GM LLC Agreement without such Percentage Voting Interest and the other rights set forth in this Agreement.

**2.04 Management by Voting Members.** Each Member is a "Voting Member." The Voting Members shall manage the Company and shall have the right to vote, in their capacity as Managers, upon all matters upon which Managers have the right to vote under the Act or under this

Agreement, in proportion to their respective Percentage Voting Interests in the Company. Voting Members need not identify whether they are acting in their capacity as Members or Managers when they act.

**2.05 Voting.** Except as otherwise provided or permitted by this Agreement, Voting Members shall in all cases, in their capacity as Members or Managers of the Company, act collectively, and, unless otherwise specified or permitted by this Agreement, unanimously. Except as otherwise provided or permitted by this Agreement, no Voting Member acting individually, in his capacity as a Member or Manager of the Company, shall have any power or authority to sign for, bind or act on behalf of the Company in any way, to pledge the Company's credit, or to render the Company liable for any purpose. Unless the context requires otherwise, in this Agreement, the terms "Member" or "Members," without the qualifier "Voting" refers to the Voting Members collectively; and the terms "Manager" or "Managers" refers to the Voting Members.

**2.06 Liability of Members.** All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

**2.07 New Members.** New Members may be admitted to the Company, only if such new Member (i) is approved unanimously by the Voting Members; (ii) delivers to the Company his required capital contribution (which may be zero); (iii) agrees in writing to be bound by the terms of this Agreement by becoming a party hereto; and (iv) delivers such additional documentation as the Voting Members shall reasonably require to so admit such new Member to the Company. Upon the admission of a new Member or Members, as the case may be, to the Company, the capital accounts of Members, and the calculations that are based on the capital accounts, shall be adjusted appropriately. Notwithstanding any contrary provision in this Agreement, no person may be admitted to the Company as a new Member without the prior written approval of Palisades.

**2.08 Special Management Provisions**. Notwithstanding any contrary provision of this Agreement, until such time as the earlier of (i) Palisades has been Redeemed in Full, or (ii) a Redemption Default (as such term is defined in the Five Star GM LLC Agreement including the cure rights provided therein) has occurred, Barton shall be the Manager responsible for the day to day management of the Company and act on behalf of the Company in its capacity as Manager of each of Five Star GM pursuant to the Five Star GM LLC Agreement, Five Star TC, LLC, a Delaware limited liability company ("Five Star TC") pursuant to the Company Agreement of Five Star TC dated September 16, 2019 (the "Five Star TC LLC Agreement") (the Five Star GM LLC Agreement and Five Star TC LLC Agreement collectively sometimes referenced herein with the Limited Liability Company Agreement dated September 16, 2019 of MO 2999TC MZ, LLC, a Delaware limited liability company ("MezzCo") and the Limited Liability Company Agreement dated September 16, 2019 of MO 2999TC, LLC, a Delaware limited liability company ("Project Owner") as the "Operating Agreements"). Notwithstanding the designation of Barton as the Manager of the Company with responsibility for day-to-day management of the Company and the Company's management of Five Star GM, Five Star TC, MezzCo and Project Owner (each of the preceding, individually and collectively, an "Operating Company") pursuant to the Operating Agreements, Barton shall not undertake any of the following actions with respect to the Company under this

Agreement or on behalf of the Company with respect to any Operating Company pursuant to the Operating Agreements without the prior written approval of Palisades until such time as Palisades has been Redeemed in Full:

(a) leasing, selling, disposing, exchanging, mortgaging, pledging, or transferring the Project or any material portion thereof or other asset that costs in excess of $100,000 except as provided in the Project Budget (defined as the predevelopment budget for Five Star TC attached hereto as Exhibit A);

(b) failing to maintain, demolishing, removing or rendering unusable for its intended purpose any existing improvements currently a part of the Project or entering into contracts for such purposes or construction of the anticipated improvements on the Project;

(c) applying for or modifying any existing zoning for the Project;

(d) entering into any brokerage or exclusive listing agreement for the sale or leasing of any portion of the Project;

(e) entering into, amending, modifying, terminating or canceling any property management agreement with any person for management and leasing of the Project;

(f) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton [Affiliate having the same definition for purposes hereof as such term is defined in the Five Star GM LLC Agreement]), provided, however, that Palisades (acting alone and without any approval or joinder of any other person) will have the right to enforce any of the Company's and Operating Company's rights and remedies under any Related-Party Agreements by and between Barton or any of his Affiliates on the one hand and the Company or any Operating Company on the other hand;

(g) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company or any Operating Company of more than $100,000 in any year except as provided in the Project Budget;

(h) entering into, amending, modifying, terminating or canceling any contract that grants any form of encumbrance (defined as any lien, easement, lease, hypothecation, or other restriction on transfer or use) over an asset of the Company or any Operating Company;

(i) agreeing to or indemnifying any person pursuant to this Agreement or any Operating Agreement or agreeing to or indemnifying any person other than as provided in this Agreement or any Operating Agreement;

(j) entering into, amending, modifying, terminating or canceling any term sheet or letter of intent for the acquisition, financing, or capitalization of the Company, any

Operating Company, the Project or any direct or indirect voting or economic interest in any of same;

(k) guarantying the payment of any money or debt of the Company, any Operating Company or any other person, or guarantying the performance of the Company, any Operating Company or any other person, except pursuant to the Loan Documents;

(l) approving the Project Budget or any amendment thereto;

(m) incurring any expenses (including, without limitation, for the acquisition of capital assets) outside of the approved Project Budget;

(n) making any request for additional Capital Contributions under this Agreement or any Operating Agreement;

(o) creating reserves, determining the amount of cash available for distribution and making distributions pursuant to this Agreement or any Operating Agreement;

(p) approving of the transfer or encumbrance of any direct or indirect interest in the Company or any Operating Company and approving of any admission of any person as an additional member of the Company or any Operating Company;

(q) hiring and compensation of, and any employment agreement with respect to, any employee of the Company or any Operating Company or entering into any collective bargaining or other agreement with any labor union, labor organization or similar body;

(r) filing or defending any litigation, arbitration or similar legal disputes with respect to any claim or potential claim involving the Company or any Operating Company equal to or greater than $100,000, or settling any claim or potential claim for an amount (including all costs of settlement) for $100,000 or more;

(s) amending or modifying this Agreement or any Operating Agreement or the certificate of formation for the Company or any Operating Company;

(t) making any election to cause the Company or any Operating Company to incorporate or offer or issue securities;

(u) the selection and/or retention of any new or additional audit or tax accountants for or on behalf of the Company or any Operating Company;

(v) the transfer of, or granting of a license to use, any intellectual property owned directly or indirectly by the Company or any Operating Company;

(w) removing the partnership representative (as such term is defined in Section 6223(a) of the Code) of the Company or any Operating Company;

(x) offering or issuing additional ownership interests by the Company or any Operating Company or permitting the Company or any Operating Company to make any loan or advance to any person;

(y) engaging in any line of business in contravention of the purposes of the Company or any Operating Company as provided in this Agreement and the Operating Agreements, respectively;

(z) effecting a dissolution or liquidation of the Company or any Operating Company or the merger, conversion, consolidation or other reorganization of the Company or any Operating Company;

(aa) causing or permitting the Company or any Operating Company to engage in any reorganization or commencing any proceedings or the filing of any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal or state bankruptcy, insolvency or similar law, on behalf of the Company or any Operating Company or admitting, confessing or acquiescing to any involuntary bankruptcy filing or similar action against the Company or any Operating Company;

(bb) making any distribution to any person other than Palisades under this Agreement or the Five Star GM LLC Agreement or to any other person other than Five Star GM under the Five Star TC LLC Agreement or permitting Property Owner to make any distribution to any person other than MezzCo or permitting MezzCo to make any distribution to any person other than Five Star TC;

(cc) taking any other action that requires the consent of all the Members under this Agreement or any Operating Agreement;

(dd) modifying or amending any of the Loan Documents or paying in full all amounts due under the Loan Documents prior to Palisades being Redeemed in Full;

(ee) incurring on behalf of the Company or any Operating Company any loan or other indebtedness including loans or advances from Members of the Company or any Operating Company (other than under the Loan Documents or indebtedness that constitutes customary third-party trade payables incurred by the Company or any Operating Company in the ordinary course of business) or guaranty or other contingent liability, approving of the form of the loan documents evidencing such indebtedness, or making any material election under such loan documents; or

(ff) entering into, modifying, amending or terminating any agreement with Mandarin Hotels (the so called HMA).

For purposes of this Agreement, "Loan Documents" means all documents evidencing the indebtedness of Project Owner, as "Maker," to 2999 Turtle Creek LLC, as "Payee," pursuant to and in connection with that certain Secured Promissory Note in the original principal amount of $32,500,000 dated September 16, 2019.

**2.09 Sale Right**. In addition to such other rights Palisades may have under this Agreement and notwithstanding any contrary provision of this Agreement, upon the occurrence of a Redemption Default which is not timely cured, Palisades shall have the right, but not the obligation, to act on behalf of the Company and cause the Company to act on behalf of each Operating Company, in each instance in its sole and absolute discretion without the consent or approval of Barton or any other Member of the Company or any Operating Company, to market and cause the sale of the Project to an independent third party on such terms and conditions as Palisades may determine appropriate in its sole and absolute discretion. In determining an appropriate sale price for the Project, Palisades shall not be obligated to take into consideration any so called fair value or other market value for the Project; rather Palisades may look solely to such sale price for the Project that is most likely to result in proceeds sufficient to cause Palisades to be Redeemed in Full. Barton shall cooperate and shall cause the Company and each Operating Company to cooperate with Palisades to accomplish such sale.

## ARTICLE III
## CAPITAL ACCOUNTS

**3.01 Initial Capital Contributions.** The capital contributions to the Company by any Member shall be reflected on the books and records of the Company. No interest shall be paid by the Company by reason of any capital contribution made by a Member, whether consisting of property, services or cash. Palisades has been admitted as a Member of the Company without being required to make any capital contribution to the Company.

**3.02 Capital Accounts.** At such time as the Company is taxed as a partnership for federal income tax purposes, the Company shall establish and maintain a capital account ("Capital Account") for each Member in accordance with Section 704(b) of the Internal Revenue Code of 1986, as amended (the "Code"), and Treasury Regulations Section 1.704-l(b)(2)(iv).

**3.03 Additional Contributions.** No Member shall be required to make any additional capital contributions to the Company. The Company may, however, accept capital contributions from the Members upon unanimous approval of the Voting Members. The capital accounts of the Members, and the calculations that are based on the capital accounts, shall be adjusted appropriately to reflect any transfer of an interest in the Company, distributions, or additional capital contributions.

## ARTICLE IV
## MANNER OF ACTING

**4.01 Officers and Agents of the Company.** The Voting Members may authorize any Member or Members of the Company, or other individuals or entities, whether or not a Member, to take action on behalf of the Company, as the Voting Members deem appropriate. Any Member may lend money to and receive loans from the Company, act as an employee, independent contractor, lessee, lessor, or surety of the company, and transact any business with the Company that could be carried out by someone who is not a Member as unanimously approved by the Voting Members. The Company may receive from or pay to any Member remuneration, in the form of wages, salary, fees, rent, interest, or any form that the Voting Members unanimously approve.

The Voting Members may appoint officers of the Company who, to the extent provided by the Voting Members, may have and may exercise all the powers and authority of the Members or Managers in the conduct of the business and affairs of the Company. The officers of the Company may consist of a President, a Treasurer, a Secretary, or other officers or agents as may be elected or appointed by the Voting Members. The Voting Members may provide rules for the appointment, removal, supervision and compensation of such officers, the scope of their authority, and any other matters relevant to the positions. The officers shall act in the name of the Company and shall supervise its operation, within the scope of their authority, under the direction and management of the Voting Members.

The initial officers are Timothy Barton as President and Saskya Zuniga as Treasurer. In addition to the authorities and duties that are normally associated with the office of the President, the Voting Members non-exclusively delegates to the President all of the powers of the Managers subject to the restrictions defined herein. Both the President and the Treasurer are authorized to open, manage, and close any and all Company accounts with any bank or financial institution and to be a signatory on such accounts (although only one signatory shall be required). From and after the occurrence of a Redemption Default (as defined in Section 2.08 hereof ), which is not timely cured, Palisades shall have the unilateral right, but not obligation, to remove all officers of the Company and appoint new officers in its sole and absolute discretion.

Any action taken by a duly authorized officer, pursuant to authority granted by the Voting Members in accordance with this Agreement, shall constitute the act of and serve to bind the Company, and each Member hereby agrees neither to dispute such action nor the obligation of the Company created thereby.

**4.02 Meetings of Voting Members.** No regular, annual, special or other meetings of Voting Members are required to be held. Any action that may be taken at a meeting of Voting Members may be taken without a meeting by written consent in accordance with the Act. Meetings of the Voting Members, for any purpose or purposes, may be called at any time by any Voting Member, or by the President of the Company, if any. The Voting Members may designate any place as the place of meeting for any meeting of the Voting Members. If no designation is made, the place of meeting shall be the principal place of business of the Company.

**4.03 Notice of Meetings.** In the event that a meeting of the Voting Members is called, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than five nor more than sixty business days before the date of the meeting unless otherwise provided, either personally or by mail, by or at the direction of the Members calling the meeting, to each Voting Member. Notice of a meeting need not be given to any Voting Member who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such Voting Member.

**4.04 Record Date.** For the purpose of determining Voting Members entitled to notice of or to vote at any meeting of Voting Members or any adjournment thereof, the date on which notice of the meeting is provided shall be the record date for such determination of the Voting Members.

When a determination of Voting Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

**4.05 Quorum.** Members holding all of the Percentage Voting Interests in the Company represented in person, by telephonic participation, or by proxy, shall constitute a quorum at any meeting of Voting Members. In the absence of a quorum at any such meeting, any Voting Member so represented may adjourn the meeting from time to time for a period not to exceed sixty days without further notice. However, if the adjournment is for more than sixty days, or if after the adjournment a new record date is fixed for another meeting, a notice of the adjourned meeting shall be given to each Voting Member. The Voting Members present at a duly organized meeting may continue to transact business only as previously provided on the agenda until adjournment, notwithstanding the withdrawal during such meeting of that number of Voting Members whose absence would cause less than a quorum.

**4.06 Voting.** If a quorum is present, a unanimous vote of the Percentage Voting Interests of the Voting Members so represented shall be the act of the Members or Managers, unless the vote of a lesser proportion or number is otherwise required by the Act, by the Certificate or by this Agreement.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

**5.01 Allocations of Profits and Losses.** Profits and Losses, after deducting Guaranteed Payments, shall be allocated among the Members in proportion to their Percentage Ownership Interests. Any special allocations necessary to comply with the requirements set forth in Code Section 704 and the corresponding regulations thereunder, including, without limitation, the qualified income offset and minimum gain chargeback provisions contained therein, shall be made if the Voting Members deem these actions to be appropriate.

**5.02 Distributions.** Subject to applicable law and any limitations elsewhere in this Agreement, the Voting Members shall determine the amount and timing of all distributions of cash, or other assets, by the Company. Except as otherwise provided in this Agreement, all distributions shall be made to all of the Members, in proportion to their Percentage Ownership Interests. Except as otherwise provided in this Agreement, the decision as to whether to make distributions shall be within the sole discretion of the Voting Members. Notwithstanding any contrary provision of this Agreement, no distributions shall be made by the Company to any Member (nor any loan or advance to any Member, Manager or officer) unless and until Palisades has been Redeemed in Full. For purposes of this Agreement, "Redeemed in Full" has the same meaning assigned to such term in the Five Star GM LLC Agreement.

All such distributions shall be made only to the Members who, according to the books and records of the Company, are the holders of record on the actual date of distribution. The Voting Members may base a determination that a distribution of cash may be made on a balance sheet, profit and loss statement, cash flow statement of the Company or other relevant information.

**5.03 Form of Distribution.** No Member has the right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to

accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members except on the dissolution and winding up of the Company.

## ARTICLE VI
## TRANSFER AND ASSIGNMENT OF INTERESTS

**6.01 Reserved.**

**6.02 Reserved.**

**6.03 Restrictions on Transfer.** No Member may transfer its Ownership Interest or any part thereof without the unanimous approval of the Voting Members; provided, however, in the event of a Redemption Default, Palisades may freely transfer all direct or indirect interests which it may have in the Company without the approval of any other Member, and upon any such transfer by Palisades of all or any portion of its Ownership Interest following a Redemption Default, such transferee shall be automatically admitted to the Company as a new Member with all of the rights to which Palisades is entitled under this Agreement.

**6.04 Involuntary Transfer of a Membership Interest.** A creditor's charging order or lien on a Member's Membership Interest, bankruptcy of a Member, or other involuntary transfer of Member's Membership Interest (including by death, divorce or disability), shall constitute a material breach of this Agreement by such Member. The creditor, transferee or other claimant, shall only have the rights of an Assignee, and shall have no right to become a Member, or to participate in the management of the business and affairs of the Company as a Member or Manager under any circumstances, and shall be entitled only to receive the share of profits and losses, and the return of capital, to which the Member would otherwise have been entitled. The Voting Members, including a Voting Member whose interest is the subject of the charging order, lien, bankruptcy, or involuntary transfer, may unanimously elect, by written notice that is provided to the creditor, transferee or other claimant, at any time, to purchase all or any part of Membership Interest that was the subject of the creditor's charging order, lien, bankruptcy, or other involuntary transfer, at a price that is equal to one-half (1/2) of the book value of such interest, adjusted for profits and losses to the date of purchase. The Members agree that such valuation is a good-faith attempt at fixing the value of the interest, after taking into account that the interest does not include all of the rights of a Member or Manager, and after deducting damages that are due to the material breach of this Agreement.

## ARTICLE VII
## ACCOUNTING, RECORDS AND REPORTING

**7.01 Books and Records.** The Company shall keep books and records in accordance with accepted accounting principles. The books and records shall be open for inspection and copying by any Member without cost to such Member. The fiscal year of the Company shall be the calendar year (the "Fiscal Year").

**7.02 Inspection of Books and Records.** Each Member has the right, on reasonable request for purposes reasonably related to the interest of the person as a Member or a Manager, to: (a) inspect and copy during normal business hours any of the Company's records described in

Section 7.1; and (b) obtain from the Company promptly after their becoming available a copy of the Company's federal, state and local income tax or information returns for each Fiscal Year.

**7.03 Accountings.** As soon as is reasonably practicable after the close of each Fiscal Year, the Voting Members shall make or cause to be made a full and accurate accounting of the affairs of the Company as of the close of that Fiscal Year and shall prepare or cause to be prepared a balance sheet as of the end of such Fiscal Year, a profit and loss statement for that Fiscal Year and a statement of Members' equity showing the respective Capital Accounts of the Members as of the close of such Fiscal Year and the distributions, if any, to Members during such Fiscal Year, and any other statements and information necessary for a complete and fair presentation of the financial condition of the Company, all of which the Manager shall furnish to each Member. In addition, the Company shall furnish to each Member, information regarding the Company necessary for such Member to complete such Member's federal and state income tax returns. The Company shall also furnish a copy of the Company's tax returns to any Member requesting the same. On such accounting being made, profits and losses during such Fiscal Year shall be ascertained and credited or debited, as the case may be, in the books of account of the Company to the respective Members as herein provided. Until such time as Palisades has been Redeemed in Full, it shall have the right to approve all tax returns filed by the Company including all elections included therein. Until such time as Palisades has been Redeemed in Full, the Company shall provide monthly financial reports to the Members, within ten (10) days following the end of each calendar month with respect to such preceding calendar month, which financial reports shall include all expenses and income of the Company for the calendar month and balance sheet as of the last day of the calendar month detailing all assets and liabilities of the Company and the Capital Accounts of each Member.

**7.04 Filings.** The Voting Members, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Voting Members, at Company expense, shall also cause to be prepared and timely filed with appropriate federal and state regulatory and administrative bodies amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Company is required by the Act to execute or file any document and fails, after demand, to do so within a reasonable period of time or refuses to do so, any Member may prepare, execute and file that document with the Delaware Secretary of State.

**7.05 Bank Accounts.** The Company shall maintain its funds in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be co-mingled in any fashion with the funds of any other person.

**7.06 Company Representative**. Barton shall be the partnership representative of the Company pursuant to Section 6223(a) of the Code (the "Company Representative"). Notwithstanding that Barton is the Company Representative with respect to such tax years, all nonministerial decisions regarding tax elections, audit, tax litigation, settlement and other tax matters shall be subject to unanimous approval of the Voting Members. For example, but not by way of limitation, the Company Representative shall not take any position or action with the Internal Revenue Service (the "Service") without prior unanimous approval of the Voting Members, including but not limited to any decision (i) to enter into a settlement agreement with respect to any

Company tax matter; (ii) to file a petition as contemplated in Section 6234(a) of the Code; (iii) to file any request contemplated in Section 6227 of the Code; or (iv) to enter into an agreement extending the period of limitations as contemplated in Section 6235(b) of the Code. If an audit results in an imputed underpayment as determined under Section 6225 of the Code, the Company and/or Barton shall accept sole responsibility for payment of any such underpayment and indemnify and hold harmless Palisades from any such underpayment. The Company Representative shall furnish to each Member a copy of all notices or other written communications received by the Company Representative from the Service within five (5) days of receipt thereof. The Company Representative shall notify each Member of all communications it has had with the Service and shall keep all Members informed of all matters which may come to its attention in its capacity as Company Representative by giving them written notice thereof within five (5) days after the Company Representative becomes informed of any such matter or within such shorter period as may be required by the appropriate statutory or regulatory provisions. Nothing contained herein is intended to authorize the Company Representative to take any action which is left to the determination of an individual Member under Sections 6221 through 6241 of the Code (and/or comparable provisions of state and local law). All non-ministerial decisions regarding tax elections, audit, tax litigation, settlement and other tax matters shall be subject to the written consent of each Member of the Company during the tax year at issue that subsequently Transferred its interest in the Company (each, a "Former Member"). For example, but not by way of limitation, the Company Representative shall not take any position or action with the Service without prior written consent of each Former Member, including but not limited to any decision (i) to enter into a settlement agreement with respect to any Company tax matter; (ii) to file a petition as contemplated in Section 6234(a) of the Code; (iii) to file any request contemplated in Section 6227 of the Code; (iv) to enter into an agreement extending the period of limitations as contemplated in Section 6235(b) of the Code; or (v) to make the "push out" election under Section 6226(a) of the Code. A Former Member shall not be required to pay any expenses incurred by the Company in connection with any tax matters. The Company hereby agrees to indemnify, defend and hold each Former Member harmless of and from any and all liabilities, claims, demands, and expenses of any kind or nature which arise or in any way relate to any violation or breach of this Section 5.4. This Section 5.4 will survive a Member's ceasing to be a member of the Company, as well as the termination, dissolution, liquidation and winding up of the Company.

## ARTICLE VIII
## DISSOLUTION AND WINDING UP

**8.01 Dissolution.** The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of: the entry of a decree of judicial dissolution pursuant to the Act; or the unanimous approval of the Voting Members.

**8.02 Winding Up.** On the occurrence of an event specified in Section 8.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors. The Voting Members shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the assets and liabilities of Company, shall cause such assets to be sold or distributed, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 9.4. The Voting Members shall give written notice of the commencement of winding up by mail to all

known creditors and claimants whose addresses appear on the records of the Company. The Members shall be entitled to reasonable compensation for such services.

**8.03 Distributions in Kind.** Any noncash assets distributed to the Members shall first be valued at their fair market value to determine the profit or loss that would have resulted if such assets were sold for such value. Such profit or loss shall then be allocated pursuant to this Agreement, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged against the Capital Account of each Member receiving an interest in a distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by unanimous consent of the Voting Members, or if any Voting Member objects, by an independent appraiser (and any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by unanimous consent of the Voting Members.

**8.04 Order of Payment of Liabilities on Dissolution.** After a determination that all known debts and liabilities of the Company in the process of winding up, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members as provided in Section 5.02 hereof.

**8.05 Adequacy of Payment.** The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, shall have been adequately provided for if payment thereof shall have been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the person, was determined in good faith and with reasonable care by the Members to be adequate at the time of any distribution of the assets pursuant to this Section. This Section shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

**8.06 Compliance with Regulations.** All payments to the Members on the winding up and dissolution of Company shall be strictly in accordance with the positive capital account balance limitation and other requirements of Regulations Section 1.704-1(b)(2)(ii)(d), as the voting Members deem appropriate.

**8.07 Limitations on Payments Made in Dissolution.** Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of such Member's positive Capital Account balance and shall have no recourse for such Member's Capital Contribution or share of profits (on dissolution or otherwise) against any other Member. No Member shall have any obligation or liability to restore or contribute capital to the Company on account of a deficit capital account which may exist at any time for such Member.

**8.08 Certificate of Cancellation.** The Voting Members conducting the winding up of the affairs of the Company shall cause to be filed in the office of, and on a form prescribed by the Delaware Secretary of State, a certificate of cancellation of the Certificate on the completion of the winding up of the affairs of the Company.

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**9.01 Exculpation of Members.** No Member shall be liable to the Company or to the other Members for damages or otherwise with respect to any actions taken or not taken in good faith and reasonably believed by such Member to be in or not opposed to the best interests of the Company, except to the extent any related loss results from fraud, gross negligence or willful or wanton misconduct on the part of such Member or the material breach of any obligation under this Agreement or of the fiduciary duties owed to the Company or the other Members by such Member. Notwithstanding any contrary provision of this Agreement, each of the Company and Barton waive to the maximum extent possible under the Act all fiduciary duties which Palisades might otherwise owe to the Company or any other Member or Manager under the Act.

**9.02 Indemnification by Company.** The Company shall indemnify, hold harmless and defend the Members, in their capacity as Members, Managers, or Officers, from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts or omissions arising out of their activities on behalf of the Company or in furtherance of the interests of the Company, including but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, if the acts or omissions were not performed or omitted fraudulently or as a result of gross negligence or willful misconduct by the indemnified party. Reasonable expenses incurred by the indemnified party in connection with any such proceeding relating to the foregoing matters may be paid or reimbursed by the Company in advance of the final disposition of such proceeding upon receipt by the Company of (i) written affirmation by the person requesting indemnification of its good-faith belief that it has met the standard of conduct necessary for indemnification by the Company and (ii) a written undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a court of competent jurisdiction that such person has not met such standard of conduct, which undertaking shall be an unlimited general obligation of the indemnified party but need not be secured.

**9.03 Insurance.** The Company shall have the power to purchase and maintain insurance on behalf of any person who is or was a Member or an agent of the Company against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as a Member or an agent of the Company, whether or not the Company would have the power to indemnify such person against such liability under Section 10.1 or under applicable law.

## ARTICLE X
## MISCELLANEOUS

**10.01 Authority.** This Agreement constitutes a legal, valid and binding agreement of each Member, enforceable against such Member in accordance with its terms. Each Member is empowered and duly authorized to enter into this Agreement (including the power of attorney herein) under every applicable governing document, partnership agreement, trust instrument, pension plan, charter, certificate of incorporation, bylaw provision or the like. The person, if any, signing this Agreement on behalf of the Member is empowered and duly authorized to do so by the governing document or trust instrument, pension plan, charter, certificate of incorporation, bylaw provision, board of directors or stockholder resolution or the like.

**10.02 Indemnification by the Members.** Each Member hereby agrees to indemnify and defend the Company, the other Members and each of their respective employees, agents, partners, members, shareholders, officers and directors and hold them harmless from and against any and all claims, liabilities, damages, costs and expenses (including, without limitation, court costs and attorneys' fees and expenses) suffered or incurred on account of or arising out of any breach of this Agreement by that Member.

**10.03 Notices.** Except as otherwise expressly provided herein, any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally, when transmitted by facsimile if receipt is acknowledged by the addressee, one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, or three business days after being mailed by first class mail, charges and postage prepaid, properly addressed to the party to receive such notice at the address set forth beneath such Member's name on the signature pages of this Agreement. A Member may change the Member's address for purposes of this Agreement by providing notice to the Company and each Member of such change of address.

**10.04 Severability.** If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby.

**10.05 Binding Effect.** Subject to Article VI, this Agreement shall bind and inure to the benefit of the parties and their respective Successors.

**10.06 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**10.07 Entire Agreement.** This Agreement contains the entire agreement of the parties and supersedes all prior or contemporaneous written or oral negotiations, correspondence, understandings and agreements between or among the parties, regarding the subject matter hereof.

**10.08 Further Assurances.** Each Member shall provide such further information with respect to the Member as the Company may reasonably request, and shall execute such other and further certificates, instruments and other documents, as may be necessary and proper to implement, complete and perfect the transactions contemplated by this Agreement.

**10.09 Headings; Gender; Number; References.** The headings of the Sections hereof are solely for convenience of reference and are not part of this Agreement. As used herein, each gender includes each other gender, the singular includes the plural and vice versa, as the context may require. All references to Sections and subsections are intended to refer to Sections and subsections of this Agreement, except as otherwise indicated.

**10.10 Parties in Interest.** Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any persons

other than the Members and their respective Successors nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**10.11 Amendments.** All amendments to this Agreement shall be in writing and signed by all of the Members to the agreement at the time of the amendment.

**10.12 Attorneys' Fees.** In any dispute between or among the Company and one or more of the Members, the prevailing party or parties in such dispute shall be entitled to recover from the non-prevailing party or parties all reasonable fees, costs and expenses including, without limitation, attorneys' fees, costs and expenses, all of which shall be deemed to have accrued on the commencement of such action, proceeding or arbitration. Attorneys' fees shall include, without limitation, fees incurred in any post-award or post-judgment motions or proceedings, contempt proceedings, garnishment, levy, and debtor and third party examinations, discovery, and bankruptcy litigation, and prevailing party shall mean the party that is determined in the arbitration, action or proceeding to have prevailed or who prevails by dismissal, default or otherwise.

**10.13 Remedies Cumulative.** *R*emedies under this Agreement are cumulative and shall not exclude any other remedies to which any Member may be lawfully entitled.

**10.14 Jurisdiction and Venue/Equitable Remedies.** The Company and each Member hereby expressly agrees that if, under any circumstances, any dispute or controversy arising out of or relating to or in any way connected with this Agreement shall be the subject of any court action at law or in equity, such action shall be filed exclusively in the courts of the State of Texas or of the United States of America located in Dallas County, as selected by the Member that is the plaintiff in the action, or that initiates the proceeding. Each Member agrees not to commence any action, suit or other proceeding arising from, relating to, or in connection with this Agreement except in such a court and each Member irrevocably and unconditionally consents and submits to the personal and exclusive jurisdiction of such courts for the purposes of litigating any such action, and hereby grants jurisdiction to such courts and to any appellate courts having jurisdiction over appeals from such courts or review of such proceedings. Because the breach of the provisions of this Section would cause irreparable harm and significant injury to the Company and the other Members, which would be difficult to ascertain and which may not be compensable by damages alone, each Member agrees that the Company and the other Members will have the right to enforce the provisions of this Section by injunction, specific performance or other equitable relief in addition to any and all other remedies available to such party or parties without showing or proving any actual damage to such parties. Members will be entitled to recover all reasonable costs and expenses, including but not limited to all reasonable attorneys' fees, expert and consultants' fees, incurred in connection with the enforcement of this Section.

**10.15 Palisades Approvals**. If Palisades fails to respond to any notice requesting its approval or consent under this Agreement within five (5) Business Days of receipt of such notice requesting its approval or consent, Palisades shall be deemed to have approved the matter for which approval or consent was requested. Notwithstanding the preceding, if within five (5) Business Days of receipt of any approval or consent request notice, Palisades denies such approval or consent or requests further information in order to make its decision, Palisades' approval or consent shall not

be deemed granted. Palisades agrees to undertake any response to any approval or consent request in good faith and shall act in its reasonable discretion unless its sole discretion is expressly provided for any such approval or consent request.

**10.16 Palisades Payments**. All distributions or payments of any kind due to Palisades under this Agreement shall be wired in same day available funds to such account as Palisades may provide notice.

[Signatures on following page.]

IN WITNESS WHEREOF, this Agreement has been duly executed by or on behalf of the parties hereto as of the date first above written.

______________________________
Timothy Barton

1755 Wittington, Suite 340
Dallas, Texas 75234

PALISADES TC LLC,
a Texas limited liability company

By: ______________________________
Joaquin Charles de Monet, Manager

1919 McKinney Ave., Suite 100
Dallas, Texas 75201

IN WITNESS WHEREOF, this Agreement has been duly executed by or on behalf of the parties hereto as of the date first above written.

______________________________
Timothy Barton

1755 Wittington, Suite 340
Dallas, Texas 75234

PALISADES TC LLC,
a Texas limited liability company

By: ______________________________
Joaquin Charles de Monet, Manager

1919 McKinney Ave., Suite 100
Dallas, Texas 75201

Exhibit A

Predevelopment Budget

**2999 Turtle Creek 5-Star Hotel & Residences**
**12-Month Pre-development Sources & Uses**

| Project Month | | 1-Closing | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Calendar Month** | | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | |
| **Phase** | | Schematic | | Design Development | | | Construction Documents | | | | | | | |
| | | | | | | | Sales Model | | | | Permitting | | | |
| **Uses of Funds** | | | | | | | | | | | | | | |
| **Land Purchase** | | | | | | | | | | | | | | |
| Land Purchase | | 42,500,000 | | | | | | | | | | | | 42,500,000 |
| Additional FAR Square Feet | | 1,050,767 | | | | | | | | | | | | 1,050,767 |
| Extension Fees | | | 800,000 | | | | | | | | | | | 800,000 |
| Closing Costs (in Financing) | | | | | | | | | | | | | | - |
| Total Acquisition Cost | | 43,550,767 | 800,000 | - | - | - | - | - | - | - | - | - | - | 44,350,767 |
| **Hard Costs** | | | | | | | | | | | | | | |
| Demolition Costs | | | | | | | | | | | | | | - |
| Early Grading | | | | | | | | | | | | | | - |
| Total Hard Costs | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Soft Costs** | | | | | | | | | | | | | | |
| **Architectural & Engineering** | | | | | | | | | | | | | | |
| Concept Design | | | 255,150 | | | | | | | | | | | 255,150 |
| Schematic Design | | | | 258,125 | | | | | | | | | | 258,125 |
| Design Development | | | | | 150,34' | 150,347 | 150,347 | | | | | | | 451,041 |
| Construction Documents | | | | | | | | 150,347 | 150,347 | 150,347 | 150,347 | 150,347 | 150,347 | 902,081 |
| Sales Model | | | | | | | | 38,238 | 38,238 | | | | | 76,475 |
| Construction Administration | | | | | | | | | | | | | | - |
| Additional Services/Reimbursables | | | | | | | | 16,001 | 16,001 | 16,001 | 16,001 | 16,001 | 16,001 | 96,008 |
| Total A & E | | - | 255,150 | 258,125 | 150,34' | 150,347 | 150,347 | 204,586 | 204,586 | 166,348 | 166,348 | 166,348 | 166,348 | 2,038,880 |
| **PreDevelopment Costs** | | | | | | | | | | | | | | |
| Other-JMJ Cost Pre-Closing | | | 700,000 | | | | | | | | | | | 700,000 |
| Total PreDevelopment | | - | 700,000 | - | - | - | - | - | - | - | - | - | - | 700,000 |
| **Other Soft Costs** | | | | | | | | | | | | | | |
| Project Management | | | | | | | | | | | | | | - |
| Sales & Marketing | | | | | | | | | | | 50,000 | 50,000 | 50,000 | 150,000 |
| Legal | | | 500,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 650,000 |
| Development Fees | | | 250,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 550,000 |
| Real Estate Taxes | | | | | | | 335,000 | | | | | | | 335,000 |
| Insurance | | 63,975 | | | | | | | | | | | | 63,975 |
| Total Other Soft Costs | | 63,975 | 750,000 | 45,000 | 45,000 | 45,000 | 380,000 | 45,000 | 45,000 | 45,000 | 95,000 | 95,000 | 95,000 | 1,748,975 |
| **Financing Costs** | | | | | | | | | | | | | | |
| Net Closing Costs | | (188,857) | | | | | | | | | | | | (188,857) |
| Lender Expenses | | 60,000 | | | | | | | | | | | | |
| Equity Fee | | | | | | | | | | | | | | - |
| A&D Loan - Broker Fee | 1.0% | 325,000 | | | | | | | | | | | | 325,000 |
| A&D Loan - Lender Fees | 2.0% | 650,000 | | | | | | | | | | | | 650,000 |
| A&D Loan - Interest Expense | 12.5% | | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 3,723,958 |
| | | 846,143 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 4,510,101 |
| **Total Uses of Funds** | | **44,460,885** | **2,843,692** | **641,667** | **533,889** | **533,889** | **868,889** | **588,127** | **588,127** | **549,890** | **599,890** | **599,890** | **599,890** | **53,348,723** |

| As Proposed | | Arch<br>FAB | Structural<br>RLG | MEP<br>BEI | Civil<br>PKCE | Interior<br>(Champ Only) | Landscape<br>Talley | Lighting | Graphics | Misc | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Concept Design | 10.0% | 575,000 | 29,000 | 60,000 | | 230,000 | - | | | 35,000 | 929,000 | 7.7% |
| Schematic Design | 15.0% | 862,500 | 58,000 | - | 29,000 | 705,000 | 68,000 | | | 52,500 | 1,775,000 | 14.8% |
| Design Development | 20.0% | 1,150,000 | 116,000 | 50,000 | 33,500 | 1,190,000 | 85,000 | 40,000 | 30,000 | 70,000 | 2,764,500 | 23.0% |
| Construction Documents | 43.0% | 2,472,500 | 292,000 | 450,000 | 70,000 | 566,000 | 117,500 | 136,000 | 102,000 | 150,500 | 4,296,500 | 35.7% |
| Other | | - | - | - | - | | 76,500 | | | - | | |
| Sales Model | 1.0% | 57,500 | - | - | - | 174,000 | - | 2,000 | 1,500 | 3,500 | 238,500 | 2.0% |
| Construction Administration | 11.0% | 632,500 | 145,000 | 60,000 | 7,500 | 428,000 | 68,000 | 22,000 | 16,500 | 38,500 | 1,418,000 | 11.8% |
| Additional Services/Reimbursables | 5.0% | 287,500 | 29,000 | 31,000 | 35,000 | 164,650 | 20,750 | 10,000 | 7,500 | 17,500 | 602,900 | |
| | 100.0% | 6,037,500 | 609,000 | 651,000 | 175,000 | 3,457,650 | 435,750 | 200,000 | 150,000 | 350,000 | 12,024,400 | 95.0% |
| Percent Hard Cost | | 2.98% | 0.30% | 0.32% | 0.09% | 1.71% | 0.22% | 0.10% | 0.07% | 0.17% | 5.93% | |
| FAB Base Fee | | 5,750,000 | | | | | | | | | | |
| Percent CD's | | 89.0% | 75.0% | 90.3% | 94.6% | 87.0% | 83.6% | 89.0% | 89.0% | 89.0% | 87.6% | |
| Total Cost of CD | | 5,117,500 | 435,000 | 560,000 | 132,500 | 2,865,000 | 347,000 | 178,000 | 133,500 | 311,500 | 10,003,500 | 83.2% |

# Exhibit B

Execution

# COMPANY AGREEMENT OF
# FIVE STAR GM, LLC
# A DELAWARE LIMITED LIABILITY COMPANY

SEPTEMBER 16, 2019

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ..... 1
1.01 Definitions ..... 1

ARTICLE II ORGANIZATION ..... 6
2.01 Formation ..... 6
2.02 Name ..... 6
2.03 Registered Office and Registered Agent ..... 6
2.04 Principal Office and Other Offices ..... 7
2.05 Purposes ..... 7
2.06 Powers ..... 7
2.07 Foreign Qualification ..... 7
2.08 Term ..... 8
2.09 Mergers and Exchanges ..... 8
2.10 Outside Activities ..... 8
2.11 Palisades Reimbursement ..... 8

ARTICLE III MEMBERSHIP ..... 8
3.01 Initial Members, Capital Commitments, and Percentage Interests ..... 8
3.02 Admission of Class B and Class C Members; Profits Interests Plan ..... 8
3.03 Additional Members ..... 10
3.04 Member Rights Specified in Agreement ..... 11
3.05 Representations and Warranties ..... 11
3.06 No Authority ..... 11
3.07 Liability to Third Parties ..... 11
3.08 Withdrawal ..... 11
3.09 Investment Representations ..... 11

ARTICLE IV CAPITAL CONTRIBUTIONS ..... 13
4.01 Initial Contributions ..... 13
4.02 Additional Contributions ..... 13
4.03 Return of Contributions ..... 14
4.04 Loans by Members ..... 14
4.05 Capital Accounts ..... 14

ARTICLE V ALLOCATIONS AND DISTRIBUTIONS ..... 15
5.01 Allocations ..... 15
5.02 Distributions ..... 16
5.03 Palisades Redemption ..... 17
5.04 Redemption Default ..... 17
5.05 Sale Right ..... 18

ARTICLE VI MANAGEMENT ..... 19
6.01 Management by Manager ..... 19

6.02 Restrictions .......... 20
6.03 Conflicts of Interest .......... 23
6.04 Contracts or Transactions with Interested Officers .......... 24
6.05 Number and Term of Office .......... 24
6.06 Vacancies; Removal; Resignation .......... 24
6.07 Compensation .......... 24
6.08 Reimbursement .......... 24
6.09 Meetings .......... 25
6.10 Approval or Ratification of Acts or Contracts by Members .......... 25
6.11 Action Without Meeting .......... 26
6.12 Action by Telephone Conference or Other Remote Communications Technology .......... 26
6.13 Budget .......... 26
6.14 Property and Project Related Agreements .......... 27

ARTICLE VII CONFIDENTIAL INFORMATION .......... 27
7.01 Confidential Information .......... 27

ARTICLE VIII MEETING OF MEMBERS .......... 28
8.01 Meetings .......... 28
8.02 Voting List .......... 29
8.03 Proxies .......... 29
8.04 Conduct of Meetings .......... 29
8.05 Action by Written Consent Without Meeting .......... 30
8.06 Action by Telephone Conference or Other Remote Communications Technology .......... 30
8.07 Classes of Members; Voting .......... 30

ARTICLE IX OFFICERS .......... 31
9.01 Qualification .......... 31
9.02 Compensation .......... 32
9.03 Resignation .......... 32
9.04 Removal .......... 32

ARTICLE X INDEMNIFICATION .......... 32
10.01 Right to Indemnification .......... 32
10.02 Advance Payment .......... 33
10.03 Indemnification of Officers, Employees and Agents .......... 33
10.04 Appearance as a Witness .......... 34
10.05 Nonexclusivity of Rights .......... 34
10.06 Insurance .......... 34
10.07 Member Notification .......... 34
10.08 Savings Clause .......... 34

ARTICLE XI TAXES .......... 34
11.01 Tax Returns .......... 34
11.02 Tax Elections .......... 35

11.03 Company Representative .... 35

ARTICLE XII BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS .... 36
12.01 Maintenance of Books .... 36
12.02 Accounts .... 36
12.03 Financial Information, Reports and Notices .... 37

ARTICLE XIII TRANSFERS .... 37
13.01 Limited Right to Transfer .... 37
13.02 Rights of an Assignee .... 38
13.03 Legal Opinion .... 38
13.04 Admission as Substituted Member .... 38
13.05 Transfer to Existing Member .... 39
13.06 Reasonable Expenses .... 39

ARTICLE XIV BUYOUT OF MEMBERSHIP INTEREST .... 39
14.01 Termination of Marital Relationship .... 39
14.02 Death of Member .... 40
14.03 Bankruptcy of Member .... 40
14.04 Insufficient Surplus .... 40
14.05 Option by Other Members .... 40
14.06 Exercise of Option .... 41
14.07 Determination of Fair Value .... 41
14.08 Fees and Expenses of Appraiser .... 41
14.09 Right to Withdraw Option .... 41
14.10 Terms of Purchase .... 41
14.11 Member Entity .... 42
14.12 Buyout Restrictions .... 42

ARTICLE XV DEFAULT OF A MEMBER .... 42
15.01 Failure to Contribute .... 42
15.02 Security .... 44
15.03 Compromise or Release .... 44
15.04 Expulsion .... 44

ARTICLE XVI WINDING UP AND TERMINATION .... 45
16.01 Event Requiring Termination .... 45
16.02 Business May Be Continued .... 45
16.03 Reserved .... 45
16.04 Liquidation .... 45
16.05 Deficit Capital Accounts .... 46
16.06 Certificate of Termination .... 47

ARTICLE XVII AMENDMENT OR MODIFICATION .... 47
17.01 Amendment or Modification .... 47

ARTICLE XVIII GENERAL PROVISIONS ..... 47
18.01 Construction ..... 47
18.02 Offset ..... 47
18.03 Notices ..... 47
18.04 Entire Agreement; Supersedes Other Agreements ..... 47
18.05 Effect of Waiver or Consent ..... 48
18.06 Binding Effect ..... 48
18.07 Governing Law ..... 48
18.08 Jurisdiction and Venue/Equitable Remedies ..... 48
18.09 Severability ..... 48
18.10 Further Assurances ..... 49
18.11 Waiver of Certain Rights ..... 49
18.12 Indemnification ..... 49
18.13 Exculpation of Members ..... 49
18.14 Counterparts ..... 49
18.15 Palisades Approvals ..... 49
18.16 Palisades Payments ..... 49

ARTICLE XIX NOTICES AND DISCLOSURES ..... 50
19.01 Compliance with Regulation D of the Securities Act of 1933 ..... 50
19.02 Notice to Members ..... 50
19.03 Limitation of Liability ..... 50

Exhibit A – Members of Five Star GM, LLC
Exhibit B – Project Budget

# COMPANY AGREEMENT OF
# FIVE STAR GM, LLC
# A DELAWARE LIMITED LIABILITY COMPANY

This Company Agreement of FIVE STAR GM, LLC, (this "Agreement") is executed as of September 16, 2019 (the "Effective Date") by the persons who sign and are identified as "Members" and "Manager" in this Agreement.

## ARTICLE I
## DEFINITIONS

**1.01 Definitions.** As used in this Agreement, the following terms have the following meanings:

"Act" means the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, Section 18-101 et seq., as amended from time to time.

"Additional Contribution" has the meaning assigned to it in Section 4.02.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any in the Member's Capital Account as of the end of the relevant Allocation Year, after giving effect to the following adjustments:

(i) Credit to the Capital Account any amounts the Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii) Debit to the Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and will be interpreted consistently therewith.

"Affiliate" shall mean (i) any person directly or indirectly controlling, controlled by or under common control with another person; (ii) any person that, directly or indirectly, owns or controls 10% or more of the outstanding voting securities or beneficial interests of such other person; (iii) any officer, director, trustee member, manager or general partner of such person; (iv) if such other person is an officer, director, member or manager, trustee or partner of another entity, then the entity for which that person acts in any such capacity; (v) any spouse or issue of the person or any person who is of a relationship described in Section 267 (b) of the Code substituting 10% in place of 50%, where applicable, and (vi) an entity formed which is to be owned directly or indirectly for the benefit of any of the persons described in subparagraph (v) above. For purposes of this paragraph and for determining when a person is directly or indirectly controlling, controlled by or under, controlled with any other person, the term control

shall refer to an interest of 10% or more of the outstanding voting securities or beneficial interest of such person.

"Agreement" has the meaning set forth in the preamble.

"Assignee" means a person who receives a Transfer of all or a portion of the Membership Interest of a Member as permitted herein, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent all Members consent otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Base Return" means an amount due on the first day of each month which is equal to nine percent (9%) per annum accrued on the Unreturned Priority Capital.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in Dallas, Texas are closed.

"Capital Account" means a capital account maintained for a Member as provided by Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

"Capital Commitment" of a Member represents the aggregate amount of capital that such Member has agreed to contribute to the Company.

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member and shall include all contributions described in Sections 4.01 and 4.02.

"Certificate of Formation" means the initial, amended, and restated certificate of

formation of the Company.

"Class" means the specific group of Members as designated herein under which each Class may have different rights, obligations, and ownership interests as described herein. Each Class shall own a certain Percentage Interests of the Company which shall total one hundred percent (100%) as further identified in Exhibit A.

"Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Company" means FIVE STAR GM, LLC, a Delaware limited liability company.

"Competing Business" shall mean any partnership, entity, association, joint venture, company, or agreement for the construction, development, sales, marketing, promotion, representation, or management of a project involving either a hotel or residential condominiums or both within a one (1) mile radius of the Property other than the project contemplated at 148 Pittsburgh Street, Dallas, Texas 75207.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Default Return" means an amount due on the first day of each month which is equal to fourteen percent (14%) per annum, compounded annually, on the Unreturned Priority Capital. The Default Return shall apply immediately at such time as any Base Return is not distributed on the due date thereof and the Default Return shall accrue in lieu of such Base Return not timely distributed.

"Distributable Cash" shall have the meaning ascribed to such term in Section 5.02(a).

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however, this term does not include a person who ceases to be a Member as a result of bankruptcy, default, or expulsion.

"General Interest Rate" means a rate per annum equal to the lesser of (a) three percent (3%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Majority"/"Majority in Interest"/"Majority of the Members"/"Simple Majority" means the consent or approval of one or more of the Members which are entitled to vote

having among them more than fifty percent (50%) of the applicable Class Membership Interests, where a consent within the Class is required, or otherwise having among them more than fifty percent (50%) of the ownership interests entitled to vote in the Company.

"Manager" has the meaning assigned to such term in the Act.

"Managing Member" shall be the person identified as the Manager herein which shall also be a Member of the Company. The Managing Member shall not belong to any Class and shall have the right to vote on any matter of the Company where any Members are entitled to vote. The terms Managing Member and Manager have the same meaning in this Agreement and are used interchangeably throughout this Agreement.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any person who has ceased to be a Member of the Company. Each Member who is not a Managing Member will be designated as a Class A Member, a Class B Member, or a Class C Member which corresponds with such classifications of the Membership Interests as defined herein.

"Membership Interest" means the Percentage Interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve. Membership Interests may be divided into one or more Classes. The holders of record of the different Classes of Membership Interests shall have such rights and obligations associated with such Membership Interests as are provided in this Agreement. Each Class shall own a designated percentage of the Company with the total of all Classes of Membership Interests equaling 100% of the Membership Interests of the Company and any issuance of any new Membership Interests in any Class shall cause a proportionate reduction of all Members' Membership Interests within that Class without affecting the proportionate ownership of any Member in a separate Class or the total ownership interests of any Class.

(iii) Class A Membership Interests. Class A Membership Interests are voting Membership Interests of the Company. Any decisions of the Class A Members shall be made by a vote pursuant to which all of such Class A Members shall be allocated votes in proportion to their Percentage Interests of the Class A Members. An affirmative vote of all of the Class A Members and the Managing Member, present or not present, is required to approve a decision of the Company. Until such time as Palisades has been Redeemed in Full, the Company shall have no Class B Members.

(iv) Class B Membership Interests. Class B Membership Interests are non-voting Membership Interests and shall have no right to vote on any matter except as expressly set forth in this Agreement or which is required by the Act only to the extent the Act prohibits this Agreement from amending such voting right.

(v) Class C Membership Interests. No Class C Members exist at the time of this Agreement but may be added as provided herein. Class C Membership Interests are non-voting Membership Interests and shall have no right to vote on any matter except as expressly set forth in this Agreement or to which is required by the Act only to the extent the Act prohibits this Agreement from amending such voting right. Class C Membership Interests represent an interest in the Company commonly referred to as a profits interest (as described in Revenue Procedure 93-27, 1993-2 C.B. 343 and Revenue Procedure 2001-43, 2001-2 C.B. 191) and represent an interest in current Company profits and losses from operations, current distributions from operations, and an interest in future appreciation or depreciation of the Company's assets after payment of liabilities and all distributions of capital contributions and profits to the Class A and Class B Members. The Class C Membership Interests do not represent an interest in any existing capital of the Company. Until such time as Palisades has been Redeemed in Full, the Company shall have no Class C Members.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any indebtedness to which the asset is subject when contributed.

"Operating Agreement(s)" means individually and collectively the Company Agreement of Five Star TC dated September 16, 2019, the Limited Liability Company Agreement of MezzCo dated September 16, 2019 and the Limited Liability Company Agreement of Project Owner dated September 16, 2019.

"Operating Company" means individually and collectively Five Star TC, MezzCo and Project Owner.

"Percentage Interest" means the ratio of ownership interests of the Members. As used herein, Percentage Interest may refer to the ratio of ownership within a Class or the ratio of ownership of the Company for each Class. The sum of the Percentage Interests of each Class shall be one hundred percent (100%). The sum of the Percentage Interests of the Members within each Class shall total one hundred percent (100%) for each Class. The Percentage Interest of ownership of the Company for each Member shall be determined by multiplying the Percentage Interest of the Class owned by the Member by the Percentage Interest of the Company owed by that same Class.

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Preferred Capital Contribution" means the Capital Contributions designated as a Preferred Capital Contribution as provided herein which shall, except as otherwise provided herein, be paid before any other distributions to the Members and which shall earn a Preferred Return.

"Preferred Return" means an annual rate of return of eight percent (8%), accrued and compounded annually, on the total unrecovered Preferred Capital Contributions in addition to any other distributions defined herein.

"Priority Capital" means all Capital Contributions of Palisades to the Company.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Redeemed in Full" means, with respect to Palisades, such time and circumstances as when Palisades has received all amounts to which it is entitled to receive pursuant to Sections 5.02(a) through (v) plus any additional amounts to which Palisades may be entitled under any other provision of this Agreement (e.g. indemnification, etc.).

"Super Majority" means the consent or approval of one or more of the Members which are entitled to vote having among them at least 2/3 of the applicable Class Membership Interests, where a consent within the Class is required, or otherwise 2/3 of the Membership Interests entitled to vote in the Company.

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of a Membership Interest or any portion of a Membership Interest, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment.

"Unreturned Priority Capital" means the Priority Capital of Palisades less all distributions to Palisades pursuant to Sections 5.02(a)(ii) and (iv).

Other terms defined herein have the meaning so given them.

## ARTICLE II
## ORGANIZATION

2.01 **Formation**. The Company has been organized as a Delaware limited liability company by filing a Certificate of Formation with the Secretary of State of Delaware, which may be amended or restated from time to time.

2.02 **Name**. The name of the Company is "FIVE STAR GM, LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as the Manager may select from time to time.

2.03 **Registered Office and Registered Agent**. The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other person or persons as the Manager may designate from time to time in the manner provided by law.

2.04 **Principal Office and Other Offices**. The principal office of the Company in the United States shall be at 1755 Wittington, Suite 340, Dallas, Texas 75234 or at such other place as the Manager may designate from time to time, which need not be in the State of Delaware. The Company may have such other offices as the Manager may designate from time to time.

2.05 **Purposes**. The sole business and purpose to be conducted or promoted by the Company is its ownership interests and related rights in Five Star TC, LLC ("Five Star TC") as the sole member in MO 2999TC MZ, LLC ("MezzCo") as the sole member of MO 2999TC LLC ("Project Owner") which will acquire the real property located at 2999 Turtle Creek Blvd., Dallas, Dallas County, Texas which includes approximately 2.4 acres and a 37,000 square foot building (which will be demolished) ("Property") for which the total cost of acquisition is estimated to be the "Total Gross Amount Due By Purchaser" as identified on the preliminary Purchaser's Statement as September 5, 2019 equal to $43,663,126.59 ("Total Purchase Price") plus such other expenses and fees incurred on behalf of the Project Owner by one or more related entities related to the acquisition of the Property and development of the Project including all zoning and entitlement costs along with all legal fees prior to the closing of the acquisition which is estimated to be $47,323,543.26 (collectively, "Total Acquisition Cost") and to take such action necessary, including acquiring any necessary debt and equity funding, to construct and develop a mixed use project including a luxury hotel and residences (collectively, "Project") including by engaging certain development and other companies to develop the Project and to engage in any lawful act or activity for which limited liability companies may be organized under the Act that is related or incidental to and necessary, convenient or advisable for the accomplishment of the foregoing objective and purpose. At the execution of this Agreement, the Company will own 99.9% of membership interests in Five Star TC and shall make such Capital Contributions and execute any other agreements and documents as required by Five Star TC in order to further the Purpose herein and that of MezzCo and the Project Owner.

2.06 **Powers**. The Company shall have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the Act, (ii) any other laws in the State of Delaware, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07 **Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than Delaware, the Manager shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Manager, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Manager, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

**2.08 Term**. The Company will commence as provided in the Certificate of Formation for the Company filed with the Secretary of the State of Delaware, and will continue until the Company terminates under the terms of this Agreement.

**2.09 Mergers and Exchanges**. The Company may be a party to a merger, an exchange, or acquisition under the Act, subject to the requirements of this Agreement.

**2.10 Outside Activities**. Neither this Agreement nor the relationship created hereby will preclude or limit, in any respect, the right of any Member or Manager or any Affiliate of any Member or Manager to engage, directly or indirectly, through participation, investment, employment, consulting, lending, or otherwise ("Participation"), in any opportunity or business of any type except as otherwise provided herein. For separate consideration the sufficiency, receipt and acceptance of which is acknowledged by the Members upon execution of this Agreement and unless otherwise consented to by the Manager, each Member while a current Member, including its officers, directors, owners, members, and managers ("Related Persons") which shall continue upon becoming a Former Member, shall be prohibited from any Participation in a Competing Business for a period of 1 year except for Palisades and its Affiliates. This provision shall survive the termination of such Former Member's agreement herein.

**2.11 Palisades Reimbursement.** The Company shall reimburse Palisades for all attorneys' fees and other costs it incurs in connection with the negotiation of this Agreement and its investment in the Company including, without limitation, any costs incurred to enforce its rights hereunder, such amount to be paid to Palisades within ten (10) days of Palisades submitting an invoice for same. Notwithstanding the foregoing, the parties acknowledge that the Company (including the member 2999TC JMJ MGR, LLC) has remitted a total of $40,000.00 for such fees and costs which is the maximum amount Palisades shall be reimbursed under this section from the Company and 2999TC JMJ MGR, LLC.

## ARTICLE III
## MEMBERSHIP

**3.01 Initial Members, Capital Commitments, and Percentage Interests**. The persons listed on Exhibit A as the Managing Member and Class A Members are hereby admitted to the Company as a Member, effective as of the Effective Date. No Class B Members or Class C Members are admitted as of the Effective Date of this Agreement. Set forth opposite the name of each Member listed on Exhibit A is such Member's Capital Contribution, Membership Interests, its Percentage Interest as of the Effective Date within its Class, and Class of its Membership Interests. The Classes listed on the table thereafter shall own the Percentage Interests in the Company as stated therein. Exhibit A may be amended from time to time to reflect changes in or additions to the membership of the Company only with the consent of Palisades and the Managing Member. Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company.

**3.02 Admission of Class B and Class C Members; Profits Interests Plan**. As of the Effective Date, there are no Class B Members or Class C Members. A Class B Membership

Interest may only be issued upon the consent of the Manager and all of the Class A Members. Class C Membership Interests may be issued in the future for zero consideration which shall vest, subject to certain restrictions and forfeiture events, following one (1) year from the Effective Date of each issuance to certain employees, independent contractors, or other individuals who may contribute to the Company or to whom the Company may owe certain liabilities to in order to align their interests with the interests of the other Members and to provide an incentive to build value for the Company as determined in the sole discretion of the Manager. Prior to a distribution to the Class C Members, the Company shall be responsible for the payment of any income taxes on behalf of the Class C Members when due and payable by the Class C Members except that the Company will reduce any distribution to the Class C Members by the tax paid or by the amount of the taxes that will be paid by the Company on behalf of the Class C Members for the year in which the distribution occurred. The total Percentage Interest of ownership in the Company by all Class C Members may not exceed five percent (5%) without the written consent of the Manager and all of the Class A Members. Any increase or decrease in the Class C Percentage Interest in the Company shall only increase or decrease the Class B Members' Percentage Interest proportionately to their ownership in the Company. Any such distributions earned through the date of such termination shall be finally distributed at such time the Manager makes a distribution to the other Members. This Section 3.3 shall constitute a written compensation plan and agreement within the meaning of Rule 701 of the 1933 Act and as required by any governing state securities act.

a. Class C Members will have an initial Capital Account balance of zero as of the date they are granted Class C Membership Interests and shall have no requirement to commit any Capital Contributions. Because the Class C Members will have an initial Capital Account balance of zero as of the Effective Date, the Class C Members would not be entitled to a share of the proceeds if the Company's assets were sold at fair market value as of the Effective Date and then the proceeds were distributed in a complete liquidation of the Company.

b. The Company and the Members will treat the Class C Members as the owners of all of the Class C Membership Interests granted to the Class C Members from the vesting date corresponding to the issuance following date they are granted such Class C Membership Interests for all federal income tax purposes and each Class C Member will take into account his/her distributive share of the Company's items of income, gain, loss, deduction, and credit associated with such interest in computing such Class C Member's federal income tax liability for the entire period during which a Class C Member holds a Class C Membership Interest. Neither the Company nor any of the Members will deduct any amount (as wages, compensation, or otherwise) for the fair value, if any, of the Class C Membership Interests.

c. If a Class C Member (i) transfers, assigns, pledges, or encumbers his/her Class C Membership Interest without consent of the Manager in violation of the Agreement; or (ii) is terminated by the Company or a Company Affiliate for cause or voluntarily ceases to provide services to or be employed by the Company, then the defaulting Class C Member shall automatically cease to be a Member and the defaulting Class C Member's Class C Membership Interest shall be revoked and forfeited and automatically be transferred to the Company without compensation. In the event (i) any

Class C Member resigns as an employee, consultant, or contractor of the Company or elects not to provide services to the Company on a consistent and regular basis through no fault of the Company or its Members, (ii) any Class C Member is terminated as an employee, consultant, or contractor of the Company for good cause, or (iii) any Class Member is terminated or resigns for any reason prior to the vesting date, such Class C Membership Interests shall automatically and without notice be rescinded and otherwise terminated and the Membership Interests of the Class C Member shall be forfeited and reallocated proportionately to the other Class C Members unless otherwise agreed to by the Manager. However, if the Class C Member is terminated from its role without cause after the vesting date, then the Class C Member's Percentage Interest shall survive and may only be terminated to the same extent as that of a Class B Member or otherwise the Manager may elect to have the Company purchase the Class C Member's Membership Interests for Fair Value at the date of such termination which, as decided by the Manager, may be either remitted in equal monthly or annual installments over a period not to exceed five (5) years from the termination date.

d. Nothing contained in this Agreement confers upon a Class C Member any right to serve as an employee, independent contractor, or officer of the Company or a Company Affiliate.

e. Class C Membership Interests including all rights related thereto are non-transferable and non-assignable, including upon death or divorce, and under no circumstances may such interests be pledged, encumbered, assigned, transferred, or sold to any third party in which case such interests shall automatically terminate.

f. The Company may impose such additional restrictions on the Class C Membership Interests as it may, in good faith, deem advisable.

g. Each Class C Member represents that he/she has relied upon advice from his/her own independent counsel in connection with tax and other consequences related to the grant and ownership of a Class C Membership Interest.

**3.03 Additional Members.** Additional persons may be admitted to the Company as additional Class A Members, Class B Members, or Class C Members (collectively, "Additional Members") on such terms and conditions as shall be determined by all of the Class A Members and the Manager, and the Percentage Interests of the Membership Interests for the Members within the Class shall be reallocated proportionally based on the amount of the total Capital Contributions of the Members within that Class following the Initial Capital Contributions of Additional Member or in the case of Class C Members, the Percentage of Interests to be received by the additional Class C Member. Likewise, only where an additional Class A Member is admitted shall the Percentage Interest of ownership in the Company for each Class be reallocated based proportion of the total Capital Contributions of each Class following the receipt of the Capital Contributions of the additional Class A Member. **Otherwise, the admission of any Additional Member in any other Class SHALL NOT REDUCE the total Percentage Interest of the Company owned by all Class A Members or the Managing Member except upon consent of all of the Class A Members and Managing Member.** The Members within the Class shall be given the opportunity to deliver to the Company such

additional Capital Contributions in order to maintain its Membership Interests percentage on such terms as defined by the Manager. The terms of admission or issuance must specify the Percentage Interests and the Capital Contributions applicable thereto and the time for remittance. The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties. The Manager shall reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed only by the Manager.

3.04 **Member Rights Specified in Agreement.** Except as approved by the Manager or as otherwise specifically provided in this Agreement, no Member shall have the right (a) to sell, transfer, pledge, encumber, or assign any of its Membership Interests in the Company including any rights or obligations related thereto; (b) to require partition of the Property of the Company; (c) to compel the sale of Company assets; (d) encumber the Property in any way, (e) to cause the winding up of the Company. Except as otherwise provided herein related to a material breach of this Agreement or related agreement,

3.05 **Representations and Warranties.** Each Member hereby represents and warrants to the Company and each other Member that, if that Member is a business entity: (a) that Member is duly organized, validly existing, and in good standing under the law of the state of its organization; (b) that Member is duly qualified to do business in the jurisdiction of its principal place of business; (c) that Member has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder; (d) all necessary actions by the board of directors, shareholders, members, Manager or other representative of that Member necessary for the due authorization, execution, delivery, and performance of this Agreement have been duly taken; and (e) that Member's authorization, execution, delivery, and performance of this Agreement does not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound.

3.06 **No Authority.** Except as otherwise specifically provided in this Agreement, no Member (other than a Manager or an officer duly appointed pursuant to the terms herein) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

3.07 **Liability to Third Parties.** No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court. Notwithstanding the foregoing, any guaranties required by any creditors of the Company shall be provided for by the Manager of the Company.

3.08 **Withdrawal.** Except as provided herein, no Member may withdraw without the consent of the Manager.

3.09 **Investment Representations**. Each Member hereby represents and warrants as follows:

(a) Such Member is acquiring such Member's Membership Interests for investment solely for such Member's own account and not for distribution, transfer or sale to others in connection with any distribution or public offering.

(b) Such Member is financially able to bear the economic risk of an investment in the Company and has no need for liquidity in this investment. Furthermore, the financial capacity of such Member is of such a proportion that the total costs of such Member's investment in the Company is not material when compared with such Member's total financial capacity.

(c) Such Member has such knowledge, experience and skill in financial and business matters in general and with respect to investments of a nature similar to an investment in the Company so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, this investment. Such Member acknowledges and understands that the purchase of such Member's Membership Interests involves an investment in a new business that has no previous operating experience, and, therefore, this is a speculative investment with no assurance of success.

(d) Such Member: (i) has received all information that such Member deems necessary to make an informed investment decision with respect to an investment in the Company; (ii) has had the unrestricted opportunity to make such investigation as such Member desires pertaining to the Company and an investment therein and to verify any information furnished to such Member; (iii) has had the opportunity to ask questions of representatives of the Company concerning the Company and such Member's investment, and (iv) has had or had the opportunity to have an attorney of the Member's own choosing review the terms of this Agreement and the investment of such Member.

(e) Such Member understands that such Member must bear the economic risk of an investment in the Company for an indefinite period of time because (i) the Membership Interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act") and applicable state securities laws and (ii) the Membership Interests may not be sold, transferred, pledged or otherwise disposed of except in accordance with this Agreement and then only if they are subsequently registered in accordance with the provisions of the Securities Act and applicable state securities laws or registration under the Securities Act or any applicable state securities laws is not required.

(f) Such Member understands that the Company is not obligated to (i) register the Membership Interests for resale under the Securities Act or any applicable state securities laws or (ii) supply such Member with information or assistance in complying with any exemption under the Securities Act or any applicable state securities laws. Upon the request of the Company, such Member will provide the Company with an opinion of counsel satisfactory to the Company that a proposed resale of the Membership Interests complies with the Securities Act or any applicable state securities laws.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

**4.01 Initial Contributions.** Contemporaneously with the execution of this Agreement, each Member shall make the initial Capital Contribution as described for that Member in Exhibit A. The Capital Contribution of Palisades shall be Priority Capital.

**4.02 Additional Contributions.** In the event the Company requires additional capital to operate or continue in its business affairs as determined by the Manager, then the Manager, Class A Members and/or Class B Members may contribute such required additional capital upon request of the Manager within the period requested by the Manager and otherwise thirty (30) days of after written notice from the Manager to the Members stating that the Manager has determined that the Company does not have sufficient capital to pay its business obligations and accordingly, additional Capital Contributions are needed to satisfy such obligations. The written notice shall set forth the amount of additional Capital Contribution requested. The Members may contribute requested additional Capital Contributions in proportion to their Membership Interests in the Company. The Manager with consent of all of the Class A Members may designate any additional Capital Contributions as Preferred Capital Contributions. Any Capital Contributions contributed by a Member pursuant to a request for additional Capital Contributions shall be an "Additional Contribution." Palisades shall have no obligation to make any Additional Contributions to the Company; however, if Palisades elects to make any Additional Contribution it shall constitute Priority Capital.

No Members shall be required to make an additional Capital Contribution without their consent but may make Additional Contributions in order to prevent the dilution of their Membership Interests within their Class resulting from the elective Additional Contributions of any other Member or of the Capital Contributions of any new Member (collectively, "Dilution Event"). **Under no circumstances shall a Dilution Event cause the Managing Member or the total Class A Percentage Interest in the Company to be diluted without the consent of all of the Class A Members and the Manager.** The Manager shall notify the current Members of any pending Dilution Event ("Notice of Dilution") and the amount of such Additional Contributions necessary to protect against such Members' interests being diluted. Such Members may elect to protect against the dilution of their Membership Interests by notifying the Company of their intent to contribute such Additional Contributions necessary to preserve their membership interests within five business (5) days of such Member(s) receiving notice of the Dilution Event. Such Members shall then have fifteen (15) days to contribute such Additional Contributions to the Company following the receipt of the Notice of Dilution else such Member shall waive the right to protect against being diluted as to that specific Dilution Event. Where the Manager or a Class A Member is unable or unwilling to contribute any requested additional Capital Contribution in response to a request for additional Capital Contributions, such Person's may choose to obtain a loan from an outside lender in which case it may pledge the distribution rights to any portion of its Membership Interests as collateral for the loan which shall exclude any voting rights or rights to participate in the management of the Company (which shall control in the event of any conflict) unless specifically authorized by the Manager. Otherwise, the Manager, without further consent of the Members so long as the rights and interests of the Class A Members are not diluted or encumbered, may seek and acquire either additional financing in whatever form and upon terms the Manager reasonably

determines in its sole discretion is best for the Company whether in the form of a loan from whatever source identified by the Manager or equity from additional investors (who shall be admitted as Class B Members) and which may include a reasonable finder's fee to any finder which assists in acquiring such financing.

**4.03 Return of Contributions.** Except as provided in Article V of this Agreement, no Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.

**4.04 Loans by Members.** Except as otherwise provided in this Agreement, if the Company does not have sufficient cash to pay its obligations, then, subject to Article VI below, any Member that may agree to do so with the Manager's consent may advance all or part of the needed funds to or on behalf of the Company. An advance described in this paragraph constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

**4.05 Capital Accounts.** A Capital Account shall be established and maintained for each Member. The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and/or (ii) the Fair Value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Code) or (iii) property contributed by that Member that is converted to "cash" during the term of this Agreement all as set forth on Exhibit "A";

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the Fair Value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Code), (iii) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single Capital Account that

reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

**5.01 Allocations.**

(a) Except as may be required by Section 704(c) of the Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Percentage Interests existing as of the date such allocation is made.

(b) All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Code and the regulations thereunder.

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this paragraph 5.01(c) were not in this Agreement.

(d) For the purpose of determining the Members entitled to receive allocations as provided for in this Agreement, the Manager may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the allocation is taken. If no record date is fixed, then the date on which the Manager take action to authorize such an allocation pursuant to this Agreement and the Code, shall be the record date for such determination of Members.

(e) As provided in Section 11.01, no allocations of income, gain, loss, deduction or credit of the Company shall be allocated to Palisades.

**5.02 Distributions**.

(a) Except as otherwise provided herein, from time to time the Manager, subject to Article VI below, shall determine in its reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service (including payments on loans by Members to the Company), acquisitions, and a reasonable contingency reserve (hereinafter, "Distributable Cash"). If any such Distributable Cash exists, the Manager shall, subject to Article VI below, cause the Company to distribute the Distributable Cash to the Members, in accordance with their Class and Percentage Interests that exist as of the date of such distribution, as follows:

(i) first, to Palisades, the Base Return or, if applicable, the Default Return.

(ii) next, on or before March 9, 2020, to Palisades an amount equal to no less than fifty percent (50%) of its Unreturned Priority Capital.

(iii) next, on or before March 9, 2020, to Palisades an amount equal to no less than 50% of the amount distributed to Palisades pursuant to Section 5.02(a)(ii).

(iv) next, after March 9, 2020 but on or before September 16, 2020, to Palisades an amount equal to its Unreturned Priority Capital until such amount is reduced to zero.

(v) next, after March 9, 2020 but on or before September 16, 2020, to Palisades an amount equal to fifty percent (50%) of the amount distributed to Palisades pursuant to Section 5.02(a)(iv).

(vi) next, proportionately to any Preferred Returns until all such returns have been paid in full.

(vii) next, proportionately to any Preferred Capital Contributions until all such capital contributions have been paid in full.

(viii) next, proportionately to the Capital Contributions to the Class A Members (other than Palisades) until the minimum Class A return has been paid in full as may be agreed to by the Manager and all of the other Class A Members upon the admittance of any additional Class A Members.

(ix) next, proportionately to the Capital Contributions to the Class A (other than Palisades) and Class B Members until all such Capital Contributions have been paid in full.

(x) Finally, remaining distributions shall be paid to all Members (other than Palisades) in proportion to their Membership Interests.

The Manager may require all loans to Members including any rate of return on such loans be repaid to the Company prior to distributing any Distributable Cash to such Members.

The Company may not repay any loans or advances from Members to the Company prior to making all distributions to Palisades required in Sections 5.02(a)(i) through (v) above.

(b) From time to time the Manager, subject to Article VI below, also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their Percentage Interests and may be made subject to existing liabilities and obligations; provided, however, no distributions other than cash shall be made to Palisades. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

(c) For the purpose of determining the Members entitled to receive a distribution as provided for in this Agreement, the Manager may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the distribution is taken. If no record date is fixed, then the date on which the Manager takes action to authorize such a distribution pursuant to this Agreement and the Code, shall be the record date for such determination of Members.

**5.03 Palisades Redemption.** The Company shall provide notice to Palisades at such time as the Company believes it has made all distributions necessary for Palisades to be Redeemed in Full. If Palisades provides written confirmation to the Company that it has been Redeemed in Full, such confirmation shall result in the Transfer of Palisades' Membership Interest to the Company without further action, writing or instrument. Palisades shall provide confirmation that it has or has not been Redeemed in Full within five (5) Business Days of receipt of the notice from the Company. Unless Palisades provides notice to the Company that it has <u>not</u> been Redeemed in Full within such five (5) Business Day period, Palisades shall be deemed to be Redeemed in Full if it does not otherwise provide a response. Palisades shall not waive any rights to indemnification under this Agreement when it is Redeemed in Full, such rights surviving Palisades being Redeemed in Full.

**5.04 Redemption Default.**

(a) A "Redemption Default" shall occur upon any of the following:

(i) The Company fails at any time to distribute all amounts due to Palisades pursuant to Section 5.02(a)(i).

(ii) The Company fails to distribute all amounts due to Palisades pursuant to Sections 5.02(a)(i) and (ii) on or before March 9, 2020.

(iii) The Company fails to distribute all amounts due to Palisades pursuant to Sections 5.02(a(i) through (v) on or before September 16, 2020.

(iv) The Manager, any Member other than Palisades or the Company breaches any of its obligations under this Agreement, including, without limitation, the failure to obtain the approval of Palisades whenever required in this Agreement.

(b) Subject to Section 5.04(c), in the event of a Redemption Default described in Section 5.04(a)(i), Palisades shall have the right to require the Manager to request an additional Capital Contribution from the Members other than Palisades in an amount sufficient to bring Palisades current on the distributions to which it is entitled pursuant to Section 5.02(a)(i). Subject to Section 5.04(c), in the event of any other Redemption Default, Palisades may exercise its rights under Section 5.05 and as otherwise provided in this Agreement.

(c) The Company shall have the right to cure any Redemption Default if within thirty (30) days (five (5) days if the default is due to the nonpayment of monies) following notice of default from Palisades of such default, if the Company cures such default within such thirty (30) day (five (5) days with respect to the payment of monies) period. If the Company cures such default within the requisite time period the applicable Redemption Default shall be cured as if same had not occurred. Furthermore, where a distribution is not timely remitted which results in a Redemption Default and such distribution is thereafter paid by the Company along with any related costs and expenses incurred by Palisades as a result of such Redemption Default prior to Palisades exercising its rights under section 5.05, such payment shall result in the Redemption Default being cured.

**5.05 Sale Right.** In addition to such other rights Palisades may have under this Agreement and notwithstanding any contrary provision of this Agreement, upon the occurrence of a Redemption Default which is not timely cured, Palisades shall have the right, but not the obligation, to act on behalf of the Company and cause the Company to act on behalf of each Operating Company, in each instance in its sole and absolute discretion without the consent or approval of the Manager or any other Member of the Company or any Operating Company, to market and cause the sale of the Project to an independent third party on such terms and conditions as Palisades may determine appropriate in its sole and absolute discretion. In determining an appropriate sale price for the Project, Palisades shall not be obligated to take into consideration any so called fair value or other market value for the Project; rather Palisades may look solely to such sale price for the Project that is most likely to result in proceeds sufficient to cause Palisades to be Redeemed in Full. The Manager and each Member of the Company shall cooperate and shall cause the Company and each Operating Company to cooperate with Palisades to accomplish such sale.

# ARTICLE VI
# MANAGEMENT

**6.01 Management by Manager.** Except for situations in which the approval of the Class A Members is required by this Agreement or by nonwaivable provisions of applicable law, and subject to the provisions of paragraph 6.02 of this Agreement, the Manager shall have the sole and exclusive control of the management, business and affairs of the Company, and the Manager shall make any and all decisions and take any and all actions on behalf of the Company without further consent of the Members or any other persons, including but not limited to the following:

(a) entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in connection with the purposes of the Company at the Manager's reasonable and sole discretion (except entering into any contract with or a sale to any related entity of any Member that is not for fair value or upon terms standard for the industry that would be conducted as an arms-length transaction) and making all decisions and waivers thereunder;

(b) entering into and executing agreements in the ordinary course of business and related to the capital assets of the Company including those related to construction, development, sales (including assets), management, marketing and promotion of the Company and the Project;

(c) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money;

(d) maintaining the assets of the Company in good order;

(e) collecting sums due the Company;

(f) to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(g) utilizing for Company purposes any asset of the Company;

(h) borrowing money or otherwise committing the credit of the Company for Company activities to further the Purpose and voluntary prepayments or extensions of debt and in the event required by a creditor which may be guaranteed by the Manager and/or Timothy Barton on behalf of the Company;

(i) selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

(j) obtaining and maintaining insurance for the Company;

(k) disposition of Company property in the ordinary course of business;

(l) disposition of Company property not in the ordinary course of business;

(m) designating Members or other individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(n) borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

(o) incurring any debt or liability (or agreeing to incur any debt or liability) on behalf of the Company;

(p) determining the amount and timing of distributions of Company cash and other property as provided in paragraph 5.02 of this Agreement;

(q) appoint officers of the Company and provide such officers with authorities, powers, and any type of compensation or remuneration;

(r) sell or issue additional Membership Interests and admit Members of the Company subject to the restrictions in this Agreement;

(s) delegate any responsibilities to any Member, officer, or person retained by the Manager to perform certain tasks; and

(t) where the Company is a member, shareholder, partner, or joint venture in any partnership or entity, execute any necessary resolution, consent, or agreement on behalf of the Company including voting the interests of the Company.

The Manager non-exclusively delegates to the President all of the Manager's authority under this Agreement including to take all actions and make all decisions regarding the management and operation of the Company and take any actions on behalf of the Company, with notice to the Manager upon request by the Manager, related to subparagraphs (a) through (t), and the President shall have no other authority not otherwise delegated to the President by the Manager. The initial President shall be Timothy Barton. The President may only be removed by the Manager upon written notice to the President for any reason; provided, however, the President may be removed and another appointed by Palisades upon the occurrence of a Redemption Default. In the event of the death or incapacity of the Manager (including where the Manager is an entity owned 100% by Timothy Barton or controlled by Timothy Barton), then the other officers (upon majority consent) shall elect such Person to perform the duties of the Manager and where no other officers have been appointed then such person as elected by all of the Class A Members.

**6.02 Restrictions.** Notwithstanding the provisions of paragraph 6.01 of this Agreement or any other provision of this Agreement granting authority to the Manager to act on behalf of the Company, until such time as Palisades has been Redeemed in Full, the Manager shall not undertake any of the following actions with respect to the Company under this Agreement or on behalf of the Company with respect to any Operating Company pursuant to the Operating Agreements without the prior written approval of Palisades :

(a) leasing, selling, disposing, exchanging, mortgaging, pledging, or transferring the Project or any material portion thereof or other asset that costs in excess of $100,000 except as provided in the Project Budget (defined as the predevelopment budget for Five Star TC attached hereto as Exhibit B);

(b) failing to maintain, demolishing, removing or rendering unusable for its intended purpose any existing improvements currently a part of the Project or entering into contracts for such purposes or construction of the anticipated improvements on the Project;

(c) applying for or modifying any existing zoning for the Project;

(d) entering into any brokerage or exclusive listing agreement for the sale or leasing of any portion of the Project;

(e) entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Project;

(f) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), provided, however, that Palisades (acting alone and without any approval or joinder of any other Person) will have the right to enforce any of the Company's and Operating Company's rights and remedies under any Related-Party Agreements by and between Barton or any of his Affiliates on the one hand and the Company or any Operating Company on the other hand;

(g) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company or any Operating Company of more than $100,000 in any year except as provided in the Project Budget;

(h) entering into, amending, modifying, terminating or canceling any contract that grants any form of encumbrance (defined as any lien, easement, lease, hypothecation, or other restriction on transfer or use) over an asset of the Company or any Operating Company;

(i) agreeing to or indemnifying any Person pursuant to this Agreement or any Operating Agreement or agreeing to or indemnifying any Person other than as provided in this Agreement or any Operating Agreement;

(j) entering into, amending, modifying, terminating or canceling any term sheet or letter of intent for the acquisition, financing, or capitalization of the Company, any Operating Company, the Project or any direct or indirect voting or economic interest in any of same;

(k) guarantying the payment of any money or debt of the Company, any Operating Company or any other Person, or guarantying the performance of the

Company, any Operating Company or any other Person, except pursuant to the Loan Documents;

(l) approving the Project Budget or any amendment thereto;

(m) incurring any expenses (including, without limitation, for the acquisition of capital assets) outside of the approved Project Budget;

(n) making any request for additional Capital Contributions under this Agreement or any Operating Agreement;

(o) creating reserves, determining the amount of cash available for distribution and making distributions pursuant to this Agreement or any Operating Agreement;

(p) approving of the transfer or encumbrance of any direct or indirect interest in the Company or any Operating Company and approving of any admission of any Person as an additional member of the Company or any Operating Company;

(q) hiring and compensation of, and any employment agreement with respect to, any employee of the Company or any Operating Company or entering into any collective bargaining or other agreement with any labor union, labor organization or similar body;

(r) filing or defending any litigation, arbitration or similar legal disputes with respect to any claim or potential claim involving the Company or any Operating Company equal to or greater than $100,000, or settling any claim or potential claim for an amount (including all costs of settlement) for $100,000 or more;

(s) amending or modifying this Agreement or any Operating Agreement or the certificate of formation for the Company or any Operating Company;

(t) making any election to cause the Company or any Operating Company to incorporate or offer or issue securities;

(u) the selection and/or retention of any new or additional audit or tax accountants for or on behalf of the Company or any Operating Company;

(v) the transfer of, or granting of a license to use, any intellectual property owned directly or indirectly by the Company or any Operating Company;

(w) removing the partnership representative (as such term is defined in Section 6223(a) of the Code) of the Company or any Operating Company;

(x) offering or issuing additional ownership interests by the Company or any Operating Company or permitting the Company or any Operating Company to make any loan or advance to any Person;

(y) engaging in any line of business in contravention of the purposes of the Company or any Operating Company as provided in this Agreement and the Operating Agreements, respectively;

(z) effecting a dissolution or liquidation of the Company or any Operating Company or the merger, conversion, consolidation or other reorganization of the Company or any Operating Company;

(aa) causing or permitting the Company or any Operating Company to engage in any reorganization or commencing any proceedings or the filing of any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal or state bankruptcy, insolvency or similar law, on behalf of the Company or any Operating Company or admitting, confessing or acquiescing to any involuntary bankruptcy filing or similar action against the Company or any Operating Company;

(bb) making any distribution to any Person other than Palisades under this Agreement or the Five Star GM LLC Agreement or to any other Person other than Five Star GM under the Five Star TC LLC Agreement or permitting Property Owner to make any distribution to any Person other than MezzCo or permitting MezzCo to make any distribution to any Person other than Five Star TC;

(cc) taking any other action that requires the consent of all the Members under this Agreement or any Operating Agreement;

(dd) modifying or amending any of the Loan Documents or paying in full all amounts due under the Loan Documents prior to Palisades being Redeemed in Full;

(ee) incurring on behalf of the Company or any Operating Company any loan or other indebtedness including loans or advances from Members of the Company or any Operating Company (other than under the Loan Documents or indebtedness that constitutes customary third-party trade payables incurred by the Company or any Operating Company in the ordinary course of business) or guaranty or other contingent liability, approving of the form of the loan documents evidencing such indebtedness, or making any material election under such loan documents; or

(ff) entering into, modifying, amending or terminating any agreement with Mandarin Hotels (the so called HMA).

**6.03 Conflicts of Interest**. Notwithstanding any conflicting provision herein, the Manager, and its Related Persons, may at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company or under contract with the Company (so long as such contracts with the Company on terms substantially similar to an arms length transaction at fair value), with no obligation to offer to the Company or any other Member, Manager or officer the right to participate therein.

6.04 **Contracts or Transactions with Interested Officers**. Any of the following contracts shall be valid upon the approval of the Manager: (a) between the Company and one or more of its Managers, Members or officers, (b) between the Company and an entity or other organization in which one or more of the Company's Manager, Members or officers is a managerial official or has a financial interest, and/or (c) between the Company, and any of its Affiliates, or the Affiliate(s) of any of its Manager, Members, or officers; provided that until Palisades has been Redeemed in Full, no such contract shall be valid without the prior approval of Palisades.

6.05 **Number and Term of Office**. Where more than one Managing Member exists, the Managing Members may elect by unanimous consent of the Class A Members to appoint a single Managing Member to serve as the Manager but the Manager at all times shall consist of at least one (1); provided, however, that no decrease in the number of Managers that would have the effect of shortening the term of an incumbent Manager may be made by the Manager. Each Manager shall hold office until his earlier death, resignation or removal by the Manager. Unless otherwise provided in the Certificate of Formation, Manager need not be Members or residents of the State of Delaware. Notwithstanding any contrary provision of this Article VI or other provision of this Agreement, upon a Redemption Default, Palisades shall have the right, but not the obligation to, remove any Manager and appoint a new Manager of its own choosing without the approval of any Member or Manager.

6.06 **Vacancies; Removal; Resignation.** Any Manager position to be filled by reason of an increase in the number of Manager or other reason may be filled by the Manager. Any Manager may resign at any time, except that the resignation of Five Star MM as Manager without removal by Palisades shall constitute a Redemption Default. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Manager. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.07 **Compensation**. For their services in the management of the Company and its operations, the Manager may receive such compensation, if any, as may be approved by Palisades alone until such time as Palisades has been Redeemed in Full.

6.08 **Reimbursement**. The Manager is not required to advance any funds to pay costs and expenses of the Company. However, subject to Section 6.02, in the event the Manager advances such funds, including through its related entity, the Manager shall be entitled to be reimbursed for the reasonable and necessary out-of-pocket costs and expenses incurred in the course of their service hereunder which shall be treated as a loan to the Company and which may earn interest at the General Interest Rate and which shall be reimbursed prior to any distribution to the Members; provided, however, until such time as Palisades has been Redeemed in Full, (i) all such expenses shall be subject to the prior approval of Palisades before reimbursement to the Manager, (ii) no loan shall be made to the Company by the Manager or any Member, and (iii) any loan to the Company by any Manager or Member, and approved by Palisades, shall not be repaid by the Company. Such expenses include any funds expended or liabilities incurred by the Manager or its related entities on behalf of and related to the Project prior to the formation of the Company which are hereby conveyed to and assumed by the

Company unless the Manager agrees to include such expenses as part of its Capital Contribution.

6.09 **Meetings.** In the event of multiple Managers which have the power to vote, the following shall control:

(a) Unless otherwise waived by the Manager, or required by law or provided in the Certificate of Formation or this Agreement, a majority of the total number of Manager fixed by, or in the manner provided in, the Certificate of Formation or this Agreement shall constitute a quorum for the transaction of business of the Manager, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Manager. A Manager who is present at a meeting of the Manager at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action. Where the Manager vote is split 50-50, then the Class A Members may be called upon by any Manager to break the tie by the vote of unanimous consent of the Class A Members.

(b) Meetings of the Manager may be held at such place or places as shall be determined from time to time by resolution of the Manager. At all meetings of the Manager, business shall be transacted in such order as shall from time to time be determined by resolution of the Manager. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold their first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members. Notice of such meeting at such time and place shall not be required.

(d) Regular meetings of the Managers shall be held at such times and places as shall be designated from time to time by resolution of the Managers. Notice of such regular meetings shall not be required.

(e) Special meetings of the Managers may be called by any Manager on at least 24 hours' notice to each other Manager. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate of Formation or this Agreement. Notice of special meetings may be given by facsimile or electronic message (e-mail).

6.10 **Approval or Ratification of Acts or Contracts by Members**. The Managers in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members, or at any special meeting of the Members called for the purpose of considering any such act or contract. Any act or contract that shall be approved or be ratified

by a majority of the Managers or as otherwise provided herein shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by every Member of the Company subject, however, to the provisions of Section 6.02 hereof and any other provision of this Agreement requiring the approval of Palisades.

6.11 **Action Without Meeting**. Any action permitted or required by the Act, the Certificate of Formation or this Agreement to be taken at a meeting of the Manager may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by a majority of the Managers unless more than a majority of the Managers is required by this Agreement in which case such consent in writing shall be signed by the necessary number of Manager or where required their Percentage Interests in the Company or Class A. Every written consent shall bear the date of signature of each Manager who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram, electronic mail, or similar transmission by a Manager, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this paragraph. Such consent shall have the same force and effect as the required vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Delaware, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Manager. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

6.12 **Action by Telephone Conference or Other Remote Communications Technology.** Subject to the requirements of the Act, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, the Manager may participate in and hold a meeting of the Managers by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each Manager and Member entitled to participate in the meeting consents to the meeting being held by means of that system (which may be evidenced by their participation) and the system provides access to the meeting in a manner or using a method by which each Manager participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Notwithstanding any contrary provision of this Agreement, (i) no meeting of Members shall be valid without the presence of Palisades, and (ii) the Managers may not take any action approved by the Managers unless same has been approved by Palisades as provided in this Agreement.

6.13 **Budget**. The Manager shall adopt a budget on behalf of the Company as the Manager reasonably determines is in the best interest of the Company and any singular Manager, or any officer of the Company as delegated to by the Manager, shall have the power to spend money or incur liabilities in the ordinary course of business in accordance with the budget subject, however, to the provisions of Section 6.02 and any other provision of this Agreement requiring the approval of Palisades. The Project Budget attached hereto as Exhibit B is hereby approved as the initial budget of the Company.

6.14 **Property and Project Related Agreements**. In furtherance of the Purpose of the Company and each Operating Company, except as otherwise provided in this Agreement with respect to approvals required of Palisades, the Members consent to the described transactions herein and the Manager or the President is authorized, without further consent, to (i) execute any agreements on behalf of the Company as necessary to assign and close on the Purchase Agreement for the Property which is currently between JMJ Acquisitions, LLC, as the purchaser, and the Property owner, as the seller, which will be assigned from JMJ Acquisitions, LLC to the Project Owner; (ii) execute and cause the assignment of any and all ancillary agreements, approvals, permits, licenses, and other personal and intellectual property from JMJ Acquisitions, LLC or its related entities to the Project Owner, including but not limited to contracts related to the due diligence of the acquisition and development of the Property including as related to engineering, architectural, environmental, surveying, legal, construction, and consulting; (iii) enter into and execute any loan, investment, incentive, or development related agreements related to the acquisition of the Property and development of the Project by the Project Owner which the Manager or President deems, in its sole discretion, is reasonably necessary to further the Purpose of the Company including all related loan agreements, investment agreements, permits, plans, authorizations, subscriptions, deeds of trust, promissory notes, deeds of trusts, demolition, representations, guarantees, consents, architecture, engineering, construction, contractor, development, incentive, financial, legal, consulting, and any other agreements.

## ARTICLE VII
## CONFIDENTIAL INFORMATION

7.01 **Confidential Information**. The Manager shall disclose to the Members, from time to time, all information regarding the business, affairs, and financial condition of the Company. Accordingly, the Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is identified as "trade secret" or confidential, the release of which may be damaging to the Company or persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company, including the terms of this Agreement, unless such information is not confidential and may not disclose it to any person other than another Member or a Manager, except for disclosures (i) compelled by law (but the Member must notify the Manager promptly of any request for that information, before disclosing it, if practicable), (ii) to advisers or representatives of the Member or persons to which that Member's Membership Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this paragraph, or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality. All Former Members and Manager shall continue to be bound by this provision.

## ARTICLE VIII
## MEETING OF MEMBERS

**8.01 Meetings.**

(a) A quorum shall be present at a meeting of Members entitled to vote if the all of those entitled to vote are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Percentage Interests of all Members entitled to vote is required by the Act or this Agreement, the affirmative vote of all of the Members at a meeting of Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Delaware as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to paragraph 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or all of the Members shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of all of the Members. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d) Intentionally Deleted.

(e) Special meetings of the Members for any proper purpose or purposes may be called at any time by the Manager, Palisades or the holders of at least ten percent of the Percentage Interests of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Manager or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be given when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in paragraph 8.02 of this Agreement, with postage thereon prepaid.

(g) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Manager declaring a distribution is adopted, as the case

may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

(h) Notice of meetings may be given to Members by facsimile or electronic message (e-mail).

8.02 **Voting List**. The Manager shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, with the Percentage Interests held by each and if not, such list shall be those Members as defined herein on Exhibit A. For a period of ten (10) days prior to such meeting, such list shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this paragraph shall not affect the validity of any action taken at the meeting.

8.03 **Proxies**. A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this paragraph. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Manager, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Manager, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Percentage Interests that are the subject of such proxy are to be voted with respect to such issue.

8.04 **Conduct of Meetings.** All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Manager (or representative thereof) designated by a majority of the Managers. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

**8.05 Action by Written Consent Without Meeting.**

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by written consent of all of the Members, or other such consent as required herein, setting forth the action so taken. Every written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts. A facsimile, electronic mail, or similar transmission by a Member, or a photographic, photostatic, facsimile, electronic mail, or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this paragraph. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Manager. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Manager.

(c) If any action by Members is taken by written consent, any certificates or documents filed with the Secretary of State of Delaware as a result of the taking of the action shall state, in lieu of any statement required by the Act concerning any vote of Members, that written consent has been given in accordance with the provisions of the Act and that any written notice required by the Act has been given.

**8.06 Action by Telephone Conference or Other Remote Communications Technology**. Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

**8.07 Classes of Members; Voting.** The Manager may from time to time establish additional classes or groups of Members. One or more of the Members' groups or classes may have certain expressed relative rights, powers, and duties, including voting rights, to be established at the time when the classes or groups are created, with seniority granted to one or more class or group as designated by the Manager.

# ARTICLE IX
# OFFICERS

**9.01 Qualification**. Subject to Section 6.02, the Manager may, from time to time, designate one or more persons to be officers of the Company. No officer need be a resident of the State of Delaware, a Member or a Manager. Any officers so designated shall have such authority and perform such duties as the Manager may, from time to time, delegate to them. Subject to Section 6.02, the Manager may assign titles to particular officers. Unless the Manager decides otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Manager pursuant to this paragraph. Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Manager. Any number of offices may be held by the one person. Unless otherwise modified by the Managing Member, the following officers shall have the following scope of authority:

(a) President. The President, if appointed, shall be the chief executive officer of the Company and, subject to the provisions of this Agreement, shall have such authority and powers as delegated by the Manager and general supervision of the affairs of the Company as normally inherent to the position, shall have general and active control of all its business except where such powers or authorities are exclusively reserved to the Manager. The President shall have general authority to execute bonds, deeds and contracts in the name of the Company; to cause the employment or appointment of such employees and agents of the Company as the proper conduct of operations may require, and to fix their compensation, subject to the provisions of this Agreement; to remove or suspend any employee or agent who shall have been employed or appointed under his authority or under authority of an officer subordinate to him; to suspend for cause, pending final action by the authority which shall have elected or appointed him, any officer subordinate to the President; and, in general, to exercise all the powers and authority usually appertaining to the chief executive officer of a corporation, except as otherwise provided in this Agreement. The initial President is Timothy Barton.

(b) Vice President. The Vice President shall have only such powers and perform only such duties as the Managing Member or the President may from time to time prescribe or as the President may from time to time delegate to such Vice President. Upon any incapacity (physical or mental as reasonably determined by a health professional) or death of the President, the Vice President may act in place of the President and shall have all powers and authority of the President which shall automatically terminate upon the recovery by the President of the incapacity or appointment of a new President. The initial Vice-President shall be Michael Matthews.

(c) Secretary. The Secretary shall attend all meetings of the Members and record all votes and the minutes of all proceedings in a book to be kept for that purpose. The Secretary shall give, or cause to be given, notice of all meetings of the members and

shall perform such other duties as may be prescribed by the President under whose supervision the Secretary shall be. The initial Secretary Shall be Saskya Zuniga.

(d) Treasurer. The Treasurer, shall have the custody of the Company funds and securities and shall keep full and accurate accounts of receipts and disbursements of the Company and shall deposit all monies and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Managing Member. The Treasurer shall disburse the funds of the Company as may be ordered by the Managing Member, taking proper vouchers for such disbursements, and shall render to the President and the Managing Member, at the regular meetings of the Members, or whenever they may require it, an account of all transactions as Treasurer and of the financial condition of the Company, and shall perform such other duties as the Managing Member may prescribe. If required by the Managing Member, the Treasurer shall give the Company a bond in such form in such sum, and with surety or sureties as shall be satisfactory to the Managing Member for the faithful performance of the duties of such office and for the restoration to the Company, in case of the Treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money, and other property of whatever kind in the Treasurer's possession or under the Treasurer's control belonging to the Company. The Treasurer or the President shall be the signatory on all bank accounts. The initial Treasurer shall be Timothy Barton.

9.02 **Compensation**. No salaries or other compensation will be paid to any of the officers and/or agents of the Company or to the Manager. Election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

9.03 **Resignation**. Any officer may resign as such at any time except that the resignation of Timothy Barton as President, other than as a result of death or disability or removal by Palisades, shall constitute a Redemption Default. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Manager. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04 **Removal**. Any officer may be removed as such, either with or without cause, by the Manager whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

## ARTICLE X
## INDEMNIFICATION

10.01 **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article, each person who was or is made a party or is threatened to be made a party to or is involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is (i) the legal representative, (ii) is or was a Member or Manager of the Company or (iii) while a Member or Manager of the Company is or was serving at the request of the Company in connection of furthering the Company's purpose, as a Manager, director, officer, partner, venturer, proprietor, legal representative, trustee, employee, agent, or

similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise (collectively, "Indemnified Person") shall be indemnified by the Company to the fullest extent permitted by the Act, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against claims, judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with any Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder. The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability. The right to be indemnified by the Company excludes Indemnified Person's breach of this Agreement; claims asserted by a Member, Manager or the Company against the Indemnified Person; and acts or omissions of the Indemnified Person that are knowingly, fraudulently, criminally, or grossly negligently committed by the Indemnified Person outside the scope of their authority.

**10.02 Advance Payment**. The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under paragraph 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of detailed invoices and supporting documentation substantiating the expenses, and a written affirmation by such person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article or otherwise.

**10.03 Indemnification of Officers, Employees and Agents**. The Company, by adoption of a resolution of unanimous consent of the Class A Members and approval of the Manager, may indemnify and advance or reimburse expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Manager under this Article; and, the Company may indemnify and advance or reimburse expenses to persons who are not or were not Manager, officers, employees, or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of

his status as such a person to the same extent that it may indemnify and advance expenses to Manager under this Article.

**10.04 Appearance as a Witness.** Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member or Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

**10.05 Nonexclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or Manager or other person indemnified pursuant to paragraph 10.03 of this Agreement may have or hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Manager or otherwise.

**10.06 Insurance**. The Manager on behalf of the Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

**10.07 Member Notification.** To the extent required by law, any indemnification of or advance of expenses to a Member or Manager in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

**10.08 Savings Clause.** If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or Manager or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law. The rights and obligations related to any Member, Manager, officer, or employee under this Article X Indemnification shall survive the termination or resignation of any such Member, Manager, officer, or employee.

## ARTICLE XI
## TAXES

**11.01 Tax Returns**. The Manager shall cause to be prepared and filed all necessary federal and state income or franchise tax returns for the Company, including making the elections described in paragraph 11.02 of this Agreement. Each Member shall furnish to the

Manager all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed. For federal income tax purposes, Palisades shall not be a Member of the Company (i.e. a partner in the Company filing a partnership tax return); rather the Capital Contributions of Palisades shall be treated as debt of the Company for federal income tax purposes and Palisades shall be treated as a lender to the Company for federal income tax purposes. For state law purposes, however, Palisades shall be a Member of the Company having the rights set forth in this Agreement and granted to a Member under the Act and the federal income tax treatment of Palisades shall have no effect on Palisades' status as a Member of the Company.

**11.02 Tax Elections**. The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) if permitted under the Code, to adopt the cash method of accounting for keeping the Company's books and records;

(c) if a distribution of Company property as described in Section 734 of the Code occurs or if a transfer of a Membership Interest as described in Section 743 of the Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Code, to adjust the basis of Company properties;

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Code; and

(e) any other election the Manager, with Palisades' approval, may deem appropriate and in the best interest of the Members.

Subject to the prior written approval of Palisades, either the Company or any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Code or any similar provisions of applicable state law.

**11.03 Company Representative**. Timothy Barton shall be the partnership representative of the Company pursuant to Section 6223(a) of the Code (the "Company Representative"). Notwithstanding that Timothy Barton is the Company Representative with respect to such tax years, all nonministerial decisions regarding tax elections, audit, tax litigation, settlement and other tax matters shall be subject to approval of the Voting Members. For example, but not by way of limitation, the Company Representative shall not take any position or action with the Internal Revenue Service (the "Service") without prior approval of the Voting Members, including but not limited to any decision (i) to enter into a settlement agreement with respect to any Company tax matter; (ii) to file a petition as contemplated in Section 6234(a) of the Code; (iii) to file any request contemplated in Section 6227 of the Code; or (iv) to enter into an agreement extending the period of limitations as contemplated in Section 6235(b) of the Code. If an audit results in an imputed underpayment as determined under Section 6225 of the Code, the Company and/or Five Star MM shall accept sole responsibility for

payment of any such underpayment and indemnify and hold harmless Palisades from any such underpayment. The Company Representative shall furnish to each Member a copy of all notices or other written communications received by the Company Representative from the Service within five (5) days of receipt thereof. The Company Representative shall notify each Member of all communications it has had with the Service and shall keep all Members informed of all matters which may come to its attention in its capacity as Company Representative by giving them written notice thereof within five (5) days after the Company Representative becomes informed of any such matter or within such shorter period as may be required by the appropriate statutory or regulatory provisions. Nothing contained herein is intended to authorize the Company Representative to take any action which is left to the determination of an individual Member under Sections 6221 through 6241 of the Code (and/or comparable provisions of state and local law). All non-ministerial decisions regarding tax elections, audit, tax litigation, settlement and other tax matters shall be subject to the written consent of each Member of the Company during the tax year at issue that subsequently Transferred its interest in the Company (each, for purposes of this Section 11.03, a "Former Member"). For example, but not by way of limitation, the Company Representative shall not take any position or action with the Service without prior written consent of each Former Member, including but not limited to any decision (i) to enter into a settlement agreement with respect to any Company tax matter; (ii) to file a petition as contemplated in Section 6234(a) of the Code; (iii) to file any request contemplated in Section 6227 of the Code; (iv) to enter into an agreement extending the period of limitations as contemplated in Section 6235(b) of the Code; or (v) to make the "push out" election under Section 6226(a) of the Code. A Former Member shall not be required to pay any expenses incurred by the Company in connection with any tax matters. The Company hereby agrees to indemnify, defend and hold each Former Member harmless of and from any and all liabilities, claims, demands, and expenses of any kind or nature which arise or in any way relate to any violation or breach of this Section 5.4. This Section 5.4 will survive a Member's ceasing to be a member of the Company, as well as the termination, dissolution, liquidation and winding up of the Company.

## ARTICLE XII
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

**12.01 Maintenance of Books**. The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members and its Manager. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement. The calendar year shall be the accounting year of the Company. All Members will at all reasonable times have access to and the right to inspect and audit at the Company's expense such books of account, as well as the Company's information and documents regarding the Project.

**12.02 Accounts**. The Manager shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Manager determine. The Manager may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Manager's investment of its own funds or investments by their Affiliates.

**12.03 Financial Information, Reports and Notices.**

(a) The Manager will cause to be prepared and delivered to each of the Members:

(i) monthly, not later than ten (10) days following the end of each calendar month, management reports for the Project including progress reports on development activity regarding the Project and a report detailing expenditures pursuant to the Project Budget including any variations from same ;

(ii) monthly, not later than ten (10) days following the end of each calendar month, financial statements of the Company, including (A) a balance sheet as of the end of such month and an income statement for such month prepared in accordance with the standard accounting principles of the Manager and the amount of unreturned Capital Contributions of each Member, and (B) a cash flow statement for such month; and

(iii) annually, not later than thirty (30) days after the close of each calendar year, financial statements of the Company, including (A) a balance sheet as of the end of such calendar year, and an income statement for such calendar year, prepared in accordance with the standard accounting principles of the Manager, (B) a cash flow statement for such calendar year, (C) the amount of unreturned Capital Contributions of each Member as of the last day of such calendar year, and (D) a summary report describing in reasonable detail the financial and business activities of the Company during such calendar year.

(b) The Manager will promptly deliver to Palisade copies of any notices of default under any loan including, without limitation, under the Loan Documents

## ARTICLE XIII
## TRANSFERS

**13.01 Limited Right to Transfer**. Until such time as Palisades has been Redeemed in Full, no Member shall make any Transfer of all or any part of its Membership Interests (or any indirect Transfer if such Transfer would create any right in the Company or any Operating Company granting any Person the right to receive any payment prior to Palisades being Redeemed in Full), whether now owned or hereafter acquired, except with the consent of Palisades; provided, however, in the event of a Redemption Default, Palisades may freely transfer all direct or indirect interests which it may have in the Company without the approval of any other Member or Manager, and upon any such transfer by Palisades of all or any portion of its Membership Interest following a Redemption Default, such transferee shall be automatically admitted to the Company as a new Member with all of the rights to which Palisades is entitled under this Agreement. Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*.

**13.02 Rights of an Assignee.**

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company. The Membership Interest of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

(b) In the event that the Members make Additional Contributions to the Company which the Membership Interest is held by an Assignee, the Assignor Member and its Assignee shall be jointly and severally liable for the corresponding contribution in connection with the Membership Interest held by Assignee. If the Assignor Member or Assignee does not make such contribution in accordance with the provisions of this Agreement, then the Assignor Member and Assignee shall be treated as being in Default. In the event that one or more new Members are admitted into the Company, or one or more existing Members increase their Membership Interest, the Membership Interest of the Assignee may be correspondingly reduced and no consent or other action on the part of such Assignee shall be required.

**13.03 Legal Opinion**. For the right of a Member to transfer a Membership Interest or any part thereof or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must receive an opinion from legal counsel acceptable to the Palisades that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Code or Treasury Regulations. Palisades, however, may waive the requirements of this paragraph.

**13.04 Admission as Substituted Member**. An approved Assignee has the right to be admitted to the Company as a Substituted Member with the Percentage Interest and the Capital Commitment so transferred to such person, in the event that:

(a) the Member making such Transfer grants the Assignee the right to be so admitted;

(b) such Transfer is consented to in accordance with paragraph 13.01 of this Agreement; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Manager, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations

and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Percentage Interests and the Capital Commitments after the Transfer of the Member effecting the Transfer and the person to which the Membership Interest of part thereof is transferred (which together must total the Percentage Interest and the Capital Commitment of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

**13.05 Transfer to Existing Member**. In the event of a Transfer to an existing Member, the existing Member shall be automatically deemed to be a Substituted Member.

**13.06 Reasonable Expenses**. The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in paragraph 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due; provided, however, any Transfer of all or any portion of Palisades' Membership Interest following a Redemption Default shall be at the sole cost of the Company, and the Company shall promptly reimburse Palisades and the transferee for all such costs incurred by Palisades and such transferee in connection with any such transfer. If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

## ARTICLE XIV
## BUYOUT OF MEMBERSHIP INTEREST

**14.01 Termination of Marital Relationship.**

(a) the marital relationship of a Member (is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in the Membership Interest (such spouse is referred to hereafter in this Article as the "Assignee Spouse"), either as outright owner of such Membership Interest or as a trustee of a trust holding such Membership Interest, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Membership Interest to which such Member does not succeed. Such option must be exercised within ninety (90) days after the death of or the Member's divorce from the Assignee Spouse. Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Membership Interest of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement. If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the Membership Interest at Fair Value held in such

trust. Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust. Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest for a period of ninety (90) days after the lapse of the initial 90-day period.

**14.02 Death of Member**. Commencing upon the death of a Member, the Manager shall for a period of ninety (90) days have the option to purchase all or any portion of the deceased Member's Membership Interest at Fair Value (determined as of the date of the death of the Member); provided, however, the exercise of said option shall require the approval of the Manager. Upon the expiration of ninety (90) days after the death of a Member, the remaining Members may purchase all, and not less than all, of the deceased Member's Membership Interest at Fair Value which the Manager does not elect to purchase pursuant to the option granted in the preceding sentence. The Assignee (which may include spouse and executors or administrators of the deceased Member) shall sell all of the deceased Member's Membership Interest to the Manager or the other Members in accordance with the option or obligation established by this paragraph.

**14.03 Bankruptcy of Member.** If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Manager to the Bankrupt Member (or its representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Membership Interest at Fair Value (determined as of the date that notice of the exercise of such option is given by the Manager ); provided, however, the exercise of said option shall require the approval of the Manager. In the event that notice of the exercise of such option is given by the Manager to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its interest to the Company as provided by this Article. If the Company refuses to exercise such Option, then the Manager followed by the other Members shall have the right to purchase such interests in accordance with the procedure established in section 13.06.

**14.04 Insufficient Surplus**. If the Company shall not have sufficient surplus to permit it lawfully to purchase the Membership Interest under paragraph 14.01 or 14.03 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Membership Interests to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Membership Interest.

**14.05 Option by Other Members**. If the Company fails or declines to exercise an option to purchase a Membership Interest of a Member as provided by this Agreement within the period of time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Membership Interest in such proportions as they mutually agree or in proportion to their respective Percentage Interests for the same price and upon the same terms available to the Company. Likewise if the Members fail or decline to exercise an option to purchase a Membership Interest as provided in this Agreement, then the Company shall have the option to purchase such interests upon the same terms.

**14.06 Exercise of Option**. Any option to purchase a Membership Interest as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

**14.07 Determination of Fair Value**. The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of the Class A and Class B Membership Interests pursuant to this Agreement. In the event that the Fair Value of a Membership Interest (or any other asset) is to be determined under this Agreement, the Fair Value shall be the amount agreed upon by unanimous consent of the Members as approved by the Manager, however, if unanimous consent of the Members cannot make such determination within thirty (30) days, the Manager shall select a qualified independent appraiser to make such determination, and the Manager shall make the books and records available to the appraiser for such purpose. The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

**14.08 Fees and Expenses of Appraiser**. In the case of a purchase and sale of Membership Interest under paragraph 14.01 or 14.02 of this Agreement (in the event of death or divorce of a Member), the fees and expenses of such appraiser shall be paid by the Company. In the case of a purchase and sale of Membership Interest under paragraph 14.03 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company. Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

**14.09 Right to Withdraw Option**. In the event that a Member, including the Manager, has exercised an election to purchase a Membership Interest under this Agreement and Fair Value has been determined as provided by paragraph 14.07 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee. In such an event, the initial payment shall be returned to the Member withdrawing the option, and such option shall be deemed to have been declined by such Member.

**14.10 Terms of Purchase**.

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Membership Interest.

(b) Payment of the purchase price for a Membership Interest may be made by the Company and/or the other Members as follows: (i) a down payment equal to ten

percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly installments, with the first payment due thirty (30) days after the date of closing. Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in advance of maturity without penalty. In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Membership Interest will transfer the Membership Interest free and clear of any liens or encumbrances, other than those which may have been created to secure any indebtedness or obligations of the Company.

(d) In each event that a Membership Interest in the Company is purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Membership Interest in the Company. The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members. The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this paragraph.

**14.11 Member Entity**. For the purposes of this ARTICLE XIV BUYOUT OF MEMBERSHIP INTEREST only, where "Member" is an entity owned 100% by an individual person, whether directly or indirectly or whether as such person's separate or community property, then "Member" as used in this article refers to that individual person.

**14.12 Buyout Restrictions.** Notwithstanding the provisions of this Article XIV, until such time as Palisades has been Redeemed in Full, without Palisades' prior approval (i) no Member may Transfer any interest in this Company, (ii) the Company shall not purchase any Member's or Assignee's interest in the Company, and (iii) no Member may purchase any Member's or Assignee's interest in the Company.

## ARTICLE XV
## DEFAULT OF A MEMBER

**15.01 Failure to Contribute.** If this Agreement is amended to require any Member to contribute an initial Capital Contribution or additional Capital Contribution and if such Member does not contribute such Capital Contribution, within thirty (30) days after receipt of written notice after the time required all or any portion of a Capital Contribution that a Member is required to make as provided in this Agreement, the Member shall not be liable for

such unpaid Capital Contribution, however, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies:

(a) permitting the Manager or the other Members in proportion to their Percentage Interests or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Manager or the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member pursuant to the applicable provisions of this Agreement,

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member,

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Membership Interest, as more fully set forth in paragraph 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(vii) the Manager or the Lending Member shall have the right to vote on behalf of the Defaulting Member without any input or consent from the Defaulting Member and the Defaulting Member's voting rights and any other rights bestowed upon it by this Agreement shall be suspended until such time the Defaulting Member has cured the default.

(b) exercising the rights of a secured party under the Uniform Commercial Code of the State of Delaware (without recourse to such Defaulting Member for any deficiency);

(c) reducing the Defaulting Member's Membership Interest or other interest in the Company;

(d) suspending the rights of the Member including voting rights;

(e) subordination of the Defaulting Member's Membership Interest to the nondefaulting Member; or

(f) a forced sale of the Defaulting Member's Membership Interest at Fair Value and upon the terms of purchase as provided in Article XIV.

**15.02 Security**. Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Defaulting Member under this Article, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Defaulting Member pursuant to paragraph 15.01(b) of this Agreement, a security interest in, and a general lien on its Membership Interest and the proceeds thereof, all under the Uniform Commercial Code of the State of Delaware. It is expressly agreed that the security interest created thereby shall be governed by Chapter 8 of the Uniform Commercial Code of the State of Delaware. On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Delaware with respect to the security interest granted in this Article. Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Manager or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Article. At the option of the Manager or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

**15.03 Compromise or Release**. The obligation of a Defaulting Member or its legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the Act or this Agreement may be compromised or released only with the approval of the Manager and, until such time as Palisades has been Redeemed on Full, Palisades.

**15.04 Expulsion**. A Member may be expelled from the Company upon approval by the Manager and unanimous consent of the Class A Members (not including the Member to be expelled) if that Member (a) has willfully violated any provision of this Agreement; (b) committed a criminal act or moral turpitude or fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) knowingly (or should have known) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company. Such a Member shall also be considered a Defaulting Member, and the Company or other Members may also exercise any one or more of the remedies provided for in Article 15.01 in addition to exercising any other remedy available at law and/or in equity which shall be cumulative. The Company may offset any damages to the Company or its Members occasioned by the misconduct of the expelled Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

## ARTICLE XVI
## WINDING UP AND TERMINATION

**16.01 Event Requiring Termination**. The Company shall begin to wind up its affairs upon the first of the following to occur:

(a) the execution of an instrument approving the termination of the Company by unanimous consent of the Members entitled to vote with consent of the Manager;

(b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member agrees to cancel the event requiring winding up, to continue the Company and to become a Member, or to designate another person who agrees to become a Member, as of the date of termination of the membership of the last remaining Member;

(c) entry of a decree of judicial dissolution of the Company;

(d) the occurrence of a nonwaivable event under the terms of the Act which requires the Company to be terminated; or

**16.02 Business May Be Continued.** Except as provided in paragraph 16.01(b) of this Agreement:

(a) an event that requires the winding up of the Company's business shall not terminate the Company if, no later than one year after the date of the event, the Manager consents to cancel the event requiring winding up.

(b) the expiration of a period of duration that requires the winding up of the Company's business shall not terminate the Company if, no later than three years after the date the period of duration expires, the unanimous consent of the Members and the Manager consents to amend the Company's Certificate of Formation and this Agreement to extend the Company's period of duration.

**16.03 Reserved.**

**16.04 Liquidation**. As soon as possible following an event requiring termination of the Company, the Manager shall act as liquidator or may appoint one or more Manager or Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Manager. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of

certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in paragraph 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(c) all remaining assets of the Company shall be distributed to the Members as follows:

(i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(ii) with respect to all Company property that has not been sold, the Fair Value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the Fair Value of that property on the date of distribution; and

(iii) Company property shall be distributed among the Members in accordance with Section 5.02.

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this paragraph. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

**16.05 Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Class A and Class B Members in proportion to their respective Percentage Interests, at no time shall such deficit be an asset of the Company, and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

**16.06 Certificate of Termination.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Manager (or such other person or persons as the Act may require or permit) shall execute, acknowledge and cause to be filed a certificate of cancellation as provided in Section 18-203 of the Act, at which time the Company shall cease to exist as a limited liability company.

## ARTICLE XVII
## AMENDMENT OR MODIFICATION

**17.01 Amendment or Modification.** This Agreement may be amended or modified from time to time only with a written instrument executed by a Super Majority of the Members entitled to vote and approval of the Manager and, until such time as Palisades has been Redeemed in Full, the approval of Palisades.

## ARTICLE XVIII
## GENERAL PROVISIONS

**18.01 Construction**. Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. In the event there is only one Member, then references to Members in the plural should be construed as singular; likewise, in the event there is only one Manager, then references to Members in the plural should also be construed as singular.

**18.02 Offset.** Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

**18.03 Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company or the Manager must be given to the Manager at the following address:

FIVE STAR GM, LLC
1755 Wittington, Suite 340
Dallas, Texas 75234

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**18.04 Entire Agreement; Supersedes Other Agreements.** This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and

supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

**18.05 Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company. Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**18.06 Binding Effect.** Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns. However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the Act to assignees.

**18.07 Governing Law.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

**18.08 Jurisdiction and Venue/Equitable Remedies.** The Company and each Member hereby expressly agrees that if, under any circumstances, any dispute or controversy arising out of or relating to or in any way connected with this Agreement shall be the subject of any court action at law or in equity, such action shall be filed exclusively in the courts of the State of Texas or of the United States of America located in Dallas County, as selected by the Member that is the plaintiff in the action, or that initiates the proceeding. Each Member agrees not to commence any action, suit or other proceeding arising from, relating to, or in connection with this Agreement except in such a court and each Member irrevocably and unconditionally consents and submits to the personal and exclusive jurisdiction of such courts for the purposes of litigating any such action, and hereby grants jurisdiction to such courts and to any appellate courts having jurisdiction over appeals from such courts or review of such proceedings. Because the breach of the provisions of this Section would cause irreparable harm and significant injury to the Company and the other Members, which would be difficult to ascertain and which may not be compensable by damages alone, each Member agrees that the Company and the other Members will have the right to enforce the provisions of this Section by injunction, specific performance or other equitable relief in addition to any and all other remedies available to such party or parties without showing or proving any actual damage to such parties. Members will be entitled to recover all reasonable costs and expenses, including but not limited to all reasonable attorneys' fees, expert and consultants' fees, incurred in connection with the enforcement of this Section.

**18.09 Severability**. If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of

this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

18.10 **Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

18.11 **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.12 **Indemnification.** To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

18.13 **Exculpation of Members.** No Member shall be liable to the Company or to the other Members for damages or otherwise with respect to any actions taken or not taken in good faith and reasonably believed by such Member to be in or not opposed to the best interests of the Company, except to the extent any related loss results from fraud, gross negligence or willful or wanton misconduct on the part of such Member or the material breach of any obligation under this Agreement or of the fiduciary duties owed to the Company or the other Members by such Member. Notwithstanding any contrary provision of this Agreement, each of the Company and each Manager and Member other than Palisades waive to the maximum extent possible under the Act all fiduciary duties which Palisades might otherwise owe to the Company or any other Manager or Member under the Act.

18.14 **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

18.15 **Palisades Approvals**. If Palisades fails to respond to any notice requesting its approval or consent under this Agreement within five (5) Business Days of receipt of such notice requesting its approval or consent, Palisades shall be deemed to have approved the matter for which approval or consent was requested. Notwithstanding the preceding, if within five (5) Business Days of receipt of any approval or consent request notice, Palisades denies such approval or consent or requests further information in order to make its decision, Palisades' approval or consent shall not be deemed granted. Palisades agrees to undertake any response to any approval or consent request in good faith and shall act in its reasonable discretion unless its sole discretion is expressly provided for any such approval or consent request.

18.16 **Palisades Payments**. All distributions or payments of any kind due to Palisades under this Agreement shall be wired in same day available funds to such account as Palisades may provide notice.

## ARTICLE XIX
## NOTICES AND DISCLOSURES

**19.01 Compliance with Regulation D of the Securities Act of 1933**. The OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. The INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MANAGER (WHICH, IN THE DISCRETION OF THE MANAGER, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS. The OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

**19.02 Notice to Members.** By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in this Agreement, and all of the provisions of the Certificate of Formation. Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

**19.03 Limitation of Liability**. Pursuant and to the limits of any governing state securities act the liability of a lawyer, accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services. By executing this Agreement, each Member hereby acknowledges the disclosure contained in this paragraph.

*[Signatures appear on the following page]*

**IN WITNESS HEREOF**, the Managing Member and Members have adopted and executed this Company Agreement as of the Effective Date.

**MANAGING MEMBER:**

Five Star MM, LLC,
a Delaware limited liability company

By: TLB 2018 Trust
Its: Managing Member

By: ____________________
Name: Timothy Barton
Title: Trustee

**MEMBERS:**

2999TC JMJ MGR, LLC
a Delaware limited liability company

By: TLB 2018 Trust
Its: Managing Member

By: ____________________
Name: Timothy Barton
Title: Trustee

Palisades TC LLC,
a Texas limited liability company

By: ____________________
Name: Joaquin Charles de Monet
Its: Manager

**IN WITNESS HEREOF**, the Managing Member and Members have adopted and executed this Company Agreement as of the Effective Date.

**MANAGING MEMBER:**

Five Star MM, LLC,
a Delaware limited liability company

By: TLB 2018 Trust
Its: Managing Member

By: ______________________
Name: Timothy Barton
Title: Trustee

**MEMBERS:**

2999TC JMJ MGR, LLC
a Delaware limited liability company

By: TLB 2018 Trust
Its: Managing Member

By: ______________________
Name: Timothy Barton
Title: Trustee

Palisades TC LLC,
a Texas limited liability company

By: ______________________
Name: Joaquin Charles de Monet
Its: Manager

EXHIBIT A
Members of FIVE STAR GM, LLC

| Member's Name and Address | Capital Contribution | Total Co. Membership Interest | Class | Class Membership Interest % |
|---|---|---|---|---|
| Five Star MM, LLC<br>1755 Wittington<br>Suite 340<br>Dallas, TX 75234 | $10.00 | 0.1% | Managing Member | N/A |
| Palisades TC LLC<br>1919 McKinney Ave.,<br>Suite 100<br>Dallas, TX 75201 | $4,000,000.00 | 49.95% | A | 50% |
| 2999 TC JMJ MGR, LLC<br>1755 Wittington<br>Suite 340<br>Dallas, TX 75234 | $12,250,000* | 49.95% | A | 50% |
| Class B Members – None | | | B | |
| Class C Members - None | | | C | |

*Estimated to be no less than this amount at Effective Date. Actual amount to be provided to Palisades within two (2) days following Property acquisition closing.

# EXHIBIT B
## Project Budget

**2999 Turtle Creek 5-Star Hotel & Residences**

**12-Month Pre-development Sources & Uses**

| Project Month | | 1-Closing | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Calendar Month | | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | |
| Phase | | Schematic | | Design Development | | | Construction Documents | | | | | | | |
| | | | | | | | Sales Model | | | | Permitting | | | |
| **Uses of Funds** | | | | | | | | | | | | | | |
| **Land Purchase** | | | | | | | | | | | | | | |
| Land Purchase | | 42,500,000 | | | | | | | | | | | | 42,500,000 |
| Additional FAR Square Feet | | 1,050,767 | | | | | | | | | | | | 1,050,767 |
| Extension Fees | | | 800,000 | | | | | | | | | | | 800,000 |
| Closing Costs (in Financing) | | | | | | | | | | | | | | - |
| Total Acquisition Cost | | 43,550,767 | 800,000 | - | - | - | - | - | - | - | - | - | - | 44,350,767 |
| **Hard Costs** | | | | | | | | | | | | | | |
| Demolition Costs | | | | | | | | | | | | | | - |
| Early Grading | | | | | | | | | | | | | | - |
| Total Hard Costs | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Soft Costs** | | | | | | | | | | | | | | |
| **Architectural & Engineering** | | | | | | | | | | | | | | |
| Concept Design | | | 255,150 | | | | | | | | | | | 255,150 |
| Schematic Design | | | | 258,125 | | | | | | | | | | 258,125 |
| Design Development | | | | | 150,347 | 150,347 | 150,347 | | | | | | | 451,041 |
| Construction Documents | | | | | | | | 150,347 | 150,347 | 150,347 | 150,347 | 150,347 | 150,347 | 902,081 |
| Sales Model | | | | | | | | 38,238 | 38,238 | | | | | 76,475 |
| Construction Administration | | | | | | | | | | | | | | - |
| Additional Services/Reimbursables | | | | | | | | 16,001 | 16,001 | 16,001 | 16,001 | 16,001 | 16,001 | 96,008 |
| Total A & E | | - | 255,150 | 258,125 | 150,347 | 150,347 | 150,347 | 204,586 | 204,586 | 166,348 | 166,348 | 166,348 | 166,348 | 2,038,880 |
| **PreDevelopment Costs** | | | | | | | | | | | | | | |
| Other-JMI Cost Pre-Closing | | | 700,000 | | | | | | | | | | | 700,000 |
| Total PreDevelopment | | - | 700,000 | - | - | - | - | - | - | - | - | - | - | 700,000 |
| **Other Soft Costs** | | | | | | | | | | | | | | |
| Project Management | | | | | | | | | | | | | | - |
| Sales & Marketing | | | | | | | | | | | 50,000 | 50,000 | 50,000 | 150,000 |
| Legal | | | 500,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 650,000 |
| Development Fees | | | 250,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 550,000 |
| Real Estate Taxes | | | | | | | 335,000 | | | | | | | 335,000 |
| Insurance | | 63,975 | | | | | | | | | | | | 63,975 |
| Total Other Soft Costs | | 63,975 | 750,000 | 45,000 | 45,000 | 45,000 | 380,000 | 45,000 | 45,000 | 45,000 | 95,000 | 95,000 | 95,000 | 1,748,975 |
| **Financing Costs** | | | | | | | | | | | | | | |
| Net Closing Costs | | (188,857) | | | | | | | | | | | | (188,857) |
| Lender Expenses | | 60,000 | | | | | | | | | | | | |
| Equity Fee | | | | | | | | | | | | | | - |
| A&D Loan - Broker Fee | 1.0% | 325,000 | | | | | | | | | | | | 325,000 |
| A&D Loan - Lender Fees | 2.0% | 650,000 | | | | | | | | | | | | 650,000 |
| A&D Loan - Interest Expense | 12.5% | | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 3,723,958 |
| | | 846,143 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 338,542 | 4,510,101 |
| **Total Uses of Funds** | | **44,460,885** | **2,843,692** | **641,667** | **533,889** | **533,889** | **868,889** | **588,127** | **588,127** | **549,890** | **599,890** | **599,890** | **599,890** | **53,348,723** |

| As Proposed | | Arch | Structural | MEP | Civil | Interior | Landscape | Lighting | Graphics | Misc | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | FAB | RLG | BEI | PKCE | (Champ Only) | Talley | | | | | |
| Concept Design | 10.0% | 575,000 | 29,000 | 60,000 | | 230,000 | - | | | 35,000 | 929,000 | 7.7% |
| Schematic Design | 15.0% | 862,500 | 58,000 | - | 29,000 | 705,000 | 68,000 | | | 52,500 | 1,775,000 | 14.8% |
| Design Development | 20.0% | 1,150,000 | 116,000 | 50,000 | 33,500 | 1,190,000 | 85,000 | 40,000 | 30,000 | 70,000 | 2,764,500 | 23.0% |
| Construction Documents | 43.0% | 2,472,500 | 232,000 | 450,000 | 70,000 | 566,000 | 117,500 | 136,000 | 102,000 | 150,500 | 4,296,500 | 35.7% |
| Other | | - | - | - | - | | 76,500 | | | - | | |
| Sales Model | 1.0% | 57,500 | - | - | - | 174,000 | - | 2,000 | 1,500 | 3,500 | 238,500 | 2.0% |
| Construction Administration | 11.0% | 632,500 | 145,000 | 60,000 | 7,500 | 428,000 | 68,000 | 22,000 | 16,500 | 38,500 | 1,418,000 | 11.8% |
| Additional Services/Reimbursables | 5.0% | 287,500 | 29,000 | 31,000 | 35,000 | 164,650 | 20,750 | 10,000 | 7,500 | 17,500 | 602,900 | |
| | 100.0% | 6,037,500 | 609,000 | 651,000 | 175,000 | 3,457,650 | 435,750 | 200,000 | 150,000 | 350,000 | 12,024,400 | 95.0% |
| Percent Hard Cost | | 2.98% | 0.30% | 0.32% | 0.09% | 1.71% | 0.22% | 0.10% | 0.07% | 0.17% | 5.93% | |
| FAB Base Fee | | 5,750,000 | | | | | | | | | | |
| Percent CD's | | 89.0% | 75.0% | 90.3% | 94.6% | 87.0% | 83.6% | 89.0% | 89.0% | 89.0% | 87.6% | |
| Total Cost of CD | | 5,117,500 | 435,000 | 560,000 | 132,500 | 2,865,000 | 347,000 | 178,000 | 133,500 | 311,500 | 10,003,500 | 83.2% |

# Exhibit C

PALISADES TC LLC
1919 McKinney Ave., Suite 100
Dallas, Texas 75201

March 20, 2020

*VIA FEDEX OVERNIGHT MAIL*

Timothy Barton
1755 Wittington, Suite 340
Dallas, Texas 75234

Five Star MM LLC
1755 Wittington, Suite 340
Dallas, Texas 75234

Re: Amended and Restated Company Agreement dated September 16, 2019 (the "**Company Agreement**") of Five Star MM, LLC, a Delaware limited liability company (the "**Company**"). Company Agreement dated September 16, 2019 ("**Five Star GM LLC Agreement**") of Five Star GM, LLC, a Delaware limited liability company ("**Five Star GM**"). All capitalized terms used herein that are not specifically defined herein shall have the meanings provided in the Company Agreement or the Five Star GM LLC Agreement.

Mr. Barton:

You are a Member of the Company, and under Section 2.08 of the Company Agreement you have the responsibility over the day-to-day management of the Company. The Company is the Managing Member and Manager of Five Star GM, and under Section 6.01 of the Five Star GM LLC Agreement the Company has the responsibility over the day-to-day management of Five Star GM. Palisades is a Member of both the Company and Five Star GM.

This letter is provided as notice of various actual and potential defaults existing under the Company Agreement and the Five Star GM LLC Agreement, to wit the following non-exclusive list:

- failure to timely provide financial reports of the Company as required under Section 7.03 of the Company Agreement;
- failure to obtain the prior written approval of Palisades as required under Section 2.08 of the Company Agreement;

- failure of Five Star GM to timely satisfy its payment obligations to Palisades under Section 5.02(a) of the Five Star GM LLC Agreement;

- failure of Five Star GM to timely provide financial reports of Five Star GM as required under Section 12.03 of the Five Star GM LLC Agreement; and

- failure to obtain the prior written approval of Palisades as required under Section 6.02 of the Five Star GM LLC Agreement (collectively, the "**Prior Actions**").

Palisades, on behalf of itself and on behalf of its successors, assigns, affiliates, owners, directors, officers, employees, parents, subsidiaries, principals, agents, members, managers, administrators, legal representatives, insurers and attorneys (collectively, the "**Reserving Parties**"), hereby reserves all rights, benefits, remedies and claims available under the Company Agreement, Five Star GM LLC Agreement and/or the Operating Agreements, and all other rights, benefits, remedies and claims at law, in equity or in contract that are available to the Reserving Parties (including, without limitation, for recovery of any penalties, interest and other charges imposed on the Reserving Parties) arising out of, relating to or in connection with the Prior Actions. This letter shall in no way be deemed to impair, limit or waive, any of the rights, benefits, remedies, or claims that any of the Reserving Parties may have against you, personally, as the day-to-day Manager of the Company, the Company, as the day-to-day Manager of Five Star GM, or any affiliates, constituent owners, partners, members, officers, directors, agents and representatives thereof. Further, and without limiting the foregoing, Palisades retains its rights to inspect the books and records of the Company and Five Star GM pursuant to Section 7.02 of the Company Agreement and Section 12.01 of the Five Star GM LLC Agreement, respectively.

Additionally, the description herein of the Prior Actions shall not be to the exclusion of any other defaults or breaches now existing or hereafter occurring under the Company Agreement, Five Star GM LLC Agreement, Operating Agreements, or any other documents. Furthermore, the description herein of the specific rights of the Reserving Parties shall not be deemed to limit or exclude any other rights to which the Reserving Parties may be or become entitled under the Company Agreement, Five Star GM LLC Agreement, Operating Agreements, or any other documents, at law, in equity or otherwise.

Any past inaction or delay in exercising any of such rights, benefits, remedies or claims, shall not be deemed a course of dealing between the parties, and you, the Company and Five Star GM are not entitled to rely upon the Reserving Parties continuing to refrain from taking any of such rights, benefits, remedies or claims as may be otherwise available to the Reserving Parties. The Reserving Parties hereby advise you, the Company and Five Star GM that the Reserving Parties specifically reserve all such rights, benefits, remedies and claims with respect to any and all prior failures of you, the Company and Five Star GM to strictly comply with the Company Agreement, Five Star GM LLC Agreement, Operating Agreements, or any other documents, and with respect to any present or future breaches or defaults by you, the Company and Five Star GM with any of the terms, covenants and conditions contained in the Company Agreement, Five Star GM LLC Agreement, Operating Agreements, or any other documents, and that any single or

partial exercise of any of such rights, benefits, remedies and claims shall not preclude any other or further exercise of any available rights, benefits, remedies and claims.

Sincerely,

PALISADES TC LLC

By: ________________________________
Joaquin Charles de Monet, Manager

# Exhibit D

# Five Star GM, LLC
# Mandarin Oriental Hotel and Branded Residences

**2999 Turtle Creek Boulevard**
**Dallas, Texas**

## Project Status and Force Majeure Forbearance Request
## March 27, 2020

### Status of Entitlement

1. **Zoning**
   Re-zoning is approved by the Dallas City Council in a Planned Development (PD) format which includes site plans exhibits setting forth all approved setbacks and height requirements. The PD is much more comprehensive than a typical zoning approval as it was approved after consultation with the City staff and staff approval of the setbacks, height, curb cuts etc.

2. **Permitting**
   The benefit of the comprehensive zoning the project has received is that the permitting process will be much more streamlined due to the prior approval of the PD. Throughout the design process, JMJ will continuously work closely with the City of Dallas predevelopment and "Q" team programs to periodically review drawings for conformance as the design process progresses to insure that the building permit can be approved quickly and with no unforeseen issues with the submittals as the permit packages are completed.

### Development Schedule

The following milestone schedule summarizes the design, construction and funding schedule which with a 30-month construction schedule would indicate a completion date in Q1 2023.




### Development Process & Methodology

1. **Design Delivery Approach**
   Our delivery approach integrates the project consultants and contractors into a cohesive team early in the process to harness the talent and integrate the skill sets of the project team through effective collaboration and communication. The result is increased value, reduced costs and maximized efficiency.

2. **Design Process**
   By integrating the design and construction team early in the process, design, constructability, design coordination and systems selection is constantly vetted with the expertise of the architect and engineers, but also with the experience of the contracting team. Instead of "value engineering" when the final pricing is completed, the project budget is tested and maintained throughout the design process. The process of continuous drawing and pricing results in a project that conforms to the design and financial requirements while maintaining design intent and overall budget.

3. **Contracting and Competitive Bidding**
   Based on the scope of work, detailed RFP's are issued with specific contract requirements including fixed price fee structures for both the design and contracting team. Design team fee structures are based on the scope of work, not a percentage of the project cost. The general contractor and prime subcontractors are selected on the basis of fee as a percentage of the cost of the work, general conditions and a costs savings participation percent which in the case of Moss will be 100% to the owner. All Moss prime subcontractors are required to contract with the Moss on the same GMP basis. Competitive bidding is achieved through the RFP process and at the subcontractor level by requiring Moss to obtain multiple bids for all trades.

4. **IGMP and FGMP**
   A key component is the guaranteed maximum price structure. A two-stage GMP pricing process is utilized; initial guaranteed maximum price (IGMP) and final guaranteed maximum price (FGMP). Late in the architectural design development stage, the Moss and prime subcontractors submit the IGMP which is the price the Moss and the prime subcontractors are contractually obligated to complete the project. Upon review, negotiation and acceptance, construction drawings with details and specifications are completed at which time Moss and the prime subcontractors provide the FGMP.

5. **Construction**
   With the design and construction team fully integrated and functioning as a cohesive team for many months during the design and permitting process, there is a smooth transition from design to construction. The process is further enhanced because the common occurrence coordination issues resulting in contractor requests for information and supplemental instructions from the design team are lessened because of the joint efforts of the team throughout the design process. This results in a faster, more efficient and cost-effective construction process which in turn results in an on-time and on-budget project.

## Architecture & Engineering

After a lengthy request for proposal process, we have selected the following consultants and are moving forward with schematic design.

| | |
|---|---|
| Owner's Representative | SLS Consultants |
| Architect | FAB Studio |
| Interior Design | Studio Munge |
| MEP Engineer | Alvine Engineering |

| | |
|---|---|
| Structural Engineer | Brockette Davis Drake |
| Landscape Architect | Talley & Associates |
| Elevator Consultant | Lerch Bates |

Concept drawings are complete and approved by MOHG allowing us to proceed with schematic design. As a part of schematic design on the hotel side, we are continuously revising the hotel program with input from the MEP, structural and elevator consultants incorporating technical program elements that affect space planning. We have spent an inordinate amount of time focused on systems selections especially regarding mechanical systems. Mechanical (HVAC) is a critical aspect of design and we are balancing new technology (VRF) with reliable standard systems (chilled water) to provide the most effective systems for the project. With input from not only MEP Engineering, but also suppliers and subcontractors, we are close to finalizing these selections. The resulting decision has a tremendous effect on space planning as the space requirements are vastly different in terms of amount and location.

Another area of design that is progressing well is the interior design space. We are impressed and excited about Studio Monge who has done a great job of defining the design narrative for the hotel, food & beverage and residences. We are continuously working through the process with Studio Monge and MOHG as it relates to approvals and the effect of interior design on the overall design process.

We continue to utilize Moss Construction in the design and system selection process providing input from major subcontractor trades with regard to mechanical, structural, exterior enclosure issues. This input tests constructability issues, construction costs, coordination issues and current trade market conditions and is critical to the final outcome.

We continue to work with the all consultants (design, construction and sales) fine tuning the residence test fit floor plans and unit mix to optimize saleable area and pricing. This includes assessing and capitalizing on view corridors and placing right sized units in these locations to ensure the highest sales possible.

In short, we are taking a measured approach to the early design process ensuring that the final outcome ensures the optimum result without having to digress in the design process to correct an early misstep.

## Sales and Marketing

We have been in discussions with several qualified Sales and Marketing companies over the past 3 months to gauge who we believe can best serve the project. One such company is Douglas Elliman out of Houston. After several exploratory meetings with Douglas Elliman, we have begun initial negotiations as to what and when their involvement could be. While they have agreed to come on board, we believe that at this time it is premature to incur additional cost and believe it is better served to utilize a highly qualified local sales team and coordinate with Mandarin while we finish the interior design and actual unit mix, unit square footage and layout. Once we have more clarity in the unit design and are closer to finalizing the condo map, which is required to actually put a sale in title, we can then finalize an agreement with DE if all parties believe that is the best source to lead the sales effort.

Notwithstanding the above, we have an unofficial sales list with approximately 10 buyers who want to be at the top of the list for selecting their respective units. This is especially true with regard to the penthouse units. Several of these buyers are interested in acquiring a second unit as they believe the market price will escalate during the construction period providing a great opportunity to resell the unit.

DE would not only implement the sales and coordinate the closings, but they will also provide marketing and design consulting services which include all printed materials, websites and media relations as well as design, finish and amenity coordination of the residences. DE also bring tremendous value to the project through its national and international experience in advising on the right unit mix, unit size and pricing to maximize the residence unit sales.

DE has $24 billion of projects on the market in New York, Boston, Florida and California. Another $10 billion of new projects are in the pipeline. DE is the second largest independent residential real estate brokerage in the United States by sales volume. With more than 7,000 agents, the company operates approximately 120 offices in New York City, Long Island, The Hamptons, Westchester, Connecticut, New Jersey, Florida, California, Colorado, Texas and Massachusetts. Moreover, Douglas Elliman has a strategic global alliance with London-based Knight Frank Residential for business in the worldwide luxury markets spanning 60 countries and six continents.

## Hotel & Residences Management Agreements

JMJ and Mandarin Hotel Group (MOHG) have executed all agreements regarding the project. This was a very time-consuming process involving legal, business as well as design issues. The signed agreements include:

1. Onshore Management agreement
2. Offshore Management agreement
3. Technical Service Agreement
4. License Agreement
5. Residences Management Agreement
6. Residences Licensing Agreement

MOHG will manage the hotel, food and beverage operations, spa operations, the residences and HOA association on behalf of the owner. These agreements and summary of the key commercial terms are available upon request.

## Senior Debt

JMJ is negotiating at present with several groups for the senior debt which is expected to close prior to grading and foundation construction start and after execution of the IGMP and GC Contract. It is anticipated that the senior debt will require the following terms:

| Senior Debt Terms | |
|---|---|
| Proceeds | $ 255,000,000 |
| Term | 36 Months plus 2 Extensions |
| Annual Rate | L+ 5.25% |
| Extension Fee (2) - Rate | 0.25% |
| Upfront Fee | 1.00% |
| Exit Fee | 0.50% |

## Forbearance Request

Palisades TC, LLC has made a Priority Capital contribution in the amount of $4,000,000 to Five Star GM, LLC. To date Five Star has made monthly payments through February of 2020. The first of two payments were due on March 9th in an amount equal to 50% of the unreturned Priority Capital and a payment of 50% of the returned

Priority Capital ("Additional Payment") to Palisades. The second and final payment is due September 16, 2020. While Five Star has been working diligently to adhere to the payments scheduled as outlined in the Operating Agreement, the unforeseen world health crises has completely shut down the financial markets and has put an indefinite hold on any attempts to secure additional capital to comply with the current scheduled payment requirements. Five Star has diligently continued, meaningful discussion with both debt and equity sources who are underwriting this project, yet all parties have stated they are on a three to six month internal hold on all capital advancements. Throughout most of Texas, we are under a mandatory shelter-in-place decree with most businesses shut down and nationally the President has declared a National Emergency urging most businesses to do the same. Given this local and national shutdown and this unforeseen act of God, Five Star is requesting a six (6) month force majeure forbearance on the timing of the first payment of Priority Capital and the Additional Payment. In addition, Five Star is requesting a force majeure forbearance on the monthly preferred payments for a 120-day period. It is Five Star's intention to continue to source funds and pay the initial payment as quickly as possible. While we are confident that the financial markets will return to some level of normalcy soon, we cannot predict the exact timing and ask for this payment modification to allow Five Star the time necessary to adjust to this global health and financial crises.

# Exhibit E

WINSTEAD

Austin | Charlotte | Dallas | Fort Worth | Houston | New York | San Antonio | The Woodlands

2728 N. Harwood Street
Suite 500
Dallas, TX 75201

214.745.5400 OFFICE
214.745.5390 FAX
winstead.com

Kasey Ratliff
direct dial: 214.745.5339

April 8, 2020

**Via Facsimile, FedEx and Email (tbarton@jmjdevelopment.com)**

Timothy Barton
1755 Wittington, Suite 340
Dallas, Texas 75234

Five Star MM LLC
1755 Wittington, Suite 340
Dallas, Texas 75234

**Re:** Amended and Restated Company Agreement dated September 16, 2019 (the "**Company Agreement**") of Five Star MM, LLC, a Delaware limited liability company (the "**Company**"). Company Agreement dated September 16, 2019 ("**Five Star GM LLC Agreement**") of Five Star GM, LLC, a Delaware limited liability company ("**Five Star GM**").

Dear Mr. Barton:

This Firm represents Palisades TC, LLC ("Palisades") in connection with its Membership Interest in the Company and its Class A Membership Interest in Five Star GM. We are writing to you as the Manager ("Barton") of the Company which is the Managing Member and Manager of Five Star GM. All capitalized terms used herein that are not specifically defined herein shall have the meanings provided in the Company Agreement or the Five Star GM LLC Agreement.

As you are aware, on March 20, 2020, Palisades sent you notice of various actual and potential defaults under the Company Agreement and the Five Star GM LLC Agreement (the "Default Notice"). In response, Five Star GM sent Palisades a Project Status and Force Majeure Forbearance Request dated March 27, 2020 (the "Forbearance Request"). My client was surprised and disappointed to receive the Forbearance Request which failed to demonstrate that Barton and the Company have any realistic plan to promptly cure the various existing defaults under the Company Agreement and the Five Star GM LLC Agreement. Instead, the Forbearance Request simply confirmed the fact that, in many respects, Barton and the Company have engaged in a course of improper conduct that has breached their fiduciary duties to the Company, to Five Star GM, the Members, and Palisades and have materially breached the Company Agreement and the Five Star GM LLC Agreement.

Palisades therefore has claims against Barton, the Company, and Five Star GM on a direct and/or derivative basis for breach of the Company Agreement and the Five Star GM LLC Agreement and for the violation of their fiduciary duties to the Company, to Five Star GM and to Palisades. In response to Barton's, the Company's, and Five Star GM's misconduct, we have been directed by Palisades to take all steps necessary to protect and enforce its legal and equitable rights under the Company Agreement, the Five Star GM LLC Agreement, and under Delaware law, including by filing a lawsuit against Barton, the Company, and Five Star GM in state district court in Dallas County if the material breaches described in this letter are not cured by Barton, the Company and Five Star GM on or before 5:00 p.m. (Central Time) on Monday, April 13, 2020.

**March Payment Redemption Default and April Payment Redemption Default**

As you are aware, the sole purpose of the Company is to manage all entities having a direct or indirect beneficial ownership interest in MO 2999TC, LLC (the "Project Owner"). The Project Owner was established for the sole purposes of acquiring and developing certain real property and the improvements thereon located at 2999 Turtle Creek Boulevard, Dallas, Texas (the "Property"). The sole business and purposes to be conducted or promoted by Five Star GM is its ownership interests and related rights in Five Star TC, LLC ("Five Star TC") as the sole member in MO 2999TC MZ, LLC ("MezzCo") as the sole member of the Project Owner and to take such action necessary to construct and develop a mixed use project including a luxury hotel and residences on the Property.

Palisades contributed $4,000,000.00 as a Preferred Capital Contribution to Five Star GM which is to be paid before any other distributions to the Members and which earns a Preferred Return (the "Priority Capital"). Pursuant to Sections 5.02(a)(ii) and (iii) of the Five Star GM LLC Agreement, an amount equal to no less than fifty percent (50%) of Palisades Unreturned Priority Capital plus an amount equal to fifty percent (50%) thereof, in the total sum of $3,000,000.00, was required to be distributed to Palisades on or before March 9, 2020 (the "March Unreturned Priority Capital Payment"). As you are aware, and as you have been notified by Palisades, the Company failed to cause Five Star GM to make the March Unreturned Priority Capital Payment to Palisades which is a Redemption Default under Section 5.04(a)(ii) of the Five Star GM LLC Agreement (the "March Payment Redemption Default"). Further, Five Star GM has failed to cure this Redemption Default in the time period prescribed by the Five Star GM LLC Agreement following notice of default from Palisades.

Additionally, Palisades' Unreturned Priority Capital earns a Base Return due on the first day of each month which is equal to nine percent (9%) per annum accrued on the Unreturned Priority Capital. However, a Default Return equal to fourteen percent (14%) per annum on Palisades Unreturned Priority Capital shall apply immediately at such times as any Base Return is not distributed on the due date thereof and the Default Return shall accrue in lieu of such Base Return not timely distributed. As you are aware, the Company failed to cause Five Star GM to timely distribute the Base Return to Palisades which was due on or before April 1, 2020 which is a Redemption Default under Section 5.04(i) of the Five Star GM LLC Agreement (the "April Payment Redemption Default"). As a result of the April Payment Redemption Default, the Default

Return applies to the payment which was due on April 1, 2020 and which currently remains outstanding (the "April Default Return Payment").

**Demand to the Company for Capital Call, Reservation of Palisades' Sale Right and Demand for Payment**

Pursuant to Section 5.04(b) of the Five Star GM LLC Agreement, and based on the occurrence of a Redemption Default described in Section 5.04(a)(i) of the Five Star GM LLC Agreement, Palisades hereby exercises its right to require the Company to request an additional Capital Contribution from the Members other than Palisades in an amount sufficient to bring Palisades current on the distributions to which it is entitled pursuant to Section 5.02(a)(i) **no later than 5:00 p.m. (Central time), Monday April 13, 2020 (the "Demand Due Date").** Additionally, based on the occurrence of the Redemption Default described in Section 5.04(a)(ii) of the Five Star GM LLC Agreement, Palisades reserves all of its rights pursuant to Section 5.05 of the Five Star GM LLC Agreement to act on behalf of Five Star GM to market and cause the sale of the Project.

This letter constitutes formal notice of the April Payment Redemption Default as well as Palisades' final demand that Five Star GM cure the March Payment Redemption Default. DEMAND to Barton, the Company and Five Star GM is hereby made for payment no later than 5:00 p.m. (Central time), on the Demand Due Date of the March Unreturned Priority Capital Payment and the April Default Return Payment. As of April 8, 2020, the outstanding balance of the March Unreturned Priority Capital Payment is $3,000,000.00. Additionally, as of April 8, 2020, the outstanding balance of the April Default Return Payment is $59,835.62. Please contact Joaquin de Monet at Palisades Capital Realty Advisors to determine the total payoff amount due as of any date of payment. He may be reached by phone at (214) 613-0281 or by email: jdemonet@palisadescapitalrealty.com.

**Redemption Default Based on Material Breaches of the Five Star GM, LLC Agreement and Demand for Documents**

As previously noted, the Forbearance Request confirmed that certain breaches of the Company Agreement and the Five Star GM LLC Agreement that were the subject of the Default Notice have occurred, including, without limitation, (i) under Section 2.08(e) of the Company Agreement as a result of the execution of multiple management agreements with Mandarin Hotel Group without the prior written approval of Palisades; (ii) under Section 6.02(e) of the Five Star GM LLC Agreement as a result of the execution of multiple management agreements with Mandarin Hotel Group without the prior written approval of Palisades; (iii) under Section 2.08(g) of the Company Agreement as a result of entering into contracts with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates that require future payments by or to the Company or any Operating Company of more than $100,000 in any year not provided in the Project Budget without the prior written approval of Palisades; (iv) under Section 6.02(g) of the Five Star GM LLC Agreement as a result of entering into contracts with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates that require future payments by or

to the Company or any Operating Company of more than $100,000 in any year not provided in the Project Budget without the prior written approval of Palisades; (v) under Section 2.08(ff) of the Company Agreement as a result of entering into multiple agreements with Mandarin Hotel Group without the prior written approval of Palisades; and (vi) under Section 6.02(ff) of the Five Star GM LLC Agreement as a result of entering into multiple agreements with Mandarin Hotel Group without the prior written approval of Palisades. The foregoing breaches of the Company and/or Five Star GM's obligations under the Five Star GM LLC Agreement are each a Redemption Default under Section 5.04(a)(iv) of the Five Star GM LLC Agreement.

Additionally, and as you were notified in the Default Notice, the Company has failed to timely provide any of the monthly financial reports that are required under Section 7.03 of the Company Agreement. The Company has also failed to cause any of the required financial information, reports, and notices to be prepared and delivered to each of the Members as required by Section 12.03(a)(i)-(iii) of the Five Star GM LLC Agreement. These various breaches of the Company and/or Five Star GM's obligations under the Five Star GM LLC Agreement are also each a Redemption Default under Section 5.04(a)(iv) of the Five Star GM LLC Agreement.

Palisades demands that you produce all agreements that have been entered into related to the Project, including but not limited to, any agreements with Mandarin Hotel Group, SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates (the "Project Agreements") no later than the Demand Due Date. Additionally, Palisades demands that you produce the monthly financial reports from September 2019 through March 2020 that are required under Section 7.03 of the Company Agreement and the required financial information, reports, and notices from September 2019 through March 2020 as required by Section 12.03(a)(i)-(iii) of the Five Star GM LLC Agreement no later than the Demand Due Date.

Palisades also understands that JMJ Development LLC ("JMJ"), which is an Affiliate of Barton, is occupying space in the Project. Palisades demands that you produce no later than the Demand Due Date all agreements, including but not limited to, any lease agreements or license agreements with JMJ or any Affiliate of Barton to occupy space at the Project. Any such agreement would be a Related-Party Agreement which would have required the prior written approval of Palisades. The failure to obtain Palisades' prior written approval for any such Related-Party Agreement would be an additional breach of the Company and/or Five Star GM's obligations under the Five Star GM LLC Agreement and also a Redemption Default under Section 5.04(a)(iv) of the Five Star GM LLC Agreement.

**Books and Records Request to the Company and Five Star GM**

Pursuant to Section 7.02 of the Company Agreement, Section 12.02 of the Five Star GM LLC Agreement, and Section 18-305 of the Delaware Limited Liability Company Act, Palisades requests access to and the right to inspect and copy the books and records of the Company and Five Star GM no later than the Demand Due Date. Specifically, Palisades requests access to and will copy the following records for the Company and Five Star GM:

*pursuant to Section 18-305 of the Delaware Limited Liability Company Act, all information that Palisades is entitled to pursuant to Section 18-305 as a Member of the Company and as a Class A Member of Five Star GM;

*balance sheets by month from September 1, 2019 through the present day;

*profit and loss statements by month from September 1, 2019 through the present day;

*cash flow statements by month from September 1, 2019 through the present day; and

*Five Star GM information and documents regarding the Project, including but not limited to (i) any agreements with any contractor, supplier, vendor or other third party related to the Project along with contact information for all such parties, (ii) any correspondence with lenders, including but not limited to any default notices, and (iii) any notices, citations or other correspondence from any State or local governmental entity related to the Project.

Palisades is seeking this information because it wants to ensure that it has the most current understanding and status of its substantial financial investment in the Company and Five Star GM and an accurate understanding of the business transactions of such entities. Additionally, and as previously noted, Palisades is also contractually allowed access to such information. Further, the Company and Five Star GM are obligated to cooperate and shall cause Five Star GM to cooperate with Palisades to accomplish a sale of the Project in the event that Palisades elects to exercise its Sale Right pursuant to Section 5.05 of the Five Star GM LLC Agreement. The requested information is essential to Palisades' analysis related to a potential exercise of its Sale Right.

On behalf of Palisades, we request that the documents responsive to this books and records request be made available for inspection by my law firm and/or other professionals hired by Palisades no later than the Demand Due Date. We request that these materials be produced in an electronic (PDF) format and they can be uploaded for our review in a Dropbox or other, similar manner. If you have any questions along these lines, please let us know. In addition, Palisades reserves the right to seek these files in other formats as necessary to permit a prompt review to be made of the requested material.

Please be advised that if by Monday, April 13, 2020 at 5:00 p.m. (1) Palisades has not received the March Unreturned Priority Capital Payment and the April Default Return Payment, or (2) Palisades has not received the Project Agreements demanded herein, or (3) Palisades has not received the monthly financial reports that are required under Section 7.03 of the Company Agreement and the required financial information, reports, and notices to be prepared and delivered to each of the Members as required by Section 12.03(a)(i)-(iii) of the Five Star GM LLC Agreement, or (4) Palisades has not received the Related-Party Agreements as demanded herein, or (5) Palisades has not been provided access to and the right to inspect and copy the books and records of the Company and Five Star GM as demanded herein, Palisades shall promptly file suit against Barton, the Company, and Five Star GM requesting that Barton and the Company be removed and replaced from their respective roles as Manager of the Company and Managing Member and Manager of Five Star GM, and seeking damages, costs, and legal fees, and to enforce all of Palisades' rights under the Company Agreement, the Five Star GM LLC Agreement and

under Delaware law. In such event, Palisades will also take immediate steps to procure a Brokers' Opinion of Value for the Project related to the potential exercise of its Sale Right pursuant to Section 5.05 of the Five Star GM LLC Agreement.

In addition to the forgoing, Palisades demands that Barton, the Company, Five Star GM, and JMJ preserve, and not alter in any way, any evidence, wherever it may be found—including any personal or work-related mobile phones or personal computers—regarding the above-referenced claims by Palisades, events, and potential parties (including any officers, directors, employees, or affiliated entities of the parties). This request for the preservation of evidence to Barton, the Company, Five Star GM, and JMJ includes all voicemails, emails, text messages, time sheets, meeting agendas and notes, telephone records and call logs, expense reports, notes, letters, and all other relevant documents, which are maintained by Barton, the Company, Five Star GM, and JMJ. Barton, the Company, Five Star GM, and JMJ have a duty to preserve such evidence, and the failure to do so can result in sanctions.

By this letter, Palisades reserves all rights and remedies against Barton, the Company, Five Star GM, and any of their members, officers, directors, or affiliated entities, including the right to assert additional claims against those parties and to seek additional relief and/or amounts from you or those parties in addition to the claims set forth above. We look forward to your prompt response.

Sincerely,



M. Kasey Ratliff

cc: Mark Adams, *Via Email* (madams@jmjdevelopment.com)
Joaquin de Monet, *Via Email*
Brent Clifton, *Of the Firm*

# Exhibit F

# McMurry Law, PLLC

Attorney and Mediation Services

April 9, 2020

Mr. Kasey Ratliff
Winstead PC
2728 N. Harwood Street,
Suite 500
Dallas, TX 75201

RE: Response to April 8 Letter from Palisades TC, LLC ("Palisades") to Five Star GM, LLC Alleging Certain Defaults ("Notice")

Dear Mr. Ratliff,

I represent Five Star GM, LLC ("Company"), Five Star MM, LLC ("Manager") and Tim Barton and have received your Notice related to the above matter where you allege certain defaults against the Company, the Manager, and Mr. Barton. My clients dispute that any event of default has occurred under the Five Star GM, LLC Company Agreement ("GM Agreement") or the Five Star MM, LLC Company Agreement ("MM Agreement") and that any breach of any fiduciary duty by my clients has occurred for the reasons stated below.

<u>Alleged March Payment Redemption Default and April Payment Redemption Default</u>

Contrary to your assertions, the Company is not in default of its redemption obligations. Following the acquisition of the Property by the Project Owner, the Project Owner and its related parties, including the Company, have been working diligently to raise the necessary capital to obtain a construction loan to begin actual development the Project. As part of this process, such new capital would be used to make distributions to Palisades including the return of its Capital Contributions. Although the Company has been diligently working to raise the necessary funds, the recent COVID-19 global pandemic has completely shut down the financial markets and has put a temporary hold on any attempts to secure additional capital. Furthermore, the offices of the Company and all of its related entities have been closed as a result of Dallas County's shelter-at-home order in effect since March 22, 2020. Thus, no funds have been available to make any March or April distributions to Palisades under the GM Agreement.

The funds remitted to the Company by Palisades under the GM Agreement were capital contributions by a member and not loans. As such, any funds paid to Palisades would be "distributions" governed by section 5.02 of the GM Agreement. The March and April distributions which you allege the Company defaulted in paying are governed by section 5.02(a) which states that the Manager "shall determine in its reasonable judgment **to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs**, including, without limitation, for operating expenses, debt service (including payments on loans by Members to the Company), acquisitions, and a reasonable contingency reserve (hereinafter, "Distributable Cash")." [emphasis added] This section further states that **"[i]f any such Distributable Cash exists**, the Manager shall, subject to Article VI below, **cause the Company to distribute the Distributable Cash** to the Members, in accordance with their Class and Percentage Interests that exist as of the date of such distribution…" [emphasis added] Given that the Company has not been able to raise the necessary capital despite its best efforts, the Manager reasonably determined no Distributable Cash

was available to distribute to Palisades during the periods complained of. As a result, Sections 5.02(a)(ii) and (iii) which contain the distribution provisions you allege the Company defaulted on were not triggered because no Distributable Cash existed.

Furthermore, making distributions in March and April to Palisades in the amounts claimed would be a prohibited distribution under Section 101.206 of the Texas Business Organizations Code ("Code") because such a distribution would result in the total liabilities of the Company exceeding fair value of the Company's total assets. Although many provisions of the Code may be waived or modified by provisions in a company agreement, Section 101.054 of the Code prohibits any waiver or modification of Section 101.206. Thus in the event Palisades were to interpret that somehow the GM Agreement actually required such distributions regardless of the availability of Distributable Cash, Section 101.206 would invalidate such an interpretation.

Given that there were no "amounts due to Palisades" because the Company was not required to make any distributions under Section 5.02, no Redemption Default has occurred under Section 5.04.

Demand to the Company for Capital Call, Reservation of Palisades' Sale Right and Demand for Payment

Considering no "Redemption Default" described in Section 5.04(a)(i) has occurred that would give rise to any requirement that the Manager request additional Capital Contributions, the Company is not obligated to make any such request. Even assuming such a default occurred, the Manager is only required to "request" additional Capital Contributions from the Members. However, no Member is actually required to contribute any Additional Contributions. Section 4.02 of the GM Agreement states that Members "may contribute" additional capital "upon request of the Manager." In the event no Members are willing or are unable to contribute Additional Contributions upon such a request, then under Section 4.02, "the Manager, without further consent of the Members so long as the rights and interests of the Class A Members are not diluted or encumbered, may seek and acquire either additional financing in whatever form and upon terms the Manager reasonably determines in its sole discretion is best for the Company whether in the form of a loan from whatever source identified by the Manager or equity from additional investors (who shall be admitted as Class B Members)." Ultimately, the Company has been seeking such financing as previously mentioned but has been unable to acquire such funds despite its best efforts.

Without waiving any of the positions of the Company and Manager stated herein or agreeing that any default has occurred under the GM Agreement, the Manager has made a "request" to the additional Members of the Company, which consist solely of 29999TC JMJ MGR, LLC and Five Star MM, LLC which own a 49.95% and 0.1% Membership Interests respectively in the Company, and as a result, no other Member is able to remit any additional Capital Contributions at this time.

Redemption Default Based on Material Breaches of the Five Star GM, LLC Agreement and Demand for Documents

The Company and Mr. Barton disagree that certain other breaches of the GM Agreement have occurred as claimed in your Notice. Palisades was provided copies of all hotel agreements prior to execution and consented. Furthermore, the Company has entered into all other agreements and expended sums in accordance with the project budget, the GM Agreement, MM Agreement. Not only is the Company not required to deliver copies and obtain prior consent of the other agreements you identify, Palisades acting through its Manager, Mr. De Monet, has assured those working on behalf of the Company that he did not want to get involved in that level of oversight and wanted to remain more hands off from the business.

You also reference several alleged defaults related to certain financial and other reporting requirements under the GM Agreement and MM Agreement. Any failure to provide any regular reports or similar documents under the GM Agreement are immaterial and can be easily cured once available.

Finally, nothing prohibits Mr. Barton and those working on behalf of the Company and Project Owner from occupying the property and buildings actually owned by the Project Owner (not the Company), for which he serves as president of both. To suggest otherwise, would only increase the costs and expenses of the Company in order to maintain separate office space and related costs and expenses while having to maintain the improvements as required under the applicable loan documents and insurance policies, hire security, and insure an empty building.

Notwithstanding any of the foregoing, Section 5.04 provides for a thirty (30) day cure period before a non-monetary Redemption Default can occur. Given that the Default Notice you mentioned was sent on Friday, March 20, 2020, Palisades has not provided the Company the required notice and cure period before a Redemption Default can occur from an alleged non-monetary breach of the GM Agreement. For this reason alone, no defaults or demands related to any non-monetary default could be asserted at this time. Attempting to assert defaults and claims and pursue any remedies in which Palisades is not entitled to is in of itself a breach of the applicable company agreements of Five Star GM, LLC and Five Star MM, LLC.

Furthermore and as you are fully aware, Dallas County has issued a shelter-at-home order ("Order") as a result of the COVID-19 global pandemic which was issued March 22, 2020 and effective March 23, 2020 (the Monday following the date the Default Notice was sent) which states "'all individuals currently living within Dallas County are ordered to shelter at their place of residence,' unless doing an 'essential activity' (going to the grocery store or getting other necessary supplies, exercising while complying with social distancing, going to work, or caring for another family member or pet." The demands contained in your Notice, including that certain obligations under the company agreements be performed by my clients by the dates demanded, is rendered legally and sufficiently frustrated by the Order and the current pandemic. As a result, such performance requirements, including making any records available for inspection, would, at a minimum, be tolled until such time the Order is lifted and the pandemic abates. Furthermore, the Default Notice, which could not have been received at the Company's office in Dallas County until after the Order was in effect, could not trigger the cure period until such notice was actually received or the Order expired or was lifted.

Obviously, the parties had no way to foresee the current global health crises and the devastating effects it would cause on the financial markets and overall economy. Given the current situation we all find ourselves in, all of the parties involved would likely be better off working together to find amicable solutions to the situation at hand to minimize the damage this pandemic is having upon all of those involved.

Sincerely,

Vance McMurry
Attorney for Five Star GM, LLC; Five Star MM, LLC, and Tim Barton

# Exhibit G

**From:** vance@mcmurrylegal.com
**Sent:** Saturday, April 18, 2020 11:08 PM
**To:** Ratliff, Kasey
**Cc:** Clifton, Brent; Perkins, LaCrecia; vance@mcmurrylegal.com
**Subject:** RE: Notice and Demand to Timothy Barton, Five Star MM, LLC and Five Star GM, LLC
**Attachments:** RPMA - MODFW (EC)(8 Nov 2019).pdf; SNDA - MOHG Madison (EC - MO and JMJ)(8 Nov 2019).pdf; TSA - MODFW (EC)(8 Nov 2019).pdf; Licence - MODFW (EC)(8 Nov 2019).pdf; Offshore - MODFW (EC)(8 Nov 2019).pdf; Onshore MA - MODAL (EC)(8 Nov 2019).pdf; RMA - MODFW (EC)(8 Nov 2019).pdf

Attached are the hotel agreements. I've discussed your records request with my client and they will see what they can produce between them. However, I won't have anything before Monday and should know more then. Thanks.

Vance McMurry
Attorney at Law
McMurry Law, PLLC
508 W. Lookout Dr., Ste. 14-74
Richardson, Texas 75080
972-746-9656
888-388-0561 Fax
vance@mcmurrylegal.com

The information contained in this message is intended only for the personal and confidential use of the designated recipients named above. This message may be an attorney-client communication and, as such, is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at 972-746-9656 and return the message to us by email (vance@mcmurrylegal.com). Thank you.

---

**From:** Ratliff, Kasey <kratliff@winstead.com>
**Sent:** Saturday, April 18, 2020 10:33 AM
**To:** Vance McMurry <vance@mcmurrylegal.com>
**Cc:** Clifton, Brent <bclifton@winstead.com>; Perkins, LaCrecia <lperkins@winstead.com>
**Subject:** RE: Notice and Demand to Timothy Barton, Five Star MM, LLC and Five Star GM, LLC

Vance,

As a follow up to our conversation yesterday evening, we look forward to receiving an update from you by 5:00 p.m. today regarding when your clients Timothy Barton ("Barton"), Five Star MM, LLC (the "Company"), and Five Star GM, LLC ("Five Star GM") will make available to our client Palisades TC, LLC ("Palisades") the books and records of Five Star GM and the Company, and the information and documents regarding the Project that Palisades demanded in my April 8, 2020 correspondence.

While we do understand that certain information and material that is responsive to Palisades' requests might be kept solely in paper format, and therefore might be difficult to access at this time, we also believe that the vast majority of the requested information is stored electronically and can be accessed without having to physically visit JMJ Development's offices to obtain such documents. For example, you indicated in our call yesterday evening that you have electronic access to the executed version of the Hotel Management Agreement with Mandarin Hotel Group that

Palisades has demanded. We believe that multiple other categories of documents, including but not limited to, the books and records of Five Star GM and the Company, can also be accessed electronically and remotely provided that these proper requests for information from Palisades are given the priority that they deserve by your clients. Despite having received Palisades' books and records request and request for information and documents regarding the Project ten days ago, it was clear from our conversation yesterday evening that your clients had not even begun the process of determining what information could be provided electronically to Palisades. We look forward to hopefully receiving a more positive update on or before 5:00 p.m. today with the expectation that the information and material requested by Palisades can be produced on a rolling basis over this weekend.

Palisades continues to reserve all rights and remedies. Please call me if you would like to discuss.

**M. Kasey Ratliff**
Winstead PC | 500 Winstead Building | 2728 N. Harwood Street | Dallas, Texas 75201
214.745.5339 *direct* | 214.745.5390 *fax* | kratliff@winstead.com | Winstead.com

WINSTEAD
ATTORNEYS

---

**From:** Ratliff, Kasey
**Sent:** Friday, April 17, 2020 3:28 PM
**To:** 'Vance McMurry' <vance@mcmurrylegal.com>
**Cc:** Clifton, Brent <bclifton@winstead.com>
**Subject:** RE: Notice and Demand to Timothy Barton, Five Star MM, LLC and Five Star GM, LLC

Yes, that's fine. We'll call you then.

**M. Kasey Ratliff**
Winstead PC | 500 Winstead Building | 2728 N. Harwood Street | Dallas, Texas 75201
214.745.5339 *direct* | 214.745.5390 *fax* | kratliff@winstead.com | Winstead.com

WINSTEAD
ATTORNEYS

---

**From:** Vance McMurry <vance@mcmurrylegal.com>
**Sent:** Friday, April 17, 2020 3:27 PM
**To:** Ratliff, Kasey <kratliff@winstead.com>
**Cc:** Clifton, Brent <bclifton@winstead.com>
**Subject:** Re: Notice and Demand to Timothy Barton, Five Star MM, LLC and Five Star GM, LLC

Hey guys, can we reschedule for 4?

Vance McMurry
Attorney at Law
McMurry Law, PLLC
508 W. Lookout Dr., Ste. 14-74
Richardson, Texas 75080
972-746-9656
888-388-0561 Fax
vance@mcmurrylegal.com

The information contained in this message is intended only for the personal and confidential use of the designated

recipients named above. This message may be an attorney-client communication and, as such, is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at 972-746-9656and return the message to us by email (vance@mcmurrylegal.com). Thank you.

On Apr 17, 2020, at 1:16 PM, Ratliff, Kasey <kratliff@winstead.com> wrote:

Thanks, Vance. Brent and I will call you at 3:30pm today. What is the best number to reach you?

**M. Kasey Ratliff**
Winstead PC | 500 Winstead Building | 2728 N. Harwood Street | Dallas, Texas 75201
214.745.5339 *direct* | 214.745.5390 *fax* | kratliff@winstead.com | Winstead.com

**<image001.jpg>**

---

**From:** Vance McMurry <vance@mcmurrylegal.com>
**Sent:** Friday, April 17, 2020 11:31 AM
**To:** Ratliff, Kasey <kratliff@winstead.com>
**Cc:** Clifton, Brent <bclifton@winstead.com>
**Subject:** Re: Notice and Demand to Timothy Barton, Five Star MM, LLC and Five Star GM, LLC

Hey Kasey, sorry been tied up this morning. I'm available anytime after 3:30 today. Thanks.

Vance McMurry
Attorney at Law
McMurry Law, PLLC
508 W. Lookout Dr., Ste. 14-74
Richardson, Texas 75080
972-746-9656
888-388-0561 Fax
vance@mcmurrylegal.com

The information contained in this message is intended only for the personal and confidential use of the designated recipients named above. This message may be an attorney-client communication and, as such, is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at 972-746-9656and return the message to us by email (vance@mcmurrylegal.com). Thank you.

On Apr 17, 2020, at 11:12 AM, Ratliff, Kasey <kratliff@winstead.com> wrote:

Vance,

Since I haven't heard back from you, I'm assuming that 11:00 a.m. does not work for you for a call. Would you please let us know some times that do work for you for a call today or over the weekend?

Please advise.

**M. Kasey Ratliff**
Winstead PC | 500 Winstead Building | 2728 N. Harwood Street | Dallas, Texas 75201

214.745.5339 *direct* | 214.745.5390 *fax* | kratliff@winstead.com | Winstead.com

**<image001.jpg>**

---

**From:** Ratliff, Kasey <kratliff@winstead.com>
**Sent:** Thursday, April 16, 2020 10:49 PM
**To:** vance@mcmurrylegal.com
**Cc:** Clifton, Brent <bclifton@winstead.com>; vance@mcmurrylegal.com
**Subject:** Re: Notice and Demand to Timothy Barton, Five Star MM, LLC and Five Star GM, LLC

Vance,

I was tied up this afternoon but have good availability tomorrow for a call. Does 11:00am tomorrow work for you? If not please suggest a time that works.

M. Kasey Ratliff
Winstead PC | 500 Winstead Building | 2728 N. Harwood Street | Dallas, Texas 75201
214.745.5339 direct | 214.745.5390 fax | kratliff@winstead.com | Winstead.com

---

**From:** vance@mcmurrylegal.com
**Sent:** Thursday, April 16, 2020 3:30 PM
**To:** 'Ratliff, Kasey'
**Cc:** 'Clifton, Brent'; vance@mcmurrylegal.com
**Subject:** RE: Notice and Demand to Timothy Barton, Five Star MM, LLC and Five Star GM, LLC

Kasey, sorry for the delayed response. Do you have availability later this afternoon for a call? Thanks.

Vance McMurry
Attorney at Law
McMurry Law, PLLC
508 W. Lookout Dr., Ste. 14-74
Richardson, Texas 75080
972-746-9656
888-388-0561 Fax
vance@mcmurrylegal.com

The information contained in this message is intended only for the personal and confidential use of the designated recipients named above. This message may be an attorney-client communication and, as such, is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at 972-746-9656 and return the message to us by email (vance@mcmurrylegal.com). Thank you.

---

**From:** Ratliff, Kasey <kratliff@winstead.com>
**Sent:** Tuesday, April 14, 2020 1:43 PM
**To:** vance@mcmurrylegal.com

**Cc:** Clifton, Brent <bclifton@winstead.com>
**Subject:** RE: Notice and Demand to Timothy Barton, Five Star MM, LLC and Five Star GM, LLC
**Importance:** High

Vance,

I am in receipt of the attached letter that you sent to me last night at 9:41 p.m. via email on behalf of your clients Five Star GM, LLC, Five Star MM, LLC and Tim Barton. I would like to speak to you regarding the matters addressed in my Notice and Demand letter dated April 8 and your response at your earliest available opportunity. My partner Brent Clifton (copied) and I are available to speak at any time this afternoon with enough notice. Are you available for a call at 2:30 p.m. today? If so, please provide a number where you can be reached and we will call you.

**M. Kasey Ratliff**
Winstead PC | 500 Winstead Building | 2728 N. Harwood Street | Dallas, Texas 75201
214.745.5339 *direct* | 214.745.5390 *fax* | kratliff@winstead.com | Winstead.com

**<image001.jpg>**

---

**From:** vance@mcmurrylegal.com <vance@mcmurrylegal.com>
**Sent:** Monday, April 13, 2020 9:41 PM
**To:** Ratliff, Kasey <kratliff@winstead.com>
**Cc:** vance@mcmurrylegal.com
**Subject:** RE: Notice and Demand to Timothy Barton, Five Star MM, LLC and Five Star GM, LLC

Mr. Ratliff, please find the attached in response to your notice and demand. Thank you.

Vance McMurry
Attorney at Law
McMurry Law, PLLC
508 W. Lookout Dr., Ste. 14-74
Richardson, Texas 75080
972-746-9656
888-388-0561 Fax
vance@mcmurrylegal.com

The information contained in this message is intended only for the personal and confidential use of the designated recipients named above. This message may be an attorney-client communication and, as such, is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at 972-746-9656 and return the message to us by email (vance@mcmurrylegal.com). Thank you.

---

Information contained in this transmission is attorney privileged and confidential. It is intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that

any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone.

# Exhibit H

**Unsworn Declaration § 132.001 Tex. Civ. Prac. & Rem. Code**

"My name is Joaquin Charles de Monet. My date of birth is August 29, 1964 and my business address is 1919 McKinney Avenue, Suite 100, Dallas, Texas 75201. I am Manager for Plaintiff Palisades TC, LLC. I declare under the penalty of perjury that in my capacity as Manager of Plaintiff Palisades TC, LLC, I have personal knowledge that the grounds and basis for which the Temporary Restraining Order is sought are true and correct. I have read the above and foregoing Plaintiff's Original Petition and Application for Temporary Restraining Order and Temporary Injunction, and the factual statements contained therein are within my personal knowledge and are true and correct."

Executed in Dallas County, State of Texas, on this 22nd day of April, 2020.

Joaquin de Monet, Declarant

4838-2235-0978v.1
61993-1 2/22/2019